Exhibit A

574-6178/83180v3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

In the matter of the application of                     :

                                                        :        Index no. 07/600880
RAMY LAKAH and MICHEL LAKAH,            :

                                Petitioners,            :

for a judgment pursuant to Article 75 of the            :
C.P.L.R. staying the arbitration commenced by                    PETITION TO
                                                        :        STAY ARBITRATION
UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING                 :
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN,        :

                                Respondents.            :

------------------------------------------------------------X

Petitioners allege as follows:

<u>Nature Of The Proceeding</u>

1.      Petitioners seek a judgment staying arbitration against them pursuant to C.P.L.R.

Section 7503(b) on the ground that they have not made an agreement to arbitrate with

respondents.

<u>The Parties</u>

2.      Petitioner Ramy Lakah resides in the United Kingdom.

3.      Petitioner Michel Lakah resides in Canada.

4.      Respondent USB AG ("UBS") is a Swiss corporation which, on information and

belief, has its principal places of business in Zurich and Basel, in the Swiss Confederation, and

has a branch in New York.

5.      Respondent Exporters Insurance Company, Ltd. is, on information and belief, a corporation organized in Bermuda, a British Overseas Territory, with its registered seat in Hamilton, Bermuda.

6.      Respondent Arab Banking Corporation is, on information and belief, a corporation organized in the Kingdom of Bahrain with its head office in Manama, Bahrain with a branch in New York.

7.      Respondent National Bank of Abu Dhabi is, on information and belief, a corporation organized in the United Arab Emirates with its head office in the Abu Dhabi.

8.      Respondent National Bank of Oman is, on information and belief, a corporation organized in the Sultanate of Oman with its head office in Muscat.

### Jurisdiction And Venue

9.      In addition to whatever contacts each of the respondents has or had with the State of New York, each respondent has purposefully appeared in the State and County of New York as a claimant in the arbitration which petitioner seek to stay by this petition.

### The Allegations And Proceedings In The Underlying Arbitration

10.     The demand for arbitration and statement of claim (the "Demand") is attached as Exhibit 1 to petitioners' affidavits in support of the petition and is incorporated herein by reference. The Demand makes, in substance, the following contentions.

11.     In 1999, Lakah Funding Limited, an Egyptian corporation, as issuer, made an offering of Eurobonds (the "bonds") in the maximum principal amount of US$100 million.

12.     Holding Company for Financial Investments (Lakah Group), S.A.E. ("HCFI" or "Lakah Group"), Trading Medical System Egypt, S.A.E. ("TMSE"), Medequip for Trading and

Contracting, S.A.E. ("Medequip"), and Arab Steel Factory, S.A.E. ("ASF") are Egyptian corporations that signed a guaranty of payment of the Bonds.

13.     The offering documents for the bonds contain a limited arbitration clause calling for arbitration in New York City or London of disputes between the issuer or a guarantor of the bonds on the one hand, and a bondholder on the other hand.

14.     The demand for arbitration does not allege that Ramy Lakah or Michael Lakah is an issuer or a guarantor of the bonds.

15.     Neither Ramy Lakah nor Michael Lakah is the issuer or a guarantor of the bonds.

16.     All of the transaction documents on the bond issue and guarantee refer only to the corporate issuer and guarantors, and are signed only by the corporate issuer and the corporate guarantors, with but a single, and very limited, exception.  Section 1005(c)(ii) of the Indenture states in relevant part:

> Messrs. Ramy Lakah and Michel Lakah hereby agree . . . that so long as any Bond remains Outstanding, they will not directly or indirectly own or control more than 35 percent of the Capital Stock of, or otherwise exercise control of or assume any managerial or executive position in, any company or other entity . . . conducting any of the following activities in Egypt in competition with any of the Subsidiaries: (A) the distribution, sale or leasing of medical equipment and supplies; (B) the construction, sale and leasing of medical facilities; or (C) the management and servicing of hospitals and medical centers.

Demand, ¶ 104 at 26.  Counterparts of this undertaking not to complete appear in the terms and conditions of the bond and the offering circular.  Demand, id.

17.     On the signature pages of the indenture, the first signature is that of issuer Lakah Funding Limited, followed by the signatures of the four corporate guarantors, followed by the signature of The Bank of New York, as trustee.  After those signatures appears the following:

3

Accepted and Agreed
solely for purposes of
Section 1005(c)(ii) as of
the date first written above:


By: /s/_____
        Ramy Lakah


By:/s/ _____
        Michel Lakah

18.    Michel Lakah and Ramy Lakah did not sign the document in their individual

capacities for all purposes.  They signed only with respect to the non-competition provision,

Section 1005(c)(ii).

19.    For all practical purposes, the only obligation signed by Ramy Lakah and Michel

Lakah in their individual capacities is a one-paragraph long non-competition agreement, which

contains no arbitration clause.

20.    Ramy Lakah and Michel Lakah are thereby twice-excluded from arbitration.  The

arbitration clause binds only the issuer and the guarantors, and they are neither issuer nor

guarantor, and their signatures specifically limit their individual liability to one isolated

provision, which is not subject to arbitration.

21.    Each respondent herein claims to be the holder of some interest in the bonds.

22.    In mid-2006, respondents, as claimants, commenced arbitration (the

"Arbitration") before the International Center for Dispute Resolution, a division of the American

Arbitration Association, in New York City, seeking to recover US $76 million in principal and

interest allegedly due under the terms of the bond issue, but not paid.

23.    The panel of arbitrators was completed upon the appointment of the third arbitrator on or about February 26, 2007.  The last day on which to challenge appointment of the third arbitrator passed, without challenge, on March 12, 2007.

24.    Respondents named Lakah Funding, Lakah Group, TMSE, Medequip, ASF, Medical Technology, S.A.E., Technowave, S.A.E., Life Care Technology, S.A.E. and petitioners herein as respondents in the Arbitration.

25.    Lakah Funding, Lakah Group, TMSE and ASF, have appeared and have answered in the Arbitration.

26.    Medequip, Medical Technology, S.A.E., Technowave, S.A.E., Life Care Technology, S.A.E. and petitioners have neither appeared nor participated in the Arbitration.

27.    A preliminary hearing conference call was held in the Arbitration on March 15, 2007.

<u>First Cause Of Action</u>

28.    Petitioners herein, in their individual capacities, did not make an agreement to arbitrate with any of the arbitration claimants, respondents herein.

29.    Respondents herein contend, as arbitration claimants, that petitioners herein are shareholders, directors or officers of the corporate respondents in the arbitration, that they committed misconduct in carrying on the affairs of some or all of the corporations, and that the corporate veil should be pierced to hold them personally liable and to require them to arbitrate.

