US$10,000,000. It purchased its Bond holding for value on or about January 18, 2000.

17.     National Bank of Abu Dhabi ("NBAD") is a corporation organized in the United Arab Emirates, having its head office in the Emirate of Abu Dhabi and a branch in London, among other places. NBAD holds Bonds having a principal face amount of US$5,000,000. It purchased its Bond holding for value on or about March 30, 2000.

18.     National Bank of Oman ("NBO") is a corporation organized in the Sultanate of Oman, having its head office in Muscat. NBO holds Bonds in the principal face amount of US$5,000,000. It purchased its Bond holding for value on or about March 30, 2000.

19.     Respondent Lakah Funding Limited ("Lakah Funding") is the Issuer of the Bonds. Lakah Funding is a corporation organized in the British Virgin Islands, having its registered seat in Road Town, Tortola. Its corporate registry number is 347651. Its registered address is c/o CITCO B.V.I. Limited, CITCO Building, Wickhams Cay, Road Town, Tortola, B.V.I. Lakah Funding is a wholly-owned subsidiary of respondent Holding Company for Financial Investments (Lakah Group).

20.     Respondent Holding Company for Financial Investments (Lakah Group) S.A.E. ("HCFI") is a Guarantor of the Bonds. It is referred to from time-to-time in the Bond Transaction Documents as the "Parent Guarantor" because it is the parent of the other three Guarantor companies -- respondents TMSE, Medequip, and ASF -- in addition to being the parent of the Issuer. HCFI is an Egyptian corporation, having its registered seat in Cairo, Egypt. It represents that its corporate registry number is 318697 (Giza Governorate), and its registered address is 68 Merghany Street,

6

Heliopolis, Cairo. HCFI is not less than 70%-owned by respondents Ramy and Michel Lakah.

21.    Trading Medical System Egypt, S.A.E. ("TMSE") is a Guarantor of the Bonds. It is referred to from time to time in the Bond Transaction Documents as a Subsidiary Guarantor. It is an Egyptian corporation having its registered seat in Cairo, Egypt. It represents that its corporate registry number is 286523 (Giza Governorate), and its registered address is 68 Merghany Street, Heliopolis, Cairo. TMSE is 97.6%-owned by Respondent HCFI.

22.    Respondent Medical Technology, S.A.E. ("MedTech") is an Egyptian corporation, having its principal place of business in Cairo, Egypt. It is the successor of TMSE, having received the business and other assets of TMSE surreptitiously in or about 2002. Its corporate registry number is 8621 or 8671 (Giza Governorate). Its registered address is16 El Khartoum Street, Cairo. MedTech is beneficially owned by, and is controlled by, Respondents Ramy Lakah and Michel Lakah.

23.    Respondent Medequip for Trading and Contracting, S.A.E. ("Medequip") is a Guarantor of the Bonds. It is referred to from time-to-time in the Bond Transaction Documents as a Subsidiary Guarantor. Medequip is an Egyptian corporation, having its principal place of business in Cairo, Egypt. It represents that its corporate registry number is 286521 (Giza Governorate), and its registered address is 68 Merghany Street, Heliopolis, Cairo. Medequip is 97.8%-owned by Respondent HCFI.

24.    Respondent Technowave S.A.E. ("Technowave") is an Egyptian corporation, having its principal place of business in Cairo, Egypt. Technowave is a

7

successor of Medequip, having received most of the business and other assets of
Medequip surreptitiously in or about 2002. Its corporate registry number is 8747 (Giza
Governorate). Its registered address is 166 Al Hijaz Street, Cairo. Technowave is
beneficially owned by, and is controlled by, Respondents Ramy Lakah and Michel
Lakah.

25.    Respondent Life Care Technology S.A.E. ("Life Care") is an Egyptian
corporation, having its principal place of business in Cairo, Egypt. Life Care is a
successor of Medequip, having received the rest of the business and other assets of
Medequip surreptitiously in or about 2002. Its corporate registry number is 3375 (Giza
Governorate). Its registered address is 13 El Khalifa El Wathek Street, Nasr City, Cairo.
Life Care is beneficially owned by, and is controlled by, Respondents Ramy Lakah and
Michel Lakah.

26.    Respondent Arab Steel Factory, S.A.E. ("ASF") is a Guarantor of the
Bonds. It is referred to from time to time in the Bond Transaction Documents as a
Subsidiary Guarantor. ASF is an Egyptian corporation, having its head office in Cairo,
Egypt. It represents that its corporate registry number is 556 (10th of Ramadan City),
and that its address is 68 Merghany Street, Heliopolis, Cairo. Its registered address is 1
Moshir Ahmed Ismael Street, Cairo. ASF is 97.92%-owned by Respondent HCFI.

27.    Respondent Ramy Lakah (a/k/a Ramy Raymond Lakah) is an individual
citizen of Egypt and of France. His residential address is 21 Rue Galilée, Paris 16 eme,
France. Ramy Lakah is the dominant and controlling figure in the Respondent
companies and the other Lakah Group companies. He and his brother, respondent

8

Michel Lakah, together own and control at least 70% of the shares of HCFI, the Parent Guarantor, which in turn owns all or virtually all of the shares of the Issuer and the other Guarantors. He is also the beneficial and equitable owner of, and he controls, respondents MedTech, Technowave, and Life Care. Ramy Lakah is a party to and signatory of the Bond Indenture.

28.     Respondent Michel Lakah (a/k/a Michel Raymond Lakah) is an individual citizen of Egypt, currently residing in Canada. His business address is 1176 Rue Bishop, Montréal, Québec H3G 2E3, Canada, where he owns and operates at least two companies, including LBIG Construction. His last reported residential address is 999 rue White, St. Laurent/Montréal, Québec H4M 2X8, Canada. Michel Lakah is the second dominant and controlling person with regard to all of the aforesaid Respondent companies. He and his brother, Respondent Ramy Lakah, together own and control at least 70% of the shares of HCFI, the Parent Guarantor, which in turn owns all or virtually all of the shares of the Issuer and the other Guarantors. He is also the beneficial and equitable owner of, and he controls, respondents MedTech, Technowave, and Life Care. Michel Lakah is a party to and signatory of the Bond Indenture.

### Principal Bond Transaction Documents

29.     The relevant "Bond Transaction Documents" are as follows:

a.      the Offering Circular, dated December 6, 1999, relative to the Bonds (the "OC") (see Exhibit "1");

9

b. the Regulation "S" Global Bond (see Exhibit "2"), including the Terms and Conditions of the Bonds ("TCB") (see Exhibit "3");

c. the Guarantee, dated as of December 8, 1999, made jointly and severally by each of the Guarantors to and in favor of the Trustee for the benefit of the bondholders (see Exhibit "4"); and

d. the Indenture, dated as of December 8, 1999, among the Issuer, the Guarantors, and The Bank of New York, acting through its principal corporate trust office in New York City, as Trustee (the "Trustee"), for the benefit of the bondholders, providing for the issuance of the Bonds (see Exhibit "5").

