Section 20.     **Headings.** The section headings herein are for convenience only and shall not affect the construction hereof.

Section 21.     **Controlling Language.** This Guarantee is executed in the English language only and any translation hereof into any other language shall be only for convenience and shall not affect the construction of the terms hereof.

Section 22.     **Binding Effect.** This Guarantee shall be binding upon and inure to the benefit of the Guarantors and the Trustee and the Holders and their respective successors and permitted assigns.

Section 23.     **Integration of Terms.** This Guarantee contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto.

Section 24.     **Counterparts.** This Guarantee may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, each of the Guarantors has caused this Guarantee to be duly executed as of the day and year first written above.

HOLDING COMPANY FOR FINANCIAL
INVESTMENTS (LAKAH GROUP), S.A.E.

By_____
Name: RAMY RAYMOND LAKAH
Title: CHAIRMAN

MEDEQUIP FOR TRADING AND
CONTRACTING, S.A.E.

By_____
Name: RAMY RAYMOND LAKAH
Title: CHAIRMAN

TRADING MEDICAL SYSTEM EQUIPMENT,
S.A.E.

By_____
Name: RAMY RAYMOND LAKAH
Title: ATTORNEY IN FACT

10

NY—376524.3

ARAB STEEL FACTORY, S.A.E.

By

, Name: RAMY RAYMOND LAKAH

Title: ATTORNEY IN FACT

ACKNOWLEDGED AND ACCEPTED
as of the date first written above, by

THE BANK OF NEW YORK,
acting through its principal corporate
trust office in New York City as Trustee

By

Name: TREVOR BLEWER

Title: ASSISTANT VICE PRESIDENT

11

NY—376524.3

Lakah Funding Limited

December 8, 1999

The Bank of New York, London Branch
One Canada Square
London, E14 5AL
as common depositary for Morgan Guaranty Trust Company of New York, Brussels
office, as operator of the Euroclear System, an Cedelbank

Ladies and Gentlemen,

Re:     U.S.$100,000,000 12 per cent. Bonds due 2004 (the "Bonds")
of Lakah Funding Limited

We enclose herewith the duly executed Regulation S Global Bond representing U.S.$100,000,000 aggregate principal amount of the above mentioned Bonds which we request you to hold on our behalf until the time at which you effect payment of U.S.$97,700,000 in respect of the net subscription money relating to the Regulation S Global Bond and the related Restricted Global Bond on December 8, 1999 to the following account:

Payment to:     UBS AG, London Branch
Account:        Lakah Funding Limited Cash Collateral Account
                Customer Record Number: 325876
Favor:          Lakah Funding Limited

We request you thereafter to hold the Regulation S Global Bond as common depositary on behalf of Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear system and Cedelbank for the accounts of the persons entitled thereto.

These instructions are irrevocable and may not be varied except with the consent of ourselves and UBS AG, acting through its division Warburg Dillon Read.

Very truly yours,

Lakah Funding Limited

By:

Name:
Title:

UK-33623.1

**Cross Receipt**

UBS AG, acting through its division of Warburg Dillon Read ("Warburg Dillon Read ") hereby acknowledges the receipt of U.S.$ 100,000,000 aggregate principal amount of 12 per cent. Bonds due 2004 (the "Bonds") of the Lakah Funding Limited (the "Issuer"), in the form of a Regulation S Global Bond and a Restricted Global Bond, representing all of the outstanding principal amount of the Bonds, and delivered to The Bank of New York, London Branch, as common depositary of Euroclear and Cedelbank in respect of the Regulation S Global Bond and The Bank of New York, acting through its principal corporate office in New York, as the custodian for The Depository Trust Company in respect of the Restricted Global Bond.

Lakah Funding Limited, hereby acknowledges receipt from The Bank of New York, on behalf of Warburg Dillon Read, of U.S.$ 97,700,000, representing payment by Warburg Dillon Read, of the Issue Price in the amount of U.S.$99,500,000 for the Bonds represented by two Global Bonds, less commissions in the amount of U.S.$1,000,000 and expenses in the amount of U.S.$800,000, in full satisfaction of Warburg Dillon Read's obligations pursuant to the Subscription Agreement (the "Subscription Agreement"), dated December 6, 1999, among the Issuer, the Managers and the Guarantors named therein.

Capitalized terms not defined herein shall have the meanings set forth in the Subscription Agreement.

Dated:  December 8, 1999

UBS AG, acting through its division Warburg Dillon Read
By:
Name:
Title:

Lakah Funding Limited

By:
Name:
Title:

12/15/1999  14:53    212-259-6139          DEWEY BALLANTINE                    PAGE  01

18. This Letter of Representations may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts together shall constitute but one and the same instrument.

19. This Letter of Representations is governed by and shall be construed in accordance with the laws of the State of New York without giving effect to principles of conflicts of law.

20. The following riders, attached hereto, are hereby incorporated into this Letter of Representations:

_____

_____

_____

**Notes:**

A. If there is an Agent (as defined in this Letter of Representations), Agent, as well as Issuer, must sign this Letter. If there is no Agent, in signing this Letter Issuer itself undertakes to perform all of the obligations set forth herein.

B. Schedule B contains statements that DTC believes accurately describe DTC, the method of effecting book-entry transfers of securities distributed through DTC, and certain related matters.

