574-6178/859206

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

In the matter of the application of

RAMY LAKAH and MICHEL LAKAH,

Index no. 07/600880

Petitioners,

for a judgment pursuant to Article 75 of the
C.P.L.R. staying the arbitration commenced by

UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN,

Respondents.

------------------------------------------------------------X

**PETITIONERS' MEMORANDUM OF LAW
IN SUPPORT OF STAYING ARBITRATION**

LESTER SCHWAB KATZ & DWYER, LLP
120 BROADWAY
NEW YORK, N.Y. 10271-0071
212 964-6611
ATTORNEYS FOR PETITIONERS
RAMY LAKAH AND MICHEL LAKAH

# CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Table Of Authorities | | | ii |
| Preliminary Statement | | | 1 |
| The Facts | | | 1 |
| | A. | Commencement And Status Of The Arbitration | 1 |
| | B. | The Lakah Companies Before The UBS Offering | 2 |
| | C. | UBS Approaches HCFI To Act As Issuer Of The First Middle East Eurobond | 4 |
| | D. | The Bond Offering Closes And The Issuer's Cessation Of Payment | 4 |
| | E. | UBS's Allegations In the Arbitration Against Ramy And Michel Lakah | 4 |
| Point I | | | |
| | Messrs. Lakah May Not Be Compelled To Arbitrate Because They Have Not Made An Arbitration Agreement As Individuals | | 6 |
| Point II | | | |
| | UBS Cannot Prove A Case For Veil Piercing | | 10 |
| | A. | The Law On Piercing The Corporate Veil | 10 |
| | B. | UBS Has No Facts To Prove "Dominion And Control" | 11 |
| | C. | Courts In Similar Cases Have Not Pierced The Corporate Veil To Require Arbitration | 13 |
| | D. | UBS Has Failed To Allege Facts Sufficient To Warrant Veil Piercing | 17 |
| Conclusion | | | 17 |

i

TABLE OF AUTHORITIES

Page

Cases

Alex Colman, Inc. v. Silverman Products & Textiles, Inc.,
212 A.D.2d 452, 622 N.Y.S.2d 729 (1st Dep't 1995) ...........................................8

American Fuel Corp. v. Utah Energy Development Co., Inc.,
122 F.3d 130 (2d Cir. 1997) ...........................................11, 13, 14

Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Intern., Inc.,
2 F.3d 24 (2d Cir. 1993) ...........................................14

Gorrill v. Icelandair/Flugleidir,
761 F.2d 847 (2d Cir. 1985) ...........................................10

International Aircraft Trading Co. v. Manufacturers Trust Co.,
297 N.Y. 285 (1948) ...........................................11

Kaplan v. First Options of Chicago, Inc.,
19 F.3d 1503 (3rd Cir. 1994), aff'd 514 U.S. 938 (1995) ........................................15-16

Konica Corp. v. Althea P. Powers,
209 A.D.2d 219, 618 N.Y.S.2d 311 (1st Dep't 1994) ...........................................8

Lowendahl v. The Baltimore and Ohio R.R. Co.,
247 A.D. 144, 287 N.Y.S. 62 (1st Dep't), aff'd, 272 N.Y.2d 360 (1936),
reh'g denied, 273 N.Y. 584 (1937) ...........................................10-11

Marlene Industries Corp. and Carnac Textiles, Inc.,
45 N.Y.2d 327, 408 N.Y.S.2d 410 (1978) ...........................................7

Matarasso v. Continental Casualty Co.,
55 N.Y.2d 264, 451 N.Y.S.2d 703 (1982) ...........................................8-9

Matter of Allstate Ins. Co. (Richards),
178 A.D.2d 142, 576 N.Y.S.2d 577 (1st Dept. 1991), appeal denied, 79 N.Y.2d 756,
583 N.Y.S.2d 191 (1992) ...........................................9

Morgan v. Nikko Securities co. Intern., Inc.,
691 F. Supp. 792 (S.D.N.Y. 1988) ...........................................9

Morris v. New York State Dep't of Taxation & Fin.,
  82 N.Y.2d 135, 603 N.Y.S.2d 807 (1993) ........................................11

Powers v. Fox Television Stations, Inc.,
  907 F.Supp. 719, 722 (S.D.N.Y. 1995) ........................................17

Schubtex, Inc. v. Allen Snyder, Inc.,
  49 N.Y.2d 1, 424 N.Y.S.2d 133 (1979) ........................................ 7-8

