Gilbert A. Samberg (GS-2610)
David L. Barres (DB-2129)
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
(212) 935-3000
(212) 983-3115 (facsimile)

*Attorneys for Respondents UBS AG, Exporters Insurance Company, Ltd.,
Arab Banking Corporation, National Bank of Abu Dhabi and National Bank of Oman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In the Matter of the Application of            )
                                                )
RAMY LAKAH and MICHEL LAKAH,                    )
                                                )
                    Petitioners,                )
                                                )
For a judgment pursuant to Article 75 of        )
the C.P.L.R. staying the arbitration            )
commenced by                                    )    07-CV-2799 (MGC) (FM)
                                                )
UBS AG, EXPORTERS INSURANCE                     )
COMPANY, LTD., ARAB BANKING                     )
CORPORATION, NATIONAL BANK OF ABU               )
DHABI and NATIONAL BANK OF OMAN,                )
                                                )
                    Respondents.                )
------------------------------------------------------------x

## ANSWER & CROSS-PETITION TO COMPEL ARBITRATION

Respondents-Cross-Petitioners UBS AG ("UBS"), Exporters Insurance Company, Ltd. ("EIC"), Arab Banking Corporation ("ABC"), National Bank of Abu Dhabi ("NBAD") and National Bank of Oman ("NBO"), (collectively, "Respondents"), answer the Petition To Stay Arbitration of petitioners Ramy Lakah and Michel Lakah (collectively, the "Petitioners" or the "Lakahs") as follows:

1. Respondents admit that Petitioners purport to seek a judgment staying arbitration against them pursuant to CPLR 7503, but Respondents deny that they are entitled to such a judgment, and otherwise deny the allegations contained in paragraph 1 of the Petition.

2, 3. Respondents lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraphs 2 and 3 of the Petition.

4-8. Respondents admit the allegations contained in paragraphs 4 through 8 of the Petition.

9. Respondents admit that they are claimants in an arbitration, the agreed "place" of which is in the State and County of New York, which Petitioners are seeking to stay as against them, and otherwise deny the allegations contained in Paragraph 9 of the Petition.

10. Respondents refer to the Demand for Arbitration and Statement of Claim for its true and complete contents, and otherwise deny the allegations contained in Paragraph 10 of the Petition.

11. Respondents deny that Lakah Funding Limited is an Egyptian corporation, and otherwise admit the allegations contained in paragraph 11 of the Petition.

12. Respondents admit the allegations contained in paragraph 12 of the Petition.

13. Respondents refer to the offering documents for the bonds for their true and complete contents, and otherwise deny the allegations contained in paragraph 13 of the Petition.

14. Respondents refer to the Demand for Arbitration and Statement of Claim for its true and complete contents, and otherwise deny the allegations contained in paragraph 14 of the Petition.

15. Respondents deny the allegations contained in paragraph 15 of the Petition.

16. Respondents refer to the transaction documents regarding the bond issue and guarantee for their true and complete contents, and otherwise deny the allegations contained in paragraph 16 of the Petition.

17. Respondents refer to the signature pages of the Indenture for their true and complete contents, and otherwise deny the remaining allegations contained in paragraph 17 of the Petition.

18-20. Respondents deny the allegations contained in paragraphs 18 through 20 of the Petition.

21. Respondents admit the allegations contained in paragraph 21 of the Petition.

22. Respondents admit that they commenced, as claimants, an arbitration before the American Arbitration Association in New York City in mid-2006, and otherwise deny the allegations contained in paragraph 22 of the Petition.

23. Respondents admit that a third member of three-person arbitral panel was appointed on or about February 26, 2007 without subsequent challenge and otherwise deny the allegations contained in paragraph 23 of the Petition.

24-25. Respondents admit the allegations contained in paragraphs 24 and 25 of the Petition.

26. Respondents deny the allegations contained in paragraph 26 of the Petition.

27. Respondents admit the allegations contained in paragraph 27 of the Petition.

28. Respondents deny the allegations contained in paragraph 28 of the Petition.

29. Respondents refer to the Demand for Arbitration and Statement of Claim for its true and complete contents, and otherwise deny the allegations contained in paragraph 29 of the Petition.

