(d)     The Registrar shall carry out all other acts as it may deem necessary to give effect to the Conditions.

## SECTION 603.     Documents and Forms for the Registrar.

(a)     The Issuer shall deliver to the Registrar for the performance of its duties hereunder a supply of forms of Bonds in amounts sufficient to meet the Registrar's expected requirements upon the initial issue of Bonds and for the performance of the Registrar's duties.

(b)     The Registrar shall maintain in safe custody all Bonds and forms of Bonds delivered to and held by it.

(c)     Within seven days of any request therefor by the Issuer or the Trustee, so long as any Bonds are Outstanding, the Registrar shall certify to the Issuer, the Guarantors and the Trustee the number of Bonds held by it hereunder.

## ARTICLE SEVEN

## REDEMPTION

SECTION 701.     Redemption.

(a)     The Issuer hereby agrees that if the Issuer elects to redeem the Bonds (in whole) prior to their scheduled Maturity Date in accordance with the Conditions, the Issuer shall give notice of the election to the Trustee not less than 15 days prior to the date on which the Issuer will give notice to the Holders of Bonds in accordance with the Conditions of the redemption in order to enable the Trustee to perform its duties herein and in the Conditions.

(b)     Upon receipt of notice from the Issuer of its election to redeem, the Trustee shall publish the notice required in connection with any such redemption. That notice shall specify the date fixed for redemption, the redemption amount and the manner in which redemption will be effected. Each such notice shall be published in accordance with the Conditions. The Trustee shall notify the Paying Agents of any date fixed for redemption of any Bonds.

## ARTICLE EIGHT

## SUPPLEMENTAL INDENTURES

SECTION 801.     Supplemental Indentures Without Consent of Holders.

Without the consent of any Holder of Bonds, at any time and from time to time the Issuer, when authorized by a Board Resolution, and with the authorization of the Guarantors (evidenced by their execution of the relevant Supplemental Indentures or otherwise pursuant to Board Resolutions), together with the Trustee may enter into one or more Supplemental Indentures, in form satisfactory to the Trustee, for any of the following purposes:

(i)     to add to the covenants of the Issuer or the Guarantors for the benefit of the Holders or to surrender any right or power herein conferred upon the Issuer or the Guarantor or to add a new entity as a Guarantor; or

NY—363575.8

(ii)    to add any additional Events of Default; or

(iii)    without prejudice to the rights of the Holders with respect to Acts of the Holders at Meetings, to evidence and provide for the acceptance of appointment hereunder by a successor Agent or Trustee in accordance with this Indenture and to add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of this Indenture; or

(iv)    to cure any ambiguity, to correct or supplement any provision herein that may be inconsistent with any other provision herein or that is otherwise defective or to make any other provision with respect to matters or questions arising under this Indenture as the Issuer and the Trustee may deem necessary or desirable, provided that such action pursuant to this clause (v) shall not adversely affect the interest of any Holder of Bonds in any material respect; or

(v)    `to make any other change that does not adversely affect the rights of any Holder;

provided that, any such Supplemental Indenture which affects any of the Agents or the Trustee may not be entered into without the consent of that Agent or the Trustee, as the case may be; and provided, further, that, notwithstanding the foregoing references in this Section to any such Supplemental Indenture's requiring the authorization of the Guarantors and having to be satisfactory to the Guarantors, if, in the opinion of the Issuer, acting reasonably, none of the matters provided for in a Supplemental Indenture shall in any way affect any of the rights or obligations of a Guarantor hereunder, then the Supplemental Indenture shall, without execution by that Guarantor, have binding effect if otherwise adopted as provided herein by the necessary parties other than that Guarantor if the procedures listed below are followed: (1) the Issuer shall give the relevant Guarantor notice of the matters to be dealt with in the Supplemental Indenture at least ten (10) Business Days before the proposed effective date of the Supplemental Indenture, specifying that date therein; and (2) if the relevant Guarantor has not on or before the proposed effective date denied its authorization as to those matters or any of them or has not requested any change to the proposed Supplemental Indenture, the authorization of that Guarantor to that Supplemental Indenture shall be deemed given. A copy of all such Supplemental Indentures shall be provided to the Guarantors.

**SECTION 802.    Supplemental Indentures With Consent of Holders.**

(a)    With the consent of the Holders, by Act of the Holders delivered to the Issuer and the Trustee, the Issuer, when authorized by a Board Resolution, and the Trustee may enter into a Supplemental Indenture for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of the Holders under this Indenture; provided, however, that no such Supplemental Indenture shall, without the consent of the Holders of the Bonds affected thereby as specified in Condition 15(b), amend any of the matters set forth in Condition 15(b) other than as set forth in that Condition, or amend the rights of Holders to receive payments of all amounts due and payable on the Bonds, except as set forth in Section 408; provided, further, however, that, notwithstanding the foregoing reference in this Section to any such Supplemental Indenture's being entered into by the Guarantors, if, in the opinion of the Issuer, acting reasonably, none of the matters provided for in any such Supplemental Indenture shall in any way affect any of the rights or obligations of a Guarantor hereunder, then such Supplemental Indenture shall, without execution by that Guarantor, have binding effect if otherwise adopted as provided herein by the necessary parties other than that Guarantor, and if the procedures listed below are followed (it being understood, however, that the matters referred to in Condition 15(b)(i)-(viii) will in all circumstances require the express prior written consent of each Guarantor): (i) the Issuer shall give the relevant Guarantor notice of the matters to be dealt with in the Supplemental Indenture at least ten Business Days before the proposed

47

effective date of the Supplemental Indenture, specifying that date therein; and (ii) if relevant Guarantor has not on or before the proposed effective date denied its authorization as to those matters or any of them or has not requested any change to the proposed Supplemental Indenture, the authorization of that Guarantor to that Supplemental Indenture shall be deemed given. A copy of all such Supplemental Indentures shall be provided to the Guarantors.

(b)     It shall not be necessary for any Act of Holders under this Section to approve the particular form of any proposed Supplemental Indenture, but it shall be sufficient if any Act shall approve the substance thereof.

SECTION 803.     Execution of Supplemental Indentures.

In executing or accepting the additional trusts obligations created by any Supplemental Indenture permitted by this Article or the modifications thereby of the trusts obligations created by this Indenture, each of the Trustee and each Agent shall be entitled to receive and (subject to Section 501) shall be fully protected in relying upon an Opinion of Counsel and Officer's Certificate stating that the execution of that Supplemental Indenture is authorized or permitted by this Indenture. Each of the Trustee and each Agent may, but shall not be obligated to, enter into any such Supplemental Indenture that affects the Trustee's or that Agent's own rights, duties or immunities under this Indenture or otherwise.

SECTION 804.     Effect of Supplemental Indentures.

Upon the execution of any Supplemental Indenture under this Article, this Indenture shall be modified in accordance therewith, that Supplemental Indenture shall form a part of this Indenture for all purposes and every Holder of Bonds theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

SECTION 805.     Reference in Bonds to Supplemental Indentures.

Bonds authenticated and delivered after the execution of any Supplemental Indenture pursuant to this Article may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such Supplemental Indenture. If the Issuer shall so determine, new Bonds so modified as to conform, in the opinion of the Issuer and the Trustee, to any such Supplemental Indenture may be prepared and executed by the Issuer, with the *aval* of the Guarantors endorsed thereon, and authenticated and delivered by the Authenticating Agent in exchange for any outstanding Bonds affected by the Supplemental Indenture.

