Gilbert A. Samberg (GS-2610)
David L. Barres (DB-2129)
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
(212) 935-3000
(212) 983-3115 (facsimile)

*Attorneys for Respondents UBS AG, Exporters Insurance Company, Ltd.,*
*Arab Banking Corporation, National Bank of Abu Dhabi and National Bank of Oman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In the Matter of the Application of            )
                                               )
RAMY LAKAH and MICHEL LAKAH,                   )
                                               )
                           Petitioners,        )
                                               )
For a judgment pursuant to Article 75 of       )
the C.P.L.R. staying the arbitration           )
commenced by                                   )       07-CV-2799 (MGC) (FM)
                                               )
UBS AG, EXPORTERS INSURANCE                    )       **DECLARATION OF**
COMPANY, LTD., ARAB BANKING                    )       **GILBERT A. SAMBERG**
CORPORATION, NATIONAL BANK OF ABU              )
DHABI and NATIONAL BANK OF OMAN,               )
                                               )
                           Respondents.        )
-----------------------------------------------------------x

     GILBERT A. SAMBERG, pursuant to 28 U.S.C. § 1746, states and declares as follows:

     1.    I am a member of Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., attorneys for Respondents-Cross-Petitioners UBS AG ("UBS"), Exporters Insurance Company, Ltd. ("EIC"), Arab Banking Corporation, Ltd. ("ABC"), National Bank of Abu Dhabi ("NBAD") and National Bank of Oman ("NBO") (collectively the "Respondents" or "Bondholders"). I make this Declaration in opposition to the Petition of Ramy Lakah and

Michel Lakah ("collectively "Petitioners" or the "Lakahs") to stay arbitration, and in support of the Respondents' Cross-Petition to compel arbitration.

2.      I make this Declaration upon personal knowledge except where indicated otherwise, in which case a source of the information is exhibited and/or described herein.

3.      The Declaration of Dr. Amgad Zarif, dated April 16, 2007 (the "Zarif Decl."), together with supporting exhibits, is annexed hereto as Ex. 1. The Declaration of Michael Haigh, dated August 21, 2006 (the "Haigh Decl.") is annexed hereto as Ex. 2.

### A.    Background

4.      On December 8, 1999, Lakah Funding Limited ("LFL" or the "Issuer"),[1] issued a 5-year $100,000,000 Eurobond (the "Bonds" or "Eurobonds"), pursuant to the Bond Transaction Documents. True and accurate copies of the "Bond Transaction Documents" are annexed hereto as Exs. 6 - 10: (1) the Offering Circular, dated December 6, 1999, relative to the Bonds (the "OC") (see Ex. 6); (2) the Regulation "S" Global Bond (see Ex. 7), including the Terms and Conditions of the Bonds ("TCB") (see Ex. 8); (3) the Guarantee, dated as of December 8, 1999, made jointly and severally by each of the Guarantors to and in favor of the Trustee for the benefit of the bondholders (see Ex. 9); and (4) the Indenture, dated as of December 8, 1999, among the Issuer, the Guarantors, and The Bank of New York, acting through its principal corporate trust office in New York City, as Trustee (the "Trustee") (the "Indenture"), for the benefit of the bondholders, providing for the issuance of the Bonds (see Ex. 10). Interest on the

---

[1]   LFL is a special purpose vehicle, incorporated under the laws of the British Virgin Islands and is a wholly-owned subsidiary of their holding company, the Holding Company for Financial Investments (Lakah Group), S.A.E., ("HCFI"). (See Ex. 6, OC at 2.)

2

bonds was 12% per annum, payable semi-annually in arrears. (See the Ex. 6, OC (passim); Ex. 8, the TCB at § 4.)

5.  The Bonds were guaranteed jointly and severally, *per aval*, by the "Guarantors" as primary obligors. (See Ex. 6, OC (passim).)

