IN THE MATTER OF AN ARBITRATION
Before The Arbitration Tribunals of the
American Arbitration Association
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
UBS AG, EXPORTERS INSURANCE COMPANY, LTD.,      :
ARAB BANKING CORPORATION, NATIONAL BANK         :
OF ABU DHABI, and NATIONAL BANK OF OMAN,        :
                                                :
               Claimants,       :
                                                :
      -against-                             :
                                                :
LAKAH FUNDING LIMITED, HOLDING COMPANY          :    **DECLARATION OF**
FOR FINANCIAL INVESTMENTS (LAKAH GROUP),        :    **DR. AMGAD ZARIF**
S.A.E., TRADING MEDICAL SYSTEM EGYPT,           :
S.A.E., MEDICAL TECHNOLOGY, S.A.E.,             :
MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.,   :
TECHNOWAVE, S.A.E., LIFE CARE                   :
TECHNOLOGY, S.A.E., ARAB STEEL FACTORY, S.A.E., :
RAMY LAKAH, and MICHEL LAKAH,                   :
                                                :
             Respondents.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AMGAD ZARIF states and declares as follows:

1.      I am a citizen and resident of Egypt, and I am the Chairman of the Board

and Chief Executive Officer ("CEO") of Life Care Technology, S.A.E ("Life Care").

Except where otherwise noted below, I make this declaration based on my personal

knowledge.

2.      I have been employed by Life Care, which is an Egyptian corporation

based in Cairo, since December 1999, and have been its Chairman and CEO since July

2001.

3.      From July 1995 through December 1, 1999, I was employed by

respondent Medequip for Trading and Contracting, S.A.E. ("Medequip") as its Manager

with regard to distribution of medical equipment manufactured respectively by Olympus

Optical Company (Japan) ("Olympus") and by Dräger Medizintechnik (Germany)

("Dräger"). From 1989 through June 1995, I was employed by Trans World Medical

Supplies ("TW Med") as Sales Manager.

4.      Before entering the medical equipment business in 1989, I practiced

medicine for approximately 12 years, specializing in gynecology.  I received my Medical

Doctor degree from Ain Sajms University Hospital in Cairo, and I have a Bachelor's

Degree from Ain Sajms University, which is also in Cairo.

5.      While employed by Medequip, I became familiar with the business

operations of Medequip, its sister corporation Trading Medical System Egypt ("TMSE"),

and their parent company, Holding Company for Financial Investments (Lakah Group),

S.A.E. ("HCFI" or "Lakah Group").  During that time, I had regular and frequent business

dealings and social interactions with the management and employees of both Medequip

and TMSE.  Both companies had their offices in the same building, at 68 El Merghany

Street in Cairo (although a portion of Medequip, including my group, was moved to a

nearby building in 1997).

6.      To my understanding, the senior-most members of management of HCFI

were Ramy Lakah and Michel Lakah (who are brothers), and the other senior members

of management included Brian Murphy, Carl Baker, Ramy Moustafa OdaBasha, and

Mohammed Khedr.

I.      **Medequip**

7.      Medequip had two general areas of business:  (1) turnkey projects, which

consisted of the construction and equipping of hospitals; and (2) medical equipment

-2-

distribution business, which consisted of the distribution, sale, and service of medical equipment -- primarily monitoring equipment -- produced by foreign manufacturers.

8.    The key members of management of Medequip were: (1) Ramy Lakah; (2) his brother, Michel Lakah; (3) Mohammed Khedr (he managed medical equipment distribution, primarily for Hewlett Packard, and later managed turnkey projects); and (4) Hala El Fouly (manager of turnkey projects).  Ramy Aziz was an accountant at Medequip.  I cannot identify Medequip's management by formal titles and do not recall if these individuals had titles.  To the best of my recollection and belief, formal titles were not very meaningful within Medequip or the Lakah Group companies generally.  The Lakah brothers were the only real decisionmakers at Medequip, and they decided what tasks were to be performed by the company's managers.

9.    Medequip's largest customers were university and teaching hospitals throughout Egypt, including both public and private hospitals.  Medequip's key product suppliers included Hewlett-Packard Company (USA), Dräger, Olympus, Dornier Medical (Germany), Oldelift (The Netherlands), Enraf Norius (The Netherlands), Subtil Crepieux (France), and B. Braun (Germany).  I was responsible for managing the Olympus and Dräger distributorships.  (I previously had a relationship with Dräger during my prior employment with TW Med.)

10.    In 1998 through 1999, Medequip's agency/distributor business declined. A major cause of this decline was a change in Egyptian law that required companies to bid competitively for government contracts.  Medequip represented mostly top-tier foreign manufacturers whose equipment was relatively expensive.  As a result,

-3-

Medequip lost business to representatives of manufacturers of less expensive equipment. (I do not know if the turnkey business declined during this period.)

## II.    Dräger Terminates Medequip as Its Egyptian Distributor, and Contracts with Life Care To Be Its Exclusive Egyptian Distributor

11.    Medequip was the exclusive distributor for Dräger in Egypt for most of the time that I worked for Medequip. By December 1, 1999, when I departed from Medequip, Medequip no longer was Dräger's distributor.

