## Guarantee

**Currency Indemnity**
The Guarantee provides that all payments required to be made thereunder shall be made in U.S. Dollars and that, to the fullest extent permitted by applicable law, the Guarantors shall indemnify the Holders against any shortfall between an amount received in another currency, whether pursuant to a judgement or otherwise, and the amount of U.S. Dollars that the Holder entitled to such payment may purchase with the sum paid in such other currency and the Guarantors shall pay such additional amount, in U.S. Dollars, as may be necessary to compensate for the shortfall.

**Enforcement**
The Guarantee provides that a Holder of Bonds shall have the right to enforce the obligations of each Guarantor thereunder directly against such Guarantor in the manner and under the circumstances specified in the Indenture. The Indenture provides, however, that no Holder of Bonds will be entitled to proceed directly against the Issuer or any Guarantor unless the Trustee, having become bound to so proceed, fails to do so within 30 days and that the Trustee is obligated to act only if (i) the Holders of not less than 10 per cent. of the aggregate principal amount of the Bonds Outstanding shall have, by an Act of Holders, so directed the Trustee and (ii) the Trustee shall have been indemnified to its reasonable satisfaction.

**Governing Law; Submission to Jurisdiction**
The Guarantee is governed by, and shall be construed in accordance with, the laws of the State of New York, without regard to its choice of law provisions. Each Guarantor has agreed in the Guarantee that any dispute or difference whatsoever arising between any Guarantor and the Trustee or a Holder of Bonds arising out of or in connection with the Guarantee shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules of Arbitration, unless the Trustee or such Holder elects that such dispute or difference shall be resolved by litigation rather than arbitration, and each Guarantor has submitted to the non-exclusive jurisdiction of the courts of the State of New York and of the United States sitting in the Borough of Manhattan for the purposes of any action to resolve such a dispute or difference or seeking to confirm such an arbitral award.

# Form of the Bonds

**Form of Global Bonds**

The Bonds will be issued in registered form without interest coupons.

Bonds sold in offshore transactions in reliance on Regulation S under the Securities Act may be represented by a Regulation S Global Bond, which will be deposited on or about the Issue Date with DTC or a custodian therefor and registered in the name of Cede & Co. as nominee of DTC, or with a common depositary outside the United States for the accounts of Euroclear or Cedelbank. On or prior to the 40th day after the later of the date on which Bonds were first offered to persons other than distributors in reliance upon Regulation S and the Issue Date, beneficial interests in any Regulation S Global Bond may be held only through Euroclear or Cedelbank, unless delivery is made in the form of an interest in a Restricted Global Bond in accordance with the certification requirements described below. Each Regulation S Global Bond (and any Definitive Bonds issued in exchange therefor) will bear the legend applicable to Bonds sold in reliance on Regulation S under the Securities Act set forth under "*Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions.*"

Bonds sold in the United States or to U.S. Persons that are QIBs in private transactions in reliance on Rule 144A under the Securities Act will be represented by a Restricted Global Bond, which will be deposited on or about the Issue Date with DTC or a custodian therefor and registered in the name of Cede & Co., as nominee of DTC. Each Restricted Global Bond (and any Definitive Bonds) issued in exchange therefor (for as long as they continue to bear the Restricted Bond Legend (as defined in the Indenture)) will be subject to certain restrictions on transfer set forth therein and in the Indenture and will bear the legend regarding such restrictions set forth under "*Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions.*"

**Exchange of Interests in Global Bonds**

On or prior to the 40th day after the later of the date on which Bonds were first offered to persons other than distributors in reliance upon Regulation S and the Issue Date, a beneficial interest in the Regulation S Global Bond may be transferred to a person who takes delivery in the form of an interest in the Restricted Global Bond only upon receipt by the Registrar of a written certification from the transferor (in the applicable form provided in the Indenture) to the effect that such transfer is being made to a person whom the transferor reasonably believes is a QIB within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. After such 40th day, such certification requirements will no longer apply to such transfer.

Beneficial interests in a Restricted Global Bond may be transferred to a person who takes delivery in the form of an interest in the relevant Regulation S Global Bond whether before, on or after such 40th day, only upon receipt by the Registrar of a written certification from the transferor (in the applicable form provided in the Indenture) to the effect that such transfer is being made in accordance with Regulation S or Rule 144 (if available) under the Securities Act and that, if such transfer occurs on or prior to such 40th day, such interest will be held immediately only through Euroclear and Cedelbank.

Any beneficial interest in either the Restricted Global Bond or the Regulation S Global Bond that is transferred to a person who takes delivery in the form of an interest in the other Global Bond will, upon transfer, cease to be an interest in such Global Bond and become an interest in the other Global Bond, and accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to a beneficial interest in such other Global Bond for as long as it remains such an interest.

**Exchange and Transfer of Global Bonds and Definitive Bonds**

Global Bonds deposited with DTC or a custodian therefor shall be exchangeable in whole, but not in part, for corresponding Definitive Bonds under the circumstances set forth in Condition 3(a) of the Terms and Conditions of the Bonds.

**Form of the Bonds**

Regulation S Global Bonds deposited with a common depositary or depositaries for Euroclear and Cedelbank shall be exchangeable in whole, but not in part, for corresponding Definitive Bonds under the circumstances set forth in Condition 3(b) of the Terms and Conditions of the Bonds.

The Holder of a Definitive Bond may transfer such Bond by surrendering it at the specified office of the Registrar or any Transfer Agent, including the Transfer Agent in Luxembourg. Upon the transfer, exchange or replacement of Definitive Bonds bearing the applicable legend set forth under "Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions," or upon specific request for removal of such legend on a Definitive Bond, the Issuer will deliver only Definitive Bonds that bear such legend, or will refuse to remove such legend, as the case may be, unless there is delivered to the Issuer and the Registrar such satisfactory evidence, which may include an opinion of counsel as may reasonably be required by the Issuer, that neither the legend nor the restrictions on transfer set forth therein are required to ensure compliance with the provisions of the Securities Act.

A Holder of a Definitive Bond may transfer such Bond to a person who takes delivery in the form of an interest in the Restricted Global Bond or the Regulation S Global Bond, as the case may be, in a transaction exempt from registration under the Securities Act in reliance of Rule 144A, Regulation S or Rule 144 thereunder, as the case may be. In connection with such transfer, the transferor will be required to provide the Registrar or its duly authorized agent or any other Transfer Agent with the applicable written certifications in accordance with the Indenture.

Notwithstanding any statement herein, the Issuer and the Guarantors reserve the right to impose such transfer, certification, exchange or other requirements, and to require such restrictive legends on Bonds as they may determine are necessary to ensure compliance with the securities laws of the United States and the states and other jurisdictions therein and any other applicable laws, or as DTC, Euroclear or Cedelbank may require.

Neither the Registrar nor any Transfer Agent will register the transfer of or exchange interests in a Global Bond for Definitive Bonds for a period of 15 Business Days preceding the due date for any payment of the principal amount or interest on the Bonds, or register the transfer of or exchange any Bonds previously called for redemption.

**Owner of Global Bonds and Payments**

Payments of the principal amount, interest and Additional Amounts pursuant to Condition 7 of the Terms and Conditions of the Bonds, if any, on Global Bonds deposited with DTC or a custodian therefor or with a common depositary for Euroclear and Cedelbank, as the case may be, will be made to DTC or Cede & Co. as its nominee, or Euroclear or Cedelbank or its respective nominee, as the case may be, as the registered owner thereof. The Issuer expects that DTC or its nominee, or Euroclear or Cedelbank or its respective nominee, as the case may be, upon receipt of any payment of the principal amount, interest or Additional Amounts, if any, in respect of a Global Bond representing any Bonds held by it or its nominee, will immediately credit the accounts of its participants (as evidenced by the records of accounts of the applicable clearing system) with payments in amounts proportionate to their respective beneficial interests in the principal amount of such Global Bond. The Issuer also expects that such payments by such participants to owners of beneficial interests in such Global Bond held through such participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers. Such payments will be the responsibility of such participants.

So long as DTC, the common depositary for Euroclear and Cedelbank or their respective nominee is the registered holder of a Global Bond, DTC, such common depositary or such nominee, as the case may be, will be considered the sole owner and Holder of the Bonds represented by such Global Bond for all purposes under the Indenture and the Bonds. Unless any of the circumstances set forth in Condition 3(a) or Condition 3(b), as the case may be, of the Terms and Conditions of the Bonds occurs, owners of beneficial interests in such Global Bond will not be entitled to have any portion of such Global Bond registered in their names, will not receive or be entitled to receive physical delivery of Bonds in certificated form and will not be considered the owners or Holders of such Global Bond (or any Bond represented thereby) under the Indenture or the Bonds. In addition, no beneficial owner of an interest in a Global Bond will be able to transfer that interest except in accordance with the applicable procedures of DTC, Euroclear or Cedelbank, as the case may

be (in addition to those under the Indenture referred to herein). The foregoing is subject to the provisions set forth in Condition 25 of the Terms and Conditions of the Bonds.

DTC has advised the Issuer that it will take any action permitted to be taken by a Holder of Bonds only at the direction of one or more participants to whose account with DTC interests in such Bonds are credited and only in respect of such portion of the aggregate principal amount of the Bonds as to which such participant or participants has or have given such direction. In the case of a Global Bond deposited with DTC or a custodian therefor, Euroclear or Cedelbank, as the case may be, will take any action permitted to be taken by a Holder in respect of the Indenture or the Bonds, as the case may be, on behalf of a Euroclear participant or Cedelbank participant only in accordance with its relevant rules and procedures and subject to its depositary's ability to effect such actions on its behalf through DTC and subject to applicable laws and regulations. Subject to the provisions set forth in Condition 25 of the Terms and Conditions of the Bonds, owners of interests in a Global Bond credited to their accounts with DTC, Euroclear or Cedelbank will be entitled to proceed directly against the Issuer on the basis of statements of account showing such ownership provided by DTC, Euroclear and Cedelbank and subject to applicable laws and regulations.

## Clearing and Settlement

The information set forth below is subject to any change in or reinterpretation of the rules, regulations and procedures of DTC, Euroclear or Cedelbank (together, the "Clearing Systems") in effect for the time being. Investors wishing to use the facilities of any of the Clearing Systems must check the rules, regulations and procedures of the relevant Clearing System in effect at the time being. None of the Issuer, any Guarantor or the Trustee will have any responsibility for the performance by DTC, Euroclear or Cedelbank or their respective participants or indirect participants of their respective obligations under the rules, regulations and procedures governing their operations.

**DTC**

DTC has advised the Issuer as follows: DTC is a limited purpose trust company established in May 1973 and organized under the laws of the State of New York, a member of the United States Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to Section 17A of the Exchange Act. DTC was created to hold securities for its participants ("DTC Participants") and to facilitate the clearance and settlement of securities transactions between DTC Participants through electronic book-entries, thereby eliminating the need for physical movement of certificates. DTC Participants include securities brokers and dealers, banks, trust companies, and clearing corporations. Indirect access to the DTC system also is available to others such as banks, brokers, dealers, and trust companies that clear through or maintain a custodial relationship with a DTC Participant either directly or indirectly ("Indirect Participants"). DTC is owned by a number of its participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc.

Under the rules, regulations, and procedures creating and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers of Bonds among DTC Participants on whose behalf it acts with respect to Bonds accepted into DTC's book-entry settlement system as described below (the "DTC Bonds") and to receive and transmit distributions of the principal amount and interest on the DTC Bonds. DTC Participants and Indirect Participants with which beneficial owners of DTC Bonds ("Owners") have accounts with respect to the DTC Bonds similarly are required to make book-entry transfers and receive and transmit such payments on behalf of their respective Owners. Accordingly, although Owners who hold DTC Bonds through DTC Participants or Indirect Participants will not possess Bonds, the Rules, by virtue of the requirements described above, provide a mechanism by which such Owners will receive payments and will be able to transfer their interests with respect to the Bonds.

Because DTC may only act on behalf of DTC Participants, who in turn act on behalf of Indirect Participants, any Owner desiring to pledge its beneficial interest in a DTC Bond to persons or entities that do not participate in DTC, or otherwise to take actions with respect to such interest, may be affected by the lack of a physical certificate evidencing such interest.

