UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| In the Matter of the Application of | ) |
| | ) |
| RAMY LAKAH and MICHEL LAKAH, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| For a judgment pursuant to Article 75 of | ) |
| the C.P.L.R. staying the arbitration | ) |
| commenced by | ) 07-CV-2799 (MGC) (FM) |
| | ) |
| UBS AG, EXPORTERS INSURANCE | ) |
| COMPANY, LTD., ARAB BANKING | ) |
| CORPORATION, NATIONAL BANK OF ABU | ) |
| DHABI and NATIONAL BANK OF OMAN, | ) |
| | ) |
| Respondents. | ) |

------------------------------------------------------------x

**RESPONDENTS-CROSS-PETITIONERS' MEMORANDUM OF LAW
IN OPPOSITION TO PETITION TO STAY ARBITRATION AND
<u>IN SUPPORT OF THE CROSS-PETITION TO COMPEL ARBITRATION</u>**

Gilbert A. Samberg (GS-2610)
David L. Barres (DB-2129)
Joseph Vizcarrondo (JV-8971)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
The Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
(212) 935-3000

*Attorneys for Respondents-Cross-Petitioners
UBS AG, Exporters Insurance Company, Ltd., Arab Banking Corporation,
National Bank of Abu Dhabi and National Bank of Oman*

## TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ................................................................. 1

PROCEDURAL HISTORY ...................................................................... 5

STATEMENT OF FACTS ....................................................................... 5

    A.    The Parties ............................................................................. 6

    B.    Arbitration Agreements in the Bond Transaction Documents ........................... 7

    C.    Piercing the Corporate Veil(s) ........................................................ 8

        1.    The Lakahs Had Complete Control of the Bond Guarantors and Issuer ................................................................................. 8

        2.    The Lakahs Used the Guarantors as Mere Instrumentalities ................... 10

        3.    The Lakahs Used Their Domination and Control of the Guarantors to Perpetrate Frauds Against the Respondents-Bondholders ......................................................................... 12

        4.    The Bondholders' Investigations and Discovery .......................... 16

ARGUMENT ................................................................................. 17

    POINT I    WHETHER VIEWED AS SIGNATORIES OR AS NON-SIGNATORIES, THE LAKAHS ARE PARTIES TO OR OTHERWISE BOUND BY THE PERTINENT ARBITRATION AGREEMENTS ........................................... 17

        A.    The Lakahs Personally Must Be Compelled to Arbitrate Because They and the Guarantor-Signatories to the Arbitration Agreement Are Mere Alter Egos ........................................... 19

            1.    The Lakahs Personally Dominated and Controlled the Guarantors ............................................................ 20

            2.    The Lakahs Used Their Domination and Control of the Guarantors to Perpetrate Financial Frauds on Respondent Bondholders ............................................. 24

            3.    The Lakahs' Fraudulent Manipulation and Use of the Guarantor Companies Caused Harm to the Respondents ............................................................. 27

Page

B.    The Lakahs Personally Must be Compelled to Arbitrate
Because Piercing the Corporate Veil is Virtually Mandated to
Prevent a Fraud or Where to Do Otherwise Would Permit a
Shareholder to Avoid Legal Liability for Fraud..........................................28

1.    Clandestine Sale of ASF's Assets............................................32

2.    Clandestine Evisceration of Medequip and TMSE ...................34

POINT II    RESPONDENTS ARE ENTITLED TO DISCOVERY
RELATIVE TO ARBITRABILITY ISSUES HEREIN ............................35

POINT III    THE LAKAHS' PETITION TO STAY ARBITRATION IS
TIME-BARRED ................................................................................36

CONCLUSION.................................................................................................39

TABLE OF AUTHORITIES

**Page**

Federal Cases

Am. Fuel Corp v. Utah Energy Dev. Co.,
  122 F.3d 130, 133 (2d Cir. 1997)............................................................18, 19, 20, 21

American Protein Corp. v. AB Volvo,
  844 F.2d 56, 60 (2d Cir. 1988)...........................................................................30

Cary Oil Co., Inc. v. MG Ref. & Mktg. Inc.,
  230 F. Supp 2d 439, 460 (S.D.N.Y. 2002) .........................................................34

Del Costello v. Int'l Bd. of Teamsters,
  462 U.S. 151, 171 (1983)...................................................................................37

Dover Ltd. v. A.B. Watley, Inc.,
  No., 04 Civ. 7366, 2006 WL 2987054 (S.D.N.Y. Oct. 18, 2006)
  (Maas, Magistrate J.) .........................................................................................35

Freeman v. Complex Computing Co., Inc.,
  119 F.3d 1044, 1052 (2d Cir. 1997)........................................................18, 19, 21

General Textile Printing & Processing Corp. v. Expromtorg International Corp.,
  891 F. Supp. 946 (S.D.N.Y. 1995) ...........................................................28, 30, 31

Golub v. Kidder, Peabody & Co.,
  No. 89 Civ. 5903, 2000 WL 1024688 at *3 (S.D.N.Y. July 25, 2000) ..................20

In re Favara, Skahan, Tabaczyk, Ltd. (Ewing),
  1992 WL 80659, at *2 (S.D.N.Y. April 9, 1992)..............................................37, 38

In re Herman Miller, Inc.,
  1998 WL 193213, at *3 (S.D.N.Y. April 21, 1998).............................................37

Kinetic Instruments v. Lares,
  802 F. Supp. 976, 986 (S.D.N.Y. 1992) ....................................28, 29, 30, 35

Mag Portfolio Consultant, GMBH v. Merlin Biomed Group, LLC,
  268 F.3d 58, 63 (2d Cir. 2001)............................................................................21

Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.,
  757 F.2d 1256, 1264 (Fed. Cir. 1985)..................................................................28

Mobius Mgmt. Sys. Inc. v. Technologic Software Concepts, Inc.,
  2002 WL 31106409 at *2 (S.D.N.Y. Sept. 20, 2002)........................18, 20, 33, 37, 38

**Page**

Morgan v. Nikko Secs. Co. Int'l, Inc.,
   691 F. Supp. 792, 795 (S.D.N.Y. 1988) ...................................................37

Sec. Ins. Co. of Hartford v. Dennis,
   No. 3:05 MC 334-C, 2005 WL 3481422 at *3 (W.D.N.C. Dec. 20, 2005)...................35

Thompson-CSF, S.A. v. Am. Arbitration Ass'n,
   64 F.3d 773, 776 (2d Cir. 1995) ...................................................18, 19, 35

Weinreich v. Sandhaus,
   850 F. Supp. 1169, 1170 (S.D.N.Y. 1994) ...............................................30

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,
   933 F.2d 131, 140 (2d Cir. 1991)......................................................20

## State Cases

Aetna Life & Cas. Co. v. Stekardis,
   34 N.Y.2d 182, 185 (1974)...............................................................37

In re Lane (Abel-Bey),
   50 N.Y.2d 864, 866 (1980)...............................................................38

In re Matarasso (Continental Gas Co.),
   56 N.Y.2d 264, 268 (1982)...............................................................37

In re Woodcrest Fabrics, Inc. (Taritex, Inc.),
   98 A.D.2d 52, 54 (1st Dep't 1983).....................................................37, 38

John W. Cowper Co., Inc. v. Clintstone Properties, Inc.,
   120 A.D.2d 976, 977 (4th Dep't 1986) .......................................28, 29, 35, 37

RLC Elecs., Inc. v. Am. Elecs. Lab., Inc.,
   39 A.D.2d 757, 758 (2d Dep't. 1972) ....................................................35

Respondents-Cross-Petitioners UBS AG ("UBS"), Exporters Insurance Company, Ltd. ("EIC"), Arab Banking Corporation ("ABC"), National Bank of Abu Dhabi ("NBAD"), and National Bank of Oman ("NBO") (collectively "Respondents" or the "Bondholders") submit this memorandum in opposition to the Petition of Ramy Lakah and Michel Lakah (collectively "Petitioners" or the "Lakahs") to stay arbitration and in support of Respondents' Cross-Petition to compel arbitration (or, alternatively, to take discovery).

## INTRODUCTORY STATEMENT

On December 8, 1999, Lakah Funding Limited ("LFL") issued a US$100,000,000 5-year Eurobond (the "Eurobond" or the "Bond") that was guaranteed jointly and severally by four related Egyptian companies -- Holding Company for Financial Investments (Lakah Group), S.A.E. ("HCFI"), Trading Medical System Egypt, S.A.E. ("TMSE"), Medequip for Trading and Contracting, S.A.E. ("Medequip"), and Arab Steel Factory, S.A.E. ("ASF") (each a "Guarantor," collectively the "Guarantors").[1]  Interest on the Eurobond was payable semi-annually in arrears.  After making the first two interest payments, the Issuer and the Guarantors made no further payment of interest or principal, and have been in default since June 8, 2001.  (See generally, a Declaration, dated April 16, 2007, by Gilbert A. Samberg in opposition to the Petition and in support of the Cross-Petition (the "Samberg Decl."), which is submitted herewith.)

Petitioners Ramy Lakah and Michel Lakah are the dominant figures in the Lakah Group of companies.  They own at least 70% of HCFI, which in turn owns all or virtually all of the stock of the other Guarantors and of the Issuer.

