UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In the Matter of the Application of

RAMY LAKAH and MICHEL LAKAH,

                                  Petitioners,        DECLARATION OF
                                                                   IBRAHIM AHMED
           — against —                                        IBRAHIM

for a judgment pursuant to Article 75 of the
C.P.L.R. staying the arbitration commenced by

UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN,

                                  Respondents.
------------------------------------------------------------------X

Dr. Ibrahim Ahmed Ibrahim declares:

    1.      I am an attorney admitted to Egypt's Supreme Court since 1987. I have practiced law for thirty-eight years in Egypt and throughout the Middle East. I am a professor and head of the private international law department at Ain Shams University in Cairo, one of two leading law universities in Egypt.

    2.      I have long been an active member in the Cairo international commercial arbitration regional center, the Arab Gulf commercial arbitration center and the Abu Dhabi and Dubai Industry and Chamber of Commerce arbitration centers. I am listed as an arbitrator for the Central Bank of Egypt for matters affecting Egypt's banks. I have substantial familiarity with Egypt's commercial and banking laws. I have published articles and papers in areas ranging from commercial contract law and the law of commercial paper to fraud litigation.

3.  I have been asked to provide an opinion regarding certain aspects of Egyptian commercial law as they apply to events I understand occurred during the period December, 1999 through February, 2000 in connection with the first Eurobond Offering in the Middle East.

4.  I am being compensated at my normal hourly rate of US$400 per hour for preparing this declaration, which has taken approximately twenty (20) hours.

5.  I have been asked to opine as to the use of powers of attorney in bond offerings in Egypt in and about 1999 and 2000, and to explain the legal significance of certain discretely added statements apparently placed on a document dated December 3, 1999 by a person who appears to have been an officer of a former Egyptian national bank called Banque du Caire. I have also been asked to opine as to the materiality of the statements at issue in the context of a new bond offering.

6.  I have reviewed the December 3 document (without the modifications), (Ex.IA_1), the December 3 document (with the modifications), (Ex.IA_2), certain powers of attorney in favor of Banque du Caire which I understand were provided in connection with bond offerings conducted on the Cairo Exchange by Arab Steel Factory, S.A.E. ("ASF") and Holding Company for Investments (Lakah Group) ("HCFI") (the "Local Bonds"), (Ex.IA_3 and Ex.IA_4), and, also, a contract for the sale of certain ASF assets dated as of February 19, 2000, Ex.IA_5).

7.  First, under standard Egyptian banking practice and custom, commercial banks obtain powers of attorney from debtors in connection with loans they make. This is certainly true where the bank guarantees payment of interest or principal for the benefit of the debtor's bondholders. Taking powers of attorney permits a bank to register a

security interest within Egypt's Commercial Registry system at the bank's chosen timing. Where a new loan follows a prior loan, ordinary due diligence invariably requires review of all powers of attorney provided in connection with earlier banking commitments. This is true of all banking commitments, including the Eurobond Offering which I understand to be at issue between the parties to this action.

8. Second, the unmodified December 3 letter provides for the release of pledges on certain identified collateral shares and borrowing restrictions apparently imposed in connection with a prior bond offering. It does not indicate Banque du Caire intends to assert any other rights (or is asserting the existence of any other rights). The discrete modifications to the December 3 letter, apparently made December 6 by a Banque du Caire officer, in contrast, expressly assert Banque du Caire is "reserving all its other rights," relative to ASF.

9. By reserving "all its other rights," Banque du Caire, engaging in standard banking practice, was openly and aggressively attempting to put all parties to the Eurobond Offering on notice that Banque du Caire had and potentially could assert those "other rights." One such right Banque du Caire had, on December 3, was the right to use its power of attorney issued in connection with the prior Local Bond offering by ASF.

10. Third, Banque du Caire's reservation of "all its other rights" was a material modification of the December 3 letter in terms of the risks it posed to HCFI and ASF and, also, to each of the Eurobond bondholders. If, for example, Banque du Caire exploited that "other right," *i.e.*, its ability to obtain other security for continuing obligations undertaken in connection with the ASF Local Bond offering, the Eurobond

participants would suffer a potential reduction in the extent of collateral securing the repayment by the issuer and guarantors of interest and principal.

11. Failure by a party to a commercial transaction to disclose a that a material modification of a document has occurred is unlawful and one party to a commercial transaction may not induce another party to enter into a transaction where the former knows or should know the latter is under a mis-apprehension as to his material rights in what he is signing. A bond offering is one species of commercial transaction and this principle is applicable.

12. In the context of a bond offering, where an issuer or guarantor is induced to sign documents by a party aware of a material, but undisclosed, textual change that could affect the rights of the other party, a fraud in the execution phase of the transaction occurs. The fraud vitiates the assent normally shown by a party's signature, rendering the obligation unenforceable.

13. This rule refuses to tolerate fraud and discourages it, and helps assure that reasonable commercial bargains are entered into only upon proper consideration of their economic merits.

14. The discrete changes to the December 3 letter, in my opinion, were a very serious, material alteration.

15. The changes should have been disclosed to the party signing the document, especially given the close timing of the change and bond closing.

16. Absent disclosure and if, as a matter of fact, the signing party did not know about the discrete modification (but the other party did know about them), a fraud in the execution phase of the transaction occurred.

17. If this occurred, the bond documents would be unenforceable against the defrauded signatory and the party responsible for the fraud would be liable for damages flowing from the transaction, under applicable law.

18. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

19. Executed at Cairo, Egypt, on June _____ , 2007.

_____
IBRAHIM AHMED IBRAHIM

891163