## VI  Projected results (continued)

### Summary of results – IIC (continued)

- IIC commenced operating the detergent factory in 2000, it having been previously leased. In the first year of operation it achieved a modest profit.

- The business is focusing on the "economy" sector of the market, in which in the first year of trading, the business has achieved a 20% market share. This sector is growing and by concentrating on this sector IIC avoids head-on competition with the major brands. The market for detergents in Egypt is growing particularly for Economy 'High Suds' powders.

- The main threat to achievement of the projections are adequacy of key raw material supplies and cost increases due to currency depreciation increasing the price of imported raw materials.

- Management is implementing various cost-reduction and productivity improvements to seek to offset price increases for raw materials.

- A further threat is that in their cash flow projections, IIC assume that sales are collected in 30 days and in the current economic environment that is likely to be unrealistic. During 2000 receivables averaged 57 days. Unless the Group can accommodate this consequent reduction in cash flow, this could constrain the ability to finance raw materials and thereby threaten production and achievement of the projected turnover.

- IIC has received a purchase order worth Euro 750,000 under the UN Oil for Food Programme for the supply of detergent to hospitals. This order is not included in the projections.



## VI  Projected results (continued)

Projected interest charges

|  | Actual Year ended 31 December 2000 LE millions | Projected Year to 31 December 2001 LE millions | Projected Year to 31 December 2002 LE millions |
|---|---|---|---|
| Local Bonds | 75.7 | 74.75 | 74.75 |
| Eurobonds | 45.3 | 48.00 | 48.00 |
| Egyptian Banks | 74.2 | 92.24 | 113.68 |
|  | 195.2 | 214.99 | 236.43 |
| Interest Receivable | (18.3) | (22.86) | (60.88) |
| Total interest charges | 176.9 | 192.13 | 175.55 |

- Interest on local borrowing increases due to increasing long-term loans arising from the moratorium on payments of interest and principal until end 2002. The Group's cash flow projections assume that liquidity is restored to the economy from Q4 2001 with the result that there is a substantial reduction in receivables by the end of 2002. This results in a build up of cash balances, as until end 2002 the cash is not used to reduce bank borrowings.

- Interest on the Euro Bond is at 12% and assumes an exchange rate of LE 4/US$1.



PRICEWATERHOUSECOOPERS

Report dated 18 July 2001

97

## VI  Projected results (continued)

### Projected taxation charge

- The Group and all of the companies within it are loss-making and expected to remain so. Accordingly, no taxation charge is included in the projections.

### Potential impact of UN Food for Oil Programme

- The Group has estimated the impact of the first contract of US$59.35 million. This can be summarised as follows:

|  | US$ | LE |
|---|---|---|
| Contract Value | 59.35 | 237.4 |
| Margin | 24.3 | 97.2 |

- This has not been included in the projections.

- Of the margin, US$18 million will be set aside in an escrow account to fund the missed June 2001 coupon, and the December 2001 and June 2002 coupons.



PricewaterhouseCoopers

Report dated 18 July 2001

98

# VII Projected cash flows and short term cash needs

## Accuracy of past cash flow budgets

- The Group has produced to us short term cash flow forecasts for the three principal trading companies, Medequip, TMSE and IIC, for the three months from 1 June to 31 August 2001. We comment on these below.

- We understand that the Group does not attempt to consolidate its short term cash flow requirements at Group level. This is a significant omission in the Group's financial management, on which we comment elsewhere.

- We understand that the three principal trading companies do routinely monitor their short term cash requirements, to ensure that their facilities are not exceeded.

- We have recommended to the Group that this process is extended to other Group companies and the results consolidated at Group level, so that management may be forewarned of approaching difficulties and surplus cash may be utilised efficiently.

## Short term cash needs

- The graph below shows management's estimate of the short term cash flow position of each of the principal trading companies.

- It will be seen that all three are forecast to generate cash over the three months from 1 June to 31 August. We are informed that the forecast for June includes and is adjusted for actual cash receipts to 24 June.

