# Fax

This fax is confidential. If you are not the named recipient, Please notify the sender immediately. You must not disclose the contents. Use it for any purpose, or take any copies.

Chatsworth House
66 – 70 St Mary Axe
London
EC3A 8BD

Tel 0207-382-5521
Fax 0207-382-5499

Jonathan.m.raven@barclayscorporate.com

Clearway 7-4260-5521
Reuters BAXY/BAZY

**BARCLAYS**

| | | |
|---|---|---|
| To | UBS WARBURG | |
| | MOHAMED SAMMAKIA | 020-7567-3317 |
| | KURT SCHMID | 007-095-726-5742 |
| | PETER BELMONT / VLADIMIR LEDOCHOWSKY, | |
| | ECOBAN | 020-7702-3356 |
| | MIKE COOKE / CRAIG McMURRAY, STANDARD | |
| | | 020-7979-4382 |
| | MOHAMMED EL CALAMAWY / STEPHEN JENKINS, | |
| | ARAB BANKING CORP | 00973-532-248 |
| | HADIA BADAWY / SAMIA AL ZANFALY, | |
| | ARAB INTERNATIONAL | 00202-393-3705 |
| | R. RAMASWAMY, | |
| | BANK OF OMAN | 00968-704-703 |
| | SAKIT AL JUNDI, | |
| | NAT BANK OF ABU DHABI | 009712-666-8751 |
| | MOHAMED SEIF EL-NASR / TAREK DABA, | |
| | NATIONAL COMMERCIAL BANK | 009662-643-7472 |
| | REEM TAWFIC / KEVIN O'KEEFFE, | |
| | BARCLAYS | 020-7773-8910 |
| | ROBERT SVENSK | 001-212-370-0357 |
| From | JONATHAN RAVEN – BUSINESS SUPPORT SPECIALIST TEAM | |
| Date | 18 February 02 | |
| No. of pages | 16 (including this one) | |
| Subject | LAKAH BONDHOLDERS | |

**PLEASE SEE ATTACHED.**

Barclays PLC Registered in England. Registered No 48839 Registered Office. 54 Lombard Street, London, EC3P 3AH

To the Lakah Bondholders

Please find the following 4 documents included:
1. Recommendations from our internal legal council
2. Email from ABC re: their meeting with Bank du Caire
3. Letter from DKLL to the bondholders re: Ramy Lakah
4. Letter to the bondholders re: Lakah Group/USD100,000,000 Eurobond

Document 4 refers to a meeting called by the Lakah Group in London on Wednesday 20 February 02. Barclays will be attending the meeting, and assume we will see you all there.


Kind Regards
Jonathan Raven
Business Support Specialist Team

**Memo**

Draft

Legal: Litigation & Disputes
3rd Floor
54 Lombard Street
London EC3P 3AH
Tel 020 7699 2750
Fax 020 7699 4474

To         Bob Byrne
Copy       Edward Lightfoot, Jonathan Raven, John Featherstone, Richard Hickson
From       Nathan Carr
Date       18 February 2002
Subject    The Lakah Connection: Recovery recommendation

**BARCLAYS**

## Executive Summary

### Key issues

Barclays Bank of Egypt are part of a syndicated Bondholding Agreement ("The Bond") involving a lending total of US$100 M to the Lakah Holding Company who have defaulted on their interest payments under the Bond. Barclays' involvement in the Bond stands at US$25M.

The liabilities of the Lakah Holding Company are covered by guarantees from four Lakah subsidiary Companies. Neither Lakah Holding Company nor the four guarantors hold any assets, which appear to put any of these companies in a position to repay the borrowing.

However, the business and operating assets of one of the guarantors, the Arab Steel Factory S.A.E. ("ASF") were sold in January 2000 for LE 321 million. LE100 million was paid in cash with the remainder due in notes payable over six years, guaranteed by the National Bank of Egypt. The cash proceeds have been claimed by Banque du Caire pursuant to a pledge apparently granted by the Lakah group of companies, and they are also intending to claim the proceeds of the notes in due course.

