# U.S. DEPARTMENT of STATE

## Egypt

### Country Reports on Human Rights Practices  - 2002
Released by the Bureau of Democracy, Human Rights, and Labor
March 31, 2003

According to its Constitution, Egypt is a social democracy in which Islam is the state religion. The National Democratic Party (NDP), which has governed since its establishment in 1978, has used its entrenched position to dominate national politics and has maintained an overriding majority in the popularly elected People's Assembly and the partially elected Shura (Consultative) Council. In 1999 President Hosni Mubarak was reelected unopposed to a fourth 6-year term in a national referendum. The President appoints the Cabinet and the country's 26 governors and may dismiss them at his discretion. The judiciary generally was independent; however, this independence has been compromised by the State of Emergency legislation in force, under which the range of cases subject to its jurisdiction has been compromised due to the improper use of State Emergency Security Courts and military courts for inappropriate cases.

There are several security services in the Ministry of Interior, two of which have been involved primarily in the Government's campaign against terrorism: The State Security Investigations Sector (SSIS), which conducted investigations and interrogated detainees, and the Central Security Force (CSF), which enforced curfews and bans on public demonstrations and conducted paramilitary operations against terrorists. The President is the commander-in-chief of the military; the military is a primary stabilizing factor within society but generally has not involved itself in internal issues. The security forces committed numerous, serious human rights abuses during the year; however, there continued to be no reports of the use of deadly force in the campaign against suspected terrorists.

Over the past decade, policy reforms encouraged a transition from a government-controlled economy to a free market system, although state-owned enterprises still dominated some key sectors of the economy. The country had a population of approximately 68 million, which increases by approximately 2 percent annually. The agricultural sector employed the largest number of persons, and was almost entirely privately controlled. Official statistics placed 34 percent of the employed labor force in the agricultural sector, and knowledgeable observers estimated that 3 to 5 percent of those were subsistence farmers. Income from tourism, remittances from approximately 2 million citizens working abroad, petroleum exports, and Suez Canal revenues were the other principal sources of foreign currency and are vulnerable to external shocks. Egypt is a middle income developing country, with poverty (according to the Government's definition) at 23 percent of the population.

The Government generally respected the human rights of its citizens in some areas; however, the Government's record remained poor with respect to freedom of association, the improper use of State Security Emergency Courts and military courts, and torture, among other areas. The President and the entrenched NDP dominated the political scene to such an extent that citizens did not have a meaningful ability to change their Government.

The Emergency Law, which has been in effect since 1981 and was renewed for another 3 years in June 2000, continued to restrict many basic rights. The security forces continued to arrest and detain suspected members of terrorist groups. In combating terrorism, the security forces continued to mistreat and torture prisoners, arbitrarily arrest and detain persons, held detainees in prolonged pretrial detention, and occasionally engaged in mass arrests. In actions unrelated to the antiterrorist campaign, local police killed, tortured, and otherwise abused both criminal suspects and other persons. Most cases were not pursued, although the Government took

disciplinary action against some police officers accused of abusing detainees, including prosecution of a number of offenders.

Prison conditions remained poor. The Emergency Law allows authorities to detain persons without charge, and the Government continued to arrest and detain persons arbitrarily. Thousands of persons were detained without charge on suspicion of illegal terrorist or political activity; others served sentences after being convicted on similar charges. There was a past practice of improper use of State Security Emergency Courts and military courts to try inappropriate cases which infringed on a defendant's normal right under the Constitution to a fair trial before an independent judiciary. During the year, the Government did not refer any new cases to military courts.

The Government used the Emergency Law to infringe on citizens' civil liberties. Although citizens generally expressed themselves freely, the Government partially restricted freedom of the press and significantly restricted freedom of assembly and association. On July 29, a State Security Court concluded a retrial with the conviction of Dr. Saad Eddin Ibrahim and his codefendants of defaming the state and illegally accepting foreign funds. The verdict was overturned by the Court of Cassation on December 4 and is scheduled to be retried in February 2003 by the Court of Cassation, rather than another State Security Court. Ibrahim's case had broad implications for freedom of expression, and had a deterrent effect on the activities of human rights organizations. The Government generally permitted human rights groups to operate openly. The Government placed some restrictions on freedom of religion.

Domestic violence against women was a problem. Although the Government banned the practice of female genital mutilation (FGM), it persisted in the traditional milieu. Women and Christians faced discrimination based on tradition and some aspects of the law.

The Government limited workers' rights. Child labor remained widespread, despite government efforts to eradicate it. Exposure of workers to hazardous working conditions and other abuses of the law by employers continued, and the Government did not enforce labor laws effectively. Egypt was invited by the Community of Democracies' (CD) Convening Group to attend the November 2002 second CD Ministerial Meeting in Seoul, Republic of Korea, as an observer.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary and Unlawful Deprivation of Life
There were no reports of political killings or of extrajudicial killings of suspected terrorists by security forces during the year; however, police committed other extrajudicial killings.

Human rights organizations and the press reported on the death in custody at police stations or prisons of 14 persons during the year: Ahmed Youssef; Sayyed Eissa; Adel Mohamed; Mohamed Mahmoud Osman; Nader Fathy Sayyed; Ahmed Mahmoud Mohamed; Mustafa Labib Hemdan; Mohamed Ali Shahine. Hussein Hassan Khater died after a hunger strike at Kanater prison. He maintained he was innocent. On October 26, it was reported that authorities were investigating the death of five inmates at Ghurbaniyat prison, all of whom died within a 2-week period in early October. Reportedly, their deaths were listed as due to "circulatory failure." The results of the investigation had not been publicized by year's end.

The retrial of 96 suspects accused of participating in the January 2000 violence in al-Kush, Sohag Governorate, that left 21 Christians and 1 Muslim dead, concluded its sessions on October 9. The State Security Court is scheduled to announce the verdicts in January 2003 (see Section 5).

b. Disappearance

The Egyptian Organization for Human Rights (EOHR) reported one disappearance during the year. On February 9, Adel Mohammed Kamiha, a coffee shop owner, reportedly disappeared following his transfer from police custody to the custody of State Security in Alexandria.

In December an administrative court ordered the Ministry of the Interior to pay $46,200 (100,000

Egyptian pounds) to a family in compensation for the disappearance of their son, detained in 1989. The Court also ruled that the reasons for his detention were illegitimate and ordered his release by a court in April 1990. The victim was an alleged member of the banned al-Jihad terrorist organization and a student at Zaqaziq Faculty of Medicine. The Interior Ministry reportedly failed to provide any information about his fate.

At year's end, 46 other cases of disappearance from previous years documented by human rights organizations remained unsolved. Human rights organizations provided names to the U.N. Working Group on Enforced and Involuntary Disappearances; the Government reportedly has denied any involvement in the cases.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution prohibits the infliction of "physical or moral harm" upon persons who have arrested or detained; however, torture and abuse of detainees by police, security personnel, prison guards was common and persistent. The November session of U.N. Committee Against Torture noted a systematic pattern of torture by the security forces.

Under the Penal Code, torture of a defendant or giving orders to torture are felonies punishable by hard labor or 3 to 10 years' imprisonment. If the defendant dies under torture, the crime is one of intentional murder punishable by a life sentence at hard labor. Arrest without due cause, threatening death, or using physical torture is punishable by temporary hard labor. Abuse of power to inflict cruelty against persons is punishable by imprisonment of no more than 1 year or a fine of no more than $61 (134 Egyptian pounds). In addition, victims may bring a criminal or civil action for compensation against the responsible government agency. There is no statute of limitations in such cases.

Despite these legal safeguards, there were numerous, credible reports that security forces tortured and mistreated citizens. Reports of torture and mistreatment at police stations remained frequent. While the Government investigated torture complaints in criminal cases and punished some offending officers, the punishments generally have not conformed to the seriousness of the offense.

Incommunicado detention is authorized for prolonged periods and frequently accompanied allegations of torture (see Section 1.d.).

While the law requires security authorities to keep written records of detained citizens, human rights groups reported that such records often were lacking, effectively blocking the of complaints.

Human rights groups believed that the SSIS continued to employ torture. Victims usually were taken to an SSIS office, where they were handcuffed, blindfolded, and questioned about their associations, religious beliefs, and political views. Torture was used to extract information, coerce the victims to end their oppositionist activities, and to deter others from similar activities.

Principal methods of torture reportedly employed by the police included: Being stripped and blindfolded; suspended from a ceiling or doorframe with feet just touching the floor; beaten with fists, whips, metal rods, or other objects; subjected to electrical shocks; and doused with cold water. Victims frequently reported being subjected to threats and forced to sign blank papers to be used against the victim or the victim's family in the future should the victim complain of abuse. Some victims, including male and female detainees, reported that they were sexually assaulted or threatened with the rape of themselves or family members.

In March the EOHR reported 59 documented cases of torture in 2001 in police stations and other detention centers, in which 11 victims died. The report included nine cases of citizens apparently unaffiliated with any political group or trend. In one case, four family members of a wanted defendant were tortured. Twenty-two of the cases involved individuals on trial for conspiracy to commit terrorism and membership in an extremist organization, known as the "Wa'ad" ("The Promise") (see Section 1.e.). One individual arrested in a police Internet "sting" claimed that he had been tortured (see Sections 1.d., 1.f., and 2.a.).

In September 51 defendants in the Wa'ad case were convicted and 43 were acquitted. Of the

43 acquitted, 12 were rearrested. Twenty-eight of the 94 Wa'ad defendants told the prosecution that they were tortured during interrogations.

