## The Egyptian Organization for Human Rights
## REPORT

## Torture in Egypt

**Cairo, February 1999**

# Police excesses and the difficulty of obtaining evidence

### The seventh EOHR report on torture and ill-treatment inside police stations in Egypt

## EOHR's Board of Trustees

Abdel-Aziz Mohammed, Chairman
Yasser Hassan, Vice-Chairman
Hafez Abu-Seada, Secretary General
Ibrahim El-Sherbini, Treasurer
Abul Qassim Al-Nubi, Assistant Treasurer
Abdalla Abdel Latif
Adel Eid
Ahmed Abel Malik
Dr. Atef El-Banna
Dr. Ayman Nour
Hassanein Kroum
Hisham Kassim
Ramy Lakkah
Rida Tolba
Councilor Saeed Al-Gamal
Dr. Selim El-Awwa
Dr. Waheed Abdel-Meguid
Dr.Yehia Abdel Aziz Al-Gamal

"Torture in Egypt - Police excesses and the difficulty of obtaining evidence" is the second report issued by the EOHR in 1999, and its seventh thematic report[1] dealing with torture and ill-treatment and other excesses committed by the security forces

against citizens in police stations. These reports are issued in the context of EOHR's ongoing campaign against torture.

The report reviews 30 cases of torture that took place in more than 15 police stations in various Egyptian governorates. It also includes two cases of death in police stations which raise strong doubts that they may have occurred as a result of severe torture. The first is that of Gamal Abdalla Mohamed, who died in the Maadi police station, and the second Shaaban Mohamed Abdel Gawad, who died in the Kalyoub police station.

The report relies on the information obtained by EOHR's fact-finding missions, police minutes, forensic reports, witnesses' testimonies, complaints received and verified by the EOHR, and rulings made by the Egyptian judiciary condemning many policemen in cases of torture. It must be noted that the cases included in this report do not constitute all cases of torture that took place but only those which the EOHR was able to document. They, however, highlight a major fact, i.e. that torture is practiced in police stations in governorates all over Egypt, from Aswan in the south to Alexandria in the north.

The report is divided into three parts:

The first part reviews the legal obstacles faced by victims of torture, which lead to the granting of impunity for the perpetrators and open the door for the continuation of this practice in police stations and other places of detention. This part also points out to a serious phenomenon, i.e. the double standard of judicial rulings with respect to crimes of torture. One case may be administratively closed by the Public Prosecution, thus dropping the victim's right to file a criminal suit. At the same time, the civil judiciary may issue a ruling ordering compensation for a civil claimant, thus proving the occurrence of torture in a case that was closed by the Public Prosecution.

Part two includes those cases of torture and ill-treatment in police stations that were monitored by the EOHR in 1998 through complaints, reports of fact-finding missions and court rulings. This part includes in detail two cases in which persons accused of murder confessed to crimes they did not commit after being subjected to severe torture. Only later it transpired that no crime had actually occurred. The court referred the case to the Public Prosecution to take the necessary steps to bring them to trial. Part two ends with two cases of death in police station.

Part three includes previous EOHR recommendations and stresses their importance in the context of the organization's campaign against the practice of torture.

Perhaps the main feature of this report is that all the cases included are of ordinary citizens who do not belong to any political trend and are not accused in political cases. They were all accused or detained in connection with criminal cases. The report also discusses the methods used by the police to search for suspects in criminal cases, and the use of torture as the main method to obtain confessions, which are relied upon as the ultimate evidence. This led in many cases, some of which are included in this report, to the referral of innocent people to court on the basis of confessions for crimes they did not commit. Torture in fact does not only reflect the security bodies'

disregard of human dignity, but also a weakness in their work mechanisms with respect to investigating and solving crimes.

Following the issuance of its last report on torture, on 28 September 1998, under the title "Collective punishment in Al-Kosheh village…", the EOHR faced fierce attacks in an aborted attempt to discredit it, as well as the entire human rights movement in Egypt. Instead of investigating the incidents of torture that took place in Al-Kosheh, the authorities brought accusations against the EOHR upon which its secretary general was imprisoned and later released on bail. In the face of this, human rights activists in Egypt, many journalists known for their honesty and numerous Egyptian intellectuals hastened to support the EOHR and to call for investigations into the incidents of torture and respect for human rights.

One of the major consequences of what is now known as the crisis of the EOHR's Al-Kosheh report is that it placed the issue of torture at the center of public opinion. Even official statements were unable to deny the occurrence of torture, though they tried to minimize it to make it appear as the practice of individual policemen. The EOHR believes that torture is the most heinous human rights violation, and that it is used as a systematic practice and not just in individual cases. This is particularly true given the continuos disregard by the authorities of EOHRs' reports and recommendations demanding the amendment of many legal provisions which provide legal protection for the perpetrators of acts of torture.

In spite of the many notifications on cases of torture made by the EOHR and other human rights organizations in Egypt to the Public Prosecutor, not one single legal action was taken against any policeman involved in acts of torture. The main reason for this is the existence of many obstacles that hamper any efforts to prove the occurrence of torture. These obstacles are mentioned in the present report, divided in the following categories: legal obstacles related to the legal provisions that provide protection for policemen accused of torture; procedural obstacles to prove the occurrence of torture, especially the difficulty to obtain forensic examinations; obstacles related to victims' statements; obstacles resulting from the pressure exerted on the victims by the perpetrators; and lastly, obstacles resulting from the disregard of the concerned bodies towards complaints made by human rights organizations on incidents of torture. It is important to note that, in the 54th Session of the United Nations Human Rights Commission, the Special Rapporteur on Torture said in response to the Egyptian Government's reply:

The Special Rapporteur again expresses his appreciation for the substantial efforts the Government has undertaken in order to respond to the numerous allegations he has transmitted. He notes that in no case has a police or security official been convicted and sentenced for torture. He detects a willingness of the agencies of the administration of justice to place too heavy a burden on the alleged victims pursuing their investigations, thus implying a great willingness to close cases. [(2)]

However, the EOHR would like to note that a civil court in Alexandria passed a sentence ordering the Ministry of Interior to pay a compensation of LE 10,000 to a woman detained and tortured in the Bab Al-Shark police station, in Alexandria. It is especially noteworthy that the Interior Ministry brought a suit before the same court demanding that the police officers responsible be compelled to pay the said amount.

The EOHR believes that the Ministry's stance in this case sets a commendable precedent and represents a step forward towards ending police irregularities.

The EOHR issues this report convinced that its legitimacy as a human rights organization is based on disclosing these excesses and violations before the public opinion and urging for the necessary practical and legal steps to prevent them, as well as for respect of all human rights principles as stipulated in international human rights standards ratified by the Egyptian government.

The EOHR hopes that this report will spur civil society institutions, political parties, and intellectuals to work together to stop all violations and excesses faced by citizens in places of detention, and to urge the Egyptian government to take prompt and serious steps to stop these violations which threaten human rights in Egypt.

## I. Torture in Egypt - Police excesses the difficulty of obtaining evidence

*"No one shall be subjected to torture or to cruel, inhuman or degrading treatment of punishment"*

### Article 5 of the Universal Declaration of Human Rights

Based on its firm stance that torture is the most serious human rights violation, not only for the pain it causes to victims but also because it constitutes a blatant and deliberate attack on the dignity of the person, the EOHR brings once again torture complaints to the Egyptian public opinion. In this regard, the organization points out to a number of legal, procedural and security obstacles that prevent victims of torture from pursuing their rights and lead to granting impunity to the perpetrators. These obstacles provide support for the practice of torture, whether at the legal level or in terms of the involvement of concerned officials. Hence, even if acts of torture are described as mere police excesses, thy take place in fertile ground that helps reproduce them.

### 1. <u>Legal obstacles</u>

The provisions of international treaties and the Egyptian Constitution provide basic guarantees for the protection of the right to life and personal safety. However, the Egyptian legislation[3] still includes provisions that give law enforcement officers broad powers to arrest and question people. Moreover, these provisions impose lenient punishments when the torture is proved to have been committed by a member of the security forces.

Article one of the Convention Against Torture, ratified by Egypt in 1986, states that: "For the purposes of this Convention, the term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person

acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."