30.    Petitioners herein deny the misconduct alleged by the Arbitration claimants.

31.    This proceeding is timely, since petitioners are not parties to an agreement to arbitrate.

5

WHEREFORE, petitioners demand judgment staying arbitration against them pursuant to C.P.L.R. 7503(b), together with the costs and disbursements of this proceeding.

Dated:   New York, New York       LESTER SCHWAB KATZ & DWYER, LLP
         March 19, 2007           120 Broadway
                                  New York, New York  10271
                                  212  964-6611
                                  Attorneys for Petitioners
                                  RAMY LAKAH and MICHEL LAKAH


                                  Dennis M. Rothman


TO:

Gilbert A. Samberg, Esq.
MINTZ, LEVIN, COHN, FERRIS, BILOVSKY & POPEO, P.C.
666 Third Avenue
New York, NY  10017
212 935-3000
Attorneys for Respondents


6

574-6178/859206

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

In the matter of the application of :

RAMY LAKAH and MICHEL LAKAH, :

                    Petitioners, :

for a judgment pursuant to Article 75 of the :
C.P.L.R. staying the arbitration commenced by

                              :

UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING :
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN, :

                    Respondents. :

------------------------------------------------------------X

Index no. 07/600880

# PETITION TO STAY ARBITRATION

## LESTER SCHWAB KATZ & DWYER, LLP
120 BROADWAY
NEW YORK, N.Y. 10271-0071
212 964-6611
ATTORNEYS FOR PETITIONERS
RAMY LAKAH AND MICHEL LAKAH

805999/574-6178

At I.A.S. Part _60_ , Rm. _540_ , of the
Supreme Court, State of New York, at the
courthouse at 60 Centre Street, New York,
NY, on March _20_ , 2007

MOTION SEQUENCE # 001

Present:

_B. Fried_                         J.S.C.

--------------------------------------------------------------X

In the matter of the application of            :

RAMY LAKAH and MICHEL LAKAH,            :            Index no. _07/600880_

               Petitioners,            :

for a judgment pursuant to Article 75 of the            :
C.P.L.R. staying the arbitration commenced by            :            ORDER TO SHOW CAUSE

UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING            :
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN,            :

               Respondents.            :

--------------------------------------------------------------X

     Upon reading and filing the petition of Ramy Lakah and Michel Lakah dated March 19,

2007, the affidavit of Ramy Lakah sworn to March 6, 2007, the affidavit of Michel Lakah sworn

to March 14, 2007, and the affirmation of Dennis M. Rothman dated March 19, 2007, ~~2007,~~ with

exhibits annexed, and for good cause shown, it is:

     ORDERED, that respondents or their attorney show cause before this court, at I.A.S.

Part _60_ , Room _540_ , before the Hon.                   On

April 16, 2007, at 10:00 : ~~0~~ a.m. ~~p.m.~~ why an order should not be made and entered

staying the above-referenced arbitration as to petitioners pursuant to C.P.L.R. 7503(b) on the

ground that a valid agreement to arbitrate was not made; and it is

ORDERED, that opposing papers, if any, shall be served by respondents so as to be

received by petitioners' counsel ~~at least~~ by April 9, 2007 ~~days before the return date hereof; and~~

~~petitioner shall serve any reply papers so as to be received by respondent's counsel at least~~

~~_____ day(s) before the return date hereof; and it is~~

ORDERED, that personal service of this order to show cause and its supporting papers

shall be sufficient if made by hand on respondent's counsel, Mintz, Levin, Cohn, Ferris, Glovsky

& Popeo, P.C., at their offices at 666 Third Avenue, New York, NY 10017, so as to be received

by March 26, 2007.

Oral Argument
Directed:

_____
J.S.C.

**BERNARD J. FRIED**
**J.S.C.**

E N T E R :

_____
HON. _____, J.S.C.

**BERNARD J. FRIED**
**J.S.C.**

**ORAL ARGUMENT**
**DIRECTED**

_____
J.S.C.

2

574-6178/858873

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X
In the matter of the application of                            :

RAMY LAKAH and MICHEL LAKAH,                    :          Index no.

                                    Petitioners,             :

for a judgment pursuant to Article 75 of the          :
C.P.L.R. staying the arbitration commenced by

                                                             :

UBS AG, EXPORTERS INSURANCE                          AFFIRMATION
COMPANY, LTD., ARAB BANKING                      :
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN,             :

                                    Respondents.            :
-------------------------------------------------------------X

 

Dennis M. Rothman, a member of the New York bar, affirms the truth of the following

pursuant to C.P.L.R. 2106:

1.       I am a member of Lester Schwab Katz & Dwyer, LLP, attorneys for

petitioners Ramy Lakah and Michel Lakah on this proceeding to stay arbitration. I make this

affirmation in support of the petition. The petition should be granted because petitioners did not

make an agreement to arbitrate with respondents.

<u>Commencement And Status Of The Arbitration</u>

2.       In June 2006, respondents, as claimants, filed a demand for arbitration (the

"Demand"), Exhibit 1, with the American Arbitration Association in New York City, case no.

50 148 T 00251 06, against:

- Lakah Funding Limited;

- Holding Company for Financial Investments (Lakah Group), S.A.E.;

- Trading Medical System Egypt, S.A.E.;

- Medical Technology, S.A.E.;

- Medequip for Trading and Contracting, S.A.E.;

- Technowave, S.A.E.;

- Life Care Technology, S.A.E.;

- Arab Steel Factory S.A.E.;

- Ramy Lakah; and

- Michel Lakah.

3.      We represent Lakah Funding Limited, Holding Company for Financial Investments (Lakah Group), S.A.E., Trading Medical System Egypt, S.A.E., and Arab Steel Factory, S.A.E. in the arbitration.  Their arbitration answer and counterclaim, Exhibit 3, is filed with the AAA simultaneously with the filing of this application in court.

4.      Medical Technology, S.A.E., Medequip for Trading and Contracting, S.A.E., Technowave, S.A.E. and Life Care Technology, S.A.E. have not appeared in the arbitration. We do not represent them.

5.      Ramy and Michel Lakah have not appeared in the arbitration.  We represent them only on this application.

6.      The arbitration panel was completed on March 12, 2007.

7.      The first conference of the parties that have appeared and the arbitrators was held Thursday, March 15.  As a result of the conference, counsel are to meet and confer to prepare and submit a proposed case management order to the panel.  Claimants' reply to the arbitration counterclaim is due April 9.  The parties who appeared are to serve document

2

requests by April 23 and respond to those requests, stating their objections or willingness to produce, by May 8. Hearings on the merits are to commence late in January 2008. I disclosed during the March 15 conference that Ramy Lakah and Michel Lakah would be making this application to the court. Given the schedule in the arbitration, we do not seek a temporary restraining order on this application, but reserve the right to seek interlocutory relief if the need arises.

## The Limited Nature Of This Application

8.        Petitioners seek to stay arbitration only as to themselves, and not as to the parties that have appeared in the arbitration.