### Principal Bond Transaction Terms

30. The principal Bond transaction terms are as follows:

- Bonds, in the total face amount of US$100 million, were issued effective December 8, 1999 (the "Issuance Date") and matured on December 8, 2004 (the "Maturity Date"). (Global Bond at p.1; OC at p. 9; TCB §5(a).)

- Interest at 12% per annum was payable semi-annually in arrears on June 8th and December 8th of each year beginning in 2000 and running through the Maturity Date in 2004. (TCB §4.)

10

- Failure to pay either interest or principal constitutes an Event of Default. (TCB §10(a); Indenture §401), in addition to a breach of contract.

- Default interest on any principal unpaid when due to accrue at 12% per annum. (TCB §4.)

- Bond holders are entitled to reimbursement from the Issuer of all costs and expenses incurred in connection with any Event of Default or in protecting or enforcing any right or remedy under the Bonds or the Indenture. (Indenture §1001.)

- The Guarantors bind themselves jointly and severally, irrevocably and unconditionally, as primary obligors (and not merely as sureties), for the benefit of the Holders of the Bonds, with regard to the payment of all amounts due with respect to the Bonds (whether principal, interest, or any other amounts), when and as due, as well as the prompt and full performance of any and all other obligations of the Issuer in respect of the Bonds and otherwise under the Indenture, etc. (Guarantee §§1(a), (2).)

- The Guarantors effectively waive all temporal limitations on their liabilities and other obligations under the Guarantee. (Guarantee §3.)

- Respondents Ramy Lakah and Michel Lakah, individually, covenant with the Holders of the Bonds not to compete with the businesses of the Guarantors or any other subsidiaries of the Parent

11

Guarantor, HCFI. (Indenture §1005(c)(ii); accord, TCB §11(b);

Offering Circular at p. 79.)

- The Bonds, the Guarantee, and the Indenture are to be governed

  by and construed in accordance with the laws of state of New York

  without reference to its choice of law principles. (TCB §19(a);

  Guarantee §14(a); Indenture §111(a).)

- Upon any consolidation, merger, conveyance or transfer in one or

  more transactions of all or substantially all of the properties or

  assets of any Guarantor to any other person or entity, the

  successor or transferee shall succeed to and be substituted for the

  relevant Guarantor, and shall be bound by every obligation under

  the Bonds and the Guarantee as if the successor had been named

  as the relevant Guarantor. (TCB §§14(b), 14(a).)

These principal terms are quoted in Appendix "1" hereto.

### Arbitration Clauses

31.    Section 18(a) of the Terms and Conditions of the Bonds provides in

pertinent part as follows:

> "(a) *Submission to Arbitration*
> "[A]ny dispute or difference whatsoever between the Issuer or any
> Guarantor...and...a Holder of the Bonds arising out of or in
> connection with the Bonds, the Guarantee or the Indenture shall be
> finally settled by submission to arbitration by the American
> Arbitration Association under its Commercial Rules of Arbitration,
> as at the time in force, by a panel of three arbitrators appointed in
> accordance with such Rules."

12

"(b) *Terms of the Arbitration*
The place of the arbitration shall be New York, New York or London, England; the language of the arbitration shall be English; and the appointing authority shall be the American Arbitration Association."

32.     Section 13 of the Guarantee provides in pertinent part as follows:

"(a) [A]ny dispute or difference whatsoever arising between any Guarantor and the...Holder...arising out of or in connection with this Guarantee, the Bonds or the Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules of Arbitration, as at the time in force, by a panel of three arbitrators appointed in accordance with such Rules.

(b) The place of the arbitration shall be New York, New York or London, England; the language of the arbitration shall be English; and the appointing authority shall be the American Arbitration Association."

33.     Correspondingly, Section 110 of the Indenture provides in pertinent part as follows:

"(a) [A]ny dispute or difference whatsoever arising between the Issuer or any Guarantor... and...a Holder of Bonds...arising out of or in connection with the Bonds, the Guarantee or this Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Arbitration Rules, as at the time in force, by a panel of three arbitrators appointed in accordance with such rules."

(b) The place of the arbitration shall be New York, New York or London, England; the language of the arbitration shall be English; and the appointing authority shall be the American Arbitration Association."

13

## Facts Common to All Claims

34.    The Bonds were issued on or about December 8, 1999 (the "Issuance Date"), and matured on December 8, 2004 (the "Maturity Date").  (See, Global Bond at p. 1; OC at p. 9; TCB §5(a).)

35.    The Bonds were evidenced by a Regulation S Global Bond dated December 8, 1999 (the "Global Bond") (Exh. "2"), executed by Lakah Funding and, in the "PAYMENT GUARANTEED" section, by each of the Guarantors.

36.    The Global Bond was accompanied by a Guarantee dated as of December 6, 1999 (the "Guarantee") (Exh. "4"), made jointly and severally by HCFI (as Parent Guarantor), Medequip, TMSE, and ASF (as Subsidiary Guarantors, and collectively with HCFI, as "Guarantors"), to and in favor of The Bank of New York, as Trustee, for itself and for the benefit of the holders of the Bonds.  Section 1 of the Guarantee provides in pertinent part:

> (a) Each of the Guarantors, as primary obligor and not merely as surety, HEREBY JOINTLY AND SEVERALLY, ABSOLUTELY, IRREVOCABLY AND UNCONDITIONALLY GUARANTEES to the Trustee, for the benefit of the Holders of the Bonds, the Trustee and the Agents, (i) prompt payment of all amounts due in respect of the Bonds (whether principal, interest or any other amounts) or otherwise under the Indenture or the Paying Agency Agreement, which are not paid by the Issuer as and when due, in the manner, place and currency provided for the Indenture and Conditions . . . and (ii) the prompt and full performance of any and all other obligations of the Issuer in respect of the Bonds and otherwise under the Indenture and Paying Agency Agreement on the terms specified therein.  Each Guarantor further guarantees the prompt payment, as and when due, of all amounts payable under the Indenture or the Paying Agency Agreement by the Issuer to the Trustee or any Agent.

Section 2 of the Guarantee provides in pertinent part:

14

> If the Issuer shall for any reason whatsoever fail to pay in full when and as due any amount (whether in respect of principal, interest, or otherwise) that may be owing by the Issuer in respect of the Bonds or otherwise under the Indenture, or the Issuer shall otherwise fail to perform any act, agreement, or covenant required to be performed by it under the Conditions or the Indenture, the Guarantors shall, so often as any such failure occurs, immediately pay such sum or amount to the Trustee, for the benefit of the Holders, and/or perform such act, agreement, or covenant, all without any demand, presentment, protest or notice of any kind whatsoever.