Very truly yours,

Lakah Funding Limited
(Issuer)

By: _____
(Authorized Officer's Signature)

The Bank of New York
(Agent)

By: _____
(Authorized Officer's Signature)

Holding Company for Financial Investments
(Lakah Group, S.A.E.)
(Guarantor)

By: _____
(Authorized Officer's Signature)

Medequip for Trading and Contracting, S.A.E.
(Guarantor)

By: _____
(Authorized Officer's Signature)

Arab Steel Factory, S.A.E.
(Guarantor)

By: _____
(Authorized Officer's Signature)

Trading Medical System Equipment, S.A.E.
(Guarantor)

By: _____
(Authorized Officer's Signature)

Received and Accepted:
**THE DEPOSITORY TRUST COMPANY**

By: _____

cc: Underwriter
    Underwriter's Counsel

Accordingly, the Issuer and the Guarantors hereby consent to the printing and distribution, in accordance with the Subscription Agreement dated as of December 6, 1999, of the Offering Circular substantially in the form submitted to us for review.

Very truly yours,

Lakah Fu~ 'ing Limited

By:

Name: RAMY LAKAH

Title: CHAIRMAN.

Holding Company for Financial Investments (Lakah Group), S.A.E.

By:

Name: RAMY LAKAH

Title: CHAIRMAN.

2

Certificate of Authorized Signatories
for
Lakah Funding Limited

Reference is hereby made to that certain Indenture dated as of December 8, 1999 (the "Indenture") among Lakah Funding Limited; (the "Issuer"), Holding Company for Financial Investments (Lakah Group), S.A.E., Medequip for Trading and Contracting, S.A.E., Trading Medical System Egypt, S.A.E. and Arab Steel Factory, S.A.E. (the "Guarantors"), and The Bank of New York, as trustee (the "Trustee") in respect of the U.S.$ 100,000,000 12 per cent. bonds due 2004 (the "Bonds"). For all purposes of the Indenture and the Bonds, each of the persons named below shall be an authorized signatory of the Issuer, and the signatures of said persons, as set opposite their names below, are their genuine signatures.

| Name | Signature |
|------|-----------|
| RAMY LAKAH | |
| H | |
| | |

IN WITNESS WHEREOF, the undersigned has hereunto signed my name this 8th day of December, 1999.

LAKAH FUNDING LIMITED

By _M. Khader_

Name: MOHAMED KHADR
Title: DIRECTOR

388525

### Certificate of Authorized Signatories

Reference is hereby made to that certain Indenture dated as of December 8, 1999 (the "Indenture") among Lakah Funding Limited (the "Issuer"); Holding Company for Financial Investments (Lakah Group), S.A.E. (the "Lakah Holding Company"), Medequip for Trading and Contracting, S.A.E. ("Medequip"), Trading Medical System Egypt, S.A.E. ("TMSE") and Arab Steel Factory, S.A.E. ("Arab Steel") (the "Guarantors"); and The Bank of New York, as trustee (the "Trustee"), in respect of the U.S.$ 100,000,000 12 per cent. bonds due 2004 (the "Bonds"). For all purposes of the Indenture and the Bonds, each of the persons named below shall be an authorized signatory of the Guarantor named opposite such person, and the signatures of said persons, as set opposite their names below, are their genuine signatures.

| Name | Guarantor represented | Signature |
|------|----------------------|-----------|
| RAMY LAKAH | Lakah Holding Company | |
| | Lakah Holding Company | |
| | Lakah Holding Company | |
| RAMY LAKAH | Medequip | |
| | Medequip | |
| | Medequip | |
| RAMY LAKAH | TMSE | |
| | TMSE | |
| | TMSE | |
| RAMY LAKAH | Arab Steel | |
| | Arab Steel | |
| | Arab Steel | |

IN WITNESS WHEREOF, the undersigned has hereunto signed its name this 8th day of December, 1999.

HOLDING COMPANY FOR FINANCIAL
INVESTMENTS (LAKAH GROUP), S.A.E.

By
Name: MICHEL LAKAH
Title:

388529

**Certificate**

**To:**     The Luxembourg Stock Exchange

Lakah Funding Limited U.S.$100,000,000
12 per cent. Bonds due 2004 (the "Bonds")

Dear Ladies and Gentlemen:

We hereby certify that the constitutional documents and board minutes annexed hereto and provided in satisfaction of the requirements of the Luxembourg Stock Exchange for obtaining listing thereon of the Bonds, are true copies and where applicable, up to date and in force at the date hereof.

By:

Authorized signatory on behalf of
Lakah Funding Limited
Name:
Title:

UK-35551.1

**Conditions Precedent Certificate**

To:    UBS AG, acting through its division Warburg Dillon Read
       and the other Managers of the issuance of the Bonds
       referred to below

c/o    Warburg Dillon Read
       1 Finsbury Avenue
       London  EC2M 2PP


       Lakah Funding Limited (the "Issuer") U.S.$100,000,000
       12 per cent. Bonds due 2004 (the "Bonds")

Dear Ladies and Gentlemen:

We hereby certify that the constitutional documents and board minutes annexed
hereto are true copies and where applicable, up to date and in force at the date hereof
and are provided in satisfaction of the requirements of Section 6.1 of the Subscription
Agreement dated December 6, 1999 between the Issuer, the Guarantors and the
Managers as defined in the Offering Circular dated December 6, 1999.