Thomson-CSF, S.A. v. American Arbitration Ass'n,
  64 F.3d 773 (2d Cir. 1995) ........................................14, 15

TNS Holdings, Inc. v. MKI Securities Corp.,
  92 N.Y.2d 335, 680 N.Y.S.2d 891 (1998) ........................................6, 7

Value Time, Inc. v. Windsor Toys, Inc.,
  709 F.Supp. 436 (S.D.N.Y. 1989) ........................................16

We're Associates Co. v. Cohen, Stracher & Bloom, P.C.,
  103 A.D.2d 130, 478 N.Y.S.2d 670 (2d Dep't 1984)........................................16

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,
  933 F.2d 131 (2d Cir. 1991) ........................................11, 13, 14

Rules

C.P.L.R. 7503(b)........................................1

C.P.L.R. 7503(c)........................................8, 9

### Preliminary Statement

Petitioners Ramy Lakah and Michel Lakah submit this memorandum in support of their petition pursuant to C.P.L.R. 7503(b) to stay arbitration against them in the American Arbitration Association ("AAA"), under case no. 50-148-T-00251-06 02 CACA-C, in New York County (the "Arbitration"). The Arbitration should be stayed against Messrs. Lakah because petitioners did not enter into an agreement to arbitrate and there is no basis on which to pierce the corporate veil so as to require petitioners to arbitrate under an arbitration agreement entered into by corporations in which they had an interest.

### The Facts

The facts are stated in the affidavits of Ramy and Michel Lakah and the affirmation of Dennis Rothman, on which this petition is made. A summary of the essential aspects follows.

A.    <u>Commencement And Status Of The Arbitration</u>

In 2006, UBS AG and other financial institutions ("UBS"), claiming that they had purchased interests in a December, 1999 Eurobond offering by Lakah Funding Limited ("Lakah Funding"), which had been guaranteed by Holding Company for Financial Investments (Lakah Group), S.A.E. ("Lakah Group" or "HCFI"), and other corporations, commenced the Arbitration seeking to recover $76,000,000 in principal and interest on the bonds. UBS named as respondents, in addition to issuer Lakah Funding and guarantor Lakah Group:

- three additional corporate guarantors of the issue;

- three other, different corporations, on the allegation that those corporations were fraudulent transferees of the assets of the issuer or the guarantors; and

- Ramy and Michel Lakah.

Lakah Funding and three of the four guarantors have appeared, but not answered, in the Arbitration. One guarantor and the three supposed fraudulent transferees have not appeared. Ramy and Michel Lakah have not appeared in the arbitration, and bring this petition to stay. No other applications have been made to stay arbitration.

The panel of three arbitrators was completed on March 12, 2007, the final date for objection to service of the last arbitrator seated. A first telephone conference was held on March 15 between counsel who have appeared to date and the panel.

Ramy and Michel Lakah seek to stay arbitration only as to themselves. They do not seek to stay the entire Arbitration.

B.    The Lakah Companies Before The UBS Offering

HCFI is the corporate parent. Lakah Funding, Trading Medical System Egypt, S.A.E. ("TMSE"), Medequip for Trading and Contracting, S.A.E. ("Medequip") and Arab Steel  Factory, S.A.E. ("ASF") are, or were, subsidiary corporations of HCFI. HCFI and its subsidiaries are Egyptian companies, all of which engage, or engaged, in business in the Middle East, chiefly in Egypt, where they were incorporated. Their principal activities were selling and servicing medical equipment and supplies and manufacturing steel, with involvement in other industries. The HCFI companies were successful businesses up to the time of the December 1999 Eurobond offering run by UBS.

2

To that date, none of the companies had defaulted on a loan or guarantee. None had been named in a law suit, administrative proceeding or arbitration.

In August 1998, ASF conducted a "local bond offering" which raised US$80,000,000. An Egyptian national bank, Banque Du Caire, guaranteed ASF's obligation to the bondholders in consideration of a commercial pledge against all ASF's assets.

When HCFI was formed as a holding company on November 29, 1998, it was capitalized at E£1,149,880,000. It became listed on the Cairo Stock Exchange, and could raise money by selling its shares there.

In April 1999, HCFI conducted its own local bond offering, raising the equivalent of roughly US$130,000,000. Lakah Group looked to Banque du Caire to guarantee HCFI's payments to its local bond holders. Banque du Caire gave the guarantee, and took additional security.