30. Respondents admit that Petitioners purport to deny their misconduct (described in the Demand for Arbitration and Statement of Claim), and otherwise deny the allegations contained in paragraph 30 of the Petition.

31. Respondents deny the allegations contained in paragraph 31 of the Petition.

WHEREFORE, Respondents respectfully request that the Court deny the relief sought in the Petition and grant such other relief as it deems just and proper.

* * * * *

## CROSS-PETITION TO COMPEL INTERNATIONAL ARBITRATION

Pursuant to 9 U.S.C. § 206 and 9 U.S.C. § 4, Respondents seek an order compelling Petitioners to appear in an international arbitration proceeding for the reasons stated below. For their cross-petition to compel arbitration, Respondents allege as follows:

**Procedural History**

1. On June 8, 2006, Respondents herein commenced an arbitration proceeding (the "Arbitration") against Petitioners herein (brothers Ramy and Michel Lakah), as well as against several of their companies -- Lakah Funding Limited ("LFL") (the "Issuer"); Holding Company for Financial Investments (Lakah Group), S.A.E. ("HCFI"), Trading Medical System Egypt, S.A.E. ("TMSE"), Medequip for Trading and Contracting, S.A.E. ("Medequip"), and Arab Steel Factory, S.A.E. ("ASF") (each a "Guarantor," collectively the "Guarantors"); Medical Technology, S.A.E. ("MedTech"), Technowave, S.A.E. ("Technowave"), and Life Care Techonology, S.A.E. ("Life Care," along with MedTech and Technowave, the "Successor Companies") -- by filing with the American Arbitration Association a Demand for Arbitration and Statement of Claim (the "Demand for Arbitration").

2. The principal claims against the Petitioners and the other respondents

(several of which have appeared therein) in the Arbitration are: (1) for breach of contract based on defaults in payment by the Issuer and the Guarantors of virtually all interest and all principal on a US$100,000,000 Eurobond issued pursuant to an Indenture dated December 8, 1999 (the "Bond"); (2) for fraudulent inducement of the Arbitration claimants (Respondents herein) to acquire the Bonds in question; and (3) for tortious interference with the performance by the Bond Guarantors of their payment obligations.[1]

3.    The Arbitration is currently pending before an arbitral tribunal of the International Center for Dispute Resolution, a division of the American Arbitration Association.

4.    In the Arbitration, claimants (Respondents herein) seek an award against Ramy Lakah, Michel Lakah, the Issuer, the Guarantors, and the Successor Companies, jointly and severally, of damages including the principal amounts of the Bonds through the Maturity Date (totaling US $47,420,000); unpaid interest during the term of the Bonds through the Maturity Date (totaling US $22,761,600); default interest at 12% per annum (in accordance with the terms of the Bond Transaction Documents)[2] on the

---

[1] As is described further below, Petitioners stripped the assets of the operating company Guarantors -- i.e., Medequip, TMSE, and ASF -- by, among other things, surreptitiously transferring the businesses and assets of Medequip and TMSE to the Successor Companies (MedTech TechnoWave, and Life Care). The Petitioners thus rendered the Guarantors incapable of satisfying their obligations of payment of the Bonds.

[2] The "Bond Transaction Documents" are: (a) the Offering Circular, dated December 6, 1999, relative to the Bonds (the "Offering Circular" or "OC"); (b) the Regulation "S" Global Bond, including the Terms and Conditions of the Bonds ("TCB"); (c) the Guarantee, dated as of December 8, 1999, made jointly and severally by each of the Guarantors to and in favor of the Trustee for the benefit of the bondholders; and (d) the Indenture, dated as of December 8, 1999, among the Issuer, the Guarantors, and The Bank of New York, acting through its principal corporate trust office in New York City, as

unpaid principal thereafter; pre-award interest on unpaid Bond interest; punitive damages for fraud and other intentional misconduct; and Claimants' costs of collection of all amounts due pursuant to the Bonds (in accordance with the terms of the Bond Transaction Documents).

5.   The Issuer and three of the Guarantors have appeared in the pending Arbitration, and they filed and served a response (styled an "Answer and Counterclaim") therein on March 19, 2007.