SECTION 806.     Notice of Supplemental Indentures.

Promptly after the execution by the Issuer, if applicable, the Guarantors, and the Trustee of any Supplemental Indenture pursuant to the provisions of Section 802, the Issuer shall give notice, setting forth in general terms the substance of that Supplemental Indenture, in the manner provided in Section 105 and, if that Supplemental Indenture did not require the consent of any Guarantor or Agent, shall also give notice, setting forth in general terms the substance of that Supplemental Indenture, to that Guarantor and that Agent in the manner provided in Section 104 and shall provide a conformed copy of that Supplemental Indenture to the Trustee and each of the Agents. Any failure of the Issuer to give such a notice, or any defect therein, shall not in any way impair or affect the validity of any such Supplemental Indenture.

NY—363575.8

### ARTICLE NINE

### MEETINGS OF HOLDERS OF BONDS

**SECTION 901.    Purposes for Which Meetings May Be Called.**

A Meeting of the Holders may be called at any time and from time to time to make, give or take any request, demand, authorization, direction, notice, consent, election, waiver or other action provided by this Indenture or under applicable law to be made, given or taken by Holders. The Issuer shall provide prior written notice to the Guarantors and the Trustee of any Meeting called by the Issuer.

**SECTION 902.    Call, Notice and Place of Meetings.**

(a)    The Trustee may, and on the written request of the Issuer or Holders (subject to the Trustee being indemnified to its reasonable satisfaction against all costs and expenses thereby occasioned) representing at least ten per cent. (10 per cent.) in aggregate principal amount of the Outstanding Bonds shall, call a Meeting of Holders for any purpose specified in Section 901. Any such Meeting shall be held at such time and at such place as the Trustee shall determine. The Trustee may participate in such meeting simultaneously in New York, by any means of telecommunications which permits the participants to hear and speak to each other, and any simultaneous meeting shall be deemed to constitute a single meeting for purposes of the Quorum and voting percentage applicable to such meeting. Notice of every Meeting of Holders of Bonds, setting forth, in general, the time and the place of, and the agenda for, that Meeting, shall be given, in the manner provided in Section 105, not less than 15 and not more than 60 days prior to the date fixed for the Meeting.

(b)    In the case of a Meeting being held pursuant to a written request of Holders, the agenda for the Meeting shall be as set forth in the request and the meeting shall be convened within 30 days from the date the request is received by the Trustee.

**SECTION 903.    Persons Entitled to Vote at Meetings.**

To be entitled to vote at any Meeting of Holders, a Person shall be (i) a Holder of one or more Outstanding Bonds, or (ii) a Person appointed by an instrument in writing as proxy for a Holder or Holders of one or more Outstanding Bonds by such Holder or Holders. The only Persons who shall be entitled to be present or to speak at any Meeting of Holders shall be the Persons entitled to vote at that Meeting and their counsel, and representatives of the Trustee and its counsel and any representatives of the Issuer or the Guarantors and their respective counsel. With respect to all matters not specifically contemplated by this Indenture, Meetings shall be held in accordance with New York law.

**SECTION 904.    Quorum; Action.**

(a)    One or more Persons entitled to vote 66-2/3 per cent. in principal amount of the Outstanding Bonds shall constitute a quorum ("*Quorum*") for a Meeting of the Holders. In the absence of a Quorum within 45 minutes of the time appointed for any such Meeting, the Meeting may be adjourned for a period of not less than five and not more than 30 days. At any reconvening of a Meeting adjourned for lack of Quorum, one or more Persons entitled to vote a majority in principal amount of the Outstanding Bonds shall constitute a Quorum. Notice of the reconvening of any adjourned Meeting shall be given as provided in Section 902(a), except that such notice need only be published not less than three days prior to the date on which the Meeting is scheduled to be reconvened. Any Holder who has executed an instrument in writing appointing a Person as proxy shall be deemed to be present for the purposes of determining a Quorum and be deemed to have voted; provided that such Holder shall be considered as

49

present or voting only in respect of the matters covered by such instrument in writing (which may include authorization to vote on any other matters as may come before the Meeting).

(b)    Except as limited by the provisos to Section 802 and by the provisions of Section 402, Section 407 and Section 408, any modifications, amendments or waivers to this Indenture or the Conditions shall require the lesser of (i) the consent of the Holders of Bonds representing a majority in principal amount of the Outstanding Bonds affected thereby or (ii) the approval of Persons entitled to vote 75 per cent. in principal amount of the Bonds represented and voting at a Meeting of the Holders duly called in accordance with the provisions hereof and at which a Quorum is present. Any modification, amendment or waiver approved in accordance with the provisions of this Section 904 shall be binding on all the Holders of Bonds, whether or not present or represented at the Meeting.

SECTION 905.    Determination of Voting Rights; Conduct of Meetings.

(a)    Notwithstanding any other provisions of this Indenture, the chairman of the Meeting may make such reasonable regulations as it may deem advisable for any meeting of Holders of Bonds in regard to proof of the holding of Bonds and of the appointment of proxies and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate. Except as otherwise permitted or required by any such regulations, the holding of Bonds shall be proved in the manner specified in Section 103(a) or Section 103(b) and the appointment of any proxy shall be proved in the manner specified in Section 103(a). Such regulations may provide that written instruments appointing proxies, regular on their face, may be presumed valid and genuine without the proof specified in Section 103(b) or other proof.

(b)    The Trustee shall, by an instrument in writing, appoint a temporary chairman of the Meeting. A permanent chairman and a secretary of the Meeting shall be elected by vote of the Persons entitled to vote a majority in principal amount of the Outstanding Bonds represented at the Meeting.

(c)    At any Meeting, each Holder of a Bond or proxy shall be entitled to one vote for each U.S. $10,000 principal amount of Bonds held or represented by the Holder; provided, however, that no vote shall be cast or counted at any Meeting in respect of any Bond challenged as not Outstanding and ruled by the chairman of the Meeting to be not Outstanding. The chairman of the Meeting shall have no right to vote, except as a Holder of a Bond or as a proxy. All decisions and determinations of the chairman of the Meeting regarding the number of votes that the Holder of each Bond is entitled to shall, in the absence of manifest error, be conclusive for all purposes and irrevocably binding upon the Issuer and all Holders of Bonds.

(d)    Any Meeting of Holders of Bonds duly called pursuant to Section 902 at which a Quorum is present may be adjourned from time to time by Persons entitled to vote a majority in principal amount of the Outstanding Bonds represented at the Meeting; and the Meeting may be held as so adjourned without further notice.

SECTION 906.    Counting Votes and Recording Action of Meetings.

The vote upon any resolution submitted to any Meeting of Holders of Bonds shall be by written ballots on which shall be subscribed the signatures of the Holders of Bonds or of their representatives by proxy and the principal amounts and serial numbers of the Outstanding Bonds held or represented by them. The chairman of the Meeting shall appoint two inspectors of votes who shall count all votes cast at the Meeting for or against any resolution and who shall make and file with the secretary of the Meeting their verified written reports in duplicate of all votes cast at the Meeting. A record, at least in duplicate,

of the proceedings of each Meeting of Holders of Bonds shall be prepared by the secretary of the Meeting and there shall be attached to the record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more Persons having knowledge of the facts setting forth a copy of the notice of the Meeting and showing that the notice was given as provided in Section 902 and, if applicable, Section 904. Each copy shall be signed and verified by the affidavits of the chairman and secretary of the Meeting and one such copy shall be delivered to the Issuer and another to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the Meeting. Any record so signed and verified shall be conclusive evidence of the matters therein stated.