6.  After initial interest payments were made on or about June 8, 2000 and December 8, 2000, no further payments of Bond interest, nor any payment of principal, nor any payment of any other kind, were made by the Issuer or any of the Guarantors. Thus, the Issuer and the Guarantors are in default on their principal and interest payment obligations under the Bonds.

7.  The Respondents are Eurobond holders, who thereby suffered enormous injury.

8.  On June 8, 2006, in accordance with the arbitration provisions in the Bond Transaction Documents, the Bondholders filed a Demand for Arbitration and Statement of Claim, dated June 8, 2006 (the "Demand for Arbitration and Statement of Claim") with the American Arbitration Association (New York) against the Petitioners, and against Lakah Funding Limited ("LFL"), the Issuer; Holding Company for Financial Investments (Lakah Group), S.A.E. ("HCFI"), Trading Medical Systems Egypt, S.A.E. ("TMSE"), Medequip for Trading and contracting, S.A.E. ("Medequip"), and Arab Steel Factory, S.A.E. ("ASF," along with HCFI, TMSE and Medequip, each a "Guarantor" and together the "Guarantors"); as well as several companies believed to be Corporate successors to the Guarantors: Medical Technology, S.A.E. ("MedTech"), Technowave, S.A.E. ("Technowave"), and Life Care Technology, S.A.E. ("Life Care," along with MedTech

3

and Technowave, the "Successor Companies") (the "Arbitration")  (A true and accurate copy of the Demand for Arbitration and Statement of Claim is annexed hereto as Ex. 3.)

9. The Demand for Arbitration, together with a Notice Pursuant to New York Civil Practice Laws and Rules (the "CPLR") 7503(c) (the "7503 Notice"), were delivered to and received by Petitioners.  (A true and accurate copy of the 7503 Notice is annexed hereto as Ex. 4.)

10. Petitioner Michel Lakah received service in Montreal via Federal Express on June 12, 2006.  (A true and accurate copy of the pertinent Affidavit of Service, dated July 20, 2006, together with additional proof of service, are annexed hereto as part of Ex. 5.)  Petitioner Ramy Lakah was served in Paris, in accordance with French rules regarding service of process by a bailiff ("hussier") on July 20, 2006.  (A true and accurate copy of the pertinent Affidavit of Service, is annexed hereto as part of Ex. 5.)  It is evident from Petitioners' subsequent conduct, including their filing of a Petition to Stay Arbitration, that they each received the Demand for Arbitration and the 7503 Notice.

11. Petitioners Ramy Lakah and Michel Lakah have not formally appeared in the Arbitration.

12. For the reasons set forth below, The Bondholders oppose the Petition and have Cross-Petitioned to compel the Lakahs, in their individual capabilities, to appear and participate in the Arbitration.

13. Three related arbitration clauses in the Bond Transaction Documents are invoked as the basis for the Arbitration.  (See Ex. 8, TCB § 18; Ex. 9, Guarantee § 13; and Ex. 10, the Indenture § 110.)

**B.   The Parties**

14.   UBS is a Swiss corporation, having its head offices in Zurich and Basel, Switzerland, and having a branch in New York, among other places. EIC is a corporation organized in Bermuda, having its registered seat in Hamilton, Bermuda. ABC is a corporation organized in the Kingdom of Bahrain, having its head office in Manama, and having a branch in New York, among other places. NBAD corporation organized in the United Arab Emirates, having its head office in the Emirate of Abu Dhabi. NBO is a corporation organized in the Sultanate of Oman, having its head office in Muscat.

15.   UBS, ABC, EIC, NBAD, and NBO are holders of Bonds in the following principal face amounts respectively: UBS (US $17,420,000); EIC (US $10,000,000); ABC (US $10,000,000); NBAD (US $5,000,000); and NBO (US$ 5,000,000).