12.    On or about October 27, 1999, Dräger and Life Care entered into a contract in which Life Care became the exclusive distributor of Dräger's medical products in Egypt. Attached hereto as Exhibit "A" is a true and accurate copy (except for the redaction of the confidential commission rates in Section 7.2.2) of the initial Distributor Agreement, dated October 27, 1999, between Dräger (as Seller) and Life Care (as Distributor) (the "Initial Distribution Agreement"). This agreement provided that it shall come into effect on November 1, 1999. (See Exh. "B", § 17.1.) The agreement was fully executed on November 4, 1999. (See id., p. 13.)

13.    Attached hereto as Exhibit "B" is a true and accurate copy of the Sales and Technical Assistance Agreement, dated October 27, 1999, between Dräger and Life Care, in which Dräger agreed to assist Life Care, its exclusive distributor in Egypt, with the sale and service of its medical products. This agreement provided that it shall come into effect immediately after it was signed by both parties. (See Exh. "C", § 8.1.) The agreement was fully executed on November 4, 1999. (See id, p. 10.)

14.    I had a business relationship with Dräger that predated my employment with Medequip. Dräger began using Medequip as its distributor after I joined Medequip

-4-

in 1995, and I remained Dräger's primary contact at Medequip throughout my employment there.  By the time I formally departed from Medequip on December 1, 1999, the residue of Dräger's former relationship to Medequip was only that Dräger was shipping to fill orders that had been made via Medequip prior to Dräger's termination of Medequip.

15.    Attached hereto as Exhibit "C" is a true and accurate copy (except for the redaction of the confidential commission rate in Section 7.2.2) of the First Amendment to the Distributor Agreement signed on October 27, 1999 and November 11, 1999 (the "First Amendment").  The First Amendment is dated January 21, 2000.

16.    Life Care is a corporation that was formed approximately in July 1999. Life Care's founding shareholders and original board members were Ramy Aziz, who owned 99% of the stock, and was an accountant for Medequip; Ihab Magdy, who owned 0.5% of the stock, and was an accountant for the Lakah Group; and Samy Tarshouby, who owned 0.5% of the stock.  Life Care was inactive until it entered into the Initial Distribution Agreement with Dräger dated October 27, 1999.

17.    From July 1999 until approximately July 2001, Ramy Aziz was the CEO of Life Care, and I was its General Manager.  Because Life Care was not meeting Dräger's sales quotas, Dräger indicated that it intended to terminate Life Care as its distributor effective August 31, 2001.  However, Ramy Aziz agreed to sell me his stock in Life Care, and Dräger agreed to keep Life Care as its distributor under my management and control.

18.    In or about July 2001, I purchased 98.5% of Life Care's stock from Ramy Aziz for an agreed price of E£1,000,000, including a net payment in cash of E£250,000.

-5-

At around the end of 2002, I purchased an additional 0.5% of the stock from Mr. Aziz and 0.5% from Mr. Magdy for about E£1,000 each, again making the payments in cash.

19.    From approximately June 2001 through the present day, I have been the CEO of Life Care. The other senior managers have been Dr. Mamdou Shoukry (Sales Manager), who previously had been the Sales Manager and Product Specialist for Anesthesia at Medequip; Samy Tarshouby (Product Specialist for Ventilation); and Sameh Nelson (Service Manager), who previously had been a Technical Manager at Medequip. Dr. Shoukry, Mr. Tarshouby, and I are the current board members of Life Care.

20.    Life Care continues to be Dräger's exclusive distributor and agent in Egypt.

## III.    **Formation of TechnoWave**

21.    As far as I can recall, Medequip ceased doing business approximately in 2002 or 2003. Shortly after Medequip ceased doing business, a company called TechnoWave, S.A.E. ("TechnoWave") began operating in Egypt. It, too, does both (a) turnkey projects and (b) medical monitoring equipment distribution businesses.

22.    TechnoWave's key management personnel are: (1) Mohammed Khedr, (2) Hala El Fouly, and (3) Ramy Moustafa OdaBasha. All of these individuals were schoolmates or are long-time friends or business associates of Ramy Lakah, and all were senior members of Medequip or TMSE's management.

## IV.    **TMSE**

23.    TMSE was another subsidiary of the Lakah Group in the medical equipment business. Specifically, TMSE was in the business of selling and servicing

medical imaging equipment, primarily equipment produced by Toshiba Medical Systems ("Toshiba"). In Egypt, TMSE functioned as Toshiba's exclusive distributor. TMSE's customers included public hospitals, private hospitals, and clinics.

24.     TMSE's key managers were (1) Ramy Lakah; (2) Michel Lakah; (3) Ramy Moustafa OdaBasha; (4) Abdel Shourbagy (sales manager); and (5) and Ashraf Adly (service manager). I do not recall if these individuals had formal titles within TMSE. To the best of my recollection and belief, formal titles were not meaningful within TMSE or any Lakah-controlled company. The Lakah brothers were the only real decisionmakers at TMSE, and they decided what tasks were to be performed by the company's other managers.

25.     TMSE regularly provided its customers (a) with financing and (b) with product warranties for a period of seven years, an unusually long period in the medical equipment business. Manufacturers of medical equipment typically provide a one-year warranty. TMSE also provided some of its private-sector customers with seven-year credit terms.

26.     TMSE's credit terms and warranties were very costly to TMSE. However, they helped to make the Lakahs and Toshiba popular in the Egyptian market.