DTC will take any action permitted to be taken by an Owner only at the direction of one or more DTC Participants to whose account with DTC such Owner's DTC Bonds are credited. Additionally, DTC has advised the Issuer that it will take such actions with respect to any percentage of the beneficial interest of Owners who hold Bonds through DTC Participants or Indirect Participants only at the direction of and on behalf of DTC Participants whose account holders include undivided interests that satisfy any such percentage.

To the extent permitted under applicable law and regulations, DTC may take conflicting actions with respect to other undivided interests to the extent that such actions are taken on behalf of DTC Participants whose account holders include such undivided interests.

**Euroclear and Cedelbank**

Euroclear and Cedelbank have advised the Issuer as follows:

Euroclear and Cedelbank hold securities for participating organizations and facilitate the clearance and settlement of securities transactions between their respective participants through electronic book-entry changes in accounts of such participants. Euroclear and Cedelbank provide to their participants, among other

things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Euroclear and Cedelbank interface with domestic securities markets. Euroclear and Cedelbank participants are financial institutions such as underwriters, securities brokers and dealers, banks, trust companies and certain other organizations. Indirect access to Euroclear and Cedelbank is also available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Euroclear or Cedelbank participant, either directly or indirectly.

Euroclear is operated by Morgan Guaranty Trust Company of New York, Brussels office as operator of the Euroclear system (the "Euroclear Operator"), under contract with Euroclear Clearance System Société Cooperative, a Belgian cooperative corporation (the "Cooperative"). All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator, not the Cooperative. The Cooperative establishes fundamental policies for Euroclear on behalf of Euroclear participants. The Euroclear Operator is regulated and examined by the Board of Governors of the Federal Reserve System, the New York State Banking Department and the Belgian Banking Commission.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the terms and conditions governing use of Euroclear, the related operating procedures of the Euroclear system and applicable Belgian law (collectively, the "*Euroclear Terms and Conditions*"). The Euroclear Terms and Conditions govern transactions of securities and cash within Euroclear, withdrawal of securities and cash from the system, and receipts of payments with respect to securities in the system. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Euroclear Terms and Conditions only on behalf of Euroclear account holders, and has no record of or relationship with persons holding through Euroclear account holders.

**Initial Settlement in Relationship to DTC Bonds**

Upon the issue of a Regulation S Global Bond and/or a Restricted Global Bond deposited with DTC or a custodian therefor, DTC or its custodian, as the case may be, will credit, on its internal system, the respective principal amount of the individual beneficial interest represented by such relevant DTC Bond or Bonds to the accounts of persons who have accounts with DTC. Such accounts initially will be designated by or on behalf of the Manager. Ownership of a beneficial interest in a DTC Bond will be limited to DTC Participants, including Euroclear and Cedelbank, or Indirect Participants. Ownership of beneficial interests in DTC Bonds will be shown on, and the transfer of that ownership will be effected only through, records maintained by DTC or its nominee (with respect to interests of DTC Participants) and the records of DTC Participants (with respect to interests of Indirect Participants).

Euroclear and Cedelbank will hold omnibus positions on behalf of their participants through customers' securities accounts for Euroclear and Cedelbank on the books of their respective depositories, which in turn will hold such positions in customers' securities accounts in such depositories' names on the books of DTC.

Investors that hold their interests in a DTC Bond will follow the settlement procedures applicable to global bond issues. Investors' securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors that hold their interests in a DTC Bond through Cedelbank or Euroclear accounts will follow the settlement procedures applicable to conventional Eurobonds, except that there will be no "lock-up" required by U.S. Treasury Regulations. The interests will be credited to the custody accounts on the settlement date against payment in same-day funds.

**Secondary Market Trading in Relation to DTC Bonds**

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date. Although DTC, Euroclear and Cedelbank have agreed to the following procedures in order to facilitate transfers of interests in Global Bonds deposited with DTC or a custodian therefor among participants of DTC, Euroclear and Cedelbank, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. Neither the Issuer nor any agent of the Issuer will have any responsibility for the performance by DTC, Euroclear or Cedelbank or their

respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

Trading between DTC Participants
Secondary market trading between DTC Participants will be settled using the procedures applicable to global bond issues in same-day funds.

Trading between Cedelbank and/or Euroclear Participants
Secondary market trading between participants in Cedelbank ("Cedelbank Participants") and/or participants in Euroclear ("Euroclear Participants") will be settled using the procedures applicable to conventional Eurobonds in same-day funds.

Trading between Euroclear or Cedelbank Accountholders
If an Owner holding in Euroclear or Cedelbank sells to a third party that wishes to hold such Bond in either Euroclear or Cedelbank, the trade will be settled using either Euroclear or Cedelbank and procedures applicable to conventional Eurobonds.

Trading between Euroclear or Cedelbank Seller and DTC Purchaser
Due to time zone differences in their favor, Euroclear Participants and Cedelbank Participants may employ their customary procedures for transactions in which interests in DTC Bonds are to be transferred by the respective clearing system, through its respective depositary, to a DTC Participant. The seller will send instructions to Euroclear or Cedelbank through a Euroclear Participant or Cedelbank Participant, as the case may be, at least one Business Day prior to settlement. In these cases, Euroclear or Cedelbank will instruct its respective depositary to deliver the interest in the DTC Bond to the DTC Participant's accounts against payment. Payment will include interest (if any) accrued on such beneficial interest in such Bond being transferred from and including the immediately preceding date for the payment of interest to but excluding the settlement date. The payment will then be reflected in the account of the Euroclear Participant or Cedelbank Participant the following day, and receipt of the cash proceeds in the Euroclear Participant's or Cedelbank Participant's account would be back valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Euroclear Participant or Cedelbank Participant have a line of credit in its respective clearing system and elect to be in debit in anticipation of receipt of the sale proceeds in its account, the back valuation will extinguish any overdraft charges incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Euroclear Participant's or Cedelbank Participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Euroclear and Cedelbank to purchase interests in the DTC Bond from DTC Participants for delivery to Euroclear Participants or Cedelbank Participants should note that these trades would automatically fail on the sale side unless affirmative action is take. At least three techniques should be readily available to eliminate this potential problem:

(a) borrowing through Euroclear or Cedelbank for one day (until the purchase side of the day trade is reflected in their Euroclear or Cedelbank accounts) in accordance with the clearing system's customary procedures;

(b) borrowing the interests in the United States from a DTC Participant no later than one day prior to settlement, which would give the interests sufficient time to be reflected in their Euroclear or Cedelbank account in order to settle the sale side of the trade; or

(c) staggering the value date for the buy and sell sides of the trade so that the value date for the purchase from the DTC Participant is at least one day prior to the value date for the sale to the Euroclear Participant or Cedelbank Participant.

Trading between DTC Seller and Euroclear or Cedelbank Purchaser
When interests are to be transferred from the account of a DTC Participant to the account of a Euroclear Participant or Cedelbank Participant, the purchaser will send instructions to Euroclear or Cedelbank through a Euroclear Participant or Cedelbank Participant, as the case may be, at least one Business Day prior to settlement. Euroclear or Cedelbank, as the case may be, will instruct its respective depositary to receive such

interest against payment. Payment will include interest (if any) accrued on such beneficial interest in such DTC Bond being transferred from and including the immediately preceding date for the payment of interest to but excluding the settlement date. Payment will then be made by the depositary to the DTC Participant's account against delivery of the interest in such DTC Bond. After settlement has been completed, the interest will be credited to the respective Clearing System, and by the Clearing System, in accordance with its usual procedures, to the Euroclear Participant's or Cedelbank Participant's account. The securities credit will appear the next day (European time) and the cash indebtedness will be back valued to, and any interest on such DTC Bond will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (i.e. the trade fails), the Euroclear and Cedelbank cash indebtedness will be valued instead as of the actual settlement date.

Euroclear Participants and Cedelbank Participants will need to make available to the respective Clearing System the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as such participants would for any settlement occurring within Euroclear or Cedelbank. Under this approach, such participants may take on credit exposure to Euroclear or Cedelbank until the interests in the DTC Bond(s) are credited to their accounts one day later.

Alternatively, if Euroclear or Cedelbank has extended a line of credit to a Euroclear Participant or Cedelbank Participant, as the case may be, such accountholder may elect not to preposition funds and allow that credit line to be drawn upon to finance settlement. Under this procedure, Euroclear Participants or Cedelbank Participants purchasing interests in DTC Bond(s) would incur overdraft charges for one day, assuming they cleared the overdraft when the interests in the Bond(s) were credited to their accounts. However, any interest on such Bonds would accrue from the value date. Therefore, in many cases the investment income on the interest in such Bond(s) earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although this result will depend on each participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC Participants can employ their usual procedures for transferring Global Bonds to the respective depositories of Euroclear or Cedelbank for the benefit of Euroclear Participants or Cedelbank Participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC Participants, a cross-market transaction will settle no differently than a trade between two DTC Participants.

Secondary trading in long-term certificates and debentures of corporate issuers is generally settled in clearing house or next-day funds. In contrast, DTC Bonds held through DTC Participants or Indirect Participants will trade in DTC's Same-Day Funds Settlement System until maturity, and secondary market trading activity in such DTC Bonds will therefore be required by DTC to settle in immediately available funds. No assurance can be given as to the effect, if any, of settlements in immediately available funds on trading activity in such DTC Bonds.

## Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions

As a result of the following restrictions, purchasers of Bonds in the United States are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of such Bonds.

Each prospective purchaser of Bonds offered otherwise than in reliance on Regulation S under the Securities Act (the "Restricted Bonds"), by accepting delivery of this Offering Circular, will be deemed to have represented and agreed as follows:

(1) Such offeree acknowledges that this Offering Circular is personal to such offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire Bonds other than pursuant to Rule 144A or Section 4(2) of the Securities Act or in offshore transactions in accordance with Regulation S. Distribution of this Offering Circular, or disclosure of any of its contents, to any person other than such offeree and those persons, if any, retained to advise such offeree with respect thereto is unauthorized, and any disclosure of any of its contents, without the prior written consent of the Issuer, is prohibited.

(2) Such offeree agrees to make no photocopies of this Offering Circular or any documents referred to herein.

Each purchaser of Restricted Bonds will be deemed to have represented and agreed as follows (terms used in the following paragraphs that are not defined therein will have the meaning given to them in Rule 144A or in Regulation S, as the case may be):

(1) In the case of Bonds purchased and sold pursuant to Rule 144A under the Securities Act, the purchaser is a QIB, is aware that the sale of Bonds to it is being made in reliance on Rule 144A and is acquiring such Bonds for its own account or for the account of a QIB, as the case may be.

(2) The purchaser understands that the Restricted Bonds are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, that such Bonds have not been and will not be registered under the Securities Act or under applicable securities laws of the States and other jurisdictions of the United States and that (A) prior to the date (the "Resale Restriction Termination Date") which is two years after the later of the Issue Date and the last date on which the Issuer or any Guarantor or any affiliate of the Issuer or any Guarantor was the owner of a Bond (or any predecessor of such Bond), it may not resell, pledge or otherwise transfer any such Bonds, except (i) to a person who the seller reasonably believes is a QIB in a transaction meeting the requirements of Rule 144A; (ii) in an offshore transaction (as such term is defined in Regulation S) complying with Rule 904 of Regulation S; (iii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available); or (iv) pursuant to an effective registration statement under the Securities Act; and in each of cases (i) through (iv) in accordance with any applicable securities laws of the States and other jurisdictions of the United States; and that (B) the purchaser will, and each subsequent holder of such Bonds is required to, notify any purchaser from it of such Bonds of the resale restrictions referred to in subparagraph (A) above.