---

[1]     HCFI is the holding company parent of the other Guarantors and of the Issuer.

Respondents are Eurobond holders.  On June 8, 2006, Respondents commenced an arbitration proceeding (the "Arbitration") against the Petitioners and several of their companies, including the Issuer, the Guarantors, and certain Egyptian company Successors to the Guarantors -- Medical Technology, S.A.E. ("MedTech"), Technowave, S.A.E. ("Technowave"), and Life Care Technology, S.A.E. ("Life Care") (collectively the "Successor Companies") -- by filing with the American Arbitration Association a Demand for Arbitration and Statement of Claim (the "Demand for Arbitration").  The Petitioners, among others, received the Demand for Arbitration and certain related papers over the following 45 days.

The principal claims against the Petitioners and their companies in the Arbitration are:  (1) for breach of contract based on defaults in payment by the Issuer and the Guarantors of virtually all interest and all principal on the Eurobond; (2) for fraudulent inducement of the Respondents to acquire the Eurobonds; and (3) for tortious interference with the performance by the Guarantors of their payment obligations.[2]

The Issuer and three of the Guarantors have appeared in the pending Arbitration, and filed a response (styled an "Answer and Counterclaim") therein on March 19, 2007. Ramy Lakah and Michel Lakah have not formally appeared individually in the Arbitration.

---

[2]    As is described further below, Petitioners stripped the assets of the operating company Guarantors -- i.e., Medequip, TMSE, and ASF -- by, among other things, surreptitiously transferring the businesses and assets of Medequip and TMSE to the Successor Companies (MedTech Technowave, and Life Care).  The Petitioners thus rendered the Guarantors incapable of satisfying their obligations of payment of the Bonds.

Three related arbitration clauses in the Bond Transaction Documents[3] were invoked as the basis for the Arbitration. (See, Terms and Conditions of the Bonds § 18; Guarantee § 13; Indenture § 110.)

The Lakahs have petitioned to stay the Arbitration as against them, alleging that they are not bound by any of those arbitration agreements. The Respondents-Bondholders request that the Lakahs' Petition be denied summarily, and that the Cross-Petition to compel arbitration be granted, on the following grounds.

1.      The Lakahs in their individual capacities are signatories of and parties to the Indenture for purposes of a key substantive covenant (the "Lakah Family Undertaking") in support of the Guarantees, and must be deemed as Guarantors for arbitrability purposes. The Petitioners, far from being strangers to Bond Transaction Documents containing the arbitration agreements, are, as owners of at least 70% of the Lakah Group, the principal beneficiaries of the Eurobond offering financing obtained thereby.

2.      The corporate veils of the Lakahs' companies should be pierced for these purposes based upon (a) the Petitioners' dominance and control the Guarantors and the Issuer, and their use of those vehicles to defraud Respondents; and (b) the Petitioners' fraudulent stripping of the assets of the Guarantors so as to render them (i) unable to

---

[3]   The "Bond Transaction Documents" are: (a) the Offering Circular, dated December 6, 1999, relative to the Bonds (the "Offering Circular" or "OC"); (b) the Regulation "S" Global Bond, including the Terms and Conditions of the Bonds ("TCB"); (c) the Guarantee, dated as of December 8, 1999, made jointly and severally by each of the Guarantors to and in favor of the Trustee for the benefit of the bondholders; and (d) the Indenture, dated as of December 8, 1999, among the Issuer, the Guarantors, and The Bank of New York, acting through its principal corporate trust office in New York City, as Trustee (the "Trustee") for the benefit of the bondholders, providing for the issuance of the Bonds.

fulfill their obligations as Bond Guarantors to the Respondents and (ii) judgment-proof shells.

Petitioners operated their companies as mere instrumentalities of their personal will.  Among other things, they fraudulently manipulated the Guarantors in order to attract financing and investment from sources such as the Respondents, which funds eventually were diverted from their intended use(s), were put to the Lakahs' personal use, or vanished.  Evidence of such financial and securities frauds by the Petitioners are factually corroborated by, inter alia, the investigations of various Egyptian governmental regulatory and justice agencies, which resulted in a pending criminal prosecution of the Petitioners in Egypt.  That criminal prosecution for securities and financial frauds has resulted thus far in a Cairo criminal court judgment freezing the assets in Egypt of Petitioners Ramy Lakah and Michel Lakah (and of their families).

3.      The Lakahs' Petition is time-barred pursuant to N.Y. C.P.L.R. ("CPLR") 7503(c), and should be denied summarily.

Finally, Respondents are in the midst of independent investigations, and are now commencing discovery, in anticipation of a trial of the eventual factual issues herein, and respectfully request adequate time to complete their pending investigations and discovery for these purposes if the Cross-Petition is not granted summarily.

In that regard, Respondents are prepared to undertake that, with the agreement of the Lakahs (without prejudice to their objection to arbitrability) and the permission of the Arbitral Panel, during the period of such discovery, Respondents will stay the prosecution in the Arbitration of their claims against the Lakahs in their individual capacities.

## PROCEDURAL HISTORY

On June 8, 2006, the Respondents (Bondholders) filed a Demand for Arbitration and Statement of Claim (the "Demand for Arbitration") with the American Arbitration Association (New York) against the Petitioners, among others.  Service on the Petitioners was made of the Demand for Arbitration and of a Notice pursuant to N.Y. CPLR 7503(c) consistent with the provisions of the Bond Transaction Documents and of CPLR § 7503(c).[4]  (Samberg Decl. ¶¶ 9-10, Exs. 4, 5.)  It is evident from Petitioners' subsequent conduct, including their filing of a Petition to Stay and their arguments in their Petition papers, that they received the said Notice.

On March 19, 2007, the Lakahs filed a Petition pursuant to CPLR Article 75, seeking a limited Stay of Arbitration (as against them) in the Supreme Court of New York, New York County.  On April 6, 2007, Claimants removed the action to this Court pursuant to 9 U.S.C. § 4.

## STATEMENT OF FACTS

On or about December 8, 1999, Lakah Funding Limited (the "Issuer"), a special purpose B.V.I. corporation, issued a 5-year $100,000,000 Eurobond, with interest payable semi-annually in arrears.  The Bonds were guaranteed by HCFI, Medequip, TMSE and ASF *per aval* (i.e., as primary obligors).  (Samberg Decl. ¶ 5, Ex. 6).

After interest payments were made on or about June 8 and December 8, 2000, no further payment of Bond interest, nor any payment of principal, nor any payment of

---

[4]    Michel Lakah received service in Montréal via Federal Express on June 12, 2006 (Samberg Decl. ¶ 10, Ex. 5), and Ramy Lakah was served in Paris, in accordance with French rules law regarding service of process, by a bailiff ("huissier") on July 20, 2006 (id., ¶ 10, Ex. 5).

any other kind, was made by the Issuer or any of the Guarantors.  (Id. ¶ 6.)  Thus, the Issuer and the Guarantors have been in default on their principal and interest payment obligations since June 8, 2001.

## A.    The Parties

Respondents are Eurobond holders.  UBS AG is a Swiss corporation, having its head offices in Zurich and Basel, Switzerland, and having a branch in New York, among other places.  (Samberg Decl. ¶ 14).  Exporters Insurance Company, Ltd. is a corporation organized in Bermuda, having its registered seat in Hamilton, Bermuda. (Id.)  Arab Banking Corporation  is a corporation organized in the Kingdom of Bahrain, having its head office in Manama, and having a branch in New York, among other places.  (Id.)  National Bank of Abu Dhabi is a corporation organized in the United Arab Emirates, having its head office in the Emirate of Abu Dhabi.  (Id.).  National Bank of Oman is a corporation organized in the Sultanate of Oman, having its head office in Muscat.  (Id.)

Guarantors HCFI, Medequip, TMSE and ASF are Egyptian companies.  (Id. Ex. 6.)  The Issuer is a special purpose vehicle formed in the British Virgin Islands.  (Id.)  At the time of the Bond transaction, the Issuer and three of the Guarantors (ASF, Medequip and TMSE) were each wholly-owned or virtually wholly-owned subsidiaries of "Parent Guarantor" HCFI.  (Id. ¶ 24.)

Petitioner Ramy Lakah (a/k/a Ramy Raymond Lakah a/k/a Ramy Ramon Lakah) is an individual citizen of Egypt and of France.  (Id. ¶ 16.)  After having been a domiciliary of Egypt from birth, he became a domiciliary of France in or about 2001, and then recently reportedly moved his residence to England.  He reportedly left both Egypt

and, more recently, France, under the duress of distinct criminal investigations of various financial and securities frauds and related improprieties, which have resulted thus far in a criminal prosecution in Egypt (see, Id. ¶ 16, Exs. 11, 20, 24). The assets in Egypt of Mr. Lakah (and of his family) have been frozen by order of a Cairo Criminal Court. (Id.) (As is described further below, those criminal frauds are relevant here.)[5]

Petitioner Michel Lakah (a/k/a Michel Raymond Lakah a/k/a Michel Raymon Lakah) is an individual citizen of Egypt. After having been a domiciliary of Egypt from birth, he became a domiciliary of Canada in or about 2001. He currently resides in Montréal, Canada. (Id. ¶ 17.) He reportedly left Egypt under the duress of a criminal investigation, which resulted in a criminal prosecution for financial and securities frauds and related improprieties (id. ¶ 16, Ex. 11, 24). The assets in Egypt of Mr. Lakah (and of his family) have been frozen by order of a Cairo Criminal Court. (Id. ¶ 4, Ex. 20.) (Those criminal frauds are relevant here.)