- On the basis of this information, the Group does not have an immediate cash crisis.



PricewaterhouseCoopers

Report dated 18 July 2001

99

## VII Projected cash flows and short term cash needs



PriceWaterhouseCoopers — Report dated 18 July 2001

## VII Projected cash flows and short term cash needs (continued)

### Summary of the medium term cash flow projection

- We show below medium term cash projections that we have aggregated from individual Company projections. Just prior to publishing this Report the Group provided us with a Consolidated projection. This shows higher cash inflows in 2001 and 2002. In the time available, we have not been able to fully analyse and understand the reasons for the increased cash inflow. A significant part, however, appears to relate to the timing of interest payments.

|  | Projected | |
|---|---|---|
|  | Year to 31 December 2001 LE millions | Year to 31 December 2002 LE millions |
| Projected loss | (197) | (130) |
| Less Non cash items and finance charges | 228 | 253 |
| **Net Cash from operations before working capital movements** | **31** | **123** |
| Changes in working capital | 129 | 661 |
| Financial Payments | (27) | (124) |
| Fixed asset and other investing activities | (3) | 0 |
| **Net cash outflow from investing and operating activities** | **130** | **660** |
| Increase in Time Deposit | (19) | (21) |
| Reduction in balance due to Banks | (35) | (28) |
| Other cash movements | 2 | (6) |
| **Net increase in cash balances** | **78** | **605** |



# VII Projected cash flows and short term cash needs (continued)

## Summary of the medium-term cash flow projection (continued)

- The projected cash flow for 2001 shows a net inflow from operations (before financing costs) of LE 31 million. Adding back depreciation and interest represents the difference between this amount and the projected loss before interest of LE 197 million.

- The change in working capital for 2001 is a net inflow of LE 129 million. This is due to a substantial reduction in stock offset in part by an increase in receivables and deduction in creditors.

- Finance payments total LE 27 million, being only the December Euro Bond coupon and interest on short term loans. All local bank and local bond interest is not paid in accordance with the Framework Agreement. This results in an increase in long term loans that increase by LE 168 million.

- After repayments to banks of LE 35 million, there is a net increase of cash of LE 78 million during 2001.

- For 2002, the projected cash flow shows a net inflow from operations (before financing costs) of LE 123 million. The change in working capital for 2002 is a net inflow of LE 661 million.

- Finance payments total LE 124 million and include catch-up payments for the missed Eurobond coupon and the two 2002 coupons (LE72 million in total) and the 2002 Local Bond coupons (except the 31 December 2002 coupon on the LE 400 million bond is not payable until 1 January 2003 and is therefore excluded from the 2002 cash flow).

- In 2002, the cash inflow from working capital is principally attributable to reduction in receivables. The Group has assumed a reduction between end 2001 and end 2002 in short term and long term receivables of LE 546 million.

- The net effect in 2002 after repayments to banks of LE28 million is an increase in cash balances of LE605 million.

# VII Projected cash flows and short term cash needs (continued)

## Summary of the medium term cash flow projection (continued)

- The Group's basic assumption is that liquidity in the Egyptian economy will increase substantially in the second half on 2001 and in 2002 and in particular that the Government will be able to settle its debts. In addition that private sector customers will settle their debts in accordance with rescheduling agreements. These are key assumptions since the cash inflow from the reduction in receivables totals approximately LE 546 million of the LE 605 million increase in cash balances.

- Clearly if this amount of cash balances were achieved by the end of 2002 the Group's ability to commence repayment of its loans would be transformed.

PRICEWATERHOUSECOOPERS 🌐                                    Report dated 18 July 2001

103

## VIII Management's Proposals to the Bondholders

### Introduction

- The Group's proposals to the bondholders were first outlined at the Bondholder meeting on 14 March 2001 in London and were developed further at the informal meeting on 1 June in Cairo. In essence they can be summarised as follows:

- The separation of overseas revenues to provide a mechanism for funding the missed interest coupon, ongoing coupons and building up a sinking fund to secure redemption of the Eurobonds at maturity.