> - The first issue is whether Banque du Caire are entitled to claim this pledge which puts them in the position of a secured creditor or whether this pledge is open to attack in which case the ASF proceeds would be available to all creditors.

> - The second issue is whether there are any other recovery avenues available for the Bondholders to pursue.

### The facts

Appendix A to this Executive Summary sets out the key facts and Appendix B illustrates the framework of the Lakah Group and the lending structure.

### Banque du Caire

- Ramy Lakah contends that the pledge (over the assets and sale proceeds of ASF) was obtained without his knowledge and consent.

- Ramy Lakah further claims that the Lakah Group was not in default of its obligations to Banque du Caire when the ASF's assets were sold.
- Based on previous communications and dealings, there is reason to doubt the accuracy of the version of events put forward by Ramy Lakah.
- The question is whether Banque du Caire are entitled to retain both the LE 100 million proceeds and the proceeds of the notes pursuant to the pledge.
- There are sensitivities on the basis that Banque du Caire is a substantial shareholder of Barclays Bank of Egypt.
- However, if at least the proceeds of these loan notes are available to creditors generally then this will potentially enhance significantly any recovery under the Bond.

ABC's meeting with Banque du Caire

- Representatives of ABC recently met with Banque du Caire to discuss the pledge. An email highlighting the upshot of the meeting is attached.
- At the meeting Banque du Caire confirmed that the pledge was taken with the full co-operation and knowledge of Lakah and was obtained in accordance with Egyptian banking practise.

Proposed Action in respect of Banque du Caire

1) On the strength of the ABC's meeting there appears to be very little to pursue in respect of the pledge.
2) If we were to pursue this aspect further more information is needed in respect of the taking of the pledge and the exposure of the Lakah Group to Banque du Caire. We need to know the validity of the pledge and the basis on which Banque du Caire are holding the proceeds of the ASF assets. Presumably the key documents are in Arabic and therefore it is proposed that the Bank's litigation team in Egypt works in conjunction with the Litigation Team in Lombard Street to ascertain the relevant facts.
3) Bearing in mind the sensitivity of the relationship between Barclays and Banque du Caire, any investigations could be taken forward in the name of the Syndicate.
4) Until such investigations have been completed, it is not possible to make any official approach or, indeed, criticism of Banque du Caire in respect of the assets they are holding.

The Lakah Holding Company/Guarantors

- ABC, one of the other syndicated Bondholders has instructed Egyptian Law Firm, Helmy Hamza, to provide written advice on recovery options available to the bondholders. The advice is less than optimistic in terms of recovering any substantial sums for the Group.
- PWC, who have completed an IBR, have identified that there are no real assets in the Lakah Group and advise against any form of insolvency proceedings.

### Proposed Action against the Holding Company/Guarantors

1) Until negotiations are completed and further investigations of the Banque du Caire position are undertaken, I would strongly advise against any precipitous action against either the holding company or the guarantors as this would ultimately lead to the collapse of the group and a counterproductive result.

2) Further investigations into action under Egyptian law against the directors personally is a possibility. However, this option needs to be investigated bearing in mind that, to the best of our knowledge, most of Ramy Lakah's business investments are heavily encumbered. Pursuing these interests may also give rise to jurisdictional issues.

3) In the final analysis, the outlook of gaining any substantial recovery through formal legal action is bleak. Due to the structure of the lending, the economic turbulence in Egypt as well as the lack of definitive information regarding Ramy Lakah's personal investments there do not appear to be any avenues available to us, at this stage, which provide a commercially viable course of action.

Memo

Appendix A:

Legal: Litigation & Disputes
3rd Floor
54 Lombard Street
London EC3P 3AH
Tel 020 7699 2750
Fax 020 7699 4474

| | |
|---|---|
| To | Bob Byrne |
| Copy | Edward Lightfoot, Jonathan Raven, John Featherstone, Richard Hickson |
| From | Nathan Carr |
| Date | 5 February 2002 |
| Subject | The Lakah Connection: Recovery recommendation |

**BARCLAYS**

### Background Facts:

2. **Barclays Egypt** is leading a syndicate of bondholders jointly with Arab Banking Corporation ("ABC"). The Bond was entered into in December 1999 and our participation stands at US$25M in respect of a total lending value of US$100M.