During the year, the Government expanded efforts to hold security personnel accountable for torturing prisoners in their custody. Human rights organizations and the press reported during the year 17 different instances in which personnel were held publicly accountable. Some of the cases involved incidents that took place in previous years. Some but not all of the cases prosecuted involved the deaths of prisoners.

In June the EOHR welcomed moves by the Ministry of Interior to combat torture. The EOHR called for reviewing of all legislation on the subject, amending articles of the Penal Code, and establishing a permanent mechanism for investigating torture complaints. In addition, the Human Rights Center for the Assistance of Prisoners (HRCAP), in an October report entitled "The Truth," commended judicial efforts to try security officers for torture, but outlined current obstacles, including a vague legal definition of torture, and the inability of victims to sue perpetrators directly.

During the year, the Government took some steps to hold torturers accountable. For example, in March the Menoufiya Criminal Court sentenced the warden of Wadi Natroun Prison to 10 years' imprisonment, a subordinate to 7 years' imprisonment, and four other policemen to 5-year terms for torturing inmate Ahmed Mohamed Eissa to death and falsifying documents to disguise the cause of death. The defendants had contested the 2000 verdict and were tried before a different circuit, which handed down the same sentences.

In June the Prosecutor's office began an investigation into the May 27 death, allegedly due to torture, of Mohamed Mahmoud Osman, who was detained at Old Cairo Police Station for 2 days prior to his death. Osman reportedly had refused a body search after being stopped by police. Osman was released after 2 days and reportedly had extensive bruising on his body. He died at home within days.

Also in July, the Cairo Criminal Court sentenced two policemen and a police informant to 5 years at hard labor for torture resulting in the February 23 death of Ahmed Youssef, whose brother Yasser was wanted by the police. Ahmed was taken instead to El Wayli police station where he was severely tortured to obtain information on the whereabouts of his brother.

In August the Cairo Criminal Court sentenced the head of the investigations unit at the Nasr City Police Station and a captain in the unit, to 3-years' imprisonment and a fine of $924 (2,001 Egyptian pounds) each for the torture to death of Sayyed Eissa and the severe torture of his friend, Mustafa Abdel Aziz. The two defendants were detained without charge for 45 days on suspicion of car theft. The Minister of Interior personally referred the case for prosecution. Two other defendants in the case, the head of the auto theft unit and a police officer, were acquitted.

In addition to prosecutions of police involved in cases of torture and abuse of detainees, civil courts continued to review cases and frequently awarded compensation to victims of police abuse. Human rights observers recommended that rules and standards for victims be established to obtain redress and parity in compensation.

In prominent criminal cases, defendants alleged that they were tortured during questioning by police. Attorneys for 52 allegedly homosexual men, arrested in May 2001 and charged with debauchery and "insulting a heavenly religion," claimed that their clients were abused physically during the initial days of their detention, and that several had confessed under torture. Defendants in other cases involving homosexuality also claimed that they were tortured in order to extract confessions to the charge of "debauchery" (see Sections 1.e. and 2.c.).

In the Government's pending investigation of the alleged torture of dozens of suspects detained during the investigation of a double murder in the town of al-Kush, Sohag Governorate, in 1998, no interviews of village residents took place and the investigation appeared to make no progress during the year.
From November 11 to 22, three domestic human rights associations, as well as two international organizations, presented their allegations and findings to the Committee Against Torture (CAT), a subcommittee of the U.N. Commission on Human Rights. The final recommendations of the U.N. Committee welcomed several recent actions taken by the Government including: The abolition of flogging in prisons (undertaken in 2001); unannounced

inspections of places of detention; court decisions that disregarded confessions obtained under duress; increased human rights training for police officials; and the establishment of several human rights committees and departments within government ministries.

However, the CAT report expressed concerns about: The continued implementation of the state of emergency since 1981; consistent reports of torture and ill treatment, especially at the hands of the SSIS; abuse of juveniles; abuse of homosexuals; the continued use of administrative detention; the lack of access by victims of torture to the courts and the length of proceedings, in addition to disparities in the awarding of compensation; and restrictions on NGOs.

The CAT recommended that the Government consider: Ending the state of emergency; the adoption of a clear legal definition of torture; the abolition of incommunicado detention; the prompt investigation of complaints of torture; the more frequent inspection of places of detention; the review of military court decisions by a higher tribunal; the removal of ambiguities in the law that allow the prosecution of individuals for their sexual orientation; cessation and punishment of the abuse of minors and a halt to their detention with adults; the acceptance of a visit by a U.N. Special Rapporteur on Torture; the establishment of rules and standards for victims to obtain redress and parity in compensation; and to allow human rights organizations to pursue their activities unhindered.

The country's delegation told the CAT that "incompatibility of timetables" had not made possible a visit to the country by the U.N. Special Rapporteur on Torture.

Prison conditions remained poor and tuberculosis was widespread. Prisoners suffered from overcrowding of cells, the lack of proper hygiene, food, clean water, proper ventilation, and recreational activities, as well as inadequate medical care. Some prisons continued to be closed to the public.
On June 9, the Public Prosecutor issued orders to all prosecutors' offices to allow defense lawyers access to investigation reports prior to the prosecution's questioning of defendants and ordered that lawyers and defendants not be separated for any reason during questioning.

On July 10, HRCAP obtained an administrative court order that allows prisoners and their lawyers to meet privately without any barriers between them (such as standard mesh fencing).

Prisoners were sometimes released on religious holidays without administrative delays, reflecting the Ministry of Interior's decision for direct release from prisons, rather than an intermediate transfer to security directorates for out-processing. However, human rights organizations reported that implementation of the policy in criminal cases was inconsistent, and that the direct-release policy was not implemented in general in cases involving political prisoners, especially in cases of detainees suspected of membership in the Muslim Brotherhood.

Suspected Islamic group members were released during the year. Some were identified as repentant members of the Islamic Group, a banned terrorist organization. Observers said that the number of suspected Islamic Group members released during the year was 750.

In March, April, and June, HRCAP successfully won court cases against the Ministry of Interior to lift the ban on visits to four prisons.

Failure to implement judicial rulings regarding the release of administrative detainees or of prisons to visits continued to be a problem during the year. Relatives and lawyers often were unable to obtain access to prisons for visits. Restrictions were placed on visits to prisoners who are incarcerated for political or terrorist crimes, limiting the number of visits allowed for each prisoner and the total number of visitors allowed in the prison at one time. In November a Ministry of the Interior decree prohibited visits to inmates in three maximum security prisons, Istiqbal Tora, Abu Za'abal, and Liman Abu Za'abal, citing security concerns. The EOHR issued a statement regretting the move and asserting that the decree contradicted previous court rulings and existing regulations governing the treatment of prisons.

As required by law, the public prosecutor continued to inspect prisons during the year. Findings were not made public. However, the premises of the SSIS, where torture was practiced, were excluded from mandatory judicial inspection.

In December 2001, the People's Assembly approved an amendment banning flogging as a disciplinary measure in prisons. Local human rights groups welcomed the ban.

There were separate prison facilities for men, women, and juveniles. However, the separation of adults from juveniles did not always occur, and abuses of minors were common. There were separate military prisons, and civilians were not detained in them. Political prisoners generally were detained separately from prisoners convicted of violent crimes.

In principle lawyers, acting as de facto human rights monitors, were permitted to visit prisoners in their capacity as legal counsel; however, in practice they often faced considerable bureaucratic obstacles that prevented them from meeting with their clients who were prisoners. The International Committee of the Red Cross (ICRC) and other domestic and international human rights monitors did not have access to prisons or to all places of detention.

d. Arbitrary Arrest, Detention, or Exile

During the year, security forces conducted large-scale arrests and detained hundreds of individuals without charge. Police also at times arbitrarily arrested and detained persons. Under the provisions of the Emergency Law, the police may obtain an arrest warrant from the Ministry of Interior upon showing that an individual poses a danger to security and public order. This procedure nullified the constitutional requirement of showing that an individual likely has committed a specific crime to obtain a warrant from a judge or prosecutor.

The Emergency Law allows authorities to detain an individual without charge. After 30 days, a detainee has the right to demand a court hearing to challenge the legality of the detention order and may resubmit his motion for a hearing at 1-month intervals thereafter. There is no maximum limit to the length of detention if the judge continues to uphold the legality of the detention order or if the detainee fails to exercise his right to a hearing. Incommunicado detention is authorized for prolonged periods by internal prison regulations. Human rights groups and the CAT both expressed concern over the application of measures of solitary confinement.

In addition to the Emergency Law, the Penal Code also gives the State broad detention powers. Under the Penal Code, prosecutors must bring charges within 48 hours or release the suspect. However, they may detain a suspect for a maximum of 6 months pending investigation. Arrests under the Penal Code occurred openly and with warrants issued by a district prosecutor or judge. There is a system of bail. The Penal Code contains several provisions to combat extremist violence, which broadly define terrorism to include the acts of "spreading panic" and "obstructing the work of authorities."

Hundreds, perhaps thousands, of persons were detained administratively in recent years under the Emergency Law on suspicion of terrorist or political activity, in addition to several thousand others convicted and serving sentences on similar charges (see Section 1.e.). In July Mohamed Zarei, head of HRCAP, put the total figure at 15,000. Other estimates ranged between 13,000 and 16,000. Zarei stated that the number reflected the release of approximately 7,000 detainees over the past 3 years.