It must be noted that article 126 of the Egyptian Penal Code deals with one case only, i.e. that of the public official who commits torture with the aim of extracting confessions. Practical experience in Egypt has proved that policemen use torture for many reasons other than obtaining confessions, and in such cases, the law does not provide any protection for victims. Also, this article imposes a punishment in case the public officer carries out the torture personally or orders it, but not when his role is confined to instigating, consenting or acquiescing to it. Moreover, article 126 penalizes torture when committed by a public officer or employee, thus it does not apply to police informers and conscripts who practice torture upon orders by their superiors. Finally, article 126 of the Penal Code does not state any punishment for psychological torture, as it assumes that torture can only be physical. This concept contradicts article two of the Convention Against Torture.

Even in cases when torture is used to extract confessions, the law also provides ways to grant impunity to the perpetrators. Article 129 provides lenient punishment in this regard: "A civil servant, public employee or any person in charge of public office who, relying on his position, uses cruelty with people and causes dishonor to them or physical pain, shall receive an imprisonment sentence of no more than one year and a fine of no more than LE 200."

Among the protection given to public servants is that stipulated in article 63 of the Penal Code, which states that there is no crime when the act has been committed by a public employee in implementation of an order made by a superior, or in case he did it in good faith in implementation of the legal texts or what he believed to be his jurisdiction. This provision allows law enforcement officers to use good faith as an excuse for their acts. And it is difficult for the judge to prove or ascertain the real motives behind the action as long as law enforcement officers prove that they were not aware that the act they were doing was illegal.

In addition, paragraph two of article 232 of the Code of Criminal Procedure prevents civil claimants from bringing a direct suit against a civil servant, public official or a law enforcement officer for an offence that took place during the performance of his duty or because of it. Also, articles 162 and 210 of the Code prohibits a civil claimant from appealing against orders made by the investigation judge or the public prosecution on the basis that there is no logic in bringing a criminal suit if it is directed against a civil servant for an offense he committed during or because of the performance of his job.

The EOHR reaffirms that these provisions grant impunity to officers accused of using cruel treatment and torture against citizens. This is particularly true given that investigations into these cases last from one year and a half to two years, and often end with the closure of the case by the Public Prosecution.

In this regard, the EOHR would like to point out to the double standards of court rulings regarding cases of torture. Whereas a case of torture against a policeman may be closed, when the same victim resorts to the civil judiciary, this may issue a civil compensation ruling. An example of this is the case of Fatheya Motwalli Mahmoud,

who was detained, tortured and threatened with rape in the Bab El-Shark police station, in Alexandria. She filed a complaint to the Public Prosecution about the incident (no. 11132/1995-Bab Al-Shark). She was referred to the forensic department, which proved the occurrence of torture in a report issued on 7 November 1995. Nevertheless, the Public Prosecution decided to close the case. In such cases, as mentioned above, the victim does not have the right to challenge the decision to close the case, nor does she have the right to bring a direct lawsuit. Thus, the channels for the continuation of criminal action were closed.[(4)]

However, the victim resorted to the civil judiciary and, on the basis of article 163 of the Civil Code, which states that "Compensation must be paid by the person who commits a fault that caused harm to a person," the court granted her financial compensation. The court stated that the report closed by the Public Prosecution was truthful and that torture had actually taken place. This reflects the above mentioned double standards of judicial rulings.

## 2. <u>Procedural obstacles</u>

These are the obstacles that accompany investigations into incidents of torture, mainly the procedures for referral to the forensic department. The EOHR observes that in most cases of torture, the victim is referred to the forensic department a long time after the injuries took place. By then, most of the signs of torture have faded or totally disappeared. This makes it difficult to prove that such injuries took place as a result of torture and in a specific period, i.e. during the victim's detention. This is particularly true given that the signs of torture usually disappear quickly due to the 'progress' made in the techniques used.

Even when a forensic report confirms the victim's statements about the torture, the prosecution may close the case for other reasons, such as the victim's lateness in reporting it. Such delay may constitute a few days only, and is often due to the victims' lack of awareness of the legal procedures that should be taken, or because they may be in a state shock, or for the consequences of the torture, which may cause the victim to stay in bed for some time. The present report includes an example of such cases, that of the torture of Youssef Sayid Mustafa and Mohamed Ismael Bakr in the Kalyoub police station. The attorney general decided to close the case although the forensic report proved the existence of torture. The main reason for the closure was what the attorney general considered laxity in reporting the case, although the victims reported it on 14 March 1998 and the incident took place on 7 March, i.e. one week after its occurrence!

The EOHR points out that the delay in referring the victim to a forensic doctor may be due to many reasons, mainly the continuation of the illegal detention of the victim and the slow litigation procedures.

## 3- <u>Obstacles due to police pressures</u>

The EOHR noticed that, in many cases of torture, victims are exposed to pressures by policemen. They are threatened with having crimes forged against them in case they dare to report their torture to the Public Prosecution. Also, many victims of torture

become scared as a result of the torture and feel relieved when they leave the police station. They do not take any action as they only want the end of the nightmare.

The present report includes flagrant examples of the pressures exerted on the victims. This was the case of Zenhum Mohamed Badr, a conscript who was forced under severe torture to confess to the killing of a girl and hiding her body. It was later found that the girl was still alive. The police threatened him in many ways in order to prevent him from reporting to the Public Prosecution that his confession was the result of torture. In his account to the EOHR, Zenhum said:

"On our way to the Keleen Public Prosecution Office, the officer accompanying me said: 'If you make any statement other than what I told you, I will put you in a military court and destroy your family.' The prosecution chief asked me: 'Has anyone beaten you?' I said: 'No.' Then he asked: 'Have you confessed because you were tortured?' I told him what officer Mustafa Kasim had told me to say 'My morale was very low…'"

In addition, the interrogations by the prosecution are always made in the presence of the policemen involved in the complaint, which exerts a negative influence on the interrogations and puts pressure on the victims.

## 4. Obstacles concerning the victims' statements

One of the main problems faced by victims of torture is their inability to identify the perpetrators because torture usually takes place while they are blindfolded. In many cases, the statements made by the victims are contradictory and full of weaknesses, which make it difficult to condemn the perpetrator. The EOHR believes that this is mainly due to the frightening and intimidating circumstances in which torture takes place. These affect the level of concentration of the victims, who frequently lose consciousness as a result of the severity of the torture. Their statements then become illogical and confused.

The EOHR monitored many cases in which the perpetrators were granted impunity because the victims could not identify those who tortured them, or because the statements of the victims were, according to the investigating body, contradictory. This is what occurred in case no. 299 of 1986, one of the cases concerning the political Islam trends. The court heard the case in 1986, after the Public Prosecution referred 41 policemen accused of having committed torture for investigations. In this case, although the occurrence of torture was proved, the victims were unable to identify the policemen who had committed the torture because they had been blindfolded.

## 5. Disregard of the complaints and notifications made by the EOHR

The EOHR observes a passive and indifferent attitude by the Public Prosecution and the Ministry of the Interior towards torture complaints and notifications made by the EOHR. Although the EOHR and other human rights organizations were able to spur the Public Prosecution to take legal actions on cases of torture, it is almost the rule that its complaints to the Public Prosecutor and the Minister of Interior are altogether ignored.

In 1998, the EOHR received scores of torture complaints. It subsequently sent 43 notifications to the Minister of Interior and 47 to the Public Prosecutor, but it received no reply. This disregard has become the usual reaction of these two bodies. However, other governmental areas have responded to EOHR's letters, as seen below:

|  | Public Prosecutor | Interior Minister | Prisons Department | Ministry of Foreign Affairs and Embassies | Other governmental areas | Total |
|---|---|---|---|---|---|---|
| No. of letters | 294 | 290 | 173 | 75 | 253 | 1085 |
| No. of replies | - | - | - | 12 | 34 | 46 |
| Percentage | 0% | 0% | 0% | 16% | 13.4% | 4.2% |

Even worse than this negligence and indifference is that the EOHR itself is subjected to harassment. This was the case following its report on the torture of citizens in Al-Kosheh village. No significant legal action was taken against the policemen responsible for the torture, but the EOHR's secretary general was arrested and accused of threatening national security. The situation seemed as if the crime was not the torture but its disclosure. In this sense, the Al-Kosheh crisis represents a serious turn in the stance of the authorities towards human rights organizations. They no more suffice themselves with disregard and indifference towards them, but they now take openly hostile stances. Human rights activists are thus under threat, whereas the perpetrators have legal and institutional protection.