## The Claims In The Demand For Arbitration

9.        In general terms, the demand for arbitration alleges:

- Lakah Funding issued $100 million in Eurobonds in December 1999

- Holding Company for Financial Investments (Lakah Group), S.A.E., Trading Medical System Egypt, S.A.E., Medequip for Trading and Contracting, and Arab Steel Factory S.A.E. guaranteed payment to the bondholders

- Each arbitration claimant is a bondholder, with claimant UBS AG holding bonds in the principal amount of $17.42 million; Exporters Insurance Company Ltd., $10 million; Arab Banking Corporation, $10 million; National Bank of Abu Dhabi, $5 million; and National Bank of Oman, $5 million.[1]

---

[1] The claimants represent, collectively, $47.42 million in principal face amount of the bond issue. We are unaware of any proceeding brought by the holders of the other $52.58 million of the bonds.

3

- Claimants allege that the bonds and guarantees went into default on or about June 8, 2001, when an installment of interest went unpaid.

- Medical Technology, S.A.E., Technowave, S.A.E., Life Care Technology, S.A.E. received the assets or the issuer or the guarantors without consideration.

- Ramy Lakah and Michel Lakah fraudulently misrepresented the businesses, assets and financial condition of the guarantors and participated in the fraudulent conveyance of the assets of the issuer and the guarantors.

E.g., Demand, ¶¶ 2, 4-7 at 2-3.

10.     The Demand relies on three essentially identical arbitration clauses in, respectively, the Terms and Conditions of the Bonds, the Guarantee, and the bond Indenture, stating:

> [A]ny dispute or difference whatsoever between the issuer or any Guarantor . . . and a Holder of the Bonds arising out of or in connection with the Bonds, the Guarantee or the Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules of Arbitration

Demand, ¶ 31 at 12, quoting Section 18(a) of the Terms and Conditions of the Bonds.

> [A]ny dispute or difference whatsoever arising between any Guarantor and the . . . Holder arising out of or in connection with this Guarantee, the Bonds or the Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules of Arbitration

Demand, ¶ 32 at 13, quoting Section 13 of the Guarantee.

> [A]ny dispute or difference whatsoever arising between the issuer or any Guarantor . . . and . . . a Holder of the Bonds . . . arising out of or in connection with the Bonds, the Guarantee or this Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Arbitration Rules

4

Demand, ¶ 33 at 13, quoting Section 110 of the Indenture.

<u>Ramy Lakah And Michel Lakah Are Not Bound By The Arbitration Clauses Quoted Above</u>

11.    The arbitration clauses quoted above subject to arbitration claims arising between a bondholder on one side and the issuer or a guarantor on the other.  Neither Ramy Lakah nor Michel Lakah is the issuer.  Neither Ramy Lakah nor Michel Lakah is a guarantor.

12.    We suggest that the court's inquiry could, and should, end there.  Since neither petitioner is an issuer or guarantor, neither petitioner is bound to arbitrate under the express terms of the three arbitration clauses, and arbitration as to petitioners should be stayed. An express agreement to arbitrate is plainly lacking.

<u>Ramy Lakah And Michel Lakah Are Not Signatories To The Arbitration Clauses</u>

13.    All of the transaction documents on the bond issue and guarantee refer only to the corporate issuer and guarantors, and are signed only by the corporate issuer and the corporate guarantors, with but a single, and very limited, exception.  Section 1005(c)(ii) of the Indenture states in relevant part:

> Messrs. Ramy Lakah and Michel Lakah hereby agree . . . that so long as any Bond remains Outstanding, they will not directly or indirectly own or control more than 35 percent of the Capital Stock of, or otherwise exercise control of or assume any managerial or executive position in, any company or other entity . . . conducting any of the following activities in Egypt in competition with any of the Subsidiaries: (A) the distribution, sale or leasing of medical equipment and supplies; (B) the construction, sale and leasing of medical facilities; or (C) the management and servicing of hospitals and medical centers.

Demand, ¶ 104 at 26.  Counterparts of this undertaking not to complete appear in the terms and conditions of the bond and the offering circular.  Demand, <u>id.</u>

14.     On the signature pages of the indenture, the first signature is that of issuer Lakah Funding Limited, followed by the signatures of the four corporate guarantors, followed by the signature of The Bank of New York, as trustee. After those signatures appears the following:

> Accepted and Agreed
> solely for purposes of
> Section 1005(c)(ii) as of
> the date first written above:
>
> By: /s/_____
>     Ramy Lakah
>
>
> By:/s/ _____
>     Michel Lakah

Signature pages, Ramy Lakah affidavit, Exhibit 2.

15.     Michel Lakah and Ramy Lakah did not sign the document in their individual capacities for all purposes. They signed only with respect to the non-competition provision, Section 1005(c)(ii). For all practical purposes, the only obligation signed by Ramy Lakah and Michel Lakah in their individual capacities is a one-paragraph long non-competition agreement, which contains no arbitration clause.

16.     Ramy Lakah and Michel Lakah are thereby twice-excluded from arbitration. The arbitration clause binds only the issuer and the guarantors, and they are neither issuer nor guarantor, and their signatures specifically limit their individual liability to one isolated provision, which is not subject to arbitration.

6

### Claimants' Veil-Piercing Arguments Must Be Adjudicated In This Court

17.        The arbitration claimants, seeking to broaden the reach of the arbitration clauses beyond their plain terms, contend in the demand that Ramy Lakah and Michel Lakah "dominated and controlled [the issuer] and Guarantors . . . and misused these corporate entities to perpetrate a fraud." Demand, ¶ 122 at 31. Allegations of this kind are scattered through the Demand. E.g., Demand, ¶ 12 at 4; ¶ 60 at 20-21.

18.        As we show in our memorandum of law, when an arbitration claimant seeks to compel arbitration against a non-party to an arbitration agreement on a claim that the corporate veil should be pierced, the court adjudicates first whether the veil is to be pierced. If there is an adjudication that the veil is pierced, only then may the non-party to the arbitration agreement be compelled to arbitrate.

### This Application Is Timely

19.        The twenty-day limitation of C.P.L.R. 7503(c) in which to petition to stay arbitration is not applied to persons who are not bound by an arbitration clause. That provision therefore does not operate here.

20.        Upon information and belief, claimants did not comply with the service provisions of C.P.L.R. 7503(c).

21.        This application is, accordingly, timely.

### Statement Pursuant to C.P.L.R. 2217(b)

22.        No other application has been made for the relief sought herein.

7

### Service Of This Application

23.       The arbitration claimants are represented by a single law firm, Mintz, Levin,

Cohn, Ferris, Glovsky & Popeo, P.C., at 666 Third Avenue, New York, NY 10017.  We ask that

the court direct service of the petition and the other papers on this application be served on the

claimants by service upon Mintz, Levin.  We ask the court to dispense with service of this

application as to Medical Technology, S.A.E., Medequip for Trading and Contracting, S.A.E.,

Technowave, S.A.E. and Life Care Technology, S.A.E.  None of them have appeared in the

arbitration, and we do not know if or how they were served with the Demand.