37. The Terms and Conditions of the Bonds (Exh. "3") comprise a part of or are incorporated by reference into the Global Bond (p. 1), the Guarantee (e.g., §§1, 2, 9) and the Indenture (e.g., §101, Art. 4, Exh. "A").

38. The Bond bears interest from and including December 8, 1999 at the rate of 12% per annum. Scheduled interest was payable semi-annually in arrears on June 8 and December 8 during each year from 2000 through 2004, the first such payment being due on June 8, 2000. (TCB §4; OC at p 10.)

39. The Issuer was obligated to redeem the Bonds at their principal amounts, together with all accrued but unpaid interest thereon, on December 8, 2004. (TCB §5(a); OC at p 9.)

40. The Issuer agreed to pay, before the opening of business two days prior to each payment date, an amount sufficient to pay the aggregate amount of principal, interest, and any other amount due in respect of the Bonds, and to make such payments unconditionally by credit transfer and in immediately available, freely transferable funds. (Indenture (Exh. "5") §§309(a)(i)-(ii).) The Issuer separately agreed to pay any amount due in respect of any Bond, other than in respect of its final

redemption, on the 15th calendar day prior to when that payment was due.  (TCB
§ 6(b)).

41.    Bond interest payments were made on or about June 8, 2000 and
December 8, 2000, and were eventually received by the Claimants.

42.    No Bond interest payment was made after the payment that was due in
December 2000.  This withholding of payment was improper.

43.    No principal payment was made before, at, or after the Maturity Date
(December 8, 2004).  This withholding of payment was improper.

44.    No payment of any kind has been made to satisfy any of the obligations to
the Claimants in relation to the Bonds or the Guarantees after the payment of Bond
interest that was due in December 2000.  This withholding of payment was improper.

45.    If payment of any Bond principal is improperly withheld or refused, interest
continues to accrue on the unpaid principal at the rate of 12% per annum until all such
sums are paid.  (TCB §4.)

46.    Any failure to pay when due of either interest or principal in relation to the
Bonds constitutes an Event of Default.  (TCB §10(a).)

47.    The Issuer agreed "to be responsible for and to reimburse Holders for any
costs or expenses (including court and collection fees, if any, in Egypt) incurred in
connection with the occurrence and continuance of an Event of Default or in protecting
or enforcing any of their rights or remedies under [the] Indenture or Bonds." (Indenture
§1001.)

16

48.    It was anticipated that purchasers of the Bonds would hold their Bond interests in custodial accounts with DTC, Euroclear, Clearstream, Cedelbank, or the like. (See, e.g., TCB §25(b); Indenture §407(b); OC at pp. 104-110.)

49.    Each of the Claimants holds its Bond interest in a custodial account or accounts with Euroclear or Clearstream or Cedelbank, etc.

50.    The Bonds were offered and marketed to the international financial community, including the Claimants, primarily through the Offering Circular, dated December 6, 1999 (Exh. "1").

51.    The OC states:

> The Issuer and Guarantors, having made all reasonable inquiries, confirm that this Offering Circular contains or incorporates all information with respect to the Issuer, the Guarantors, the Lakah Holding Company and its Subsidiaries (as defined below) taken as a whole (the "Lakah Group"), the Bonds and the Guarantee, which is material in the context of the issue and offering of the Bonds and the Guarantee; that such information is true and accurate in all material respects and is not misleading in any material respect; that the opinions and intentions expressed in this Offering Circular with regard to such information are honestly held; and that there are no other facts the omission of which would make this Offering Circular as a whole or any such information or the expression of any such opinions or intentions misleading in any material respect . . . ." (Exh. "1", p. 2)

These representations by the Issuer and the Guarantors were false and misleading.

52.    The OC purports to contain complete and accurate descriptions of the business, financial condition, and recent performance of each of the Issuer, the Guarantors, and the other subsidiaries of Guarantor HCFI. In fact, Respondents made numerous material misrepresentations in the OC, and withheld various material information from the OC.

17

53.    Such material misrepresentations and omissions in and from the Offering Circular included:

a.    inflated financials of the various Guarantor companies, including misrepresentations concerning their assets, sales, and profits;

b.    overstated assets of the Parent Guarantor, HCFI, based on unlawful manipulative trading in the stocks of its subsidiaries to boost their prices;

c.    inclusion of unconsummated (indeed, never consummated) "sales" to an Egyptian Government agency as if they were fully performed;

d.    overstatements concerning the assets, businesses, and performances of non-Guarantor subsidiaries of HCFI;

e.    overstatements of the scope and size of the assets, business, and business results of Guarantor TMSE;

f.    overstatement of the business of Guarantor Medequip;

g.    overstatement of the value of Guarantor ASF; and

h.    failure to disclose the then present intention and plan to sell all or substantially all of the operating assets of, or to sell as a whole, Guarantor ASF in short order.

18

54.    Respondents also engaged in conduct after the Eurobond issuance in furtherance of their fraud upon the Claimants, to evade their debts to the Claimants, and to interfere with the Guarantors' performance of their agreements with the Claimants.

55.    Not later than on or about February 16, 2000, little more than two months after issuance of the Bonds, Respondents Ramy Lakah and Michel Lakah, in collusion with Respondents - Guarantors HCFI and ASF, completed the sale of ASF or of all of its operating assets to a third party, and the proceeds of the sales transaction were diverted from ASF and from HCFI.

56.    In or about 2002, Respondents surreptitiously caused all of the assets and business operations of TMSE to be transferred to MedTech.   MedTech gave no consideration in return.   Medtech is a successor to TMSE.   Medtech is beneficially and equitably owned and is controlled by respondents Ramy Lakah and Michel Lakah.

57.    In or about 2002, Respondents surreptitiously caused all of the assets and business operations of Medequip to be transferred to Life Care and Technowave. Technowave and Life Care gave no consideration in return.  Technowave and Life Care are successors to Medequip.  Technowave and Life Care are each beneficially owned and are controlled by respondents Ramy Lakah and Michel Lakah.

58.    MedTech, Life Care, and Techowave are the corporate successors of TMSE and Medequip.  Respondents Ramy Lakah and Michel Lakah directly or indirectly control all five of these companies.  They directed the transfer of the assets and business operations from two Guarantor companies to three non-Guarantor companies.

19

As a result, TMSE and Medequip became shell corporations incapable of fulfilling their obligations as Guarantors to the Claimants.