By:

Authorized signatory on behalf of
Holding Company for Financial
Investments (Lakah Group), S.A.E.
Name:
Title:

**Certificate of No Default of the Issuer**

To UBS AG, acting through its division Warburg Dillon Read and the other Managers party to the Subscription Agreement referred to below

c/o  UBS AG acting through its division Warburg Dillon Read
1 Finsbury Avenue
London
EC2M 2PP

December 8, 1999

Dear Sirs

**Lakah Funding Limited**
**U.S.$ 100,000,000 12 per cent.**
**Bonds due 2004 (the "Bonds")**

I, being a Director and General Manager of Lakah Funding Limited refer to the Subscription Agreement dated December 6, 1999 (the "Subscription Agreement") between the Issuer, the Guarantors and yourselves relating to the issue of the Bonds.  Terms defined in the Subscription Agreement shall bear the same meanings when used in this letter.

As required by the Subscription Agreement, I certify that there is outstanding no default, event of default or other breach, which has not been waived of any of the obligations of the Issuer under the Bonds, the Indenture, the Paying Agency Agreement or the Subscription Agreement.

Yours faithfully,

LAKAH FUNDING LIMITED

By:

Name:
Title:

UK-35613.1

## Certificate of No Default of the Guarantors

To UBS AG, acting through its division Warburg Dillon Read and other Managers party to the Subscription Agreement referred to below

c/o  UBS AG, acting through its division Warburg Dillon Read
1 Finsbury Avenue
London
EC2M 2PP

December 8, 1999

Dear Sirs

**Lakah Funding Limited
U.S.$ 100,000,000 12 per cent.
Bonds due 2004 (the "Bonds")**

I, being a Director and General Manager of the Holding Company for Financial Investments (Lakah Group) S.A.E. refer to the Subscription Agreement dated December 6, 1999 (the "Subscription Agreement") between the Issuer, the Guarantors and yourselves relating to the issue of the Bonds.  Terms defined in the Subscription Agreement shall bear the same meanings when used in this letter.

As required by the Subscription Agreement, I certify that there is outstanding no default, event of default or other breach, which has not been waived of any of the obligations of any Guarantor under the Bonds, the Guarantor, the Indenture, the Paying Agency Agreement or the Subscription Agreement.

Yours faithfully,

HOLDING COMPANY FOR
FINANCIAL INVESTMENTS
(LAKAH GROUP), S.A.E.

By:

Name:
Title:

UK-35621.1

Certificate of No Material Adverse Change of the Issuer

To UBS AG, acting through its division Warburg Dillon Read and the other Managers party to the Subscription Agreement referred to below

c/o  UBS AG acting through its division Warburg Dillon Read
1 Finsbury Avenue
London
EC2M 2PP

December 8, 1999

Dear Sirs

Lakah Funding Limited
U.S.$ 100,000,000 12 per cent.
Bonds due 2004 (the "Bonds")

I, being a Director and General Manager of the Issuer refer to the Subscription Agreement dated December 6, 1999 (the "Subscription Agreement") between the Issuer, the Guarantors and yourselves relating to the issue of the Bonds.

As required by the Subscription Agreement, I certify that at today's date (a) there has been no adverse change which is material in the context of the issue of the Bonds, in the financial or other condition of the Issuer from that described in the Offering Circular dated December 6, 1999 prepared by the Issuer in connection with issuance of the Bonds; (b) the representations and warranties of the Issuer contained in the Subscription Agreement are true, accurate and correct at, and as if made, today; and (c) the Issuer has performed all of its obligations under the Subscription Agreement to be performed on or before today.

Yours faithfully,

LAKAH FUNDING LIMITED

By:

Name:
Title:

UK-35614.1

Certificate of No Material Adverse Change of the Guarantors

[Letterhead of the Lakah Holding Company]

To UBS AG, acting through its division Warburg Dillon Read and other Managers party to the Subscription Agreement referred to below

c/o UBS AG, acting through its division Warburg Dillon Read
1 Finsbury Avenue
London
EC2M 2PP

December 8, 1999

Dear Sirs

**Lakah Funding Limited**
**U.S.$ 100,000,000 12 per cent.**
**Bonds due 2004 (the "Bonds")**

I, being a Director and General Manager of the Holding Company for Financial Investments (Lakah Group), S.A.E refer to the Subscription Agreement dated December 6, 1999 (the "Subscription Agreement") between the Issuer, the Guarantors and yourselves relating to the issue of the Bonds.

As required by the Subscription Agreement, I certify that at today's date (a) there has been no adverse change which is material in the context of the issue of the Bonds, in the financial or other condition of the Guarantor from that described in the Offering Circular dated December 6, 1999 prepared by the Issuer in connection with issuance of the Bonds; (b) the representations and warranties of the Issuer contained in the Subscription Agreement are true, accurate and correct at, and as if made, today; and (c) the Issuer has performed all of its obligations under the Subscription Agreement to be performed on or before today.

Yours faithfully,

HOLDING COMPANY FOR
FINANCIAL INVESTMENTS
(LAKAH GROUP) S.A.E.

By:

Name:
Title:

UK-35622.1

5.    This Appointment may be signed in counterparts each of which shall constitute an original and all of which together shall constitute an original. This Appointment shall be governed by and construed in accordance with the laws of the State of Delaware without reference to its principles of conflict of laws. Any action or other legal proceeding against CSC arising under or pertaining to this Agreement may be brought only in the courts of the State of Delaware.