In August 1999, HCFI went public in Europe becoming listed on the Luxembourg Stock Exchange, and raising the equivalent of US$102,500,000.

Hence, in less than one year, before UBS sought to underwrite the Eurobond offering, HCFI raised almost US$320,000,000. The HCFI companies were viewed, by the Egyptian public and financial community, as a model for a successful Egyptian conglomerate.

C.    <u>UBS Approaches HCFI To Act As Issuer Of The First Middle East Eurobond</u>

UBS first contacted HCFI in July, 1999, asking if it or one of its companies wanted to issue the first Eurobond offering in the Middle East, to be underwritten by UBS.  UBS stated that it hoped thereby to open the Middle East to future financings, and more business opportunities for UBS.  Lakah Group was interested.

UBS and HCFI began exploring the possibility of an offering, and UBS began putting together an underwriting syndicate and undertaking due diligence of the HCFI entities. ASF then had a positive cash flow of approximately US$20,000,000 annually.

D.    <u>The Bond Offering Closes And The Issuer's Cessation Of Payment</u>

On December 8, 1999, the offering closed.   Eighteen months after the bond offering closed, the issuer, after paying two interest installments, ceased paying interest.

The claims between UBS, the bondholders and the issuer and guarantors are not directly at issue on this petition.  Only the claim seeking to pierce the veil to compel the brothers Lakah to arbitrate is at issue.

That issue should be decided in favor of Ramy and Michel Lakah.

E.    <u>UBS's Allegations In The Arbitration Against Ramy And Michel Lakah</u>

The demand for arbitration asserts in paragraph 6, at 3, Exhibit 1, that "Ramy and Michel Lakah individually are parties to the Bond Transaction Documents." This is a deceptive half-truth.  The Lakahs signed the Bond Transaction Documents in their corporate capacities only.  They signed as individuals only a one-paragraph non-competition agreement, stating:

4

> Mr. Ramy Lakah and Mr. Michel Lakah have agreed . . .
> that, so long as any Bond remains Outstanding, they will
> not directly or indirectly own or control more than 35
> percent, of the Capital Stock of, or otherwise exercise
> control of or assume any managerial or executive position
> in, any company or other entity . . . conducting any of the
> following activities in Egypt in competition with any of the
> Subsidiaries

Not only is that indenture not signed by Ramy or Michel Lakah in their personal capacities: that provision is not subject to arbitration under the limited arbitration clause at issue here:

> [A]ny dispute or difference whatsoever arising between the
> Issuer or any Guarantor, as the case may be, and the
> Trustee (or a Holder of Bonds) or any Agent arising out of
> or in connection with the Bonds, the Guarantee or this
> Indenture shall be finally settled by submission to
> arbitration.

Only disputes against the Issuer or the Guarantors are arbitrable under this limited clause. Neither Ramy nor Michel Lakah is an issuer; neither are they guarantors.

The claims against them are not arbitrable.

The principal part of UBS's allegations against Messrs. Lakah appear in paragraphs 53, 55, and 57 through 61 of the demand for arbitration, at 18 to 22.

UBS makes the kind of boilerplate claims made in any veil piercing case, i.e., that the Lakahs dominated and controlled the decision making of the corporations, that they caused the intermingling of funds, that they participated in fraudulent transfers, and that they caused the corporations to be undercapitalized, or operated them with insufficient capital.

UBS may not start its claim against the Lakahs by commencing arbitration against them. Instead, UBS must first prove a basis for veil-piercing in this court, on this petition. Only if the court holds the veil to be pierced may the Lakahs be required to

5

arbitrate. This UBS cannot do, because there is no factual basis whatever to warrant piercing the corporate veil.

As the accompanying affidavits of Ramy and Michel Lakah show, the corporations were properly formed, the distinctness of the corporations was observed, they were adequately capitalized, and there were no fraudulent transfers.

UBS cannot show otherwise.

Upon the failure by UBS to prove a veil-piercing case in this court, arbitration against Ramy and Michel Lakah should be permanently stayed.

Point I

MESSRS. LAKAH MAY NOT BE COMPELLED TO
ARBITRATE BECAUSE THEY HAVE NOT MADE
AN ARBITRATION AGREEMENT AS INDIVIDUALS

The Demand alleges that Ramy and Michel Lakah are bound to arbitrate under Section 18(a) of the Terms and Conditions of the Bonds which states, inter alia:

> [A]ny dispute or difference whatsoever between the Issuer or any Guarantor ... and... a Holder of the Bonds arising out of or in connection with the Bonds, the Guarantee or the Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules or Arbitration, as at the time in force, by a panel of three arbitrators appointed in accordance with such Rules.