6.   Ramy Lakah and Michel Lakah have not formally appeared individually in the Arbitration.

7.   Along with the Demand for Arbitration, Petitioners were served with a Notice Pursuant to New York Civil Practice Law and Rules § 7503(c), dated June 8, 2006.

8.   On or about March 20, 2007, Ramy Lakah and Michel Lakah commenced a Special Proceeding by filing a Petition to Stay Arbitration, pursuant to Article 75 of the New York Civil Practice Law and Rules, in the Supreme Court of the State of New York, County of New York.

9.   On April 6, 2007, Respondents timely removed the proceeding to the United States District Court for the Southern District of New York.

---

Trustee (the "Trustee") for the benefit of the bondholders, providing for the issuance of the Bonds.

## The Parties

10. USB AG is a Swiss corporation, having its head offices in Zurich and Basel, Switzerland, and having a branch in New York, among other places.

11. Exporters Insurance Company, Ltd. is a corporation organized in Bermuda, having its registered seat in Hamilton, Bermuda.

12. Arab Banking Corporation is a corporation organized in the Kingdom of Bahrain, having its head office in Manama, and having a branch in New York, among other places.

13. National Bank of Abu Dhabi is a corporation organized in the United Arab Emirates, having its head office in the Emirate of Abu Dhabi.

14. National Bank of Oman is a corporation organized in the Sultanate of Oman, having its head office in Muscat.

15. Petitioner Ramy Lakah (a/k/a Ramy Raymond Lakah a/k/a Ramy Ramon Lakah) is an individual citizen of Egypt and of France. Upon information and belief, after having been a domiciliary of Egypt from birth, he became a domiciliary of France in or about 2001, and he recently moved his residence to England. Ramy Lakah is the dominant and controlling figure in the Lakah Group companies. He and his brother, respondent Michel Lakah, together own and control at least 70% of the shares of HCFI, which in turn owns all or virtually all of the shares of the Issuer and the other Guarantors. He is also the beneficial and equitable owner of, and he controls, MedTech, Technowave, and (either presently or in the past) Life Care. Ramy Lakah is

a signatory of all of the Bond Transaction Documents, and he is a party to and signatory of the Bond Indenture.

16.    Petitioner Michel Lakah (a/k/a Michel Raymond Lakah a/k/a Michel Raymon Lakah) is an individual citizen of Egypt. After having been a domiciliary of Egypt from birth, he became a domiciliary of Canada in or about 2001. He currently resides in Montreal, Canada. Michel Lakah is the second dominant and controlling person with regard to all of the aforesaid Respondent companies. He and his brother, Ramy Lakah, together own and control at least 70% of the shares of HCFI, which in turn owns all or virtually all of the shares of the Issuer and the other Guarantors. He is also the beneficial and equitable owner of, and he controls, MedTech, Technowave, and (either presently or in the past) Life Care. Michel Lakah is a party to and signatory of the Bond Indenture.

### Jurisdiction and Venue

17.    This Court has subject matter jurisdiction over this proceeding pursuant to 9 U.S.C. §§ 203 and 205, because it falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (see, 9 U.S.C.A. § 201) (the "New York Convention"), to which the United States is a party.

18.    Venue is proper herein pursuant to 9 U.S.C. § 204 because this is the district and division which embraces New York, New York, the place designated in the arbitration agreements as one of the two permitted places of arbitration, and pursuant to 9 U.S.C. § 205 because this is the district court of the United States for the district and division embracing the place where the relevant State Court proceeding was pending.

**Agreements to Arbitrate**

19. Three related arbitration clauses in the Bond Transaction Documents were invoked as the bases for the Arbitration.

20. Section 18(a) of the Terms and Conditions of the Bonds provides in pertinent part as follows:

> "[A]ny dispute or difference whatsoever between the Issuer or any Guarantor…and…a Holder of the Bonds arising out of or in connection with the Bonds, the Guarantee or the Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules of Arbitration, as at the time in force, by a panel of three arbitrators appointed in accordance with such Rules."

A copy of the Terms and Conditions of the Bonds is appended hereto as Exhibit "A".

21. Section 13 of the Guarantee provides in pertinent part as follows:

> "(a) [A]ny dispute or difference whatsoever arising between any Guarantor and the…Holder…arising out of or in connection with this Guarantee, the Bonds or the Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules of Arbitration, as at the time in force, by a panel of three arbitrators appointed in accordance with such Rules."