**SECTION 907.     Act of Holders in Lieu of Meetings.**

Notwithstanding any other provision of this Article Nine, any action by Holders of Bonds that may be taken at a Meeting of those Holders may be taken without a Meeting, without prior notice and without a vote, if a written Act of Holders of Bonds in accordance with Section 103 setting forth the action so taken is duly delivered to the Trustee and the Issuer and the Guarantors by Holders of Bonds having not less than the minimum number of votes that would be necessary to authorize or take such action at a Meeting at which Holders representing all Bonds entitled to vote thereon were present and voted. Prompt notice of the taking of the action without a Meeting specified in the Act of Holders shall be given by the Issuer to those Holders of Bonds who have not consented in writing to that Act of Holders.

# ARTICLE TEN

## COVENANTS AND REPRESENTATIONS

**SECTION 1001.     Taxes and Stamp Duties; Other Costs and Expenses.**

The Issuer agrees to pay any and all stamp, issue, registration, documentary or other similar taxes and other duties (including interest thereon and penalties with respect thereto) that may be payable in connection with, and to reimburse Holders for any such taxes or duties paid be Holders in connection with, the execution, delivery, performance and enforcement of this Indenture, the Bonds and the Paying Agency Agreement. In addition, the Issuer agrees to be responsible for and to reimburse Holders for any costs or expenses (including court and collection fees, if any, in Egypt) incurred in connection with occurrence and continuance of an Event of Default or in protecting or enforcing any of their rights or remedies under this Indenture or the Bonds.

**SECTION 1002.     Currency Indemnity.**

Each reference in this Indenture or the Conditions to a specified currency is of the essence. All payments hereunder and in respect of the Bonds shall be made in U.S. Dollars. To the fullest extent permitted by applicable law, the obligations of the Issuer and the Guarantors in respect of any amount due under the Bonds, the Guarantee or this Indenture shall, notwithstanding any payment in any other currency (whether pursuant to a judgement or otherwise), be discharged only to the extent of the amount in U.S. Dollars that the Person entitled to receive that payment may, in accordance with normal banking procedures, purchase with the sum paid in such other currency (after any premium and costs of exchange) on the Business Day immediately following the date on which that Person receives that payment, and the Issuer and the Guarantors shall indemnify each such Person against any deficiency arising or resulting from any variation in rates of exchange between the date as of which the amount due in U.S. Dollars is notionally converted into such other currency for the purposes of any such judgement or otherwise and the date of actual payment in such other currency. If the amount in U.S. Dollars that may be so purchased for any reason falls short of the amount originally due, the Issuer or the Guarantors shall pay such

51

additional amount, in U.S. Dollars, as may be necessary to compensate for the shortfall. Any obligation of the Issuer or a Guarantor not discharged by payment in such other currency shall be due as a separate and independent obligation, which, to the extent permitted by applicable law, shall continue in full force and effect, until discharged as provided herein, notwithstanding any judgement or order for a liquidated sum or sums in respect of amounts due in respect of the Bonds or otherwise under the Guarantee or this Indenture or under any such judgement or order or any indulgence granted from time to time, and shall give rise to a separate and independent cause of action. Any such shortfall will be deemed to constitute a loss suffered by the Person entitled to the relevant payment and no proof or evidence of any loss will be required.

**SECTION 1003.    Payment of Principal, Interest and Other Amounts.**

The Issuer shall duly and punctually pay, in U.S. Dollars, the principal amount of, interest on, and all other amounts (including any Additional Amounts required by Condition 7), if any, owing in respect of, the Bonds in accordance with the Conditions and this Indenture. Each Guarantor shall duly pay, in U.S. Dollars, at the time specified in the Guarantee, the amount payable by it thereunder in accordance with the terms of the Guarantee. Any payment to be made in respect of the Bonds or the Guarantee by the Issuer or a Guarantor may be made as provided in the Conditions and this Indenture and, to the extent so made, will be good and valid discharge of the relevant payment obligations of the Issuer or the Guarantors, as the case may be, under the Bonds or the Guarantee, subject to the terms and conditions thereof.

**SECTION 1004.    Status.**

The Issuer and each Guarantor will insure that its respective obligations under the Bonds and this Indenture, and, in the case of a Guarantor, under the Guarantee, will constitute its direct, general, unconditional, unsubordinated, and subject to the provisions relating to the negative pledge covenant of the Issuer or such Guarantor, as the case may be, unsecured obligations of the Issuer or such Guarantor, respectively, and will at all times rank at least *pari passu* in priority of payment with all other present and future unsecured and unsubordinated Indebtedness of the Issuer or such Guarantor, as the case may be, except for any obligations that may be preferred by provisions of law that are both mandatory and of general application.

**SECTION 1005.    Covenants in Conditions and Guarantee.**

(a)        Negative Pledge.

(i)        Issuer's Negative Pledge and Related Covenants.  So long as any Bond remains Outstanding, the Issuer will not:

(A)        directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any of its property or assets, whether now owned or held or hereafter acquired, other than a pledge or assignment of the net proceeds of the Bonds or any similar debt instruments to secure a loan or other financing arrangement made in favor of any one or more of the Guarantors contemporaneously with the issuance of the Bonds or such other debt instruments;

(B)        engage in any business or activity other than the financing of the business activities of the Parent Guarantor and its Subsidiaries and such other activities as are incidental thereto or necessary in connection therewith; or

52

(C)    have or form, or cause or permit to be formed, any Subsidiaries or subsidiary undertakings or have any employees or premises.

(ii)    <u>Guarantors' Negative Pledge and Related Covenant</u>. So long as any Bond remains Outstanding, no Guarantor will, and each Guarantor shall procure that none of its Subsidiaries (if any) will, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any of its property or assets or any property or assets of any of its Subsidiaries, whether now owned or held or hereafter acquired, to secure:

(A)    any Relevant Indebtedness or any guarantee in respect of any Relevant Indebtedness; or

(B)    any Indebtedness or any guarantee in respect of any Indebtedness, other than a Permitted Lien;

unless, in each case, provision has been made whereby the Bonds are secured to the satisfaction of the Trustee equally and ratably with the Relevant Indebtedness or, as the case may be, the Indebtedness secured by such Lien for so long as such Relevant Indebtedness or, as the case may be, Indebtedness is so secured, or such other security or guarantee for the Bonds has been provided, which the Trustee in its absolute discretion shall have deemed to be not materially less prejudicial to the Holders or which shall have been approved by an Extraordinary Resolution of the Holders.

In particular, without limiting the generality of the foregoing, so long as any of the Bonds remains Outstanding, no Guarantor will take any action for the liquidation or winding-up of the Issuer.

(b)    <u>Financial Covenants</u>.

(i)    <u>Maintenance of Net Worth</u>. So long as any Bond remains Outstanding, the Parent Guarantor will, at all times, maintain a Net Worth of not less than E£1 billion.