16.   Petitioner Ramy Lakah (a/k/a Ramy Raymond Lakah a/k/a Ramy Ramon Lakah) is an individual citizen of Egypt and of France. After having been a domiciliary of Egypt from birth, he became a domiciliary of France in or about 2001. (Business Today.com, dated November 2004, a true and accurate copy which is annexed hereto as Ex. 11 hereto.) Upon information and belief, he recently moved his residence to England. As more fully set forth below, Ramy Lakah is the dominant and controlling figure in the Lakah Group companies, including the Issuer and the Guarantors. He and his brother, Petitioner Michel Lakah, together own and control at least 70% of the shares of HCFI, which in turn owns all or virtually all of the shares of the Issuer and the other Guarantors. (See Ex. 6, OC at 16.) Upon information and belief, he is also the beneficial and equitable owner of, and he controls, MedTech, Technowave, and (either

currently or in the past) Life Care. Ramy Lakah is a signatory of all of the Bond Transaction Documents, and he is a party to and signatory of the Indenture. (See Certificate of Authorized Signatories for the Issuer and the Guarantors respectively, true and accurate copies of which are annexed hereto as Ex. 12.)

17. Petitioner Michel Lakah (a/k/a Michel Raymond Lakah a/k/a Michel Raymon Lakah) is an individual citizen of Egypt. After having been a domiciliary of Egypt from birth, he became a domiciliary of Canada in or about 2001. (See "Summer-time Business Blues," Al-Ahram Weekly Online, 16-22 August 2001, a true and accurate copy of which is annexed hereto as Ex. 13.) He currently resides in Montreal, Canada. As more fully set forth below, Michel Lakah is the second dominant and controlling person in the Lakah Group companies, including the Issuer and the Guarantors. He and his brother, Ramy Lakah, together own and control at least 70% of the shares of HCFI, which in turn owns all or virtually all of the shares of the Issuer and the other Guarantors. (See Ex. 6, OC at 16.) Upon information and belief, he is also the beneficial and equitable owner of, and he controls, MedTech, Technowave, and (either currently or in the past) Life Care. Michel Lakah is a party to and signatory of the Indenture. (See Ex. 10, Indenture at 62.)

18. <u>Lakah Family Undertaking</u>: The Lakahs executed the Indenture in their individual capacities with regard to one of the covenants therein. (See Ex. 10, Indenture § 1005(c)(ii).)

C. **Summary of Claims in Arbitration**

19. The principal claims against the Petitioners, the Guarantors and the Successor Companies in the Arbitration are: (1) for breach of contract based on defaults in payment by the Issuer and the Guarantors of virtually all interest and all principal on the Eurobond; (2) for fraudulent inducement of the Respondents herein to acquire the Eurobonds; and (3) for tortious interference with the performance by the Guarantors of their payment obligations. A more complete recitation of the claims in arbitration is set forth in the Demand for Arbitration and Statement of Claim. (See Ex. 3.)

D. **Piercing the Corporate Veil**

20. The Lakahs declared without reservation during the period in question that "the Lakah family remains firmly in control of the Lakah Group ...". (See, excerpt from Lakah Group website (http://www.lakah-group.com/mainfrm.htm), a true and accurate copy of which is annexed hereto as Ex. 14.)

21. The Issuer, the Guarantors, and the Lakahs represented in the Offering Circular, dated December 6, 1999, that the Lakahs exerted complete ownership control over HCFI -- owning 70% of the company's outstanding shares:

> Control of the Lakah Holding Company
> As at the date hereof [December 6, 1999], "Messrs. Ramy Lakah and Michel Lakah owned approximately 70 per cent. of the outstanding shares of the Lakah Holding Company [HCFI]. These shareholders are able to exert substantial control over the Lakah Holding Company [HCFI] and, as long as they directly or indirectly own such shares, they will have the ability to elect all of the Lakah Holding Company's directors, to cast a majority of the votes with respect to virtually all matters submitted to a vote of Lakah Holding Company's shareholders and to prevent a change in the control of the Lakah Holding Company.

7

See Ex. 6, OC at 16. (Emphasis added).