## V.     Medical Technology Becomes Toshiba's Distributor

27.     I believe that TMSE also ceased doing business in approximately 2002 or 2003. At approximately the same time that TMSE ceased doing business, a company called Medical Technology, S.A.E. ("Medical Technology" or "MedTech") began operating as Toshiba's exclusive distributor in Egypt. It continues to represent Toshiba to this day.

28.     MedTech's key management personnel are (1) Ramy Moustafa OdaBasha; (2) Abdel Shourbagy (sales manager); and (3) Ashraf Adly (service manager).  All of these individuals are old friends or schoolmates of Ramy Lakah, and all were senior members of TMSE's management.

## VI.    Lakah Group Financial Control

29.     Ramy Lakah was the Chairman of the Lakah Group, and Michel Lakah was its Chief Operating Officer.  It appeared to me that Lakah Group and its subsidiaries operated as a single, large company owned and controlled by the Lakah brothers.  To the best of my knowledge and belief, they made all of the strategic and financial decisions for the Lakah Group and all companies within the group, including for my company Medequip.  They decided how this group spent its money.  I knew of no finance department within the Lakah Group, for example, that regulated the flow of funds in and out of the Group or in and out of any of its subsidiary companies.

30.     Originally, the Lakahs were in the medical-equipment business only. When I started at Medequip in 1995, it was still a medium-sized company that the Lakahs had inherited from their father.  In about 1995, Medequip moved into the office building at 68 El Merghany Street.  Medequip expanded, and it had its best year in 1997.  In 1997 through 1999, the Lakahs expanded their businesses beyond medical equipment to include steel production, light-bulb production, detergent production, airlines, travel, tourism, media, real estate, and other businesses.

31.     Nevertheless, as Medequip and the Lakah Group expanded, the Lakahs continued to run them like a family business -- that is, like a small company that is owned, controlled, and operated by a wealthy family.  As far as I could observe, and

based on information from other employees in the office, the Lakahs made all of the significant financial and business decisions for the group.

32.     I never heard or observed that there was a finance department at Medequip, for example,  that regulated the flow of funds in and out of the company, or that could limit how the Lakahs spent the company's money.

33.     The Lakahs openly and publicly lived lives of great luxury.  They rented a personal jet with a crew, and had multiple homes (including at least two palaces) in Egypt and in other countries, bodyguards, servants, many cars, and held lavish parties. Ramy Lakah also ran a very expensive campaign for election to the Egyptian Parliament.  It was common knowledge that the major source of funding of their spending was the medical equipment businesses of the Lakah Group.  They were the oldest and most successful businesses in the Lakah Group, while many of the newer companies, such as Arab Steel Factory, were known among the employees of the Lakah Group and in the Egyptian news media to be loss-making ventures.

## VII.  **Lack of Observance of Corporate Formalities**

34.     Attached as Exhibit "D" is a copy of a public filing of Medequip with the Corporate Registry of Egypt (along with an English translation of it).  On its front cover, the document states that it contains data for the period of December 17, 1994 through January 3, 2000.

35.     The document filed by Medequip states that I was a member of the Board of Directors of Medequip apparently beginning on August 3, 1999 (See Exh. "D", English version, p. 7), and that I apparently resigned from that position on January 1, 2000 (see id., p. 8).  (The document contains a list of dates numbered 1 through 12,

which corresponds to the dates of various amendments of registry information made by Medequip. See page 6 of the translation, in the lower right corner. The reference numbers indicate that my alleged appointment and resignation occurred on dates 10 and 12, which are August 3, 1999 and January 1, 2000, respectively.)

36.    I never attended a meeting of the Board of Directors of Medequip. Indeed, I have never heard that a meeting of the Board of Directors of Medequip was ever held.

37.    In fact, I was never informed that I was a member of the Board of Directors of Medequip. (The public filing that is Exhibit "D", which I first reviewed recently, is the first indication I have had of it.) I was never invited to attend any meeting of the Board of Directors of Medequip, nor was I ever informed about any meeting of the Board of Directors of Medequip. I have never acted in any capacity as a member of the Board of Directors of Medequip. I never resigned from the Board of Directors of Medequip, because I had no knowledge of ever having been on that Board in the first place.

38.    I have never observed or heard that Medequip followed corporate formalities of any kind, such as holding shareholder meetings, holding board meetings, or maintaining separate financial books and records.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April _16_, 2007.

_____
Dr. Amgad Zarif

NYC 368676v.4

-10-

A

2648V/fr
27/10/99

# Distributor Agreement

between

Dräger Medizintechnik GmbH

Moislinger Allee 53 - 55

23542 Lübeck

Germany

- hereinafter called "Dräger MT" -

and

Life Care Technology S.A.E.

13 El Khalifa El Wathek

Nasr City - Cairo

Egypt

- hereinafter called "Distributor" -

- both Dräger MT and Distributor together hereinafter called "the Parties" -

- 2 -

## 1.    Definitions

1.1    "Product" or "Products" shall mean Dräger Medical Products as described in Appendices A1 and A2.

1.2    "Exclusive Products" shall mean the Products as described in Appendix A1 for which exclusive distribution rights are granted to Distributor.

1.3    "Non-Exclusive Products" shall mean the Products as described in Appendix A2 for which non-exclusive distribution rights are granted to Distributor.

1.4    "Territory" shall mean Egypt.