(3) The purchaser understands that the Restricted Bonds will bear a legend to the following effect (with appropriate insertions or modifications relating to the identity of the Issuer) (the "Restricted Bonds Legend") unless the Issuer determines otherwise in compliance with applicable law:

THIS BOND (OR ITS PREDECESSOR) AND THE GUARANTEE WERE ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE SECURITIES LAWS OF THE STATES AND OTHER JURISDICTIONS OF THE UNITED STATES, AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. THIS BOND MAY ONLY BE SOLD IN ACCORDANCE WITH THE INDENTURE, COPIES OF WHICH ARE AVAILABLE FOR INSPECTION AT THE OFFICES OF THE TRUSTEE AND EACH PAYING AGENT. EACH PURCHASER OF THIS BOND THAT IS A QUALIFIED

BOWNE OF LONDON 12/02/1999 22:21 BL/SM CUMULATIVE NEXT PCN: 114.00.00.00 -- Page is valid, no graphics U41077 113.00.00.00 22X

**Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions**

INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IS HEREBY NOTIFIED THAT THE SELLER OF THIS BOND MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

THE HOLDER OF THIS BOND AGREES FOR THE BENEFIT OF LAKAH FUNDING LIMITED (THE "ISSUER") AND EACH OF HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E., MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E., TRADING MEDICAL SYSTEM EQUIPMENT, S.A.E. AND ARAB STEEL FACTORY, S.A.E. (THE "GUARANTORS") THAT (A) PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") WHICH IS TWO YEARS AFTER THE LATER OF THE ISSUE DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY GUARANTOR OR ANY AFFILIATE OF THE ISSUER OR ANY GUARANTOR WAS THE OWNER OF THIS BOND (OR ANY PREDECESSOR OF SUCH BOND), THIS BOND MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A; (II) IN AN OFFSHORE TRANSACTION COMPLYING WITH THE PROVISIONS OF RULE 904 OF REGULATION S UNDER THE SECURITIES ACT; (III) PURSUANT TO THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE); OR (IV) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT; AND IN EACH OF CASES (I) THROUGH (IV) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF THE STATES AND OTHER JURISDICTIONS OF THE UNITED STATES; AND THAT (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER OF THIS BOND IS REQUIRED TO, NOTIFY ANY PURCHASER FROM IT OF THIS BOND OF THE RESALE RESTRICTIONS REFERRED TO IN CLAUSE (A) ABOVE.

THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE. THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS BOND FROM IT OF THE TRANSFER RESTRICTIONS REFERRED TO IN THIS PARAGRAPH. NO REPRESENTATION CAN BE MADE AS TO AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT FOR RESALE OF THIS BOND.

IF REQUESTED BY THE ISSUER OR ANY GUARANTOR, THE HOLDER AGREES TO PROVIDE THE INFORMATION NECESSARY TO DETERMINE WHETHER THE TRANSFER OF THIS BOND IS PERMISSIBLE UNDER THE SECURITIES ACT AND UNDER APPLICABLE SECURITIES LAWS OF THE STATES AND OTHER JURISDICTIONS OF THE UNITED STATES. THIS BOND AND ANY RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS BOND TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFER OF RESTRICTED SECURITIES GENERALLY. THE HOLDER OF THIS BOND SHALL BE DEEMED BY THE ACCEPTANCE OF THIS BOND TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

After the Resale Restriction Date, a Restricted Bond may be exchanged for a Bond not bearing the Restricted Bond's Legend but bearing the following legend upon certification by the transferor in the form set forth in the Indenture that the transfer of any such Restricted Bond has been made in accordance with Rule 904 under the Securities Act:

THIS BOND (OR ITS PREDECESSOR) AND THE GUARANTEE WERE ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE SECURITIES LAWS OF THE STATES AND OTHER JURISDICTIONS OF THE UNITED STATES, AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE

112

BOWNE OF LONDON 12/02/1999 22:21 BL/SM CUMULATIVE NEXT PCN: 115.00.00.00 -- Page is valid, no graphics U41077 114.00.00.00 27X

Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions

UNITED STATES. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

No representation can be made as to availability of the exemption provided by Rule 144 under the Securities Act for the resale of Restricted Bonds.

113

# Taxation

The following summary should not be viewed as legal or tax advice and is based on taxation laws in force at the date of this Offering Circular. Prospective investors should consult their own advisors on the taxation and other implications of their acquiring, holding or disposing of Bonds under the laws of the various jurisdictions that may be applicable to them.

## Egyptian Taxation

The comments below are of a general nature only and are based on the provisions currently in force in the Egyptian Republic. They describe the principal tax consequences of receipt of interest and sale of the Bonds for Holders who are not residents of Egypt. They should not be viewed as tax advice. Holders of Bonds who are in doubt as to their personal tax position should consult their professional advisers.

### Payments by the Issuer

Under current Egyptian law, interest and other amounts payable in respect of the Bonds by the Issuer to a Holder who is not a resident of Egypt will not be subject to taxation in Egypt.

### Payments under the Guarantee

Under current Egyptian law, payments of interest required to be made by a Guarantor under the Guarantee will be subject to withholding tax at the rate of 32 per cent. Pursuant to the Guarantee, each Guarantor has agreed, subject to certain exceptions, that it will (i) deduct or withhold the full amount of Egyptian Taxes required to be paid in respect of any payment made by it under the Guarantee and pay such amount to the relevant taxing authorities and (ii) upon the demand of a Holder (or the Trustee on behalf of such Holder), pay to the account of such Holder (or the account of the Trustee for the benefit of such Holder), an amount sufficient to indemnify such Holder fully against, and to reimburse such Holder for, the amount deducted or withheld.

Egyptian counsel has advised that the indemnification for Egyptian Taxes agreed to by the Guarantors is valid and enforceable, notwithstanding that contractual provisions for the payment by one party of taxes levied on another party may not be valid under current Egyptian law.

### Loan Payments

Pursuant to Article 11 of the Double Taxation Treaty between Egypt and Switzerland, published in the Egyptian Gazette on November 17, 1988, interest and other amounts payable by the Parent Guarantor to the Swiss banking institution acting as lender in respect of the Swiss Loan will not be subject to taxation in Egypt.

### Capital Gains Tax

Capital gains realized upon the sale or other disposition of Bonds are not subject to taxation in Egypt.

### Inheritance Taxes

No inheritance or similar tax is imposed in Egypt.

### Stamp Duties

No stamp, registration or similar duties or taxes will be payable in the Egyptian Republic by Holders in connection with the issue of the Bonds. A nominal tax of E£ 3 will be assessed in connection with the making of the Guarantee.

## British Virgin Islands Taxation

Under current British Virgin Islands laws, (i) the Issuer is not subject to income or corporation taxes in the British Virgin Islands; (ii) payments of principal and interest in respect of, and gains derived from the sale of, Bonds are not subject to taxation in the British Virgin Islands; and (iii) withholding is not currently required on payments to Holders. The Issuer has been further advised by its British Virgin Islands counsel that, as a matter of British Virgin Islands law, it is able to pay such Additional Amounts as may be required to compensate for any amounts withheld from payments to Holders in respect of Egyptian Taxes.

In the event that any such withholding or deduction is required, the Issuer and the Guarantors are obliged, subject to certain standard exceptions, to pay Additional Amounts to Holders so that the net amount received

by each of the Holders is equal to the amount it would have received had no withholding on account of BVI Taxes been made. *See "Terms and Conditions of the Bonds — 7. Additional Amounts and Taxes".*

**United States Taxation**

The following is a general discussion of the material United States federal income tax consequences of the acquisition, ownership and disposition of Bonds to beneficial owners thereof that are U.S. Holders (as defined below). This discussion is based on currently existing provisions of the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Department regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect on the date hereof and all of which are subject to change, possibly on a retroactive basis. This discussion applies only to initial beneficial owners that purchase Bonds upon original issuance at the initial offering price thereof, and is limited to initial beneficial owners that hold Bonds and exchange Bonds as capital assets.

As used herein, the term "U.S. Holder" means a beneficial owner of a Bond that is, for U.S. federal income tax purposes,

(i) a citizen or resident of the United States,

(ii) a corporation or partnership created or organized in or under the laws of the United States or any State thereof, including the District of Columbia, or

(iii) an estate or trust described in Section 7701(a)(30) of the Code.

Payments of Interest

In general, interest on a Bond will be taxable to a U.S. Holder as ordinary income at the time it accrues, or is actually or constructively received, in accordance with the U.S. Holder's method of accounting for U.S. federal income tax purposes. The Issuer anticipates that the Bonds will be issued without original issue discount ("OID") within the meaning of Section 1273 of the Code and the following discussion so assumes.

Sale, Exchange or Retirement of the Notes or Exchange Notes

Upon the sale, exchange, redemption, retirement at maturity or other taxable disposition of a Bond, a U.S. Holder generally will recognize taxable gain or loss equal to the difference between (1) the sum of cash plus the fair market value of all other property received on such disposition (except to the extent such cash or property is attributable to accrued but unpaid interest, in which case, it will be taxable as ordinary income), and (2) such U.S. Holder's adjusted tax basis in the Bond.

Gain or loss recognized on the disposition of a Bond generally will be capital gain or loss. Such capital gain or loss will be long-term capital gain or loss if at the time of such disposition the U.S. Holder's holding period for the Bond is more than one year. In the case of a U.S. Holder that is an individual, estate or trust "net capital gain" (i.e., the excess of net long-term capital gain over net short-term capital loss) is generally subject to a reduced rate of U.S. federal income tax. The deductibility of capital losses is subject to limitations.

THE U.S. FEDERAL TAX DISCUSSION SET FORTH ABOVE IS INCLUDED FOR GENERAL INFORMATION ONLY AND MAY NOT BE APPLICABLE DEPENDING UPON A U.S. HOLDER'S PARTICULAR SITUATION. IT IS NOT INTENDED TO CONSTITUTE A COMPLETE ANALYSIS OF ALL OF THE TAX CONSEQUENCES RELATING TO THE OWNERSHIP OF THE BONDS GENERALLY OR THAT MAY BE RELEVANT TO PARTICULAR BENEFICIAL OWNERS IN LIGHT OF PERSONAL CIRCUMSTANCES OR TO CERTAIN TYPES OF BENEFICIAL OWERNS SUBJECT TO SPECIAL RULES. U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES TO THEM OF THE OWNERSHIP AND DISPOSITION OF THE BONDS, INCLUDING THE TAX CONSEQUENCES UNDER THE TAX LAWS OF THE UNITED STATES, STATES, LOCALITIES, COUNTRIES OTHER THAN THE UNITED STATES AND ANY OTHER TAXING JURISDICTIONS AND THE POSSIBLE EFFECTS OF CHANGES IN SUCH TAX LAWS.

**Proposed EU Withholding Tax Directive**

In May 1998, the European Commission presented to the Council of Ministers of the European Union a proposal to oblige Member States to adopt either a "withholding tax system " or an "information reporting

system" in relation to interest, discounts and premiums. It is unclear whether this proposal will be adopted, and if it is adopted, whether it will be adopted in its current form. The "withholding tax system" would require a paying agent established in a Member State to withhold tax at a minimum rate of 20 per cent. from any interest, discount or premium paid to an individual resident in another Member State unless such an individual presents a certificate obtained from the tax authorities of the Member State in which he is resident confirming that those authorities are aware of the payment due to that individual. The "information reporting system" would require a Member State to supply, to the other Member States, details of any payment of interest, discount or premium made by paying agents within its jurisdiction to an individual resident in another Member State. For these purposes, the term "paying agent" is widely defined and includes an agent who collects interest, discounts or premiums on behalf of an individual beneficially entitled thereto. If this proposal is adopted, it will not apply to payments of interest, discounts and premiums made before January 1, 2001.

# Subscription and Sale

**Subscription**

The Managers have, pursuant to a Subscription Agreement dated as of December 6 1999 (the "Subscription Agreement") among the Issuer, the Guarantors and the Managers, agreed, subject to the satisfaction of certain conditions, to purchase the Bonds at 99.50 per cent. of their principal amount plus accrued interest, if any. The Issuer has agreed to pay to the Managers a combined management and underwriting commission of 0.5 per cent. and a selling commission of 0.5 per cent., respectively, of the principal amount of the Bonds. In addition, the Issuer has agreed to reimburse certain expenses incurred by the Managers in connection with the issue of the Bonds. The Subscription Agreement entitles the Managers to terminate it in certain circumstances prior to payment being made to the Issuer.

**Selling Restrictions**

General

No action has been or will be taken in any jurisdiction by the Issuer, any Guarantor or any Manager that would permit a public offering of the Bonds, or possession, circulation or distribution of this Offering Circular, in preliminary or final form, or any amendment or supplement hereto or any other offering or publicity material relating to the Bonds, in any country or jurisdiction where action for that purpose is required. The offer and sale of Bonds, and the delivery of this Offering Circular, are restricted by law in certain jurisdictions and Bonds may not be offered or sold, and this Offering Circular may not be distributed, in any jurisdiction under circumstances where such offer, sale or distribution would be prohibited or restricted by law. Each Manager will comply with all applicable laws and regulations in each jurisdiction in which it acquires, offers, sells or delivers Bonds or has in its possession or distributes any offering documents or any amendment or supplement thereto or any other offering or publicity material.