B.    **Arbitration Agreements in the Bond Transaction Documents[6]**

Section 110 of the Indenture provides in pertinent part as follows:

---

[5]  We note also that Petitioner Ramy Lakah remains the subject of an outstanding Interpol alert, which was requested by the Egyptian authorities in connection with the Petitioner's criminal conviction for writing business checks that drew on a bank account with insufficient funds, which is a criminal offense in Egypt. (Samberg Decl. ¶ 57, Ex. 25.)

[6]  The "Bond Transaction Documents" are: (a) the Offering Circular, dated December 6, 1999, relative to the Bonds (the "Offering Circular" or "OC") (see Samberg Decl., Ex. 6); (b) the Regulation "S" Global Bond (see id., Ex. 7), including the Terms and Conditions of the Bonds ("TCB") (see id., Ex. 8); (c) the Guarantee, dated as of December 8, 1999, made jointly and severally by each of the Guarantors to and in favor of the Trustee for the benefit of the bondholders (see id., Ex. 9); and (d) the Indenture, dated as of December 8, 1999, among the Issuer, the Guarantors, and The Bank of New York, acting through its principal corporate trust office in New York City, as Trustee (the "Trustee"), for the benefit of the bondholders, providing for the issuance of the Bonds (the "Indenture") (see id., Ex. 10).

> "(a) [A]ny dispute or difference whatsoever arising between the Issuer or any Guarantor… and…a Holder of Bonds…arising out of or in connection with the Bonds, the Guarantee or this Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Arbitration Rules, as at the time in force, by a panel of three arbitrators appointed in accordance with such rules."

> (b) The place of the arbitration shall be New York, New York or London, England; the language of the arbitration shall be English; and the appointing authority shall be the American Arbitration Association."

Section 18 of the Terms and Conditions of the Bonds (see Samberg Decl. Ex. 8) and Section 13 of the Guarantee set forth substantially similar arbitration clauses (see id., Ex. 9).

Ramy Lakah was the sole authorized signatory, and the sole signatory, on behalf of the Issuer and each of the Guarantors of all of the Bond Transaction Documents. (Samberg Decl. ¶ 16, Ex. 12.)

Each of the Petitioners is a signatory party to the Indenture in his individual capacity, having each agreed to one of the covenants therein (see, Indenture § 1005(c)(ii), the "Lakah Family Undertaking"). (Samberg Decl. ¶¶ 16, 17, 18, Ex. 10 at 55, 62.) (That covenant was essential to assure the viability of the Guarantees.)

## C.    Piercing the Corporate Veil(s)

### 1.    The Lakahs Had Complete Control of the Bond Guarantors and Issuer

The Lakahs declared without reservation during the period in question that "the Lakah family remains firmly in control of The Lakah Group. . . ." (Samberg Decl. ¶ 20, Ex. 14.)

In the Offering Circular regarding the Eurobonds, Petitioners formally confirmed their complete ownership control of the Lakah Group companies via their holding company, HCFI:

> As at the date hereof [December 6, 1999], Messrs. Ramy Lakah and Michel Lakah owned approximately 70 per cent. of the outstanding shares of the Lakah Holding Company [HCFI]. These shareholders are able to exert substantial control over the Lakah Holding Company [HCFI] and, as long as they directly or indirectly own such shares, they will have the ability to elect all of the Lakah Holding Company's directors, to cast a majority of the votes with respect to virtually all matters submitted to a vote of Lakah Holding Company's shareholders and to prevent a change in the control of the Lakah Holding Company ([HCFI]." (Emphasis added).

(Samberg Decl. ¶ 21, Ex. 6, OC at 16).

In addition to their control as dominant shareholders, the Lakahs were the principal officers and directors of HCFI and of the other Guarantors. (Id., ¶ 25, Exs. 6, 10). With respect to HCFI, for example, Ramy Lakah served as Chairman and CEO, and Michel Lakah served as Vice-Chairman and Co-CEO. (Id.) With respect to Medequip, Ramy Lakah served as Chairman and a Managing Director, while Michel Lakah also served as Vice-Chairman and a Managing Director. (Id., ¶ 25, Ex. 1, Ex. D at 2). Hence, PricewaterhouseCoopers observed in July, 2001, after a review (but not an audit) of the Lakah Group based on the Lakahs' input, that "Ramy Lakah is the dominant individual within the [Lakah] Group." (Id., ¶ 26, Ex. 15, PWC Rpt. at 42.)

The Lakahs' control of HCFI meant that they also had complete control of the other Guarantors and of the Issuer, inasmuch as HCFI owned 97.8% of Medequip's shares; 97.6% of TMSE's shares; 97.9% of ASF's shares; and 100% of LFL's shares.

(Id. ¶ 24, Ex. 6)  Indeed, in instances where HCFI owned less than 100% of the shares of a subsidiary, Ramy Lakah and Michel Lakah owned a portion of the remaining shares of those subsidiaries as well.  (See, id., Ex. 6, OC at F-54, F-60, F-66.)

In connection with the Eurobond offering, Ramy Lakah was the sole authorized signatory, and the sole signatory in fact, of all of the Bond Transaction Documents on behalf of each of the Issuer and the several Guarantors (See, id., ¶ 16, Exs. 6-12).

Further facts in this regard are adduced below.

2.    The Lakahs Used the Guarantors as Mere Instrumentalities

The Lakahs dominated and controlled the Issuer and the Guarantors, and utilized the Guarantors as mere instrumentalities of their personal wills.  The following are pertinent in that regard:

   a.    At least three of the Guarantors were operated by the Lakahs from the same office and each received mail at the same address -- 68 El Merghany Street, Heliopolis, Cairo.  (E.g., Samberg Decl. ¶ 28, Ex. 16.)  All of the Guarantors (and all other Lakah Group companies) used a single common "Lakah Group" website.  (Id.)

   b.    In addition to Petitioners' positions as directors of each and senior-most officers of each, there was substantial other overlap in officers and directors among the Guarantors (Ramy Lakah Aff. at ¶ 40).

   c.    Corporate formalities were not observed:

   •    Board Meetings were not held (see, e.g., Id. ¶ 30, Ex. 1, Ex. D at 6);

   •    Because the Lakahs manipulated the memberships of their companies' boards of directors, and rarely if ever held board meetings, public filings listing corporate directors were falsified or a listed board member might not even be aware that he had been "appointed" as such by the Lakahs.  See, e.g.,

appointment of Dr. Amgad Zarif as a member of the Board of Medequip, regarding which Dr. Zarif was never informed. (Id.);

- The Guarantors which were represented to be capitalized at roughly $450,000,000 and worth a multiple of that amount (id. ¶ 31, Ex. 6), had no oversight mechanism(s) with respect to the use of corporate funds (see, e.g., id., Ex. 1).

d.    The Lakahs intermingled funds and obligations of the various Guarantors

- The Lakahs used the assets of one Guarantor as security to obtain debt financing for other Guarantors. For example, a local bond was issued by ASF in 1998 with a guarantee by Banque du Caire. The guarantee facility for the benefit of ASF was secured by HCFI's pledges of 800,000 shares of Medequip and 400,000 shares of TMSE that HCFI owned. (See Samberg Decl. ¶ 3, Ex. 6, OC at 58). Later, in order to recover those pledged shares, HCFI paid US$35,000,000 to Banque du Caire out of loan financing that it had received, which loan was collateralized by the proceeds of the Eurobond issue. (See id., Ex. 14, OC at 58; Ex.17, PWC Rpt. at 56-59).

e.    The Lakahs made no distinctions between corporate and personal funds:

- It was common knowledge among Lakah employees that the Lakahs used corporate funds -- particularly the revenues of their medical distribution businesses -- to support their lavish lifestyles of mansions, automobiles and private jets (see id., Exs. 1, 2);

- Ramy Lakah used the revenues of the Guarantors to fund his political campaign for the Egyptian parliament in 2000 (see id.);

11

3.    The Lakahs Used Their Domination and Control of the Guarantors
to Perpetrate Frauds Against the Respondents-Bondholders

a.    Egyptian governmental regulatory and justice agencies
have investigated and are prosecuting the Lakahs for
financial and securities frauds that affected Respondents.