- This will be achieved through the setting up of an SPV outside of Egypt to capture international revenues with 60% of the net revenue flowing to the bondholders. This action appears consistent with Clause 10 of the Framework Agreement under which the Group has an obligation to service the Eurobonds from the surplus of overseas revenues.

- The assignment to the Bondholders of up to US$18m of revenue from the US$59 million Oil for Food Programme to fund the missed June 2001 coupon and the December 2001, and June 2002 coupons.

- 20% of net proceeds from further UN contracts to contribute to funding ongoing coupons and maturing of the Eurobond.

- The pledging and sale of MidWest Airline, and the sale of the Scandinavian Company for Touristic Investments (the Sharm El-Sheik hotel).

- These proposals will be included in a standstill agreement.

PRICEWATERHOUSECOOPERS 

Report dated July 2001

104

# VIII Management's Proposals to the Bondholders

## Special Purpose Vehicle (SPV)

- An overseas domiciled SPV is to be set up to handle the international business. This may be followed subsequently by other overseas revenues.

- Following preliminary advice from a tax partner in PwC Mansour Egypt Cairo office the possibilities for the domicile offshore of the SPV include Cyprus and Lebanon.

- The Group's suggested organisational structure for channelling the revenues into the SPV is set out below:



# VIII Management's Proposals to the Bondholders (continued)



Report dated July 2001

PRICEWATERHOUSECOOPERS

## VIII Management's Proposals to the Bondholders (continued)

### SPV (continued)

- The general guidelines of this operation are;

  - The SPV will be located offshore and its physical location is of no operational consequence since the liaison office handles the daily operations.

  - The role of the SPV is to provide the Capital and Financing support required for the business.

  - The SPV is also responsible for all policy and pricing issues.

  - The SPV will enter into a new distribution agreement with a leading OEM.

- The liaison office should be located within the Middle- East region and the main criteria affecting its location are:

  - Operational costs.

  - Communication infrastructure.

  - Additional liaison offices with sub regional responsibilities may be required in order to handle specific areas i.e. Turkey / North West Africa.

- The role of the liaison office, which is a cost centre, is to provide all logistic and product & sales support to the distributors.

- Technical support is also co-ordinated by the Liaison office utilising the existing resources available in the region and if required will source additional resources either directly from the OEM or other regional offices.

# VIII Management's Proposals to the Bondholders (continued)

## SPV (continued)

- The Group's projected turnover, in US$, for the SPV and for a single OEM is shown below (this excludes any business related to the UN Oil for Food program).

|  |  | 04/01 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Egypt |  | 0 | 11,000,000 | 12,500,000 | 14,000,000 |
| Margin | 11% | 0 | 1,210,000 | 1,375,000 | 1,540,000 |
| International |  | 1,750,000 | 11,000,000 | 15,000,000 | 21,500,000 |
| Margin | 28% | 490,000 | 3,080,000 | 4,200,000 | 6,020,000 |
| Total |  | 490,000 | 4,290,000 | 5,575,000 | 7,560,000 |
| Bondholders | 60% | 294,000 | 2,574,000 | 3,345,000 | 4,536,000 |

- The Group is currently preparing a detailed business plan for the SPV which it is envisaged will include additional revenues, and will be presented to the bondholders in the near future.



PriceWaterhouseCoopers

Report dated July 2001

108

# VIII Management's Proposals to the Bondholders (continued)

## SPV (continued)

- It is assumed that the customer price level in Egypt is lower than that of other countries in the region and therefore the achievable margin for Egypt is reduced.

- The workflow is as shown below:



- It is envisaged to have the SPV operational prior to the beginning of the 4th quarter 2001.

- The SPV would enter into a distribution agreement with an OEM, and the SPV would issue sub-agencies to overseas distributors for the international business.

## VIII Management's Proposals to the Bondholders (continued)

### SPV (continued)

- The SPV would receive both the margin on the international business and that from its business through TMSE. At the informal bondholders meeting on 1 June 2001 it was proposed that 60% of the margin of the SPV would be paid into the Bondholders Sinking Fund.