3. The borrower is Lakah Funding Limited, a shell company incorporated under the International Business Companies Act of the British Virgin Isles. The Lakah Group of companies ("The Group") conduct business through the construction and equipping of hospitals in Egypt and the Middle East.

4. The Lakah Group is owned by the Lakah brothers, Ramy and Michel, (53%), Banque du Caire (7%) and Institutional shareholders (40%) and consists of the Lakah Holding Company and eight subsidiary companies.

5. The bond was made on the strength of an offering circular (prospectus) produced by UBS acting through its division, Warburg Dillon Read.

6. The net proceeds of the Bond were deposited with a Swiss bank, which made a loan to the Lakah Holding Company. Lakah Holding, in turn, made funds available to each of the subsidiary guarantors.

7. Four Egyptian companies stand as guarantors jointly and severally.

    ➢ Holding Company for Financial Investments [parent guarantor], S.A.E
    ➢ Medequip for Trading and Contracting, S.A.E
    ➢ Trading Medical System Egypt, S.A.E
    ➢ Arab Steel Factory, S.A.E

8. Each of the guarantor companies is a joint stock company incorporated in Egypt. (None of these guarantees are backed by any security).

9. The assets of each of the guarantor companies have been pledged to secure local lending. Therefore, the reality is that the Bond stands as being unsecured.

10. The Managing Director and principal shareholder of the borrower, Mr Ramy Lakah, has prevaricated for over a year. He is no longer permitted back into Egypt due to his previously adopted political stance and is presently residing in Paris. There is sufficient reason to treat any communication received from Mr Lakah with a sense of distrust.

11. The Lakah Groups difficulties largely stem from the fact that they have done £70M of work for the Egyptian government which has not been paid for due to lack of liquidity and ongoing economic turbulence in Egypt.

12. Following the Groups admission that they would be unable to cover the June 2001 interest payment on the Bond the bondholders instructed Price Waterhouse Coopers to perform an IBR. As a result of the IBR an SPV was established to capture any non-Egyptian cash flow.

13. Egyptian lawyers were instructed to apply pressure against the company and Ramy Lakah personally, however, this action has had no impact.

14. Pursuant to the offering circular (6 December 1999) the guarantee is governed by the laws of the State of New York and that any dispute arising out of the enforcement or interpretation of the guarantee between the trustee, bondholder or guarantor shall be settled by submission to arbitration by the American Arbitration Association.

15. Barclays' local exposure, which falls under Barclays Africa, totals £9.2M against which there is full provision.

### The Lakah Group, Arab Steel Factory and Banque du Caire:

16. Banque du Caire in Egypt is the Groups principal banker.

17. As concluded in PWC's report, it is apparent that there is a significant level of strain on the relationship between the Group and Banque du Caire. Given the Bank's exposure to the group it is clearly a very sensitive matter.

18. For the Arab Steel Factory, as a subsidiary guarantor, to secure the guarantee obligation in respect of the Bond, Banque du Caire had taken pledges on shares of Medequip and TMSE. Additionally, ASF undertook not to borrow from other Banks.

19. Pursuant to the financial restructuring agreed in terms of the Issue of the Bond in December 1999 it was agreed that Banque du Caire would release the pledges held (over Medequip and TMSE shares) and release ASF from its undertaking not to borrow from other banks. In consideration for doing so, Banque du Caire would receive US$35M from the proceeds of the Bond to be placed in a blocked deposit account to provide for a sinking fund to repay the LE 250 M bonds (with Banque du Caire) on maturity.

20. On 8 December 1999 Banque du Caire released the pledges on the shares and cancelled the restriction on ASF borrowing from other banks. The deposit of US$35 M was duly made from funds made available from the Bond.