In March HRCAP began the issuance of a series of lists of sick prisoners that it alleged were detained illegally. As of October, the group counted 505 such persons. The lists provided information on the date of arrest (all from the 1990s), the number of court orders for release, their present place of detention, and their ailment. The reports did not include information on the reasons for detention (political or criminal). HRCAP forwarded the lists to the President, urging the release of the detainees.

Between February and June, newspapers and human rights groups reported the arrest of several individual members of the Popular Egyptian Committee to Support the Intifada and the Palestinian People. Tawfik Wail was arrested at the Cairo Book Fair while gathering signatures for a petition and released 3 days later. The Committee claimed that Wail was tortured. The National Committee in Defense of Prisoners of Conscience claimed in April that Haytham Mahmoud Mohamed was arrested in Alexandria along with seven members of the Popular Egyptian Committee to Support the Intifada and the Palestinian People, for unspecified reasons. The Secretary General of the Committee also was charged with possession of leaflets calling demonstrations in support of Palestine. On May 21, EOHR issued a statement congratulating the prosecution for the release of the detainees.

Over the course of the year, security forces arrested approximately 300 persons allegedly associated with the Muslim Brotherhood, which has been an illegal organization since 1954. Charges leveled against members typically included: Belonging to and attempting to revive the activities of a banned organization; obstructing the laws and constitution of the country; inciting the masses against the Government (usually organizing demonstrations critical of the Government's position on the peace process and relationship with the United States; and attempting to infiltrate student bodies to spread the ideology of a banned organization.

Of the approximately 300 detained, none remained in detention at year's end, according to a lawyer for the Muslim Brotherhood. Of those detained, 101 were arrested on charges of rioting, vandalism, and destruction of public property in Raml district during the June 27 parliamentary elections. Raml, near Alexandria, was the site of skirmishes between security forces and supporters of two candidates affiliated with the Muslim Brotherhood. Six lawyers affiliated with the campaign of (female) Islamist candidate Gihan El Khalafawi also were arrested and detained by prosecutors for 15 days on suspicion of incitement to riot. In October the court acquitted 35 of the 101 defendants and sentenced the remaining 66 to 3 months (time served). In an unusual statement, the judge in the case called on the Government to repeal the Emergency Law and urged authorities to limit referrals to the State Security Court to cases of an exceptional nature with a direct impact upon national security (see Section 1.e.).

Arrests targeting high level Muslim Brotherhood members included Ali Abdel Fattah, who was arrested in May in Alexandria and released in August, for allegedly planning a "million man march" in support of the Intifada, and the September arrest in Cairo of Rashad Bayoumi and 17 others. In June security forces impounded the offices of the Alexandria Physicians' Syndicate, whose head and Secretary-General were members of the Muslim Brotherhood. Syndicate offices allegedly were used as a base for Brotherhood activities. In July a military court handed down rulings in the case of 22 Muslim Brotherhood members who had been referred to the by presidential decree in November 2001. The court sentenced 5 of them to 5-years' imprisonment, 11 to 3-years' imprisonment, and acquitted 6.

In compliance with court orders, 35 members of the Muslim Brotherhood, including Muhammad El-Sayed Habib, were released in August after 15 months in detention. After a court ordered the release of 12 Muslim Brotherhood members, having served three-quarters of their sentence, the Government contested the ruling. In October prominent Brotherhood member Mokhtar Nouh was released from prison.

During the year, there were several confirmed reports that converts to Christianity were harassed by security authorities (see Section 2.c.). For example, in June convert Hisham Samir Abdel-Lateef Ibrahim was detained in Alexandria by the SSIS, and held for 52 days at SSIS facilities in Alexandria and Cairo before being transferred to Torah Farms Prison, where he was interrogated at least three times. Ibrahim is believed to have been charged with forging identity documents, and "contempt of religion," although as of year's end, his case had not been referred to court. In a letter smuggled out of the prison, Ibrahim claimed that other converts to Christianity were detained in the same prison. He admitted to having procured a falsified identity document that showed his new religious affiliation. Ibrahim's case came to the attention of Coptic activists during the summer, when they retained legal counsel for him and began to sue for his release.

The Government did not use forced exile.

e. Denial of Fair Public Trial

The judiciary was generally independent; however, under the Emergency Law, cases involving terrorism and national security may be tried in military, State Security, or State Security Emergency Courts, in which the accused does not receive all the normal constitutional protections of the civilian judicial system. The authorities ignored judicial orders in some cases.

In a number of public statements during the year, Public Prosecutor Maher Abdel Wahed stated his intention to support abolishment of State Security Emergency Courts.

The Constitution provides for the independence and immunity of judges and forbids interference by other authorities in the exercise of their judicial functions, and this provision generally was observed in practice. The President appoints all judges upon recommendation of the Higher Judicial Council, a constitutional body composed of senior judges. Judges are appointed for life,

with mandatory retirement at age 64. Only the Higher Judicial Council may dismiss judges for cause, such as corruption. The Higher Judicial Council is a set body headed by the president of the Court of Cassation. The Council regulates judicial promotions and transfers. The Government included lectures on human rights and other social issues in its training courses for prosecutors and judges.

In the civilian court system, there are criminal courts, civil courts, administrative courts, and a Supreme Constitutional Court. There are three levels of regular criminal courts: Primary courts, appeals courts, and the Court of Cassation, which represents the final stage of criminal appeal. Criminal courts also have a state security division to hear cases that the Government considers to bear on state security; in these courts, the defendant may appeal only on procedural grounds. Civil courts hear civil cases and administrative courts hear cases contesting government actions or procedures; both systems have upper-level courts to hear appeals. The Supreme Constitutional Court hears challenges to the constitutionality of laws or verdicts in any of the courts.

A lawyer is appointed at the court's expense if the defendant does not have counsel. Appointed lawyers are drawn from a roster that is chosen by the Bar Association; however, expenses are borne by the State. Any denial of this right is grounds for appeal of the ruling. However, detainees in certain high security prisons continued to allege that they were denied access to counsel or that such access was delayed until trial, thus denying counsel the time to prepare an adequate defense. A woman's testimony is equal to that of a man's in court. There is no legal prohibition against a woman serving as a judge, but no women served as judges (see Section 5).

In 1992 following a rise in extremist violence, the Government began trying cases of defendants accused of terrorism and membership in terrorist groups before military tribunals. In 1993 the Supreme Constitutional Court ruled that the President may invoke the Emergency Law to refer any crime to a military court. This use of military and State Security Emergency Courts under the Emergency Law since 1993 was broadly interpreted and deprived hundreds of civilian defendants of their normal right under the Constitution to be tried by a civilian judge. The Government defended the use of military courts as necessary to try terrorism cases, that trials in the civilian courts were protracted and that civilian judges and their families were vulnerable to terrorist threats. No new cases involving civilian defendants were referred to military courts during the year.

Military verdicts were subject to a review by other military judges and confirmation by the President, who in practice usually delegated the review function to a senior military officer. Defense attorneys claimed that they were not given sufficient time to prepare defenses and that judges tended to rush cases involving a large number of defendants. Nonetheless, judges had guidelines for sentencing, defendants had the right to counsel, and statements of the charges against defendants were made public. Observers needed government permission to attend. Diplomats attended some military trials during the year. Human rights activists have attended, but only when acting in their capacity as lawyers for one of the defendants.

On September 9, a military court handed down verdicts in the trial of 94 defendants (5 of whom remained at large) on charges of conspiracy to commit acts of terrorism and membership in an illegal Islamist organization, the Wa'ad. The court sentenced defendants to varying terms of up to 15 years at hard labor, including Egyptian-American Muhammad Hisham Seif Iddin, or up to 3-years' imprisonment, and acquitted 43 other defendants. The release of the acquitted reportedly was delayed, and 12 were rearrested, including lead defendant Sheikh Nash'at Ibrahim. No new developments were reported by year's end.

In the case of 170 defendants of the terrorist Islamic Group, there were no developments during the year; available information indicated that they remained in prison awaiting trial. In the case of the 22 Muslim Brothers, on July 30 the courts acquitted 6, sentenced 5 to 5 years in prison, and 11 to 3 years in prison.

The State Security Emergency Courts shared jurisdiction with military courts over crimes affecting national security. The President appointed judges to these courts from the civilian judiciary upon the recommendation of the Minister of Justice and, if he chose to appoint military judges, the Minister of Defense. Sentences were subject to confirmation by the President. There was no right of appeal. The President may alter or annul a decision of a State Security

Emergency Court, including a decision to release a defendant.

During the year, State Security Emergency Courts handed down verdicts in 5 cases involving defendants.

In March a court sentenced Sherif El-Filali to 15 years' hard labor on espionage charges. On March 5, a court convicted eight persons from the city of Matariya of "insulting a heavenly religion." Sentences ranged from 3 years in prison to a 1-year suspended sentence (see Section 2.c.). In April courts sentenced to 10 years at hard labor Mohammed El-Sayid Soliman, an alleged member of the banned terrorist Islamic Jihad group, as well as an alleged associate of Al-Qai'da leader Ayman Al-Zawahiri. In June a court sentenced Magdi Anwar Tawfiq to 10 years at hard labor for spying for Israel. In a July retrial, Mahmoud Abdel Ghani, an alleged member of the outlawed terrorist Islamic Group, was sentenced to life in prison for having joined the military wing of the group in Assiut and subsequently killing a police officer. At his first trial, Abdel Ghani had been sentenced to 5 years, but a military governor, on behalf of the President, refused to ratify the ruling and ordered a retrial. There were no further judgments issued by emergency courts after July.