## II. Torture inside police stations: Facts and complaints

### Sexual Abuse

#### Aswan Police Station: Abdel-Hayy Mohamed Abu-Bakr, 6/2/1998

Abdel-Hayy Mohamed Abu-Bakr, resident in the hamlet of Naga Al-Sheikh Ali, Abu Al-Rish village, Aswan. Accountant at the Agricultural Credit and Development Bank. On 6 February 1998, at 2.30 a.m., members of the Counterfeit Unit of the Public Funds Investigations, Aswan police station, went to his house. They searched it and arrested him on charges of counterfeiting currency (case no. 145/98-Aswan).

He was taken in a police vehicle from Abu-Al-Rish village towards the Aswan police station. He said:

Before we arrived at the police station and in front of the Aswan Sports Club, the car stopped and the guard accompanying me was ordered to blindfold me. As soon as I arrived at the station they started torturing me.

He said that the torture was carried out by several policemen, among whom were Capt. Ayman Baliegh, head of the investigation unit, his assistant Mostafa Kamal, and another policeman called Mahmoud Mohammed Abdel-Nabi. When the victim had been stripped off his clothes, the latter said to him:

We are infidels [an expression used to mean merciless], and we will do whatever we want… you have to tell us about the place where the machine is [the counterfeiting device], and about the rest of the gang.

The torture began with beatings with hands, sticks and whips. He said to the EOHR:

They poured very hot water on my bare body, then cold water… then they placed two electric wires, one in my right toe and the second in my penis … and gave me electricity. After this, they moved the wires from the penis to the anus and other parts of the body. After the electricity, they started beating me first with a stick on the legs, then suspended me from a door after tying my hands and legs. They tried to insert something into my anus, they kept beating me with hands and sticks until I could not speak.

He reported his arrest and detention to the prosecution on 14 February 1998. The Prosecution Department examined the injuries and issued a report which stated the existence of "Old grazes on the right elbow and right shoulder, and two small marks on the right wrist. The defendant, in addition, pointed to a reddish area in his left foot in the shape of a half circle."

A report made by the Aswan Health Department on 14 February recorded the following: old bruises and grazes on the right shoulder and elbow, and small grazes on the right hand. It future asserted that the first had been caused by collision with a solid body and the second were the result of electric shocks, and that the wounds were about a week or ten days old. The health inspector answered the prosecution's question about how the injuries might have taken place by saying: "They could have happened according to the story mentioned by the accused Abdel-Hayy Mohamed Abu Bakr."

The EOHR sent notifications to the Public Prosecutor and the Minister of Interior on 16 September 1998, but up to the drafting of this report it has received no reply. The organization learnt from the complainant that the chief attorney general ordered the closure of the investigations into the reports of torture.

### Kalyoub Police Station: Yousif Sayid and Mohamed Ismael Ibrahim, 7/3/1998

Yousif Sayid Mahmoud went to the Kalyoub police station to report the theft of his wallet and accused his former wife of stealing it. However, it would appear as if in the Kalyoub police station, reporting a theft has become a valid justification for torturing a citizen! That is what in fact took place.

Yousif Sayid was surprised when he was arrested in the investigations room and a police assistant and three other policemen started to beat him. In his complaint to the EOHR, he said: "After they beat me, all of them, officers and detectives, they brought two wires with a clip at the end, they put one of them in my right ear and the other in the left one. They connected the wire to something that looked like a telephone… whenever the telephone receiver rotated, I felt a shiver in my head and teeth and bit my tongue. They kept torturing me with electric shocks for a long time. Then they tied my hands and legs and kept beating my feet with clubs. I also had to run in the

corridor opposite to the office of the head of the investigation unit." He added that he was held in the detention room until the next morning.

In the evening of the same day, Mohamed Ismael Bakr, his nephew, was summoned to the police station. He was subjected to a similar treatment by the same police members.

Yousif Sayid Mostafa said: "My ex-wife has connections with some policemen there, she learnt that they tortured us in order to stop us from asking for the return of the stolen money."

Following their release on the following day, the victims reported the torture to the Kalyoub Prosecution Office. The prosecution ordered their examination by the forensic department which, in report no. 1088/1998-Kalyoubya, issued on 26 March 1998, stated:

After examining the victim, Yousif Sayid Mostafa, reddish brown marks were observed in his right ear. Also, a healing wound with infection appeared on the left side of his tongue.

With respect to Mohamed Ismael Ibrahim Bakr, the report found the following:

Marks of wounds in his left ear similar to those found on Yousif Sayid Mostafa. Also, a healing wound of 0.25 x .5 cm was found on the right side of the tongue.

The report concluded: "The injuries found in the right ear of Yousif Sayid Mostafa, and in the left ear of Mohamed Ismael correspond, in shape and formation, with what would result from direct contact with electricity, and are likely to have occurred on the date that corresponds to that indicated in their statement (7/3/1998). Similarly, the marks found in the tongue correspond in shape and formation to what would be caused by biting themselves at the same time as the above mentioned injuries occurred."

As soon as it received their complaint, the EOHR filed notifications to the Public Prosecution and the Minister of Interior, but it received no response.

The Attorney General decided to close the case despite the fact that the forensic reports proved the occurrence of torture. The main reason for the case closure was what the Attorney General believed to be negligence in reporting the incident, which they reported on 14 March 1998, i.e. one week after its occurrence!

In another incident, investigation officer Zakareya Eissawy attacked a person while in a mission in the Meit Nama area. The situation worsened when a number of people gathered to express their protests about the incident. A force from the Kalyoubya Security Directorate arrived to contain the situation, and the Minister of Interior ordered the suspension from work of the said officer and referred him to investigations.

***

**Attacks on Lawyers**

**Kafr Al-Sheikh Security Directorate: Fathi Basyouni Mohamed, 9/6/1998**

The EOHR received a complaint from lawyer Fathi Basyouni Mohamed, from Rode Al-Farag, Cairo, in which he claimed to have been tortured by an officer of the criminal investigations unit of Kafr Al-Sheikh Security Directorate. The complainer alleged that, while in the Kafr Al-Sheikh court, on 9 June 1998, to defend a client in connection with case no. 5038 of 1998-Kafr Al-Sheikh Misdemeanors, and after his client was released by the court, an officer from the criminal investigations unit intercepted them and arrested his client. When he protested, the officer ordered the accompanying force to take the two of them to the Kafr Al-Sheikh Security Directorate. This incident took place in the presence of several lawyers that were in the court building. According to his report, after being held for five hours he was attacked by the criminal investigations officer and a number of detectives. They beat him with fists and sticks, and kicked him severely on the face and other parts of his body. As a result, he suffered a fracture of the left arm and visible bruises in several parts of the body.

It must be noted that the head of the Lawyers Syndicate in Kafr Al-Sheikh reported the incident to the Kafr Al-Sheikh Prosecution Office. Also, the EOHR sent notifications to the Public Prosecutor, the Minister of Interior and the head of the Kafr Al-Sheikh Security Directorate asking for an investigation into the complaint and the punishment of the perpetrators.

***

**Tied to the *Falaka***

**Al-Zawya Al-Hamra Police Station: Mohamed Saeed Mohamed, 12/6/1998**

Mohamed Saeed Mohamed, 19 years old, completed technical school, resident of Al-Zawya Al-Hamra. In his complaint, he said to the EOHR that a police officer from Al-Zawya Al-Hamra detained him and tortured him on 12 and 13 June 1998.

A police officer from Al-Zawya Al-Hamra police station stopped him on 12 June 1998 and asked him to produce his ID. He gave him the passport, but the officer was not satisfied and replied with a series of insults and curses. When Mohamed Saeed objected to such treatment and asked about the reasons for it, the officer ordered the guards to throw him in a police car. He was taken to the police station.

They placed me in a room adjacent to Nabatshya's office [the officer on duty]. The officer and some guards hit me with sticks all over the body. They also beat me with their hands, kicked me and tied me to the *falaka* [a torture instrument used to facilitate beating on the feet]. They did not leave me until the evening of the following day.

On 14 June 1998, Mohamed Saeed, helped by an EOHR lawyer, filed a notification to the Public Prosecutor, who referred it to the North Cairo Prosecution. An investigation into the claims of torture was made the following day, 15 June 1998, and an examination of the injuries showed that: "The complainant presents fractures in the

jaw and teeth, bruises in the buttocks and face, beneath the right eye, and wounds on left arm and leg." The chief prosecutor referred the complainant to the forensic department.

It must be noted that the officer refused to return the victim's passport. Moreover, he threatened him with forging a case of possession of drugs if he reported the torture. In addition, the father of the victim reported that the officers of the police station were exerting pressure on him to make a reconciliation.