### Conclusion

The petition should be granted, and arbitration stayed as to Ramy Lakah and

Michel Lakah only, together with the costs and disbursements of this proceeding.

Dated:       New York, New York
             March 19, 2007

                                        _____
                                        Dennis M Rothman

8

574-6178/840141

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------X
RAMY LAKAH and MICHEL LAKAH,

                                                        Index no.

                       Petitioners,

       -against-

UBS AG, EXPORTERS INSURANCE                     AFFIDAVIT OF
COMPANY, LTD., ARAB BANKING                      RAMY LAKAH
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN,

                             Respondents.
----------------------------------------------------------------X

Ramy Lakah, being sworn, says:

    1.     I am a petitioner. I make this affidavit on personal knowledge in support of my petition for judgment permanently staying respondents from proceeding with an arbitration they have filed against me at the American Arbitration Association, stated in their Demand for Arbitration (the "Demand"). Exhibit 1.

    2.     I did not sign an agreement to arbitrate with any of the respondents. I signed documents agreeing to arbitrate only on behalf of companies in which I hold or held an interest. The one document I signed in my individual capacity, a covenant not to compete, does not provide for arbitration. The signature pages of the documents are attached. Exhibit 2.

    3.     Respondents state in their Demand that they may "pierce the corporate veil," and, thereby force me to give up my right to a jury trial for wrongdoing they allege I committed. As set forth in more detail below:



- I never exercised dominion and control over the Lakah Group or its subsidiaries. Indeed, Lakah Group took extensive steps to assure each Lakah Group subsidiary company functioned independently, as a separate business entity, respecting all appropriate formalities, and conducting their businesses through properly capitalized operations.

- I did not dispose of the ASF asset in violation of the terms of the bond indenture.

- I have not committed the fraud alleged by respondents in the Demand, nor, indeed, any other fraud. I have never taken personal loans from our companies, I have never received any options from our companies and I have never used assets of any of these companies for personal purposes.

- I have no equity or managerial interest, or any other interest, direct or indirect, in Life Care, Technowave or MedTech, the companies respondents allege are successor companies or fraudulent transferees. I have no interest in any company which has an interest in any of those companies. Although respondents invidiously describe these as "successors" to the guarantor subsidiaries, Demand at 3-4, 7-8, this is false and there are no facts to support that allegation.

4.    Because I have never signed an agreement to arbitrate, in my personal capacity, nor exercised improper dominion and control of Lakah Group or its guarantor subsidiaries, nor engaged in a fraud, nor improperly transferred assets, I respectfully request that this arbitration be stated as to me.

2

## THE LAKAH GROUP AND THE UBS OFFERING

5.    The Lakah family has been in business in Egypt since the early 1900's. I took over the family business in or about 1985.

6.    The Lakah Group ("HCFI") subsidiary companies named in the Demand, Arab Steel Factory, S.A.E. ("ASF"), Medequip for Trading and Contracting ("Medequip"), and Trading Medical System Egypt ("TMSE"), were formed in 1995. HCFI was formed in November, 1998.

7.    HCFI businesses sell and service medical equipment and engage in other lines of trade and manufacture. Between 1995 and 1998, neither HCFI nor its subsidiaries defaulted on a loan or guarantee. None were named in a law suit, administrative proceeding or arbitration.

8.    My brother Michel Lakah and I formed The Holding Company For Financial Investments a/k/a Lakah Group a/k/a HCFI as a holding company for the medical and industrial businesses on November 29, 1998. We placed eight companies under the holding company umbrella, which was capitalized at E£1,149,880,000 the equivalent of approximately US$ 340 million. HCFI was listed, simultaneously, on the Cairo Stock Exchange and could raise money by selling shares.

9.    In April 1999, HCFI conducted a local bond offering, raising 400 million Egyptian pounds the equivalent of approximately US$130 million, on the Cairo Exchange. A few months later, in August 1999, HCFI went public in Europe, and was listed on the Luxembourg Stock Exchange, successfully raising US$102,500,000. ASF, one of HCFI's subsidiaries, conducted its own bond offering and raised 250 million Egyptian pounds, equivalent to approximately US$75 million.

3

10.    In less than one year, HCFI and ASF raised almost $310 million.

11.    The HCFI companies were viewed by the financial community, generally, as a model for a successful Egyptian conglomerate. This is why UBS approached HCFI — we did not approach them – to participate in the Eurobond offering that is the subject of the Arbitration.

12.    Mr. Adel Kamber, an officer of UBS, first contacted HCFI in July, 1999. He told me that UBS was reaching out to HCFI based on advice from Dewey Ballantine, UBS's legal advisors, which knew HCFI from a prior HCFI financings in which it had participated.

13.    Mr. Adel Kamber said that UBS wanted to underwrite the first Eurobond offering in the Middle East to attract banking clients and financings there, and that UBS thought the bond issue could substantially enhance HCFI's financial position.

14.    HCFI was interested in the UBS Offering for two reasons. It would provide additional expansion capital for HCFI's medical equipment and supplies businesses; it would enhance HCFI's financial position, including that of ASF.

15.    At that time, neither HCFI nor any of its subsidiaries, nor I, had ever defaulted on a loan. No one had ever filed a claim against HCFI, nor any of its subsidiaries, nor against me. Prior to the UBS Offering, HCFI received high grades from every rating company review, as detailed below.

16.    I told Mr. Adel Kamber that HCFI was willing to explore the possibility of a Eurobond offering with a Lakah entity as issuer and UBS as lead underwriter. UBS then started to take preliminary steps to put together an underwriting syndicate and to make its extensive due diligence of the HCFI entities.

4

17.     The UBS offering closed on December 8, 1999, raising US$63 million, not $100 million.[1]

18.     On February 16, 2000, HCFI, with complete transparency, sold the assets of its subsidiary, ASF, for 330 million Egyptian pounds, equivalent to approximately US $100 million.  Due to misconduct by UBS during the closing of the offering, certain documents regarding ASF's obligations were amended, without my knowledge. These amendments resulted in ASF's assets being repledged to the pledgee, Banque du Caire.

19.     Thus, after HCFI paid US$35 million to release such pledges, the pledgee was in a position, as a result of UBS misconduct, to seize (and in fact did seize) the entire $100 million proceeds from our sale of ASF.  HCFI thereby lost, in addition to the US$35 million it paid to release the pledge, the $100 million proceeds from the sale and, also, $20 million annual cash flow that ASF had generated, prior to the UBS Offering.