59.    As at December 6, 1999, "Messrs. Ramy Lakah and Michel Lakah owned approximately 70 per cent. of the outstanding shares of the Lakah Holding Company [HCFI]. These shareholders are able to exert substantial control over the Lakah Holding Company [HCFI] and, as long as they directly or indirectly own such shares, they will have the ability to elect all of the Lakah Holding Company's directors, to cast a majority of the votes with respect to virtually all matters submitted to a vote of Lakah Holding Company's shareholders and to prevent a change in the control of the Lakah Holding Company." OC at 16. "The Lakah family remains firmly in control of the Lakah Group, with Ramy Lakah owning 50% of the shares and Michel Lakah owning 40%." www.lakah-group.com/main.htm.

60.    Respondents Ramy Lakah and Michel Lakah, each and together, dominated and controlled, and continue to dominate and control, each and all of the Guarantors, the Issuer, the other subsidiaries of Guarantor HCFI, and the Successor Companies. Among other things:

a.    they dominated and controlled the decision-making of the Issuer, the Guarantors and the Successor Companies;

b.    they caused the intermingling and transfer of funds and other assets between and among different corporations under their control, including the Respondent Corporations, and between those Corporations and themselves;

20

purchase their Bonds, and to deprive the Claimants of the means of collecting the funds owed to them.

### First Claim
#### (Breach of Contract Against Lakah Funding, as Issuer)

62.   Claimants restate and incorporate the allegations set forth in all of the foregoing paragraphs as though fully stated herein.

63.   The Global Bond (including the TCB) is a valid and binding obligation of Lakah Funding to the Claimants.

64.   The Indenture is a valid and binding contract entered into by Lakah Funding for the benefit of the Claimants.

65.   Lakah Funding, the Issuer of the Bonds, has failed to make any of the Bond interest payments that were due on or about June 8, 2001 (for the period beginning December 9, 2000) and thereafter.

66.   Lakah Funding has failed to make any payment of any portion of the principal amount of $100,000,000 that was due on December 8, 2004.

67.   Lakah Funding has failed to make any other payment of funds that are due to the Claimants pursuant to the Bond.

68.   Lakah Funding has breached the payment terms of the Bond and of the Indenture.

69.   Lakah Funding's aforesaid breaches have caused the Claimants to suffer injury, warranting an award in their favor of compensatory damages of not less than $76,000,000 and of a precise amount to be determined at the hearing of this matter.

70.    Furthermore, Lakah Funding is obligated (see, Indenture §1001) to reimburse Claimants for all costs and expenses, including the costs and legal fees in this arbitration, incurred by Claimants in enforcing their rights under the Bonds and the Indenture. Lakah Funding has failed to do so.

<u>Second Claim</u>
**(Breach of Contract Against HCFI, TMSE, Medequip, and
ASF, as Guarantors, and Against MedTech, Life Care,
and Technowave, as Successors to the Guarantors)**

71.    Claimants restate and incorporate the allegations set forth in all of the foregoing paragraphs as though fully stated herein.

72.    The Guarantee is a valid and binding undertaking and agreement between the Guarantors (HCFI, TMSE, Medequip, and ASF) and the Trustee for the benefit of the Claimants.

73.    The Issuer defaulted on all interest and principal payments due from June 8, 2001 through December 8, 2004.

74.    The Guarantors were and are jointly and severally liable and obligated to make those payments, as well as any other payments required in relation to the Bonds. (See, Guarantee §§1, 2.)

75.    The Guarantors have each and all failed to make any of the interest payments that were due on or about June 8, 2001 (for the period beginning December 9, 2000) and thereafter.

76.    The Guarantors have each and all failed to pay any portion of the principal amount that was due on December 8, 2004.

77.   The Guarantors have each and all failed to pay any of the other payments required in relation to the Bonds.

78.   The Guarantors are each and all in breach of the terms of the Guarantee relative to the Claimants.

79.   The Guarantors' breaches of the Guarantee have caused the Claimants to suffer injury, warranting an award in their favor and against the Guarantors, jointly and severally, of compensatory damages of not less than $76,000,000 and of a precise amount to be determined at the hearing of this matter.

80.   MedTech, Life Care, and Technowave are the successors to Guarantors TMSE and Medequip, and have assumed or are deemed to have assumed the obligations and liabilities of TMSE and Medequip under the Guarantee.

81.   Claimants are entitled to an award of damages in their favor and against the Successor Companies, jointly and severally,  in the same amounts as against the predecessor companies, Guarantors TMSE and Medequip.

82.   Furthermore, the Guarantors and the Successor Companies are obligated (see, Indenture §§1001) to reimburse Claimants for all costs and expenses, including the costs and legal fees in this arbitration, incurred by Claimants in enforcing their rights under the Bonds and the Indenture.  They have failed to do so.

83.   Claimants are entitled to an award of damages in their favor, and against the Guarantors and the Successor Companies, jointly and severally, in the amount of all such costs and expenses incurred by Claimants in enforcing their rights under the Bonds and the Indenture.

### Third Claim
**(Breach of the Implied Covenant of Good Faith and Fair Dealing
Against HCFI, TMSE, and Medequip, as Guarantors, and Against MedTech,
Life Care, and Technowave, as Successors to the Guarantors)**

84.    Claimants restate the allegations set forth in all of the foregoing paragraphs as though fully stated herein.

85.    The Guarantee, which is governed by New York law, has an implied covenant of good faith and fair dealing.

86.    When TMSE and Medequip transferred all of their assets to the Successors Companies for no consideration, TMSE and Medequip became worthless shell corporations incapable of fulfilling their obligations as Guarantors.

87.    TMSE and Medequip thus acted in bad faith for the purpose of depriving the Claimants of any possibility of being repaid, and thereby breached the implied covenant of good faith and fair dealing contained in the Guarantee.

88.    HCFI, the virtual sole shareholder of TMSE and Medequip, also breached the implied covenant by authorizing the foregoing transfer of its subsidiaries' assets.

89.    TMSE's, Medequip's and HCFI's breaches of the implied covenant of good faith and fair dealing has caused the Claimants to suffer injury, warranting an award in their favor and against the aforesaid Guarantors, jointly and severally, of compensatory damages of not less than $76,000,000 and of a precise amount to be determined at the hearing of this matter.

90.    MedTech, Life Care, and Technowave succeeded to all of TMSE's and Medequip's obligations and liabilities under the Guarantee, and thus have or are

deemed to have breached the implied covenant of good faith and fair dealing contained in the Guarantee to the same extent as TMSE and Medequip.

91.    Such breaches have caused the Claimants to suffer injury, warranting an award of damages in their favor and against the Successor Companies in the same manner and amount as against their predecessors, TMSE and Medequip.