LAKAH FUNDING LIMITED

By:

Name:
Title:

CORPORATION SERVICE COMPANY

By:

Name: *Merrill Wiener*
Title: *Authorized person*

2

NY—388378.1

20 1999 10:08

PAGE.15

(7) to inform promptly the holders of convertible or exchangeable securities or of securities with warrants of any amendment to the rights attached to the different categories of shares to which such securities relate; and

(8) to provide facilities to the public in Luxembourg for obtaining promptly its most recent annual report and accounts, publication of which is required by the laws of the country of incorporation of the Issuer.

Yours faithfully

LAKAH FUNDING LIMITED

By:

Name:
Title:

UK-35595.1

12/02/99  13:03 FAX 284 494 4783          CITCO BVI                        @002

# LAKAH FUNDING LIMITED

### Consent of the Board of Directors in writing
### Pursuant to the Articles of Association

The undersigned being the Board of Directors of Lakah Funding Limited, an International Business Company established and operating under the laws of the British Virgin Islands, hereby consent to the adoption of the following resolutions:

RESOLVED, that the registered office of the Company will be situated at Citco Building, P.O. Box 662, Road Town, Tortola, British Virgin Islands;

and further

RESOLVED, that the registered agent of the Company will be Citco B.V.I. Limited of Citco Building, P.O. Box 662, Road Town, Tortola, British Virgin Islands;

and further

RESOLVED, that the seal, an impression of which appears on these resolutions, be and hereby is adopted as the seal of the Company;

and further

RESOLVED, to issue 100 shares in the Company with a par value of US$10.00 each registered in the name of Holding Company for Financial Investments (Lakah Group), S.A.E.;

and further

RESOLVED, to issue 1 registered share certificate numbered 1 covering the total shares issued in the Company;

and further

RESOLVED, to record the issue of the registered share certificate in the share register.

Adopted and signed this 11th day of October, 1999.

_____        _____        _____
Ramy R. Lakah                  Ramy Rida Pacha                 Mohamed A. Khadr

DEC 02 1999 12:25

284 494 4783      PAGE.02

** TOTAL PAGE.008 **

RESOLVED, that the Medequip may need negative pledge covenant pursuant to which Medequip will agree not to grant any security in respect of indebtedness without granting similar security to the beneficiaries of the guarantee, subject to such exceptions as may be negotiated by the Chairman, limitation on certain transactions between Medequip and parties related thereto, restriction on consolidation, merger and transfer of assets and the maintenance of certain financial ratios as set forth in the Terms and Conditions of the Bonds .

*Listing:*  Luxembourg Stock Exchange;

*Settlement:*  Depository Trust Company, Euroclear, Cedelbank.

RESOLVED, that the Chairman Mr. Ramy Raymond Michel Lakah and the First Vice-Chairman Mr. Michel Raymond Michel Lakah are hereby authorized, to take any and all action and execute all agreements and documents, necessary or advisable to carry out the intent of these resolutions.

By:                                         By: *Mohamed Farah Mohamed*
Name: Ramy Raymond Michel Lakah            Name: Mohamed Farah Mohamed Ahmed
Title: Chairman                             Title: Secretary
Date:                                       Date:

We hereby certify that this is a true copy of the original.

Medequip For Trading And Contracting S.A.E

2

After submitting the agenda to the attending members, the following resolutions were unanimously adopted:

**First:** Subject to Banque du Caire's approval, to cancel the first resolution adopted by ASF's Ordinary General Assembly dated December 12, 1998 related to ASF's prohibition from borrowing or granting any pledge without the written approval of Banque du Caire.

**Second:** To notify Banque du Caire of ASF's Ordinary General Assembly's resolution.

By: _____
Name: Mohamed Bilal Al Sayed Ali Dabbah
Title: Chairman
Date:

By: _____
Name: Mr. Cherif Mohamed Hammouda
Title: Auditor
Date:

We hereby certify this document to be a true copy of the original.

Arab Steel Factory S.A.E

Exhibit 3

574-6178/858804

AMERICAN ARBITRATION ASSOCIATION
NEW YORK, NEW YORK
-------------------------------------------------------------------X

UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING                          Case No. 50 148 T 00251 06
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN,

                                    Claimants,

             – against –

LAKAH FUNDING LIMITED, HOLDING                      ANSWER AND
COMPANY FOR FINANCIAL INVESTMENTS                   COUNTERCLAIM
(LAKAH GROUP), S.A.E., TRADING MEDICAL
SYSTEM EGYPT, S.A.E., MEDICAL
TECHNOLOGY, S.A.E., TECHNOWAVE, S.A.E.,
LIFE CARE TECHNOLOGY, S.A.E., ARAB
STEEL FACTORY, S.A.E., RAMY LAKAH and
MICHEL LAKAH,
                                    Respondents.
-------------------------------------------------------------------X

Respondents Lakah Funding Limited, Holding Company for Financial

Investments (Lakah Group), S.A.E., Trading Medical System Egypt, S.A.E., and Arab

Steel Factory, S.A.E. answer the Demand for Arbitration dated June 8, 2006 (the

"Demand") as follows:


Preliminary Statement

    1.    The central allegations of the Demand are false.  Lakah Funding Limited

("Funding") did not raise $100 million from a bond issue in December 1999 (the "UBS

offering").  The assets of the issuer and the guarantors of the issue were not fraudulently

overstated.  There were no fraudulent transfers of assets from the issuer and the

guarantors.  Fraud in the execution of the offering by UBS caused the answering

respondents losses of hundreds of millions of dollars.