Neither Ramy Lakah nor Michele Lakah is the issuer, a guarantor or a holder. This arbitration clause in the Terms and Conditions therefore cannot and does not bind them individually. A party may not be forced into arbitration absent unequivocal evidence of an express intent to forego his right to a trial.

In TNS Holdings, Inc. v. MKI Securities Corp., 92 N.Y.2d 335, 680 N.Y.S.2d 891 (1998), one corporation commenced arbitration against another under the arbitration clause of their agreement, adding as respondents other corporations affiliated with the

6

arbitration respondent. Those other corporations sought a stay of the arbitration against them on the ground that they were not parties to the agreement to arbitrate, and their parent-subsidiary or affiliate status did not subject them to arbitration. The arbitration claimant argued that the corporate veil should be pierced to require the related corporations to arbitrate. The Court of Appeals refused to require arbitration, holding: "[A]bsent a showing of abuse of the corporate form [in court, not in arbitration], the non-signatory corporation cannot be compelled to arbitrate." 92 N.Y.2d at 337, 680 N.Y.S.2d at 892.

TNS held that a non-signatory to an arbitration agreement may be bound to it only if the party seeking to enforce arbitration demonstrates: (a) that the corporation was "dominated as to the transaction," and (b) that such domination was the instrument of fraud or otherwise resulted in an inequity. 92 N.Y.2d at 339, 680 N.Y.S.2d at 893.

A party may not compel arbitration absent a specific, contractual agreement to arbitrate. See, e.g., Marlene Industries Corp. and Carnac Textiles, Inc., 45 N.Y.2d 327, 333-334, 408 N.Y.S.2d 410, 413 (1978) ("It has long been the rule in this State that the parties to a commercial transaction 'will not be held to have chosen arbitration as the forum for resolution of their disputes in the absence of an express, unequivocal agreement to that effect; absent such an explicit agreement, neither party may be compelled to arbitrate'") (citation omitted). By agreeing to arbitrate, a party waives rights under state procedural and substantive law; courts have held it would be unfair to infer such a significant waiver on the basis of anything less than clear, expressed evidence of intent. See Marlene Industries, 45 N.Y.2d at 333-334, 408 N.Y.S.2d at 413; Schubtex, Inc. v. Allen Snyder, Inc., 49 N.Y.2d 1, 5-6, 424 N.Y.S.2d 133, 135 (1979)

("[A] litigant ought not to be forced into arbitration... absent evidence of an express intention to be so bound").

Absent "express" and "unequivocal" agreements arbitrate, compelling arbitration is error.  See Alex Colman, Inc. v. Silverman Products & Textiles, Inc., 212 A.D.2d 452, 452, 622 N.Y.S.2d 729, 729 (1st Dep't 1995) ("[P]arties to a commercial transaction will not be held to have chosen arbitration as the forum for the resolution of their disputes in the absence, as here, of an express, unequivocal agreement to that effect."); Konica Corp. v. Althea P. Powers, 209 A.D.2d 219, 220, 618 N.Y.S.2d 311, 311 (1st Dep't 1994) ("[P]arties will not be forced to arbitrate a dispute that they did not agree to arbitrate").

Neither Ramy nor Michel Lakah executed any "express" nor "unequivocal" agreement to arbitrate any dispute, with any of arbitral claimants.  Having neither made an agreement to arbitrate and never having participated in the Arbitration, this application is not limited by the twenty-day period of C.P.L.R. 7503(c), and may be made at any time.

The twenty-day time limit to apply for a stay of arbitration does not apply the when no agreement to arbitrate exists between the petitioner and the respondent.  In Matarasso v. Continental Casualty Co., 56 N.Y.2d 264, 451 N.Y.S.2d 703 (1982), the Court of Appeals held that the statute's imposition of a time limit on the "party" served with a demand or notice to arbitrate contemplates the existence of a "party" to an arbitration agreement, i.e., a person who has entered into such an agreement.