A copy of the Guarantee is appended hereto as Exhibit "B".

22. Section 110 of the Indenture provides in pertinent part as follows:

> "(a) [A]ny dispute or difference whatsoever arising between the Issuer or any Guarantor… and…a Holder of Bonds…arising out of or in connection with the Bonds, the Guarantee or this Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Arbitration Rules, as

at the time in force, by a panel of three arbitrators appointed in accordance with such rules."

A copy of the Indenture is appended hereto as Exhibit "C".

23. The Bond Transaction Documents, and the arbitration provisions contained therein, are valid, have not been revoked, and are enforceable upon such grounds as exist at law or in equity. The validity and enforceability of the contracts containing the relevant arbitration clauses are not at issue in this proceeding.

24. The Petitioners, in their individual capacities, are parties to the Indenture, which agreement contains an arbitration provision, through Indenture Section 1005(c)(ii) ("Limitations on Related Party Transactions").

25. Each of the Petitioners personally made the substantive covenant in Section 1005(c)(ii) of the Indenture. Section 1005(c)(ii) is a fundamental provision of the Bond Transaction Documents. That "Lakah Family Undertaking" was the *sine qua non* to assure the viability of the Guarantors, and must be read in conjunction with and as an essential element of the contemporaneous Guarantees. Disputes concerning the Petitioners' obligations or performance of their obligations pursuant to the Lakah Family Undertaking covenant in the Indenture are subject to the dispute resolution provisions of the Indenture (and the other Bond Transaction Documents).

**Facts**

A. **The Eurobond Offering and Default**

26.     On December 8, 1999, Lakah Funding Limited, a B.V.I. corporation owned by HCFI and controlled by the Lakahs, issued a 5-year $100,000,000 Eurobond, bearing interest at 12% per annum, payable semi-annually in arrears (the "Bonds").

27.     The Bonds were guaranteed jointly and severally, *per aval*, by the Guarantors as primary obligors.

28.     HCFI and each of the other Guarantors is an Egyptian company that, at all relevant times, was controlled by the Lakahs.

29.     The Respondents herein are holders of the Bonds.

30.     After initial interest payments were made on or about June 8, 2000 and December 8, 2000, no further payments of Bond interest, nor any payment of principal, nor any payment of any other kind, were made by the Issuer or any of the Guarantors. Thus, the Issuer and the Guarantors are in default on their principal and interest payment obligations to the Respondents herein under the Bonds, amounting to more than US $70,000,000 through the Maturity Date, December 8, 2004, plus interest thereafter.

31.     The Respondents herein thereby suffered enormous injury.

**B.   The Petitioners**

32.   According to the Lakah Group, "the Lakah family remain firmly in control of The Lakah Group... ."

33.   Prior to the issuance of the Bonds, the Lakahs reported that they owned not less than 90% of HCFI.  (Ramy Lakah owned 50% of the shares, Michel Lakah owed 40%, and the remaining shares were owned by Banque du Caire.)

34.   The Lakahs represented in the Offering Circular in December 1999 that they exerted complete ownership control over HCFI:

> "Control of the Lakah Holding Company
> 
> As at the date hereof [December 6, 1999], Messrs. Ramy Lakah and Michel Lakah owned approximately 70 per cent. of the outstanding shares of the Lakah Holding Company [HCFI].  These shareholders are able to exert substantial control over the Lakah Holding Company [HCFI] and, as long as they directly or indirectly own such shares, they will have the ability to elect all of the Lakah Holding Company's directors, to cast a majority of the votes with respect to virtually all matters submitted to a vote of Lakah Holding Company's shareholders and to prevent a change in the control of the Lakah Holding Company." (Emphasis added.)

35.   The Lakahs' control of HCFI meant that they also had complete control of the other Guarantors and of the Issuer.  HCFI owned 97.8% of Medequip shares; 97.6% of TMSE shares; 97.9% of ASF shares; and 100% of LFL's shares.