(ii)    <u>Financial Ratios</u>. So long as any Bond remains Outstanding, the Parent Guarantor agrees that:

(A)    the ratio of its Indebtedness (as defined in Section 101, except that there shall be excluded therefrom, solely for purposes of this Section 1005(b)(ii), any Indebtedness incurred in connection with the purchase of medical equipment, which is then leased or resold, provided that the Indebtedness is fully secured by lease receivables or promissory notes issued by lessees or purchasers of such equipment) to Net Worth shall not exceed 1:1;

(B)    the ratio of its Indebtedness (as defined in Section 101, except that there shall be excluded therefrom, solely for purposes of this Section 1005(b)(ii), any Indebtedness incurred in connection with the purchase of medical equipment, which is then leased or resold, provided that the Indebtedness is fully secured by lease receivables or promissory notes issued by lessees or purchasers of such equipment) to EBITDA shall not exceed 4.5:1; and

(C)    at each Calculation Date, the ratio of EBITDA to Interest shall not be less than 3.0:1.

NY—363575.8

(iii)   <u>Compliance Certificate</u>.  Not later than 90 days after each Calculation Date falling on December 31 in any year, the Issuer shall deliver, or shall cause to be delivered, to the Trustee a certificate duly executed by any two members of the Board of Directors of the Parent Guarantor and a certificate of the Independent Auditors, in each case, certifying, to the best of their knowledge and belief (after reasonable inquiry), whether or not the Parent Guarantor was in compliance with the covenants set forth in Section 1005(b)(i) and Section 1005(b)(ii)(A), (B) and (C) above on the last Calculation Date; and, not later than 60 days after each Calculation Date falling on June 30 in any year, the Issuer shall deliver, or shall cause to be delivered, to the Trustee a certificate duly executed by any two members of the Board of Directors of the Parent Guarantor and a certificate of the Independent Auditors, in each case, certifying, to the best of their knowledge and belief (after reasonable inquiry), whether or not the Parent Guarantor was in compliance with the covenants set forth in Section 1005(b)(i) and Section 1005(b)(ii)(A), (B) and (C) above on the last Calculation Date.

(iv)   <u>Opportunity to Remedy</u>.  Notwithstanding the foregoing, on the first occasion that the Parent Guarantor is not in compliance with the covenant set forth in Section 1005(b)(i) or any ratio set forth in Section 1005(b)(ii)(A), (B) and (C), it shall, prior to the date which is not later than 90 days from the Calculation Date certified by any two directors of the Parent Guarantor and the Independent Auditors to be the first date upon which such covenant or ratio (as the case may be) was not complied with and the next date on which interest or any other amount is or becomes due and payable in respect of the Bonds, whichever is earlier, remedy such non-compliance, such remedy to be confirmed by a certificate given by the Independent Auditors within 14 days of such remedy; and provided further that the Parent Guarantor shall have the right to remedy any such non-compliance in the manner set out in this Section 1005(b)(iv) on not more than one occasion.

(c)   <u>Limitations on Related Party Transactions</u>.

(i)   <u>Limitations applicable to the Guarantors</u>.  So long as any Bond remains Outstanding, no Guarantor shall, or shall permit any of its Subsidiaries to, directly or indirectly, enter into any transaction with a Related Party, including the renewal or extension of any such transaction, other than transactions intended to effect the plan of reorganization referred to in Section 1005(e)(v) below, unless (A) the transaction has been approved by the Trustee or by an Extraordinary Resolution of Holders or (B)(1)the transaction is on terms no less favorable to such Guarantor or such Subsidiary than those that could be obtained in a comparable arm's length transaction with an entity that is not a Related Party, (2) such Guarantor or such Subsidiary, as the case may be, has complied with, and has obtained all regulatory and other approvals necessary under, applicable law and regulations of Egypt or any other applicable jurisdiction, (3) the transaction is in the ordinary course of business activities of such Guarantor or such Subsidiary, as the case may be, and (4) the transaction has been approved by at least a majority of the disinterested members of the Board of Directors of such Guarantor or such Subsidiary, as the case may be.

The terms of this Section 1005(c)(i) shall not apply to any transaction, or series of similar transactions, involving an aggregate amount of U.S. $250,000 or less (or the equivalent in any other currency) between any Guarantor or any Subsidiary of a Guarantor, on the one hand, and any Related Party, on the other.

As soon as practicable following (and in any event within ten Business Days after) the completion of the annual audit by the independent auditors of the financial statements of each Guarantor, the relevant Guarantor shall cause such auditors to deliver to the Trustee a letter certifying, based on such audit, that neither such Guarantor nor any of its Subsidiaries has, directly or indirectly, entered into any transaction with a Related Party (including any renewal or extension of any such transaction), except in compliance with the provisions of this 1005(c)(i). Thereafter, from time to time, but not more frequently than once within any period of 30 consecutive calendar days, at the request of the Trustee, each Guarantor shall deliver to the Trustee a certificate of a duly authorized representative of such Guarantor to the effect that, as of the date of such certificate, neither such Guarantor nor any of its Subsidiaries has, directly or indirectly, entered into any transaction with a Related Party (including the renewal or extension of any such transaction), except in compliance with the provisions of this 1005(c)(i).

(ii) <u>Lakah Family Undertaking</u>.  Messrs. Ramy Lakah and Michel Lakah hereby agree, for the benefit of the Trustee and the Holders, that, so long as any Bond remains Outstanding, they will not directly or indirectly own or control more than 35 per cent. of the Capital Stock of, or otherwise exercise control of or assume any managerial or executive position in, any company or other entity (other than any Subsidiary in existence on the Issue Date, so long as the Parent Guarantor and/or the Lakah Family together continue to own at least 35 per cent. of the issued share capital of, and to control, such Subsidiary) conducting any of the following activities in Egypt in competition with any of the Subsidiaries:  (A) the distribution, sale or leasing of medical equipment and supplies; (B) the construction, sale and leasing of medical facilities; or (C) the management and servicing of hospitals and medical centers.

(d) <u>Provisions Concerning Distributions</u>.

(i) <u>Limitations on the Issuer</u>.  So long as any Bond remains Outstanding, the Issuer shall not declare or pay any dividends to its shareholders or make any other distribution of assets, properties, cash, rights, obligations or securities on account of any interest in the Issuer.

(ii) <u>Limitations on the Parent Guarantor; Funding Obligation</u>.  So long as any Bond remains Outstanding, the Parent Guarantor shall not declare or pay any dividends to its shareholders or make any other distribution of assets, properties, cash, rights, obligations or securities on account of any interest in the Parent Guarantor or any of its Subsidiaries (A) at any time when there exists an Event of Default or an event that, with the passage of time, the giving of notice, or both, may give rise to an Event of Default, or (B) at any time when no such Event of Default exists, (1) more frequently than once during any calendar year or (2) in an aggregate amount exceeding 75 per cent. of the Consolidated Net Income of the Parent Guarantor for the period in respect of which the dividends are being paid or the distribution is being made.  The foregoing limitation shall not, however, apply to distributions by the Parent Guarantor of shares of its capital stock in connection with an increase of capital.  The Parent Guarantor further agrees that it will procure that sufficient funds are at all times made available to the Issuer to enable it to meet its liabilities in respect of the Bonds and otherwise under the Indenture as and when they fall due.