22. Prior to the issuance of the Bonds, the Lakah Group website (www.lakah-group.com/about.htm) reported the Lakahs' ownership stake in HCFI at no less than 90%. The website reported that Ramy Lakah owned 50% of the company's shares, while Michel Lakah owed 40%. The remaining shares of HCFI were purportedly owned by Banque du Caire. (See Ex. 14.)

23. In connection with the Euroband offering, Ramy Lakah was the sole authorized signatory, and the sole signatory in fact, on behalf of the Issuer and each of the Guarantors of all of the Bond Transaction Documents and of all of the documents related to the Eurobond issuance. (See Ex. 12.)

24. The Lakahs' ownership control of HCFI translated into ownership control over its virtually wholly-owned subsidiaries. HCFI owned 97.8% of Medequip shares (Ex. 6, OC at 42); 97.6% of TMSE shares (Ex. 6, OC at 50); and 97.9% of ASF shares. (Ex. 6, OC at 54.)

25. In addition to their respective ownership stakes as majority shareholders, the Lakahs were the senior-most officers and directors of HCFI and certain of the Guarantors. With respect to HCFI, for example, Ramy Lakah served as "Chairman" and "CEO" (see Ex. 6, OC at 71) and Michel Lakah served as "Vice Chairman" and co-"CEO" (Id.). With respect to Medequip, Ramy Lakah served as "Chairman" and a "Managing Director," while Michel Lakah also served as "Vice Chairman" and a "Managing Director". (See Ex. 1, Zarif Decl., Ex. D at 2.

26. In July 2001, PricewaterhouseCoopers observed that "Ramy Lakah is the dominant individual within the [Lakah] Group." (See excerpt from Report of

8

PricewaterhouseCoopers, dated July 18, 2001 (the "PWC Rpt."), a true and accurate copy of which is annexed hereto as Ex. 15, PWC Rpt. at 42.) Moreover, the Lakah companies were dependent upon the Lakahs' involvement as their leadership and public face:

> Most aspects of the Lakah Group's business depend on the services of certain key individuals. Each Subsidiary devotes considerable resources to recruiting, training and compensating such individuals. The Lakah Group's success has been significantly dependent on a number of key executives, including Mr. Ramy Lakah and Mr. Michel Lakah. ....

(Ex. 6, OC at 16.)

27. The Lakahs, by reason of their control, were required to provided the Bondholders with a form of guarantee or undertaking as to the viability, and thus the ability to perform, of the Guarantors. (See Ex. 10, Indenture § 1005(c)(ii); Ex. 8, TCB § 11(b).)

### 1. Failure to Observe Corporate Formalities and Separateness

28. <u>Common Facilities</u>: The Guarantors shared a common location and mailing address at 68 Merghany Street, Heliopolis, Cairo, Egypt. (See Ex. 6, OC at I-5.) All of the Guarantors (and all other Lakah Group companies) used a single common "Lakah Group" website. (See Ex.16, Lakah Group website excerpts.)

29. <u>Overlap in Officers and Directors</u>: In addition to the ubiquitous involvement of the Petitioners as directors and officers of the Issuer and the Guarantors, there was a substantial overlap of other officers and directors among the Guarantors. (See Affidavit of Ramy Lakah, dated March 6, 2007 ("R. Lakah Aff."), at ¶ 40.)

30. <u>Lack of Independent Directors/ Board Meetings</u>: The Guarantors rarely if ever convened meetings of their boards of directors or shareholders. (See, e.g., Ex. 1,

Zarif Decl. at ¶ 36.) Moreover, listings of corporate directors in Egyptian public filings were misleading, as the Lakahs could and did appoint and remove directors at will, and even without their knowledge. For example, although Dr. A. Zarif was listed for a time as a Director of Medequip in public filings, Dr. Zarif was unaware of his "appointment." (See id. at ¶¶ 34-38, Ex. D at 6.)