1.5    "Dräger Affiliates" shall mean the companies of the Dräger Group, from whom Distributor shall order and purchase certain Products.

1.6    "Seller" or "Sellers" shall mean Dräger MT and Dräger Affiliates jointly or severally.

## 2.    Scope of the Agreement

For the period of this Agreement Dräger MT hereby grants to Distributor

- the exclusive rights to distribute the Exclusive Products as described in Appendix A1 in the Territory, and

- the non-exclusive rights to distribute the Non-Exclusive Products as described in Appendix A2 in the Territory.

## 3.    Distributor's Rights to Purchase

Distributor shall preferably purchase the Products as set forth in Appendix D from such Dräger Affiliates as nominated in Appendix D. Section 21.4 shall apply hereto. Distributor shall purchase all other Products only from Dräger MT.

However, Distributor is also entitled to purchase the Products as set forth in Appendix D from Dräger MT in connection with collective orders.

2648V/fr

- 3 -

4.     **Discontinuation of Distribution**

In case Seller should cease to distribute any of the Products in the Territory, Dräger MT shall inform Distributor at least 90 days in advance. Dräger MT and Seller, however, shall not be held responsible for any losses or damages resulting from such discontinuation.

Section 21.3 (c) shall apply hereto.

In any case Seller shall deliver the Products to Distributor, if Distributor has placed the order with Seller before Distributor's receipt of such notice of discontinuation.

5.     **Relationship between the Parties**

5.1     Distributor buys and sells in its own name and for its own account.

Distributor acts as independent trader as regards both Seller and its customers.

5.2     Nothing contained in this Agreement shall be deemed to authorise or empower either Party to act as agent on behalf of Seller or conduct business in the name or for the account of Seller or otherwise bind Seller.

5.3     Distributor shall undertake all investments regarding its distributor activities solely at its own risk.

6.     **Discounts/Net Prices and Terms of Payment**

6.1     The Parties shall agree upon transfer prices, which shall be applicable for all orders placed by Distributor with Seller. The transfer prices shall be reviewed once per year.

6.2     All net prices are FOB seaport or FCA airport in the country of Seller as per INCOTERMS 1990, as designated by Distributor, packed according to the specified shipment, unless otherwise agreed between the Parties.

6.3     Seller shall notify Distributor of list price changes not later than 90 days prior to taking effect.

6.4     Payment for all orders placed by Distributor shall be effected net within 60 days from the date of invoice.

- 4 -

Any balance exceeding the open account of the aggregate amount of EURO 130,000 (or equivalent) has to be secured either by a bank guarantee of a first-class bank or by irrevocable Letter of Credit in favour of Seller, confirmed by and payable against presentation of documents at a first-class bank in the country of Seller, unless Dräger MT has in advance otherwise agreed in writing. Distributor shall bear the bank charges for the confirmation of the Letter of Credit for payment.

7.    **Direct Supplies and Commissions**

7.1    If expressly required by Distributor's customer, Distributor is also entitled to arrange direct sales transactions between the customer and Seller concerning supplies of Products into the Territory. However, Distributor is not entitled to accept orders or to make any promise or commitment or to sign any contract on behalf of Seller or to accept payments on behalf of Seller. Seller is not obliged to accept all business transactions which Distributor intends to arrange.

7.2    For orders on purchase of Products placed by the customers resulting from Distributor's direct sales activities and executed by Seller, Seller will grant to Distributor the following commission, always provided that Seller is informed in writing about such direct sales activities of Distributor in due time:

7.2.1    the price difference between the list price valid at the time of receipt of order and the transfer price agreed upon between the Parties

less

the price difference between the list price and the invoiced price.

7.2.2    In any case the total commission for arranged direct supplies into the Territory shall be not less than       on invoiced prices, but shall not exceed the price difference between the list price and the transfer price.

In case Distributor proves that the minimum commission                  has not been sufficient to cover Distributor's obligations regarding the service as contemplated in Section      of Appendix C, Seller will reasonably increase such minimum commission.

7.2.3    For Products, which are not covered by the valid price list, special conditions on the commission shall be agreed upon in writing from case to case.

7.3    Seller is also entitled to execute direct supplies of Products into the Territory, which are not arranged by Distributor, if it is necessary for Seller for some special reason. Seller will immediately inform Distributor about such direct

- 5 -

sales negotiations on Exclusive Products between Seller and the customer in the Territory.

7.4   For direct supplies of Exclusive Products into the Territory, which are not arranged by Distributor, Seller will grant Distributor a commission of      on invoiced prices.

In case Distributor proves that the commission of      on invoice prices has not been sufficient to cover Distributor's obligations regarding the service as contemplated in Section     of Appendix C, Seller will reasonably increase such commission.

For direct supplies of Non-Exclusive Products into the Territory, which are not arranged by Distributor, Distributor is not entitled to receive any commission.

7.5   All commissions will be payable after receipt of complete payment of the corresponding invoices.

7.6   With respect to Distributor's obligations regarding service for direct supplies, reference is made to Section ⅰ of Appendix C.

7.7   Seller is entitled to supply Products or parts of Products under the trademark of third parties (OEM products or private label products) to customers in the Territory directly or indirectly via third parties. Seller will inform Distributor about such OEM contracts or private label contracts concerning the Territory. In case Distributor has arranged such OEM contracts or private label contracts, Distributor will be entitled to receive a reasonable commission for its tasks which shall be agreed upon in writing in advance between the Parties.