Without limiting the foregoing, prospective purchasers of Bonds should be aware of the following restrictions:

United States

The Bonds and the Guarantee have not been and will not be registered under the Securities Act or any state securities laws and may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons except in accordance with Regulation S or pursuant to certain transactions exempt from the registration requirements of the Securities Act and applicable state securities laws.

Each Manager has represented and agreed that, except as permitted by the Subscription Agreement, it will not offer, sell or deliver Bonds (i) as part of its distribution at any time and (ii) otherwise until 40 days after the later of the date on which Bonds were first offered to Persons other than distributors in reliance on Regulation S and the Issue Date, within the United States or to, or for the account or benefit of, U.S. persons except that certain offers, sales and deliveries of Bonds may be made by one of the Managers in the United States to U.S. persons that are QIBs in transactions exempt from the registration requirements of the Securities Act and applicable state securities laws, and it will have sent to each dealer to which it sells Bonds in reliance on Regulation S during such 40-day restricted period a confirmation or other notice setting forth the restrictions on offers and sales of the Bonds within the United States or to, or for the account or benefit of, U.S. persons. Terms used in the preceding paragraph and in this paragraph have the meanings given to them by Regulation S under the Securities Act.

In addition, until the expiration of the 40-day period referred to above, an offer or sale of Bonds within the United States by the Managers (whether or not participating in the offering) may violate the registration requirements of the Securities Act if such offer or sale is made otherwise than pursuant to Rule 144A or another exemption from registration under the Securities Act or the requirements of applicable state securities laws.

Each Manager has acknowledged and agreed that, except as permitted by the Subscription Agreement, it will not offer, sell or deliver Bonds as part of its distribution at any time within the United States or to United States persons. Each purchaser of Bonds is hereby notified that the offer and sale of Bonds may be made in reliance upon the exemption from the registration requirement of the Securities Act provided by Rule 144A.

## Subscription and Sale

United Kingdom

Each Manager has represented and agreed that (i) it has not offered or sold and, prior to the date six months after the date of issue of the Bonds, will not offer or sell any Bonds to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995 (as amended); (ii) it has complied and will comply with all applicable provisions of the Financial Services Act 1986 with respect to anything done by it in relation to the Bonds in, from or otherwise involving the United Kingdom; and (iii) it has only issued or passed on and will only issue or pass on to any person in the United Kingdom any document received by it in connection with the issue of the Bonds if that person is of a kind described in Article 11 (3) of the Financial Services Act 1986 (Investment Advertisements) (Exemptions) Order 1996 (as amended) or is a person to whom such document may otherwise lawfully be issued or passed on.

Egypt

Each Manager has represented and agreed that it has not offered or sold, and will not offer or sell, any of the Bonds using any form of general solicitation or general advertising or in a public offering in Egypt.

The British Virgin Islands

No invitation may be made to any person resident in the British Virgin Islands to subscribe for the Bonds.

General

Each Manager has agreed that it will (to the best of its knowledge and belief) comply with all applicable securities laws and regulations in force in any jurisdiction in which it purchases, offers, sells or delivers Bonds or possesses or distributes this Offering Circular and will obtain any consent, approval or permission required by it for the purchase, offer, sale or delivery by it of Bonds under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such purchases, offers, sales or deliveries and neither the Issuer nor any of the Guarantors shall have any responsibility therefor.

Purchasers of Bonds sold by the Managers may be required to pay stamp taxes and other charges in accordance with the laws and practices of the country of purchase in addition to the offering price and accrued interest, if any.

None of the Issuer, any Guarantor or any Manager represents that the Bonds may at any time lawfully be sold in compliance with any applicable registration or other requirements in any jurisdiction, or pursuant to any exemption available thereunder, or assumes any responsibility for facilitating such sale.

Although application has been made to list the Bonds on the Luxembourg Stock Exchange, the Bonds constitute a new issue of securities with no established trading market. The Managers may make a market in the Bonds, but are not obligated to do so and may discontinue any market-making, if commenced, at any time without notice. No assurance can be given as to the liquidity of the trading markets for the Bonds. Bonds issued and sold in reliance on Rule 144A have been designated for trading in the PORTAL system of the National Association of Securities Dealers, Inc.

One of the Guarantors intends to purchase Bonds as part of their initial distribution and the Guarantors may purchase additional Bonds from time to time thereafter. The Indenture provides that any Bond purchased and held by or for the account of any Guarantor shall be deemed not to be Outstanding for various purposes specified in the Indenture, including the right to attend and vote at any meeting of the Holders.

In connection with the offering of the Bonds, Warburg Dillon Read may engage in transactions that stabilize or maintain the market price of the Bonds at a level which might otherwise not prevail, including purchases of Bonds to stabilize their market price or to cover some or all of a short position in the Bonds and the imposition of penalty bids. Such transactions, if commenced, may be discontinued at any time. All such transactions will be carried out in accordance with all applicable laws and regulations.

## General Information

1. Application has been made to list the Bonds on the Luxembourg Stock Exchange. In connection with and prior to the listing of the Bonds on the Luxembourg Stock Exchange, the constituent documents of the Issuer and each Guarantor, respectively, and a legal notice relating to the issue of the Bonds will be deposited with the Chief Registrar of the District Court in Luxembourg ("*Greffier en Chef du Tribunal d'Arrondissement de et à Luxembourg*") where such documents will be available for inspection and where copies of such documents will be obtainable upon request. Bonds issued and sold in reliance on Rule 144A have been designated for trading in the PORTAL system of the National Association of Securities Dealers, Inc.

2. The issue of the Bonds and the making of the Guarantee have been authorized by all necessary action (corporate or otherwise) on the part of the Issuer and each Guarantor, respectively. Without limiting the generality of the foregoing, the issue of the Bonds was authorized by the Board of Directors of the Issuer on December 6, 1999 and the giving of the Guarantee by each Guarantor was authorized by a resolution of the Board of Directors of each Guarantor adopted on October 6, 1999.

3. All necessary consents, approvals, registrations, authorizations or other orders of regulatory authorities required under the laws and regulations of the British Virgin Islands and Egypt, as the case may be, prior to the issuance of the Bonds by the Issuer and the giving of the Guarantee by the Guarantors have been obtained.

4. Since the date of its incorporation, no financial statements of the Issuer have been prepared. The Issuer is not required by British Virgin Islands law to prepare or publish financial statements.

5. The auditors of the Lakah Holding Company, Cherif Mohamed Hammouda, a member of RSM International, and Mustafa Shawki & Co Deloitte & Touche, have audited the annual consolidated financial statements of the Lakah Holding Company as at and for the twelve-month period ended December 31, 1998 and the semi-annual consolidated financial statements of the Lakah Holding Company as at and for the six-month period ended June 30, 1999; Cherif Mohamed Hammouda, a member of RSM International, has also audited the separate annual financial statements of each of the Subsidiary Guarantors as at and for the twelve-month periods ended December 31, 1996, 1997 and 1998 (if applicable) and the separate semi-annual financial statements of each of the Subsidiary Guarantors as at and for the six-month periods ended June 30, 1998 and 1999. Such auditors have given and have not withdrawn their written consent to the distribution of this Offering Circular with the inclusion herein of their reports and references to their name in the form and context in which they appear.

6. Except as disclosed in this Offering Circular, since June 30, 1999, there has been no material adverse change in the condition (financial or otherwise), business affairs or prospects of any Guarantor individually or of the Lakah Group taken as a whole.

7. Neither the Issuer nor any Guarantor, nor any Subsidiary of a Guarantor, is involved in any litigation or arbitration proceedings which are material in the context of the issue of the Bonds nor so far as the Issuer or any Guarantor is aware is any such litigation or arbitration pending or threatened.

8. So long as the Bonds are listed on the Luxembourg Stock Exchange, the Issuer will maintain a Paying Agent in Luxembourg. The name of the Paying Agent initially appointed in Luxembourg is set forth at the end of the Offering Circular.

9. So long as any Bond is Outstanding, the Indenture, the Guarantee and the Paying Agency Agreement or copies thereof, may be inspected during normal business hours at the specified offices of the Trustee, the Paying Agent in London and the Paying Agent in Luxembourg.

10. So long as any Bond is Outstanding, copies of the following documents (together with English translations thereof) may be obtained during normal business hours at the specified office of the Paying Agent in Luxembourg: (a) the constituent documents of the Issuer and of each Guarantor, respectively,

(b) the most recently audited annual consolidated financial statements of the Lakah Holding Company and its Subsidiaries and the most recently audited separate annual financial statements of each of the Subsidiary Guarantors; and (c) the most recently available interim financial statements of each Guarantor and its consolidated Subsidiaries (if any). The Lakah Holding Company prepares quarterly unaudited consolidated financial statements, but does not publish non-consolidated financial statements.

11. For so long as the Bonds are listed on the Luxembourg Stock Exchange, all notices to be given to Bondholders or will also be published in a leading daily newspaper of general circulation in Luxembourg, which is expected to be the *Luxemburger Wort*, and for so long as the Bonds are listed on the Luxembourg Stock Exchange, Banque Internationale à Luxembourg S.A. will serve as intermediary between the Luxembourg Stock Exchange and persons connected with the issue and listing of the Bonds.

12. The Bonds have been accepted for clearance through Euroclear and Cedelbank with a Common Code of 010507870. The International Securities Identification Number (ISIN) for the Bonds is XS0105075708. In addition, Bonds purchased pursuant to Rule 144A have been accepted for trading in book-entry form by DTC under CUSIP number 507376AA9.

# Annex A
## Summary of Certain Significant Differences Between IAS and U.S. GAAP

IAS 4, **Depreciation Accounting**, requires the disclosure, for each major class of depreciable assets, of certain information including "the useful lives or the depreciation rates used, total depreciation allocated for the period and accumulated depreciation," whereas U.S. GAAP requires disclosure of depreciation expense for the period but not by asset class as well as accumulated depreciation either by major classes of depreciable assets or in total, and the depreciation rates used are not required to be presented. The Lakah Holding Company presents depreciation expense on the face of the income statement and discloses historical cost and accumulated depreciation in total in the notes to financial statements.

IAS 7, **Statement of Cash Flow**, requires financial institutions to classify as operating cash flows those amounts that result from the purchase and sale of dealing or trading securities and loans. This is different from FASB Statement 95, which allows the reporting entity to set policy for such classifications. The Lakah Holding Company applies the requirement of IAS.

IAS 24, **Related Party Disclosures**, is essentially compatible with U.S. GAAP. However, FASB Statement 57 requires "disclosures of material related party transactions other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business," The Lakah Holding Company discloses, in the notes to financial statements, the basis on which it deals with related parties. This basis is the same as the basis on which the Lakah Holding Company deals with non-related parties.

# Annex B
## The Arab Republic of Egypt

The information set forth in this section with respect to the Arab Republic of Egypt has been obtained from official or other public sources. Such information has not been independently verified by the Issuer, the Guarantors or the Manager or any of their respective affiliates or advisors.

### Geography and Population

Egypt is situated in the northeastern corner of the African continent. Its total area is approximately one million square kilometers, of which approximately 35,000 square kilometers are settled and cultivated. Egypt's Mediterranean shoreline extends from the border with Libya in the west to the border with the Gaza Strip and Israel in the east. The other country sharing a border with Egypt is Sudan in the south.

Approximately 96 per cent. of Egypt is uninhabited desert, and the country relies heavily on the Nile River to support the water needs of the population, its agriculture and its industry. The climate is hot and dry, with the temperature in Cairo during the mid winter months ranging from 8C to 18C, rising to an average maximum temperature of 36C in July, the hottest month.

The resident population totaled approximately 62.7 million at January 1, 1998, according to official estimates, of which approximately 25 per cent. live in greater Cairo, which is also the main business and tourist center. According to estimates based on 1986 census figures, approximately 94 per cent. of the population is Muslim and six per cent. Coptic Christian. The official language is Arabic, although English and, to a lesser extent, French, are widely spoken, particularly in business centers and tourist areas. A significant informal economic sector exists, whose economic contribution is not captured in official statements.