i.    Securities Fraud Investigation by the CMA

In October 2000, the Egyptian Capital Markets Authority (the "CMA") -- a
regulatory agency analogous to the Securities and Exchange Commission -- determined
that the Lakahs violated Egyptian banking and securities laws by their fraudulent
manipulation of and then fraudulent misrepresentations concerning the apparent values
of Lakah-controlled companies, including HCFI, TMSE, Medequip, and ASF. (Samberg
Decl. ¶ 36, Ex. 19). For example, the CMA determined that in 1998, the Lakahs
conspired with their securities brokerage company, AlEman Company for Financial
Brokerage ("AlEman"),[7] to establish fake trading accounts and conduct fictitious trades
of Lakah company securities in order to pump up the prices of the stocks in question.
This scheme included the buying and selling back and forth between Ramy and Michel
Lakah of their shares of the respective companies. (Id.) The CMA found, *inter alia*, that
the sham transactions engaged in by the Lakahs resulted in "economically unjustified"
increases (a) of the stock price of ASF by almost 100%; (b) of the stock price of TMSE
by 81.65%; and (c) of the stock price of Medequip by 78%. Furthermore, in each case,
immediately following the fraudulent and artificial stock price increase, the shares of
stock were transferred from Ramy Lakah and Michel Lakah to HCFI. (Id.) The purpose
of the sham transactions was to artificially inflate the apparent balance sheet value of

---

[7]    It is believed that the Lakahs are among the owners of AlEman.

the parent company, HCFI.  (The resulting fraudulently-inflated financials of HCFI became the basis of the representations made in the Eurobond Offering Circular, which in turn induced the Respondents to purchase the Eurobonds.  Id.)

ii.      Banking Fraud Investigation by the ACA

In addition to securities fraud, an investigation by the Egyptian Administrative Control Authority ("ACA") concluded that the Lakahs colluded with one or more officers of Misr International Bank to obtain forged bank certificates of deposit in very substantial amounts.  (Samberg Decl. ¶¶ 40-41, Ex. 21).  The false bank certificates too were used to fictitiously inflate the apparent capital of the Guarantors in order to make them more attractive to lenders and investors like Respondents.  (Id.)

According to the ACA, the Petitioners' scheme successfully elicited tens of millions of dollars in additional financing, including sizeable loans both to the Guarantors and to the Lakahs personally, that were never paid.  (Id.)  The ACA concluded that as a result of this fraud, the Lakahs personally converted millions in loan funds.

iii.     The Lakahs Have Been and Are Being Prosecuted
         Criminally in Egypt for Financial and Securities Frauds

In January 2003, the Cairo Criminal Court (North District Circuit 19) issued a judgment freezing the assets of the Petitioners (and of their families) in Egypt based on evidence presented by the CMA, by the ACA, and by the Egyptian Public Prosecutor General (the "Public Prosecutor").  (Samberg Decl. ¶ 41, Ex. 20).  The Public Prosecutor also apparently charged the Lakahs with, *inter alia*, fraudulent manipulation of financial information concerning the Lakah Group.  The criminal prosecution of the Petitioners reportedly has not been concluded.

13

     iv.    Petitioner Ramy Lakah is Being Investigated
               Criminally For Financial Fraud in France

Since not later than December 2005, Petitioner Ramy Lakah has been under criminal investigation by a Paris Magistrate for misuse of company property consisting of "dubious fund transfers" between one of his French companies and one of his related English companies. Approximately €14,000,000 was said to have been found thus far to have been transferred. (Samberg Decl. ¶ 58, Ex. 26.)

Also in 2005, Petitioner Ramy Lakah was reportedly being investigated for an unexplained transfer of €200,000 from his French-based company, Air Horizons, to an unrelated Lakah-owned U.K. company, Trading Medical System Ltd. (Samberg Decl. ¶ 59, Ex. 27.)

     b.    The Petitioners' Clandestine Stripping of the Guarantors' Assets

After perpetrating securities and bank frauds utilizing the Guarantor companies to obtain financing and investment funding from various sources, including Respondents, the Lakahs surreptitiously stripped the Guarantors of their assets in order to render them judgment-proof shells.

     i.    Clandestine Sale of ASF's Assets

Approximately 1 ½ months after the Eurobond issue, on January 26, 2000, Ramy Lakah, as Chairman and CEO of the Lakah Group (i.e., HCFI), advised the Eurobond Trustee that "the Holding Company for Financial Investment (Lakah Group) is in advance [sic] negotiations for the sale of its steel business… ." (Samberg Decl. ¶ 42, Ex. 21.) Upon review of the matter, the Trustee opined to the Petitioners that their pending transaction required, in accordance with the Bond Transaction Documents,

notice to and the consents of the Eurobond holders.  (Samberg Decl. ¶ 42, Ex. 22.)  The Lakahs provided no such notice (and sought no such consents).[8]  (Id.)

Instead, on February 16, 2000, Ramy Lakah, as Chairman and CEO of HCFI, and Michel Lakah, as Vice-Chairman and Co-CEO of HCFI, certified to the Eurobond Trustee that ASF had sold "certain of its assets" as of February 16, 2000; that "the assets sold by ASF... were sold for Fair Market Value... and the purchase price received in connection with the ASF Sale was received, in full, by ASF simultaneously with their disposal of the subject assets, 100% in cash."  The Lakahs further certified that "the ASF Sale does not constitute a sale of 'all or substantially all' of the assets of any Guarantor, including ASF or the Company [i.e., HCFI]... ."  (Id. ¶ 43, Ex. 21.)

In fact, the assets that were sold comprised all of ASF's operating assets, and the sale price of approximately E£331,000,000 consisted of approximately E£100,000,000 in cash and approximately E£231,000,000 in promissory notes, maturing sequentially, and avalized by the National Bank of Egypt.  (See id. ¶ 44, Ex. 17).  Furthermore, the E£100,000,000 in cash disappeared and the promissory notes were apparently diverted to another creditor of the Lakah Group, without challenge or objection by the Lakahs.  Thus, within approximately two months of the Eurobond offer, one of the three operating company Guarantors had effectively been gutted by the Lakahs.  The Respondents were left with the empty shell of ASF, which of course later defaulted on its Bond payment obligations as a Guarantor.

---

[8]   Nothing regarding the imminent sale of all of ASF's assets had been disclosed to the Petitioners in the Offering Circular for the Eurobonds.  (Samberg Decl. ¶46, Ex. 6.)

ii.    <u>Evisceration of TMSE and Medequip</u>

After the initial Eurobond interest payment default in June 2001, and during the

tenor of the Bonds, the Petitioners surreptitiously transferred, without consideration, the

assets and businesses of TMSE and of Medequip to seemingly-unrelated Successor

Companies (MedTech, Technowave and Life Care).  (Samberg Decl. ¶ 49-51; Ex. 1,

¶¶ 11-12, 20-28).  The business and assets of TMSE were transferred without

consideration to MedTech (Samberg Decl. ¶ 50; Ex. 1, ¶¶ 1, 12, 21), and the business

and assets of Medequip were transferred to Technowave and Life Care.  (Samberg

Decl. <u>id.</u>)  As a result, TMSE and Medequip were eviscerated and became incapable of

fulfilling their obligations as Guarantors to the Bondholders (including Respondents).

Petitioners reportedly directly, indirectly or beneficially owned and/or controlled

the Successor Companies.  (Samberg Decl. ¶ 51.)

4.    <u>The Bondholders' Investigations and Discovery</u>

The Respondents are in the midst of pertinent investigations in the Middle East,

in Europe, and elsewhere.  (Samberg Decl. ¶ 52.)  For example, in Egypt, after lengthy

and arduous efforts, the Respondents have been granted access to relevant

investigative and prosecutorial reports and records from the CMA, the ACA, and other

governmental agencies charged with investigating the Lakahs.  (<u>Id.</u>)  In addition to the

evidentiary materials proffered herewith (see Samberg Decl.), the Respondents have

thus far received from the Egyptian Public Prosecutor's office a substantial volume of

certified copies of documents from its files concerning the fraud investigation and

prosecution of the Lakahs.  (<u>Id.</u>)  The process of translation of those documents recently

began.  Receipt of additional materials from those files is anticipated.

Moreover, other investigations outside of Egypt are in progress.

Furthermore, Respondents have identified witnesses who have relevant information for present purposes.  Several of them, including former Lakah employees, have been interviewed.  (Samberg Decl. ¶ 55.)  As a result of those interviews, Respondents have obtained certain declarations (e.g., Messrs. Haigh and Zarif), other declarations are in preparation, and work is progressing toward obtaining additional declarations.  Respondents expect to conduct additional such interviews.  Finally, Respondents have commenced discovery herein, and expect to use discovery, inter alia, to obtain evidence from identified non-party witnesses who are in the United States.  (Id.)

Further facts will be adduced in the course of the arguments below.

## ARGUMENT

## POINT I

### WHETHER VIEWED AS SIGNATORIES OR AS NON-SIGNATORIES, THE LAKAHS ARE PARTIES TO OR OTHERWISE BOUND BY THE PERTINENT ARBITRATION AGREEMENTS

Ramy Lakah and Michel Lakah is each a party-signatory in his individual capacity to the Indenture (one of the Bond Transaction Documents) for purposes of one of its substantive covenants (the Lakah Family Undertaking).  Moreover, Ramy Lakah is the sole authorized signatory on behalf of the Issuer and each of the Guarantors in connection with every document in relation to the Eurobond issuance.  Both of the Petitioners were intimately engaged in the Eurobond transaction and the related post-issuance events.  As parties to one of the agreements having a pertinent arbitration clause, and as the principal beneficiaries of the transaction as a whole (considering their

17

70% ownership of the Lakah Group), Ramy Lakah and Michel Lakah are bound to arbitrate the claims against them that are pending in the Arbitration.