- The following key steps need to be dealt with by the Group to implement the SPV

    - The Group needs to finalise considerations of domicile and move to set up the SPV as soon as possible.

    - Agreement needs to be reached with the OEM to grant a new agreement to the SPV and then legal agreements put in place between the SPV and TMSE and all the overseas distributors.

    - Further consideration needs to be given to the mechanics of setting up a Liaison office and the detailed arrangements worked out and put in place.

    - Once this has been achieved consideration can be given to the extent to which other overseas business can be operated through the SPV.

### Oil for Food Programme

- As the bondholders are aware the Group has been pursuing a contract to supply medical equipment under the Oil for Food programme.

- We understand that Phase Nine of the Programme was due to have expired on 8 June 2001 but has now been extended to November 2001. Phase Ten has we understand also been approved.



# VIII Management's Proposals to the Bondholders (continued)

## Oil for Food Programme (continued)

- During most of our fieldwork many of the Group's senior management have been overseas assisting the Group's efforts in winning the contracts.

- We understand that the current position is that contracts totalling US$59million have been secured. The related purchase orders have been signed and are in the process of being forwarded to the UN for finalisation. Additional contracts are under discussion and the Group will advise the bondholders of the outcome in due course.

- We have been provided with a copy of a letter from Standard Bank confirming that they are willing to act as the transferring bank for the L/C issued by the UN via Credit Agricole Indosuez. Standard Bank will then arrange for L/C's for the cost of the equipment to be supplied, and the transfer of up to US $18million to a bondholder escrow account for the three coupons.

- We have seen a copy of a small purchase order in favour of IIC for the supply of detergents to hospitals under the Oil for Food Programme worth approximately Euro 750,000.

## Personal Investments

- At the bondholder meeting on 14 March 2001 Ramy Lakah undertook to the bondholders that he would provide additional security for the Eurobonds by way of pledges over various investments personally held by him and his brother.

- At the 1 June 2001 informal bondholder meeting the Group refined this proposal to include the two key assets (MidWest Airline and the Scandinavian Company for Touristic Investments (the Sharm El-Sheik hotel) ) and the creation of the SPV for the international revenues.

- As requested by Barclays on behalf of the bondholders a list of the 8 investments with each company's shareholders was provided to Barclays on 14 June 2001.


PRICEWATERHOUSECOOPERS

Report dated July 2001

111

## VIII Management's Proposals to the Bondholders (continued)

### Personal investments (continued)

- We have not carried out any detailed review of these investments since this was not included in the scope of our work. We have however sought to discuss the 8 investments with Ramy Lakah in order to gain a general understanding of the investments.

### Mid West Airline, SAE ('MidWest')

- 81.24% of shares in MidWest are held by the Lakah brothers. MidWest has licences to operate scheduled, charter and cargo flights to various destinations in Europe, North America, South America and Africa. Two Airbus 300's are currently on lease purchase.

- In June 1999 MidWest was required to purchase a further aircraft, with a loan of LE 135million from National Bank of Egypt, and a lease back to the vendor. The loan included a two- year interest moratorium due to expire shortly. Ramy Lakah advises that this transaction and loan are onerous and the position needs to be resolved before a sale of MidWest can take place. (See Section V)

- Ramy Lakah advises that other carriers have showed serious interest in the airline and that if the above issue is resolved MidWest might be saleable for net sale proceeds of US$20-30million.

### Scandinavian Company for Touristic Investments ('Scandinavian')

- Scandinavian is also fully owned (99.8%) by the Lakah brothers. The company owns the Sharm El- Sheik hotel at Neema Bay, the hotel is 80% constructed. There is a loan of US$20million outstanding to Misr Iran Bank.

- Ramy Lakah advises that Scandinavian is in default with Misr Iran due to non payment of the December interest. Misr Iran has filed a legal action for the appointment of a Custodian to take control of the hotel pending finding a buyer or investor.

- Absent the above problem Ramy Lakah values the equity in the hotel at approximately US $12million.