21. It is alleged by Ramy Lakah that, following receipt of the deposit, Banque du Caire caused ASF to grant a pledge over ASF's assets in favour of Banque du Caire, using a power of attorney.

22. In January 2000 the business and operating assets of ASF were sold for LE 321 M. Payment was made partly in cash (LE100M) and partly in notes totalling LE221M payable over six years, guaranteed by National Bank of Egypt.

23. The notes were deposited with Banque du Caire in the expectation that, as they matured, the proceeds would be made available to the Group for investment.

24. According to Ramy Lakah, the Group was not in default of its obligations to either local banks (other) or the bondholders when the sale of ASF was completed.

25. Banque du Caire is presently paying the proceeds on the Notes into a blocked deposit account accruing interest. We understand that Banque du Caire intends to apply the proceeds and interest thereon to repay Holdings' bond (with Banque du Caire) on maturity.

26. Despite the Group requesting Banque du Caire to release pledges held on non-Eurobond guarantee assets and shares (or to release the Notes) Banque du Caire is keeping the proceeds of the Notes and maintaining the shares pursuant to the pledge over ASF.

27. The Group considers that this action by Banque du Caire has deprived the Group of both liquid funds and the opportunity to raise additional loans from other banks to invest in production activities. Ramy Lakah advocates that Banque du Caire has therefore contributed significantly to the decline of the Group.

Framework Agreement:

28. Beyond the Bond in question the Group maintained facilities with a number of local banks, including Barclays Bank of Egypt, Banque du Caire and Credit Lyonnais.

29. In June 2000 the Group defaulted to Banque du Caire on interest payments due on the LE 250 M Guaranteed bonds issued by ASF and Lakah Holdings, and guaranteed by Banque du Caire. This caused concern with the local Banks.

30. In October 2000 the Group commenced negotiating a debt restructuring agreement with the local banks. That agreement, the Framework Agreement, was signed on 8 October 2000.

31. In terms of the agreement, Ramy Lakah agreed to sell specified personal assets/investments within two years of the agreement being concluded. The balance – after payment of amounts secured by pledges – was to be paid to the local banks in reduction of the outstanding position.

Page 4

32. The most valuable of such assets appear to be the Mid West Airline (estimated value of US$20M) and the Scandinavian Company for Toursitic Investments (estimated value of US$12M). However, the Mid West airline is subject to an onerous loan to National Bank of Egypt.

33. Most importantly, the framework agreement does not contain a negative pledge. This should enable the Group to deal with these investments and the balance of the proceeds.

Present position:

34. To date, Mr Lakah has promised much but failed to deliver. His credibility has been undermined further by his conviction for dishonoured cheques. As a result he has been sentenced to a custodial sentence of three years (in absentia) in Egypt.

35. ABC have met with Banque du Caire to discuss the position regarding the pledge allegedly made in respect of the sale proceeds of ASF. Banque du Caire have confirmed that a pledge was made over ASF's assets, in favour of Banque du Caire, however, this was done by Ramy Lakah's full involvement and consent.

Appendix B:



~0033671.txt

From: Raven, Jonathan M : LgrBusLondon
Sent: 18 February 2002 14:14
To: Carr, Nathan : Legal
Subject: ABC meeting with Banque du Caire

---------------------- Forwarded by Jonathan M Raven/LgrBusLondon/Corporate/Barclays on 18/02/2002 14:14 ---------------------------

Liam Wilson <Liam.Wilson@arabbanking.com> on 18/02/2002 10:35:38
To: Jonathan M Raven/LgrBusLondon/Corporate/Barclays@Barclays
cc:
Subject: ABC meeting with Banque du Caire


Jon,

As discussed, here are the salient points.

Senior management of ABC had a meeting with Banque du Caire and AIB on Sunday 27th.

Significant issues coming out of this meeting were as follows:-

* None of the Egyptian banks are suing Lakah, under instructions from Egyptian Government. There are similar high profile corporates in financial difficulty and Egyptian Government is anxious that their banks (State & private) do not rock the boat.