In May President Mubarak ordered a civilian court to retry 50 men in what was called the "Queen Boat case," 23 of whom had been convicted in a State Security Emergency Court of "habitual debauchery" in November 2001. At the same time, the President ratified the verdicts against two of the original defendants who had been convicted of "insulting a heavenly religion" and "unorthodox religious beliefs and practices." The retrial of the 50 was ongoing at year's end.

In July the Military Governor's office rejected the appeal of Mamdouh Mehran, who had been sentenced in 2001 to prison for 3 years for propagating false information and "insulting a heavenly religion," by publishing an article about the alleged sexual misconduct of a defrocked Coptic monk (see Section 2.a.).

On February 6, the Court of Cassation overturned Saad Eddin Ibrahim's May 2001 conviction and ordered a retrial. On July 29, a State Security Court found Ibrahim guilty of seeking to harm the reputation of the State, accepting foreign funding without government approval, and defrauding a donor, and sentenced him to 7-years' imprisonment. Three codefendants were convicted on fraud charges and sentenced to 2- to 3-year terms, and three others received 1-year suspended sentences. The verdict was issued moments after formal oral arguments had been concluded.

In the Ibrahim case, the charge of defrauding a donor stemmed from an E.U. Commission grant of $246,266 (261,000 euros) to Ibrahim's Ibn Khaldoun Center for Development Studies. Judges disregarded an affidavit from the chief of the E.U. mission in the country that affirmed that the E.U. was fully satisfied with the way the Center handled its grant. As in the first trial, the defense was denied access to the files of the Ibn Khaldoun center, seized by investigators at the time of Ibrahim's initial arrest in 2000. During the trial, judges did not address numerous defense motions, and at year's end had not provided the defense with a copy of the court transcript. Lawyers for Ibrahim and his codefendants filed appeals in September. On December 4, the Court of Cassation overturned the State Security Court's July 29 conviction and set a retrial date of January 7, 2003, later rescheduled to February 4. Since this was the second time the court overturned a lower court's verdict, the Court of Cassation itself, rather than another State Security Court, will retry the case.

On October 20, a State Security Court began hearing the case of 26 persons, including three Britons, accused of membership in the extremist "Islamic Liberation Party," which allegedly aimed to overthrow the Government. Some defendants have alleged they were tortured. One British defendant, who told the press his confession had been coerced, incorporated the word "lies" into his English signature on his confession.

During the year, the Government continued to try and convict journalists and authors for slander, as well as for expressing their views on political and religious issues (see Sections 2.a. and 2.c.).

According to local human rights organizations, there were approximately 13,000 to 16,000 persons detained without charge on suspicion of illegal terrorist or political activity (see Section 1.d.), in addition to several thousand others convicted and serving sentences on similar

charges.

The Government did not permit access by international humanitarian organizations to political prisoners (see Section 1.c.). In October, an Amnesty International (AI) delegation was permitted to visit the country, but authorities denied the group's request to pay visits to detainees.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Constitution provides for the sanctity and secrecy of the home, correspondence, telephone calls, and other means of communication; however, the Emergency Law abridges the constitutional provisions regarding the right to privacy, and the Government used the Emergency Law to infringe on these rights. Under the Constitution, police must obtain warrants before undertaking searches and wiretaps. Courts have dismissed cases in which warrants were issued without sufficient cause. Police officers who conducted searches without proper warrants were subject to criminal penalties, although penalties seldom were imposed. However, the Emergency Law empowers the Government to place wiretaps, intercept mail, and search persons or places without warrants. Security agencies frequently placed political activists, suspected subversives, journalists, foreigners, and writers under surveillance, screened their correspondence (especially international mail), searched them and their homes, and personal property.

In November the upper house of Parliament, the Shura Council, approved a draft bill that permits security agencies and the Interior Ministry to conduct telephone and Internet wiretaps in the interest of national security. A draft article that permitted such tapping without court approval faced resistance among members and was withdrawn from the bill.

Although the law does not explicitly criminalize homosexual acts, police have targeted homosexuals using Internet-based "sting" operations leading to arrests on charges of "debauchery." According to a press report, a senior Interior Ministry official counted 19 arrests suspected homosexuals via the Internet. Local NGOs have counted 31 instances of Internet-based arrests of homosexuals since police began the practice in 2001. There were allegations of torture and convictions in the absence of evidence (see Sections 1.c. and 2.a.).

The Ministry of Interior has the authority to stop specific issues of foreign-published newspapers from entering the country on the grounds of protecting public order; it exercised this authority sporadically (see Section 2.a.).

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press; however, the Government partially restricted these rights. Citizens openly expressed their views on a wide range of political and social issues, including vigorous criticism of government officials and policies, but generally avoided certain topics, such as direct criticism of the President.

The case of Dr. Saad Eddin Ibrahim, director of the Ibn Khaldoun Center for Development Studies, had broad implications for freedom of expression and a deterrent effect on human rights groups. Local observers believed that Ibrahim was prosecuted because of public remarks that he made regarding high-ranking officials that exceeded unwritten limits regarding freedom of expression (see Sections 1.e. and 4).

The Constitution restricts ownership of newspapers to public or private legal entities, corporate bodies, and political parties. There are numerous restrictions on legal entities that seek to establish their own newspapers, including a limit of 10 percent ownership by any individual.

The Government owned stock in the three largest daily newspapers, and the President appointed their editors in chief, who generally followed the government line. The Government also held a monopoly on the printing and distribution of newspapers, including those of the opposition parties. The Government used its monopolistic control of newsprint to limit the output of opposition publications.

Opposition political parties published their own newspapers but received a subsidy from the Government and, in some cases, subsidies from foreign interests as well. Most newspapers were weeklies, with the exception of the dailies Al-Wafd and Al-Ahrar, both of which had small circulations. Opposition newspapers frequently published criticism of the Government. They also gave greater prominence to human rights abuses than did state-run newspapers. All party newspapers were required by law to reflect the platform of their parties.

On July 15, the Higher Council for the Press approved the publication of 10 new periodicals and changes to the names of 2 existing publications. No publications lost the right to publish. All 10 new newspapers were independent.

In May the Higher Administrative Court overturned a previous revocation of the permit of the weekly tabloid An-Naba', following publication of an article alleging sexual misconduct by a defrocked Coptic Orthodox monk (see Section 1.e.).

In April the Administrative Court ruled for the 14th time in favor of the return of Al-Shaab newspaper, the official publication of the Labor Party. The court decided that since the Labor Party was suspended, but not disbanded, its newspaper could continue to publish.

Because of the difficulties in obtaining a license, several publishers of newspapers and magazines aimed at a domestic audience obtained foreign licenses. The Department of Censorship in the Ministry of Information has the authority to censor or halt their distribution.

The Center for Human Rights and Legal Assistance in 1999 organized a legal challenge to the constitutionality of the Information Ministry's censorship of offshore publications. The Supreme Constitutional Court began hearing the case in 2000 and held another hearing in January, but still had not issued a decision by year's end.

There were no cases of censorship of foreign-licensed publications during the year.

The Penal Code, Press Law, and Publications Law govern press issues. The Penal Code stipulates fines or imprisonment for criticism of the President, members of the Government, and foreign heads of state. The Supreme Constitutional Court agreed in 1998 to review the constitutionality of those articles of the Penal Code that specify imprisonment as a penalty for journalists convicted of libel, but had not begun hearing the case by year's end. The Press and Publication Laws ostensibly provide protection against malicious and unsubstantiated reporting. Financial penalties for violations were increased substantially in 1996 when relevant provisions of the Penal Code were revised, but the judicial process remained long and costly, creating a bar to realistic legal recourse for those wrongly defamed. In recent years, opposition party newspapers have published within limits articles critical of the President and foreign heads of state without being charged or harassed. The Government continued to charge journalists with libel. If he were found to be negligent, an editor-in-chief could be considered criminally responsible for libel contained in any portion of the newspaper.

For example, one of the six libel cases referred to the Constitutional Court during the year was the 1999 case of Mohamed Abdellah, who was sentenced in 2001 to 3 months' suspended sentence and fined a total of $4,620 (10,000 Egyptian pounds) for allegedly slandering Press Syndicate president Ibrahim Nafei. The Constitutional Court held its first session to review it and five other cases that were combined and heard together on March 18. The date of the next session was not set by year's end.

During the year, the courts tried a number of prominent cases of libel filed both by government officials and private individuals. For example, in February the Cairo Criminal Court acquitted Mustafa Bakry, chief editor of Al-Osbou' newspaper but sentenced two journalists at the newspaper to a fine of $6,930 (15,000 Egyptian pounds) each for libel against a member of the People's Assembly. In April the Boulaq Court of Misdemeanors sentenced Ahmed Haredi Mohamed, a member of the Press Syndicate and the chief editor of Al Mithak Al Arabi, an electronic newspaper, to 6 months' imprisonment, a fine of $462 (1,000 Egyptian pounds), and $924 (2,001 Egyptian pounds) as temporary compensation. Haredi was charged with libel and slander against Ibrahim Nafei, Press Syndicate President and chief editor of Al-Ahram, who initiated the lawsuit.

In June the Fayyoum Court of Misdemeanors acquitted journalist Maher Naguib of slander and dismissed a civil suit against his newspaper, Akhbar El Youm, and its chief editor Ibrahim Se'da. Naguib had published a feature story on the allegedly improper acquisition of state owned land by private interests. The court stated that the intent of the article was not to libel the plaintiff but to defend public welfare. In November the Boulaq Court of Misdemeanor sentenced chief editor of Al-Midan newspaper Said Abdel Khaleq and a journalist to 3 months in prison at labor (suspended) for publishing a photo of Anwar Sadat's body after his assassination.