***

### Rape Threats

**Kasr Al-Nil Police Station, Cairo: Several persons, 6/9/1998**

The EOHR received a complaint from Mervat Mohamed Hassan to the effect that, on 6 September 1998, policemen from the Basateen police station arrested her husband, Sayid Abdalla Soliman, in front of their home in the Cairo district of Dar Al-Salaam. He, along with his mother, sister and brother, were taken to the Kasr Al-Nil police station to be questioned in connection with a theft with the use of violence reported by a woman for whom his mother worked as a cleaner. When asked about his whereabouts at the time of the theft, he said he was visiting his relative, Akram Mohamed Hassan, in Al-Salam City. The police then arrested Akram, his two brothers Hani and Emad Mohamed Hassan, and took them to the Kasr Al-Nil station. They were handcuffed, suspended from the door of the detention room, and beaten in several parts of the body. At the same time, Mohamed Ahmed Ali, brother-in-law of Sayid Abdalla Soliman, was also arrested.

On the following day, 7 September, complainant Mervat Mohamed Hassan went to the police station to enquire about her husband. The police detained her, threatened her with rape, and attacked her to force her to make a confession against her husband. The police in addition arrested two other relatives of the accused, and detained and beat them in the station to extract information from them about the theft. The complainant said that nine of those arrested were released on condition that they reported to the station, and three were transferred to an unidentified place.

The EOHR sent two lawyers to the Kasr Al-Nil police station, but the station chief denied the detention of any of the said persons in the station. The lawyers then reported their detention to the chief prosecutor and demanded that he visit the alleged place of detention, as stipulated by article 43 of the Code of Criminal Procedure. About two and a half hours later, the EOHR lawyers were informed that none of the mentioned persons were detained in the Kasr Al-Nil station. Subsequently, on 11 September 1998, the EOHR filed a notification to the attorney general of Central Cairo Prosecution (no. 1110) to investigate the incident. On 13 September, the organization filed notification no. 1111 to the Public Prosecutor and issued an urgent press release demanding investigations into these incidents.

***

### Shoes are for faces!

### Heliopolis Police Station: Mostafa Gad Al-Karim Mostafa, 15/9/1998

Mostafa Gad Al-Karim Mostafa, merchant and resident of Ain Shams, Cairo. He filed a complaint to the EOHR alleging that, on 15 September 1998, he was subjected to torture in the Heliopolis police station. He said that in the course of an argument between him and a neighbour, the latter died as a result of a heart attack. Subsequently, he and some others were arrested and held by the investigation unit of the Heliopolis police station. The complainer alleged that he was tortured during detention. They made him remove his clothes, tied his hands and legs, and beat him on the feet after being tied to the *falaka*. And to humiliate him, they stamped their shoes on his face!

On 16 September 1998, the Heliopolis Prosecution Office examined his injuries, which were visible all over the body, and ordered that he be examined by a forensic doctor on 21 September 1998. Although the Prosecution released him on bail, he remained in police custody for a further two days.

The EOHR sent a notification to the Assistant Public Prosecutor, who examined the injuries personally. It also sent a report to the Attorney General, who referred the complaint to the head of the Heliopolis Prosecution Office.

***

### Sexual Harassment

### Al-Hawamdya Police Station, Giza, 10/10/1998

On 10 October 1998, three defendants escaped from the Hawamdya police station, in Giza. Immediately, the officers at the station launched an arrest campaign against the neighbors of the fugitives, held them in the station and ill-treated them in order to force them to given information on the hiding place of the fugitives. On 11 October, the lawyer of the detained filed a notification to the Badrashein Public Prosecution and to the attorney general (no. 1332). Nevertheless, they were not released.

On 13 October, the EOHR received a complaint from the families. An EOHR lawyer visited them and learnt that they were held in detention accused of helping and hiding the three fugitives, and that they would be referred to the Public Prosecution. However, this did not happen. On 14 October, the EOHR filed a report to the Badrashein Prosecution (no. 1196) asking for an investigation into their detention.

Following a telephone call from the complainers, the EOHR learnt that the detained were released at five a.m. on 15 October 1998, and that they had been subjected to torture during their detention. Immediately, the EOHR made notification no. 1572 (15/10/1998) to the Public Prosecutor, the Minister of Interior, and the Badrasheen Prosecution Office. The following day, an EOHR representative accompanied the complainers to the Badrasheen Prosecution Office to report their detention and torture and to ask that they be referred to the forensic department, but he faced administrative obstacles. In the face of this, the EOHR made another notification to the attorney general of the South Giza Prosecution on the detention and torture. He referred it to the Badrashein Prosecution Office. On 18 October, the Badrashein Prosecution started

to investigate the events and ordered that the complainers be examined by the Badrashein Hospital to determine their injuries. The statements made by the victims, and the medical reports issued by the Badrashein Hospital on 18 October, attached to prosecution report no. 234, indicate the following:

**Mahmoud Sami Mohamed**, 30 years old, tinsmith

According to his complaint, he was held in detention for the period of 10 - 14 December 1998, during which he was tortured in the office of the head of the investigation unit. He was blindfolded, his hands tied to the back, beaten with sticks, and administered electric shocks in several parts of the body. He added that one of the officers threatened to rape his wife in front of him if he did not speak.

The medical report mentioned the following injuries:

- Bruises on the right shoulder and arm
- Bruises on the left elbow
- Bruises on right knee and thigh
- A wound above the right wrist
- Bruises and marks on the back, beneath the neck

**Rabha Atta Ibrahim**, 40 years old, housewife

She was arrested on 10 October 1998 and held in Hawamdya police station until her release on 14 October. During this period she was allegedly tortured in the office of the head of the investigations unit to force her to give information about the whereabouts of the three fugitives: "They beat me on the feet with a stick after tying me to the *falaka*. They cut my hair, punched my shoulders, kicked me all over, and tied my hands and legs and gave me electric shocks."

The report of Badrashein Hospital on her case mentioned the following injuries:

- A bruise on the upper right arm
- Bruises and swelling on both knees

**Nagwa Fadl Tawfeek**

She does not present visible marks, but she complains from pain all over the body, her head and back. She was arrested on 10 October 1998 and taken to the police station, where "they removed my head cover, beat my face with their hands, and then tied my legs and raised them while they beat my feet with a stick for fifteen minutes. Then, the officer ordered me to stand up and kept beating me on my head and the whole body with a stick." She added: "Then, I was taken to an empty room, where an officer came with someone else and tried to rape me… he tried to remove my clothes and touch my breasts. He told me that he would order the guards to rape me. He grabbed me from the shoulders and kept shaking me strongly, beating me all the while on the back and everywhere."

**Shaaban Sami Al-Rayis**, driver at the Public Transport Authority

Brother of Azzam, one of the fugitives. He was arrested on 10 October 1998, when the police could not find his brother. He describes what happened:

When we arrived at the police station, I was left for half an hour in the investigations office. Then, they took me to the corridor in front of the office and asked me about my brother Azzam. I said that I did not know anything. The investigation officer said: 'I will bring your mother and sister you son of ...' He started beating me with his hand and kicked my genitals. Another officer joined him in beating. I felt dizzy after every blow… At two a.m, they took me to the investigation office. There, two police assistants blindfolded me, tied my hands and put me to the *falaka*, connected an electric wire to my body and started asking me about the whereabouts of my bother. Whenever I said I did not know, they connected the current. They kept doing this for half an hour, after which they poured water on me. The officer said: 'Untie this son of… we will know how to make you speak.' They took me outside the office and I remember nothing until the next morning, when I woke up.

***

**Evening Session**

**Isna Police Station, Qena: Al-Shazli Alam Al-Din Mohamed, 16/10/1998**

The EOHR received a complaint from Al-Shazli Alam Al-Din Mohamed, student and resident of Isna town. He said that on 16 October 1998, while working in a small fishing boat in front of the Isna canal lock, at about one in the afternoon, the river police arrested him and took him to the Isna police station. He was held until the next morning, when he was referred to the Public Prosecution, which released him under guarantee of his place of residence. Nevertheless, he was taken back to the station and referred to the chief of the investigation unit in the evening session. The chief told all present to take their shoes off and then ordered a number of guards to beat them. He beat the complainer with a whip on his feet until they became swollen. And then, as they always do in such cases, the officer ordered him to run on a floor flooded with water to ease the swelling.

The EOHR filed complaints to the Public Prosecutor, the Minister of Interior, and the director of Qena Security Department but it received no reply.