20.     Within nine weeks of the UBS offering being closed, HCFI obtained only US $28 million from the $100 million UBS offering --  it parted with $135 million, simultaneously, losing the $20 million annual cash flow that ASF had been generating, without any off-setting benefit.

21.     HCFI, with great difficulty, made one year of interest payments but was unable to continue making further interest payments to the bond holders.

22.     Several years later, the Arbitration followed.

---

[1]     UBS was unable to sell out the issue. Only $63 million was raised.  At UBS's suggestion, HCFI purchased $37 million of its own bonds so UBS could represent it had completed a $100 million offering.  We bought our own bonds because Mr. Patrick O'Brien and Mr. Mohammed Samakkia, of UBS, told us UBS would be able to sell them, at face value, in the aftermarket.

## THE UBS ARBITRATION

23.    The Demand alleges HCFI, the guarantor companies, my brother Michel, and I made misrepresentations and omitted material facts causing the default. Although lengthy, the Demand makes few factual allegations of fraud against HCFI, its guarantors and me. They are contained, primarily, in one paragraph, Demand ¶ 52, which sets forth the following bare assertions of wrongdoing – as against all the arbitration respondents, that they:

> inflated financials of the various Guarantor companies, including misrepresentations concerning their assets, sales, and profits;
>
> overstated assets of the Parent Guarantor, Lakah Group, based on unlawful manipulative trading in the stocks of its subsidiaries to boost their prices;
>
> inclusion of unconsummated (indeed, never consummated) "sales" to an Egyptian Government agency as if they were fully performed;
>
> overstatements concerning the assets, businesses, and performances of non-Guarantor subsidiaries of Lakah Group;
>
> overstatements of the scope and size of the assets, business, and results of Guarantor Lakah Group;
>
> overstatement of the business of Guarantor Medequip;
>
> overstatement of the value of Guarantor ASF; and
>
> failure to disclose the then present intention and plan to sell all or substantially all of the operating assets of, or to sell as a whole, Guarantor ASF in short order.

## FACTS RELEVANT TO UBS'S CLAIM FOR VEIL PIERCING

24.    <u>Corporate Formalities</u>: HCFI observed the corporate distinctness of all of HCFI's companies.  HCFI and the related companies were dual audited by RSM International, Deloitte and Touche, and PriceWaterhouseCoopers to ensure the accuracy

6

and transparency of statements in its reports. Board meetings of each company were noticed, the boards of each company met, minutes were taken, and signed by the each company's chairman. Board resolutions were taken regarding financial affairs and they were reflected in the minutes. Annual shareholder meetings, likewise, were noticed and held. Quorum requirements were observed; votes were taken and recorded, minutes of meetings were kept and action taken, pursuant to resolutions reached at the meetings.

25.     Under Egyptian law, certain Egyptian government officials were required to be present at some meetings. The authorities were notified, officials attended, and their presence was noted, on the records. When extraordinary shareholder meetings were scheduled, notice to shareholders was issued pursuant to the bylaws. HCFI held seven meetings in 1999 and five in 2000. ASF held three meetings in 1999 and three in 2000.

26.     Each company operated under its own unique signature protocols which designated who could sign obligations for the company and the maximum amount for which he could sign. The protocols were published in the commercial registry to put the public on notice. Signing authority was delegated under limited powers of attorney to persons working for these companies to handle routine transactions: payroll, for example. Different signature mandates existed with respect to each company. Expenditures were made in accordance with budgets approved by each Board.

27.     The composition of the board was different for each company. Generally, more than fifty percent of the board members of each company were non-HCFI personnel. A non-HCFI member was always a managing director of the company and held signatory power for the company, under the appropriate signature mandates.

28.    <u>Undercapitalization</u>:    UBS alleges the HCFI companies were under-capitalized and that their capital strength was misrepresented.  In fact, HCFI financial soundness, including the adequacy of its capitalization, was vetted, on at least seven occasions over a twelve-month period leading up to the UBS offering.   To the date of the UBS offering, neither HCFI nor its subsidiaries defaulted on any obligation to a creditor. They paid their debts out of income from operations, selling steel and medical goods and equipment and servicing the equipment.  From the end of 1998 through the UBS Offering closing, HCFI and its companies underwent the following examinations:

29.    <u>December, 1998</u>:    HCFI was vetted by the Egypt's Capital Market Authority ("CMA"), roughly equivalent to the SEC in the United States.  The CMA was required to review company consolidated, published financial statements for each of the underlying subsidiary companies.   Its approval of HCFI confirmed its capital and the capital of its subsidiaries was properly stated and adequate for its business purposes.  The CMA included more than forty notes describing every detail of HCFI's financial situation.

30.    <u>February, 1999</u>:  In February, 1999, Fitch IBCA, a rating agency similar Moody's ratings, rated HCFI with a local AA- in connection with HCFI's local bond offering.  This was the highest rating of any Egyptian company at that time.

31.    <u>June, 1999</u>:  In June 1999, Banc du Caire, an Egyptian public sector bank, sought to acquire a ten percent interest in HCFI from Michel Lakah.   The price was roughly E£114 million, equivalent to approximately US$ 35 million.  Banque du Caire brought its investigators to HCFI, and each of its subsidiaries, and reviewed, <u>inter alia</u>, purchase orders, book keeping, receivables, and bank documents and facilities.  It

8

questioned rank and file employees and managers at length before consummating the transaction, without objection.

32.  <u>May and June, 1999</u>:  Dewey Ballantine with numerous attorneys, fluent, collectively, in Arabic, English and French, conducted due diligence for HCFI's IPO on the Cairo Exchange, which raised 330 million Egyptian pounds, equivalent to approximately  US$100 million.  Over several weeks, the team reviewed all organizational documents, financial statements, balance sheets and cash flows, purchase orders, sales contracts, employment contracts, receivables and business processes, including logistics, chain of command, human resources policies, for HCFI and its subsidiaries, interviewing each company's managers, outside the presence of HCFI management.  The IPO raised 330 million Egyptian pounds, equivalent to approximately US $100 million.

33.  <u>July 29, 1999</u>:  Fitch IBCA again vetted HCFI when the Egyptian CMA approved an increase of capital of the HCFI from E£1,149,880,000, equivalent to approximately US $348 million, to E£1,499,880, equivalent to approximately US $454 million.  Capital was increased through an Initial Public Offering.

34.  <u>August, 1999</u>:  Fitch IBCA again conducted due diligence of HCFI in connection with the UBS offering and it gave HCFI  an International BB- rating.  This was the highest rating of any Egyptian company, to that time.  Fitch IBCA again interviewed all managers at HCFI managers and its subsidiaries.  Fitch was given access to all the documents Dewey Ballantine (UBS legal counsel) reviewed and many others.  Fitch IBCA confirmed its International BB- on December 8, 1999, just prior to closing.