**Fourth Claim**
**(Breach of Contract Against Ramy Lakah and Michel Lakah**
**-- Piercing the Corporate Veil of HCFI, etc.)**

92.    Claimants restate and incorporate the allegations set forth in all of the foregoing paragraphs as though fully stated herein.

93.    As of December 6, 1999, respondents Ramy Lakah and Michel Lakah together owned not less than 70% of the shares of HCFI. Moreover, they controlled additional shares of HCFI.

94.    HCFI, in turn, owned 97.6% of the shares of TMSE, 97.8% of the shares of Medequip, 97.92% of the shares of ASF, and 100% of the shares of Lakah Funding.

95.    Respondents Ramy Lakah and Michel Lakah dominated and controlled HCFI (as well as the other Guarantors, and the Successor Companies), and operated HCFI as a personal business vehicle without respect for corporate formalities and without distinguishing between the respective obligations of HCFI, the other Guarantors, the Successor Companies, their other companies, and themselves.

96.    Respondents Ramy Lakah and Michel Lakah exercised complete domination and control over HCFI, etc., and used HCFI, the other Guarantors, and the Successor Companies as devices for committing frauds on the Bondholders.

26

97.    HCFI's dominating and controlling shareholders, Ramy Lakah and Michel Lakah, are liable for the obligations and liabilities of HCFI and of the other Guarantors, including for their breaches of the Guarantee.

98.    Those breaches of the Guarantee warrant an award against respondents Ramy Lakah and Michel Lakah, jointly and severally, and in favor of the Claimants in an amount of not less than $76,000,000 and of a precise amount to be determined at the hearing of this matter.

### Fifth Claim
**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Ramy Lakah and Michel Lakah -- Piercing the Corporate Veil of HCFI, etc.)**

99.    Claimants restate the allegations set forth in all of the foregoing paragraphs as though fully stated herein.

100.    TMSE and Medequip breached the implied covenant of good faith and fair dealing in the Guarantee when they transferred their assets and business operations to the Successor entities.    HCFI breached the implied covenant of good faith and fair dealing in the Guarantee when it directed and/or authorized those transfers.

101.    Respondents Ramy Lakah and Michel Lakah, as the dominating and controlling shareholders of HCFI, and in turn of TMSE and Medequip, are personally liable for the breaches by HCFI, and by TMSE and Medequip, of the implied covenant of good faith and fair dealing in the Guarantee.

102.    Those breaches of the implied covenant of good faith and fair dealing in the Guarantee caused injury to the Claimants, and warrant an award in their favor and

27

against Ramy Lakah and Michel Lakah, jointly and severally, in an amount not less than US$76,000,000 and of a precise amount to be determined at the hearing of this matter.

### Sixth Claim
### (Breach of Contract Against Ramy Lakah and Michel Lakah)

103.    Claimants restate and incorporate the allegations set forth in all of the foregoing paragraphs as though fully stated herein.

104.    Respondents Ramy Lakah and Michel Lakah individually agreed for the benefit of the Claimants that so long as any Bond remains outstanding they each:

> will not directly or indirectly own or control more than 35 per cent. of the Capital Stock of, or otherwise exercise control of or assume any managerial or executive position in, any company or other entity (other than any Subsidiary in existence on the Issue Date . . .) conducting any of the following activities in Egypt in competition with any of the subsidiaries:  (A) the distribution, sale or leasing of medical equipment and supplies; (B) the construction, sale and leasing of medical facilities; or (C) the management and servicing of hospitals and medical centers.

(See, Indenture §1005(c)(i); OC at p. 79; TCB §11(b).)

105.    But for this covenant, none of the Claimants would have purchased an interest in the Bonds.

106.    Prior to the issuance of the Bonds, Ramy Lakah and Michel Lakah formed Toshiba Middle East which, to the present day, has engaged in Egypt in the businesses of distribution, sales and leasing of medical equipment and supplies. Toshiba Middle East was not and is not a "Subsidiary" as defined in the Bond Transaction Documents. Ramy Lakah and Michel Lakah each directly or indirectly has, since its inception, owned or controlled more than 35 per cent. of the Capital Stock of, or exercised control of and/or assumed managerial or executive positions in, Toshiba Middle East.

28

107.    Beginning not later than in or about 2002, after the initial Bond defaults and while the Bonds were still outstanding, Ramy Lakah and Michel Lakah caused MedTech, Life Care, and Technowave (together, the "Successor Companies") to engage in Egypt in the businesses of distribution, sale, and leasing of medical equipment; construction and sale of medical facilities; and management and servicing of hospitals and medical centers.

108.    The Successor Companies at all pertinent times have been and are beneficially and equitably owned and are controlled by the Lakahs.  Ramy Lakah and Michel Lakah each directly or indirectly has, since their inception, owned or controlled more than 35 per cent. of the Capital Stock of, or exercised control of and/or assumed managerial or executive positions in, each of the Successor Companies.

109.    None of MedTech, Life Care, or Technowave (a) was in existence on December 8, 1999, the Issuance Date of the Bonds; or (b) was or is a Subsidiary as defined in Indenture §101.

110.    Respondents Ramy Lakah and Michel Lakah have each breached their covenants set forth in section 1005(c)(i) of the Indenture.

111.    The aforesaid breaches by respondents Ramy Lakah and Michel Lakah have caused the Claimants to suffer injury, warranting an award in their favor and against Ramy Lakah and Michel Lakah, jointly and severally, of damages in an amount of not less than US$76,000,000 and of a precise amount to be determined at the hearing of this matter.

**Seventh Claim**
**(Fraudulent Inducement Against HCFI, TMSE, Medequip,**
**and ASF, as Guarantors, and Against MedTech, Life Care,**
**and Technowave, as Successors to the Guarantors)**

112.    Claimants restate and incorporate the allegations set forth in all of the foregoing paragraphs as though fully stated herein.

113.    The Guarantors made numerous misrepresentations of material fact, and caused omissions of material fact that make the disclosed statements misleading, in the Offering Circular.

114.    The Guarantors made such misrepresentations and omissions in the Offering Circular knowing that they were false and/or misleading.

115.    The Guarantors made such misrepresentations and omissions with the intent to induce the Claimants to purchase Bonds.

116.    The Claimants reasonably relied on the foregoing material misrepresentations and omissions in the Offering Circular when they decided to purchase the Bonds.

117.    The Guarantors fraudulently induced the Claimants to purchase the Bonds.

118.    Consequently, the Claimants have suffered injury, warranting an award in their favor and against the Guarantors, jointly and severally, of compensatory damages of not less than $76,000,000 and of a specific amount to be determined at the hearing of this matter.

119.  MedTech, Life Care, and Technowave, as the successors to TMSE and Medequip, have assumed or are deemed to have assumed the liabilities of TMSE and Medequip.