2.    None of the answering respondents, who are the issuer and the guarantors of the bond issue, should be liable to any of the claimants because they were defrauded by UBS.

3.    If the issuer or guarantors are found liable to any of the claimants other than UBS, UBS should indemnify the issuer and guarantors for the loss.

## The Facts

4.    The answering respondents were in strong financial condition before the UBS offering.

5.    To the date of the UBS offering, none of the answering respondents had defaulted on a loan, nor had any creditor filed a claim against HCFI, its subsidiaries, or its principals.

6.    In less than one year before the UBS offering, Holding Company for Financial Investments (Lakah Group) ("HCFI") and its subsidiaries raised almost $300 million.  Prior to the UBS Offering, HCFI received high grades from every rating company review and from several leading investment banks.

7.    After HCFI conducted a successful IPO on the Cairo/Luxembourg Stock Exchange, Mr. Adel Kamber of UBS, through the recommendation of Dewey Ballantine, contacted Ramy Lakah at HCFI.

8.    Mr. Kamber explained that UBS wanted to act as underwriter for the first Eurobond offering in the Middle East to enhance the bank's business prospects there and that HCFI could use the offering to enhance its debt structure substantially.

9.    UBS and HCFI began exploring the possibility of a bond offering.  UBS took preliminary steps to assemble an underwriting syndicate and to undertake due diligence of the HCFI entities through the law firm Dewey Ballantine.

The Need To Irrevocably Release Banque du Caire's Restrictions

10.    Prior to the UBS offering, Arab Steel Factory, S.A.E. ("ASF") had a positive cash flow of 70 million Egyptian pounds (E£70 million) annually, or approximately $20 million.

11.    In the Offering Circular and associated business plans it was foreseen that HCFI could raise about $100 million by selling the assets of ASF to be re-invested in the expansion of HCFI's healthcare business.

12.    Banque du Caire ("Banque du Caire") held pledges on, among other things, ASF's assets and on the shares of TMSE and Medequip, given in connection with prior financings.  UBS and HCFI concluded jointly that Banque du Caire might accept a payment of about $35 million to irrevocably release the ASF pledges so as to permit ASF's assets to be sold and to remove its pledges on the shares of TMSE and Medequip.

13.    If Banque du Caire released its ASF, Medequip and TMSE pledges for $35 million and if HCFI sold ASF for $100 million, HCFI's payment of $35 million to Banque du Caire would net HCFI $65 million for expansion capital.  Adding those funds to the remaining $65 million from the contemplated UBS offering, HCFI would end up with about $135 million of new funds, less transaction costs.

14.    UBS knew that Banque du Caire's irrevocable release of its lien was essential in order for ASF to be sold to supply more working capital, and worked to obtain it.  Dewey Ballantine, counsel for UBS, wrote in an October 1, 1999 memorandum

sent to Warburg Dillon Read (UBS), the law firm Abboud, Abousleiman & Tyan,

Egyptian counsel acting for Dewey Ballantine, and HCFI officers Ramy Lakah,

Mohamed Khadr and Ramy Oda Pacha:

> [Ramy Lakah] has advised me, and Randa has verbally
> confirmed, that Banque du Caire [has] adopted a resolution
> agreeing to remove the pledge against a payment of
> approximately E£130 million [approximately US$ 35
> million]. The resolution does not mention the removal of
> the borrowing restrictions. Of course, the removal of these
> two items will be a condition precedent to the managers'
> obligation under the subscription agreement.

(Emphasis added). UBS and HCFI expected Banque du Caire to release the pledges for

about $35 million.

    15.    A draft letter dated October 1999 from Banque du Caire to Ramy Lakah

shows that the parties contemplated that Banque du Caire would irrevocably release the

restrictions:

> This letter will confirm our irrevocable commitment that,
> subject to our receipt of the amount of ___ on or before
> November __, 1999, we shall...deliver [documentation]
> confirming our release of our pledge in respect of the above
> captioned shares...take all other action necessary to
> evidence our complete release of the pledge and any other
> rights we have in respect of the shares described
> above...[and] take all restrictions on additional borrowings
> affecting HCFI...including recording such release on the
> relevant commercial registers.

(Emphasis added).

    16.    Another draft letter dated October 1999 from Banque du Caire to Misr

Clearing and Central Depositary states:

> This letter will confirm that we have irrevocably agreed to
> remove the pledge made in our favor by Holding Company
> for Financial Investments (HCFI), S.A.E. in respect of
> 800,000 shares of MedeQuip Trading & Contracting,

S.A.E., and 800,000 shares of Trading Medical System
Egypt, S.A.E.

We hereby instruct that you immediately remove the
inscription of the pledge on your records and advise El
Iman Brokerage accordingly.