In Matarasso, an automobile insurance coverage dispute, there was no agreement to arbitrate since "the umbrella policy . . . contains no provision for arbitration . . . . [T]he incorporation of the underlying . . . liability policy [containing an arbitration

clause] did not extend to the provisions for uninsured motorist coverage (and arbitration of claims arising thereunder), as the umbrella policy covers only liability of the insureds for damages owing third parties." 56 N.Y.2d at 268, 451 N.Y.S.2d at 705.

A party is constrained by the twenty-day period only when the arbitration agreement is challenged for invalidity or noncompliance with its conditions. It does not apply where no agreement to arbitrate was made. The Legislature did not intend "to bind persons to the arbitral process by their mere inaction for 20 days where no agreement to arbitrate has ever been made." 56 N.Y.2d. at 267, 451 N.Y.S.2d at 704-05. A non-party to an arbitration agreement may not be bootstrapped into arbitration merely because he has been served with a twenty-day notice under C.P.L.R. 7503(c). Matter of Allstate Ins. Co. (Richards), 178 A.D.2d 142, 576 N.Y.S.2d 577 (1st Dept. 1991), appeal denied, 79 N.Y.2d 756, 583 N.Y.S.2d 191 (1992); Morgan v. Nikko Securities Co. Intern., Inc., 691 F. Supp. 792, 798-99 (S.D.N.Y. 1988)(citing Matarasso, supra)(executor of an estate was not subject to 20-day period in seeking to stay arbitration over the decedent's entitlement to certain benefits where no written arbitration agreement was made).

Neither Ramy Lakah nor Michel Lakah signed an arbitration agreement.

As non-parties to the agreement to arbitrate, the Lakahs may not be compelled to arbitrate.

Point II

## UBS CANNOT PROVE A CASE FOR VEIL PIERCING

Piercing the corporate veil, whether to hold a person or a corporation liable for the wrongs of another, or to bind a person or a corporation to an arbitration clause he did not himself enter into, is an extraordinary remedy, invoked only where an injured party proves that subject of the veil-piercing effort exercised "actual and complete dominion" over an entity and "used such dominion" to perpetrate a fraud.  In all events, whether the veil is to be pierced is a determination for the court, and not the arbitrators.  Only if this court holds the veil is to be pierced may arbitration be compelled against petitions.  See Point II(C), below.

A.     The Law On Piercing The Corporate Veil

New York law only reluctantly disregards the corporate form and only where the proponent asking the court to disregard the corporate form meets a very heavy burden.

The party seeking to pierce the veil must demonstrate the "complete domination" of a corporation by another entity, so that there is "absolutely no basis for treating the entities as distinct", and it must also show that respecting the corporate form would result in an "inequity." See, e.g., Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985) (parent dominated subsidiary so as to permit piercing the corporate veil where resolution of parent's board directed subsidiary to give certain employment preferences, parent's chief executive officer directed firing of subsidiary's employees, and parent's employees effectuated subsidiary's employees' discharges) (citing Lowendahl v. The Baltimore and Ohio R.R. Co., 247 A.D. 144, 287 N.Y.S. 62 (1st Dep't), aff'd, 272 N.Y.2d 360 (1936), reh'g denied, 273 N.Y. 584 (1937)).

10

Veil-piercing represents an "extraordinary departure" from bedrock corporate law principles, it is warranted only to "prevent fraud or to achieve equity." International Aircraft Trading Co. v. Manufacturers Trust Co., 297 N.Y. 285, 292 (1948).

The party seeking to pierce the veil must demonstrate that such an extraordinary departure is warranted by making a two-part showing: (a) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (b) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. See Morris v. New York State Dep't of Taxation & Fin., 82 N.Y.2d 135, 603 N.Y.S.2d 807 (1993); Lowendahl, 247 A.D. 144, 287 N.Y.S. 62.

B.    UBS Has No Facts To Prove "Dominion and Control"

Courts frequently consider ten factors to determine if a company has been improperly "dominated" within the meaning of the piercing the corporate veil doctrine. See American Fuel Corp. v. Utah Energy Development Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997)(citing Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991):

> In Passalacqua, 933 F.2d 131, we enunciated a list of factors that tend to identify a dominated corporation: (1) whether corporate formalities are observed, (2) whether the capitalization is adequate, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) whether there is overlap in ownership, officers, directors, and personnel, (5) whether the corporate entities share common office space, address and telephone numbers, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the alleged dominator deals with the dominated corporation at arms length, (8) whether the corporation is treated as an independent profit center, (9) whether others pay or guarantee debts of the dominated corporation, and (10) whether the corporation in question had property that was used by the alleged dominator as if it were the dominator's own. Id. at 139.