36.   In addition to their control as dominant shareholders, the Lakahs were the principal officers and directors of HCFI and of the other Guarantors.  With respect to HCFI, for example, Ramy Lakah served as "Chairman" and "CEO" and Michel Lakah

served as "Vice Chairman" and co-"CEO." With respect to Medequip, Ramy Lakah served as "Chairman" and a "Managing Director," while Michel Lakah also served as "Vice Chairman" and a "Managing Director."

37. Ramy Lakah is the sole authorized signatory, and the sole signatory of all of the Bond Transaction Documents, on behalf of all and each of the Issuer and various corporate Guarantors.

38. Ramy Lakah and Michel Lakah are each a "Related Party" *vis-à-vis* each Bond Transaction Document. A "Related Party" is:

> "(A) any Person owning, directly or indirectly, at least 25 per cent. of the outstanding capital stock of or other ownership interests in the Issuer, any Guarantor or any Subsidiary of a Guarantor and (B) any Person directly or indirectly controlling or controlled by or in the direct or indirect common control with the Issuer, any Guarantor or any Subsidiary of a Guarantor." (E.g., Indenture, Exh. "C," at p. 10.)

C. **Domination and Control**

39. At all relevant times, petitioners Ramy Lakah and Michel Lakah, each and together, dominated and controlled each and all of the Issuer, the Guarantors and the Successor Companies.

40. The Issuer and the Guarantors were not independent entities, but rather were dominated entirely by the will of Ramy Lakah and Michel Lakah, who dictated their finances, policies and business transactions and practices.

41. The Issuer and the Guarantors did not observe corporate formalities. For example, they rarely, if ever, convened meetings of their boards of directors or shareholders; they intermingled and transferred funds and other assets between and among themselves and other Lakah companies at the bidding of the Petitioners; and Petitioners manipulated the composition of their boards of directors at will.

42. The Petitioners took financing, funds, and other assets and benefits from the Guarantor companies both on a recorded and unrecorded basis.

**D.    Fraudulent Manipulation of the Financials of the Guarantors**

43. The Petitioners, in collusion with others, artificially inflated the values of each of the Guarantors in order to fraudulently induce the Respondents to invest in the Eurobond.

44. For example, in 1998, the Petitioners conspired with their securities brokerage company (of which they reportedly owned part), AlEman Company for Financial Brokerage ("AlEman"), to establish fake trading accounts and perform fictitious trades of the securities of ASF, Medequip and TMSE, all of which were then virtually 100% owned by the Petitioners. Shortly after the stock prices of those Guarantor companies were successfully and fraudulently inflated, the stocks were transferred to HCFI. The purpose of the sham transactions was to artificially inflate the financial statement value of HCFI in order to make HCFI attractive to financiers and investors.

45. The Petitioners also colluded with one or more officers of Misr International Bank to obtain forged bank certificates, which Petitioners used to

fictitiously inflate the apparent capital of the Guarantors in order to make them more attractive to sources of finance like the Respondent-Bondholders herein.

### (i) Egyptian Governmental Agency Investigations of the Petitioners

46. A number of Egyptian governmental agencies have conducted and are conducting investigations of relevant financial fraud by the Petitioners.

47. The Egyptian Capital Markets Authority (the "CMA") -- a financial regulatory agency analogous to the Securities and Exchange Commission -- has determined that the Petitioners have violated Egyptian banking and securities laws by their fraudulent manipulation of, and then fraudulent misrepresentations concerning, the apparent values of Lakah-controlled companies, including HCFI, TMSE, Medequip, ASF, and various others.

48. For example, the CMA determined that in 1998, the Lakahs conspired with AlEman, as aforementioned, to establish fake trading accounts and perform fictitious trades of Lakah company securities in order to pump the prices of the stocks in question. The purpose of the sham transactions was to artificially inflate the value of the stock of the parent company, HCFI.

49. The CMA found, *inter alia*, that the sham transactions engaged in by the Lakahs resulted in "economically unjustified" increases (a) of the stock price of ASF by almost 100%; (b) of the stock price of TMSE by 81.65%; and (c) of the stock price of Medequip by 78%. Furthermore, in each case, immediately following the fraudulent and artificial stock price increase, the shares of stock were transferred from Ramy Lakah

and Michel Lakah to HCFI.

50. The resulting fraudulently inflated financials of HCFI, etc. became the basis of the representations made in the OC, which in turn induced the Bondholders to purchase the Lakah Eurobonds.