(iii) <u>Obligations Binding on the Subsidiary Guarantors</u>.  So long as any Bond remains Outstanding, no Guarantor will, and each Guarantor will not permit any of its Subsidiaries to, directly or indirectly, create or suffer to exist or enter into any agreement

NY—363575.8

with any person that would cause any consensual encumbrance or restriction of any kind on the ability of such Guarantor or any of its Subsidiaries (A) to pay dividends or make other distributions in respect of its capital stock; (B) to pay Indebtedness owed to the Issuer or any other Guarantor; (C) to make any loans or advances to the Issuer or any other Guarantor; (D) to transfer any of its properties or assets to the Issuer or any other Guarantor; or (E) to guarantee any Indebtedness of the Issuer or any other Guarantor, in any case, except for such encumbrances or restrictions existing under or by reason of (1) applicable law, (2) customary provisions restricting subletting or assignment of any lease or assignment of any other contract to which any Guarantor is a party or to which any of their respective properties or assets are subject, (3) any agreement or other instrument of a Person acquired by any Guarantor in existence at the time of such acquisition (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired, so long as the agreement containing such restriction does not violate any other provision of the Conditions or this Indenture, (4) encumbrances and restrictions in effect on the Issue Date and (5) encumbrances and restrictions substantially similar to those contained in the Conditions or this Indenture or otherwise in accordance with normal banking practices in Egypt.

(e)     Restrictions on Disposals of Assets.

(i)     Disposals of Assets. So long as any Bond remains Outstanding, none of the Issuer or any Guarantor will, and each will procure that its Subsidiaries will not, either in a single transaction or in a series of transactions, whether related or not and whether voluntarily or involuntarily, sell, assign, convey, transfer, grant or otherwise dispose of any of its or their assets or property to any Person, other than to another Guarantor or a Subsidiary of a Guarantor.

(ii)     Exceptions. The restrictions set forth in Section 1005(e)(i) shall not apply to:

(i)     disposals of any assets for Fair Market Value the consideration for which is received by the Issuer or the Guarantor making such disposal simultaneously with the disposal in cash or Cash Equivalents or, to the extent of not more than 25 per cent. of such consideration, evidenced by a promissory note or other similar debt instrument of the purchaser or assignee secured by the assets or property then being sold or assigned;

(ii)     disposals of trading assets or the expenditure of cash in the ordinary course of trading for Fair Market Value;

(iii)     disposals of obsolete or redundant plant and equipment, or of real property not required for the operation of its business, for Fair Market Value;

(iv)     disposals of assets for Fair Market Value where the proceeds of the disposal are to be reinvested in the purchase of replacement assets, which are comparable or superior as to type, value and quality;

(v)     subject to Section 1005(f) and the related provisions of Condition 14, disposals of all or any part of the Capital Stock of any Subsidiary Guarantor, or of any other Subsidiary of the Parent Guarantor or any Subsidiary Guarantor, in accordance with a plan of reorganization pursuant to which such Capital Stock is transferred to another entity or entities (the "New Owner(s)"), provided that (A) after giving effect to such reorganization, the Parent Guarantor

56

and/or the Lakah Family together own at least 51 per cent. of the issued share capital of, and control, the New Owner(s), (B) the New Owner(s) unconditionally and irrevocably guarantee the obligations of the Issuer in respect of the Bonds on a joint and several basis with the Guarantors on the terms set forth in the Guarantee and (C) for purposes of calculating and determining compliance with the covenants set forth in Section 1005(b)(i) and Section 1005(b)(ii)(A), (B) and (C), the financial statements of the Parent Guarantor and the New Owner(s) shall be consolidated on a pro forma basis;

   (vi)    the payment of fees, interest and expenses under and in connection with the Bonds; and

   (vii)    disposals of assets for Fair Market Value not otherwise permitted under this Section 1005(e), provided that the aggregate Fair Market Value of assets disposed of since January 1st in any year shall not exceed U.S. $5,000,000 during any consecutive 12 calendar months.

(f)    Consolidation, Merger, Conveyance or Transfer.

(i)    Conditions to Consolidation, Merger, Conveyance or Transfer. Neither the Issuer nor any Guarantor shall, except as permitted by the Trustee or an Extraordinary Resolution of Holders, consolidate with or merge into any other Person or convey or transfer in one transaction or a series of transactions all or substantially all of its properties or assets to any other Person unless:

   (A)    the Person formed by the consolidation or into which the Issuer or such Guarantor is merged or the Person that acquires by conveyance or transfer all or substantially all of the properties and assets of the Issuer or such Guarantor (the "Successor Company") agrees in writing to assume the obligation to make due and punctual payment of all amounts payable under the Bonds and the Guarantee (as the case may be) and all other obligations of the Issuer or such Guarantor (as the case may be) under the Bonds, the Guarantee and this Indenture;

   (B)    immediately after giving effect to the transaction, no Event of Default will have occurred and be continuing;

   (C)    the Issuer or such Guarantor, as the case may be, has delivered to the Trustee (1) a certificate of an Authorized Representative thereof stating that the consolidation, merger, conveyance or transfer complies with this Section 1005(f) and that all requirements set forth herein relating to the transaction have been complied with and (2) an opinion of counsel that the Successor Company has validly assumed the obligations to be assumed by it pursuant to clause (A) above and that the Indenture, the Guarantee and the Bonds constitute legal, valid and binding obligations of the Successor Company, enforceable against it in accordance with their terms, subject to bankruptcy, insolvency, reorganization or other laws of general applicability relating to or affecting the enforcement of creditors' rights and to general equity principles; and

   (D)    the Successor Company expressly agrees (1) to indemnify each Holder of a Bond against any BVI Taxes or Egyptian Taxes (as the case may be) thereafter imposed on that Holder solely as a consequence of the consolidation, merger, conveyance or transfer, and (2) subject to Condition 7 of the Bonds, to pay such Additional Amounts or provide such indemnity as may be necessary in order that the net amounts received by the

57

Holders of Bonds shall, after any deduction or withholding of BVI Taxes or Egyptian Taxes and any present or future taxes, duties, assessments or other governmental charges of whatever nature imposed or levied by or on behalf of, or within any political subdivision of, or any authority having power to tax in any other jurisdiction in which the Successor Company is incorporated or is engaged in business, equal the amounts that would have been received in respect of those Bonds in the absence of the consolidation, merger, conveyance or transfer.

(ii)    <u>Effect of Consolidation, Merger Conveyance or Transfer</u>.   Upon any consolidation, merger, conveyance or transfer in accordance with this Section 1005(f), the Successor Company shall succeed to and be substituted for, may exercise every right and power of, and shall be bound by every obligation of, the Issuer or the relevant Guarantor, as the case may be, under the Bonds and the Guarantee with the same effect as if the Successor Company had been named as the Issuer or Guarantor, as the case may be.

(g)    <u>Release of Banque du Caire Pledge</u>.   The Parent Guarantor shall have obtained a full and complete release of the Banque du Caire Pledge, and shall have delivered to the Trustee evidence, in form and substance satisfactory to the Trustee, of such release.

(h)    <u>Other Covenants</u>.   Without prejudice to the foregoing, each of the Issuer and each Guarantor shall observe, perform and comply with each of the acts, covenants and agreements contained in the Conditions and the Guarantee, which are to be performed by it.

## SECTION 1006.    Maintenance of Offices or Agencies; Changes in Agents.

(a)     The Issuer agrees that, for so long as any Bond is Outstanding, or until moneys for the payment of all amounts in respect of all Outstanding Bonds have been made available to the Principal Paying Agent or have been returned to the Issuer or, if applicable, a Guarantor, as provided herein, there shall at all times be a Paying Agent and a Transfer Agent with a specified Office in one of the jurisdictions referred to in Section 507 which, so long as the Bonds are listed on a Stock Exchange, shall be in such place as may be required by the rules and regulations of the relevant Stock Exchange, and there shall at all times be a Registrar and a Transfer Agent with specified Offices in New York City. Any variation, termination, appointment or change of a Paying Agent, Registrar or Transfer Agent shall only take effect (other than in the case of insolvency, when it shall be of immediate effect) after not less than 30 and not more than 45 days' prior notice thereof shall have been given to the Holders of Bonds in accordance with the Conditions.