31. <u>Lack of Financial Oversight</u>: The Guarantors which were represented to be capitalized at roughly E£1.5 billion (or approximately US$450,000,000) and worth a multiple of that amount (see Ex. 6, OC at 8.) had no oversight mechanisms(s) with respect to the use of corporate funds. (See Ex. 1, Zarif Decl. at ¶¶ 32, 38.) Accordingly, the Lakahs alone determined how proceeds and funds of the Guarantors were to be used. (See <u>Id.</u> at ¶¶ 31-33.)

32. <u>Misuse of Corporate Funds</u>: It was common knowledge among employees of the Lakah companies that the Lakahs diverted corporate proceeds, particularly from the medical distributors, to their personal use. (See e.g., Ex. 1, Zarif Decl. at ¶ 33.) For example, the Lakahs used corporate funds to support their lavish lifestyles and to fund Ramy Lakah's political campaign in 2000. (<u>Id.</u>; Ex. 2, Haigh Decl. at ¶ 4.)

33. <u>Disregard for Corporate Distinctions</u>: The Lakahs disregarded corporate distinctions by securing the obligations of one Lakah Group entity with the assets of another. For example, in 1998, a bond guarantee facility extended to ASF by Banque du Caire was secured by HCFI's pledges of its stock in Medequip (800,000 shares) and in TMSE (400,000). (See, e.g., Ex.6, OC at 58.) Later, in order to recover those pledged shares, HCFI paid US $35,000,000 to Banque du Caire out of proceeds of loan

financing that it had received, which loan had been collateralized by LFL's proceeds of the Eurobond issue. (See, correspondence from Banque du Caire to Dewey Ballantine, dated Dec. 6, 1999, a true and accurate copy is annexed hereto as Ex. 14; PWC Rpt. at 56-59. True and accurate copies of the relevant pages of the PWC Rpt. are annexed hereto as Ex.17.)

### 2. Frauds Investigated and Prosecuted by Egyptian Governmental Agencies

34. <u>Securities Fraud</u>: In October 2000, the Egyptian Capital Markets Authority (the "CMA") -- an agency analogous to the Securities and Exhcnage Commission -- determined after investigations that the Lakahs had violated Egyptian banking and securities laws through fraudulent manipulation of the apparent values of Lakah-controlled entities, including the Guarantors (HCFI, TMSE, Medequip, and ASF). (A true and accurate copy of the CMA's summary of its conclusions, dated October 1, 2006 (the "October 1 CMA Summary"), is annexed hereto as Ex. 18.)

35. The CMA investigation established that between January and June 1998, the Lakahs conspired with their brokerage firm, AlEman Company for Financial Brokerage, to establish fake trading accounts and perform fictitious trades of the stocks of the various Guarantors, which shares were actually and secretly held personally by the Lakahs. (See Ex. 18 at 2.) Thus, Ramy Lakah and Michel Lakah traded these shares back and forth in order to pump up the prices of the stocks in question.

36. The CMA found that these sham transactions resulted in an "economically unjustified" increase by almost 100% of the stock price of ASF. (A true and accurate copy of the CMA's supplemental summary, dated October 18, 2006 (the "October 18 CMA Summary"), is annexed hereto as Ex. 19 at 1.) Similarly, the CMA found that the

TMSE stock price had been "unjustifiably" inflated by 81.65%, and that the Medequip stock price had been "unjustifiably" inflated by 78%. (Id.)

37. After inflating the stock prices of ASF, TMSE and Medequip, the Lakahs transferred ownership of their inflated shares to HCFI. (Id.) The ultimate purpose of the sham transactions was to artificially inflate the value of HCFI. Id. The fraudulently inflated financials of the Guarantors became the basis of the representations made in the OC, which in turn induced the Respondents to purchase the Eurobonds.

38. Banking Fraud: An investigation by the Egyptian Administrative Control Authority ("ACA") found that the Lakahs had colluded with officers of Misr International Bank to obtain forged bank certificates of deposit. (See Judgment of the Cairo Criminal Court, dated January 21, 2003 (the "Criminal Court Judgment"), a true and accurate copy of which is annexed hereto as Ex. 20.)