8.   **Responsibilities of Distributor**

8.1   Distributor shall use its best endeavours to attend to Dräger MT's interests in the Territory concerning the Products and to inform Dräger MT about the market situation and competition in the Territory concerning the Products.

8.2   Distributor shall use all reasonable means to effectively promote the sale of the Products. These means include, but are not limited to, advertisements and participation in exhibitions and congresses.

8.3   Distributor shall keep a reasonable quantity of Products available for demonstration purposes.

8.4   If necessary, Distributor shall after consultation with Dräger MT amend operating instructions and information material for the Products in

- 6 -

accordance with the local laws and regulations and shall translate such operation instructions and information material into the language of the user. Distributor shall submit one copy of its new operating instructions and information material to Dräger MT without delay. Distributor shall bear the cost for the amendment or translation of such operating instructions and information material. In case such new operating instructions are issued, Distributor shall attach such new operating instructions to the Products.

Distributor shall indemnify Dräger MT against any liabilities arising from the use of Distributor's amendments or translations or from Distributor's failure to attach the operating instructions to the Products.

8.5    For the use of Dräger MT's trademark or trade-name in its own sales literature and letter-heads Distributor needs the prior written approval of Dräger MT.

8.6    Distributor shall resell the Products only in the form originally received from Dräger MT, unless Dräger MT has agreed in writing to any alterations or additions.

8.7    Distributor shall visit the customers regularly and shall make its best efforts to sell the Products.

8.8    Distributor shall at any time assist Dräger MT in arranging visits to customers in the Territory.

8.9    Distributor shall inform Dräger MT about any alteration of the legal status of its company, any resignation or replacement of its managing directors and any change in the proportion of shares of Distributor's company.

8.10    For each Product supplied by Distributor into the Territory, except Spare Parts, Distributor shall maintain records for 11 years after dispatch of the Product containing name and address of the customer, date of dispatch, location, product no. and serial no. If Dräger MT requests access to such records for Product tracing, recall purposes or corrective actions, Distributor shall immediately make such records available to Dräger MT.

Even after expiration of this Agreement Distributor shall maintain such records and shall make such records available to Dräger MT under the conditions contemplated above.

In addition, Distributor shall without delay notify Dräger MT by telefax of any event that might require Dräger MT to trace back or recall any Product or to undertake corrective action. Distributor shall strictly adhere to Dräger MT's instructions "Immediate Reporting of Customer Complaints" and "Warranty Claims".

- 7 -

## 9.    Business Plan, Reports and Minimum Purchase Quota

9.1    On the date this Agreement has been signed by both Parties the Parties shall agree upon a business plan for the period until 31 December 1999 and thereafter in September of each year the Parties shall agree upon a business plan for the following calendar year. Such business plan shall contain Distributor's sales and marketing activities as well as purchase expectations with respect to each Product.

9.2    Such business plan shall be the basis for Dräger MT's decision on

(a)    the definition of Exclusive Products and Non-Exclusive Products as per Appendices A1 and A2,

(b)    the termination of distribution rights regarding certain Products.

Section 21.3 shall apply hereto.

9.3    At the end of each calendar month Distributor shall inform Dräger MT in writing about Distributor's sales and marketing activities and sales organisation.

9.4    Distributor shall

(a)    purchase Products from Seller for resale in the Territory and/or

(b)    arrange direct sales transactions between customer and Seller concerning supplies of Products into the Territory

at the following aggregate minimum amount related to Seller's net purchase price:

1999:    EUR   1.3 million    (or equivalent amount)
2000:    EUR   4.2 million    (or equivalent amount)
2001:    EUR   4.7 million    (or equivalent amount)
2002:    EUR   5.1 million    (or equivalent amount)
2003:    EUR   5.6 million    (or equivalent amount)

Commencing with the year 2004 the minimum purchase quota shall be increased annually at a rate of 9 % p.a. to each preceding calendar year, unless Dräger MT has agreed in writing to a lower minimum purchase quota.

9.5    In case Distributor fails to achieve the minimum purchase quota as per Section 9.4, then Dräger MT is entitled to terminate this Agreement to the end of a calendar month with a 6 months notice, given by registered mail. Reference is made to Section 17.3.

2648V/fr

- 8 -

Any claims of Dräger MT against Distributor for acceptance of deliveries up to the minimum purchase quota or for compensation because of having failed to achieve the minimum purchase quota are hereby expressly excluded.

### 10. After-Sales Service

10.1   Distributor shall establish and perform the after-sales service in the Territory in accordance with the provisions laid down in Appendix C.

10.2   Distributor shall undertake the after-sales service for all Products in the Territory whether sold or not sold by Distributor.

10.3   Distributor is not entitled to allow third parties to perform the after-sales service in the Territory, unless Distributor has received the prior written approval of Dräger MT.

10.4   Dräger MT will check the quality of Distributor's after-sales service performances regularly. In case of massive dissatisfaction or complaints of the customers with Distributor's service performances, Dräger MT has the right to terminate this Agreement.

### 11. Non-Competition

For the period of this Agreement Distributor, its affiliates, managing directors and executive managers shall not manufacture, distribute, assist in or promote the manufacture or distribution of any products likely to compete with the Products, unless Distributor has received the prior written approval of Dräger MT.