### History

After the Pharaonic era, which spanned 3,000 years, Egypt was successively conquered by the Assyrians, the Persians and the Greek, Roman and Byzantine empires until, with the birth of Islam in the seventh century A.D., the Arab armies conquered Egypt. The country was then brought under the administrative rule and political sovereignty of the Ottoman Empire, following the Ottoman conquest of 1517.

Although remaining nominally an Ottoman province, Egypt became involved in the Franco-British war in the late 18th century and was invaded by Napoleon in 1798. Three years later, however, the French had surrendered to the British and Ottoman forces. Egypt was formally a British protectorate from 1914 until 1936. Only after the Second World War were British troops evacuated.

The last Egyptian monarch, King Farouk, was exiled in 1952 after a revolution, and Egypt was officially declared a republic on June 18, 1953, with General Mohammed Naguib as its first President. General Naguib was replaced as President by Gamel Abdel-Nasser in 1954.

In the early 1960s, the Nasser Government introduced policies of nationalization with the intention of accelerating the industrialization of Egypt to achieve a more even distribution of wealth. A socialist command economy was introduced with restrictions on private enterprise leading to the flight of capital from the country. The Government's policy was to provide subsidized food, housing, healthcare and education to all and to guarantee employment to all university graduates.

During this period, Egypt became the recognized leader of the Arab world, with Arab unity constituting its predominant foreign policy objective. Egypt under Nasser fought two major wars: the Suez War in 1956 and the war with Israel in 1967, the last of which resulted in the occupation of the Gaza Strip and the Sinai by Israel.

After his death in September 1970, Nasser was succeeded as President by Anwar El Sadat who joined forces with Syria in October 1973 to wage war against Israel to recover lost territories. Following the 1973 war, a solution was brokered by the United States, resulting in the 1978 Camp David Peace Accord. This provided the basis for the 1979 peace treaty between Egypt and Israel, which led to the Israeli withdrawal from the

BOWNE OF LONDON 12/03/1999 08:35 BL/SM CUMULATIVE NEXT PCN: 196.00.00.00 -- Page is valid, no graphics U41077 195.00.00.00 15X

**Annex B — The Arab Republic of Egypt**

Sinai peninsula. The treaty met with widespread Arab condemnation, resulting in Egypt's expulsion from the Arab League and the termination of diplomatic and economic ties by all Arab states except for Sudan, Oman and Somalia.

In June 1974, a new "Open Door" policy was introduced by the Government and President Sadat, as enshrined in Law 43. This policy aimed to liberalize the economy and encourage both domestic and foreign private investment. In the mid-1970s, revenues from oil exports, Suez Canal tolls, tourism and remittances from expatriate workers increased together with foreign aid and credit facilities to the Government and the banking sector. This allowed the Government to make significant commitments to welfare benefits. In the early 1980s, however, a collapse in oil prices contributed to an economic downturn.

As a result of the deteriorating economic situation, unemployment increased significantly and up to 2.5 million workers emigrated. Domestic unrest increased, and a revival of religious fundamentalism occurred. President Sadat was assassinated in October 1981 by an extremist group, following which his Vice-President, Mohamed Hosni Mubarak, became Egypt's fourth President.

Under Mubarak's presidency, relations with the major Organization for Economic Cooperation and Development countries ("OECD") and African and Asian countries were improved, and the foreign policy goal of reinstating Egypt in the Arab League was achieved in May 1989. Following the 1991 Gulf War, in which Egypt played a major role as an ally of Kuwait, political ties with the United States and the European Union ("EU") were strengthened.

Domestically, the Government has adopted a gradualist program of economic reform focusing on the development of Egypt's infrastructure and the encouragement of private investment. This was accelerated and expanded by the 1991 IMF-sponsored economic reform program. Maintenance of domestic order and stability, in the face of extremism, is a major policy objective.

**Government and Constitutional System**

Egypt is governed according to the Constitution of 1971. The 1971 Constitution provides for a bicameral parliament consisting of the *Majlis el-Shaab* (People's Assembly) of 444 directly elected members, with a further ten members appointed by the President, and the *Majlis el-Shoura* (Advisory Council) of 140 directly elected members, with a further 70 members appointed by the President. The *Majlis el-Shaab* may be dissolved by the President only with the support of the majority of the electorate in a referendum.

The head of state is the President of the Republic who is nominated by a two-thirds majority of the *Majlis el-Shaab* and elected by referendum for a six-year term. The President has, *inter alia*, the power to formulate and supervise the implementation of general state policy, to call elections, subject to legislative approval, and to conduct foreign policy. Elections and referenda in Egypt are by universal direct suffrage. The current President, Mohamed Hosni Mubarak, was re-elected for a third term in October 1999, representing the National Democratic Party ("NDP"), and currently has a decisive majority in the legislature. Parliamentary elections to be held in 2000.

The National Government is composed of a Council of Ministers, currently headed by the Prime Minister, H.E. Dr. Atef Muhammad Ebeid. The President is responsible for the appointment and removal of all ministers. Ministers are obliged to resign if the parliament passes a motion of no confidence. If a motion of no confidence in the Prime Minister is passed against the wishes of the President, then the matter may be put to a referendum. The last major reshuffle of the Council of Ministers took place on October 11, 1999.

The main political party in Egypt is the NDP. Opposition parties include the Labor Party, the Liberal Party, the New Wafd Party, the National Progressive Unionist Party and the Democratic Nasserist Party. At the last legislative election, on November 29, 1995, the NDP won a large majority, comprising 417 parliamentary seats. The next legislative election is due to be held in November 2000.

**Legal System**

The Egyptian legal system has been influenced by, among other things, the French "*Code Civile*," upon which the Egyptian Civil Code of 1948 is largely based. Egypt is governed by a constitution, and Egyptian laws are generally in accordance with principles of Islamic law. Major legislation includes The Commercial Code of 1883, Bank and Credits Law 163 of 1957, as amended, The Code of Civil and Commercial Procedures of

B-2

BOWNE OF LONDON 12/03/1999 BL/SM CUMULATIVE NEXT PCN: 197.00.00.00 -- Page is valid, no graphics U41077 196.00.00.00 15X

Annex B — The Arab Republic of Egypt

1968, as amended, Companies Law 159 of 1981, as amended by Law 3 of 1998, Investment and Guarantees Law 8 of 1997, Capital Market Law and Arbitration Law 27 of 1994, as amended.

**International Relations**

Egypt is a founding member of the United Nations and the League of Arab States and is a member of all international organizations under the auspices of the United Nations, the International Bank for Reconstruction and Development (World Bank), the IMF, the International Finance Corporation, the African Development Bank and the International Development Association.

Egypt hosts the League of Arab States and other international organizations such as the United Nations Regional Office for Education, Science and Culture in the Arab Countries, the United Nations Commission for Refugees, Food and Agriculture Organization, World Health Organization, the United Nations Fund for Childhood, the United Nations Development Program and the Arab Center for Legal and Judicial Research affiliated with the Arab League.

Egypt has a long tradition of openness to the international community, with close ties to the Arab world, Europe and America.

Egypt is currently in talks with the EU over Egypt's membership in the EU-Mediterranean free-trade zone which is intended to be established by 2010. The talks have been proceeding slowly, principally due to issues relating to the reduction and phasing out of import tariffs, although a 12-year transition period has been agreed. According to the EU, the key elements in the talks are free circulation of industrial goods, rules of origin, agriculture, economic co-operation and competition rules. The agreement, which would cover Egypt's membership of the free-trade zone, also covers principles of democracy, human rights and private enterprise. No assurance can be given that any such agreement will be signed.

Cairo is to host the permanent headquarters of the Bank for Economic Co-operation and Development in the Middle East and North Africa ("MEDB"). The MEDB's objective will be to encourage private sector growth, provide assistance with financing cross-border infrastructure projects and maintenance of regional economic policy dialogue.

**The Economy**

In 1956, President Nasser entered into a conflict with Western powers when he nationalized the Suez Canal. Throughout the 1960s, Egypt under Nasser began to pursue policies of non-alignment and independent development, and implemented a socialist economic model based upon central planning. Many domestic and foreign companies, including banks, were nationalized during this period.

The Egyptian economy grew rapidly from the mid-1970s to the early 1980s due to President Sadat's "Open Door" policy. However, an over-emphasis on import substitution rather than exports, combined with a growing population, rising food subsidy costs, the inefficiencies of a centrally-controlled economy and the collapse of oil prices in the mid-1980s led to the rapid accumulation of external debt, which Egypt found increasingly difficult to service. Inflation and unemployment grew rapidly as a result, while the economic growth rate declined.

By the end of 1986, Egypt's total foreign debt had risen to over U.S.$46 billion. In May 1987, the Government laid the foundation for the rescheduling of Egypt's foreign debt when it concluded a Special Drawing Rights ("SDR") standby arrangement of U.S.$250 million with the IMF. This allowed approximately U.S.$6.5 billion of foreign debt to be rescheduled in a Paris Club accord. In addition, Egypt's support of Kuwait and the Arab and Western allies in the Gulf War resulted in donations of approximately U.S.$5.5 billion from Arab States in 1991 and write-offs of U.S.$7 billion in military debt by the United States and a further U.S.$7 billion of foreign debt by Arab states.

In May 1991, coinciding with the Government's reform program, an SDR standby accord of U.S.$400 million was signed with the IMF and was followed by a U.S.$300 million structural adjustment loan from the World Bank. A Paris Club agreement in the same month covered U.S.$27 billion of debt.

In the ten-year period before 1973, Egypt achieved an average annual price inflation of approximately 3 per cent. During the 1980s, inflation increased rapidly to a peak of 28.5 per cent. in December 1989, as domestic

B-3

BOWNE OF LONDON 12/03/1999 08:35 BL/SM CUMULATIVE NEXT PCN: 198.00.00.00 -- Page is valid, no graphics U41077 197.00.00.00 15X

Annex B — The Arab Republic of Egypt

fiscal and monetary conditions loosened. However, as a result of the 1991 economic reform program and the tightening of fixed and monetary policies, consumer price inflation had been reduced to 9.0 per cent. as at June 30, 1994. As a result of sharp increases in food costs and signs of economic recovery, the annualized rate of inflation for 1995, rose to 9.9 per cent. but moderated to 8.3 per cent. in 1996 and 3.8 per cent. in 1998.

The following table sets out certain key Egyptian economic and financial indicators:

| Real Economy | 1993-94 | 1994-95 | 1995-96 | 1996-97 | 1997-98 |
|---|---|---|---|---|---|
| Nominal GDP at Market Price (L.E. billions) | 175 | 204 | 229 | 256 | 280 |
| Real GDP at Market Prices (L.E. billions) | 149 | 156 | 164 | 173 | — |
| Real GDP Growth Rate | 3.9 | 4.7 | 5.0 | 5.3 | 5.7 |
| # Real GDP Growth Rate (per capita) | 1.9 | 2.5 | 2.9 | 3.4 | 3.4 |
| Unemployment Rate | 9.8 | 9.6 | 9.2 | 8.8 | 8.3 |
| Average Annual Inflation | 9.1 | 9.4 | 7.3 | 6.2 | 3.8 |
| End of Period yr./yr. Inflation Rate | 6.4 | 9.9 | 8.3 | 4.8 | 4.1 |
| **Savings — Investments** | In per cent. of GDP — Unless Otherwise Stated | | | | |
| Gross Domestic Savings (L.E. billions) | 26.5 | 30.6 | 29.1 | 27.5 | 44.0 |
| Gross Domestic Investments (L.E. billions) | 29.0 | 33.1 | 36.8 | 45.2 | 54.6 |
| Gross Domestic Savings | 15.1 | 15.0 | 12.7 | 10.7 | 15.7 |
| Gross Domestic Investments | 16.6 | 16.2 | 16.0 | 17.6 | 19.5 |