Furthermore, if they are viewed as non-signatories to the Indenture and to the other pertinent agreements, they are nonetheless bound by the pertinent arbitration agreements because piercing the corporate veils of the Guarantors (and of the Issuer) is manifestly warranted here.

Clearly, "piercing the corporate veil between a signatory and non-signatory party may bind the non-signatory party to an arbitration agreement of its alter ego." Am. Fuel Corp v. Utah Energy Dev. Co., 122 F.3d 130, 133 (2d Cir. 1997), citing Thompson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995); Mobius Mgmt Sys., Inc. v. Technologic Software Concepts, Inc., 2002 WL 31106409 at *2 (S.D.N.Y. Sept. 20, 2002).

The Second Circuit has indicated that veil piercing will be allowed in two broad situations:  (a) to prevent fraud or other wrong, or (b) based upon a parent's domination and control of a subsidiary.  Freeman v. Complex Computing Co., Inc., 119 F.3d at 1044, 1053 (2d Cir. 1997); Thomson-CSF, supra, 64 F.3d at 777.

Petitioners have routinely used their companies as if they were fingers on the hand of the Lakah family.  Accordingly, they have used those companies -- foremost among them being the Guarantors (under the umbrella of Parent Guarantor, HCFI) -- as mere instrumentalities to lure financing from outsiders for various purposes, including undisclosed expansions into other businesses, a political campaign in Egypt by Ramy Lakah, and their own lavish lifestyles.  Those "outsiders" have included local banks and

other financial sources in Egypt, and the Respondent-Eurobond holders from the international financial community.

In the instant case, as discussed below, Petitioners' domination and manipulation of the Guarantors as their instrumentalities *vis-à-vis* the Respondents relative to the Eurobond financing -- both before and after the Bond issuance -- compel the conclusion that the Guarantor companies were mere alter egos of the Lakahs, and that Petitioners utilized them to perpetrate frauds on the Respondents, both before and after the Eurobond issuance.

In sum, this Court may and should pierce the corporate veils of the Guarantors in order to compel the Lakahs to arbitrate.  Am. Fuel Corp v. Utah Energy Dev. Co., 122 F.3d 130, 133 (2d Cir. 1997), citing Thomson-CSF, S.A., 64 F.3d 773, 776 (2d Cir. 1995); Freeman v. Complex Computing Co., Inc., 119 F.3d 1044, 1052 (2d Cir. 1997).

A.    **The Lakahs Personally Must Be Compelled to Arbitrate Because They and the Guarantor-Signatories to the Arbitration Agreement Are Mere Alter Egos**

If the Petitioners are viewed solely as non-signatories of the pertinent arbitration agreements, they nevertheless should be compelled to arbitrate herein because (i) they dominated the Guarantors with respect to the subject matter of the Arbitration; and (ii) their domination was used to commit a fraud or wrong against Respondents; (iii) which fraud or wrong injured the Respondents.  See Freeman v. Complex Computing Co., Inc., 119 F.3d 1044, 1052 (2d Cir. 1997) (and citations therein); Golub v. Kidder, Peabody & Co., No. 89 Civ. 5903, 2000 WL 1024688 at *3 (S.D.N.Y. July 25, 2000); cf. Am. Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997).

1.    The Lakahs Personally Dominated
and Controlled the Guarantors

Whether the corporate veil is pierced on an alter ego theory to reach an individual shareholder, or to reach another corporate entity, the veil piercing analysis is the same. See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 140 (2d Cir. 1991)[9]

The following factors, among others, are pertinent to the Court's determination for present purposes that the Lakahs dominated one or more of the Guarantors (or the Issuer):[10]  (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm's-length; (8) whether the corporations are

---

[9]    For example, in Passalacqua, as here, members of the Resnick family operated a real estate business consisting of various partnerships and corporations, all controlled either directly or indirectly by Resnick family members.  Plaintiff sought to pierce the corporate veil to hold liable both the corporate parent as well as the Resnicks individually on an alter ego theory.  See 933 F.2d at 140.  In determining whether there was sufficient evidence of domination and control by either the corporate parent or the Resnicks, the Second Circuit considered the typical factors and eventually cited, among other things, evidence of undercapitalization; common offices and staff; overlapping management and directors; a failure to regard corporations as independent profit centers; and insider transactions.  The Passalacqua court found sufficient bases to pierce the veil to reach both the corporate parent and the Resnicks individually.

[10]    The issue of arbitrability in this case is governed by Federal law.  Moreover, in relation to the ultimate question of arbitrability,

"although the law of the state of incorporation typically governs alter ego claims, 'where the parties have agreed to the application of the forum law their consent concludes the choice of law inquiry.'"  Mobius Mgmt. Sys., Inc. v. Technologic Software Concepts, Inc., No. 02 Civ. 2820, 2002 WL 31106409, at *3 (S.D.N.Y. Sept. 20, 2002), citing Am. Fuel Corp v. Utah Energy Dev. Co. Inc., 122 F.3d 130, 134 (2d Cir. 1997).

Here, as in Mobius, the agreements in question contain a New York choice of law provision.

treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity; (10) and intermingling of property between the entities. Freeman, supra 119 F.3d at 1053; accord, Mag Portfolio Consultant, GMBH v. Merlin Biomed Group, LLC, 268 F.3d 58, 63 (2d Cir. 2001); see, e.g., Am. Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997).

The Lakahs were principal officers, directors and controlling shareholders of HCFI, owning at least 70 percent of the company's outstanding shares.[11] The Lakahs' substantial ownership allowed them to unilaterally elect all of HCFI's directors, to control all matters subject to voting approval, and to prevent any change in control. (Samberg Decl. ¶ 21, Ex.6). Naturally, the Lakahs' ownership control extended also to the Guarantors as HCFI's wholly-owned subsidiaries.

In addition to their control as dominant shareholders, the Lakahs were the principal officers and directors of HCFI and of the other Guarantors.[12] Hence, PricewaterhouseCoopers observed in July 2001, after a review of the Lakah Group based on the Lakahs' own input, that "Ramy Lakah is the dominant individual within the [Lakah] Group."

Hence, too, the Lakahs themselves declared without reservation during the period in question that "the Lakah family remains firmly in control of The Lakah Group... ."

---

[11]  Lakah Group website (available at http://www.lakah-group.com/mainfrm.htm) shows  that together the Lakahs owned 90% of HCFI.  (Samberg Decl. ¶ 22, Ex. 14).

[12]  The Lakahs concede that there was substantial other overlap as well among the officers and directors of the Guarantors.  (Ramy Lakah Decl. ¶ 40.)

Consequently, it was not surprising to find that Ramy Lakah was the sole authorized signatory, and the sole signatory in fact, of all of the Bond Transaction Documents on behalf of each of the Issuer and the various respective Guarantors.

The Lakahs have, among other things, disregarded corporate formalities and separateness, intermingled corporate funds and other assets, diverted corporate proceeds for their personal use, pledged the assets of one company to secure the debts of another, and have acted to strip the assets of companies within their control in order to avoid legal liability.

The Guarantor companies were established and treated as mere instrumentalities of the Petitioners. All of the Guarantors (and all of the other Lakah Group companies) use a single common "Lakah Group" website. Three of the Guarantors [and the Issuer] were operated by the Lakahs from the same office, and each received mail at the same address -- 68 El Merghany Street, Heliopolis, Cairo.

Furthermore, consistent with the Petitioners' domination of all of the Guarantors, starting with HCFI, (a) board meetings of the respective corporations were not held; (b) nominal membership in the boards of directors became meaningless, as evidenced by the fact that the board had appointed members who were never informed of their "appointments".

So too, the Guarantors, each of which were represented to be worth hundreds of millions of dollars, had no oversight mechanisms with respect to the use of corporate funds. Hence, the Lakahs could and did make use of corporate funds of the Guarantors for myriad personal purposes. Thus, it was common knowledge among Lakah employees that the Lakahs used the funds of the companies -- particularly the revenues

of their medical distribution businesses (Medequip and TMSE) -- to support their lavish lifestyles of mansions, automobiles, and private jets, as well as to fund Ramy Lakah's political campaign for the Egyptian Parliament in 2000.

Furthermore, the Lakahs transferred and otherwise utilized assets among the Guarantors as if they were interchangeable. For example, the Lakahs used the assets of HCFI as security to obtain debt financing for the other Guarantors. Thus, when ASF issued a E£250,000,000 bond in 1998 with a guarantee by Banque du Caire, the guarantee facility for the benefit of ASF was secured by HCFI's pledges to Banque du Caire of 800,000 shares of Medequip and 400,000 shares of TMSE that HCFI (not ASF) owned. Later, in order to recover those pledge shares, HCFI paid US$35 million to Banque du Caire out of loan financing that HCFI had received, which loan had been collateralized by the proceeds of the Eurobond issue by LFL.