PricewaterhouseCoopers    Report dated July 2001    112

# VIII Management's Proposals to the Bondholders (continued)

## Delta Sound, SAE

- Ramy Lakah owns 60% of Delta Sound. The company owns the rights to various Egyptian entertainment artists' material dating back to 1978. Negotiations have taken place for a sale of the company to an Arab investor but have been discontinued. Ramy Lakah values his 60% interest at approximately LE 15million.

## Empain for Touristic Investments, SAE ('ETI')

- ETI is fully owned (99%) by the Lakah brothers. The company owns land in Sharm El- Sheikh City. However the land is likely to revert to the Governor of South Sinai due to the company having failed to commence development within prescribed time-scales. This investment is therefore of minimal, if not, nil value.

## Arab Factory for Fine Steel, SAE ('AFFS')

- The Lakah brothers hold 70% of the shares in AFFS. The company owns land in Alexandria, on which is a disused tin factory (constructed in the 1960's). The value of the land (6510 square metres) is stated in the schedule to the Framework agreement as between 1200 and 1500 per square metres. In view of the economic position in Egypt the value is likely to be reduced and of minimal value.


PRICEWATERHOUSECOOPERS

Report dated July 2001

113

## VIII Management's Proposals to the Bondholders (continued)

### Golden N, SAE

- The shares in Golden N are fully owned by the Lakah brothers (99%). Golden N owns land adjacent to the beach in Fayed City. The land has a building licence for the construction of apartments. Arab Real Estate Bank has an outstanding loan of LE 20million. Ramy Lakah estimates the net equity in the land at approximately LE 18million.

### Indigo Travel Services, SAE

- Indigo is 80% owned by the Lakah brothers. It operates as a travel agent in 5 locations in Egypt and elsewhere. The company is considered by Ramy Lakah to be worth approximately LE 6million.

### International Co for Touristic Investments, SAE ('ICTI')

- ICTI is fully owned by the Lakah brothers (99.83%). The company owns land in Safaga (Soma Bay) near to Kiriazy, on which some building work has commenced but been discontinued for lack of funding. The ultimate intention was to construct a hotel on the site. Ramy Lakah advises that unless building work recommences within 2 years of February 2001 the land will revert to the Government.

- Ramy Lakah estimates the value of the land at approximately LE 35million.



PRICEWATERHOUSECOOPERS

Report dated July 2001

114

# VIII Management's Proposals to the Bondholders (continued)

## Summary

- On the basis of the above information the Lakah brothers' interest in these investments may be in the range US$50-55m. However this figure cannot and should not be relied upon by the bondholders. It may be appropriate for the bondholders to commission detailed appraisals and valuations of the investments.

- A further issue is that as noted earlier in this report in December 2000 Ramy & Michel Lakah executed agreements transferring the above interests in real estate from four of above companies to the Group holding company, for sums totalling LE 92.1m. The four companies are Golden N, Empain, AFFS, and ICTI.

- Whilst we are not qualified to express a legal opinion on these agreements, the copies of the agreements we have seen appear not to have been registered at the real estate register, and therefore may not be effective in transferring legal title. However this is a matter that needs to be clarified, in order to ensure that if pledges are taken over the above companies the properties are held in the companies. Alternatively direct security may need to be taken over the land.

- It should also be noted that in the case of some of the investments there are other issues that will probably need to be resolved before a sale of the investments could take place. In particular, MidWest needs to resolve the onerous loan with National Bank of Egypt, and the possible appointment of a Custodian by MisrIran Bank will need to be taken into account in realising the value of this investment.

- Finally we note that these eight investments are those investments listed in the annex to the Framework agreement. There does not appear to be a negative pledge in the Agreement, and only LE 34 million of the proceeds from Group cash flow and/or the sale of their investments would be required to satisfy the Group's obligations to local banks under the Agreement. As a result the Group should be free to deal with these investments and the balance of the proceeds thereof to finance its activities.



PRICEWATERHOUSECOOPERS

Report dated July 2001

115