* Lakah is not servicing interest on his borrowings with the Egyptian banks. However, those Egyptian banks with exposure to Lakah are all secured.

* Suing BDC for their stance in the ASF/Power of Attorney issue would be a waste of time and probably counter-productive. In any event, despite R.L's protestations to the contrary, BDC maintain that he never objected to the P.O.A being utilised.

* BDC have no knowledge of Lakah's foreign assets.

* Iraq Transaction has been resuscitated, but Lakah's recent "business plan" is totally dependant on the success of it. Any attractiveness of the Iraqi transaction is further diminished by the need for conditional

Page 1

~0033671.txt

L/Cs. *

* Apparently Medequip etc. are still operating, principally with maintenance contracts. Helmy & Hamza are trying to establish whether this is the case or not.

Liam Wilson
Arab Banking Corporation (B.S.C.)
Remedial Loans Unit
P O Box 5698
Manama,
Bahrain

Tel: (00 973) 543705
Fax:(00 973) 533062/533163
E-mail: Liam.Wilson@arabbanking.com

*********************************************************

Except where specifically stated to the contrary, nothing in this message or its attachments constitutes an invitation, offer or acceptance [ or an investment recommendation or investment or other advice].
The message and any attachments are confidential and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, please email the sender, delete this message and any attachments from your system and do not copy this message or any attachment or disclose the contents to any other person.

www.arabbanking.com
*********************************************************

Page 2



**DKL SOLICITORS**

Somerset House (?)
Clerkenwell
London EC1M 5NR
Fax: 0207 251 4892
email: city@dkll.co.uk
DX: 53314 Clerkenwell

Telephone 0207 251 4891

FAO Mr Edward Lightfoot
Barclays Bank
Chatsworth House
66-70 St Mary Axe
London
EC3A 8BD

Our ref: 18/13167/1
Your ref:
Date: 15 February 2002

By fax
020 7382 5499

Dear Sirs,

**Re: Ramy Lakah**

We represent Mr Ramy Lakah and Mr Michel Lakah. It has been brought to the notice of both of our clients that an investigation by private investigators has been discovered by them. The investigation has been intrusive and on one view in breach of any normal and decent safeguards in any civilised society. The investigation has apparently gone to the extent of individuals pretending to be our clients, contacting financial institutions including UBS Warburg and Nomura and wrongly pretending to be our clients. That is a quite breathtaking and serious matter, which you will agree with us ought not to continue.

By fortuitous coincidence the private investigators identity has been discovered by our clients and a letter sent to the investigators inviting them to undertake that they will not continue with this behaviour. The investigators have replied by way of a solicitors letter from a London firm called McFaddens. We have sought to engage the firm in dialogue and await from them further information. Within the scope of that correspondence it further disturbs our clients that McFaddens have made allegations which are totally unsubstantiated or particularised of improper behaviour of our clients. You we are sure you will agree that any individual under the circumstances would justifiably be aggrieved and no doubt you will sympathise with our clients' position. Messrs McFaddens seem to indicate (although it is not entirely clear), that the investigation is being undertaken by those with a "legitimate" interest in the financial affairs for the Lakah Group although apparently not in our clients directly. We are not convinced that that is not the position. We obviously wish to trace on behalf of our clients the origin of this intrusive investigation and for the sake of completeness, so that we are not criticised for lack of enquiry, feel that we:

a. Ought to inform you of this development
b. Have it made crystal clear that none of the bondholders is in fact the originator of these extraordinary and bizarre activities.