The Public Prosecutor may issue a temporary ban on the publication of news pertaining to cases involving national security in order to protect the confidentiality of the cases. The length of the ban is based on the length of time required for the prosecution to prepare its case.

The law provides penalties for individuals who disclose information about the State during emergencies, including war and natural disasters. The penalties include fines of up to $2,772 (6,000 Egyptian pounds) and prison sentences of up to 3 years. There were no reports that the law was applied during the year.

The law prohibits current or former members of the police from publishing work-related information without prior permission from the Interior Minister.

Various ministries legally are authorized to ban or confiscate books and other works of art upon obtaining a court order; however, books may not be confiscated from the market without a court order. There were no court-ordered confiscations of books during the year.

During the year, criminal and other lawsuits were brought or continued against several authors for expressing their views on religious or political issues. Most notable among these was the case of sociologist Saad Eddin Ibrahim whose charges in the State Security Emergency Court included harming the reputation of the State through his writings (see Sections 1.e. and 4).

The Ministry of Interior regularly confiscated leaflets and other works by Islamists and other critics of the State. Members of the illegal Muslim Brotherhood also were arrested in connection with publications (see Sections 1.d. and 3). In many cases, the press reported that police confiscated written materials such as leaflets during the arrests.

The Ministry of Interior sporadically prevented specific issues of foreign-published newspapers from entering the country on the grounds of protecting public order (see Section 1.f.). The Ministry of Defense may ban works about sensitive security issues. The Council of Ministers may order the banning of works that it deems offensive to public morals, detrimental to religion, or likely to cause a breach of the peace.

The Government controlled and censored the state-owned broadcast media. The Ministry of Information owned and operated all ground-based domestic television and radio stations. Two private satellite stations, al Mihwar and Dream TV, began broadcasting in 2001 and operated without direct government interference. The Government had a 20 percent financial stake in the first and a 10 percent stake in the second. The Government did not block reception of foreign channels via satellite. The percentage of residents who received satellite television broadcasts was small, but many coffee shops and other public places offered satellite television.

Plays and films must pass Ministry of Culture censorship tests as scripts and as final productions. However, many plays and films that were highly critical of the Government and its policies were not censored. Plays and films must pass Ministry of Culture censorship tests as scripts and as final productions. However, many plays and films that were highly critical of the Government and its policies were not censored.

The Ministry of Culture also censored foreign films to be shown in theaters, but it was more lenient regarding the same films in videocassette format. Government censors ensured that foreign films made in the country portrayed the country in a favorable light. The Censorship Department banned three films from public viewing during the year: "From Hell," banned for its violent and sexually explicit scenes; an Arabic film, "Hidden Shadows," which dealt with relationships between spirits and humans; and "The Guard," a science fiction story that depicted an "evil" spirit Talal, found in southern Iraq, fighting the "good" spirit David.

The Ministry of Communication and Information Technology estimated that approximately 1 million citizens were Internet users. The Government did not restrict Internet use and did not monitor citizens' Internet use on a broad scale, although there may have been some monitoring by law enforcement officials.

On July 7, the Sayyeda Zeinab Court of Misdemeanors issued the first verdict of its kind. It ordered a 1-year (suspended) prison term and a fine for Shuhdy Naguib Serrour for posting on the Internet a poem written by his father containing phrases that "violated public ethics." The political poem, written in the early 1970s, was banned from publication at the time. The prosecution considered posting the piece on the Internet to be a violation of the ban. On August 26, Shuhdy contested the ruling before the Court of Appeals. On October 14, the South Cairo Court of Appeals upheld the previous decision.

In June the Dokki Court of Misdemeanors sentenced Mohamed Hisham and his wife Hannan Sayyed to 6 months imprisonment with labor and a fine of $3,210 (5,000 Egyptian pounds) each for posting nude pictures on the Internet. Other cases of arrest related to the Internet also have included homosexuals in police "sting" operations (see Section 1.f.).

The Government did not restrict directly academic freedom at universities. However, deans were government-appointed rather than elected by the faculty. The Government justified the measure as a means to combat Islamist influence on campus. The Government also occasionally banned books for use on campuses, although no such cases occurred during the year.

b. Freedom of Peaceful Assembly and Association

The Government significantly restricted freedom of assembly. Citizens must obtain approval from the Ministry of Interior before holding public meetings, rallies, and protest marches. Many demonstrations were not approved; however, the Government tightly controlled public demonstrations that did occur to prevent them from spreading into the streets or other areas. The Interior Ministry selectively obstructed meetings scheduled to be held on private property and university campuses (see Section 4).

The Government significantly restricted freedom of association. During the year, Law 84 into force. The law regulates the formation, function, and funding of NGOs and private foundations. The law grants to the Minister of Insurance and Social Affairs the authority to dissolve by decree NGOs, a power previously reserved to the courts. The law also requires NGOs to obtain permission from the Government before accepting foreign funds. According to government officials, funds from foreign government donors with established development programs in the country were excluded from this requirement. Government officials said that the law, which went into effect with the publication of executive regulations in October, would be applied in a liberal spirit.

In 2000 the Supreme Constitutional Court overturned the previous law, Law 153. Pending the passage of Law 84 and the issuance of executive regulations, an earlier law (Law 32) was reinstated, leaving many NGOs in an unsettled registration status. No human rights organizations were registered as NGOs during the year. Several other human rights organizations that applied for registration in the past, including the EOHR, HRCAP, and the Cairo Institute for Human Rights Studies (CIHRS) were not registered by year's end.

Under legislation governing professional syndicates, at least 50 percent of the general membership of an association must elect the governing board. Failing a quorum, a second election must be held in which at least 30 percent of the membership votes for the board. If a quorum is unattainable, the judiciary may appoint a caretaker board until new elections can be scheduled. The law was adopted to prevent well-organized minorities, specifically Islamists, from capturing or retaining the leadership of professional syndicates. Members of the have reported that Islamists have used irregular electoral techniques, such as physically blocking polling places and limiting or changing the location of polling sites.

c. Freedom of Religion

The Constitution provides for freedom of belief and the practice of religious rites; however, the

Government placed restrictions on this right and discrimination against religious minorities existed. Only Islam, Christianity, and Judaism are recognized by the Government as religions.

Most citizens are Sunni Muslims. There is a small number of Shi'a Muslims. Approximately 8 to 10 percent of the population are Christians, the majority of whom belong to the Coptic Orthodox Church. There are other small Christian denominations, a small Baha'i community, and a Jewish community that numbers approximately 200 persons.

Under the Constitution, Islam is the official state religion and primary source of legislation. Accordingly, religious practices that conflict with Shari'a (Islamic law) are prohibited. However, the practice of Christianity or Judaism does not conflict with Shari'a and, for the most part, members of the non-Muslim minority worshipped without harassment and maintained links with coreligionists abroad.

All mosques must be licensed, and the Government was engaged in an effort to control them legally. The Government appointed and paid the salaries of the imams who lead prayers in mosques, proposed themes for them, and monitored their sermons. In December 2001, the Minister of Awqaf announced that the Government controlled 57,000 mosques and 13,000 mosques located in private buildings. There were more than 80,000 mosques in the country, of which as many as 10,000 may be unlicensed. In an effort to combat extremists, the Government announced its intention to bring all unauthorized mosques under its control.

Neither the Constitution nor the Civil and Penal Codes prohibits proselytizing or conversion. However, during the past two decades, several dozen Christians who were accused of proselytizing or who had converted from Islam were harassed by police or arrested on charges of violating Article 98(F) of the Penal Code, which prohibits citizens from ridiculing or insulting heavenly religions or inciting sectarian strife.

There are no restrictions on the conversion of non-Muslims to Islam. However, in cases involving conversion from Islam to Christianity, authorities have charged several converts with violating laws prohibiting the falsification of documents. In such instances, converts, who fear government harassment if they officially register the change from Islam to Christianity, have altered their identification cards and other official documents themselves to reflect their new religious affiliation.

In 1996 human rights activist Mamdouh Naklah filed a lawsuit challenging the constitutionality of the 10 conditions for building a church, some dating from the Ottoman era. The court requested in October 2001 that the State Commissioners render an opinion on the constitutionality of the conditions. No opinion was issued during the year.

In response to strong criticism of the restrictive requirements dating back to the Ottoman era, President Mubarak took several steps to facilitate church repairs. In 1999 he issued a decree making the repair of all places of worship subject to a 1976 civil construction code. The decree was significant symbolically because it made churches and mosques equal under the law. The practical impact of the decree was to facilitate significantly church repairs; however, Christians reported that local permits still were subject to approval by security authorities.

During the year, the Government issued 12 permits for church-related construction. The approval process for church construction suffered from delays and was insufficiently responsive to the Christian community, although the President reportedly approved all requests for permits that were presented to him. The incidence of blocked or delayed orders varied, often depending on the church's relationship with local security officials and the level of support of the local governor.

In July following a complaint by Muslim villagers, Sohag security authorities closed a building used as a church since 1975 in Nag'a al Kiman on the grounds that it had no permit, and briefly arrested some of the congregation. Church officials maintained that most churches in the area had no permit and the security authorities were aware of that fact. There was no resolution of the problem by year's end.

The Constitution requires schools to offer religious instruction. Public and private schools provided religious instruction according to the faith of the student.