***

**Victims of torture confess
crimes they did not commit**

**Forced to confess the killing of a girl who was still alive**

**The electricity police of Ghazal village and the police of Damanhour village, 30/7/1998**

Name: **Zenhum Mohamed Badr**

Age: 20 years old

Occupation: Carpenter

Address: Kafr Al-Gazair, Keleen, Kafr Al-Sheikh

The following is a very special, and painful at the same time, case of torture. It is the case of Zenhum Mohammed Badr, aged 20, a conscript with the electricity police of Ghazal village. He was accused of kidnapping and killing a girl called Iman. Questioned about the two charges, he confessed under severe torture, and when asked about the body, he said he had hid it somewhere. A commotion then took place when the girl was back with her family 26 days later. She announced that she had ran away to Alexandria to find work there after her cousin saw her speaking with the said conscript and reprimanded her. Thus, the crime was a fallacy and so was the confession. The only reality was that the mentioned person was subjected to such brutal torture that he confessed a crime he had not committed.

On 30 July 1998, he was accused of killing the girl. The torture started while in the custody of the electricity police of Ghazal village to make him confess. Under heavy torture, the conscript confessed to having killed and buried the girl. Between the time the accusation was made and the confession, and until the truth was made clear by the girl's return, a real tragedy took place. The following is the story as told by Zenhum to the EOHR:

On 29 July 1998, I was at home as it was my day off. When I returned to my unit, Major Mostafa Hassan Kasim, from the electricity police station of Zawit Ghazal, asked me about a girl called Iman. I told them I knew nothing about her. I learnt from the officer that she had disappeared on 22 July 1998. The officer said to me: 'You took the girl with you.' I said no. He ordered the detectives to hold me in the station. When the employees had left, the detectives came and took me to the officer again. He asked them whether I had confessed or not. I did not know anything then. The detectives, following the officer's orders, removed my shirt, tied my hands to the back, and then to an iron door inside the station. I remained like this for one hour. They asked me to confess, but I did not. They took me down. Then Col. Sami Ramadan Mohamed, the station chief, came and asked the officer: 'Did he confess?' The officer said 'No.'

Zenhum added:

When I was tied at the gate, they bound my legs with a belt that detective Ali Hatim kept tightening from time to time. Then, they untied me and put me down. Col. Mohamed Abbas Abu Gazya, from the electricity police of Alexandria, came and they took me to the office of Major Mostafa Hassan Kasim, on the first floor. Col. Mohamed Abbas asked me about the girl. I swore that I knew nothing about her. He told the detective to leave me suspended until I died. So, detectives Ali Hatim, Mohamed Al-Okbi and another called Sabry, left me suspended from the door in the same manner from 3 to 7 a.m. This was on 30 July. They tied my leg again with my belt, and the detectives kept pulling it until 7 a.m. I said I knew nothing about the whereabouts of the girl. The officer ordered the detectives to bring a generator they have at the station. They connected it. The detective attached two wires to my penis. They repeated this for half an hour taking shifts. While this was happening, officer Mostafa Kasim said to me: 'Accuse one of your brothers and give us some evidence,

and I will let you out of the case. I refused. The detectives said: 'Say that you and your brother Ibrahim slept with her, and that your mother told you to kill her.' But I kept denying such things.

He continued:

Finally, I confessed that I took her to my sister's, in the Tolombat area, Abu Hommos. The detectives took me there at three in the afternoon. They asked my brother-in-law, Mahmoud Yousif Al-Harti, about the case and about the girl. He said that I had not visited them for four months. On our way back to the station the detective kept beating me. On the same day at 8 p.m., officer Mostafa Kasim came and asked: 'Did you find the girl?' They said: 'The guy was fooling us. So he insulted my mother, slapped my face, while the detectives kept beating me too. They kept asking me about the girl's location. Col. Sami Ramadan Omar, the station chief, came down and asked them: 'Did he speak or not?' They told him that no, so he answered: 'Do whatever to make him do.' They brought two chairs, a rope and a stick. They tied my leg to the stick and put the stick between two chairs, on each chair one of them grabbed an end of the stick. My legs were raised between the two chairs. Detectives Ali Hatim and Mohamed Al-Okbi, and officer Mostafa Ahmed Kasim beat me with an electric cable. They took half-hour shifts each.

The chief then came back again and asked: 'Did he confess?' They said no again. He said: 'Suspend this son of…' They brought a wooden desk and put me on it, detective Ali Hatim tied me to the same gate in front of the office of the head of the investigation unit. They pulled the table and said: 'Tell us anything and we will put you down.' This lasted for one hour, and on the same day, at one a.m., officer Mohamed Abu Gazya came and said that he did not believe that I did not know her location. He ordered that I be suspended again. They did, and then they dropped me on the wooden desk and pulled it from beneath me, so I fell on my arm. The detectives then came and pulled me to the ground.

They prompted me to say that I had taken her, slept with her, and then took her to her family, and … to say that my brother Ibrahim slept with her too. They took me to town, to the Keleen police station, and told me that I must say this story. I was taken to the police chief and told him the story I was told. They asked me to take them to the place. We went to a field and whenever they beat me, I would say 'I buried her here.' They dug but found nothing. I was taken to the station again. They also brought my mother, my brother Ibrahim, my sister-in-law Atteyat, and told me that I must face my brother. They kicked me and beat me with their hands.

The beating was very heavy, so I faced my brother and said: 'I brought the girl and you killed her, and your mother said take her and bury her away.' My brother kept saying to me 'Do not say that, it did not happen' and I said that it did. I also saw my mother and sister-in-law. They held the latter in the Keleen station and took my mother, brother and me to the Damanhour police station. The chief there asked me to tell him what had happened. I told him the story. He said: 'Face your brother and mother' and I did. Then, on 2 August, I was taken to the Public Prosecutor after being held in the electricity police station from 29 July to 2 August 1998, one day in the Keleen station, and the last day in the Damanhour station. We went to the Damanhour Prosecution Office, where officer Mostafa Kasim came with us and I was handcuffed.

He warned me not to change my statement in front of the Prosecution. There, Mostafa Kasim told the detectives to beat me and, in front of the chief prosecutor, the officer attended the interrogation. I confessed everything because of the torture. On 4 August, I was taken to the Public Prosecution to complete the questioning. They interrogated me again and, of course, I was beaten before entering the office. I repeated the same story and the Prosecution ordered my imprisonment for four days. I was taken to Al-Abadya Prison, in Damanhour. The Prosecution then ordered the renewal of my imprisonment for 45 days.

On 18 August, the girl turned up. They took me to the Damanhour Prosecution Office and got me out. The Prosecution then summoned me. Officer Mostafa Kasim learnt about this and told me: 'Tell them that you were tired, that your morale was low and your mind not well, and that you were not aware of what you were saying.'

After the EOHR made a complaint, the Public Prosecution summoned me with a letter. My brother took it and went to the police station. Officer Mostafa Kasim took the letter and said that they would send for us. He summoned me then and said: 'Why do your brothers complain? Do they want money? I can help you to get out of the military service and receive a LE 200 pension.' I said to him that I wanted to complete my military service. On 1 December 1998, on my way to the Keleen Prosecution Office, the officer was with me and said: 'If you say your statement, I will put you in a military trial and destroy your family, you must say what I told you.' When the chief prosecutor asked me: 'Did you confess because you were tortured?' I said what officer Mostafa Kasim told me about my low morale…

When I left the prosecution office, the officer said to me that I would be alright and that everything was quite fine. He warned me against telling my brothers. I really did not tell them anything. But they insisted that my brother come with me to the Keleen Prosecution. There, the secretary said to my brother that I had wasted my right. We then saw the chief prosecutor of Keleen, who questioned me again. I told him the whole truth and he told me to bring my family on Sunday to investigate into my torture. We went, but he did not interrogate us and said: 'This is your problem now because you were asked and gave up your right.'

Thus, Zenhum was forced to confess to killing the girl and forced to deny that his confession had been made under torture!