35.     <u>October-December, 1999</u>:  UBS and Dewey Ballantine undertook another due diligence review in connection with preparation of the UBS offering circular, finding no problems.

36.     When the June 2001 interest installment on the bonds went unpaid, I contacted all the bondholders and we attempted to try to find a resolution.  The bondholders requested that PriceWaterhouseCoopers London ("PWC") conduct a comprehensive audit of the HCFI entities, and it was appointed, by the bondholders, to do so.  The PWC review occupied a team of fourteen auditors, for three months.  Every department head and supervisor was interviewed.   PWC had access to every file, and they confirmed this in their report.

37.     PWC's report did not list under-capitalization as a reason for the default. It did, however, list the problem with Banque du Caire as a cause of the default.

38.     Neither CMA, nor Fitch IBCA, nor Dewey Ballantine, nor PWC identified "under-capitalization" as a potential problem nor, after the fact, did PWC identify undercapitalization as a cause or a contributing cause of the default on interest payments.

39.     <u>Personal Use of Funds</u>:  I never transferred or used any company funds for personal use, as confirmed by the auditors' reports for 1999 and 2000, both approved by the Cairo Market Authority ("CMA").  Both reports were implicitly confirmed by the PWC Report, which does not identify any personal use of funds as a cause of (or a factor contributing to) any HCFI financial difficulties.

40.     <u>Overlap in Ownership</u>:  Each of the individual companies had its own managing director, its own bylaws, its own signature protocols, its own balance sheets, and audited income statements.  The managers exercised full power and day-to-day

10

control, in every aspect of operations, including but not limited to entering contracts, establishing purchase orders in amounts set by signature protocols, and negotiating with suppliers without any intervention by HCFI management. Although a few companies had a few common directors, at least half of each company's directors were non-HCFI personnel.

41.     <u>Corporate Entities Sharing Offices</u>:  Each of the Lakah companies had its own office, address, stationery, bank accounts, phone numbers, facsimile numbers, email addresses and business logo.

42.     <u>Business Discretion</u>:  Each company had its own decision making structure and operated as an independent entity.  Each company's Board set its own policy and business goals.  Michel Lakah and I represented HCFI on the Board of only one guarantor company, Medequip.  Each company had its own bank accounts, approved its own budgets, obtained its own contracts, issued its own purchase orders, and followed its own signature mandates, pursuing policies set by each company's Board.

43.     <u>Arms Length Dealing</u>:  My dealings with the companies were on ordinary business terms.  None of the seven pre-UBS Offering vettings, nor the PWC Report, nor any auditing report ever raised a single issue regarding any non-arms-length dealing between HCFI and me.  No review, by CMA, Dewey Ballantine, or Fitch IBCA questioned any transactions.

44.     <u>Independent Profit Center</u>:  Each company had its own financial reporting process, its own balance sheets and income statements and filed its own tax documents, and annual auditor reports.

45.     <u>Payment of Corporate Debts by Individuals</u>:  I never paid corporate obligations with personal funds before the UBS offering.  After the losses caused by the UBS offering, I infused my own money and personal assets into the companies to support them. Money and assets flowed in one direction, from me to our businesses.

46.     <u>Use of Corporate Property by Individuals for Personal Purposes</u>:  I never used corporate property for personal purposes.  Under Egyptian auditing principles, the companies' dual auditors were required to review company books to determine whether any funds were used for improper purposes.

47.     Contrary to the Demand, HCFI never made improper transfers of assets to the so-called "successor companies."  None of the alleged companies are "successors" in any sense, whatsoever.  I own no direct or indirect interest in any of them.

48.     No auditing report, in any year, by either of the companies' dual auditors, identified any improprieties by HCFI, its subsidiaries, or me.

49.     The companies never made me any personal loans.

50.     The companies never issued any options to me.

51.     The companies never let their construction capabilities be utilized by me, nor members of my family, nor relatives nor acquaintances.

52.     I have not taken any corporate assets for any personal purposes.

                                                                     _____

                                                                     Ramy Lakah

Sworn to before me on ~~February~~ 6th March 2007 ,2007.

MANISH KUMAR SONI



SONI &CO
N O T A R Y S
4 - 5 INVERNESS MEWS
LONDON    W2 3JQ
TEL:    0456 120 130
FAX:    020 7938 2050
www.notary-soni.co.uk

MANISH KUMAR SONI, Notary Public

12



**APOSTILLE**

(Hague Convention of 5 October 1961 / Convention de La Haye du 5 octobre 1961)

**UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND**

1. Country:  United Kingdom of Great Britain and Northern Ireland
   Pays:  Royaume-Uni de Grande-Bretagne et d'Irlande du Nord

   This public document / Le présent acte public

2. Has been signed by      **Manish K Soni**
   a été signé par

3. Acting in the capacity of    **Notary Public**
   agissant en qualité de

4. Bears the seal/stamp of     **The Said Notary Public**
   est revêtu du sceau/timbre de

                              Certified/Attesté
5. at London/à Londres        6. the/le   **07 March 2007**

7. by Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs /
   par le Secrétaire d'Etat Principal de Sa Majesté aux Affaires Etrangères et du Commonwealth.

8. Number/sous No     **H313013**

9. Stamp:                     10. Signature:   Z. Ahmed
   timbre:



*For the Secretary of State / Pour le Secrétaire d'Etat*

If this document is to be used in a country which is not party to the Hague Convention of 5 October 1961, it should be presented to the consular section of the mission representing that country. An apostille or legalisation certificate only confirms that the signature, seal or stamp on the document is genuine. It does not mean that the contents of the document are correct or that the Foreign & Commonwealth Office approves of the contents.

MANISH KUMAR SONI, Notary Public

574-6178/836354v2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------X

In the matter of the application of                    :

RAMY LAKAH and MICHEL LAKAH,                           :

                    Petitioners,    :

for a judgment pursuant to Article 75 of the           :
C.P.L.R. staying the arbitration commenced by          :

UBS AG, EXPORTERS INSURANCE                            :
COMPANY, LTD., ARAB BANKING
CORPORATION, NATIONAL BANK OF ABU                      :
DHABI and NATIONAL BANK OF OMAN,                       :

                  Respondents.    :

------------------------------------------------------X

Index no.

AFFIDAVIT OF
MICHEL LAKAH

PROVINCE OF QUEBEC     )
                       )
CITY OF MONTREAL      )    SS.:
                       )
CANADA              )

Michel Lakah, being sworn, states:

1.     I am one of the petitioners in this proceeding.

2.     I submit this affidavit in support of my application for an order permanently staying respondents from proceeding with arbitration against me as set forth in their Demand for Arbitration, attached as Exhibit 1 to the accompanying affidavit of Ramy Lakah (the "Ramy Lakah Affidavit").

3.     I have never signed an agreement which binds me to arbitrate any dispute with any of the respondents, including the dispute underlying this proceeding.