120.  Consequently, Claimants are entitled to an award against MedTech, Life Care, and Technowave, jointly and severally, in the same amount as against TMSE and Medequip.

### Eighth Claim
**(Fraudulent Inducement Against Ramy Lakah and Michel Lakah -- Piercing the Corporate Veil of HCFI, etc.)**

121.  Claimants restate and incorporate the allegations set forth in all of the foregoing paragraphs as though fully stated herein.

122.  Respondents Ramy Lakah and Michel Lakah dominated and controlled HCFI and the Subsidiary Guarantors (TMSE, Medequip, and ASF), and misused these corporate entities to perpetrate a fraud upon the Claimants.

123.  Respondents Ramy Lakah and Michel Lakah are personally liable for the material misrepresentations and omissions by HCFI and by the Subsidiary Guarantors, which fraudulently induced the Claimants to purchase Bonds.

124.  Claimants have suffered injury, warranting an award in their favor of compensatory damages as against Ramy Lakah and Michel Lakah, jointly and severally, of not less than $76,000,000 and of a precise amount to be determined at the hearing of this matter.

31

### Ninth Claim
**(Fraudulent Inducement Against Ramy Lakah and Michel Lakah)**

125.   Claimants restate the allegations set forth in all of the foregoing paragraphs as though fully incorporated herein.

126.   Prior to and at the time of the issuance of the Bonds, respondents Ramy Lakah and Michel Lakah were directors and officers of HCFI, of TMSE, of Medequip, and of ASF.

127.   In HCFI, for example, respondent Ramy Lakah held the position of Chairman and co-Chief Executive Officer, and respondent Michel Lakah held the position of Vice Chairman and co-Chief Executive Officer.

128.   Respondents Ramy Lakah and Michel Lakah knowingly provided false and misleading information regarding the various Guarantors, including HCFI, to be included in the Offering Circular; withheld material information concerning the various Guarantors from the Offering Circular; authorized the issuance of the Offering Circular containing such false and misleading information and such material omissions; and certified the completeness and accuracy of the information in the Offering Circular that they knew to be inaccurate and incomplete.

129.   Respondents Ramy Lakah and Michel Lakah acted thus with the intention of deceiving the Claimants and inducing them to purchase Bonds.

130.   The Claimants respectively reasonably relied on the material misrepresentations and omissions in the Offering Circular when they decided to purchase the Bonds.

131. Respondents Ramy Lakah and Michel Lakah fraudulently induced the Claimants to purchase the Bonds.

132. Consequently, the Claimants suffered injury, warranting an award in their favor and against Ramy Lakah and Michel Lakah, jointly and severally, of compensatory damages of not less than $76,000,000 and of a precise amount to be determined at the hearing of this matter.

### Tenth Claim
**(Tortious Interference with Contract, Against MedTech,
Life Care, Technowave, Ramy Lakah, and Michel Lakah)**

133. Claimants restate and incorporate the allegations set forth in all of the foregoing paragraphs as though fully stated herein.

134. The Guarantee is a valid and binding agreement by the Guarantors in favor of the Claimants as Bondholders.

135. Respondents MedTech, Life Care, and Technowave knew of the Guarantee and of the Global Bond. The Successor Companies were and are managed by the same or virtually all of the same executives as had managed the Guarantors Medequip and TMSE; and the Successors are controlled by the same persons as Medequip and TMSE, namely respondents Ramy Lakah and Michel Lakah. Thus, the Successor Companies possessed the same knowledge as Guarantors Medequip and TMSE.

136. Respondents Ramy Lakah and Michel Lakah, acting as directors, officers, and controlling persons of HCFI and of its Subsidiary Guarantors, caused Medequip and TMSE surreptitiously to transfer all of their assets and business operations to the

33

Successor Companies without consideration, thereby turning Medequip and TMSE into shell corporations.

137.    Respondents Ramy Lakah and Michel Lakah caused these transfers for the purpose of rendering Medequip, TMSE, and HCFI unable to fulfill their obligations as Guarantors, and to deprive the Claimants of solvent Guarantors against which they could enforce their rights.

138.    Respondents Ramy Lakah, Michel Lakah, and the Successor Companies intentionally procured and caused Medequip and TMSE to breach the Guarantee beginning not later than in or about 2002 by causing the transfer without consideration of the assets and business operations of Medequip and TMSE to the Successor Companies, thereby rendering Medequip and TMSE incapable of satisfying their contractual obligations as Guarantors.

139.    The aforesaid transfers also rendered Medequip's and TMSE's parent, HCFI, unable to satisfy its contractual obligations as a Guarantor.

140.    The Successor Companies participated in the transfers of those assets and business operations in furtherance of the scheme, orchestrated by respondents Ramy Lakah and Michel Lakah, to defraud the Claimants and to evade the just claims of the Claimants.

141.    Such tortious interference with the performance of the Guarantee caused the Claimants to suffer injury, warranting an award in their favor and against Ramy Lakah, Michel Lakah, and the Successor Companies, jointly and severally, of

34

compensatory damages in excess of $76,000,000 and of a precise amount to be determined at the hearing of this matter.

WHEREFORE, Claimants respectfully request that an award be made in their favor and against Respondents, jointly and severally.

A.   With respect to each of <u>Claimants' Claims One through Six</u> (for breaches of contract):

Awarding to Claimants ratably,

1.   the unpaid principal amount of US$47,420,000; plus

2.   unpaid Bond interest through the Maturity Date (December 8, 2004) of US$22,761,600; plus

3.   contractual default interest on the unpaid principal amount at 12% per annum from the Maturity Date (December 8, 2004) to the date of payment in full of all outstanding amounts under the Bonds; plus

4.   pre-Award interest, accruing at the statutory interest rate of 9% per annum, see NY CPLR § 5004, on unpaid Bond interest payments from their respective due dates to the date of the Award herein; plus

5.   reimbursement, in accordance with their contractual right, of the costs of recovery (including attorneys' fees) with regard to the defaulted payments of interest and principal under the Bonds.

B.   With respect to each of <u>Claimants' Claims Seven through Nine</u> (for fraudulent inducement):

Awarding to Claimants, respectively,

1.   their out-of-pocket costs to acquire their Bond holdings; plus

2.    interest thereon at 9% per annum from the date of their respective expenditures to the date of the Award; minus

3.    the interest payments received respectively by the Claimants on or about June 8, 2000 and December 8, 2000; plus

4.    punitive damages in the amount of US$10,000,000.