17.     The Bond Escrow Agreement prepared by Dewey Ballantine, dated

December 6, 1999, shows that UBS knew, and sought, the irrevocable release of the

Banque du Caire pledge upon payment of $35 million from the proceeds of the UBS

offering:

As part of the transaction, we are looking to remove the
pledges currently held by Banque du Caire on the shares of
Medequip for trading and Contracting S.A.E. and Trading
Medical System Egypt, S.A.E. and the restriction on
additional borrowings imposed on Arab Factory, S.A.E.
We understand that discussions have taken place in this
regard between your institution and Mr. Ramy Lakah.  This
letter will outline the steps to be taken to effect the removal
of the pledges and the restriction and to make payment to
Banque du Caire....

As soon as Bank of New York receives the letter from Misr
Clearing or other evidence satisfactory to it of the removal
of the pledges and the restriction, it will remit the amount
of $U.S.$35,000,000 to Banque du Caire.

(Emphasis added).

18.     Another letter from Dewey Ballantine to Banque du Caire dated December

3, 1999 states:

Dewey Ballantine is counsel to Warburg Dillon Read
[UBS] and other managers in connection with the issuance
and sale of the above captioned Bonds.  As part of this
transaction, we are looking to remove the pledges currently
held by Banque du Caire on the shares of Medequip for
Trading and Contracting S.A.E. and trading Medical
System Egypt, S.A.E.  We understand that discussions have
taken place in this regard between your institution and Mr.
Ramy Lakah. This  letter will outline the steps to be taken

5

to effect the removal of the pledges and the restriction and
to make payment to Banque du Caire…

If you agree with the terms of this letter, please execute a
copy of this letter and of Annex A and return it to Mr.
Lakah, with a copy to the undersigned.

(Emphasis added)

## UBS's Failure To Sell The Offering And Its Scheme To Conceal The Failure

19.    Shortly before the closing date, Mr. Kamber and Mr. Patrick O'Brien,
both acting for UBS, which was acting as manager and as book runner, told Ramy Lakah
that they believed UBS would only be able to raise $63 million of the expected $100
million, a result that would be badly received by the world's financial community as a
Middle East failure that would negatively effect UBS's reputation and business prospects
in the region.

20.    Mr. O'Brien and Mr. Samakkia, both acting for UBS, told Ramy Lakah
that UBS had a scheme to permit UBS to represent that the offering had raised $100
million: UBS wanted HCFI to buy $37 million of its own bonds.  They explained the
purchase would be similar to a bridge financing in that UBS would be able to re-sell the
$37 million in bonds in the aftermarket, at face value, shortly after the UBS offering
closed.

21.    HCFI agreed to the UBS scheme to buy its own bonds.

22.    In order to implement UBS's scheme, the transaction documents were
changed as the closing drew near.  Instead of the issuer drawing on the proceeds of the
offering, the proceeds were deposited in a Swiss bank – UBS – to secure a loan to the
issuer for the amount of the offering.  UBS, effectively, loaned HCFI $37 million to buy
its own bonds. The loan disguised the failure to sell the full amount of the offering.

6

23.    UBS, on information and belief, did not to disclose to the other underwriting syndicate members its role as "lender" of $37 million.

<u>UBS's Substitution Of A Limited Release For The Negotiated Irrevocable Release</u>

24.    Dewey Ballantine told Ramy Lakah that it had drafted an Irrevocable Release Letter for approval by HCFI's lawyer and signature by Banque du Caire.

25.    HCFI's lawyer approved the letter, which provided for an irrevocable release by Banque du Caire.

26.    Banque du Caire, instead of signing the Irrevocable Release Letter approved by HCFI's lawyer, altered the Irrevocable Release Letter to create a letter in which Banque du Caire "reserved all its rights" in ASF.

27.    On December 6, Mr. Sayed Zahran Ali of Banque du Caire made two changes to the Irrevocable Release Letter.  On the second page of the letter, Mr. Ali typed in the following:

> Agreed and accepted noting that we keep our other rights
> vis-a-vis arab steel factory . [*sic*]

28.    On the first page, Mr. Ali further limited the scope of the release, adding the limiting phrase, "only the abovementioned restriction on additional borrowings."

29.    UBS inserted the altered letter into the closing documents without telling anyone at HCFI that Banque du Caire had not granted a full, irrevocable release, and that the form of irrevocable release HCFI's lawyer had approved as part of the closing documents had not been signed by Banque du Caire.

30.    Dewey Ballantine told Ramy Lakah that Banque du Caire had signed the Irrevocable Release Letter, that the bond documents was ready for HCFI to execute and that he should come to Dewey Ballantine's offices to sign off.

31.     The Dewey Ballantine legal opinion accompanying the closing documents made no reference to any change to the irrevocable release letter that HCFI counsel had actually vetted.

32.     If HCFI had been made aware of this amended letter and its contents, it would never have agreed to sign the closing documents and would not have gone forward with the UBS offering.

33.     The substitution of Banque du Caire's letter reserving rights in place of an irrevocable release posed a staggering risk to every bond holder, including HCFI.

34.     Relying on UBS and Dewey Ballantine, Ramy Lakah went to Dewey Ballantine's office, without counsel, and signed the documents UBS set before him. At the time, he believed the documents included all and only the documents previously approved by HCFI's lawyer and advisors, including what was supposed to be the Irrevocable Release Letter, and that those documents were covered by Dewey Ballantine's legal opinions.

35.     Neither HCFI nor Ramy Lakah was aware that a "Reservation Letter" existed or had been slipped into the closing documents.