11

Under the ten factors, neither Ramy nor Michel Lakah exercised "dominion and control" over Lakah Group or any of its subsidiary entities.

HCFI and its subsidiaries scrupulously followed all corporate formalities required by their organizational documents and were dual-audited by some of the world's top accounting firms, in connection with their multiple financings.

HCFI was properly capitalized and had always paid its debts, prior to the UBS offering.  In fact, these companies were vetted seven times over a twelve month period before UBS came to HCFI seeking to make it the issuer in the bonds it wanted to offer.  During that period, they raised over $320 million.[1]

Messrs. Lakah never used corporate funds to pay personal expenses.

Each of the HCFI companies had its own office, address, stationery, bank accounts, phone numbers, facsimile numbers, email and logo.

Each HCFI subsidiary guarantor operated as a separate and independent entity with its own business decision-making structure without Messrs. Lakah interfering in the day-to-day running of the individual companies and, in some cases, the HCFI subsidiaries directly competed with each other in the same market.

Messrs. Lakah dealt with HCFI and all the subsidiary companies on an arms-length basis, on normal business terms, never accepting loans, on any terms, never accepting options, and never using any corporate assets for personal purposes

---

[1]     The reason the issuer defaulted had nothing to do with "undercapitalization," as of the date of the UBS Offering.  The HCFI companies, within nine weeks of the offering, lost in excess of $135 million as a result of misconduct by UBS, as described in the Ramy Lakah Affidavit and, thereafter, lost $20 million in annual cash flow. Id.

Each HCFI subsidiary had its own financial reporting process, including its own balance sheets and income statements, as well as its own tax statement and annual auditor's reports and each was an independent profit center. Before the UBS offering.

Messrs. Lakah never paid any corporate obligations with their personal monies; after the problems arose, they used their personal assets to try to protect the bond holders. As the auditing reports from the HCFI companies show, Messrs. Lakah did not use corporate property for personal use.

C.    Courts in Similar Cases Have Not Pierced The
      Corporate Veil So As To Require Arbitration

Courts applying New York law have refused to pierce the corporate veil to force a non-signatory into arbitration without a clear showing of wrongdoing.

In American Fuel Corp. v. Utah Energy Development Co., Inc., 122 F.3d 130 (2d Cir. 1997), the court refused to pierce the veil of a company even though it had no contracts, no office space for employees, no capital of its own, no individual address, no bank account, and to which its president contributed capital. In refusing to pierce, the court noted that the other corporate officer had the same amount of authority over the company as the president, there was no indication that the president commingled the corporate funds with his personal funds, or that there was any need for an independent source of funds. American Fuel used the ten factors identified in Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991).

Although the president and the other corporate officer personally paid corporate expenses and guaranteed corporate loans, neither shareholder withdrew corporate funds for his own use. The fact that the president shifted personal funds to the corporation, but

13

never corporate funds to his personal account, demonstrated he treated his company as a separate corporate entity. American Fuel, 122 F.3d at 135.

Here, Messrs. Lakah demonstrated far greater adherence to corporate formalities than did the president in American Fuel. Messrs. Lakah dealt with all with the HCFI companies on an arms-length basis and on normal business terms. Before the UBS Bond Offering, they never paid any corporate obligations with their personal monies. HCFI subsidiaries made their own decisions regarding entering into contracts, had their own offices, and were separately capitalized. The companies had separate phone numbers, addresses, offices, employees, accountings, tax audits, as well as separate signature protocols for each company, and separate Board and Shareholder meetings. The case against piercing here is far stronger than in American Fuel.

In Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773 (2d Cir. 1995), a corporate parent, which had purchased a subsidiary, sought a declaration that it was not bound by an arbitration agreement between the subsidiary and its supplier. After the supplier cross-moved to compel arbitration, the court held that the corporate parent was not be bound to arbitrate. A parent and subsidiary lose their distinct corporate identities only when their conduct demonstrates an "abandonment of separateness." 64 F.3d at 778 (citing Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Intern., Inc., 2 F.3d 24, 29 (2d Cir. 1993) ("No bank accounts, offices, stationery, transactions, or any other activities were maintained or carried on in the name of [the subsidiary]"); Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991) (corporate veil pierced where parent and subsidiary (1) share common office and

staff; (2) are run by common officers; (3) intermingle funds; (4) do not deal at arms length with each other; and (5) are not treated as separate profit centers).