51. In addition to the CMA, the following other Egyptian governmental agencies have conducted and are conducting investigations of frauds by the Petitioners in relation to their manipulation of the Guarantors (among other companies): The Central Bank of Egypt; The Administrative Control Authority; The Ministry of Taxation; The Ministry of Investment; The Public Prosecutor (including the Bureau of Public Funds).

        (ii)    **The Petitioners Are Being Prosecuted Criminally For Financial Frauds In Egypt**

52. In January 2003, the Cairo Criminal Court (North District Circuit 19) froze the personal assets of the Petitioners (and of their families) based on evidence presented by the CMA and by the Egyptian Public Prosecutor General (the "Public Prosecutor"). The Public Prosecutor charged the Lakahs with, *inter alia*, fraudulent manipulation of financial information concerning the Lakah Group.

53. The criminal prosecution of the Petitioners remains pending.

        (iii)    **The Petitioner Ramy Lakah is Being Investigated Criminally For Financial Fraud in France**

54. Since not later than December 2005, Petitioner Ramy Lakah has been under criminal investigation by a Paris Magistrate for misuse of company property

consisting of "dubious fund transfers" between one of his French companies and one of his related English companies. Approximately €14,000,000 was said to have been found thus far to have been transferred.

55. Also in 2005, Petitioner Ramy Lakah was reportedly being investigated for an unexplained transfer of €200,000 from his French-based company, Air Horizons, to an unrelated Lakah-owned U.K. company, Trading Medical System Ltd.

E. **The Petitioners' Clandestine Stripping of the Guarantors' Assets**

56. Petitioners surreptitiously stripped the operating company Guarantors of their assets.

57. Only two months after the issuance of the Bonds, Petitioners consummated the clandestine sale of all or virtually all of the operating assets of Guarantor ASF and diverted the proceeds of the sale from ASF (and from HCFI).

58. Not long after the initial interest payment default, and during the tenor of the Bonds, the Petitioners surreptitiously transferred, without consideration, the assets and businesses of TMSE and of Medequip to seemingly-unrelated Successor Companies (MedTech, Technowave and Life Care).

59. As a result, TMSE and Medequip were eviscerated and became incapable of fulfilling their obligations as Guarantors to the Bondholders (including Respondents).

60. Petitioners directly, indirectly or beneficially own and/or control the Successor Companies.

F.     **Misrepresentations In the Bond Transaction Documents**

61.    The Bonds were offered and marketed to the international financial community, primarily through the Offering Circular.

62.    The OC states, in relevant part, that all of the information contained in it was provided by the Issuer and Guarantors, rather than the Managers, and that that information is "true and accurate in all material respects and is not misleading in any material respect; that the opinions and intentions expressed in this Offering Circular with regard to such information are honestly held; and that there are no other facts the omission of which would make this Offering Circular as a whole or any such information or the expression of any such opinions or intentions misleading in any material respect... ."

63.    The material omissions and misrepresentations in the Bond Transaction Documents included, but were not limited to, grossly-inflated financials of the various Guarantor companies, overstatements of the value of the respective Guarantors' assets, and omissions regarding the imminent secret sale of ASF's assets.

64.    As a result of the manipulations by the Petitioners, the representations in the OC were materially false, incomplete and/or misleading, and thus induced the Respondents to purchase Bonds. (The Respondents each suffered extensive injury as a result.)

## REQUEST FOR RELIEF

65. Respondents repeat and re-allege the allegations in paragraphs 1 through 64 of their Cross-Petition.

66. Petitioners have failed, neglected or refused to arbitrate under the parties' written agreements, and Respondents-Cross-Petitioners pray that this Court will direct Ramy Lakah and Michel Lakah to appear and participate in the pending Arbitration.

WHEREFORE, Respondents-Cross-Petitioners respectfully request that the Court issue an order compelling the Petitioners to arbitrate, and grant such other relief as it deems just and proper.

Dated:   April 16, 2007
         New York, New York

MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, PC

By: _____
Gilbert A. Samberg (GS-2610)
David L. Barres (DB-2129)
Chrysler Center
666 Third Avenue
New York, New York 10017
(212) 935-3000
(212) 983-3115 (facsimile)