(b)     Subject to the preceding subparagraph (a), the Issuer reserves the right at any time or from time to time to vary the appointment of any Agents or to appoint any additional or other Agents, with, in the case of the Principal Paying Agent and the Registrar, the consent of the Trustee, and with, in all cases, the consent of the Guarantors. The Issuer will give prompt written notice to the Guarantors, the Agents and the Holders of the appointment or termination of the appointment of any Agent and of the location and any change in the location of any such agency and, in the case of the Guarantors, of the proposed appointment or termination of any Agent.

## SECTION 1007.    Delivery of Certain Information.

(a)     For so long as any Bonds remain Outstanding and are "restricted securities" within the meaning of Rule 144 (a)(3) under the Securities Act, if at any time the Issuer or a Guarantor, as the case may be, is neither subject to Section 13 or 15(d) of the Exchange Act nor exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or beneficial owner of a Bond,

NY—363575.8

the Issuer or such Guarantor will promptly furnish or cause to be furnished Rule 144A Information to that Holder or beneficial owner, to a prospective purchaser of such Bond designated by that Holder or beneficial owner or to the Trustee or any relevant Paying Agent for delivery to that Holder or beneficial owner or prospective purchaser, as the case may be, in order to permit compliance by that Holder or beneficial owner with Rule 144A in connection with the resale of that Bond by that Holder or beneficial owner, and the Issuer and each Guarantor will otherwise comply with the requirements of Rule 144A(d)(4) under the Securities Act. *"Rule 144A Information"* shall be such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

(b)    The Issuer and each Guarantor shall give, or procure to be given, to the Trustee such opinions, certificates, information and evidence as the Trustee shall reasonably require, including (but without prejudice to the generality of the foregoing) all such certificates called for by the Trustee being for the purpose of the discharge or exercise of the duties, powers, authorities and discretions vested in it hereunder or by operation of law.

(c)    Without limiting the generality of the foregoing, the Issuer and each Guarantor shall forthwith:

(i)    give notice in writing to the Trustee, for distribution by it to the Holders, of the coming into existence of any Event of Default concerning the Issuer or such Guarantor or of any Lien, which would require any security to be given in respect of the obligations of the Issuer or the relevant Guarantor pursuant to the provisions of the negative pledge covenant of the Issuer or such Guarantor, as the case may be; and

(ii)    in order to enable the Trustee to ascertain the principal amount of the Bonds Outstanding at any time, deliver to the Trustee upon being so requested in writing by the Trustee a certificate in writing signed by its Authorized Representative setting out the total number and aggregate principal amount of the Bonds which are at the date of such certificate known by it to be held by any Person (including but not limited to the Issuer or such Guarantor, as the case may be) for the benefit of the Issuer or any Guarantor.

**SECTION 1008.    Money or Property to Be Held by the Paying Agents.**

(a)    Subject to any prior payment or deposit thereof pursuant to Article Three, the Issuer shall deposit with the Principal Paying Agent at or prior to the opening of business on the second Business Day prior to each due date for the payment of principal of, any interest on, or any other amount (including Additional Amounts) owing in respect of, the Bonds, a sum sufficient to pay such principal, interest or other amount then becoming due in accordance with the Conditions, such sum to be held for the benefit of the Persons entitled to such amounts. Subject to any prior payment or deposit thereof pursuant to Article Three, each Guarantor shall deposit with the Principal Paying Agent, on or prior to the due date for payment by that Guarantor of any amount payable by it under the Guarantee, a sum sufficient to pay that amount, that sum to be held for the benefit of the Persons entitled to any portion of that amount.

(b)    Any amounts deposited with any Paying Agent for the payment of the principal amount of, interest on, and all other amounts, if any, owing in respect of, any Bond (whether under such Bond or under the Guarantee) and remaining unclaimed for two years after the Relevant Date shall be delivered to the Issuer or, if deposited by or for a Guarantor, to that Guarantor; and the Holder of that Bond shall thereafter, subject to the provisions of Section 309 and the Conditions, look only to the Issuer or, if applicable, a Guarantor (subject to Section 309(a)(vi)), for payment thereof, and all liability of that Paying Agent with respect to those amounts shall thereupon cease; provided, however, that a Paying Agent, before being required to repay any such amounts to the Issuer or to a Guarantor, shall at the expense of

the Issuer cause notice to be given as provided in Section 105, that those amounts remain unclaimed and that, after a date specified therein, which shall be not less than 30 days from the latest date of the notice, any unclaimed balance then remaining will be repaid to the Issuer or, if applicable, a Guarantor.

**SECTION 1009.    Further Assurances.**

Each of the Issuer and each Guarantor shall execute and deliver or cause to be executed and delivered, all such additional instruments, and do, or cause to be done, all such additional acts as (i) may be necessary or proper to carry out the purposes of this Indenture and the Paying Agency Agreement, (ii) may be necessary or proper to transfer to any successor Trustee or co-trustee or any successor Agent the estate, powers, instruments and funds held in trust hereunder, or (iii) the Trustee or any Agent may reasonably request.

**SECTION 1010.    Compliance with Laws.**

Each of the Issuer and each Guarantor shall comply with all applicable laws, regulations and guidelines of governmental and regulatory authorities relevant in the context of the issuance and sale of the Bonds, in the case of the Issuer, and in the context of the issuance of the Guarantee, in the case of the Guarantors, and shall submit or procure the submission on its behalf of such reports or information as may be required from time to time for compliance with such laws, regulations and guidelines.

**SECTION 1011.    Use of Proceeds.**

The Issuer agrees to apply the net proceeds from the sale of the Bonds to make a deposit with a Swiss banking institution, which will lend funds to the Parent Guarantor against a charge over such deposit (the *"Charge over Deposit"*), and the Parent Guarantor agrees to on-lend funds to each Subsidiary Guarantor. The Issuer and each Guarantor agree to execute and deliver all agreements, documents and other instruments, and to take all other action, necessary or advisable in connection with the deposit of such proceeds with the Swiss banking institution, the loan by such Swiss banking institution to the Parent Guarantor and the on-lending of funds by the Parent Guarantor to the Subsidiary Guarantors.

NY—363575.8

**IN WITNESS WHEREOF,** the parties hereto have caused this Indenture to be duly executed as of the day and year first above written.