39. The forged bank certificates were used to fictitiously inflate the apparent capitalizations of the Guarantors, and thereby to fraudulently obtain additional credit facilities. (See id. at 7-8.) According to the ACA, the scheme elicited tens of millions of dollars in additional financing, including sizeable loans both to the Guarantors and to the Lakahs personally, that were never paid. (Id.) The ACA concluded that as a result of this fraud, the Lakahs personally converted millions in loan funds. (See id.)

40. Financial news sources reported that subsequent to the Bond default in 2000, Ramy Lakah owed as much as E£1.2 billon to Egyptian creditors, and as much as US $100 million to foreign investors. (See Exs. 11, 13.)

41. The Lakahs Have Been and Are Being Criminally Prosecuted in Egypt for Financial and Securities Frauds: In January 2003, based on the Public Prosecutor's

presentation of evidence from the CMA and the ACA to the Cairo Criminal Court (North District Circuit 19), the court issued a judgment that froze the assets in Egypt of each of the Lakahs (and of their families). (See Ex. 20.) The Criminal Court's prosecution of the Lakahs remains pending.

### 3. Post-Eurobond Default Frauds

42.    Surreptitious Sale of ASF's Assets: Approximately 1 ½ months after the Eurobond issue, on January 26, 2000, Ramy Lakah, as Chairman and CEO of the Lakah Group (i.e., HCFI) advised the Eurobond Trustee that "the Holding Company for Financial Investment (Lakah Group) is in advance [sic] negotiations for the sale of its steel business… ." (See facsimile correspondence, dated January 26, 2000, from Lakah Group to The Bank of New York, a true and accurate copy of which is annexed hereto as Ex. 21.) Upon review of the matter, the Trustee indicated to the Petitioners that their pending transaction required, in accordance with the Bond Transaction Documents, notice to and the consent of the Eurobond holders. (See correspondence dated February 14, 2000, from The Bank of New York to Lakah Group, a true and accurate copy of which is annexed hereto as Ex. 22.) The Lakahs provided no notice and sought no consents

43.    Instead, on February 16, 2000, Ramy Lakah, as Chairman and CEO of HCFI, and Michel Lakah, as Vice-Chairman and Co-CEO of HCFI, certified to the Eurobond Trustee that ASF had sold "certain of its assets" as of February 16, 2000; that "the assets sold by ASF … were sold for Fair Market Value … and the purchase price received in connection with the ASF Sale was received, in full, by ASF simultaneously with their disposal of the subject assets, 100% in cash." (See "Officers' Certificate", dated February 16, 2000, from Lakah Group to The Bank of New York, a true and

accurate copy is annexed hereto as Ex. 21.) The Lakahs further certified that the "ASF sale does not constitute a sale of 'all of the assets of any Guarantor, including ASF or the Company [i.e., HCFI]... ." (Id.)

44. In fact, the ASF assets that were sold comprised all of its operating assets, and the sale price of approximately E£331,000,000 consisted of approximately E£100,000,000 in cash and approximately E£221,000,000 in promissory noties, maturing sequentially, and avalized by the National Bank of Egypt. (See, e.g., PWC Rpt. at 56-59, true and accurate copies of the relevant pages of the PWC Rpt. are annexed hereto as Ex. 17.) Furthermore, the cash evidently vanished and the payment promissory notes were apparently diverted to Banque du Caire, another creditor of the Lakah Group, without challenge or objection by the Lakahs. (Id.)

45. Thus, within approximately two months of the Eurobond offer, one of the three operating company Guarantors had effectively been hollowed-out by the Lakahs. The Bondholders were left with the empty shell of ASF, which later defaulted on its Bond payment obligations as a Guarantor.

46. Nothing regarding the imminent sale of all of ASF's assets had been disclosed to the Petitioners in the Offering Circular for the Eurobonds. (See Ex. 6, OC, passim.)