### 12. Prohibition of Sales Activities outside the Territory

Outside the Territory Distributor shall not with respect to the Products make any sales promotion, shall not establish any branch, shall not have any supply depot, shall not perform after-sales service and shall not supply the Products, unless Distributor has received the prior written approval of Dräger MT.

- 9 -

### 13.    Sales Promotion by Dräger MT

13.1    Dräger MT shall make available to Distributor catalogue material and sales literature concerning the Products at cost price in a reasonable quantity according to Distributor's turnover.

13.2    To support Distributor's sales activities Dräger MT shall arrange sales-training courses in Lübeck, in the country of Seller, in the Territory or in any other country nearby the Territory, whatever Dräger MT decides in its own discretion. Distributor shall attend all such training courses which Dräger MT deems to be essential for Distributor. Distributor shall bear the travelling-expenses and all cost for boarding and lodging associated with its attendance at the training courses.

### 14.    Governmental Approval in the Territory

14.1    Distributor shall in Seller's name apply for and pursue such governmental approvals which are required for the distribution of the Products in the Territory. Distributor shall submit the necessary documents only after prior consultation with Dräger MT. Distributor shall bear the cost incurred in the Territory.

14.2    Dräger MT shall assist Distributor in obtaining such approvals.

### 15.    Secrecy

During the period of this Agreement and any time after its expiration, Distributor and Dräger MT are obliged to preserve in strict confidence any trade secrets, confidential information and technical information of the other Party and of Sellers and to refrain from disclosing any such information to third parties.

### 16.    Contractual Basis for Supplies

For all orders placed with any Seller, the sales conditions of the respective Seller, valid at the time of receipt of order, shall apply, however, the warranty period (except for consumable products) shall be extended to 14 months respectively 8 months (for special parts with shorter warranty period as set forth in the sales conditions, e. g. for rubber, plastic, glass and ceramic parts, motors, pumps, compressors). In addition to the sales conditions of the respective Seller, the laws of the Seller's country shall apply.

2648V/fr

- 10 -

The current version of the General Terms and Conditions for Business Transactions of Dräger MT is attached hereto as Appendix B.

Dräger MT or the respective Seller shall inform Distributor of the sales conditions of the respective Seller in due time.

### 17. Period of this Agreement

17.1 This Agreement shall come into effect on 1 November 1999 and it shall continue until 31 December 2003. Thereafter it shall continue from year to year unless terminated by one of the Parties to the end of a calendar year with a 6 months notice. First notice of termination may be given until 30 June 2003 with effect on 31 December 2003.

17.2 Notwithstanding Section 17.1, Dräger MT is entitled to terminate this Agreement with a 30 days notice, if LCT has failed to receive the governmental approval in Egypt concerning its activities for Dräger Medical Products as importer, distributor (e. g. S 14 Form), installation and engineering company and service workshop until 1 January 2000 or LCT has failed to commence its business until 1 January 2000.

17.3 Notwithstanding Section 17.1, Dräger MT is entitled to terminate this Agreement to the end of a calendar month with a 6 months notice, if Distributor has failed to achieve the minimum purchase quota as per Section 9.4.

17.4 The notice of termination shall be given by registered mail.

### 18. Disposal of Stock and Settlement of Outstanding Payments in Case of Expiration of this Agreement

In the event of expiration of this Agreement Distributor may offer for sale to Dräger MT all unsold stock of Products and the Products on order with reference to Seller's product no., order no. and/or invoice no. and against payment of the net-purchase price, which was originally paid by Distributor to Seller, plus freight and insurance cost. Dräger MT shall accept such offer, if such Products are still part of the present Dräger Sales Range. If the Products have to be reconditioned, Distributor shall defray such cost.

2648V/fr

**19.    Return of Information Material**

19.1    Immediately after expiration of this Agreement Distributor shall return to Dräger MT all samples, specifications, drawings, test schedules, technical information, catalogue materials, sales brochures and literature and all other data which Distributor has received from Dräger MT or from other Sellers in relation to the distribution or after-sales service of the Products and which are not meant for submission to third parties. In respect of such information and materials Distributor has no right of retention.

19.2    After expiration of this Agreement Distributor shall not use or refer to the trademarks or the Products of Dräger MT and other Sellers, unless it is necessary for the sale of the Products remaining in Distributor's possession.

**20.    Exclusion of Claims for Compensation and Indemnity**

20.1    No claims for compensation or indemnity can be lodged by reason of the termination of this Agreement, unless claims are based on breach of contract by one of the Parties.

20.2    The Parties agree that any legal provisions for "commercial agents" regarding claims for compensation or indemnity by reason of termination shall not apply for Distributor.

**21.    Appendices**

21.1    The following Appendices are part of this Agreement:

Appendix A1 -    Exclusive Products
Appendix A2 -    Non-Exclusive Products
Appendix B  -    Current version of the General Terms and Conditions for Business Transactions of Dräger MT
Appendix C  -    After-Sales Service
Appendix D  -    Dräger Affiliates and their Products

21.2    In case of contradicting terms the provisions of this Agreement shall prevail over the Appendices.

21.3    In case

(a)    the actual Product-Nos. and their descriptions of Appendix A1 and/or A2 have been changed, or

(b)    Distributor has neglected the distribution activities with respect to certain single Products and Distributor has not met the sales

- 12 -

expectations with respect to such Products as per the business plan contemplated in Section 9, or

(c)   Dräger MT ceases to distribute any of the Products in the Territory, then

Dräger MT may terminate Appendix A1 and/or A2 separately with a 90 days written notice to the end of a calendar month and replace it by a new Appendix A1 or A2 which shall become effective between the Parties immediately after expiration of the former Appendix A1 or A2.