*Sources: Ministry of Planning and CAPMAS.*

*# Figures revised form Previous Issue.*

| External Sector | 1993/94 | 1994/95 | 1995/96 | 1996/97 | 1997/98 |
|---|---|---|---|---|---|
| | In per cent. of GDP — Unless Otherwise Stated | | | | |
| Total Balance (U.S.$ million) | (7,310) | (7,854) | (9,498) | (10,219) | (11,771) |
| | 14.2 | 13.1 | 14.1 | 13.5 | 14.2 |
| Total Exports (U.S.$ million) | 3,337 | 4,957 | 4,609 | 5,345 | 5,128 |
| | 6.5 | 8.2 | 6.8 | 7.1 | 6.2 |
| Total Imports (U.S.$ million) | (10,647) | (12,811) | (14,107) | (15,565) | (16,899) |
| | 20.6 | 21.3 | 20.9 | 20.6 | 20.5 |
| Current Account Balance | 0.8 | 0.6 | (0.3) | 0.2 | (3.4) |
| Overall BOP Balance | 4.1 | 1.3 | 0.8 | 2.5 | 0.2 |
| **External Debt Indicators** | End Period in per cent. of GDP — Unless Otherwise Stated | | | | |
| Total External Debt (U.S.$ million) | 30,894 | 32,965 | 31,043 | 28,774 | 28,076 |
| Total External Debt (of which): | 59.9 | 54.8 | 45.9 | 38.1 | 34.0 |
| Short Term Debt | 2.1 | 2.1 | 1.9 | 2.0 | 2.1 |
| Foreign Debt Service/GDP | 4.2 | 4.0 | 3.3 | 2.0 | 1.8 |
| Debt Service Ratio(1) | 13.6 | 12.7 | 12.0 | 7.2 | 7.2 |
| Net International Reserves as Number of Months of Imports | 18.8 | 16.4 | 15.7 | 15.7 | 14.3 |
| NIR to Short Term External Liabilities | 2.7 | 11.2 | 11.4 | 10.1 | 11.7 |
| **Capital Market Indicators** | End December Unless Otherwise Stated | | | | |
| Stock Market Capitalization as per cent. of GDP | 7.2 | 12.2 | 18.8 | 25.2 | 30.5 |
| Price/Earnings Ratio(2) | — | — | 11.3 | 11.5 | 8.7 |
| Annual Volatility (standard deviation)(3) | 5.6 | 2.2 | 5.9 | 3.1 | 3.6 |
| Number of Listed Companies | 700 | 746 | 646 | 650 | 861 |
| Volume of Trading (millions of Securities) | 13.7 | 29.5 | 43.7 | 170.5 | 286.7 |
| Value of Trading (£E millions) | 275 | 1,214 | 2,294 | 8,769 | 20,282 |

*Sources: Central Bank of Egypt and Capital Market Authority.*

(1) *Stands for the ratio of external debt service to current account receipts. Current account receipts include proceeds from export of goods and services and total transfer.*

(2) *The ratios are calculated according to the most actively traded stocks which represent 60 to 75 per cent. of the total capitalization of all shares listed in the stock exchange, following the IFCG indexes methodology.*

(3) *Market volatility represents the standard deviation of monthly returns during the year.*

B-4

**Annex B — The Arab Republic of Egypt**

A new IMF Extended Fund Facility was approved in September 1993. However, the IMF delayed its technical review of this facility, as it believed that the Government should devalue the Egyptian pound in order to boost exports and allow lower interest rates.

This devaluation issue was resolved with the IMF in 1996. On October 11, 1996, the Paris Club wrote off U.S.$4.2 billion of Egypt's debts pursuant to the IMF Egyptian Agreement.

Fitch IBCA assigned a long-term rating of BBB– to Egypt on August 19, 1997 following Standard and Poor's decision to award Egypt with an investment grade BBB– rating in January 15, 1997, which was one notch above Moody's rating of Ba1 announced in November 14, 1997.

The official rate of unemployment as of June 30, 1998 was 8.3 per cent. The World Bank estimates that over the next ten years there will be yearly increases of more than one million in the working-age population in Egypt and the labor force (assuming a constant participation rate) will expand at 2.8 per cent. annually, with about 560,000 people entering the job market, more than 25 per cent. of whom will be in the 15-24 age group. Thus, it is essential for Egypt to create jobs and income opportunities to meet the rising expectations of the younger generation.

**Economic Policies**

In 1991, the Government commenced an economic reform program the objectives of which are macroeconomic stability, financial sector reform and the reduction of price distortions and obstacles to foreign trade. Key elements of the program have been the introduction of a privatization program, the gradual replacement of central planning by market economics, the gradual reduction of government spending on subsidies, the deregulation of interest rates and foreign exchange, the introduction of the Capital Market Law and trade liberalization.

This program, which has received support from the IMF and the World Bank, has resulted in an improvement in Egypt's external balance of payments. After registering deficits on both trade and current accounts through the 1980s, the current account has improved since 1990, owing primarily to high receipts from invisibles, a reduction in debt service costs, and large net transfers. According to the IMF, foreign currency reserves increased from U.S.$6 billion in June 1991 to U.S.$20.3 billion in 1997, before reducing slightly to U.S.$19.8 billion in June 1998.

IMF figures show that official GDP growth has grown over the last three years at a average rate of 5.2 per cent. and that the budget deficit as a percentage of GDP has declined from 4.2 per cent. in 1993 to 1.3 per cent. in 1996 and to 1.0 per cent. in 1998. The national budget for the fiscal year ending June 30, 1997 reflects the continued tight fiscal policy. Expenditure and revenues were budgeted to rise virtually in line with inflation. The deficit for 1998 was 1.0 per cent. GDP, financed mainly from domestic sources.

## Annex B — The Arab Republic of Egypt

### Gross Domestic Product

The following table sets forth Egypt's GDP at factor cost[1] in current prices by sector and by origin for each of the years indicated:

| (E£ Million) | 1993-94 | 1994-95 | 1995-96 | 1996-97 | 1997-98 | 1998-99 Estimated |
|---|---|---|---|---|---|---|
| Total GDP | 162,967 | 191,010 | 214,185 | 239,500 | 262,220 | 283,001 |
| Total Commodity Sector | 80,880 | 93,750 | 104,684 | 118,532 | 130,509 | 138,585 |
| Agriculture | 27,500 | 32,050 | 36,968 | 42,325 | 45,878 | 49,360 |
| Industry and Mining | 28,030 | 33,330 | 37,936 | 43,383 | 48,798 | 55,225 |
| Petroleum and Products | 13,399 | 15,120 | 14,760 | 15,854 | 16,803 | 12,775 |
| Electricity | 3,451 | 3,750 | 3,980 | 4,220 | 4,470 | 4,565 |
| Construction | 8,500 | 9,500 | 11,040 | 12,750 | 14,560 | 16,660 |
| Total Production Services | 52,710 | 62,250 | 69,850 | 77,552 | 84,336 | 92,919 |
| Transportation[2] | 17,560 | 19,700 | 21,500 | 22,695 | 24,507 | 26,300 |
| Trade, Finance and Insurance | 32,870 | 39,700 | 45,109 | 51,027 | 56,665 | 63,077 |
| Hotels and Restaurants | 2,280 | 2,850 | 3,241 | 3,830 | 3,164 | 3,542 |
| Total Social Services | 29,377 | 35,010 | 39,651 | 43,416 | 47,375 | 51,497 |
| Housing and Real Estate | 2,850 | 3,450 | 3,816 | 4,375 | 4,860 | 5,412 |
| Utilities | 570 | 690 | 843 | 915 | 1,038 | 1,179 |
| Social Insurance | 107 | 120 | 140 | 165 | 185 | 214 |
| Government Services | 12,750 | 15,100 | 17,220 | 18,900 | 20,662 | 22,352 |
| Social and Personal Services | 13,100 | 15,650 | 17,632 | 19,061 | 20,630 | 22,340 |

*Source: Ministry of Planning*

(1) *Does not include net indirect taxes.*

(2) *Includes Suez Canal.*

### The Exchange Rate System

The rate of exchange between the Egyptian pound and the U.S. Dollar has remained stable in recent years, although there have been recent instances of reduced availability of U.S. Dollars on the Egyptian market. The CBE does not usually intervene directly in the foreign exchange market, but makes use of the four public sector banks to influence the exchange rate.

In 1969, the Government introduced a multiple exchange rate to encourage revenues from tourism, expatriate workers and other sources and to bolster Egypt's foreign exchange position. During the 1980s various mechanisms to fix the multiple exchange rates were established through setting different pools and determining their resources and permitted utilizations. In all these mechanisms, the primary concern was to fix the exchange rate of the U.S. Dollar to the Egyptian pound. The exchange rates of other currencies were determined on the basis of such exchange rate.

In 1987, an amendment was introduced to the foreign exchange regulations establishing the free market for foreign exchange. Pursuant to this amendment, the banks in Egypt that were authorized to deal in both Egyptian pounds and foreign currencies were allowed to buy and sell foreign currencies for their account and at their own responsibility within the scope of the free market for foreign currencies. During this period, the daily buying and selling rates of foreign currencies were declared by a special committee on the basis of supply and demand indicators. The committee announced the buying and selling rates of the U.S. Dollar in Egyptian pounds, and also determined the exchange rates of other currencies on the basis of the closing rates for U.S. Dollars in the London market for the same day. Gradually, the resource and permitted utilizations of the free foreign exchange market grew at the cost of the other governmental pools and exchange rates.

This exchange rate system was replaced in early 1991 by a simpler, market-led, two-tier structure, with one rate for private transactions by banks and non-bank dealers and another rate for government transactions, linked to the free market rates. The margin between the two rates gradually disappeared, and in October 1991 a unified free market rate was applied. This also resulted in the abolition of the CBE pool into which export revenues from oil, cotton and rice had previously been paid in order to contribute towards foreign debt servicing and subsidized food imports.

**Annex B — The Arab Republic of Egypt**

In August 1994, the current Foreign Exchange Law 38 of 1994 (the "Foreign Exchange Law") was passed to complete the previous steps to liberalize the foreign exchange market. The CBE, registered banks and other authorized entities are now free to determine the applicable exchange rate within the framework of a free foreign exchange market. The Foreign Exchange Law and its executive regulations permit the free transfer of foreign currency inside and outside Egypt provided such transfer is effected through registered banks.

The Egyptian pound is not officially convertible outside Egypt and is not subject to transfer outside Egypt through banks. Therefore, the Foreign Exchange Law provides that the entry and export of Egyptian currency, notes or coins, will be in accordance with the terms and conditions to be set forth by the competent Government minister.

Throughout the development of the exchange rate systems in Egypt and at present, the exchange rate of the Egyptian pound to the U.S. Dollar has always provided the basis for determining the exchange rates between the Egyptian pound and other foreign currencies.

The following table sets forth, for the periods indicated, certain information concerning the exchange rate (as reported by Datastream) between the U.S. Dollar and the Egyptian pound.

| Year Ended December 31, | High | Low | Average | Period End |
|---|---|---|---|---|
| 1992 | 3.4850 | 3.2326 | 3.3275 | 3.3282 |
| 1993 | 3.3984 | 3.2546 | 3.3449 | 3.3711 |
| 1994 | 3.4367 | 3.3165 | 3.3787 | 3.4088 |
| 1995 | 3.4252 | 3.3930 | 3.4049 | 3.4034 |
| 1996 | 3.4200 | 3.3920 | 3.3999 | 3.3929 |
| 1997 | 3.4123 | 3.3897 | 3.3965 | 3.4024 |
| 1998 | 3.4287 | 3.3850 | 3.4077 | 3.4100 |
| 1999[1] | 3.4425 | 3.4055 | 3.4132 | 3.4129 |

*Note:*

(1) Through September, 1999.