A former employee of one of the Guarantors (Medequip) has provided some insight regarding the actual operation of that company. Dr. Amgad Zarif indicates that Medequip did not observe corporate formalities of any kind (Samberg Decl., Ex. 1, ¶ 37). According to Dr. Zarif, the Lakahs were the exclusive decisionmakers at Medequip, and they alone decided what tasks would be performed by company management. (Id. at ¶ 24). In sum, the Lakahs operated their companies exclusively as a family affair. Furthermore, Dr. Zarif makes clear that the Lakahs' discretionary use of funds was not limited to their myriad corporate ventures, but was openly diverted to fund the Lakahs'

lavish lifestyle of mansions, expensive cars and private jets, and to build a warchest for Ramy Lakahs' political ambitions. (Id. at ¶ 32, Ex. 1, ¶ 33; Ex. 2 at 4).[13]

Finally, the capitals of the Issuer and of most of the Guarantors were apparently stripped by the Lakahs, so that they became inadequately capitalized. First, the Issuer (LFL) had virtually no capital or assets at inception, and apparently has been left with no capital or assets currently. Indeed, LFL was "struck off the register" of BVI companies on May 1, 2001 by the BVI Financial Services Commission (Registry of Corporate Affairs) for failure to pay the requisite periodic license fee. (Samberg Decl. ¶ 60, Ex. 28.) Moreover, all of the operating assets of Guarantor Arab Steel Factory were sold in February 2000, shortly after the issuance of the Eurobond, and the proceeds (ca. £E331,000,000) were diverted from ASF. In addition, the assets and businesses of the two other operating Guarantors -- TMSE and Medequip -- were transferred to other companies without consideration in or about 2002. Thus, each of these companies was deliberately stripped of its capital or had inadequate capital from inception.

2.    The Lakahs Used Their Domination and Control of the Guarantors
      to Perpetrate Financial Frauds on Respondent Bondholders

Making use of their domination and control of the Guarantors, the Lakahs engaged in fraudulent conduct (a) in order to induce the Respondents to purchase Eurobonds, and then (b) to hollow-out the Guarantors so that they would be unable to satisfy their financial obligations to the Respondents.

Specifically, the Lakahs fraudulently inflated the stated earnings and values of the Guarantors as a means of attracting financing and investment, including the

---

[13]   Thus, it is clear that any representations by the Lakahs concerning a robust independent management structure of each of the Guarantors would be pure fiction.

24

Respondents' investments in the Eurobond.  Furthermore, the Lakahs arbitrarily and surreptitiously eviscerated at least two of the Guarantors (TMSE and Medequip) and caused their businesses and assets to be transferred without consideration to other companies that they beneficially owned and controlled.  And they caused another Guarantor (ASF) to sell all of its operating assets only two months after the issuance of the Bonds (for to approximately half of the amount that they had represented in the OC was ASF's value) (see id., Ex. 6), and then diverted the proceeds of that sale away from ASF and beyond the Respondents' reach.

The Petitioners' pertinent frauds upon Respondents prior to the issuance of the Eurobonds have been the subject of, among other things, investigations and prosecution by Egyptian financial and securities regulators and the Egyptian Public Prosecutor General.

a.    Securities Fraud

In October 2000, The Egyptian Capital Markets Authority[14] (the "CMA") determined that the Lakahs violated Egyptian banking and securities laws by fraudulently manipulating the stock prices and balance sheet values of HCFI, TMSE, Medequip, and ASF.  (See, Samberg Decl. ¶¶ 34-39, Exs. 19-20.)  The CMA found, for example, that between January and June 1998, the Lakahs conspired with their securities brokerage company, AlEman Company for Financial Brokerage ("AlEman"),[15] in order to pump up the prices of the stocks in question.  This scheme included the buying and selling back and forth between Ramy and Michel Lakah of their shares of

---

[14]    The CMA is the principal securities regulatory agency in Egypt, and is the equivalent of the SEC.  (See, Ramy Lakah Aff. ¶29).

[15]    It is believed that the Lakahs are among the owners of AlEman.

the respective companies. (Id.) The CMA found, inter alia, that the sham transactions engaged in by the Lakahs resulted in "economically unjustified" increases (a) of the stock price of ASF by almost 100%; (b) of the stock price of TMSE by 81.65%; and (c) of the stock price of Medequip by 78%. Furthermore, in each case, immediately following the fraudulent and artificial stock price increase, the shares of stock were transferred from Ramy Lakah and Michel Lakah to HCFI. (Id.) The purpose of the sham transactions was to artificially inflate the apparent balance sheet value of the parent company, HCFI.

The resulting fraudulently-inflated financials of HCFI became the basis of the representations made in the Offering Circular regarding the Eurobonds, which in turn induced the Respondents to purchase the Eurobonds.

The results of the CMA's investigation became a part of the bases for a criminal prosecution of the Petitioners by the Egyptian Public Prosecutor.

    b.    <u>Banking Fraud Investigation</u>

Furthermore, based upon its own investigation, the Egyptian Administrative Control Authority ("ACA") concluded that the Lakahs colluded with one or more officers at Misr International Bank to obtain forged bank certificates. (Samberg Decl. ¶¶ 38-40, Ex. 20). The false certificates, too, were used to fictitiously inflate the apparent value of the Guarantors in order to make them more attractive to lenders and investors like Respondents. According to the ACA, the Petitioners' scheme successfully elicited tens of millions of dollars in additional financing, including sizeable loans both to the Guarantors and to the Lakahs personally that were never repaid. The ACA concluded that as a result of this fraud, the Lakahs personally, converted millions in loan funds.

Based upon its investigation, the ACA also referred the matter to the Public Prosecutor for criminal prosecution.

      c.     The Lakahs Have Been and Are Being Prosecuted
              Criminally For Financial and Securities Frauds In Egypt

In January 2003, the Cairo Criminal Court (North District Circuit 19) issued a judgment freezing the assets of the Petitioners (and of their families) in Egypt based on evidence presented by the CMA, by the ACA, and by the Egyptian Public Prosecutor. (Samberg Decl. ¶ 41, Ex. 20).  The Public Prosecutor also apparently charged the Lakahs with, inter alia, fraudulent manipulation of financial information concerning the Lakah Group.  The continuation of that criminal prosecution was anticipated.

To evade the Egyptian prosecution, [16] the Lakahs fled Egypt in 2001.[17]

3.     The Lakahs' Fraudulent Manipulation and Use of the
         Guarantor Companies Caused Harm to the Respondents

As a result of the Lakahs' aforesaid manipulation and misuse of the Guarantor companies as their instrumentalities, the Respondents were fraudulently induced to purchase the Bonds, upon which the same Issuer and Guarantor companies later defaulted.  Respondents thus were injured severely.

---

[16]   That the Lakahs fled Egypt to avoid criminal prosecution in Egypt was widely reported.  (See Samberg Decl. ¶ 56, Ex. 24.)  So, too, it was widely believed in Egypt at the time that Ramy Lakah ran for a seat in Parliament in 2000 that his motivation (like that of some of his similarly situated peers) was to attain the immunity from criminal prosecution that is gained with a Parliamentary seat.  (See, id.)

[17]   Moreover, while in exile, Ramy Lakah's fraudulent mis-use of the corporate form has continued.  Specifically, he is currently under investigation by a Paris Magistrate regarding alleged "dubious fund transfers" of more than €14 million from his insolvent French publishing company to a related U.K. entity that is in better financial condition.  (Samberg Decl. ¶ 58, Ex. 26).  Also in 2005, Petitioner Ramy Lakah was reportedly being investigated for an unexplained transfer of €200,000 from his French-based company, Air Horizons, to an unrelated Lakah-owned U.K. company, Trading Medical System Ltd.  (Id. ¶ 59, Ex.27.)

On this basis, the Court may and should pierce the corporate veil(s) of the Guarantors to compel the Lakahs to arbitrate in their individual capacities.

**B.**     **The Lakahs Personally Must be Compelled to Arbitrate Because Piercing the Corporate Veil is Virtually Mandated to Prevent a Fraud or Where to Do Otherwise Would Permit a Shareholder to Avoid Legal Liability for Fraud**

Alternatively, this Court should pierce the corporate veil of the Guarantors to reach the Lakahs in order to prevent their fraud from injuring Respondents and because to do otherwise would permit the Lakahs to avoid legal liability for their frauds -- e.g., for their surreptitious hollowing out of all of the operating Guarantors (ASF, Medequip, and TMSE) so that they became (a) unable to satisfy their obligations as Guarantors to Respondents; and (b) judgment-proof shells.  Kinetic Instruments, Inc. v. Lares, 802 F. Supp. 976, 986 (S.D.N.Y. 1992); Minnesota Mining & Mfg. Co. v. Eco Chem, Inc., 757 F.2d 1256, 1264 (Fed. Cir. 1985).

Where fraud is the basis to pierce the corporate veil, it is unnecessary to show such factors as disregard of corporate formalities, undercapitalization, or the intermingling of assets.  See Kinetic Instruments, 802 F. Supp. at 985-86; Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp., 891 F. Supp. 946 (S.D.N.Y. 1995).  Only showings of (1) substantial ownership and (2) the perpetration of a fraud causing harm to a third party are required.  Kinetic Instruments, 802 F. Supp. at 985.