Community Legal Service

Partners: Anthony Lawson, Steven Lewis, Tony Sheean, Gavin Musgrave
Consultants: Peter Stewart, Trevor Ramsey, Myra Kay, Angela Trowitz, Paul Winterton
Solicitors: Jacky Lewis, Alwyn Domolo, Niamh Patel, Joanne Olton, Eunice Davies
Solicitors: David Aisman, Zoe Endacott, Glen Fox, Fiona German, Sheila Gulliver
Solicitors: Jonathan Jacobs, Rachel Karan, Paul Masters, Susan Ross, Sandra Videla
Executives: Siobhan Lenashy, Chiemi Lo, Neil Rapp, Roger Williams, Steve Smith
Executives: Sandra McAdams, Joyce Wilson, Kevyn Micklewright, Ann Gibbons

Offices also in Croydon, Epsom and Ewell

This Firm has members of the Family Law, Children and Immigration Panels.
Drummond Kirkwood Lawson Lewis is regulated by the Law Society in the conduct of Investment Business.





**DKLL**

**SOLICITORS**

1 Briset Street
Clerkenwell
London EC1M 5NR
Fax: 0207 251 4892
email: city@dkll.co.uk
DX: 53314 Clerkenwell

Telephone 0207 251 4891

We are certain that you will be of assistance to us in confirming in writing that Barclays Bank is not associated in any way with any of these intrusive enquiries. We are certain that all bondholders will join with us in criticizing this rather distressing situation.

It is our intention to seek to prevent these types of intrusions by way of court order if necessary and to prevent the innuendo of any suggestion that our clients are engaged in fraudulent activity. You will appreciate that the latter is also remarkably disturbing.

For legal purposes your replies are urgent and necessary and we should be grateful if they are received by the close of business on the 19th February 2002 or sooner if possible.

Yours faithfully

DKLL





Offices also in Croydon, Epsom and Ewell

This firm are members of the Family Law, Children and Immigration Panels
Drummond Kirkwood Lawson Lewis is regulated by the Law Society in the conduct of Investment Business



**DKLL SOLICITORS**

Clerkenwell
London EC1M 5NR
Fax: 0207 251 4892
email: city@dkll.co.uk
DX: 53314 Clerkenwell

Telephone 0207 251 4891

FAO Mr Edward Lightfoot
Barclays Bank
Chatsworth House
66-70 St Mary Axe
London
EC3A 8BD

Our ref. 18/13167/1

Your ref.

Date 15 February 2002

By fax
020 7382 5499

Dear Sir,

**Re: Lakah Group/USD100,000,000 Eurobond**

We write on behalf of the Lakah Group. You are aware that the Group is a putative guarantor of a Eurobond upon which there has already been much discussion. The issue has been examined over some considerable period of time with an unusually detailed examination of the position of the Group by PriceWaterhouseCoopers (in July 2001). That report, after some considerable period of enquiry, concluded inter alia as follows:-

1. The Egyptian economy has substantially contracted (Report page 52) with foreign investment reduced by almost 60% in one year and state company losses now up by 55% on the previous year.

2. As at July 2001 the Egyptian Pound had been massively devalued.

3. The Government's liquidity problems have been particularly stark (report page 53). Government healthcare contract payments have been reduced from 50% to between 10% and 25% (report page 54)

4. "These factors, particularly the lack of liquidity and the deprecation for the Egyptian Pound, have been a major contributor to the groups difficulties" (Report page 54)

5. As a consequence, in June 2000 the Group defaulted in its obligations to Banque du Caire. By October 2000 incipient anxiety lead to a debt restructuring agreement with the local banks, with the support of the Central Bank of Egypt and the Minister for the Economy (Report page 54) The PriceWaterhouseCoopers conclusion was that even that Framework Agreement "may not necessarily have the effect of fully stabilising the group's position vis-à-vis the local banks"



Community Legal Service

Partners: Anthony Lawson, Steven Lewis, Tony Shilson, Gavin Murgrave, Alwyn Daniels
Consultants: Peter Stewart, Trevor Mamyn, Myra Kay, Angela Tzauou, Paul Winterford
Solicitors: Jacky Lewis, Wrean Patel, Joanne Dixon, Eunice Davies, David Allman
Solicitors: Zoe Enoacott, Gion Fall, Fiona Gorman, Sheila Guavar, Jonathan Jacobs
Solicitors: Rachel Koran, Paul Maziarz, Susan Rosg, Sandra Wdale
Executives: Siobhan Lornassey, Gudrun Lee, Neil Rapp, Robert Williams, Steve Smith
Executives: Sandra McAdams, Joyce Wilson, Kevin Micklewright, Ann Gibbons