The Government occasionally prosecuted members of religious groups whose practices deviated from mainstream Islamic beliefs and whose activities were believed to jeopardize communal harmony. In May the President upheld the convictions in a State Security Emergency Court of two citizens, charged with insulting a heavenly religion. They allegedly advocated a belief system combining Islam and tolerance for homosexuality (see Sections 1.d. and 1.e.).

On March 5, a State Security Emergency Court convicted eight persons from the city of Matariya (near Cairo) of insulting a heavenly religion. They were arrested in October 2001 for unorthodox Islamic beliefs and practices. Sentences ranged from 3 years in prison to a 1-year suspended sentence.

In September Sayed Tolba, who claimed to be a prophet, was sentenced to 3 years' imprisonment for insulting religion and promoting extreme ideas. Twenty followers received lesser sentences.

During the year, several writers also were charged with expressing unorthodox religious beliefs and practices (see Section 2.a.).

The Islamic Research Center of Al-Azhar University had legal authority to censor all dealing with the Koran and Islamic scriptural texts (see Section 2.a.).

In September 2001, the Alexandria administrative court issued a decision canceling the annual Jewish celebration at the tomb of Rabbi Abu Hasira in Beheira. Reportedly, villagers about the behavior of pilgrims. The court suspended a Ministry of Culture decree declaring the tomb a national antiquity site. Although the Ministry reportedly contested the 2001 decision, the festival was not held during the year and the matter remained unresolved at year's end.

The Constitution provides for equal public rights and duties without discrimination due to religion or creed. For the most part, the Government upheld these constitutional protections; however, discrimination against minority religions, including Christians and Baha'is, existed.

In a well-received step on December 17, the President declared that January 7, Coptic Christmas, would henceforth be a national holiday. The move was warmly welcomed by Christians and also by the country's principal Islamic leader, the Sheikh of Al-Azhar. Christian leaders stated that the declaration gave Copts increased recognition and respect and raised the consciousness of the country's Muslims toward non-Muslim fellow citizens.

Although there has been improvement in the past 2 years in some areas, such as the introduction of the Coptic era into history curriculums in all government schools and increased coverage of Christian subjects in the mass media, discriminatory government practices persisted including suspected statistical underrepresentation of the size of the Christian population for the 1986 census, the last which indicated religion.
There were no Christians serving as governors, police commissioners, city mayors, university presidents, or deans. There were few Christians in the upper ranks of the security services and armed forces. Discrimination against Christians also continued in public sector employment, in staff appointments to public universities, in failure (with the exception of one case during the year) to admit Christians into public university training programs for Arabic language teachers that involved study of the Koran, and payment of Muslim imams through public funds (Christian clergy are paid with private church funds).

The approximately 6 million Coptic Christians were the objects of occasional violent assaults by the Islamic Group and other terrorists. Some Christians alleged that the Government was lax in protecting Christian lives and property, as several riots and conflicts with injuries and property damage occurred during the year (see Section 2.c.). However, there were no reports of terrorist attacks against Christians. In a number of cases, in particular regarding murder, it was difficult to determine whether religion was a factor.

During the year, the trial continued of 96 persons (58 Muslims and 38 Christians) for crimes, including murder committed in al-Kush in Sohag Governorate in 2000. A trade dispute between a Christian clothing merchant and a Muslim customer in December 1999 escalated into violent exchanges, resulting in the deaths of 21 Christians and 1 Muslim. The Muslim victim was killed by other Muslims who mistook him for a Christian. The violence also resulted in the injury of 39

persons in al-Kush and 5 persons in the neighboring municipality of Dar al-Salaam. Approximately 200 businesses and homes in the area were damaged.

The first trial of the 96 ended in February 2001, with the acquittal of 92 of the 96 defendants. The lead judge cited inadequate evidence in justifying the verdicts. After an outcry from the Christian community, the Public Prosecutor successfully appealed the verdicts, and a retrial opened in November 2001, and completed sessions in October. The lead judge said the verdict is expected to be announced in January 2003.

There were reports of forced conversions of Coptic girls to Islam. Reports of such cases were disputed and often included inflammatory allegations and categorical denials of kidnaping and rape. Observers, including human rights groups, found it extremely difficult to determine whether compulsion was used, as most cases involved a Coptic girl who converted to Islam when she married a Muslim. According to the Government, in such cases the girl must meet with her family, with her priest, and with the head of her church before she is allowed to convert. However, there were credible reports of government harassment of Christian families that attempted to regain custody of their daughters. The law states that a marriage of a girl under the age of 16 is prohibited, and between the ages of 16 and 21 is illegal without the approval and presence of her guardian. The authorities also sometimes failed to uphold the law in cases of marriage between underage Christian girls and Muslim boys.

There is no legal requirement for a Christian girl or woman to convert to Islam in order to marry a Muslim. However, if a Christian woman marries a Muslim man, the Coptic Orthodox Church excommunicates her. Ignorance of the law and societal pressure, including the centrality of marriage to a woman's identity, often affect her decision. Family conflict and financial pressure also are cited as factors. Conversion is regarded as a disgrace to the convert's family, so most Christian families would object strongly to a daughter's wish to marry a Muslim. If a Christian girl converts to Islam, her family loses guardianship, which transfers to a Muslim custodian, who is likely to grant approval. The law is silent on the matter of the acceptable age of conversion.

In April a court ruled in the case of Iman 'Atiya Soliman, born a Christian in 1982, who "disappeared," or was "kidnaped," (according to her family) in 1999, reportedly converted to Islam in 1999, and married in 2000. The girl's father sued for custody and abolition of the marriage, alleging that authorities had issued her a falsified identity card, which showed her to be 22 at the time of her marriage. The court ruled that the father lost custody of his daughter when she converted to Islam.

Anti-Semitism is found in both the progovernment press and in the press of the opposition parties, and increased late in 2000 and again during the year following the outbreak of violence in Israel and the occupied territories. There were no violent anti-Semitic incidents in recent years directed at the tiny Jewish community.

Dream TV, a station in which the Government had a 10 percent interest, aired a historical series titled "Horseman without a Horse." The 41-episode series contained numerous anti-Semitic depictions of Jewish characters and included some references to the forged "Protocols of the Elders of Zion." Following international protests, state-owned Egypt TV, one of many stations in the Middle East that broadcast the series, edited 77 minutes from the program and added a disclaimer, which noted that the historical authenticity of the protocols had never been established and that the series was the result of the author's imagination. There was some direct criticism of the series in the local press, especially for the poor scriptwriting and low production value, but also some criticism of the anti-Semitic material. Progovernment newspapers published a denunciation of the protocols by local historian Abdel Waheb Al-Messiry. In addition, in late December, Presidential advisor Ossama El-Baz published a three-part series in the progovernment newspaper Al-Ahram in which he explained the origins of and criticized the phenomenon of anti-Semitism.

In 1960 President Gamal Abdel Nasser issued a decree banning Baha'i institutions and community activities. All Baha'i community properties, including Baha'i centers, libraries, and cemeteries, were confiscated at that time. The ban has not been rescinded. "Baha'i" is not allowable as a religious identity, which is a required category on official documents. Its prohibition constitutes an infringement on religious freedom.

For a more detailed discussion see the 2002 International Religious Freedom Report.

d. Freedom of Movement within the Country, Foreign Travel, Emigration, and Repatriation

Citizens and foreigners were free to travel within the country, except in certain military areas. Males who have not completed compulsory military service may not travel abroad or emigrate, although this restriction may be deferred or bypassed under special circumstances. Unmarried women under the age of 21 must have permission from their fathers to obtain passports and travel. Married women no longer legally require the same permission from their husbands; however, in practice police reportedly still required such permission in most cases (see Section 5). Citizens who leave the country had the right to return.

The Constitution provides for the granting of asylum and refugee status in accordance with the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol; however, the Government maintained several reservations to the convention that limited the ease with which the refugee population could integrate locally. Because the country lacked national legislation or a legal framework governing the granting of asylum, the Office of the U.N. High Commissioner for Refugees (UNHCR) assumed full responsibility for the determination of refugee status on behalf of the Government. The Government generally cooperated with the UNHCR and treated refugees in accordance with minimum standards and agreed arrangements. The UNHCR provided recognized refugees with a refugee identification card that was considered a residence permit and bore the stamp of the national authorities. Refugees generally may not obtain citizenship. During the year, approximately 9,000 recognized refugees, the majority of whom were Sudanese, resided in the country, in addition to the 70,000 Palestinian refugees registered with government authorities. There were also approximately 16,000 asylum seekers awaiting status determination. Although there was no pattern of abuse of refugees, during random security sweeps the Government temporarily detained some refugees who were not carrying proper identification. Following intervention by the UNHCR, the refugees were released.

There were no reports of the forced return of persons to a country where they feared persecution.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The ruling National Democratic Party dominated the 454-seat People's Assembly, the 264-seat Shura Council, local governments, the mass media, labor, and the large public sector, and controlled the licensing of new political parties, newspapers, and private organizations to such an extent that, as a practical matter, citizens did not have a meaningful ability to change their government.

In September 1999, President Hosni Mubarak was elected unopposed to a fourth 6-year term in a national referendum. According to official results, he received 94 percent of the vote. Mubarak had been previously nominated by the People's Assembly. Under the Constitution, the electorate is not presented with a choice among competing presidential candidates.