**Other testimonies:**

**Ibrahim Mohamed Badr**, 35 years old, Zenhum's brother

He told the EOHR:

On the first Saturday of July 1998, at about ten in the evening, a police force broke into the house, searching everywhere and asking about a girl. They searched everywhere, destroyed the furniture ... they even examined the basement. All this is happening and we are totally unaware of what is going on. Nevertheless, they took us, my mother, my wife and myself to the telephone office in the village. We remained there until the first hours of the morning without knowing anything, except that they were asking about a girl we had allegedly killed and whose body we had hid in the

basement. There, we found my brother Zenhum with his hands and legs tied with some iron device. They took us to the Keleen police station, where we were asked the same questions again. An officer took me to a room, and after some time, several guards came, and they punched and kicked me to force me to confess that I had participated with my brother in the murder of the girl. They tied me, hanged me to the door, and beat me with a stick all over the body. I remained there until noon of the following day. They also insulted my mother and wife in front of me, and asked them to confess the killing and to tell them the location of the body. Some hours later, they transferred us from the Keleen police station to the Damanhour police station, where we were kept in detention without being referred to the public prosecution.

In another account, Fouda Mohamed Badr, also brother of the accused conscript, describes the attack to which he was subjected by the electricity police of Ghazal village. He said:

I went to the station to ask about my brother Zenhum. They arrested me and my brother-in-law, and took all I had with me such as papers, money and the watch. They took my brother-in-law and I remained alone in the room. Several policemen came, tied my hands to my back, and suspended me from the door of the room. Then, one of them started to pull my head down. They tied me to a *falaka* and started beating my feet. I was then suspended from a tree in the station's yard with a wire, and I was left like that for hours. Later, I was taken in a police car along with my brother Ibrahim to Damanhour, where I was administered electric shocks. All the while, they were asking me to confess that I had killed the girl. I was not released before a notification was presented to the attorney general.

The brother-in-law of conscript Zenhum was also subjected to the same torture. He said that the officer went in a rage and kept saying 'you have to confess sons of …"

The public prosecution decided to imprison the accused, but the appearance of the girl closed the case. However, this event constitutes strong evidence of the use of torture in police stations.

***

**Montaza Police Station, Alexandria**

The second and tragic event took place in Montaza police station, Alexandria. The story goes back to 24 February 1996, when a young girl called Gehad Mohamed Badr Al-Din Gomaa disappeared. The Montaza police station was informed of the case. Seven months later, the police found the body of a girl. The father was subsequently arrested and tortured until he confessed that the body belonged to his daughter, and that he had killed her. He was imprisoned pending investigations for more than five months. During this period of preventive detention, the girl surprisingly turned up. Nevertheless, and in order to cover up what they had done, the policemen continued to keep the father in detention and even detained the girl until the father's trial was over. When their plan failed, they made many attempts to forge another accusation. This extreme story ends with a ruling by the Alexandria Criminal Court acquitting the father and referring the responsible officers to the public prosecution for investigations into the incidents of torture and the attempts to mislead justice.

This case highlights the magnitude of the tragedy, which is not confined to the use of severe torture to force an innocent person to confess a crime he did not commit. An EOHR representative interviewed the father, his second wife and the mother about the detention and torture. Here follows the outcome of these interviews.

**Mohamed Badr Al-Din Gomaa, a father accused of killing his daughter**

He told the EOHR representative the story from the beginning. In February 1996, he reported the disappearance of his daughter Gehad, who lived with him following his divorce from her mother, to the Montaza police station, in Alexandria. He said he kept searching for his disappeared daughter for months, but could not find her.

Seven months later, on 2 September 1996, a policeman from the Montaza station told him to go to the station to be questioned in connection with the disappearance of his daughter. When he arrived there, an officer asked him about the nature of his work and about his daughter's appearance. The father showed him a photo of the girl. Surprisingly, the policemen asked him to draw a picture of her and describe her rather than giving a picture. He remained about ten hours in the station after which, and before midnight, they took him back to his house in Al-Mandara. There, they searched the house and took the following items: a water hose, a pair of scissors and a shaving machine. They also took him and his wife back to the station. He was surprised when an officer accused him of having killed his daughter accidentally. The officer argued that while disciplining his daughter, her head hit the table accidentally, causing her death on the spot. When that father denied all that, they began to torture him in order to make him confess.

After eight days of continuous torture against him and his wife, he finally agreed to confess to the killing of his own daughter. He was taken from the Montaza police station to the Security Directorate, which he called the slaughter place. A new level of torture started there in spite of his confession. They brought his wife too and he heard her cries and moans from time to time. He told a police officer that he would withdraw his confession if they did not stop torturing his wife and released her. The officer agreed to this. The father was then referred to the Public Prosecution. He asked to be allowed to go home first to see his wife and children. But he was sent directly to the prosecution office, although they promised him to let him go home later. He was also told that his wife was in a police car, and that she would be tortured if he dared to disobey their orders.

Before the prosecution, he stated that he had killed his daughter. The prosecutor ordered his imprisonment for four days pending investigations. However, he remained in preventive detention pending investigations for 155 days upon orders by the Public Prosecution and later by the court.

**The daughter appeared, but the detention continued**

On 4 December 1996, he was summoned for what he thought would be the renewal of his detention. But he realized that it was to identify his daughter. He saw his daughter and her mother, his former wife. He learnt that after her disappearance, she went to a juvenile home at Al-Azarita district, in Alexandria. She ran away from the home with one of her mates and went to her mother. The mother went to the Montaza police

station on 12 November 1996 to inform them that the daughter was alive. Nevertheless, the police detained her and the daughter in order to cover their actions. They wanted to continue the torture and to hide the daughter until the trial of the father was completed. Fortunately, an inspection of the station by a chief prosecutor took place and he found the daughter and mother, who had been detained for 13 days on no legal grounds. He made a memorandum on the case and referred it to the head of the prosecution. Subsequently, the Public Prosecution summoned the father from his place of detention to identify the daughter, and it then ordered his return to the place of detention.

The session to renew the father's detention was due on 11 December. The court renewed his detention for a further 45 days. As soon as he arrived at the prison, he was transferred to the police station of Al-Masani', in Alexandria airport. He was held there for 22 days, during which he was subjected to severe torture. He was then transferred to the Montaza police station and kept there another two weeks. On 17 February 1997, he was taken back to the prison and the following day, 18 February, the court ordered his release.

### After the release

In fact, the release order by the court did not prevent the continuation of his detention. He was taken once again to the Montaza police station to face the same series of torture for 61 days to force him to confess another crime. The investigation officer asked him to confess that he had killed the girl whose body was found, and to say that he used to treat her with the use of religious verses from the Koran, and she died in the course of the treatment without his having intended to kill her. This time, he refused to confess in spite of the 61 days of torture. He was finally released on 19 April 1997.

The father told the EOHR representative: "I was back to my home, children and work, but I felt I was not fine. The newspapers wrote that I was a criminal. The people thought I was, and they know nothing else."

### What after his return?

Approximately one year after his release, he was summoned to the Montaza police station. They had forged another charge against him. This time he was accused of hitting a person with his work vehicle, and told that a five year imprisonment sentence had been issued against him *in absentia*.

### Forms of torture experienced during his detention

-

- Tying his hands and left blindfolded for long periods.

-- Beatings and kicking all over the body.

-- Electric shocks in sensitive parts of the body such as the penis, breasts, abdomen and ears. This occurred during the 22 days he was detained in the Masani' police station.

-- Being suspended from a door for long periods in the position of the roasted lamb, and being beaten with a stick while in this position.

-- Use of the *falaka* to beat his feet and then being ordered to run on a floor flooded with cold water.

-- Threatening to attack his wife, and beating her in front of him with the help of the *falaka*.

-- Removing all his clothes from the evening until the early morning, and beating him and throwing cold water on his naked body.

**The wife's statement**

Gomaa's wife told the EOHR representative:

I was arrested a few days after Mohammed. I was taken to the station and put in a room on the second floor. I did not know the reason. All I learnt from a sergeant was that an officer wanted me. They asked me to remove my head cover and, when I refused, they did so by force. One of the officers beat me and ordered me to wear trousers. Another officer ordered some policemen to hang my legs from a wooden piece with a rope. They kept beating me on the legs with a stick. Then, they brought my husband Mohammed to see me being beaten. When he saw me in this situation, he told them that he would make a confession and say what they wanted him to say. Nevertheless, I remained 9 days in the station, and all this time the detectives and officers kept beating me. When my husband was transferred to the security directorate, they took me also there and placed me in another room. I was beaten in the security directorate too, although it is not a police station. I was then released after the Public Prosecution ordered Mohamed's imprisonment for four days.

The wife added:

However, they kept harassing me. On 1 December 1996, some detectives came and said I was wanted in the station. I went with them. They took me to Al-Masani' police station, located in the airport. I remained there many days, where once more I was beaten, given electric shocks, hanged from the legs and beaten on my feet. After beating my feet, they ordered me to stand on a floor flooded with cold water. I was then released and never went back there.