4.     There is no such agreement.

5.      Respondents state in their Demand that they may "pierce the corporate veil," and thereby force me to give up my right to a trial by jury for wrongdoing they allege I committed.  I understand that to pierce the corporate veil, respondents must show I improperly exercised dominion and control over the business entities at issue and that I used such dominion and control to engage in a fraud.

6.      I have never exercised dominion and control over the Holding Company for Investments a/k/a Lakah Group ("HCFI") or its subsidiaries.  HCFI took careful measures to make certain that each subsidiary company functioned independently, as a separate business entity, respecting all appropriate formalities, and conducting their businesses through properly capitalized operations.

7.      I never committed the fraud alleged by respondents in the Demand, nor, indeed, any other fraud.

8.      I have no equity or managerial interest, or any other interest, in any of the companies which respondents have named as purported "successor companies," i.e., Life Care, Technowave or MedTech, which they claim received wrongfully transferred assets. I have no interest in any company which has an interest in any of the purported successor companies.  To my knowledge, no assets of HCFI nor any of the guarantor HCFI entities have been transferred to any of these companies.

9.      Because I have never signed any arbitration agreement, in my personal capacity, nor exercised any improper dominion or control over the HCFI subsidiaries, nor engaged in any fraud, of any type, nor improperly transferred any assets to purported "successor" companies, I ask the Court to permanently stay the Arbitration respondents have filed against me.

2

10.     The background of HCFI and its subsidiaries and the UBS Offering is detailed in the Ramy Lakah Affidavit, to which I respectfully direct the court. The Ramy Lakah Affidavit accurately states the facts leading to the financial problems which beset our companies. I was not involved in the preparation, negotiation or closing of the bond offering nor in the road-show by which UBS sought to sell the bonds which are the subject of the Arbitration.

11.     UBS claims it may pierce the corporate veil to force me arbitrate even though I never signed any arbitration agreement. I understand courts frequently consider ten factors in determining whether someone has exercised inappropriate dominion and control over an entity to justify piercing the veil. Those ten factors do not support a piercing the corporate veil in this case.

12.     First: Corporate Formalities. To the best of my knowledge, HCFI and all our subsidiaries complied with corporate formalities. The detail is set forth in the Ramy Lakah Affidavit, to which I refer the Court.

13.     Second: Undercapitalization. This issue is also covered in the Ramy Lakah Affidavit. The assertion that our inability to pay the bonds because of a pre-existing undercapitalization is contrary to seven vettings within the twelve-month period preceding the UBS Offering and the PWC report, discussed in the Ramy Lakah Affidavit.

14.     Third: Personal Use of Funds. I never transferred or used any company funds for personal use, a fact confirmed by the auditors' reports for 1999 and 2000, as well as confirmed, implicitly, by the PWC Report, which does not identify any personal use of funds as a cause or an exacerbation of HCFI's financial difficulties.

3

15.    Factors four, five, six, and eight, including overlap in ownership, corporate entities sharing offices, the level of business discretion of the relevant companies and their status as independent profit center, are covered in the Ramy Lakah Affidavit, to which I respectfully direct the Court.

16.    Seventh: Arms Length Dealing. All my dealings with our companies were on normal business terms and conditions. None of the seven pre-UBS Offering vettings, nor the PWC Report, nor any auditing report ever raised a single issue regarding any non-arms-length dealing between HCFI and me. No review, by the Cairo Markets Authority ("CMA"), nor by Banque du Caire (which purchased a $35 million stake in our companies prior to the UBS Offering), nor by the law firm Dewey Ballantine, which vetted our companies prior to the UBS Offering and prior to our companies prior IPO on the Luxembourg Stock Exchange, nor the rating company, Fitch IBCA, raised any question regarding any purported non-arms-length dealing, by me or anyone else.

17.    Ninth: Payment of Corporate Debts by Individuals. Prior to the UBS Bond Offering, I never paid corporate obligations with personal funds. After the UBS Offering, when HCFI financing became impossible as a result of UBS's conduct in respect of Banque du Caire, I tried to support our companies, using my own funds and personal assets. The monies flowed in only one direction, from me to our companies, not vice-versa.

18.    Tenth: Use of Corporate Property by Individuals for Personal Purposes. I never used or borrowed corporate property for personal purposes. Under Egyptian auditing principles, the companies' dual auditors were required to review company books to determine whether any funds were used for improper purposes. No auditing report, in

4

any year, by any of our companies' dual auditors, ever identified any improprieties in anything I did.

_____
Michel Lakah

Sworn to before me on
March 14, 2007 at Montreal
Province of Quebec, Canada

_____
Notary

Martine Comeau, Notary
Life Commission



**Chambre
des notaires
du Québec**

**CANADA
PROVINCE OF QUEBEC**

I, the undersigned, Michel Poulin, Secretary of the *Chambre des notaires du Québec*, a professional order duly constituted in virtue of the *Notarial Act* and the *Professional Code*, having its Head Office at Montreal, do hereby certify under my oath of office:

THAT Mtre Martine Comeau , Notary at Montreal , is a member of the *Ordre des notaires du Québec* since the 28th day of June 1983 , date of her entry on the Roll of the Order ;

That since that date, Mtre Comeau has always been entered on the Roll of the Chambre des notaires du Québec ;

THAT her signature affixed to the attached document corresponds to that filed in my office in accordance with the *Notarial Act*.

IN WITNESS WHEREOF, I have signed the present certificate at Montreal, on this Wednesday, March 14, 2007.

Michel Poulin, Notary
Secretary

*Membre de l'Union internationale du notariat latin*

Tour de la Bourse, 800, Place-Victoria, bureau 700, case postale 162, Montréal (Québec) H4Z 1L8
Téléphone : (514) 879-1793 • Télécopieur : (514) 879-1923
admin@cdnq.org

83814

Exhibit 1

IN THE MATTER OF AN ARBITRATION
Before The Arbitration Tribunals of the
American Arbitration Association

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UBS AG, EXPORTERS INSURANCE COMPANY, LTD., :
ARAB BANKING CORPORATION, NATIONAL BANK :
OF ABU DHABI, and NATIONAL BANK OF OMAN, :

                    Claimants,             :

         -against-             :      DEMAND FOR

LAKAH FUNDING LIMITED, HOLDING COMPANY :   ARBITRATION AND
FOR FINANCIAL INVESTMENTS (LAKAH GROUP), :  <u>STATEMENT OF CLAIM</u>
S.A.E., TRADING MEDICAL SYSTEM EGYPT, :
S.A.E., MEDICAL TECHNOLOGY, S.A.E., :
MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.,:
TECHNOWAVE, S.A.E., LIFE CARE :
TECHNOLOGY, S.A.E., ARAB STEEL FACTORY, S.A.E., :
RAMY LAKAH, and MICHEL LAKAH, :

               Respondents.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

      1.      Claimants, UBS AG ("UBS"), Exporters Insurance Company, Ltd. ("EIC"),

Arab Banking Corporation ("ABC"), National Bank of Abu Dhabi ("NBAD"), and National

Bank of Oman ("NBO"), demand arbitration of their claims against the Respondents,

Lakah Funding Limited ("Lakah Funding"), Holding Company for Financial Investments

(Lakah Group), S.A.E. ("HCFI"), Trading Medical System Egypt, S.A.E. ("TMSE"),

Medical Technology, S.A.E. ("MedTech"), Medequip for Trading and Contracting, S.A.E.