C.    With respect to Claimants' Tenth Claim (for tortious interference): Awarding to Claimants ratably,

1.    the unpaid principal amount of US$47,420,000; plus

2.    unpaid Bond interest through the Maturity Date (December 8, 2004) of US$22,761,600; plus

3.    contractual default interest on the unpaid principal amount at 12% per annum from the Maturity Date (December 8, 2004) to the date of payment in full of all outstanding amounts under the Bonds; plus

4.    pre-Award interest, accruing at the statutory interest rate of 9% per annum, see NY CPLR § 5004, on unpaid Bond interest payments from their respective due dates to the date of the Award herein; plus

5.    reimbursement, in accordance with their contractual right, of the costs of recovery (including attorneys' fees) with regard to the defaulted payments of interest and principal under the Bonds; plus

6.    punitive damages in the amount of US$10,000,000.

D.     With respect to <u>All Claims</u>:

    1.     Awarding to the Claimants their costs and disbursements, including reasonable attorneys' fees, of this arbitration; and

    2.     Awarding to the Claimants such actual expenses, costs, and disbursements, including reasonable attorneys' fees, as Claimants shall incur in enforcing any Award herein against Respondents, and retaining jurisdiction over the parties until such payment of this Award is made in full.

Dated:  New York, New York
        June 8, 2006

                    Respectfully submitted,

                    MINTZ, LEVIN, COHN, FERRIS,
                    GLOVSKY AND POPEO, P.C.

                    By:_____
                          Gilbert A. Samberg
                Attorneys for the Claimants
                    The Chrysler Center
                    666 Third Avenue
                    New York, New York  10017
                    Telephone:  (212) 935-3000
                    Telecopier:  (212) 983-3115

37

## Service List

LAKAH FUNDING LIMITED
c/o CITCO B.V.I. Limited
CITCO Building
Wickhams Cay
P.O. Box 662
Road Town, Tortola
British Virgin Islands

LAKAH FUNDING LIMITED
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710

LAKAH FUNDING LIMITED
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
  Attn:  Corporate Trust Administration

HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP),
S.A.E.
68 El Merghany Street
Heliopolis, Cairo
EGYPT

HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP),
S.A.E.
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710

HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP),
S.A.E.
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
  Attn:  Corporate Trust Administration

MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.
c/o Holding Company for Financial Investments (Lakah Group), S.A.E.
68 El Merghany Street
Heliopolis, Cairo
EGYPT

MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710

MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
   Attn:  Corporate Trust Administration

TRADING MEDICAL SYSTEM EGYPT, S.A.E.
c/o Holding Company for Financial Investments (Lakah Group), S.A.E.
68 El Merghany Street
Heliopolis, Cairo
EGYPT

TRADING MEDICAL SYSTEM EGYPT, S.A.E.
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710

TRADING MEDICAL SYSTEM EGYPT, S.A.E.
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
   Attn:  Corporate Trust Administration

ARAB STEEL FACTORY, S.A.E.
1 Moshir Ahmed Ismael Street
Cairo, Egypt

ARAB STEEL FACTORY, S.A.E.
c/o Holding Company for Financial Investments (Lakah Group), S.A.E.
68 El Merghany Street
Heliopolis, Cairo
EGYPT

ARAB STEEL FACTORY, S.A.E.
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710


ARAB STEEL FACTORY, S.A.E.
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
    Attn:  Corporate Trust Administration

RAMY RAYMOND LAKAH
21 Rue Galilée
Paris 16eme
FRANCE

MICHEL LAKAH
999, Rue White (#701)
St. Laurent, Quebec H4M 2X8
CANADA

MICHEL LAKAH
c/o LBIG Construction
1176 Rue Bishop
Montreal, Quebec H3G 2E3
CANADA

TECHNOWAVE, S.A.E.
166 Al Hijaz Street
Heliopolis, Cairo
EGYPT

LIFE CARE TECHNOLOGY, S.A.E.
13 El-Khalifa El Wathek St.
Nasr City, Cairo
EGYPT

MEDICAL TECHNOLOGY, S.A.E.
16 El Khartoum Street
Heliopolis, Cairo
EGYPT

IN THE MATTER OF AN ARBITRATION
Before The Arbitration Tribunals of the
American Arbitration Association

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UBS AG, EXPORTERS INSURANCE COMPANY, LTD.,  :
ARAB BANKING CORPORATION, NATIONAL BANK  :
OF ABU DHABI, and NATIONAL BANK OF OMAN,  :

              Claimants,  :

      -against-  :  **NOTICE PURSUANT TO**
                                        :  **NEW YORK CIVIL PRACTICE**
LAKAH FUNDING LIMITED, HOLDING COMPANY  :  **LAW AND RULES § 7503(c)**
FOR FINANCIAL INVESTMENTS (LAKAH GROUP),  :
S.A.E., TRADING MEDICAL SYSTEM EGYPT,  :
S.A.E., MEDICAL TECHNOLOGY, S.A.E.,  :
MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.,:
TECHNOWAVE, S.A.E., LIFE CARE  :
TECHNOLOGY, S.A.E., ARAB STEEL FACTORY, S.A.E., :
RAMY LAKAH, and MICHEL LAKAH,  :

              Respondents.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       PLEASE TAKE NOTICE, under § 7503(c) of the New York Civil Practice Law and

Rules, that the claimants UBS AG ("UBS"), Exporters Insurance Company, Ltd. ("EIC"),

Arab Banking Corporation ("ABC"), National Bank of Abu Dhabi ("NBAD"), and National

Bank of Oman ("NBO"), by the undersigned, intend to conduct an arbitration with respect to

the controversies described in the Demand for Arbitration and Statement of Claim, dated

June 8, 2006, enclosed herewith, pursuant to the provisions of the following contracts dated

December 8, 1999:

      a.     the Indenture, dated as of December 8, 1999, among the Issuer (Lakah
             Funding Limited), the Guarantors (Holding Company for Financial
             Investments (Lakah Group), S.A.E. ("HCFI"), Trading Medical System Egypt,
             S.A.E. ("TMSE"), Medequip for Trading and Contracting, S.A.E. ("Medequip"),
             Arab Steel Factory, S.A.E. ("ASF")), and The Bank of New York, acting
             through its principal corporate trust office in New York City, as Trustee (the

"Trustee"), for the benefit of the bondholders (including claimants UBS, EIC, ABC, NBAD, and NBO), providing for the issuance of the Bonds;

b.    the Guarantee, dated as of December 8, 1999, made jointly and severally by each of the Guarantors, relative to the Bonds, to and in favor of the Trustee for the benefit of the bondholders; and

c.    the Regulation "S" Global Bond, dated as of December 8, 1999, including the Terms and Conditions of the Bonds ("TCB").