36.     Had HCFI and Funding been aware of these facts, the closing documents would not have been executed. This Reservation Letter was not referenced in the Dewey Ballantine legal opinion despite its importance to HCFI and Funding, its guarantor companies and to the other bondholders.

37.     By letter dated December 8, 1999, The Bank of New York, escrow agent for the UBS offering, wrote to Banque du Caire to confirm the receipt of the $35,000,000:

8

> We refer to Dewey Ballantine's letter to Banque du Caire dated December 3, 1999. We confirm that we are in receipt of the amount of U.S. $35,000,000 paid to us by Holding Company for Financial Investments (HCFI) S.A.E. ("HCFI").
>
> We hereby confirm that we will transfer this amount to your account...immediately upon receipt of an original signed copy of a letter from Misr Clearing, Settlement and Central Depository or other evidence satisfactory to us, of the removal of the pledges and the borrowing restrictions referred to us in the Dewey Ballantine letter.

(Emphasis added).

38.    By a memorandum from Dewey Ballantine to The Bank of New York, escrow agent, dated December 13, 1999 (Ex. 14), Dewey Ballantine represented:

> We refer to the Escrow Agreement dated as of December 6, 1999 and the telephone conference among the representatives of The Bank of New York, Warburg Dillon Read and Dewey Ballantine. This letter will confirm the contents of the telephone conference pursuant to which Warburg Dillon Read and Dewey Ballantine advised The Bank of New York that the conditions for the release of the finds from escrow to Banque du Caire have been satisfied.

(Emphasis added).

39.    In fact, the conditions were not satisfied. Banque du Caire had not irrevocably released its liens on the ASF assets. Instead, it had stated in writing that it was keeping undefined rights in the ASF assets, but neither HCFI nor Funding were told about that reservation.

40.    On December 8, 1999, the UBS offering closed.

41.    Pursuant to the Escrow Agreement, UBS loaned HCFI $35 million, which it paid to Banque du Caire.

9

<u>The Sale of ASF And Banque du Caire's Seizure Of The $100 Million Proceeds</u>

42.    On February 10, 2000, the HCFI Board of Directors authorized the sale of

ASF.  The HCFI minutes state:

> RESOLVED, to authorize the Chairman to execute the
> contract of sale between ASF and the purchaser, <u>to receive</u>
> <u>the purchase price,</u> and to take all other action for the
> transfer of ownership of the assets to the purchaser.

(Emphasis added).

43.    ASF's assets were sold for $100 million, on February 16, as HCFI and

UBS had anticipated.

44.    When Banque du Caire indicated that it intended to reassert its pledges on

the ASF sale proceeds, HCFI raised the matter with UBS.  Dewey Ballantine advised, in

its letter dated March 2, 2000, that:

> Please be advised that any attempt by Banc du Caire to
> reinstate the pledge would constitute a breach of Banc du
> Caire's commitments made in connection with the issuance
> of the bonds; in addition it would expose Banc du Caire to
> credible claims for significant damages that it acted
> fraudulently and in bad faith in obtaining payment of the
> initial US$35 million in consideration for the release of the
> pledge. As a result, Banc du Caire would face claims for
> the return of the US 35 million and for the payment of
> significant additional amounts on account of damages.

45.    None of this was true.  Banque du Caire had altered the Irrevocable

Release letter and UBS secretly replaced the Irrevocable Release letter with the

Reservation of Rights letter HCFI had never seen.

## HCFI Loses $135 Million Due To UBS's Fraud

46.    Banque du Caire reasserted its pledges on the ASF sale proceeds, costing HCFI not only the $35 million it paid to free up the assets for sale, but the entire consideration paid for the assets, another $100 million, on or about February 10, 2000.

47.    If the UBS offering and the ASF assets sale had gone forward as planned and disclosed, HCFI would have had $165 million in its pocket for expansion capital by early February 2000: $100 from the UBS offering, less $35 million paid to Banque du Caire, plus $100 million from the sale of ASF's assets.  Instead, HCFI was left with $28 million, $63 million actually raised from the UBS offering, less the $35 million paid to Banque du Caire.  In addition having sold ASF's assets, HCFI no longer had the $20 million of annual cash flow ASF had been generating.

48.    The $37 million HCFI purchased of its own bonds could not be sold at face value in the aftermarket.  Instead, HCFI having been stripped of ASF's assets and the proceeds from those assets, the bonds were sold at a fifty percent discount, and the proceeds, approximately $18 million, were used by HCFI to pay interest to the bondholders.

49.    Left in this position, the answering respondents were unable to continue to pay interest or principal to the bondholders.

## The Demand's Insupportable Allegations of Fraud

50.    The Demand alleges that the issuer and the guarantors made misrepresentations and omitted material facts, overstating the value of its financial assets. These accusations are false.

51.    HCFI was vetted, on at least seven occasions, over a twelve month period, leading up to the UBS offering:

December, 1998. First, HCFI was vetted by the Egypt's Capital Market Authority ("CMA"), roughly equivalent to the SEC in the United States. The CMA was required to review company consolidated, published financial statements for each of the underlying subsidiary companies. Its approval of HCFI confirmed that its capital and the capital of its subsidiaries were properly stated and adequate for its business purposes. The CMA included more than forty notes describing every detail of HCFI's financial presentation.

February, 1999. Second, in February, 1999, Fitch IBCA, a rating agency similar Moody's ratings, provided HCFI with a local rating for its bond. HCFI received a local rating of AA-, the highest rating of any Egyptian company, at that time.