Thompson held, 64 F.3d at 778 (quoting Carte Blanche, 2 F.3d at 28-29)("[T]he factors that determine the question of control and domination are less subjective than "good faith"; they relate to how the corporation was actually operated."). In Thompson, the supplier seeking to compel arbitration failed to meet its burden in court to show an absence of corporate formalities or an intermingling of corporate finances or abandonment of the corporate structure. 64 F.3d at 777-778. Parent and subsidiary were operating as separate entities.

Here, HCFI adhered to corporate formalities. Although Thompson held that the parent actually controlled the subsidiary and incorporated it into the larger organizational and decision-making structure, 64 F.3d at 778, the HCFI subsidiaries operated as a separate, independent entities with their own business/decision structures. Each subsidiary had its own financial reporting process, each had its own separately audited balance sheets and income statements, and each had its own tax statements and annual auditor's reports. Messrs. Lakah did not interfere in the day-to-day running of the individual companies' businesses; in fact, they were expressly set up, via signature protocols, to permit the subsidiary managers to operate without any top down control from the HCFI or Messrs. Lakah.

Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1514-15 (3rd Cir. 1994), aff'd 514 U.S. 938 (1995) held that the president of a corporation who signed a loan agreement in a corporate capacity and a loan agreement in a personal capacity was not bound personally to the arbitration clause in the loan agreement. The president did not

sign any documents that stated he would arbitrate any individual liability under a workout. Only the corporation undertook that overall responsibility, 19 F.3d at 1514:

> We think people intend to perform the obligations that are embodied in the words of the formal agreements they sign: no more, no less… There is no ambiguity about the absence of any consent to arbitrate in the documents the Kaplans signed individually. Id.

Here, there is no formal agreement embodying any intent by either Ramy or Michel Lakah to arbitrate any dispute with UBS or any of the other claimants and they have not properly pleaded either Ramy or Michel Lakah exercised the sort of "complete domination" of Lakah Group's finances, policy and business practices or that of its guarantor subsidiaries, as to justify disregarding the corporate form in which these businesses conducted their operations.

Although Messrs. Lakah own a substantial interest in HCFI, mere share ownership – even majority share ownership – is insufficient to hold individual corporate officers responsible for a corporation's alleged liabilities. See, e.g., Value Time, Inc. v. Windsor Toys, Inc., 709 F.Supp. 436, 438 (S.D.N.Y. 1989)(no basis to justify piercing the corporate veil, concluding officer could not be held liable for the corporation's alleged breach of contract where he was acting in his official capacity, as an officer); We're Associates Co. v. Cohen, Stracher & Bloom, P.C., 103 A.D.2d 130, 132-133, 478 N.Y.S.2d 670, 673 (2d Dep't 1984) ("It is well established that in the absence of some constitutional, statutory or charter provision, the shareholders of a corporation are not liable for its contractual obligations and that parties having business dealings with a corporation must look to the corporation itself and not the shareholders for payment of their claims").

16

D.    <u>UBS Has Failed to Allege Facts Sufficient To Warrant Veil Piercing</u>

On this petition, the Lakah brothers have only UBS's demand for arbitration as a guide to the facts on which UBS relies for its veil-piercing case.

UBS has stated no facts, relying instead on allegations and conclusions.

Allegations and conclusions do not permit the court to hold the veil to be pierced.

UBS is required to prove facts in order to make a case for veil piercing in this court:

> Because Plaintiff asked the Court to depart from [the] general rule [regarding veil-piercing], it seems reasonable to require Plaintiff to demonstrate that departure was warranted.  It would be fundamentally unfair to require Defendant to affirmatively demonstrate that it is more than a mere pawn of its parent corporations.

<u>Powers v. Fox Television Stations, Inc.</u>, 907 F.Supp. 719, 722 (S.D.N.Y. 1995) (New York law).

<u>Conclusion</u>

The Arbitration should be stayed as to Ramy and Michel Lakah.

Dated:    New York, New York        LESTER SCHWAB KATZ & DWYER, LLP
          March 19, 2007            120 Broadway
                                    New York, New York  10271
                                    212  964-6611
                                    Attorneys for Petitioners
                                    RAMY LAKAH and MICHEL LAKAH

                                    Dennis M. Rothman

Lawrence A. Steckman
Paul M. Tarr
    On the brief

17