Address for Notices:

c/o CITCO B.V.I. Limited
CITCO Building
Wickhams Cay
P.O. Box 662
Road Town, Tortola
British Virgin Islands

Address for Notices:

68, Merghany Street
Heliopolis, Cairo
Egypt

Address for Notices:

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

Address for Notices:

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

Address for Notices:

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

**LAKAH FUNDING LIMITED**

By_____
  Name: RAMY LAKAH
  Title: CHAIRMAN

**HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E.**

By_____
  Name: RAMY LAKAH
  Title: CHAIRMAN

**MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.**

By_____
  Name: RAMY LAKAH
  Title: CHAIRMAN

**TRADING MEDICAL SYSTEM EQUIPMENT, S.A.E.**

By_____
  Name: RAMY LAKAH
  Title: ATTORNEY IN FACT

**ARAB STEEL FACTORY, S.A.E.**

By_____
  Name: RAMY LAKAH
  Title: ATTORNEY IN FACT

61

Address for Notices:

101 Barclay Street, Floor 21W
New York, New York 10286

**THE BANK OF NEW YORK,**
as Trustee

By

Name:    TREVOR BLEWER
Title:      ASSISTANT VICE PRESIDENT

Accepted and Agreed
solely for purposes of
Section 1005(c)(ii) as of
the date first written above:

By:
Ramy Lakah

By:
Michel Lakah

62

**ANNEX 1**

FORM OF PAYING AGENCY AGREEMENT

December 8, 1999

**THE BANK OF NEW YORK**

Dear Sirs:

     By an Indenture, dated as of December 8, 1999 (as amended and supplemented from time to time, the *"Indenture"*), Lakah Funding Limited, a company with limited liability organized under the International Business Companies Act (CAP 291) of the British Virgin Islands (the *"Issuer"*), having its registered office at c/o CITCO B.V.I. Limited, CITCO Building, Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands; Holding Company for Financial Investments (Lakah Group), S.A.E., Medequip for Trading and Contracting, S.A.E., Trading Medical System Equipment, S.A.E., Arab Steel Factory, S.A.E., each a joint stock company incorporated under the laws of Egypt (collectively, the *"Guarantors"* and each, individually, a *"Guarantor"*), each having its registered office at 68, Merghany Street, Heliopolis, Cairo, Egypt; and The Bank of New York, a bank organized under the laws of the State of New York, acting through its principal corporate trust office in New York City at 101 Barclay Street, Floor 21W, New York, New York 10286, as trustee (it and any successor in that capacity, the *"Trustee"*), The Bank of New York, acting through its principal corporate trust office in New York City (*"BNY – New York"*), was appointed as the Principal Paying Agent; The Bank of New York, London branch, acting through its principal corporate office in London (*"BNY – London"*), was appointed as a Paying Agent; and Banque Internationale à Luxembourg S.A. (*"BIL"*) was appointed as a Paying Agent, in each case, in respect of the U.S. $100,000,000 12 per cent. Bonds due 2004 (the *"Bonds"*) issued by the Issuer with the Guarantee of the Guarantors. In addition, each of BNY – New York, BNY – London and BIL was appointed as a Transfer Agent and an Authenticating Agent (in that capacity, an *"Authenticating Agent"*) and BNY – New York was appointed as the Registrar (in that capacity, the *"Registrar"*). Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Indenture.

     This will confirm that the Issuer has appointed (i) each of BNY – New York, BNY - London and BIL as the Paying Agents (in the case of BNY – New York, the Principal Paying Agent) for the payment of principal, interest and other amounts on the Bonds and as Transfer Agents for the transfer and exchange of Bonds, and as Authenticating Agents to authenticate the Bonds, and (ii) BNY – New York as the Registrar in respect of the Bonds, each as provided in the Indenture and in the Conditions. In accepting these appointments by executing this Agreement, each of BNY – New York, BNY - London and BIL hereby agrees to perform the respective duties of such Agents in accordance with the terms of the Indenture and the Conditions.

     In connection with the Bonds, the Issuer hereby appoints Banque Internationale à Luxembourg S.A. as its agent to list the Bonds on the Luxembourg Stock Exchange. In accepting this appointment by executing this Agreement, BIL hereby agrees to perform the duties of such a listing agent as set forth separately in an agreement between it and the Issuer.

I-1

Unless any Paying Agent has been advised by the Principal Paying Agent, before the opening of business on any due date for payment in respect of the Bonds, that the necessary funds have not been transferred by the Issuer or any Guarantor to the account designated by the Principal Paying Agent, as required by the Indenture, each Paying Agent may, in accordance with the Conditions, make payments with respect to the Bonds presented to it for payment without cost to the Holders thereof but no Paying Agent shall be obligated by any provision herein or otherwise to make any payments prior to such time as it shall have received from the Issuer, a Guarantor, the Principal Paying Agent or any other Paying Agent the funds necessary to make such payment.

Upon receipt of either mail, telex or telecopy notification from any Paying Agent appointed herein that such Paying Agent has made payments with respect to the Bonds presented to such Paying Agent for payment, the Principal Paying Agent shall promptly reimburse such Paying Agent, from funds it has received from the Issuer or a Guarantor, in an amount corresponding to such payments in U.S. Dollars by credit to such Paying Agent's account previously specified to the Principal Paying Agent for such purpose.

Each Agent shall cancel (in such a manner as not to obliterate the serial numbers thereof) all Bonds paid or redeemed by it on a monthly basis, and, promptly thereafter, shall send such Bonds to the Registrar at 101 Barclay Street, Floor 21W, New York, New York 10286.

Any cancelled Bonds sent to the Registrar shall be accompanied by a certificate stating (i) the amount paid in respect of such Bonds, and (ii) the serial numbers in numerical sequence of such Bonds, in each case distinguishing between Bonds of different denominations.

Bonds surrendered to an Agent which have become void in the manner described in the Bonds shall be cancelled as above and forwarded to the Registrar.

If (A) any Agent, as a Paying Agent, has notified the Principal Paying Agent that it has paid amounts with respect to the Bonds, including any additional amounts due in respect of taxation, and those amounts exceed the amounts payable under the Conditions of the Bonds in respect of the cancelled Bonds received from such Paying Agent by the Principal Paying Agent, and (B) within 30 days after such Paying Agent's receipt of notice from the Principal Paying Agent or the Issuer of such discrepancy, such Paying Agent shall not have provided satisfactory evidence of payment with respect to additional Bonds to substantiate its original notification, it shall forthwith reimburse the Issuer in an amount corresponding to the payments, and the commissions related thereto, not so substantiated by cancelled Bonds. All risk, claims and costs arising out of or relating to loss of the Bonds redeemed or the Bonds paid or cancelled by an Agent shall be borne by such Agent until such Bonds shall have been received by the Principal Paying Agent.

Each Agent shall be entitled to such commissions for services rendered as such Agent as separately agreed by it with the Issuer.

The Issuer and each Guarantor shall, jointly and severally, indemnify and hold each Agent harmless against any losses, liabilities, costs, claims, actions, demands or expenses (including, but not limited to, all reasonable costs, legal fees, charges and expenses paid or incurred in disputing or defending any of the foregoing) which such Agent may incur or which may be made against such Agent as a result of or in connection with its appointment or the exercise of its powers and duties under this Agreement except such as may result from its own gross negligence or its own willful misconduct or that of its officers, directors or employees.

I-2

All payments shall be made by each Paying Agent in accordance with the Indenture and the Conditions. In acting hereunder and in connection with the Bonds, each Agent shall act solely as the agent of the Issuer and, in the case of the Paying Agents, also as agent of the Guarantors, and none of the Agents shall thereby assume any obligation or relationship of agency or trust for or with any of the Holders of the Bonds except that all funds (if any) held by any Agent for payment to the Holders of the Bonds shall be applied as set forth herein and in the Indenture; provided, however, that after an Event of Default, the Trustee may, by written notice to the Issuer and any Paying Agent, require any Paying Agent to thereafter act, at the expense of the Issuer, as the agent of the Trustee in respect of payments to be made by or on behalf of the Trustee under the provisions of the Indenture and to hold all funds, documents and records received or held by that Paying Agent on behalf of the Trustee.