47. The sale of all of ASF's operating assets was consummated despite the following representation in the OC: "The Guarantors covenant not to dispose of assets while Bonds are outstanding except for Fair Market Value and on similar terms." (Ex. 6, OC at 94-95.)

48. While at the time of the Bond offering in December 1999, the ASF's value was represented to be approximately E£597 million (see Ex. 6, OC at 33), two months later, all of ASF's operating assets were sold for E£331 million.

49. <u>Clandestine Stripping of the Business of TMSE and Medequip</u>: The assets and businesses of the two remaining operating Guarantors -- TMSE and Medequip -- were covertly transferred to other companies in 2002. (See, e.g., Ex. 1, Zarif Decl. ¶¶ 11, 12, 20-28.)

50. The business and assets of TMSE were transferred to MedTech. (<u>Id.</u> at 27.) The business and assets of Medequip was transferred to two successor entities: Techno Wave and Life Care. (<u>Id.</u> ¶¶ 11, 12, 21.)

51. The founding officers and directors of Life Care, Techno Wave and MedTech each have or had close ties with the Lakahs, as former officers and/or directors of Medequip or TMSE, or as long-time personal friends of the Lakahs. (See <u>Id.</u> ¶¶ 3, 8, 16, 17, 19, 22, 28.)

E. **The Bondholders' Current Investigation**

52. Respondents are conducting investigations in the Middle East, Europe and elsewhere.

53. In Egypt, after lengthy and arduous effort, the Respondents have been granted access to relevant governmental records, including reports from the CMA, the ACA, and other governmental agencies charged with investigating the Lakahs.

54. As a result of these efforts, the Egyptian Public Prosecutor's office, has provided counsel with a substantial number of certified documents from its investigative files concerning fraud investigations of the Lakahs. (The process of translating those documents was recently begun.)

55. Additionally, Respondents have identified and interviewed a number of witnesses who have relevant information for present purposes. Respondents have obtained the declarations of former Lakah employees, (e.g., Dr. Amgad Zarif and Michael Haigh). Respondents are preparing and working toward obtaining additional declarations, and Respondents will be conducting further such interviews.

F. **Miscellaneous**

56. The Lakahs fled Egypt in 2001 to avoid criminal prosecution. (See "Business Blues," Al-Ahram Weekly 24-30 August 2000, a true and accurate copy of which is annexed hereto as Ex. 24.)

57. Ramy Lakah remains the subject of an outstanding Interpol alert, as he personally has been convicted in Egypt for passing bad checks in a business transaction, a criminal offense in Egypt. (See Interpol documents, dated February 10, 2003 (the "Interpol Alert"), a true and accurate copy of which is annexed hereto as Ex. 25.)

58. In France, Ramy Lakah is currently under investigation by a Paris Magistrate in relation to his alleged fraudulent diversion of more than €14 million from his insolvent French publishing company to a healthier related UK-based company under his control. (See "Former France Soir Owner Investigated," "Financial Times Information", Global News Wire, dated May 11, 2006, a true and accurate copy of which is annexed hereto as Ex. 26.) Ramy Lakah has been under criminal investigation in this regard since not later than December 2005. (See id.)

59. Also in 2005, Ramy Lakah was reportedly being investigated for an unexplained transfer of €200,000 from his French-based company, Air Horizons, to an unrelated Lakah-owned UK company, Trading Medical System Ltd. (See Air Horizons,

dated December 16, 2005 available at www.eurocockpit.com a true and accurate copy of which is annexed hereto as Ex. 27.)

60. An inquiry to the BVI Financial Services Commission has revealed that the issuer, LFL was "struck off the register" in May 2001 for failure to pay the requisite periodic license fee. (See Correspondence from BVI Financial Services Commission, dated April 5, 2006, a true and accurate copy of which is annexed hereto as Ex. 28.)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   April 16, 2007
         New York, New York

_____
Gilbert A. Samberg (GS-2610)