No claims for compensation or indemnity can be lodged by reason of the separate termination of Appendix A1 and/or A2 as set forth in this Section 21.3.

21.4   In case Dräger MT considers an alteration of the list of Dräger Affiliates as per Appendix D to be necessary, then Dräger MT may terminate Appendix D separately with a 90 days written notice to the end of a calendar month and replace it by a new Appendix D which shall become effective between the Parties immediately after expiration of the former Appendix D.

No claims for compensation or indemnity can be lodged by reason of the separate termination of Appendix D as set forth in this Section 21.4.

## 22.   Modifications and Amendments

All modifications and amendments to this Agreement and its Appendices must be in writing.

## 23.   Assignment

This Agreement and the rights hereby granted and the obligations hereby stated are not assignable or in any manner transferable to any third party by Distributor without the prior written consent of Dräger MT.

## 24.   Legal Cost and Cost for Translation

Distributor shall defray all cost including legal cost and cost for translation incurred in the Territory under or in relation to the attestation, legalisation and registration of this Agreement.

48V/fr

- 13 -

25. **Invalidity**

In the event any of the provisions of this Agreement or its Appendices become invalid or unenforceable for legal reasons, the validity of the remaining provisions shall not be affected. The Parties undertake to replace such invalid or unenforceable provision in a way that best meets the commercial intentions of this Agreement and its Appendices.

26. **Applicable Law**

This Agreement shall be governed, construed and interpreted in accordance with the German laws. However, the cogent prescriptions concerning (German) domestic "commercial agents" shall not apply.

The United Nations Convention on Contracts for the International Sale of Goods shall not apply.

27. **Arbitration**

All disputes arising in connection with this present Agreement shall be exclusively and finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by three Arbitrators appointed in accordance with the said Rules.

The award shall be in writing and shall contain the reasons for the decision.

The language of the arbitration proceeding shall be English.

The arbitration proceeding shall be held in Cairo, Egypt.

Lübeck, .....................................

Cairo, ......4./.11.../.1999.......

Dräger Medizintechnik GmbH

Life Care Technology S.A.E.

2648V/fr

Dräger Medizintechnik



2649V/fr
MVII

**Appendix A1**
to Distributor Agreement

between

Dräger Medizintechnik GmbH
23542 Lübeck, Germany

- hereinafter called "Dräger MT" -

and

Life Care Technology S.A.E.
Cairo, Egypt

- hereinafter called "Distributor" -

**Exclusive Products**
(Issue: 27 October 1999)

| No. | PRODUCT GROUP NAME |
|-----|--------------------|
| **7** | **Medical Technology** |
| | |
| **70** | **Data Management Systems** |
| 700 | Software Products |
| 702 | Data Management Software |
| 703 | Anaesthetic Systems Julian |
| 704 | OEM Sensors |
| 706 | Infusion Systems |
| 707 | Fabius |
| | |
| **71** | **Anaesthesia** |
| 710 | Other Accessories MT-A |
| 711 | Anaesthetic Systems Cicero |
| 712 | Anaesthetic Apparatus, e.g. Titus |
| 713 | Anaesthetic Monitors |
| 714 | Anaesthetic Liquid Vapor |
| 715 | Soda Lime |
| 716 | Anaesthetic Systems Cato |
| 717 | Pressure Gas Container |
| 718 | Anaesthesia Single-Parametermonitoring |
| 719 | Accessories Anaesthesia |



Dräger Medizintechnik 

- 2 -

| 72 | **Intensive Ventilation** |
|---|---|
| 720 | Other Accessories MT-I |
| 721 | Basic Care Ventilation |
| 722 | Systems for Spontaneous Breathing Therapy |
| 723 | Accessories Ventilation |
| 724 | Breathing Air Humidifier |
| 725 | Intensive Care Ventilation |
| 726 | Working Place Intensive Care |
| 727 | Standard Care Ventilation |
| 728 | OEM-Products Ventilation |
| 729 | Accessories for Ventilation |

| 73 | **Emergency Care** |
|---|---|
| | **(exclusive distribution rights only for business transactions with ambulance services, health and rescue organisations, hospitals and medical doctors)** |
| 730 | Other Accessories MT-N |
| 731 | $O_2$-Cylinder Emergency Care Products |
| 732 | Timecontrolled Short Term Ventilators |
| 733 | Transport Monitoring |
| 734 | Home Ventilation |
| 735 | Defibrillator |
| 736 | Oxylog 2000 |
| 737 | Resusciation Units |
| 738 | Training Devices |
| 739 | Telecare |

| 74 | **Neonatal Care Systems** |
|---|---|
| 740 | Neonatal Ventilation Merchandise |
| 741 | Incubators |
| 742 | Open Care Instruments |
| 743 | Paediatric Ventilation |
| 744 | Monitoring Paediatrics |
| 745 | Warming Therapy / Monitoring Merchandise |
| 746 | Humidifying Systems |
| 747 | Sensors |
| 748 | Accessories for Warming Therapy |
| 749 | Accessories for Premature Birth Breathing |