**Monetary and Financial System**

The following table sets forth information regarding the developments in monetary aggregates for the periods indicated:

| End of Period Stocks | 1993/94 | 1994/95 | 1995/96 | 1996/97 | 1997/98 |
|---|---|---|---|---|---|
| Net Foreign Assets, of which: | 45,899 | 48,017 | 48,164 | 56,110 | 45,138 |
| Net International Reserves | 86,183 | 91,970 | 90,737 | 94,031 | 81,616 |
| of which: Central Bank Reserves | 56,493 | 59,300 | 61,478 | 67,751 | 67,023 |
| Net Domestic Assets, of which: | 91,546 | 104,560 | 120,368 | 137,792 | 165,349 |
| Net Claims on Government Sector | 69,521 | 66,781 | 71,274 | 75,760 | 76,293 |
| Claims on Private Sector | 49,918 | 66,434 | 84,503 | 107,746 | 135,232 |
| National Currency | 33,145 | 48,202 | 61,815 | 77,428 | 98,908 |
| Foreign Currency | 16,773 | 18,232 | 22,688 | 30,318 | 36,324 |
| Total Liquidity | 137,445 | 152,577 | 168,532 | 193,902 | 210,487 |
| Money | 28,264 | 31,634 | 35,056 | 39,052 | 43,590 |
| Quasi Money | 109,181 | 120,943 | 133,476 | 154,850 | 166,897 |
| **Memorandum, Items:** | | | | | |
| Dollarization (% of total liquidity) | 23.4 | 25.1 | 22.9 | 19.4 | 17.9 |
| Exchange Rate (end of period) | 3.390 | 3.395 | 3.393 | 3.389 | 3.395 |

*Source: Central Bank of Egypt.*

## Annex B — The Arab Republic of Egypt

### International Reserves

The following table sets out the monthly reserve money and counterpart assets for the past year indicated:

| End — Period Stock | Sept-98 | Oct-98 | Nov-98 | Dec-98 | Jan-99 | Feb-99 | Mar-99 | Apr-99 | May-99 |
|---|---|---|---|---|---|---|---|---|---|
| Reserve Money | 58,553 | 57,275 | 57,194 | 59,194 | 60,735 | 59,627 | 62,040 | 60,069 | 60,102 |
| Net Foreign Assets | 28,380 | 26,764 | 27,531 | 25,797 | 25,775 | 26,111 | 25,112 | 24,470 | 23,301 |
| Domestic Assets | 30,173 | 30,511 | 30,010 | 33,397 | 34,960 | 33,516 | 36,928 | 35,599 | 36,801 |
| Net International Reserves (U.S. million) | 20,183 | 20,049 | 20,004 | 19,801 | 19,503 | 19,319 | 18,920 | 18,690 | 18,226 |

*Source: Central Bank of Egypt.*

### Foreign Trade

Egypt's total exports recorded a constant increase and amounted to 3.2 billion for the financial year 1998. Fuel exports constituted the single largest category of exports.

The country's imports rose over the period from 1995 to 1998, from U.S.$9.6 billion for the financial year 1995 to U.S.$16.5 billion for the financial year 1998. According to CBE statistics, food imports and equipment and machinery constituted the largest categories of imports. Egypt's main export destinations are the EU, the United States and India. The main sources of imports are the EU, the United States and Japan.

The following tables show Egypt's principal trading partners for exports and for imports for the years indicated:

| U.S.$ (million) | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| Trade Balance | (6,058) | (8,236) | (9,414) | (9,302) | (13,301) |
| Total Exports | 3,517 | 3,524 | 3,618 | 3,931 | 3,201 |
| | | *(0.0)* | *(3.0)* | *(8.6)* | *(18.6)* |
| Fuel Exports | 1,294 | 1,217 | 1,627 | 1,598 | 822 |
| Crude Oil | 792 | 703 | 817 | 670 | 161 |
| Other Products | 501 | 514 | 810 | 929 | 661 |
| Non-oil Exports | 2,224 | 2,307 | 1,991 | 2,333 | 2,379 |
| | | *(2.2)* | *(15.0)* | *(15.0)* | *(1.8)* |
| Raw Cotton | 233 | 152 | 92 | 111 | 158 |
| Raw Materials | 162 | 247 | 219 | 191 | 184 |
| Finished goods | 1,206 | 1,172 | 1,034 | 1,228 | 1,264 |
| Free Zones | 49 | 74 | 80 | 74 | 90 |
| Total Imports | 9,575 | 11,760 | 13,032 | 13,233 | 16,502 |
| | | *(23.0)* | *(11.0)* | *(2.0)* | *(24.7)* |
| Fuel Imports | 3 | 9 | 25 | 118 | 771 |
| Non-oil Imports | 9,572 | 11,751 | 13,007 | 13,115 | 15,732 |
| | | *(23.0)* | *(11.0)* | *(1.0)* | *(19.9)* |
| Raw Materials | 1,359 | 1,657 | 2,245 | 1,707 | 1,723 |
| | | *(22.0)* | *(36.0)* | *-(24.0)* | *(0.9)* |
| Intermediate Goods | 3,776 | 5,174 | 5,461 | 5,636 | 6,194 |
| | | *(37.0)* | *(5.0)* | *(3.0)* | *(9.9)* |
| Investment Goods | 2,437 | 2,633 | 2,984 | 3,339 | 3,997 |
| | | *(8.0)* | *(13.0)* | *(12.0)* | *(19.7)* |
| Consumption Goods | 1,894 | 2,188 | 2,193 | 2,337 | 2,744 |
| | | *(16.0)* | *(1.0)* | *(7.0)* | *(17.4)* |
| Durable Goods | 439 | 513 | 507 | 518 | 671 |
| Non-durable Goods | 1,455 | 1,675 | 1,686 | 1,820 | 2,073 |
| Free Zones | — | — | — | — | 1,082 |
| Exchange Rate | 3.390 | 3.392 | 3.393 | 3.392 | 3.395 |

*Source: CAPMAS, Exchange Rate C.B.E.*

*( ) per cent. change over previous year.*

*Note: Data in this table are based on Customs Authorities' computation of goods movements. It may differ from data compiled in the balance of payments which are based on financial records of the banking system.*

BOWNE OF LONDON 12/03/1999 08:35 BL/SM CUMULATIVE NEXT PCN: 203.00.00.00 -- Page is valid, no graphics U41077 202.00.00.00 21X

Annex B — The Arab Republic of Egypt

**Balance of Payments**

The following tables set out Egypt's balance of payments capital and current accounts for the years indicated. Certain data set forth below may differ in some respects from corresponding data included elsewhere in this document as a result of the use of different methods of calculation:

**Balance of Payments (Current Account)**

| U.S.$ (million) | 1993/94 | 1994/95 | 1995/96 | 1996/97 | 1997/98 |
|---|---|---|---|---|---|
| Trade Balance | (7,310) | (7,854) | (9,498) | (10,219) | (11,771) |
| Export | 3,337 | 4,957 | 4,609 | 5,345 | 5,128 |
| Petroleum | 1,772 | 2,176 | 2,226 | 2,578 | 1,728 |
| Other Export | 1,565 | 2,781 | 2,383 | 2,768 | 3,400 |
| Import | (10,647) | (12,811) | (14,107) | (15,565) | (16,899) |
| Services (net) | 3,674 | 4,042 | 5,791 | 6,193 | 4,595 |
| Receipts | 8,677 | 9,556 | 10,636 | 11,241 | 10,444 |
| Suez Canal | 1,990 | 2,058 | 1,885 | 1,849 | 1,777 |
| Travel | 1,779 | 2,299 | 3,009 | 3,646 | 2,941 |
| Investment Income | 1,197 | 1,626 | 1,829 | 2,052 | 2,080 |
| Other | 3,711 | 3,573 | 3,913 | 3,693 | 3,646 |
| Payments, of which | 5,004 | 5,514 | 4,844 | 5,048 | 5,849 |
| Interest | 1,319 | 1,485 | 1,290 | 1,085 | 941 |
| Private Transfers (net) | 3,232 | 3,279 | 2,798 | 3,256 | 3,519 |
| Current Account (excl. official Transfers) | (404) | (533) | (909) | (771) | (3,658) |
| Official Transfers (net) | 814 | 919 | 724 | 890 | 885 |
| Current Account Balance | 410 | 386 | (185) | 119 | (2,772) |

*Source: Central Bank of Egypt.*

*Note: Trade data in this table are based on banking sector compilation based on cash transactions. It may differ from data compiled by CAPMAS which are based on Custom Authorities' records of movement of goods.*

**Balance of Payments (Capital Account)**

| U.S.$ (million) | 1993/94 | 1994/95 | 1995/96 | 1996/97 | 1997/98 |
|---|---|---|---|---|---|
| Capital & Financial Account[1] | 2,511 | 430 | 1,017 | 2,041 | 3,765 |
| Direct Investment Abroad | (36) | (48) | (15) | (47) | (100) |
| Direct Investment In Egypt | 1,321 | 783 | 627 | 770 | 1,108 |
| Portfolio Investment (net) | 3 | 4 | 258 | 1,463 | (248) |
| Other Investment (net) | 1,224 | (310) | 148 | (145) | 3,006 |
| Net Borrowing | 228 | 1,084 | 89 | 225 | 920 |
| M&L Term Loans (net) | 365 | 303 | (75) | (113) | (54) |
| Drawings | 645 | 729 | 472 | 416 | 525 |
| Repayments | (280) | (427) | (547) | (528) | (579) |
| MT Suppliers Credit (net) | (136) | (171) | (283) | (251) | 322 |
| Drawings | 214 | 163 | 56 | 77 | 547 |
| Repayments | (350) | (334) | (339) | (328) | (225) |
| ST Suppliers Credit (net) | — | 953 | 447 | 588 | 652 |
| Other Assets | 1,399 | (1,406) | 237 | (1,590) | 317 |
| Other Liabilities | (404) | 13 | (177) | 1,221 | 1,769 |
| Net Errors & Omissions | (815) | (61) | (261) | (247) | (1,128) |
| Overall Balance | 2,106 | 754 | 571 | 1,912 | (135) |
| Change in CBE's Reserve Assets (increase = •) | (2,106) | (754) | (571) | (1,912) | 135 |

*Source: Central Bank of Egypt.*

*(1) Includes exceptional financing.*

B-9

## Annex B — The Arab Republic of Egypt

### Government Finances

The following table sets forth the revenues and expenditures of the Government for the years indicated:

| U.S.$ (million) | 1993/94 | 1994/95 | 1995/96 | 1996/97 | 1997/98 | 1998/99 Budget |
|---|---|---|---|---|---|---|
| Total Revenues | 52,567 | 55,719 | 60,893 | 64,498 | 67,963 | 69,919 |
| Tax revenues | 31,373 | 34,279 | 38,249 | 40,518 | 43,962 | 45,700 |
| Transferred profits | 9,070 | 10,542 | 11,133 | 11,423 | 10,780 | 9,812 |
| other non-tax revenues | 5,941 | 5,068 | 5,104 | 5,238 | 5,293 | 5,446 |
| Non-Central Government revenues[1] | 6,183 | 5,830 | 6,407 | 7,319 | 7,928 | 8,961 |
| Total Expenditure of which: | 56,264 | 58,256 | 63,889 | 66,826 | 70,783 | 73,919 |
| Current expenditure | 45,912 | 46,933 | 51,196 | 53,030 | 55,289 | 58,002 |
| of which: Domestic interest payments | 11,816 | 11,177 | 12,231 | 12,337 | 12,219 | 12,772 |
| Foreign interest payment | 4,682 | 3,613 | 3,796 | 3,114 | 2,724 | 2,624 |
| Investment expenditure | 10,659 | 11,299 | 12,581 | 14,070 | 15,635 | 16,110 |
| Overall Balance | (3,697) | (2,537) | (2,996) | (2,328) | (2,820) | (4,000) |
| Overall Balance as % of GDP | (2.1) | (1.3) | (1.3) | (0.9) | (1.0) | (1.3) |

*Source: Ministry of Finance.*

The following table sets out Egypt's total external debt by type of borrowing and maturity for the years indicated.

| U.S.$ (million) | 1993/94 | 1994/95 | 1995/96 | 1996/97 | 1997/98 | Jun-99 |
|---|---|---|---|---|---|---|
| Total External Debt | 30,895 | 32,965 | 31,043 | 28,774 | 28,076 | 28,224 |
| Medium and Long Term Public and Publicly Guaranteed Debt | 29,757 | 31,668 | 29,738 | 27,226 | 26,226 | 26,010 |
| Bilateral loans | 24,135 | 25,926 | 24,333 | 22,263 | 21,102 | — |
| Loans from International Organizations | 3,537 | 3,779 | 3,826 | 3,832 | 4,302 | 4,326 |
| Credit to Suppliers and Buyers | 2,085 | 1,963 | 1,579 | 1,131 | 822 | — |
| Short Term Debt | 1,104 | 1,271 | 1,295 | 1,541 | 1,719 | 1,830 |
| Private Sector Debt | 34 | 26 | 10 | 7 | 131 | 384 |
| **Memorandum Item** | | | | | | |
| Total External Debt as % of GDP | 59.9 | 54.8 | 45.9 | 38.1 | 34.0 | 31.5 |

*Source: Central Bank of Egypt.*

### Foreign Investment

The Egyptian authorities have been making efforts to encourage foreign direct investment. Foreign direct investments increased from U.S.$769.7 million in fiscal 1997 to U.S.$1.1 billion in fiscal 1998. Foreign portfolio investment has been low, limited by the level of liquidity of the stock market in Egypt although foreign portfolio investment increased from U.S.$724 million in 1996, with the launch of several mutual funds established to invest in the Egyptian stock market and to take advantage of the privatization program, to U.S.$1.6 billion by October 1997. However, due to worldwide market turbulence, in 1998 foreign portfolio investment declined by U.S.$248 million.