The Court in Kinetic Instruments had occasion to "pierce the corporate veil" of a California corporation (Lares Research, Inc.) in order to establish jurisdiction over its

principal shareholder (and president), Craig Lares.[18]  The Court did so on the grounds of equity and fairness, noting that a court "may use it's equitable powers to 'pierce the corporate veil' to prevent fraud and injustice." Id. at 985, 986.

The basis for the Kinetic court's determination to "pierce the corporate veil" were: (1) "[p]ost tort activity . . . conducted to strip the corporation of its assets in anticipation of impending legal liability," and (2) substantial ownership of stock of a corporation by one individual. Id. at 985.  The court agreed that "when preserving the corporate entity would permit a shareholder to avoid legal liability, 'this is precisely the situation in which courts feel most comfortable in using their equitable powers to sweep away the strict legal separation between corporation and stockholders.'" Id. at 986.

The specific facts upon which the court based its determination were:  (1) that the individual defendant was the president of the corporation in question (Lares Research, Inc.); (2) that the individual defendant owned over 70% of its shares, (3) that plaintiff alleged that the individual "controls" the corporation, and (4) that plaintiff alleged that defendant had threatened that even if plaintiff won the lawsuit against the corporation, the individual defendant had taken measures to see that plaintiff Kinetic would never get anything.[19] Kinetic Instruments, 802 F. Supp. at 986.

The court took pains to point out that it was not basing its decision on other (alter-ego theory related) factors, noting that the plaintiff had not made any allegations

---

[18]   The court was considering a motion to dismiss by the individual defendant, Craig Lares. (The plaintiff corporation had brought a separate action against the corporation, Lares Research, previously.)  In the case then at bar, plaintiff Kinetic was asserting that the corporation's principal shareholder and president were personally liable for the acts of patent infringement in question.  Kinetic Instruments, 802 F. Supp. at 980.

[19]   The individual defendant denied the plaintiff-corporation's allegations, but that was irrelevant in the context of the motion to dismiss on jurisdictional grounds that was then before the court.

concerning (a) inadequate capitalization of Lares Research, (b) intermingling of the corporation's finances with those of the defendant, (c) lack of corporate formalities, or (d) that the corporation had been established to perpetrate the alleged transgression (a patent infringement). *Id.* at 985-86.

The Court in General Textile Printing & Processing Corp. v. Expromtorg International Corp., 891 F. Supp. 946 (S.D.N.Y. 1995), applied the same rule and analysis to reach the same result in a diversity suit regarding an alleged breach of contract. In that case, General Textile sued Expromtorg and its president and principal shareholder, Razouvaev, for breach of contract. Id. at 948. The individual moved to dismiss for lack of jurisdiction. The court applied "the fraud prong" of the corporate veil-piercing doctrine to achieve an equitable result, and thereby found that it had jurisdiction over the individual.[20]

The General Textile court confirmed that the existence of post-tort activity conducted to strip the corporation of its assets in anticipation of legal liability, "together with substantial ownership of a stock of a corporation by one individual will support piercing the corporate veil for jurisdictional purposes on grounds of equity unfairness." Id. at 950, citing Weinreich v. Sandhaus, 850 F. Supp. 1169, 1170 (S.D.N.Y. 1994) (citing Am. Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988)). The Court found that the following factors were sufficient in that regard: (1) the individual was a major stockholder (indeed, the sole stockholder in that case) of the corporation; (2) the individual defendant was the president of the corporation; and, (3) the individual had

---

[20] In General Textile also, the issue was personal jurisdiction over an individual shareholder/officer of the corporate defendant in the context of a motion to dismiss. Personal jurisdiction over the corporation was not in dispute.

made threats to the effect that "if he had any problem in continuing his business through Expromtorg, he would simply open up a new company to continue his business." Gen. Textile, 891 F. Supp. 950. On that basis, and treating as true plaintiff's allegations in that regard, the individual defendant's motion to dismiss for lack of personal jurisdiction was denied. Id. at 950 n.3, 951.

In the instant case, the Lakahs' dominant ownership and control position in the Parent Guarantor, HCFI, and in turn in the other Guarantors and the Issuer, is well-established. (Samberg Decl. ¶ 24, Ex. 6) The findings of the CMA and the ACA, and the January 2003 Judgment of the Cairo Criminal Court confirm that the Lakahs have used the Guarantors to defraud lenders and investors, including the Respondents. Moreover, the Lakahs have not merely threatened, but have acted to strip the Guarantors of their assets (i) so that they became unable to fulfill their contractual obligations and (ii) in anticipation of their legal liability. (see discussion, infra.)

Therefore, if this Court does not pierce the corporate veils of the Guarantors so that Petitioners are called upon to answer Respondents claims in arbitration, the potential exists for the Lakahs to have received roughly US$100,000,000 from the Eurobond purchasers (including Respondents), to have eviscerated the nominal corporate Guarantors of repayment, and to walk away unscathed, or to cause Respondents substantial additional unwarranted expense and the risk of inconsistent results from having to re-litigate their arbitration claims in a different forum as against Ramy Lakah and Michel Lakah.

1.    Clandestine Sale of ASF's Assets

Approximately 1 1/2 months after the Eurobond issue, on January 26, 2000, Ramy Lakah, as Chairman and CEO of the Lakah Group (i.e., HCFI), advised the Eurobond Trustee that "the Holding Company for Financial Investment (Lakah Group) is in advance [sic] negotiations for the sale of its steel business… ."  Upon review of the matter, the Trustee opined to the Petitioners that their pending transaction required, in accordance with the Bond Transaction Documents, notice to and the consents of the Eurobond holders.  The Lakahs provided no notice and sought no consents.

Instead, on February 16, 2000, Ramy Lakah, as Chairman and CEO of HCFI, and Michel Lakah, as Vice-Chairman and Co-CEO of HCFI, certified to the Eurobond Trustee that ASF had sold "certain of its assets" as of February 16, 2000; that "the assets sold by ASF… were sold for Fair Market Value… and the purchase price received in connection with the ASF Sale was received, in full, by ASF simultaneously with their disposal of the subject assets, 100% in cash."  The Lakahs further certified that "the ASF Sale does not constitute a sale of 'all or substantially all' of the assets of any Guarantor, including ASF or the Company [i.e., HCFI]… ."  (Id. ¶ 43, Ex. 21.)

In fact, the assets that were sold comprised all of ASF's operating assets, and the sale price of approximately E£331,000,000 was paid approximately E£100,000,000 in cash and approximately E£231,000,000 in promissory notes, maturing sequentially, and avalized by the National Bank of Egypt.  Furthermore, the E£100,000,000 in cash disappeared and the promissory notes were apparently diverted to another creditor of the Lakah Group, without challenge or objection by the Lakahs.

Thus, within approximately two months of the Eurobond offer, one of the three operating company Guarantors had effectively been gutted by the Lakahs.[21]  The Respondents were left with the empty shell of ASF, which of course later defaulted on its Bond payment obligations as a Guarantor, and became effectively judgment-proof.

In Mobius Management Systems, Inc. v. Technologic Software Concepts, Inc., 2002 WL 31106409, at *1 (S.D.N.Y. Sept. 20, 2002), evidence was submitted to an arbitrator (1) that an individual -- not a signatory to an arbitration agreement -- was the president and majority shareholder of the corporation that had signed the arbitration agreement; (2) that the corporation had defaulted on its payment obligations; (3) that the corporation had sold its assets to a third party; and (4) that the corporation had used the proceeds for purposes other than to repay all of its creditors.  Furthermore, (5) it was reportedly merely alleged in the subsequent judicial proceeding that the individual had received a small portion of the proceeds of the sale of the assets.  The arbitrator had deemed the claims in question to be arbitrable against the individual non-signatory shareholder, based upon piercing the veil of the corporate respondent to reach its alter ego shareholder, and rendered an award against the individual.  The individual non-signatory shareholder challenged the award by challenging the arbitrator's jurisdiction over him -- i.e., the arbitrability issue.  The Court declined to disturb the award, applying a "manifest disregard for the law" standard of review of the arbitrability issue.  Id. at *3.

---

[21]    Although the Bond Transaction Documents indicated that the steel business of Guarantor ASF was quite substantial and would serve as security for the Bonds, the Lakahs surreptitiously sold the means of conducting that business, and the proceeds of that sale disappeared without objection or opposition by the Lakahs.  Moreover, it is clear from the timing of the transaction that the Lakahs had merely dangled ASF as an inducement for prospective Bond investors, while fraudulently concealing their intention to eviscerate ASF almost immediately after the sale of the Bonds.