Offices also in Croydon, Epsom and Ewell
This Firm has members of the Family Law, Children and Immigration Panels






6. According to PriceWaterhouseCoopers' understanding "Banque du Caire cancelled facilities it had previously offered to finance a medical centre", which "caused significant losses to the group and was a contributory cause of its decline" (Report page 58)

7. PriceWaterhouseCoopers also found that "although much of its revenues are in Egyptian Pounds, its key suppliers require payment in US Dollars, leading to currency exposure which, with the depreciation and non availability of the Egyptian Pound, has contributed to the difficulties." (Report page 59) Although there is typographical error in relation to the second use of "Egyptian Pound," which should read US Dollar, the point is crystal clear.

8. The Group, between 1998 and 2000, maintained a gross profit percentage of over 30% in a business that showed signs of remarkable growth. In 1999 the gross profit was Egyptian £443,000,000 (Report page 62) and between 1998 and 1999 sales grew by 82%, "in response to increasing spending by the Egyptian Government." That spending has sharply declined.

9. Funding for new investment has been severely restricted resulting in facilities operating at a "very low level" (Report page 65). PriceWaterhouseCoopers rationalised:
"turnover from continuing activities almost halved in 2000" (Report page 65)

10. Stricter financial controls and tighter management were suggested methods by PriceWaterhouseCoopers to improve the Groups resistance to the extraordinary changes in the Egyptian economy.

11. PriceWaterhouseCoopers found that Mr Ramy Lakah and employees of the companies cooperated fully in disclosing all records. The accountants experienced nor expressed any concerns on either irresponsible management or questionable transactions.

In brief, in the report commissioned by the Bondholders own chosen accountancy expert, the difficulties in the Egyptian economy are the operative causes of the Groups inability to meet its financial commitments. That position has become the more acute since July 2001. The Egyptian Pound has depreciated by a further 30%; internal investment is even more difficult; government expansion is even more severely curtailed; labour unrest is significantly higher and the prospects within the next 12 months indicate a further dramatic decline. These developments come within the context of a more competitive marketplace and a general world economic recession.

**DKLL**

The confluence of these factors has caused enormous concern to the management of the Lakah Group. Share value has progressively declined and the liabilities are at an excessively high level. The management of Lakah Group has come to a view that the situation has reached the point where the insolvency of the Group and its operations are a dramatic probability; a matter of sufficient importance and concern to make that decision within a matter of days rather than weeks. Inevitably, in these situations economic considerations force the hand of companies to take a course of action which they may not ordinarily wish to do. Lakah Group has reached that critical point.

Clearly this has an impact on all creditors of the Group. As an act of responsible management and the urgent nature of the difficulties, the Group have decided to talk first with the Bondholders to discuss this most distressing development.

In that regard the management of Lakah Group hereby call a meeting with the Bondholders to take place on Wednesday 20 February 2002 at the Landmark Hotel London, 222 Marylebone Road, London, NW1 6JQ, at 10am.

Mr Ramy Lakah will himself chair the meeting and also present will be an international insolvency expert. This is a final last minute effort to determine any cooperative rescue, however bleak those prospects might be. Time requirements for reporting to the international financial markets makes the meeting of overwhelming significance and a final chance for any meaningful appraisal. Participation should be at senior decision-making level.

We look forward to seeing you at the meeting. Please let us (attention Miss Natalie Whitmore ph 0044 207 2514891, fax 0044 201 2514892) know who will be attending by end of business on the 18 February.

You will understand that the information contained in this letter is price sensitive and any disclosure could detrimentally affect the interests of the shareholders of the company. In consequence would you please treat the contents of this letter as being strictly confidential and should not be disclosed to any third party in any circumstance.

Yours faithfully

DKLL