Despite the overall improvement in the electoral process, there still were problems affecting the fairness of the 2000 parliamentary elections, particularly in the period leading up to elections and outside some polling stations on election day. During the months preceding the elections, the Government arrested thousands of members of the Muslim Brotherhood on charges of belonging to an illegal organization. Most observers believed that the Government was seeking to undermine the Muslim Brotherhood's participation in the People's Assembly and professional syndicate elections through intimidation. In addition, previous convictions on such charges legally precluded many potential candidates from running.

The People's Assembly debated Government proposals, and members exercised their authority to call cabinet ministers to explain policy. The executive initiated almost all legislation. The Assembly exercised limited influence in the areas of security and foreign policy, and retained little oversight of the Interior Ministry's use of Emergency Law powers. Many executive branch initiatives and policies were carried out by regulation through ministerial decree without legislative oversight. Votes generally were reported in aggregate terms of yeas and nays, and thus constituents had no independent method of checking a member's voting record.

The Shura Council, the upper house of Parliament, had 264 seats; two-thirds of which were elected and one-third of which were appointed by the President. In 2001 President Mubarak appointed 45 members to the Shura Council, including 8 women and 4 Christians.

There were 16 recognized opposition parties. In 2001 the courts accepted one party, El Geel ("the generation") Democratic Party and upheld the Political Parties Committee's rejection of the Republican Party. Seven appeals were pending before the Administrative Court by parties that had been rejected by the Political Parties Committee.

The Political Parties Committee also may withdraw recognition from existing political parties. The Labor Party, which lost recognition in 2000 under similar circumstances, remained suspended (see Section 2.a.).

The Muslim Brotherhood remained an illegal organization and may not be recognized as a political party under the law, which prohibits political parties based on religion. Muslim Brotherhood members were known as such publicly and openly spoke their views, although they did not explicitly identify themselves as members of the organization. They remained subject to government pressure (see Section 1.d.). Seventeen candidates affiliated with the Muslim Brotherhood were elected to the People's Assembly (as independents) in 2000.

In November several opposition parties and human rights organizations announced the formation of a coalition termed the "Committee for the Defense of Democracy." The committee's stated mandate was to advocate political and economic reforms. The committee's first objectives were to block the extension of the Emergency Law (in force since 1981 and due for renewal in May 2003) and to oppose implementation of a law that regulates NGOs.

The total number of women in the People's Assembly was 11. The total number of People's Assembly members from religious minorities (all Christian) was seven. Two women and 2 Christians served among the 32 ministers in the Cabinet. There were no women and no non-Muslims on the Supreme Court.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

In June the Government passed a law governing the regulation and operation of NGOs. The new law replaced one struck down by the Supreme Constitutional Court in June 2000 on procedural grounds. The new law, and its subsequent implementing regulations, were controversial and drew criticism from local NGOs and international activists, some of whom charged that the law and regulations placed unduly burdensome restrictions on NGO operations. Of particular concern was a new provision in the law that granted the Minister of Social Affairs the authority to dissolve an NGO by decree, rather than requiring a court order.

The status of many NGOs remained unclear during the year, as their previous registrations were invalidated with the annulment of Law 153/1999. Under the implementing regulations of the new law, issued on October 23, NGOs were given 1 year in which to reregister. No human rights organizations were registered as NGOs during the year. Several human rights organizations that applied for registration in 1999 or 2000, including the EOHR, HRCAP, and CIHRS, were not registered by year's end (see Section 2.b.).

Despite years of nonrecognition, the EOHR and other groups at times obtained the cooperation of government officials. EOHR field workers visit some prisons in their capacity as legal but not as human rights observers. They call on some government officials and receive funding from foreign human rights organizations. In an unusual and positive development, in September 2001 the Ministry of Interior issued a detailed written rebuttal to a March 2001 report by the HRCAP regarding torture and lawsuits related to torture (see Section 1.c.).

Government restrictions on NGO activities, including limits on organizations' ability to accept funding, continued to inhibit significantly reporting on human rights abuses. The case of Saad Eddin Ibrahim, director of the Ibn Khaldoun Center for Development Studies, had a significant deterrent effect on the work of human rights organizations, which existed largely on foreign funding (see Sections 1.e. and 2.a.).

During the year the Government permitted the CIHR and other human rights organizations, including HRCAP, EOHR, Arab Center for Independence of Judiciary, and "The Land Center," to hold conferences and to participate in international conferences.

In July LCHR issued a statement signed by eight other human rights organizations in which they complained of harassment by security officials and the Azbakiya Public Prosecutor's office regarding its irregular publication "Al Ard." According to LCHR, a prosecutorial investigation was continuing at year's end (see Section 2.b.).

The Government generally cooperated with international organizations. However, it has not agreed to a requested visit by the UNCHR Special Rapporteur on Torture, according to the delegate to the November session of the CAT, because of an incompatibility of timetables (see Section 1.c.).

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

The Constitution provides for equality of the sexes and equal treatment of non-Muslims; however, aspects of the law and many traditional practices discriminated against women and religious minorities.

Women

Domestic violence against women was a significant problem and was reflected in press accounts of specific incidents. The law does not prohibit spousal abuse specifically; provisions of law relating to assault in general are applied. According to a 1995 national study, one of every three women who have ever been married had been beaten at least once during marriage. Among those who had been beaten, less than half had ever sought help. Due to the value attached to privacy in the country's traditional society, abuse within the family rarely was discussed publicly. Spousal abuse is grounds for a divorce; however, the law requires the plaintiff to produce eyewitnesses, a difficult condition to meet. Several NGOs offered counseling, legal aid, and other services to women who were victims of domestic violence. Activists believed that in general the police and the judiciary considered the "integrity of the family" more important than the well being of the woman. The Ministry of Insurance and Social Affairs operated more than 150 family counseling bureaus nationwide, which provided legal and medical services.

The Government prosecuted rapists, and punishment for rape ranges from 3 years in prison to life imprisonment with hard labor. Although reliable statistics regarding rape were not available, activists believed that it was not uncommon, despite strong social disapproval. If a rapist is convicted of abducting his victim, he is subject to execution. Marital rape is not illegal.

"Honor killings" (a man murdering a female for her perceived lack of chastity) were not common. In practice the courts sentenced perpetrators of honor killings to lesser punishments than those convicted in other cases of murder. There were no reliable statistics regarding the extent of honor killings.

FGM was common despite the Government's commitment to eradicating the practice and NGO efforts to combat it. Traditional and family pressures remained strong; a study conducted in 2000 estimated the percentage of women who have ever been married and had undergone FGM at 97 percent. The survey showed that attitudes may be changing slowly; over a 5-year period, the incidence of FGM among the daughters (from ages 11 to 19) of women surveyed fell from 83 to 78 percent. FGM was equally prevalent among Muslims and Christians.

In 1996 the Minister of Health and Population issued a decree banning FGM. In addition to attempting to enforce the decree, the Government supported a range of efforts via television and by religious leaders to educate the public. However, illiteracy impedes some women from distinguishing between the deep-rooted tradition of FGM and religious practices. Moreover, many citizens believed that FGM was an important part of maintaining female chastity, and the practice was supported by some Muslim religious authorities and Islamist political activists.

Prostitution and sex tourism are illegal but occurred, mostly in Cairo and Alexandria.

Sexual harassment is not prohibited specifically by law; there were no statistics available regarding its prevalence.

The law provides for equality of the sexes; however, aspects of the law and many traditional

practices discriminated against women. By law unmarried women under the age of 21 must have permission from their fathers to obtain passports and to travel. Married women do not, but police sometimes did not apply the law consistently. Only males may confer citizenship; children born to women with foreign husbands are not conferred the benefits of citizenship. In rare cases, this meant that children born to Egyptian mothers and stateless fathers were themselves stateless. A woman's testimony is equal to that of a man's in the courts. There is no legal prohibition against a woman serving as a judge, although in practice no women served as judges. At year's end, the Court of Cassation still was examining the cases of two female attorneys, Fatma Lashin and Amany Talaat, who challenged the Government's refusal to appoint them as public prosecutors. (To become a judge, one must first serve as a public prosecutor.)

Laws affecting marriage and personal status generally corresponded to an individual's religion. In 2000 the Parliament passed a new Personal Status Law that made it easier for a Muslim woman to obtain a divorce without her husband's consent, provided that she was willing to forego alimony and the return of her dowry. (The Coptic Orthodox Church permits divorce only in specific circumstances, such as adultery or conversion of one spouse to another religion.)

Under Islamic law, non-Muslim males must convert to Islam to marry Muslim women, but non-Muslim women need not convert to marry Muslim men. Muslim female heirs receive half the amount of a male heir's inheritance, while Christian widows of Muslims have no inheritance rights. A sole female heir receives half her parents' estate; the balance goes to designated male relatives. A sole male heir inherits all his parents' property. Male Muslim heirs face strong social pressure to provide for all family members who require assistance; however, this assistance is not always provided.

Labor laws provide for equal rates of pay for equal work for men and women in the public sector. According to government figures, women constituted 17 percent of private business owners and occupied 25 percent of the managerial positions in the four major national banks. Educated women had employment opportunities, but social pressure against women pursuing a career was strong, and women's rights advocates claimed that Islamist influence inhibited further gains. Women's rights advocates also pointed to other discriminatory traditional or cultural attitudes and practices, such as FGM and the traditional male relative's role in enforcing chastity.

A number of active women's rights groups worked in diverse areas, including reforming family law, educating women on their legal rights, promoting literacy, and combating FGM.