The story of Mohamed Badr Al-Din was only known on 17 October 1998, when the Alexandria Criminal Court acquitted him and referred the policemen responsible for his torture to the Public Prosecution for investigations. In its legal reasoning, the Court said:

>From all the above, the Court considers, firm and decisively, from the circumstances of the case that there has been clear negligence in the conduct of the investigations,

and there was a fabrication that amounts to a deliberate action to mislead justice in such a manner that is totally rejected by the principles of justice, and that no scrupulous person in this land can accept. The documents of the case reveal that torture and cruelty were used grossly on the defendant and his wife to such extent that led him to confess, and describe in details, a crime he did not commit. The Court has also to mention the peculiar investigations made by Col. Atteya Mahmoud Rizk, and that his statements during the inquiries made by the Public Prosecution are so superficial and contrived that they harm justice. The Court believes that these acts were almost deliberate. It also believes that the confessions he made were only the result of severe torture and cruel treatment. In addition, the detention of he daughter, Gehad, and her mother in the Montaza police station, and for 13 days, is also a crime aimed to mislead justice. Hence, the Court, based on its right stated by article 11 of the Criminal Procedure Code, refers to the Public Prosecution the documents of the case to investigate the above mentioned crimes attributed to Col. Atteya Mahmoud Rizk, and other policemen whose names are mentioned in the investigations. These policemen must receive a deterring punishment in order that such tragedies are not repeated, and to guarantee that freedom and honor are protected."

## Cases of Death inside Police Stations

### Death of Gamal Abdalla Mohamed, Maadi Police Station

On Friday 25 September 1998, the Al-Arab area of Maadi witnessed the arrest of Gamal Abdalla Mohamed, aged 27, known as Gamal Matrouh. He was selling a car cassette and some tapes when a secret police who happened in the area thought he was suspicious and decided to arrest him and take him to the Maadi police station. Gamal was held there upon the orders of officer Nabeel Saleem, the investigations officer. Before the dawn of next morning, Gamal was a still body full of signs of torture.

The story begins at the microbuses terminal of Al-Arab, in Maadi, where the victim Gamal Abdalla Mohammed was carrying a plastic bag with a cassette and some tapes. He was trying to sell them to the microbus drivers. A secret police suspected him and tried to arrest him. The people gathered and helped the secret police to carry out the arrest, even beating Gamal. Because he was strongly built, he was able to resist them and they could not arrest him before he was tied with a rope. An eyewitness called Abdel-Hameed Al-Meliegi, owner of a nearby butchery, said:

I found people running around and saying 'a thief, a thief, they caught him,' but he was strong and able to resist. They were many, so in the end they were able to overcome him… one of them brought a rope and tied him. He had a plastic bag with a cassette inside.

Another witness called Mohamed Korani, a poultry seller, said:

I was by chance passing by on my way to buy a spare part for my car when I saw people running behind someone and shouting that he was a thief. They threw him on to the ground. He had a plastic bag, I do not know what he was carrying in it. If he was injured, it must have been as a result of his resistance to the people.

Thus, according to the eye-witnesses, Gamal was arrested with the help of passers-by. During this episode, a police car arrived with officer Nabeel Saleem, the investigations officer, and a police force. They surrounded the victim, who was resisting the people's attacks. One of the drivers to whom the victim tried to sell the cassette said: "After the police arrested him, he tried to resist them so they beat him severely. I saw his face bleeding as he was being pushed into the police car."

Since that moment, the accused stayed in police custody. All the witnesses said that he had some superficial injuries but that he was fine and sound and resisting firmly his arrest relying on his strong body.

In the police station, the accused actually confessed that the cassette and tapes had been stolen from a car in Maadi. He even confessed to having committed other thefts. A report was made on the incident under case no. 7261/Maadi Misdemeanors. According to officer Nabeel Saleem, the accused willingly confessed having stolen the contents of the car. He was taken to the place where the theft had taken place. It was Palestine Street, in Maadi, and the owner of the car is Ibrahim Abbas, who works as accounting director. He said in his testimony:

At about two a.m. on Friday, I left my car in front of my house. The next day I went down at about eleven in the morning but I found that the cassette, two speakers, a pair of prescription glasses and some tapes were missing. I was busy, so I said I would make a report in the evening, but I was surprised when a police officer and another person whom they told me was the thief came. I recognized the cassette and the tapes, but the glasses and the speakers were not there. He said that he had sold them and was ready to tell me the identity of the buyer. He explained how he stole the car after opening it with a forged key. I went to the police station at 8.30 in the evening and made a report. The next day, I went to the public prosecution to receive the stolen items. I did not know that he had died… I learnt that it was the people who caught him and called the investigation officer. But when I saw him, he had just superficial injuries that did not require him to be taken to hospital.

Thus, all the evidence indicates that the deceased enjoyed good health, and that the injuries inflicted on him by the passersby during the arrest were superficial. The investigation officer is the only person who attributed his death to the attacks of the people. The question is whether the victim was tortured in the police station or not.

An eyewitness called Ibrahim Ouda Salim, who was at the reception of the Maadi police station said:

I saw a person with his right hand handcuffed to the wall. He asked for a cigarette. He was fine. Three or four persons were beating him strongly, and he fell to the ground. He screamed from the pain sometimes, he shouted, and also wept at times. At about 12.30 at night, he was taken from the room and I did not hear his voice again.

Another witness called Abu Khalil, charged in a food-related offense and held in the same station, said:

The accused was fine in the reception room, he was handcuffed because he had stolen a car. I saw two men in plain clothes kick him on the back. Someone brought a whip,

a stick and an iron rod. They kept beating him, and he kept crying from 11.30 until 12.30 in the evening. I was then taken down to the detention room and heard nothing more.

An examination of the victim's body by the public prosecution in the investigations office mentioned the following injuries:

• Two cuts of two and one centimeter below the right eye, and a graze and swelling below the left eye.
• A graze on the right cheek.
• Traces of blood on the left side of the back of the head with possible existence of a wound below.
• Grazes on the left and right side of the back.
• A graze on the right calve and another on the right hand.

All the information and testimonies available in this case raise strong doubts that the death of Gamal Abdalla may have occurred as a result of torture.

*** 

### Death of Shaaban Mohamed Abdel-Gawad, Kalyoub Police Station

On Sunday 13 December 1998, the village of Ramada[5] witnessed the murder of a woman called Ansaf Abdel Gawad, aged 60. Immediately, the police started to search for the killer. Twenty-one people among relatives and neighbors of the victim were considered suspects (below is a list of their names). They were detained in the Kalyoub police station for four days without being referred to the public prosecution. They were ill-treated and some of them severely tortured to force them to confess or give information about the killer. By chance, the public prosecution conducted an administrative inspection on the said police station, so the police had to release most of those detained, keeping only some of them. They were later released alive except one, whose body, with marks of torture on it, was covertly taken out of the station on 17 December in a pick up van. The police tried to bury him without informing his family or the people of his village, but by fate one of the villagers saw them and the news spread. The people took the body and marched in anger denouncing the police practices and calling for the trial and punishment of the perpetrators. The police arrested a number of them on charges of rioting. The victim was called Shaaban Mohamed Abdel-Gawad, aged 23, a baker and a nephew of the killed woman.

List of names of those detained in the Kalyoub police station:

Shaaban Mohamed Abdel Gawad    The victim
Sayid Mohamed Abdel Gawad       Brother
Sabah Mohamed Abdel Gawad       Sister
Sayeda Mohamed Abdel Gawad      Sister
Neamat Mohammed Mahmoud         Mother
Mohamed Sayid Mahmoud
Hanim Abdel Momin Ewada

Ismael Hassan Al-Azouly

Abdel-Nabi Hassan Al-Azouly

Faris Hassan Al-Azouly

Talaat Sabir Dosouki

Ali Abdel Ghafar Ali

Ateyat Hafez

Karema Hafez

Farrag Badawi Hasouna

Sayid Hasab Alla

Eid Imam

Yasser Mohamed Dosouky

Ali Abdel Salam

Adel Imam Al-Hosary

Allya Ismael

According to the eyewitnesses testimonies, the victim died as a result of torture.

The EOHR sent a fact-finding mission to listen to the testimonies of the relatives of the victim and those who witnessed the torture. Below are some of these accounts. They all confirm that he died of torture and not as a result of acute circulatory failure as claimed by the police officers.