("Medequip"), Technowave, S.A.E. ("Technowave"), Life Care Technology, S.A.E. ("Life

Care"), Arab Steel Factory, S.A.E. ("ASF"), Ramy Lakah ("Ramy Lakah"), and Michel

Lakah ("Michel Lakah"), as set forth below.

## Summary of the Claims

2.    On or about December 8, 1999, Lakah Funding (the "Issuer") issued US $100,000,000 in Eurobonds, bearing interest at 12% per annum (payable semi-annually in arrears), and maturing on December 8, 2004 (the "Bonds" or "Lakah Eurobonds"). Performance of the Bond obligations, including payment of all amounts required in accordance with the Bond Transaction Documents (defined below), was unconditionally guaranteed jointly and severally by respondents HCFI (the parent of Lakah Funding), TMSE (a subsidiary of HCFI), Medequip (a subsidiary of HCFI) and ASF (a subsidiary of HCFI) (each a "Guarantor," and collectively, the "Guarantors") as primary obligors and not merely as sureties.

3.    The Guarantors are Egyptian companies that are wholly controlled by respondents Ramy Lakah and Michel Lakah, who are brothers.  The Issuer is a special purpose vehicle formed in the British Virgin Islands, and is a wholly-owned subsidiary of Guarantor HCFI.

4.    Claimants are holders of the Bonds in the following principal face amounts respectively:  UBS (US $17,420,000); EIC (US $10,000,000); ABC (US $10,000,000); NBAD (US $5,000,000); and NBO (US$ 5,000,000).

5.    After initial interest payments were made on or about June 8, 2000 and December 8, 2000, no further payments of Bond interest, nor any payment of principal, nor any payment of any other kind, were made by the Issuer or any of the Guarantors. Therefore, the Issuer and the Guarantors are in default on their principal and interest payment obligations to the Claimants under the Bonds, amounting to more than US

$70,000,000 through the Maturity Date, December 8, 2004 plus interest thereafter.

6.    Respondents Ramy Lakah and Michel Lakah individually are parties to the Bond Transaction Documents, and have breached their respective covenants therein as well.

7.    Furthermore, respondents Ramy Lakah and Michel Lakah, individually and in their capacities as officers and directors of the Guarantors, and in collusion with others including the Guarantors, had fraudulently induced the Claimants to acquire their respective bondholdings by means of material misrepresentations and omissions with regard to (a) the businesses, the assets, and the financial conditions of the Guarantors, as well as (b) HCFI's then present intention to sell its subsidiary, ASF, to a third party and the steps taken toward the implementation of that sale.

8.    Furthermore, by not later than on or about February 16, 2000, little more than two months after their issuance of the Bonds, Respondents Ramy Lakah and Michel Lakah, in collusion with Respondents - Guarantors HCFI and ASF, had completed the sale of ASF or of all of its operating assets to a third party, and the proceeds of the sale transaction were diverted from ASF and from HCFI.

9.    Furthermore, in or about 2002, after the initial interest payment defaults and during the tenor of the Bonds (which matured in December 2004), respondents Ramy Lakah and Michel Lakah orchestrated the surreptitious evisceration of two other of the Guarantors -- TMSE and Medequip -- and the transfer without consideration of their respective assets and businesses to successor companies in Egypt and outside of Egypt, including Respondent MedTech (the recipient of the TMSE business and assets)

3

and Respondents Technowave and Life Care (the recipients of the Medequip business and assets) (together, the "Successor Companies"; each, a "Successor Company").

10.    Furthermore, respondents Ramy Lakah and Michel Lakah operated and conducted the businesses of the Issuer and the Guarantors, as well as of the Successor Companies, along with their other personal and "corporate" affairs, as personal business vehicles, without regard for corporate formalities; without distinguishing the respective interests and obligations of the Issuer, the Guarantors, the Successor Companies, their other companies, and their personal interests and obligations; using undercapitalized entities; and appropriating the assets of the various companies (including the Issuer's assets and the Guarantors' assets) at will.

11.    Furthermore, respondents Ramy Lakah and Michel Lakah diverted the ultimate proceeds of the Eurobond issue to purposes other than those described in the Bond Transaction Documents, including to their personal use.

12.    In sum, respondents Ramy Lakah and Michel Lakah have perpetrated a massive fraud on the international financial community, including the Claimants, using the Issuer and Guarantors as their instrumentalities; fraudulently induced the Claimants to purchase Lakah Eurobonds; caused a $148,000,000 Eurobond default; misappropriated the Bond proceeds; breached their personal covenants to the Bondholders; and stripped the Guarantor companies of their businesses and assets to evade and thwart the rights of their creditors, including the Claimants.  The Claimants thus and thereby were injured.

13.    Therefore, Claimants assert their claims against Ramy Lakah, Michel

4

Lakah, and the other Respondents herein, jointly and severally, for payment of the principal amounts of their Bonds through the Maturity Date (totaling US $47,420,000); for payment of unpaid interest during the term of the Bonds through the Maturity Date (totaling US $22,761,600); for payment of default interest at 12% per annum (in accordance with the terms of the Bond Transaction Documents) on the unpaid principal thereafter; for payment of pre-award interest on unpaid Bond interest; for payment of punitive damages for fraud and other intentional misconduct; and for reimbursement of their costs of collection of all amounts due pursuant to the Bonds (in accordance with the terms of the Bond Transaction Documents).

### The Parties

14.    USB AG ("UBS") is a Swiss corporation, having its head offices in Zurich and Basel, Switzerland, and having a branch in New York, among other places. UBS holds Bonds having a principal face amount totaling US$17,420,000. It purchased its Bond holdings for value on or about December 8, 1999 (US$3,420,000) and October 25, 2000 (US$14,000,000).

15.    Exporters Insurance Company, Ltd. ("EIC") is a corporation organized in Bermuda, having its registered seat in Hamilton, Bermuda. EIC holds Bonds having a principal face amount of US$10,000,000. It purchased its Bond holding for value on or about December 31, 2001.

16.    Arab Banking Corporation ("ABC") is a corporation organized in the Kingdom of Bahrain, having its head office in Manama, and having a branch in New York, among other places. ABC holds Bonds having a principal face amount of