Said arbitration will be conducted in New York City before a panel of arbitrators to be appointed in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

Unless within twenty (20) days after the service of this Notice, you apply, pursuant to the provisions of § 7503(c) of the New York Civil Practice Law and Rules, for a stay of the arbitration, you will thereafter be precluded from objecting that a valid agreement was not made or has not been complied with and from asserting in court the bar of a limitation of time.

Dated:  New York, New York
        June 8, 2006

                        MINTZ, LEVIN, COHN, FERRIS,
                        GLOVSKY AND POPEO, P.C.

                        By: _____
                            Gilbert A. Samberg
                        Attorneys for the Claimants
                            The Chrysler Center
                            666 Third Avenue
                            New York, New York  10017
                            Telephone:  (212) 935-3000
                            Telecopier:  (212) 983-3115

TO:  See Attached Service List

2

## Service List

LAKAH FUNDING LIMITED
c/o CITCO B.V.I. Limited
CITCO Building
Wickhams Cay
P.O. Box 662
Road Town, Tortola
British Virgin Islands

LAKAH FUNDING LIMITED
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710

LAKAH FUNDING LIMITED
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
  Attn:  Corporate Trust Administration

HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E.
68 El Merghany Street
Heliopolis, Cairo
EGYPT

HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E.
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710

HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E.
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
  Attn:  Corporate Trust Administration

MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.
c/o Holding Company for Financial Investments (Lakah Group), S.A.E.
68 El Merghany Street
Heliopolis, Cairo
EGYPT

MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710

MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
   Attn:  Corporate Trust Administration

TRADING MEDICAL SYSTEM EGYPT, S.A.E.
c/o Holding Company for Financial Investments (Lakah Group), S.A.E.
68 El Merghany Street
Heliopolis, Cairo
EGYPT

TRADING MEDICAL SYSTEM EGYPT, S.A.E.
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710

TRADING MEDICAL SYSTEM EGYPT, S.A.E.
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
   Attn:  Corporate Trust Administration

ARAB STEEL FACTORY, S.A.E.
1 Moshir Ahmed Ismael Street
Cairo, Egypt

4

ARAB STEEL FACTORY, S.A.E.
c/o Holding Company for Financial Investments (Lakah Group), S.A.E.
68 El Merghany Street
Heliopolis, Cairo
EGYPT


ARAB STEEL FACTORY, S.A.E.
c/o CORPORATION SERVICE COMPANY
1133 Avenue of the Americas
Suite 3100
New York, NY 10036-6710


ARAB STEEL FACTORY, S.A.E.
c/o THE BANK OF NEW YORK
101 Barclay Street ( Floor 21W)
New York, NY 10286
   Attn:  Corporate Trust Administration


RAMY RAYMOND LAKAH
21 Rue Galilée
Paris 16eme
FRANCE


MICHEL LAKAH
999, Rue White (#701)
St. Laurent, Quebec H4M 2X8
CANADA


MICHEL LAKAH
c/o LBIG Construction
1176 Rue Bishop
Montreal, Quebec H3G 2E3
CANADA


TECHNOWAVE, S.A.E.
166 Al Hijaz Street
Heliopolis, Cairo
EGYPT

LIFE CARE TECHNOLOGY, S.A.E.
13 El-Khalifa El Wathek St.
Nasr City, Cairo
EGYPT

MEDICAL TECHNOLOGY, S.A.E.
16 El Khartoum Street
Heliopolis, Cairo
EGYPT

6

Exhibit 2

# INDENTURE

By and Among

Lakah Funding Limited
as Issuer

Holding Company for Financial Investments
(Lakah Group), S.A.E.
Medequip for Trading and Contracting, S.A.E.
Trading Medical System Egypt, S.A.E.
Arab Steel Factory, S.A.E.
as Guarantors

and

The Bank of New York
as Trustee

Dated as of
December 8, 1999

U.S. $100,000,000 12 per cent. Bonds due 2004

THIS INDENTURE IS NOT QUALIFIED UNDER THE UNITED STATES TRUST INDENTURE
ACT OF 1939, AS AMENDED, OR ANY SIMILAR STATUTE OF ANY JURISDICTION.

**IN WITNESS WHEREOF,** the parties hereto have caused this Indenture to be duly executed as of the day and year first above written.

Address for Notices:

c/o CITCO B.V.I. Limited
CITCO Building
Wickhams Cay
P.O. Box 662
Road Town, Tortola
British Virgin Islands

LAKAH FUNDING LIMITED

By _____
Name: RAMY LAKAH
Title: CHAIRMAN

Address for Notices:

68, Merghany Street
Heliopolis, Cairo
Egypt

HOLDING COMPANY FOR FINANCIAL
INVESTMENTS (LAKAH GROUP), S.A.E.

By _____
Name: RAMY LAKAH
Title: CHAIRMAN

Address for Notices:

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

MEDEQUIP FOR TRADING AND
CONTRACTING, S.A.E.

By _____
Name: RAMY LAKAH
Title: CHAIRMAN

Address for Notices:

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

TRADING MEDICAL SYSTEM
EQUIPMENT, S.A.E.

By _____
Name: RAMY LAKAH
Title: ATTORNEY IN FACT

Address for Notices:

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

ARAB STEEL FACTORY, S.A.E.

By _____
Name: RAMY LAKAH
Title: ATTORNEY IN FACT

61

NY—363575.8

Address for Notices:

101 Barclay Street, Floor 21W
New York, New York 10286

THE BANK OF NEW YORK,
as Trustee

By _____
Name: TREVOR BLEWER
Title: ASSISTANT VICE PRESIDENT

Accepted and Agreed
solely for purposes of
Section 1005(c)(ii) as of
the date first written above:

By: _____
Ramy Lakah

By: _____
Michel Lakah

62

NY—363575.8

This Global Bond shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been manually signed by or on behalf of an Authenticating Agent.

IN WITNESS WHEREOF, Lakah Funding Limited has caused this Global Bond to be duly exec ed and each of the Guarantors has caused this Bond to be duly endorsed with its guarantee and *aval*.

Dated:

LAKAH FUNDING LIMITED

By _____
Authorized Signatory

PAYMENT GUARANTEED (*FOR AVAL*)

HOLDING COMPANY FOR FINANCIAL
INVESTMENTS (LAKAH GROUP), S.A.E.

By _____
Authorized Signatory

MEDEQUIP FOR TRADING AND
CONTRACTING, S.A.E.

By _____
Authorized Signatory

TRADING MEDICAL SYSTEM
EQUIPMENT, S.A.E.

By _____
Authorized Signatory

ARAB STEEL FACTORY, S.A.E.

By _____
Authorized Signatory

CERTIFICATE OF AUTHENTICATION

This is one of the Global Bonds referred to in the within mentioned Indenture.

THE BANK OF NEW YORK,
as Authenticating Agent

By _____
Authorized Signatory

UK-35628.1