June, 1999. Third, Banque du Caire, in June, 1999, sought to acquire ten percent in HCFI from shares held by Michel Lakah. The price was roughly E£114 million Egyptian pounds, approximately US$35 million. Banque du Caire brought its investigators to HCFI, and each of its subsidiaries, and reviewed, among other things, purchase orders, bookkeeping, receivables, and bank documents and facilities. It questioned rank and file employees as well as managers before consummating the transaction.

May and June, 1999. Fourth, law firm Dewey Ballantine conducted due diligence, on behalf of Nomura, for HCFI's IPO on the Cairo\ Luxemburg stock exchanges. Dewey Ballantine sent several attorneys, fluent, collectively, in Arabic, English and French, written and spoken. Over several weeks, the team reviewed HCFI and its subsidiaries, including all organizational documents, financial statements, balance

12

sheets and cash flows, purchase orders, sales contracts, employment contracts, receivable documentation and business processes, including logistics, chain of command, and human resources policies.  They interviewed each company's managers, outside the presence of HCFI management.  The IPO raised E£330 million, equivalent to US$100 million.

July 29, 1999.  Fifth, Fitch IBCA again vetted HCFI when the Egyptian CMA approved an increase of capital of the HCFI from E£1,149,880,000 to E£1,499,880,000.  Capital was increased through an initial public offering.

August, 1999.  Sixth, Fitch IBCA again conducted due diligence of HCFI in connection with the UBS offering and gave HCFI an international BB- rating. This was the highest rating of any private Egyptian company had received to that time.  Fitch IBCA again interviewed all HCFI managers and all HCFI subsidiary managers.  It had all the documents Dewey Ballantine reviewed, and other documents.  Fitch IBCA, credit committee London, confirmed its international BB- on December 8, 1999, just prior to closing.

October-December, 1999.  Seventh, another review was undertaken by UBS and Dewey Ballantine in preparation of the Eurobond offering circular.  There were no problems.

52.    The Demand alleges the bond default occurred in June, 2001.

53.    Prior to and during the default, PriceWaterhouseCoopers London ("PWC") conducted, nominated by and on behalf of the bondholders, an eighth review and audit over the course of three months, with a team of fourteen people. Every

13

department head or supervisory person was interviewed. PWC was given complete access to every file.

54.    PWC's report did not list under-capitalization as a reason for the default. It did, however, list the problem with Banque du Caire, and unrelated economic conditions in Egypt, as causes.

55.    Neither CMA, nor Fitch IBCA, nor Dewey Ballantine, nor PWC, identified under-capitalization as a potential problem before default, nor as a contributing cause of the default after the fact. The cause was the loss of $135 million to Banque du Caire and HCFI's loss of $20 million cash flow from the ASF sale.

56.    Claimants' losses are the result UBS's misconduct, which subjected every bond holder to a foreseeable and substantial risk of bond default if Banque du Caire failed to irrevocably release its pledges.

57.    None of the purported "successor companies" is a successor to any of the guarantor entities and none have received, directly or indirectly, any assets of the issuer or the guarantors.

## Affirmative Defense And Set-Off

58.    UBS's conduct stated above was the sole proximate cause of any loss it suffered and caused hundreds of millions of dollars in damages to the issuer and the guarantors.

59.    If UBS recovers an award against the answering respondents, the answering respondents are entitled to set-off their damages against the award received by UBS.

<u>Counterclaim For Indemnity Against UBS</u>

60.    If any claimant other than UBS recovers an award against any of the answering respondents, then the answering respondent should receive an award against UBS indemnifying it for the full amount any such claimant may be awarded.

Wherefore, the answering respondents request an award in accordance with the foregoing, together with their attorneys' fees and expenses of this arbitration.

Dated:    New York, New York     LESTER SCHWAB KATZ & DWYER, LLP
          March 19, 2007         120 Broadway
                                 New York, New York  10271
                                 212  964-6611
                                 Attorneys for Respondents
                                 LAKAH FUNDING LIMITED, HOLDING
                                 COMPANY FOR FINANCIAL INVESTMENTS
                                 (LAKAH GROUP), S.A.E., TRADING MEDICAL
                                 SYSTEM EGYPT, S.A.E and ARAB STEEL
                                 FACTORY, S.A.E.

                                 _____
                                 Lawrence A. Steckman
                                 Dennis M. Rothman

TO:

Gilbert A. Samberg, Esq.
MINTZ, LEVIN, COHN, FERRIS, BILOVSKY & POPEO, P.C.
666 Third Avenue
New York, NY  10017
212 935-3000
Attorneys for Respondents

15

574-6178/859206

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
In the matter of the application of

RAMY LAKAH and MICHEL LAKAH,                      Index no. 07/600880

                              Petitioners,

for a judgment pursuant to Article 75 of the
C.P.L.R. staying the arbitration commenced by

UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN

                              Respondents.
------------------------------------------------------------------X



**ORDER TO SHOW CAUSE TO STAY ARBITRATION,
WITH AFFIDAVITS AND EXHIBITS**



LESTER SCHWAB KATZ & DWYER, LLP
120 BROADWAY
NEW YORK, N.Y. 10271-0071
212 964-6611
ATTORNEYS FOR PETITIONERS
RAMY LAKAH AND MICHEL LAKAH