Each reference in this Agreement to a specified currency is of the essence. All payments hereunder and in respect of the Bonds shall be made in U.S. Dollars. To the fullest extent permitted by applicable law, the obligations of the Issuer and the Guarantors in respect of any amount due under the Bonds, the Guarantee or this Agreement shall, notwithstanding any payment in any other currency (whether pursuant to a judgement or otherwise), be discharged only to the extent of the amount in U.S. Dollars that the Person entitled to receive that payment may, in accordance with normal banking procedures, purchase with the sum paid in such other currency (after any premium and costs of exchange) on the Business Day immediately following the date on which that Person receives that payment, and the Issuer and the Guarantors shall indemnify each such Person against any deficiency arising or resulting from any variation in rates of exchange between the date as of which such amount due in U.S. Dollars is notionally converted into such other currency for the purposes of any such judgement or otherwise and the date of actual payment in such other currency. If the amount in U.S. Dollars that may be so purchased for any reason falls short of the amount originally due, the Issuer or the Guarantors shall pay such additional amount, in U.S. Dollars, as may be necessary to compensate for the shortfall. Any obligation of the Issuer or a Guarantor not discharged by payment in such other currency shall be due as a separate and independent obligation, which, to the extent permitted by applicable law, shall continue in full force and effect, until discharged as provided herein, notwithstanding any judgement or order for a liquidated sum or sums in respect of amounts due in respect of the Bonds or otherwise under the Guarantee or this Agreement or under any such judgement or order or any indulgence granted from time to time, and shall give rise to a separate and independent cause of action. Any such shortfall will be deemed to constitute a loss suffered by the Person entitled to the relevant payment and no proof or evidence of any loss will be required.

Each Agent agrees to notify the Issuer, the Guarantors, each other Agent and the Trustee in writing, 15 days prior thereto, of any change in the name of such Agent or the address of the office (in the same city as your office referred to in the Bonds) through which it will act as Agent, after which change the agency with respect to the Bonds shall be continued under such Agent's name or be located at such new address, as the case may be, on the terms and conditions hereof. Each Agent agrees to notify the Issuer, the Guarantors, each other Agent and the Trustee in writing at least 30 days prior to resigning hereunder.

Except as otherwise expressly provided in the Indenture, the Issuer shall notify each Agent, in writing, 30 days prior thereto, of the termination of such Agent's appointment as an Agent in respect of the Bonds, whereupon this Agreement shall terminate as to such Agent and all amounts due to such Agent hereunder shall promptly be paid to it.

Each Agent shall be entitled to the benefits and protections provided for it as Agent in the Indenture.

This Agreement is governed by, and shall be construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. The provisions of Section 110 and Section 111 of the Indenture are hereby incorporated by reference into this Agreement, *mututatis mutandis*, as fully as if set forth at this place.

NY—363575.8

Please confirm your acceptance of the terms and provisions of this Agreement by signing and returning to us the enclosed copy of this Agreement as soon as possible.

Yours faithfully,

**LAKAH FUNDING LIMITED**

**Address for Notices:**

c/o CITCO B.V.I. Limited
CITCO Building
Wickhams Cay
P.O. Box 662
Road Town, Tortola,
British Virgin Islands

By_____
  Name:
  Title:

**Address for Notices:**

68, Merghany Street
Heliopolis, Cairo
Egypt

**HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E.**

By_____
  Name:
  Title:

**Address for Notices:**

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

**MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.**

By_____
  Name:
  Title:

**Address for Notices:**

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

**TRADING MEDICAL SYSTEM EQUIPMENT, S.A.E.**

By_____
  Name:
  Title:

**Address for Notices:**

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

**ARAB STEEL FACTORY, S.A.E.**

By_____
  Name:
  Title:

NY—363575.8

Each of the undersigned hereby confirms its acceptance of its appointment on the terms and conditions contained herein, in the Indenture and in the Conditions.

Address for Notices:

101 Barclay Street, Floor 21W
New York, New York 10286

THE BANK OF NEW YORK,
    as Trustee, Principal Paying Agent, a Transfer
    Agent and the Registrar


By_____
    Name:
    Title:

Address for Notices:

One Canada Square
London E14 5AL, England

THE BANK OF NEW YORK,
    as a Paying Agent and a Transfer Agent


By_____
    Name:
    Title:

Address for Notices:

69 Route d'Esch
L-1470 Luxembourg

BANQUE INTERNATIONALE A
LUXEMBOURG S.A.
as a Paying Agent, a Transfer Agent and the
Luxembourg Listing Agent


By_____
    Name:
    Title:

NY—363575.8

**ANNEX II**

FORM OF LETTER OF APPOINTMENT

[date]

[NAME AND ADDRESS OF NEW AGENT]

Re:      **U.S. $100,000,000 12 per cent. Bonds due 2004
          of Lakah Funding Limited**

Reference is hereby made to (i) the Indenture, dated as of  December 8, 1999 (as amended and supplemented from time to time, the *"Indenture"*), by and among Lakah Funding Limited, a company with limited liability organized under the International Business Companies Act (CAP 291) of the British Virgin Islands (the *"Issuer"*), having its registered office at c/o CITCO B.V.I. Limited, CITCO Building, Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands; Holding Company for Financial Investments (Lakah Group), S.A.E., Medequip for Trading and Contracting, S.A.E., Trading Medical System Equipment, S.A.E. and Arab Steel Factory, S.A.E., each a joint stock company incorporated under the laws of Egypt (collectively, the *"Guarantors"* and each, individually, a *"Guarantor"*), each having its registered office at 68, Merghany Street, Heliopolis, Cairo, Egypt; and The Bank of New York, a bank organized under the laws of the State of New York, acting through its principal corporate office in New York City at 1 Wall Street, New York, New York 10286, as trustee (it and any successor in that capacity, the *"Trustee"*); and (ii) the Paying Agency Agreement dated as of the same date among the Issuer, the Guarantors and The Bank of New York, acting through its principal corporate office in New York City and the other entities acting thereunder as Agents (as amended, the *"Paying Agency Agreement"*).  Terms used and not otherwise defined herein are used as defined in the Indenture.

The Issuer hereby appoints _____ (the *"Appointee"*) as [identify nature of agency] with respect to the Bonds and the Indenture and under the Paying Agency Agreement, and the Appointee, by returning to the Issuer a copy of this Appointment Letter executed below by the Appointee, hereby accepts that appointment.  By accepting that appointment, the Appointee agrees to be bound by, and to perform and comply with all the duties and obligations of [identify nature of agency position] as set forth in the Indenture, the Paying Agency Agreement and the Conditions, to the extent applicable to this appointment.

I-1

The agreement set forth in this Appointment Letter shall be construed in accordance with and governed by the laws of the State of New York without regard to its principles of conflict of laws.

Address for Notices:

c/o CITCO B.V.I. Limited
CITCO Building
Wickhams Cay
P.O. Box 662
Road Town, Tortola,
British Virgin Islands

**LAKAH FUNDING LIMITED**

By_____
   Name:
   Title:

Address for Notices:

68, Merghany Street
Heliopolis, Cairo
Egypt

Consented to by:

**HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E.**

By_____
   Name:
   Title:

Address for Notices:

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

**MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.**

By_____
   Name:
   Title:

Address for Notices:

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

**TRADING MEDICAL SYSTEM EQUIPMENT, S.A.E.**

By_____
   Name:
   Title:

Address for Notices:

c/o Holding Company for Financial
Investments (Lakah Group), S.A.E.
68, Merghany Street
Heliopolis, Cairo
Egypt

AGENT'S ACCEPTANCE:

Accepted:

**ARAB STEEL FACTORY, S.A.E.**

By_____
   Name:
   Title:

II-2

NY—363575.8