Dräger Medizintechnik



- 3 -

**75    Oxygen and Aerosol Therapy**
751    Equipment Central Piped Supply
752    Humidifier
753    Inhalation and Insufflation
754    Oxygen-Supply Units
755    $O_2$-Concentrator
756    Respicare
757    Pressuresteered Breathing Therapy Units
758    Respicare OEM
759    Consumption Parts Oxygen- / Aerosol Therapy

**76    Aspiration**
761    Surgical Suction Units
762    Continuous Drainage
763    Bronchial Aspirators
765    Frontend
766    ICM
767    Installation Material / Networks
768    Documentation
769    Spare Parts for Suction Units

**77    Measuring Apparatus**
770    Other Accessories Monitoring
771    Volume and Pressure Measuring Instruments
772    Neuro Monitoring
773    $O_2$-Measuring Instruments
774    Physioflex (Physio B.V.)
775    Monitor Vitara
776    Monitor PM 8014 / 40
777    Temperature Measuring Instruments
778    Measuring Instruments Oxygen Saturation
779    Accessories for Patient Monitoring

**78    Rail Equipment and Special Apparatus**
780    Station Units
782    Rail Instruments
783    WMS Bed Side Monitor
784    WMS Transport Monitor & Accessories
785    WMS Network & Central Station
786    Equipment for Lung Function
787    Technology Medical Products
789    Sub Sections for Rail Programme and Special Units

Dräger Medizintechnik

# Dräger

- 4 -

| 79 | **Spare/Wear/Tear Parts** |
|---|---|
| 790 | Spare/Wear/Tear for Patient Monitoring |
| 791 | Spare/Wear/Tear Anaesthesia |
| 792 | Spare/Wear/Tear Ventilation |
| 793 | Spare/Wear/Tear Emergency Care (limited exclusivity) |
| 794 | Spare/Wear/Tear Paediatric Therapy |
| 795 | Spare/Wear/Tear Oxygen- / Aerosol Therapy |
| 796 | Spare/Wear/Tear Aspiration |
| 797 | Spare/Wear/Tear Measuring Apparatus |
| 798 | Spare/Wear/Tear Rail Equipment and Special Apparatus |
| 799 | Spare/Wear/Tear External Apparatus |

| 8 | **Medical Architectural Systems** |
|---|---|
| 81 | **Supply Systems** |
| 813 | Ponta |
| 814 | Complementary Products Workplace, e.g. Sola |
| 815 | Instruments and Accessories AS-VE |
| 816 | Supply Units |
| 818 | Accessories for Pendants |
| 819 | Gemina |

| 82 | **Apparatus Maintenance Systems** |
|---|---|
| 821 | Systems for Preparation |
| 825 | Hygienic Preparation of Equipment for Reuse |
| 829 | Accessories for Unit Recycling |

| 83 | **Components** |
|---|---|
| 831 | Components, e.g. $O_2$-Generators |

| 84 | **Gas Management Systems (GMS)** |
|---|---|
| 841 | Cylinder Manifolds |
| 844 | Accounterments and Accessories |
| 845 | Warning and Monitoring Systems |
| 846 | Bacteria Filter and Suction Systems |
| 847 | Wall Outlets and Rails |
| 848 | Wall Rail and Accessories |
| 849 | Linea |

Dräger Medizintechnik 

- 5 -

| | |
|---|---|
| **87** | **British Standard Gas Management Systems (GB)** |
| 871 | Cylinder Manifolds (GB) |
| 872 | Compressed Plants (GB) |
| 873 | Vacuum Plants (GB) |
| 874 | Distribution Systems (GB) |
| 875 | Warning and Monitoring Systems (GB) |
| 876 | Suction Systems (GB) |
| 877 | Wall Outlets (GB) |
| 878 | Wall Rail and Accessories (GB) |
| 897 | Spare/Wear/Tear Parts for British Standard Gas Management Systems (GB) |
| | |
| **89** | **Spare/Wear/Tear Parts** |
| 891 | Spare/Wear/Tear Parts for Supply Units |
| 892 | Spare/Wear/Tear Parts Apparatus Maintenance Systems |
| 893 | Spare/Wear/Tear Parts Gas Production Systems |
| 894 | Spare/Wear/Tear Parts Gas Management Systems |
| 895 | Spare/Wear/Tear Parts Distribution Systems |
| | |
| **57** | **HBO-Systems** |
| | |
| 573 | Accessories for HBO-Systems |
| 576 | Systems for HBO-Treatment |
| 578 | Spare/Wear and Tear Parts for HBO-Systems |

**NAD-MEDICAL PRODUCTS**

- **Narkomed Anesthesia Systems**
  Narkomed GS
  Narkomed 4
  Narkomed 2C
  Narkomed 2B
  Narkomed MRI
  Narkomed M
  Anesthesia System Assessories
  Spare Parts

- **NAD Monitoring Systems**
  Vitalert 3000
  NAD Eagle
  Spare Parts

2649V/fr

Dräger Medizintechnik 

- 6 -

- **Data Management Systems**
  OR Data Manager
  Clinical Data Analysis Software
  VitaLAN Network

This Appendix A1 is subject to changes as provided in Section 21.3 of the Distributor Agreement.

\* \* \*