### Foreign Assistance

The majority of Egypt's foreign aid comes from the United States through the U.S. AID and GSM102 programs. The United States is Egypt's largest individual donor, having provided in recent years in excess of U.S.$2 billion per annum of which approximately U.S.$1.3 billion per annum was by way of military aid. Other countries supply lesser amounts. Immediately after the Gulf War in 1991, Egypt was the largest recipient of foreign aid in the Middle East with a total of just under U.S.$10 billion, benefiting from its support for the allies. Total foreign aid has since fallen because of reduced direct aid from the United States and rising budgetary constraints reducing the ability of the Gulf Arab countries to provide aid to Egypt.

### The Egyptian Securities Market And The Cairo And Alexandria Stock Exchanges

The CMA was set up by the Government in 1979 pursuant to Presidential Decree No. 520 of 1979 to promote investment in the Egyptian securities market. The CMA is responsible for regulation of the securities

BOWNE OF LONDON 12/03/1999 08:35 BL/SM CUMULATIVE NEXT PCN: 205.00.00.00 -- Page is valid, no graphics U41077 204.00.00.00 20X

Annex B — The Arab Republic of Egypt

market in Egypt, the issue of licenses for financial intermediary businesses, including brokerage, venture capital, mutual fund management and portfolio management, the monitoring of continuing obligations of listed companies, the maintenance of the central securities depositary and investor protection. The President of CASE and the Chairman of the CMA have the right under the Capital Market Law to stop certain offers and bids for shares of listed companies which are considered to be manipulative, distorting or in violation of market rules. The development of the securities market in Egypt since 1992 has encouraged certain Egyptian banks and financial institutions to begin to provide such services as securities underwriting, brokerage and mutual funds.

The most important factor in the growth of the Egyptian securities market since 1992 has been the Government's privatization program. In June 1991, the Government enacted Law 203, which provided for the restructuring of 314 public sector enterprises, then accounting for approximately 70 per cent. of the Egyptian public sector. During 1993, these enterprises were reorganized under 27 (now 16) holding companies, which have authority to dispose of or liquidate their assets, in some cases after restructuring to make them more attractive to investors.

The pace of privatization in the early years was slow, but the process has been revitalized under the prior administration of Prime Minister El-Ganzouri and the current administration of Prime Minister Dr. Atef Muhammad Ebeid. As at December 31 1998, the Public Enterprise Office reported that 91 companies had been either majority privatized or liquidated for assets. Other privatization transactions in addition to those reported by the Public Enterprise Office have also occurred or are underway in various sectors of the Egyptian economy.

The Capital Market Law permitted the introduction of mutual funds to the Egyptian market with 19 mutual funds launched as at December 31, 1998. Together, these 19 mutual funds represented a total of approximately E£3.6 billion at nominal value under management as of that date.

The Egyptian Companies Law permits companies to issue bonds and other tradable securities. The only corporate bond issue listed on CASE before the enactment of the Capital Market Law was the issue of the Crédit Foncier Egyptian bonds, issued in 1951. Since the promulgation of the Capital Market Law, there have been 19 corporate bond issues.

The market capitalization of CASE (which is measured by the total number of issued shares of all listed companies, whether or not actually traded) increased by 153 per cent. in 1995 in spite of stagnating prices, and market index levels. At December 31, 1996 CASE's market capitalization was approximately E£48 billion (U.S.$14 billion). At December 31, 1998, CASE market capitalization was approximately E£83 billion (U.S.$24 billion).

CASE suffers from a relative lack of liquidity, as most of the approximately 861 listed companies are closed subscription companies and only approximately 100 trade on a regular basis. In March 1996, after a series of warnings, the CMA delisted 48 companies for failing to meet its requirements and in 1997, 18 companies were delisted. From January 1, 1998 to December 31, 1998, average daily trading volume on CASE amounted to approximately E£76.6 million (U.S.$22.5 million), or approximately 1.6 million shares daily.

B-11

# Index to Financial Statements

| | Page |
|---|---|
| **Annual Financial Statements** | |
| LAKAH HOLDING COMPANY | |
| Reports of Auditors | F-2 |
| Consolidated Balance Sheet as at December 31, 1998. | F-4 |
| Consolidated Income Statement for the year ending December 31, 1998. | F-5 |
| Statement of Cash Flows for the year ended December 31, 1998. | F-6 |
| Notes to the Consolidated Financial Statements | F-7 |
| MEDEQUIP | |
| Report of Auditor | F-15 |
| Balance Sheet as at December 31, 1996, 1997 and 1998. | F-16 |
| Income Statement for the periods ended December 31, 1996, 1997 and 1998. | F-17 |
| Statement of Cash Flows for the periods ended December 31, 1997 and 1998 | F-18 |
| Notes to the Financial Statements | F-19 |
| TMSE | |
| Report of Auditor | F-22 |
| Balance Sheet as at December 31, 1996, 1997 and 1998. | F-23 |
| Income Statement for the periods ended December 31, 1997 and 1998. | F-24 |
| Statement of Cash Flows for the periods ended December 31, 1997 and 1998 | F-25 |
| Notes to the Financial Statements | F-26 |
| ARAB STEEL | |
| Report of Auditor | F-29 |
| Balance Sheet as at December 31, 1996, 1997 and 1998. | F-30 |
| Income Statement for the period ended December 31, 1998. | F-31 |
| Statement of Cash Flows for the periods ended December 31, 1997 and 1998 | F-32 |
| Notes to the Financial Statements | F-33 |
| **Interim Financial Statements** | |
| LAKAH HOLDING COMPANY | |
| Reports of Auditors | F-36 |
| Consolidated Balance Sheet as at June 30, 1999. | F-38 |
| Consolidated Income Statement for the period from January 1, 1999 to June 30, 1999. | F-39 |
| Statement of Cash Flows for the period from January 1, 1999 to June 30, 1999. | F-40 |
| Notes to the Consolidated Financial Statements | F-41 |
| MEDEQUIP | |
| Report of Auditor | F-48 |
| Financial Position as at June 30, 1999. | F-49 |
| Income Statement for the period from January 1, 1999 to June 30, 1999. | F-50 |
| Notes to the Financial Statements | F-51 |
| TMSE | |
| Report of Auditor | F-55 |
| Financial Position as at June 30, 1999. | F-56 |
| Income Statement for the period from January 1, 1999 to June 30, 1999. | F-57 |
| Notes to the Financial Statements | F-58 |
| ARAB STEEL | |
| Report of Auditor | F-61 |
| Financial Position as at June 30, 1999. | F-62 |
| Income Statement for the period from January 1, 1999 to June 30, 1999. | F-63 |
| Notes to the Financial Statements | F-64 |
| **Pro Forma Unaudited Financial Statements** | |
| LAKAH HOLDING COMPANY | |
| Reports of Accountants | F-67 |
| Pro-Forma Consolidated Balance Sheet as at December 31, 1998. | F-69 |
| Pro-Forma Consolidated Income Statement for the year ending December 31, 1998. | F-70 |
| Basis of Preparation | F-71 |

# Auditor's Report

**Cherif Mohamed Hammouda**
*Chartered Accountant*
*Member of RSM International*

To the Board of Directors of Holding Company for Financial Investments (Lakah Group), S.A.E.

We have audited the accompanying consolidated balance sheet of Holding Company for Financial Investments (Lakah Group), S.A.E. and its subsidiaries as at December 31, 1998 and the related consolidated statements of income and cash flows for the year then ended. These consolidated financial statements are the responsibility of the Company's management. It is our responsibility to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with International Auditing Standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the report of the other auditors provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Holding Company for Financial Investments (Lakah Group), S.A.E. as at December 31, 1998, and the results of their operations and their cash flows for the year then ended in conformity with International Accounting Standards and comply with applicable Egyptian laws and regulations.

Cherif Hammouda

FESAA-FIFA-FEST
R.A.A. 14260

9 September, 1999

# Independent Auditors' Report

**Mostafa Shawki & Co**
**Deloitte & Touche**

153 Mohamed Farid St.
Bank Mist Tower
P.O. Box 2095
Cairo 11511

Telephone: (02) 391.7299
(02) 392.6000
Facsimile: (02) 393.9430
Email: mshawki@mshawki.com

To the Board of Directors of
The Holding Company for Financial Investments
(Lakah Group),
S.A.E.

We have audited the accompanying consolidated balance sheet of the Holding Company for Financial Investments (Lakah Group), S.A.E. as of December 31, 1998 and the related consolidated statements of income and cash flows for the year then ended. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit. We did not audit the financial statements of the eight subsidiaries explained in Note No. 1 (consolidated subsidiaries) which statements were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to the eight subsidiaries, is based solely on the reports of such other auditors.

We conducted our audit in accordance with International Standards on Auditing. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit and the reports of the other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audit and the reports of the other auditors, such consolidated financial statements present fairly, in all material respects the financial position of the Holding Company for Financial Investments Lakah Group (S.A.E.) as of December 31, 1998 and the results of their operations and their cash flows for the year then ended in conformity with International Accounting Standards and in compliance with applicable Egyptian laws and regulations.

Mostafa Shawki & Co
Deloitte & Touche
27 September, 1999

**Deloitte Touche**
**Tohmatsu**

## HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E.

## CONSOLIDATED BALANCE SHEET as at December 31, 1998

| | Notes | Consolidated L.E. | Consolidated U.S.$ |
|---|---|---|---|
| **Assets** | | | |
| **Current Assets** | | | |
| Cash and Cash Equivalents | (3) | 18,165,619 | 5,342,829 |
| Debtors — Short Term Balances (Net) | (4) | 506,392,231 | 148,938,891 |
| Inventory | (2-4)(5) | 194,697,123 | 57,263,860 |
| Work in progress | | 109,353,565 | 32,162,814 |
| Total Current Assets | | 828,608,538 | 243,708,394 |
| **Long Term Assets** | | | |
| Accounts Receivables — Long Term | (6) | 167,640,320 | 49,305,976 |
| Long Term Investments | (2-5)(7) | 262,135,125 | 77,098,566 |
| Fixed Assets — (Net) | (2-6)(8) | 394,603,343 | 116,059,807 |
| Projects under Construction | (9) | 164,982,129 | 48,524,156 |
| Goodwill | (10) | 248,020,160 | 72,947,106 |
| Deferred Expenses — (Net) | (2-7) | 38,361,296 | 11,282,734 |
| Total Long Term Assets | | 1,275,742,373 | 375,218,345 |
| Total Assets | | 2,104,350,911 | 618,926,739 |
| **Liabilities** | | | |
| **Current Liabilities** | | | |
| Due to Banks | (11) | 171,858,623 | 50,546,654 |
| Current Portion of Long Term Debt | (15) | 36,448,677 | 10,720,199 |
| Creditors Short Term Balances | (12) | 178,828,069 | 52,596,491 |
| Other Credit Balances | (13) | 12,933,747 | 3,804,043 |
| Provisions | (14) | 22,682,664 | 6,671,372 |
| Total Current Liabilities | | 422,751,780 | 124,338,759 |
| **Long Term Liabilities** | | | |
| Long Term Loans | (15) | 224,917,977 | 66,152,346 |
| Bonds | (16) | 250,000,000 | 73,529,412 |
| Creditors-Long Term Balances | (17) | 13,459,153 | 3,958,574 |
| Total Long Term Liabilities | | 488,377,130 | 143,640,332 |
| Minority Interest in Subsidiary Companies | | 43,342,001 | 12,747,648 |
| **Shareholders' Equity** | | | |
| Issued and Paid up Capital | (18) | 1,149,880,000 | 338,200,000 |
| Total Shareholders' Equity | | 1,149,880,000 | 338,200,000 |
| Total Liabilities and Shareholders' Equity | | 2,104,350,911 | 618,926,739 |

*The accompanying notes are an integral part of the financial statements.*

*The auditor's report is attached.*

*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = L.E.3.40*