2.    <u>Clandestine Evisceration of Medequip and TMSE</u>

In or about 2002, after the initial payment default and during the tenure of the Bonds, at the direction of the Lakahs and without the knowledge or consent of the Bondholders, the assets and businesses of the two remaining operating Guarantors -- TMSE and Medequip -- were transferred to companies with close ties to the Lakahs. (See, e.g., Samberg Decl. ¶ 51, Ex. 1, ¶¶ 3, 8, 16, 17, 19, 22, 28).  TMSE's business and assets were transferred without consideration to MedTech, and the business and assets of Medequip were transferred to two entities: Technowave and Life Care.  Again, these covert transfers left the Respondents without a viable Guarantor and left only judgment-proof shells.[22]

Where a shareholder conceives of and directs a plan to nullify his company's contractual obligations, veil piercing is appropriate under New York law.  <u>Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.</u>, 230 F. Supp 2d 439, 460 (S.D.N.Y. 2002).

In light of the above, and in the interest of equity and fairness, this Court must pierce the corporate veil and hold that dominant shareholders Ramy Lakah and Michel Lakah are bound by the arbitration agreement(s) entered into by the Guarantor companies that they used and then stripped so purposefully.

---

[22]  The Issuer (LFL) too is merely a shell.  Before the issuance of the Bonds in December 1999, the Issuer had virtually no capital or assets.  Moreover, after the Bonds were issued, Lakah Funding was "struck off the register" of BVI companies by the BVI Financial Services Commission (Registry of Corporate Affairs) in May 2001 for failure to pay the requisite periodic license fee.

## POINT II

## RESPONDENTS ARE ENTITLED TO DISCOVERY
## RELATIVE TO ARBITRABILITY ISSUES HEREIN

Respondents have commenced discovery relative to the arbitrability issues

herein, focusing principally on the veil piercing theories described above, as they are

entitled to do.[23] See, e.g., RLC Elecs., Inc. v. Am. Elecs. Lab., Inc., 39 A.D.2d 757, 758

(2d Dep't. 1972) ("a large degree of liberality should be accorded opposing parties to

disclose all matters material and necessary" to a determination of arbitrability); Sec. Ins.

Co. of Hartford v. Dennis, No. 3:05 MC 334-C, 2005 WL 3481422 at *3 (W.D.N.C. Dec.

20, 2005), citing Thomson-CSF v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir.

1995) (ordering discovery to determine whether or not non-signatory defendant (a) was

alter ego of signatory to arbitration agreement, and (b) had received any benefits under

the agreement such that he be compelled to arbitration on a theory of equitable

estoppel). Cf. Dover Ltd. v. A.B. Watley, Inc., No., 04 Civ. 7366, 2006 WL 2987054

(S.D.N.Y. Oct. 18, 2006) (Maas, Magistrate J.) (discovery regarding alter ego veil

piercing theory in context of a plenary action).

In the event that the Court decides not to deny the Petition and grant the Cross-

Petition summarily, Respondents respectfully request adequate time for discovery so

that they may establish at trial (or otherwise) the requisite evidentiary foundation on

which to grant their Cross-Petition to compel arbitration. In this regard, Respondents

---

[23]   An arbitrability challenge is essentially a challenge to the jurisdiction of the forum. At such a
stage, jurisdictional discovery is necessary, as it "may shed light on such issues as the
defendant's control over the corporation and his alleged manipulation of corporate assets
which will be relevant to plaintiff's jurisdictional theories of agency and piercing corporate
veil..." Kinetic Instruments Inc. v. Lares, 802 F. Supp. 976, 988 (S.D.N.Y. 1992).

ask the Court to consider (a) the inherently surreptitious nature of the conduct of the Petitioners that is in question here; (b) that the Petitioners have had and plainly continue to have every incentive to hide and deny the existence of the evidence of that covert conduct; (c) the imbalance between the parties regarding access to that evidence; (d) the geographic scope of the requisite search; and (e) the threshold showing that Respondents are making herewith.

Furthermore, considering the progress of Respondents' pending independent investigations, which have, _inter alia_, yielded fruits that are not yet in a form for presentation to this Court (but are expected to be so in due course), Respondents respectfully request sufficient time within which to develop that evidence as well.

## POINT III

### THE LAKAHS' PETITION TO STAY ARBITRATION IS TIME-BARRED

More than nine months after the Lakahs received the Demand for Arbitration and a CPLR 7503(c) Notice, they petitioned this Court to stay arbitration.  The Lakahs' Petition is untimely and must be denied summarily.

CPLR 7503(c)[24] requires that an application to stay arbitration be made within 20 days after receipt of the said Notice.[25]  Mobius Mgmt. Sys., Inc. v. Technologic

---

[24]  CPLR 7503(c) provides:

**Notice of Intention to Arbitrate.**  A party may serve upon another party a demand for arbitration or a notice of intention to arbitrate, specifying the agreement pursuant to which arbitration is sought and the name and address of the party serving the notice, or of an officer or agent thereof if such party is an association or corporation, and stating that unless the party served applies to stay the arbitration within twenty days after such service he shall thereafter be precluded from objecting that a valid agreement was not made or has not been complied with and from asserting in court the bar of a limitation of time.  Such notice or demand shall be served in the same manner as a summons or by

Software Concepts, Inc., No. 02 Civ. 2820, 2002 WL 31106409 at *2 (S.D.N.Y. Sept. 20, 2002). This 20-day time period is equivalent to a statutory limitation period and may not be extended, even for good cause shown. Aetna Life & Cas. Co. v. Stekardis, 34 N.Y.2d 182, 185 (1974); John W. Cowper Co., Inc. v. Clintstone Properties, Inc., 120 A.D.2d 976, 977 (4th Dep't 1986); In re Woodcrest Fabrics, Inc. (Taritex, Inc.), 98 A.D.2d 52, 54 (1st Dep't 1983).

    Although an exception regarding the 20-day statute of limitation period may be made in certain narrowly defined circumstances, this is not one of them. Here, the Lakahs' denial that they are bound by the arbitration agreements in question is insufficient. The 20-day limitation period may be avoided only in the complete absence of any agreement to arbitrate, see In re Matarasso (Continental Gas Co.), 56 N.Y.2d 264, 268 (1982) -- i.e., where it is established that there is no written agreement containing an arbitration provision -- or where the objecting party is a complete and utter stranger to the agreement in question.

    Here, the Lakahs do not dispute that the agreements at issue each contain express arbitration provisions, and they cannot maintain that they are complete strangers to these agreements. The Lakahs argue only that they did not sign those

---

registered or certified mail, return receipt requested. An application to stay arbitration must be made by the party served within twenty days after service upon him of the notice or demand, or he shall be so precluded. ... (Emphasis added).

[25]    The 20-day limitation period under CPLR 7503(c) applies here. Although FAA Art. 2 arbitrations are governed by federal law, the 20-day limitations period of New York CPLR 7503(c) is not preempted by any provision of the FAA and is strictly applied by federal courts where proper notice has been given. Del Costello v. Int'l Bd. of Teamsters, 462 U.S. 151, 171 (1983); accord, In re Herman Miller, Inc., 1998 WL 193213, at *3 (S.D.N.Y. April 21, 1998) aff'd, 173 F.3d 844 (2d Cir. 1999), cert denied, 120 S. Ct. 66 (1999); In re Favara, Skahan, Tabaczyk, Ltd. (Ewing), 1992 WL 80659, at *2 (S.D.N.Y. April 9, 1992); Morgan v. Nikko Secs. Co. Int'l, Inc., 691 F. Supp. 792, 795 (S.D.N.Y. 1988).

agreements in their personal capacities and therefore arbitration may not be had against them personally.  That argument, however, is insufficient to warrant abrogation of the 20-day limitation period of CPLR 7503(c).  See In re Lane (Abel-Bey), 50 N.Y.2d 864, 866 (1980); In re Woodcrest,  98 A.D.2d at 54; In re Favara, Skahan, Tabaczyk, Ltd. (Ewing), No. 91 Civ. 7878, 1992 WL 80659, at *2 (S.D.N.Y. April 9, 1992); Mobius, 2002 WL 31106409, at * 2.

Under the analyses set forth in Lane, Woodcrest, Favara, and Mobius, the Lakahs' Petition is time-barred and must be denied.  The Lakahs duly received a CPLR 7503(c) Notice of the Demand for Arbitration based, inter alia, on the arbitration clause contained in the Indenture, which agreement has been personally executed by both of the Lakahs.  The Petitioners' failure to file their objections within the strict 20-day limitation period now requires that they be "precluded from making an objection that a valid agreement was not made".

Accordingly, this Court must summarily deny the Lakahs' Petition and consider only the Cross-Petition to compel the Lakahs to arbitrate.

## CONCLUSION

For the reasons set forth above, Respondents-Cross-Petitioners respectfully request that the Petition to Stay Arbitration be denied, and that the Cross-Petition to Compel Arbitration be granted.  (Respondents-Cross-Petitioners furthermore request adequate time to complete their current investigations and discovery should this Court conclude that it will not grant the Cross-Petition summarily.)

Dated:   April 16, 2007
         New York, New York

                          MINTZ, LEVIN, COHN, FERRIS,
                          GLOVSKY AND POPEO, P.C.

                          By: _____
                          Gilbert A. Samberg (GS-2610)
                          David L. Barres (DB-2129)
                          Joseph Vizcarrondo (JV-8971)
                          The Chrysler Center
                          666 Third Avenue
                          New York, New York 10017
                          (212) 935-3000
                          (212) 983-3115 (facsimile)