Children

The Government remained committed to the protection of children's welfare and attempted to do so within the limits of its budgetary resources. The Child Law provides for privileges, protection, and care for children in general. Six of the law's 144 articles set rules protective of working children (see Section 6.d.). Other provisions include a requirement that employers set up or contract with a child care center if they employ more than 100 women; the right of rehabilitation for children with disabilities; a prohibition on sentencing defendants between the ages of 16 and 18 to capital punishment, hard labor for life, or temporary hard labor; and a prohibition on placing defendants under the age of 15 in preventive custody, although the prosecution may order that they be lodged in an "observation house" and be summoned upon request. International donors provided many of the resources for children's welfare, especially in the field of child immunization.

The Government provided public education, which is compulsory for the first 9 academic years (typically until the age of 15). The Government treated boys and girls equally at all levels of education.

There were no statistics available regarding the prevalence of child abuse.

Children with foreign fathers were not considered citizens and thus could not attend public school or state universities, were barred from certain professional schools, and could not work without meeting foreign residency requirements and obtaining work permits. There were an estimated 400,000 such children in the country.

FGM generally was performed on girls between the ages of 7 and 12 (see Section 5, Women).

Persons with Disabilities

There are no laws specifically prohibiting discrimination against persons with physical or mental disabilities, but the Government made serious efforts to address their rights. It worked closely with U.N. agencies and other international aid donors to design job-training programs for persons with disabilities. The Government also sought to increase the public's awareness of the capabilities of persons with disabilities in television programming, the print media, and in educational material in public schools. There were approximately 5.7 million persons with disabilities, of whom 1.5 million were disabled severely.

By law all businesses must designate 5 percent of their jobs for persons with disabilities, who are exempt from normal literacy requirements. Although there was no legislation mandating access to public accommodations and transportation, persons with disabilities may ride government-owned mass transit buses free of charge, were given priority in obtaining telephones, and received reductions on customs duties for private vehicles. A number of NGOs were active in efforts to train and assist persons with disabilities.

Section 6 Worker Rights

a. The Right of Association

There are no legal obstacles to establishing private sector unions, although such unions were not common. Workers may join trade unions but are not required to do so. A union local, or workers' committee, may be formed if 50 employees express a desire to organize. Most union members, about one-quarter of the labor force, were employed by state-owned enterprises. Unionization decreased in the past several years as a result of early retirement plans in public sector enterprises, and the privatization of many of these enterprises. The law stipulates that "high administrative" officials in Government and in public sector enterprises may not join unions.

There were 23 trade unions, all required to belong to the Egyptian Trade Union Federation (ETUF), the sole legally recognized labor federation. The International Labor Organization's (ILO) Committee of Experts repeatedly emphasized that a law that requires all trade unions to belong to a single federation infringes on freedom of association. The ILO also consistently criticized ETUF control over the nomination and election procedures for trade union officers, as well as the lack of protection of the right of workers' organizations to organize their administration, including their financial activities, without interference from public authorities. However, the Government showed no sign that it intended to accept the establishment of more than one federation. ETUF officials had close relations with the NDP, and some were members of the People's Assembly or the Shura Council. They spoke vigorously on behalf of worker concerns, but public confrontations between the ETUF and the Government were rare.

Some unions within the ETUF were affiliated with international trade union organizations. were in the process of becoming affiliated.

b. The Right to Organize and Bargain Collectively

Collective bargaining did not exist in any meaningful sense because by law the Government sets wages, benefits, and job classifications. The ILO for years claimed that the Labor Code undermined the principle of voluntary bargaining by providing that any clause of a collective agreement that might impair the economic interest of the country was null and void. Under the law, unions may negotiate work contracts with public sector enterprises if the latter agree to such negotiations, but unions otherwise lacked collective bargaining power in the public sector.

The labor laws do not provide adequately for the right to strike. The Government considered strikes a form of public disturbance and therefore illegal. Workers who strike may face prosecution and prison sentences of up to 2 years; however, there were no such prosecutions during the year.

There were approximately a dozen strikes during the year. Strikes mainly concerned delayed

payment of salaries, wage cuts, terminations, increased working hours, and suspension of job promotions. In one incident, 170 subway assistant drivers staged a hunger strike for more than 1 week because they were not promoted. The strike was significant because it took place in one of the "public utilities that provide vital services." Under the new labor law that was approved in June, workers in such utilities are denied the right to strike. Some members of parliament have threatened to challenge the constitutionality of the new law.

Firms, apart from large ones in the private sector, generally did not adhere to government-mandated standards. Although they are required to observe some government practices, such as the minimum wage, social security insurance, and official holidays, firms often did not adhere to government practice in nonbinding matters, including award of the annual Labor Day bonus.

Labor law and practice are the same in the six existing export processing zones (EPZs) as in the rest of the country.

c. Prohibition of Forced or Bonded Labor

The Constitution prohibits forced labor, and domestic and foreign workers generally are not subject to coerced or bonded labor; however, the Criminal Code authorizes sentences of hard labor for some crimes. The law does not prohibit specifically forced and bonded labor by children. In April the Government signed and ratified ILO Convention 182 on the Worst Forms of Child Labor (see Section 6.d.).

d. Status of Child Labor Practices and Minimum Age for Employment

Child labor was widespread and the Government took seriously the problem of child labor; however, in general it did not devote adequate resources to implement its child labor policies. The minimum age for employment is 14 years of age in nonagricultural work. UNICEF reported on the widespread practice of poor rural families making arrangements for a daughter to be employed as a domestic servant in the homes of wealthy citizens (see Section 6.c.).

The Labor Law of 1996 and associated ministerial decrees greatly limit the type and conditions of work that children below the age of 18 may perform legally. Provincial governors, with the approval of the Minister of Education, may authorize seasonal work for children between the ages of 12 and 14, provided that duties are not hazardous and do not interfere with schooling. During the summer, the President and the Ministry of Education authorized governors to delay the start of the school year in their governorates pending the end of the crop season. According to media reports, one provincial governor delayed school for 1 week pending the end of a crop season.

Preemployment training for children under the age of 12 is prohibited. Children are prohibited from working for more than 6 hours a day and one or more breaks totaling at least 1 hour must be included. Children may not work overtime, during their weekly day off, between 8 p.m. and 7 a.m., or for more than 4 hours continuously.

The Government continued to take steps during the year to address the problem of child labor. The Government worked closely during the year with international organizations--in particular UNICEF and the ILO--as well as international and domestic NGOs and labor unions to implement programs designed to address child labor and its root causes.

In 2000 the Ministry of Manpower child labor unit created a database for tracking child labor in the country and inspectors began raids to uncover violations in 2001. However, the Government did not take any effective action against employers, as the fines assessed were as low as $9 (20 Egyptian pounds), which did not deter violators. Inspection raids increased during the year. In 2001 The Minister of Justice also issued decree 2235, establishing the General Department for Judicial Protection for Children.

Statistical information regarding the number of working children was difficult to obtain and often out-of-date. NGOs estimated that up to 1.5 million children worked. Government studies that the concentration of working children was higher in rural than in urban areas. Nearly 78 percent of working children were in the agricultural sector. However, children also worked in

light industry. The Central Agency for Public Mobilization and Statistics (CAPMAS) conducted at the request of NCCM a household survey on child labor in 2001-02 that was analyzed by the NCCM for policy formulation. Results of the survey are expected to be made public in 2003.

While local trade unions reported that the Ministry of Labor adequately enforced the labor laws in state-owned enterprises, enforcement in the private sector, especially in the informal sector, was lax. Many working children were abused, overworked, and exposed to potentially hazardous conditions by their employers, and the restrictions in the Child Law have not improved conditions due to lax enforcement on the part of the Government.

The law does not prohibit specifically forced and bonded labor by children.

The NCCM is taking the lead on formulating a national plan to eliminate hazardous forms of child labor that exist in the country.

e. Acceptable Conditions of Work

During the year, the minimum wage for government and public sector employees increased to $81 (176 Egyptian pounds) per month for a 6-day, 36-hour workweek. The Labor Law stipulates that 48 hours is the maximum number of hours that may be worked in 1 week. Overtime for hours worked beyond 36 per week is payable at the rate of 25 percent extra for daylight hours and 50 percent extra for nighttime hours. The law also stipulates a maximum of 7 hours per day and 42 hours per week for work in "hazardous industries." Some government agencies instituted a 5-day, 36-hour workweek. The nationwide minimum wage generally was enforced effectively regarding larger private companies; however, smaller firms did not always pay the minimum wage. The minimum wage did not provide a decent standard of living for a worker and family; however, base pay commonly was supplemented by a complex system of fringe benefits and bonuses that may double or triple a worker's take-home pay and provide a decent standard of living.

The Ministry of Labor set worker health and safety standards, which also apply in the EPZs; however, enforcement and inspections were uneven.

The law prohibits employers from maintaining hazardous working conditions, and workers had the right to remove themselves from hazardous conditions without risking loss of employment.

In August the Minister of Manpower said that the total number of foreign workers holding work and residence permits was 18,177, not including Sudanese, Palestinians, and foreigners married to citizens. Unofficial estimates of undocumented workers were as high as 116,000. Foreign workers with the required permits enjoyed legal protections. There were occasional reports of employer abuse of undocumented workers, especially domestic workers. A few employers were prosecuted during the year for abuse of domestic workers, but many claims of abuse were unsubstantiated because undocumented workers were reluctant to make their identities public.

f. Trafficking in Persons

The law does not prohibit specifically trafficking in persons; however, the law prohibits prostitution and sex tourism. There were anecdotal reports of trafficking of persons from sub-Saharan Africa and Eastern Europe through the country to Europe and Israel.