- **Ismael Hassan Abdel Nabi, aged 24, hairdresser**

His testimony to the EOHR was as follows:

On Monday, 13 December 1998, at 9 p.m., they took me and my brothers Abdel Nabi, and Faris. They had just returned from their jobs in Mohandessin, Cairo. They also took Talaat Sabir Dosouki, who was having his hair cut at my shop. They said they would ask us some questions and that we would be back soon, but we stayed there for three days and were only released because of the inspection. In our first night at the station, I heard Shaaban's voice saying 'Show pity on me. I did nothing, be merciful.' He kept moaning in a loud voice all night. When officers Atif Galal and Yasser Naga were questioning me and hitting me on the face, I saw the deceased blindfolded, unable to walk, his face reddish and swollen. I saw him also on the second day, his clothes were very dirty because they took him to the toilet, which was extremely dirty. I learnt later that they gave him some clothes to change the ones he was wearing, dirty with excrement and blood. Then, they threw him in the detention room with us. He was crawling, unable to walk and he spoke with difficulty. When the inspectors arrived, they released us but Shaaban was dragged behind a desk knowing that he would not be able to speak or move. After we were released, we reported the whole story of what happened in the Kalyoub police station to the prosecution.

- **Mohamed Sayid Mahmoud Eweida, worker**

He was arrested on Monday, 14 December 1998, with the rest of the group. According to his testimony, he was tortured with electricity to extract information

from him about the murder and the place of the stolen items. He said to the EOHR representative:

A police force led by officer Yasser Naga and made of several sergeants and secret police arrested me and took me to the Kalyoub police station for questioning. The officer asked me three times about the gold of Ansaaf, the murdered woman, and I said I did not know anything. They started torturing me in the middle of the office of the head of the investigation unit, Atif Galal. They connected an electric wire to my toe and another one to my mouth, penis and testes. They kept giving me electric shocks and beating me to make me confess. After three hours of torture, at dawn, they blindfolded me and took me to the Nawa[6] police station. I learnt that they transferred me because there was an inspection in the Kalyob police station.

About the torture of Shaaban, he said:

They took me from the detention room and said that Shaaban wanted me … and that he had confessed that I was the killer. There, I saw the head of the investigation unit, Atif Galal, officer Yasser Naga and the police chief, Saad Gawish torturing Shaaban. I saw an electric wire connected to his body, they were giving him electricity, and beating and kicking him while they were asking about the location of the gold. Given the severity of the torture, he confessed to the theft and the murder. Nevertheless, they kept beating him with water hoses and giving him electric shocks. Suddenly, he went silent. They thought he was acting, so they held him with their legs and continued to give him electric shocks, but he did not move at all. They immediately blindfolded me and took me to the detention room.

- **Sayid Mohamed Abdel-Gawad, aged 19, brother of the deceased**

He was among the arrested. After his release, some policemen, officer Tarik Gab-Alla and two detectives went to his work at about twelve in the afternoon on 17 December. They took him to the Kalyoub police station. He said:

There, I met Mohamed Bek Abdel-Aal and Atif Galal, the head of the investigation unit. They wanted me to go to the public prosecution and say that I had taken my brother on Wednesday, and if I asked about his injuries, I was to say that they were old and that he had some nervous disease. They said that if I did not obey them, I would suffer the same torture like me brother, and if I did, they would find me a god job. I went to the public prosecution of Shebeen Al-Kanater accompanied by a police officer and an assistant from the Shebeen police station. I said to the prosecution officials what they wanted me to say because I was frightened from the torture and the arrest. The body was at the public hospital of Shebeen, I only saw his face in the morgue. Then, they stopped a truck and forced the driver to take my brother Shaaban to our village cemetery. The body was in the custody of two secret policemen and one officer. After they made sure that the body had entered the country, the officer went to the police station there but the other two stayed. They refused to let us do the prayer for the dead, they said we did it at he hospital and that was enough. But when the people learnt the story, they took the body from the grave before it was buried. They carried it to the Cairo-Shebeen road, very angry that he had died in the police station. We put the body on the road and called on the Ministers of Interior and Justice to take the officers responsible for the death of my brother to justice. We remained on the

road from six until one o'clock, and we also called for the release of Mohamed Sayid Mahmoud before we buried the body. He was released after the intervention of some member of the People's Assembly.

- **<u>Sheikh Eweiss Mohamed Eweiss</u>, a witness who saw the body before the burial**

According to his testimony, the face and genitals were very swollen. There was also a blood clot on the top of the head, and blue marks in different parts of the body, including the abdomen and legs.

The EOHR representative could not collect the testimony of the mother of the deceased because she was in a state of a shock and held in detention in the police station.

The EOHR affirms that the circumstances surrounding Shaaban's death indicate that it may have occurred as a result of torture.

## III. Recommendations

The EOHR has issued many recommendations to the Egyptian authorities to help stop the use of torture in police stations and other places of detention in Egypt. These recommendations are still as urgent and valid as when they were first presented, especially given that the government has not adopted any of them. Therefore, the EOHR appeals again to the authorities to promptly carry out the following:

1. To ratify Articles 21 and 22 of the International Convention Against Torture, which would permit the UN Committee Against Torture to take up complaints brought to it by state parties to the Convention or individuals.

2. The Public Prosecution must conduct prompt and impartial investigations into complaints presented by organizations and individuals concerning torture and other human rights violations inside prisons and places of detention. In addition, the concerned authorities should conduct administrative inquiries into the actions of members of the security forces involved in such violations.

3. To create an independent and impartial body formed of judges, lawyers and doctors that would examine all allegations of torture in police custody, and to bring those responsible to justice. This body must be given accces to all detention places and necessary information and be allowed to interview the victims. Its role should not be confined to the legal aspects, but should extend to the political, social and psychological implications of torture and propose solutions to stop it.

4. To organize training and educational sessions for police members, especially those in the criminal investigation departments, on the treatment of detainees in police stations. They must be trained to respect human dignity and the basic rights and freedoms guaranteed by the Egyptian Constitution, the law and international human rights treaties ratified by Egypt. These sessions would complement the human rights course already introduced in the police academy curriculum and all other police schools.



5. To amend Article 63 of the Code of Criminal Procedure to grant victims the right to bring direct lawsuits in crimes of torture committed by the police.

6. To introduce the system of judicial police, which would report to the Ministry of Justice, to be responsible for law enforcement and other duties that would guarantee justice and the proper implementation of rulings.

7. To add a new article to the Code of Criminal Procedure giving the accused the right to seek the help of a lawyer during interrogations in police stations.

8. The authorities should recognize and cooperate with human rights organizations by conducting prompt investigations into their appeals to the Ministry of Interior and the Public Prosecution. Also, they must provide these organizations with information on the cases and the results of their investigations, and enable the representatives of these organizations to visit prisons and other places of detention to monitor human rights conditions.

---

1. The reports issued are:

1- "Crime without punishment: Torture in Egypt".
-2- "Citizens without protection", 24/10/1994.
-3- "Torture in police stations must be stopped", 9/3/1997.
-4- "The Belqas tragedy: EOHR's report on the death of a citizen in Belqas police station", 28/4/1998.
-5- "No way out: Fear of a new stage of social violence", 12/9/1998.
-6- "Collective punishment in Al-Kosheh village: Random arrests, …", 28/9/1998.

2. Please refer to the 'Report of Special Rapporteur Mr. Nigel S. Rodlev', E/CN.4/1998/38, issued on 24 December 1997, Fifty-four session, UN Commission on Human Rights.

3. Please refer to EOHR report "Torture in police stations must be stopped" issued on 9/3/1997.

4. The EOHR appreciates the role played by the lawyers of the Center for Human Rights Legal Aid (CHRLA) and their efforts in disclosing incidents of torture by bringing legal action in many torture cases. They succeeded in obtaining civil compensation rulings against policemen who committed the crime of torture. This, and another case that will be mentioned in this report, that of Mohamed Badr Al-Din Gomaa, are among the cases adopted by the CHRLA.

5. The village of Ramada is located in Kalyoubya governorate, 20 kilometers from Cairo.

6. The Nawa police station belongs to the Shebeen El- Kanater district, Kalyoub governorate.

---

Other EOHR Press Releases
EOHR || Human Rights in Egypt

---

**This document is published online by Derechos Human Rights. Derechos works against violations to human rights and humanitarian law all over the world.**