DECEMBER 6, 1999

*Lakah ❦ Group.*

# Lakah Funding Limited

(incorporated under the International Business Companies Act (CAP 291) of the British Virgin Islands)

*Issuer*

# Holding Company for Financial Investments (Lakah Group), S.A.E.
# Medequip for Trading and Contracting, S.A.E.
# Trading Medical System Egypt, S.A.E.
# Arab Steel Factory, S.A.E.

(each a joint stock company incorporated in Egypt)

*Guarantors*

## U.S.$100,000,000

## 12 per cent. Bonds due 2004

## Issue Price 99.50 per cent.

**Warburg Dillon Read**

**Barclays Capital**

**Arab Banking Corporation (B.S.C.)**          **The National Commercial Bank**

**Banque Libanaise Pour Le Commerce S.A.L.**

**IMPORTANT NOTICE**

Lakah Funding Limited, a company organized under the International Business Company Act (CAP 291) of the British Virgin Islands (the "Issuer"), is issuing its U.S.$100,000,000 12 per cent. Bonds due 2004 (the "Bonds"), which will be unconditionally and irrevocably guaranteed, on a joint and several basis, pursuant to a guarantee (the "Guarantee"), made by each of Holding Company for Financial Investments (Lakah Group), S.A.E. (the "Lakah Holding Company") and three of its operating subsidiaries, Medequip for Trading and Contracting, S.A.E. ("Medequip"), Trading Medical System Equipment, S.A.E. ("TMSE") and Arab Steel Factory, S.A.E. ("Arab Steel"). The Lakah Holding Company, Medequip, TMSE and Arab Steel are hereinafter sometimes referred to individually as a "Guarantor" and collectively as the "Guarantors"; the Lakah Holding Company is hereinafter sometimes referred to individually as the "Parent Guarantor"; and Medequip, TMSE and Arab Steel are hereinafter sometimes referred to individually as a "Subsidiary Guarantor" and collectively as the "Subsidiary Guarantors". The Bonds will be issued pursuant to an indenture dated as of December 8, 1999 (as amended from time to time, the "Indenture") among the Issuer, the Guarantors and The Bank of New York, acting through its principal corporate trust office in New York City, as the trustee for the holders from time to time of the Bonds (in such capacity and any successor to it in such capacity, the "Trustee").

The Issuer and the Guarantors, having made all reasonable inquiries, confirm that this Offering Circular contains or incorporates all information with respect to the Issuer, the Guarantors, the Lakah Holding Company and its Subsidiaries (as defined below) taken as a whole (the "Lakah Group"), the Bonds and the Guarantee, which is material in the context of the issue and offering of the Bonds and the Guarantee; that such information is true and accurate in all material respects and is not misleading in any material respect; that the opinions and intentions expressed in this Offering Circular with regard to such information are honestly held; and that there are no other facts the omission of which would make this Offering Circular as a whole or any such information or the expression of any such opinions or intentions misleading in any material respect; provided that this confirmation does not extend to information set out under the heading "— *The Arab Republic of Egypt*", which is given as general information and has been extracted from publicly available information and as to which the Issuer and the Guarantors accept responsibility only for the accurate extraction of such information from publicly available sources. Except as aforesaid, the Issuer and the Guarantors accept responsibility for the information contained in this document.

It is a condition to the issuance of the Bonds that the Bonds be rated at least BB+ by Fitch IBCA Limited ("Fitch IBCA").

See "*Certain Investment Factors*" for a discussion of certain factors to be considered in connection with an investment in the Bonds.

The Managers (as defined below) have not independently verified the accuracy or completeness of the information contained in this Offering Circular and, accordingly, make no representation, warranty or undertaking (express or implied) with respect to, and do not accept any responsibility for (and hereby disclaim any liability for), the accuracy or completeness of this Offering Circular or any other information provided by the Issuer or the Guarantors, or any other person, in connection with the Bonds or their distribution or the Guarantee.

No person has been authorized to give any information or to make any representations other than those contained in this Offering Circular, the Subscription Agreement (as defined below), the Indenture or the Guarantee and, if given or made, such information or representations must not be relied upon as having been authorized. This Offering Circular does not constitute an offer to sell, or a solicitation of an offer to buy, Bonds in any circumstances in which such offer or solicitation is not authorized or is unlawful.

The distribution of this Offering Circular and the offer or sale of Bonds may be restricted by law in certain jurisdictions. No action has been taken by the Issuer, the Guarantors, the Managers or any other person which would permit a public offering of any Bonds or distribution of this document in any jurisdiction where action for that purpose is required. Accordingly, no Bonds may be offered or sold, directly or indirectly, and neither this Offering Circular nor any advertisement or other offering material may be distributed or published in any jurisdiction, except under circumstances that will result in compliance with any applicable securities laws and regulations, and each Manager has represented that all offers and sales by it will be made

on the same terms. Without limiting the foregoing, there are restrictions on the offer and sale of Bonds and/or the distribution of this Offering Circular and any other documents relating to the offering of Bonds in the United States, the United Kingdom, Egypt and the British Virgin Islands. For a further description of certain restrictions on offers and sales of Bonds and on distribution of this Offering Circular, see *"Subscription and Sale"* and *"Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions."*

NEITHER THE BONDS NOR THE GUARANTEE HAS BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS, AND NEITHER MAY BE OFFERED, SOLD OR DELIVERED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON (AS SUCH TERMS ARE DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT TO QUALIFIED INSTITUTIONAL BUYERS (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144A, AND TO CERTAIN PERSONS IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S UNDER THE SECURITIES ACT. PROSPECTIVE PURCHASERS ARE HEREBY NOTIFIED THAT SELLERS OF THE BONDS MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A. FOR CERTAIN RESTRICTIONS ON RESALES, SEE "NOTICE TO PURCHASERS AND HOLDERS OF RESTRICTED BONDS AND TRANSFER RESTRICTIONS." FURTHERMORE, NONE OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY OR ANY REGULATORY AUTHORITY OR AGENCY OF ANY OTHER JURISDICTION, INCLUDING, WITHOUT LIMITATION, THE CAPITAL MARKET AUTHORITY OF EGYPT, HAS RECOMMENDED OR APPROVED OF THE BONDS OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

In making an investment decision regarding the Bonds offered hereby, prospective investors must rely on their own examination of the Issuer and the Guarantors and of the terms of the offering, including the merits and risks involved. The offering is being made on the basis of this Offering Circular. Any decision to purchase Bonds in the offering must be based on the information contained herein. Investors should be aware that they may be required to bear the financial risk of this investment for an indefinite period of time.

The delivery of this Offering Circular does not at any time imply that the information contained herein is correct at any time subsequent to the date hereof or that any other information supplied in connection herewith is correct as of any time subsequent to the date indicated in the document containing the same.

Application has been made (i) for the Bonds to be listed on the Luxembourg Stock Exchange and (ii) for the Bonds offered and sold in reliance on Rule 144A under the Securities Act to be designated as eligible for trading on the Portal Market[SM], a subsidiary of The Nasdaq Stock Market, Inc.

The Bonds are being offered by UBS AG, acting through its division Warburg Dillon Read ("Warburg Dillon Read"), Barclays Bank PLC, Arab Banking Corporation (B.S.C.), The National Commercial Bank, Banque Libanaise Pour Le Commerce S.A.L. (collectively, the "Managers"), subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. Bonds offered otherwise than in reliance on Regulation S under the Securities Act may be offered by Warburg Dillon Read through their respective agents in the United States.

**NOTICE TO NEW HAMPSHIRE RESIDENTS**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED ("RSA"), WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF THE STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER SUCH RSA CHAPTER 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT ANY EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE OF THE STATE OF NEW HAMPSHIRE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

In connection with the offering of the Bonds, Warburg Dillon Read may engage in transactions that stabilize or maintain the market price of the Bonds at a level which might otherwise not prevail, including purchases of Bonds to stabilize their market price or to cover some or all of a short position in the Bonds and the imposition of penalty bids. Such transactions, if commenced, may be discontinued at any time. All such transactions will be carried out in accordance with all applicable laws and regulations. See *"Subscription and Sale."*

## Available Information

So long as any Bonds remain Outstanding and are "restricted securities" within the meaning of Rule 144A(a)(3) under the Securities Act, if the Issuer or a Guarantor, as the case may be, at any time is neither subject to Section 13 or 15(d) of the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a holder or beneficial owner of a Bond, the Issuer and each Guarantor will promptly furnish or cause to be furnished to such holder or beneficial owner, to a prospective purchaser of such Bond designated by such holder or beneficial owner or to the Trustee or any relevant Paying Agent for delivery to such holder or beneficial owner or prospective purchaser, as the case may be, in order to permit compliance by such holder or beneficial owner with Rule 144A under the Securities Act in connection with the resale of such Bond by such holder or beneficial owner, such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision), and the Issuer and each Guarantor will otherwise comply with the requirements of Rule 144A(d)(4) under the Securities Act.

## Available Information

So long as any Bonds remain Outstanding and are "restricted securities" within the meaning of Rule 144A(a)(3) under the Securities Act, if the Issuer or a Guarantor, as the case may be, at any time is neither subject to Section 13 or 15(d) of the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a holder or beneficial owner of a Bond, the Issuer and each Guarantor will promptly furnish or cause to be furnished to such holder or beneficial owner, to a prospective purchaser of such Bond designated by such holder or beneficial owner or to the Trustee or any relevant Paying Agent for delivery to such holder or beneficial owner or prospective purchaser, as the case may be, in order to permit compliance by such holder or beneficial owner with Rule 144A under the Securities Act in connection with the resale of such Bond by such holder or beneficial owner, such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision), and the Issuer and each Guarantor will otherwise comply with the requirements of Rule 144A(d)(4) under the Securities Act.

# Enforcement of Foreign Judgements; Arbitration and Service of Process in Egypt

Each of the Guarantors is a joint stock company incorporated in Egypt. The directors of each Guarantor are individuals resident in, or companies incorporated in, Egypt. A substantial portion of the assets of each of the Guarantors and their directors is located in Egypt. It may not be possible for investors to effect service of process within the United States or elsewhere upon the Guarantors or their directors or for such persons to enforce against any of them in United States courts judgements obtained in United States courts predicated upon the civil liability provisions of the federal securities laws of the United States.

The Bonds, the Guarantee and the Indenture will provide that any dispute or difference whatsoever between the Issuer or any Guarantor, as the case may be, and the Trustee or a Holder of Bonds arising out of or in connection with the Bonds, the Guarantee or the Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules of Arbitration, unless the Trustee or such Holder elects that such dispute or difference be resolved by litigation rather than arbitration. For the benefit of the Trustee or any Holder that elects to resolve any such dispute or difference by litigation and for the benefit of the Trustee or any Holder seeking to confirm an arbitral award with respect to such a dispute or difference, the Issuer and the Guarantors will each submit to the non-exclusive jurisdiction of the courts of the State of New York and of the United States sitting in New York City, in the Borough of Manhattan, for the purposes of any suit, action or proceeding to resolve such a dispute or difference or seeking to confirm such an arbitral award, as the case may be. See *"Terms and Conditions of the Bonds — 18. Arbitration"* and *"— 19. Governing Law; Submission to Jurisdiction."*

In accordance with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, to which Egypt is a signatory, a court in Egypt is required by law to enforce, without re-examination of the merits of the case or re-litigation of the matters arbitrated upon, except as provided in such Convention, final and conclusive arbitral award rendered in accordance with applicable provisions of Egyptian law.

Enforcement of foreign judgements in Egypt is subject to the following conditions:

(i)     the foreign courts rendering the relevant judgement must offer reciprocal treatment to judgement obtained in the courts of Egypt; if such reciprocal treatment is not offered by the court where judgement is obtained, the Egyptian courts will re-examine the merits of the case in the same manner as that adopted by such courts;

(ii)    the courts of Egypt are not exclusively competent to hear the dispute which constituted the object of the foreign judgement while the foreign courts are shown to have been competent to hear the dispute in accordance with their own respective laws;

(iii)   the parties to the dispute were duly notified and properly represented in the proceedings;

(iv)    the foreign judgement is final and conclusive in accordance with the relevant law; and

(v)     the foreign judgement does not conflict with a prior Egyptian judgement in the same case and is not contrary to public order or morality in Egypt.

# Financial and Other Information

In this document, all references to "Egyptian pounds," "E£" or "L.E." are to the currency of Egypt (E£1.00 equals 100 piasters); all references to "U.S. Dollars," "Dollars," "$" and "U.S.$" are to the currency of the United States of America. All references to "Egypt" and the "Republic" are to the Arab Republic of Egypt and all references to the "Government" are to the Government of Egypt. All references to "m($^2$)" are to square meters.

The consolidated audited financial statements and the pro forma consolidated financial statements of the Lakah Holding Company included herein have been prepared in accordance with Egyptian laws and regulations and include all information required by International Accounting Standards ("IAS"). The audited financial statements of the Subsidiary Guarantors included herein have been prepared in accordance with Egyptian laws and regulations and include all information required by Egyptian Accounting Standards ("EAS"). Financial statements for the six-month period ended June 30, 1999 are not necessarily indicative of the results for the year ending December 31, 1999. Cherif Mohamed Hammouda, a member of RSM International, and Mostafa Shawki & Co Deloitte & Touche, the auditors of the Lakah Holding Company, have advised the Lakah Holding Company that there are no material differences between EAS and IAS as they pertain to the financial statements included herein. IAS differs in certain significant respects from U.S. generally accepted accounting principles ("U.S. GAAP"). For a narrative description of the principal differences between IAS and U.S. GAAP relevant to the Lakah Holding Company and its Subsidiaries, see *"Annex A — Summary of Certain Significant Differences between IAS and U.S. GAAP."*

The U.S. Dollar equivalent information presented herein has been calculated using the rate of U.S.$1.00 = E£3.40, is provided solely for the convenience of the readers of this Offering Circular and should not be construed as implying that the Egyptian pound amounts represent, or could have been or could be converted into, U.S. Dollars at such rate of exchange at any time. The exchange rate between U.S. Dollars and Egyptian pounds was U.S.$1.00 = E£3.41 on December 31, 1998 and U.S.$1.00 = E£3.4164 on November 30, 1999, as reported by Datastream. See *"Annex B — The Arab Republic of Egypt — Exchange Rate"*. The Federal Reserve Bank of New York does not certify for customs purposes a noon buying rate for cable transfers in Egyptian pounds.

As a result of rounding adjustments, the figures or percentages in a column may not add up to the total for such column.

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| Available Information | 5 | Lakah Holding Company | 35 |
| Enforcement of Foreign Judgements and Service of Process in Egypt | 6 | Terms and Conditions of the Bonds | 80 |
| | | Form of the Bonds | 104 |
| Financial and Other Information | 7 | Clearing and Settlement | 107 |
| Summary | 8 | Notice to Purchasers and Holders of Restricted Bonds and Transfer | |
| Certain Investment Factors | 13 | Restrictions | 111 |
| Use of Proceeds | 19 | Taxation | 114 |
| The Issuer | 20 | Subscription and Sale | 117 |
| Capitalization of the Lakah Holding Company | 22 | General Information | 119 |
| | | Index to Financial Statements | F-1 |
| Selected Financial and Operating Information for the Lakah Group | 23 | Annex A — Summary of Certain Significant Differences Between IAS and U.S. GAAP | A-1 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group | 26 | Annex B — The Arab Republic of Egypt | B-1 |

# Summary

The following is a summary of certain information contained elsewhere in this Offering Circular. It does not purport to be complete and is qualified in its entirety by the more detailed information appearing elsewhere in this Offering Circular. Capitalized terms used herein have the same meanings given to them elsewhere in this Offering Circular.

## Overview of the Lakah Group

The Lakah Holding Company is a holding company incorporated in Egypt on November 29, 1998 under Law 95 of 1992. The Lakah Holding Company conducts its business through eight operating subsidiaries (the "Subsidiaries"), organized into two principal groups: the Medical Care Group, comprised of companies (including, among others, Medequip and TMSE) active in the supply and leasing of medical equipment, the management of medical imaging equipment for medical facilities, turnkey hospital projects and other construction works; and the Industrial Group, comprised of companies (including, among others, Arab Steel active in the manufacture of steel billet and lighting products, transportation using heavy trucks and real estate, including the ownership and leasing of a detergent manufacturing facility. A majority of the issued share capital of the Lakah Holding Company is owned by Messrs Ramy Lakah and Michel Lakah.

As at June 30, 1999, on a consolidated basis, the Lakah Holding Company had total assets of approximately E£2 billion (U.S.$703 million) and shareholders' equity of approximately E£1 billion (U.S.$382 million). For the first six months of 1999, on a consolidated basis, the Lakah Holding Company generated total revenues of approximately E£744 million (U.S.$219 million) and had net income of approximately E£114 million (U.S.$42 million). In 1998 on a pro forma consolidated basis, which gives effect to the Restructuring (as defined below), the Lakah Holding Company generated total revenues of approximately E£650 million (U.S.$191 million) (E£674 million (U.S.$198 million) on an actual basis before the Restructuring) and had net income of approximately E£86 million (U.S.$25 million) (E£93 million (U.S.$27 million) on an actual basis before the Restructuring). See "*Selected Financial and Operating Information*" and "*Management's Discussion and Analysis of Financial Condition and Results of Operations.*"

On June 28, 1999, the Board of Directors of the Lakah Holding Company resolved to increase its issued share capital from E£1,149,880,000 to E£1,499,880,000 through the issuance of 35 million shares (the "Capital Increase"). On August 1, 1999, 11,666,667 global depositary shares ("GDSs"), each representing three shares, par value E£10 per share, of the Lakah Holding Company, were issued pursuant to a global offering of GDSs (the "Global Offering"), which raised U.S.$102,500,000. The net proceeds of the Global Offering were applied to the Capital Increase. See "*Lakah Holding Company — Share Capital and Issuance of GDSs.*"

Pursuant to a series of transactions, the last of which occurred on August 15, 1999, the Lakah Holding Company acquired 98 per cent. of the issued share capital of Helio Medical Company, S.A.E., an Egyptian joint stock company, which owns and operates renal dialysis centers located throughout Egypt. At the date of this Offering Circular, the Lakah Holding Company has invested E£130 million in Helio Medical Company S.A.E. See "*Lakah Holding Company — Recent Developments — Helio Medical Company, S.A.E.*" In addition, pursuant to a purchase agreement dated September 15, 1999, as amended, the Lakah Holding Company and Messrs Ramy Lakah and Michel Lakah have acquired approximately 51 per cent. of the ownership interests in two partnerships, Intermedica for Manufacturing of Medical Supplies ("IMMS") and Intermedica for Distribution of Medical Supplies ("IDMS"), which are involved in the manufacture, sale and distribution of medical disposable products. The IMMS and IDMS partnerships are currently in the process of being converted into a single Egyptian joint stock company, to be named Intermedica, S.A.E. ("Intermedica"). Based on information supplied to management of the Lakah Holding Company, the combined 1998 sales of IMMS and IDMS were approximately E£20 million. The aggregate consideration paid in connection with the acquisition was E£30.6 million. Following the establishment of Intermedica, the Lakah Holding Company expected to contribute an additional E£37.74 million to subscribe for new shares to be issued upon a increase in the capital of the joint stock company, while the sellers of the IMMS and IDMS interests, which will retain a 49 per cent. ownership stake in Intermedica, are expected to make a corresponding capital contribution. See "*Lakah Holding Company — Recent Developments — Intermedica*".

The Lakah Holding Company's registered office is located at 68, Merghany Street, Heliopolis, Cairo, Egypt

**Terms of the Bonds**

| | |
|---|---|
| **Issuer:** | Lakah Funding Limited, a company incorporated under the International Business Companies Act (CAP 291) of the British Virgin Islands. The business activities in which the Issuer may engage are limited by its Memorandum of Association and the Indenture. See "The Issuer — Business". The Issuer's Memorandum of Association further provides, and the Issuer has covenanted in the Indenture, that, so long as the Bonds are Outstanding, it will not declare any dividends or have any subsidiaries. |
| **Guarantors:** | Holding Company for Financial Investments (Lakah Group), S.A.E.; Medequip for Trading and Contracting, S.A.E.; Trading Medical System Equipment, S.A.E.; and Arab Steel Factory, S.A.E. The other Subsidiaries of the Lakah Holding Company are not guarantors of, and otherwise have no direct liability for, the Bonds. |
| **Issue:** | 12 per cent. Bonds due 2004 |
| **Aggregate Principal Amount:** | U.S.$100,000,000 |
| **Issue Price:** | 99.50 per cent. |
| **Issue Date:** | December 8, 1999 (the "Issue Date"). |
| **Maturity Date:** | December 8, 2004 (the "Maturity Date"). |
| **Guarantee:** | Pursuant to the Guarantee, the Guarantors will, jointly and severally, unconditionally and irrevocably guarantee the obligations of the Issuer in respect of the Bonds and otherwise under the Indenture. See "The Guarantee." |
| **Status and Ranking:** | The Bonds will constitute direct, general, unconditional, unsubordinated, and subject to the Issuer's negative pledge covenant, unsecured obligations of the Issuer and will rank *pari passu* in priority of payment, without any preference among themselves, with all other present and future unsecured and unsubordinated indebtedness of the Issuer, except for any obligations that may be preferred by provisions of law that are both mandatory and of general application. |
| | The obligations of each Guarantor under the Guarantee will constitute direct, general, unconditional, unsubordinated, and subject to the negative pledge covenant of each Guarantor, unsecured obligations of such Guarantor and will rank pari passu in priority of payment with all other present and future unsecured and unsubordinated indebtedness of such Guarantor, except for any obligations that may be preferred by provisions of law that are both mandatory and of general application. |
| **Payment Currency:** | U.S. Dollars. |
| **Use of Proceeds:** | The net proceeds from the issue of the Bonds, expected to amount to approximately U.S.$98,500,000 prior to the deduction of transaction expenses, will be used by the Issuer to make a deposit with a Swiss banking institution, which will make a loan (the "Swiss Loan") to the Parent Guarantor. The Parent Guarantor will, in turn, on-lend funds to each Subsidiary Guarantor. Ultimately, the funds will be used principally to expand the business of the Subsidiary Guarantors primarily in the Medical Care Group, to pay-down or collateralize existing indebtedness of the Lakah Holding Company and for general working capital purposes of the Lakah Group. See "Use of Proceeds". |

| | |
|---|---|
| **Interest:**.................................... | Interest on the Bonds is payable semi-annually in arrear on June 8 and December 8 in each year. |
| **Interest Rate:**............................... | 12 per cent. per annum ("30/360 basis") |
| **Negative Pledge and Other Covenants of the Guarantors:**...... | The Guarantors will agree in the Indenture and the Guarantee to observ certain covenants, including (i) a negative pledge; (ii) limitations o: certain transactions between the Guarantors and parties related theretc (iii) restrictions on disposals of assets; (iv) restrictions on consolidatio merger and transfers of assets; and (v) the maintenance of certain financia ratios. In addition, the Lakah Holding Company will agree to certai limitations on its ability to pay dividends and make other distributions i respect of its capital stock and to procure that sufficient funds are at a times made available to the Issuer to enable it to meet its obligations i respect of the Bonds. See *"The Guarantee."* |
| **Cross Default and other Events of Default:**................................... | The Terms and Conditions of the Bonds contain customary events c default, including a cross default in respect of Indebtedness (as defined i the Terms and Conditions of the Bonds) of the Issuer and the Guarantor. See *"Terms and Conditions of the Bonds — Events of Default."* |
| **Withholding Tax:**.......................... | All payments of principal and interest in respect of the Bonds, whethe paid directly by the Issuer, by any Guarantor under the Guarantee c otherwise, shall be made free and clear of, and without withholding o deduction for or on account of, any present or future taxes, dutie assessments or governmental charges of whatever nature imposed, levie collected, withheld or assessed by or within the British Virgin Islands c Egypt or any political subdivision or any authority thereof or therei having power to tax, unless such withholding or deduction is required t law. In the event that any such withholding or deduction is required to t made by the Issuer, the Issuer shall, subject to certain exceptions, pay suc Additional Amounts (as defined below) as will result in receipt by tł holders of Bonds of such amounts as would have been received by thei had no such withholding or deduction been required. Similarly, pursuai to the Guarantee, the Guarantors have agreed, subject to certa exceptions, to indemnify the Holders against, and to reimburse tł Holders for, any such taxes that are required to be deducted or withhel See *"Terms and Conditions of the Bonds — Additional Amounts ar Taxes" "Guarantee."* |
| **Redemption for Taxation:**............ | The Bonds may be redeemed at the option of the Issuer in whole, but n in part, at any time if, as a result of any actual change in any lav regulation or ruling of the British Virgin Islands or Egypt, as the case m: be, or any political subdivision or other authority thereof or there having power to tax, or any change in the application or offici interpretation of such laws or regulations, which change or amendme becomes effective on or after the Issue Date, the Issuer has or will becon obliged to pay Additional Amounts as provided in Condition 7 or ai Guarantor has or will become obligated to indemnify any Person respect of taxes pursuant to the Guarantee, in any case, in excess of t amounts that are otherwise payable pursuant to Condition 7 or t relevant provisions of the Guarantee as of the Issue Date, and su obligation cannot be avoided by the Issuer or any Guarantor takii reasonable measures available to it. |

The redemption price will equal 100 per cent. of the principal amount of the Bonds, plus accrued but unpaid interest to the date of redemption. See *"Terms and Conditions of the Bonds — Additional Amounts and Taxes".*

**Form of Bonds:** ............................. Bonds sold outside the United States to non-U.S. persons within the meaning of Regulation S under the Securities Act will initially be represented by a single, permanent global Bond in registered form (the "Regulation S Global Bond"), which will be deposited on or about the Issue Date with a common depositary outside the United States, registered in the name of a nominee of Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear system ("Euroclear"), and Cedelbank, in each case for the accounts of Cedelbank and Euroclear.

Bonds sold to qualified institutional buyers ("QIBs") as defined in and in reliance upon Rule 144A as referred to in, and subject to the transfer restrictions described in, *"Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions,"* will initially be represented by a single, permanent global restricted Bond in registered form (the "Restricted Global Bond" and, together with the Regulation S Global Bonds, the "Global Bonds"), which will be deposited with The Depository Trust Company ("DTC"), or a custodian therefor, and registered in the name of a nominee of DTC, on or about the Issue Date.

Bonds represented by Global Bonds deposited with DTC or a custodian for DTC will trade in DTC's same-day funds settlement system and secondary market trading activity in such Bonds will therefore settle in immediately available funds. Beneficial interests in a Global Bond deposited with DTC or a custodian for DTC will be shown on, and transfers thereof will be effected only through, records maintained by DTC and its direct or indirect participants, including Cedelbank and Euroclear. See *"Clearing and Settlement."*

**Denominations:** ........................... Bonds sold outside the United States to non-U.S. persons within the meaning of, and in reliance on, Regulation S under the Securities Act (including Bonds in definitive registered form issued in exchange for interests in the Regulation S Global Bond in accordance with Condition 3 of the Bonds) will be issued, and beneficial interests in the Regulation S Global Bond may be transferred, in denominations of U.S.$10,000 and higher integral multiples of U.S.$10,000.

Bonds sold to QIBs in reliance on Rule 144A (including Bonds in definitive registered form issued in exchange for the Restricted Global Bond in accordance with Condition 3 of the Bonds) will be issued, and beneficial interests in the Restricted Global Bond may be transferred, in denominations of U.S.$100,000 and higher integral multiples of U.S.$10,000.

**Selling Restrictions:** ..................... United States, United Kingdom, Egypt, the British Virgin Islands and other applicable jurisdictions in connection with the offering and sale of the Bonds. See *"Subscription and Sale."*

**Rating:** .......................................... It is a condition to the issuance of the Bonds that the Bonds be rated at least BB+ by Fitch IBCA. Prospective purchasers of Bonds should be aware, however, that a credit rating is not a recommendation by the rating organization or any other person to buy, sell or hold securities and may be subject to revisions or withdrawal at any time by the assigning rating organization.

| | |
|---|---|
| **Governing Law:**............................ | The Bonds, the Guarantee and the Indenture will be governed by, ar construed in accordance with, the laws of the State of New York. |
| **Arbitration; Submission to Jurisdiction:** ................................ | The Bonds, the Guarantee and the Indenture will provide that any dispu or difference whatsoever between the Issuer or any Guarantor, as the ca may be, and the Trustee or a Holder of Bonds arising out of or connection with the Bonds, the Guarantee or the Indenture shall be final settled by submission to arbitration by the American Arbitratic Association under its Commercial Rules of Arbitration, unless the Trust or such Holder elects that such dispute or difference be resolved I litigation rather than arbitration. For the benefit of the Trustee or ai Holder that elects to resolve any such dispute or difference by litigatic and for the benefit of the Trustee or any Holder seeking to confirm i arbitral award with respect to such a dispute or difference, each of t! Issuer and the Guarantors has submitted to the non-exclusive jurisdictic of the courts of the State of New York and of the United States sitting New York City, in the Borough of Manhattan, for the purposes of ai suit, action or proceeding to resolve such a dispute or difference seeking to confirm such arbitral award, as the case may be. |
| **Listing and Trading:**...................... | Application has been made (i) for the Bonds to be listed on t Luxembourg Stock Exchange and (ii) for the Bonds offered and sold reliance on Rule 144A to be designated as eligible for trading on t Portal Market$^{SM}$, a subsidiary of The Nasdaq Stock Market, Inc. |
| **Trustee, Transfer Agent in New York and Registrar:**...................... | The Bank of New York, acting through its principal corporate trust offi in New York City |
| **Paying Agent and Transfer Agent in London:** ......................... | The Bank of New York, London branch |
| **Paying Agent and Transfer Agent in Luxembourg and Listing Agent:**............................... | Banque Internationale à Luxembourg S.A. |

# Certain Investment Factors

The purchase of Bonds involves substantial risks and is suitable only for, and should be made only by, investors that are fully familiar with Egypt in general and with the Egyptian health care, medical and industrial sectors in particular, and that have such other knowledge and experience in financial and business matters as may enable them to evaluate the risks and the merits of an investment in the Bonds. The following section does not describe all of the risks of an investment in the Bonds. Prior to making an investment decision, prospective investors should consider carefully, in light of their own financial circumstances and investment objectives, all the information set forth herein and, in particular, the investment considerations set forth below. Prospective purchasers of Bonds should make such inquiries as they think appropriate regarding the Bonds, the Issuer, the Guarantors, the Lakah Group, Egypt and the Egyptian health care, medical and industrial sectors, without relying on the Issuer, the Guarantors or the Managers.

**Considerations Relating to Egypt**

*Egypt's Political and Economic Situation*
Substantially all of the assets and operations of each Subsidiary are located in Egypt. As a result, the operating results of the Lakah Holding Company and its Subsidiaries (including the Subsidiary Guarantors) are and will be affected in general by economic and political developments in or affecting Egypt and, in particular, by the level of economic activity in Egypt, particularly in the health care and medical sectors.

*Economy*
The economy of Egypt, like that of many emerging markets, has been characterized by significant Government involvement through direct ownership of enterprises and through extensive regulation of market conditions, including foreign investment, foreign trade and financial services. In 1991, the Government commenced an economic reform program the objectives of which are macroeconomic stability, financial sector reform and the reduction of price distortions and obstacles to foreign trade. Key elements of the program have been the introduction of a privatization program, the gradual replacement of central planning by market economics, the gradual reduction of Government spending on subsidies, the deregulation of interest rates and foreign exchange, the introduction of a Capital Market Law and trade liberalization. The economic reform program, which has the support of the International Monetary Fund ("IMF") and the World Bank, has significantly improved the performance of the Egyptian economy since 1991; however, there can be no assurance that this positive economic trend will continue.

Despite the ongoing program of deregulation, trade liberalization and privatization, the Government continues to exercise a significant influence over many aspects of the economy. Accordingly, Government policies continue to have a significant effect on market conditions, prices and investment returns. Although the continuation of the privatization program should increase foreign direct and portfolio investment in Egypt, there can be no assurance that capital inflows will remain at recent levels, or that the Government will not have to increase interest rates, tighten the money supply or devalue the Egyptian pound in order to redress Egypt's trade imbalance. There can also be no assurance that the privatization program or any other aspect of the economic reform program will be implemented by the Government in line with the stated timetable or current expectations or at all. In particular, following the election in October 1999 of Mr. Mohamed Hosni Mubarak to a third term as President of Egypt, a new Government headed by H.E. Dr. Atef Muhammad Ebeid was formed on October 11, 1999. Although it is expected that the new Government will continue to implement the economic reform program of the past administration, no assurance can be given in this respect.

Egypt continues to experience a high level of unemployment, a problem compounded by the requirements of the Government's economic reform program, which requires staffing in the public sector to be reduced. Egypt's rapid population growth also remains a major problem for its economy. Finally, inflation rates in Egypt, which in recent years have been reduced significantly, could rise in the future as a result of deficit financing, capital outflows and/or other economic factors.

*Political Climate and Extremism*
While the political situation in the Middle East has been stabilized to some extent by the ongoing Arab-Israeli peace process, and Egypt and Jordan have entered into formal peace treaties with Israel, there can be no assurance that the peace process will continue. Within Egypt, religious militants have engaged in a campaign,

**Certain Investment Factors**

sometimes violent, against the Government in recent years. Maintenance of domestic order and stability in the face of extremism is a major policy objective of the Government. Any of the foregoing circumstances could have a material adverse effect on the political and economic stability of Egypt and, consequently, on the operating results and financial condition of all Egyptian companies, including the Lakah Holding Company and its Subsidiaries, and on the willingness of foreigners to invest in, or otherwise finance, directly or indirectly, in Egyptian companies, including by purchasing the Bonds.

*Egyptian Regulatory Considerations*
The Lakah Holding Company and its Subsidiaries are subject to regulation by Egyptian government authorities. The Companies Authority has general administrative authority, including inspection and supervision, over the Lakah Holding Company and its Subsidiaries, including the Subsidiary Guarantors, in order to ensure compliance with the Companies Law and the Executive Regulations thereunder. Furthermore, the Lakah Holding Company and its Subsidiaries, including the Subsidiary Guarantors, are subject to supervision and inspection by the Capital Market Authority ("CMA"). Each of the Lakah Holding Company and its Subsidiaries, including the Subsidiary Guarantors, are required to submit financial statements to the Cairo and Alexandria Stock Exchanges ("CASE") quarterly in accordance with EAS and to abide by the disclosure requirements of the CMA. The CMA has the authority to delist any company breaching the Capital Market Law or its regulations. See *"Annex B — The Arab Republic of Egypt — The Egyptian Securities Market and the Cairo and Alexandria Stock Exchanges."*

The Lakah Holding Company and its Subsidiaries, and their respective customers and manufacturers, are subject to varying degrees of Government regulation. Legislative or regulatory changes which affect such customers or manufacturers may indirectly affect the Lakah Group. The Lakah Holding Company cannot predict whether State legislative or regulatory changes will occur and, if so, the effect that such changes would have on its acquisition strategy or the results of operations or financial condition of the Lakah Group. See *"General Information Applicable to Subsidiaries in the Lakah Group."*

*Disclosure and Accounting Standards*
Although the Lakah Holding Company and each Subsidiary are subject to Egyptian disclosure requirements and are required to publish quarterly financial statements and deliver notices of any material developments to the CMA, there is generally less information available about the Lakah Holding Company and the Subsidiary Guarantors and other Egyptian companies than about listed companies in the United States, the United Kingdom or certain other countries. Regulations concerning reporting requirements and auditing standards for Egyptian companies may not afford the same degree of investor protection as is available in the United States or European markets. See *"Annex B — The Arab Republic of Egypt — The Egyptian Securities Market and the Cairo and Alexandria Stock Exchanges."*

Cherif Mohamed Hammouda, a member of RSM International, and Mostafa Shawki & Co Deloitte & Touche, the auditors for the Lakah Holding Company, have advised the Lakah Holding Company that there are no material differences between EAS and IAS as they pertain to the financial statements of the Lakah Holding Company included herein. IAS differs in certain significant respects from U.S. GAAP. For a narrative description of the principal differences between IAS and U.S. GAAP relevant to the Lakah Holding Company, see *"Annex A — Summary of Certain Significant Differences between IAS and U.S. GAAP."*

*Enforceability of Foreign Judgements in Egypt*
Judgements of courts of the United States, including judgements against the Guarantors and/or their directors and officers, predicated on the civil liability provisions of the U.S. federal securities laws or otherwise, may not be enforceable in Egypt. In addition, the enforcement of foreign judgements in Egypt is subject to conditions. See *"Enforceability of Foreign Judgements and Service of Process in Egypt."*

*Environmental Regulation*
The Lakah Group may become subject to increasingly stringent environmental standards in the future and may be required to make additional expenditures relating to environmental matters on an ongoing basis. The Lakah Holding Company believes that the operations of its Subsidiaries are currently in compliance with local environmental regulations as defined under Law 4 of 1994, with which compliance has been required since February 1998; however, because of the relatively brief period for which applicable environmental regulations have been enforced, it is difficult to predict the future enforcement posture of relevant regulators, which could become more stringent. There can be no assurance that future unforeseen expenditures or operating

**Certain Investment Factors**

disruptions due to environmental compliance requirements will not occur, either of which could have a material adverse effect on the results of operations or financial condition of the Lakah Group.

**Considerations relating to the Lakah Group**

*Management of Growth; Risks Associated with Acquisitions*
The rapid growth experienced by the Lakah Holding Company and its Subsidiaries to date has placed, and could continue to place, significant demands on the management and operational and financial resources of the Lakah Holding Company and its Subsidiaries. The Lakah Holding Company expects to pursue additional strategic acquisitions of complementary businesses, products or technologies as a means of expanding its existing product lines and distribution channels. There can be no assurance that suitable acquisition candidates will be available, that financing for such acquisitions will be obtainable on terms acceptable to the Lakah Group, that such acquisitions will be successfully completed or that they will generate profits to the Lakah Group.

*Operating Risks and Sales*
The Subsidiaries' operations are subject to the hazards inherent to the respective industries and fields in which they operate, which can cause personal injury and loss of life, business interruptions, property and equipment damage and pollution or environmental damage. The Subsidiaries maintain insurance covering their assets and operations at levels, which management believes to be appropriate in the Egyptian Market, but which may not cover all risks ordinarily covered by insurance in other countries such as the United States and the United Kingdom. The Lakah Holding Company also maintains insurance policies against certain liabilities arising from defective products. Whenever possible, the Subsidiaries seek indemnification from their customers, subcontractors and joint venture partners under which such persons agree to indemnify the relevant Subsidiaries against certain claims relating to injury to the employees, damage to the Subsidiary's property and consequential damages. When obtained, such contractual indemnification protection may not be supported in all cases by adequate insurance maintained by such customers, subcontractors or joint venture partners.

Because many products distributed by certain of the Subsidiaries are intended to be used in healthcare settings on patients who are or may be seriously or critically ill, the Lakah Group business in medical care is exposed to potential product liability risks inherent in the medical care industry. Component failures, manufacturing flaws, design defects or inadequate disclosure of product-related risks with respect to these or other products sold or managed by the relevant Subsidiaries could result in injury to, or death of, a patient. The occurrence of such a problem could result in product liability claims affecting one or more of the Lakah Group products or responsible officials. The Lakah Holding Company and its Subsidiaries maintain product liability coverage in amounts that are customary in the Egyptian market. There can be no assurance, however, that such coverage will be available with respect to or sufficient to satisfy all claims made against the Lakah Holding Company or the Subsidiaries or that the Lakah Holding Company or the Subsidiaries will be able to obtain insurance in the future at satisfactory rates or in adequate amounts. Product liability claims or product recalls in the future, regardless of their ultimate outcome, could result in costly litigation and could have a material adverse effect on the business, results of operations and financial condition of the Lakah Group.

*Future Capital Requirements*
The Lakah Holding Company expects that its current cash and cash equivalents, together with additional cash from operations, will be sufficient to meet the Lakah Holding Company's anticipated cash requirements in the near future. Depending upon the acquisition activity and results of operations of the Lakah Group, there can be no assurance that such resources will be sufficient, in which case the Lakah Group would need to obtain additional financing. Such additional financing could involve issuances of debt or equity securities. Adequate additional funds, whether from the financial markets or from other sources, may not be available on a timely basis, on terms acceptable to the Lakah Holding Company or at all. Insufficient funds may cause the Lakah Group to delay or abandon some or all of its acquisition or marketing programs or opportunities and may have other negative effects on the Lakah Group.

*Dependence on Manufacturers and Certain Other Parties*
Certain of the Subsidiaries engaged in the sale of medical equipment distribute products from a limited number of manufacturers. As a result, these Subsidiaries may be subject to unanticipated changes in the terms of their arrangements with manufacturers, including pricing, minimum volume and monetary requirements,

**Certain Investment Factors**

return policies and promotional allowances. If any of the principal manufacturers of a Subsidiary was experience financial difficulties, quality control problems or delays in the manufacture or delivery of produ or was to raise the price of products substantially or to terminate an arrangement, such events could hav material adverse effect on the results of operation of such Subsidiary and of the Lakah Group. In addition, Lakah Holding Company and its Subsidiaries are exposed to credit and other risks of various otl counterparties, which enter into purchasing, leasing, contracting and other contractual arrangements with Subsidiaries, including the Government and certain of its agencies. There can be no assurance that a particu Subsidiary or the Lakah Group will not suffer adverse consequences if one or more of these counterpart should experience financial difficulties or discontinue or amend the terms of their business relationships w the Lakah Holding Company or its Subsidiaries.

*Cyclicality of the Steel Industry*
The steel industry is highly cyclical. The financial condition, cash flows and results of operations of compar in the industry, including Arab Steel, are affected by general economic conditions and other factors in countries in which their products are sold, including fluctuations in gross domestic product, related mar demand, global production capacity and other factors beyond their control. Since billet is predominar produced for the rebar market and rebar products are used to reinforce concrete in the construction of put and private industrial, residential and infrastructure projects, future economic downturns in the Egypt economy could have a material adverse effect on the results of operations and financial condition of A Steel and the Lakah Group.

*Dependence on Key Personnel*
Most aspects of the Lakah Group's business depend on the services of certain key individuals. Each Subsidi devotes considerable resources to recruiting, training and compensating such individuals. The Lakah Grot success has been significantly dependent on a number of key executives, including Mr. Ramy Lakah a Mr. Michel Lakah. The Lakah Holding Company and its Subsidiaries are also dependent on their ability attract, retain and motivate additional personnel. The loss of the services of any of their executive officers other key employees or their inability to attract, retain or motivate the necessary personnel could hav material adverse effect on the business, results of operations and financial condition of the Lakah Group. "*Directors and Senior Management of the Lakah Group.*" The Lakah Holding Company or its Subsidia may, in the future, experience personnel changes that could have an adverse impact on the financial condit of the Lakah Group.

*Control of the Lakah Holding Company*
As at the date hereof, Messrs Ramy Lakah and Michel Lakah owns approximately 70 per cent. of outstanding shares of the Lakah Holding Company. These shareholders are able to exert substantial con over the Lakah Holding Company and, as long as they directly or indirectly own such shares, they will h the ability to elect all of the Lakah Holding Company's directors, to cast a majority of the votes with resp to virtually all matters submitted to a vote of the Lakah Holding Company's shareholders and to prevel change in the control of the Lakah Holding Company.

*Holding Company Structure and Investments in Associated Companies*
The Lakah Holding Company is a holding company that conducts its current business through investment the Subsidiaries, each of which it controls. As a holding company, the Lakah Holding Company relies dividends and other distributions from these entities to fund its business activities. The ability of these enti to meet their obligations, including under the Guarantee, is subject to, among other things, applicable l. and the financial condition and results of operation of such entities. In addition, on April 5, 1999, the La Holding Company issued bonds in an aggregate principal amount of E£400 million (U.S.$117.6 million). "*The Lakah Holding Company — Indebtedness.*" The Lakah Holding Company has relied and will conti to rely on distributions and other payments from its Subsidiaries to make interest and principal payment respect of these bonds. It is expected that the Lakah Holding Company will also rely on such distributions other payments in order to meet its obligations under the Swiss Loan.

*Devaluation Risk*
The Bonds are denominated and payable in U.S. Dollars. Most of the revenues of the Guarantors are real in Egyptian Pounds. Accordingly, in the event that the Egyptian Pound devalues against the U.S. Dollar, financial condition and results of operations of the Guarantors, in common with other similarly situa Egyptian companies, would be affected. The Central Bank of Egypt has been successful in maintainir

stable currency, although there have been recent instances of partial unavailability of U.S. Dollars at the official exchange rate. There can be no assurance that the Central Bank of Egypt will continue to be willing or able to maintain a stable currency, through intervention in the exchange markets or otherwise.

### Year 2000 Compliance

It is possible that the Lakah Group's currently installed computer systems, software products or other business systems, or those of the Lakah Group's suppliers, potential suppliers, customers or potential customers, working either alone or in conjunction with other software or systems, will not accept input of, store, manipulate and output dates in the years 1999, 2000 or thereafter without errors or interruptions (commonly known as the "Year 2000 Problem"). The Lakah Holding Company and its Subsidiaries have purchased nearly all of their computer infrastructure since 1996 and have conducted preliminary tests on their hardware and software applications, and, as a result, management believes that they will not face any internal effects associated with the Year 2000 Problem; however, there can be no assurance that the tests conducted by the Lakah Holding Company and its Subsidiaries are completely accurate or that they may not experience Year 2000 Problem-related difficulties with outside parties. The expenses of the Lakah Group's efforts to identify and address such problems, or the expenses or liabilities to which the Lakah Holding Company may become subject as a result of such problems, could have a material adverse effect on the business, financial condition and results of operations of the Lakah Group. In addition, suppliers or potential suppliers of the Lakah Group, as well as customers or potential customers of the Lakah Group, may be adversely affected by the Year 2000 Problem, which in turn could lead to a material adverse effect on the business, operating results and financial condition of the Lakah Group.

### Transactions with Related Parties

The Lakah Holding Company entered into several transactions with Related Parties (as defined in the Conditions) in connection with the formation of the Lakah Holding Company and the Restructuring. See "The Lakah Holding Company — History" and "— Restructuring." In addition, the entities now comprising the Lakah Group have historically engaged in transactions, some of which have been significant, with other entities affiliated with the Lakah Family. These include companies in which the Lakah Family currently has an interest, and it is likely that they will continue to do so in the future. Management believes that transactions with such affiliated companies have been conducted on terms no less favorable to the relevant Subsidiary than those that could be obtained from third parties. Each of the Guarantors has agreed with the Trustee that all material transactions between the Guarantors and a Related Party will be conducted on terms no less favorable to the relevant Guarantor than those that could be obtained from third parties.

### Forward-Looking Statements

Certain statements in this Offering Circular about the entities in the Lakah Group, including the Guarantors, are forward-looking in nature. These statements express the views of the management of the Lakah Holding Company and the Subsidiaries and expectations based upon certain assumptions regarding trends in the Egyptian and other Middle Eastern financial markets and regional economies, the political climate in Egypt, the Egyptian health care, medical and industrial sectors and other factors.

There can be no assurance that these assumptions will prove to be correct, that the actual effects of the assumptions, even if correct, will be the same as the anticipated effects or that any such differences will not be material. In particular, the actual financial condition of the Lakah Group and the market value of the Bonds may be adversely affected by future developments affecting inflation, interest rates, taxation, social instability or other economic, political or diplomatic and other matters, over which the Lakah Holding Company has no control. Prospective investors are cautioned not to place reliance on statements in this Offering Circular that are forward-looking in nature. These statements can be identified by the use of words such as "may," "will," "should," "expect," "anticipate," "estimate," "believe," "continue" and similar terminology.

## Considerations relating to the Issuer and the Bonds

### Special Purpose Vehicle

The Issuer is a special purpose company. The Issuer will not have any material assets and will not engage in any business other than (i) issuing, offering and selling the Bonds; (ii) as and to the extent permitted by the Terms and Conditions of the Bonds, issuing other debt securities, in one or more series, guaranteed by the Lakah Holding Company and/or one or more of its Subsidiaries, the proceeds of which will be used to finance the business activities of the Lakah Group; and (iii) engaging in activities incidental thereto.

**Certain Investment Factors**

*Market Liquidity*
There can be no assurance that a secondary market will develop for the Bonds or, if a secondary market there does develop, that it will continue. Accordingly, the purchase of Bonds is suitable only for investors who ca bear the risks of no liquidity and the financial and other risks associated with an investment in Bonds.

In addition, resales of Bonds will be subject to selling restrictions as described herein, including, in particula restrictions on offers and sales in the United States. See "Subscription and Sale" and "Notice to Purchase and Holders of Restricted Bonds and Transfer Restrictions."

*Credit Rating*
It is a condition to the issuance of the Bonds that the Bonds be rated at least BB+ by Fitch IBCA. Prospecti purchasers of Bonds should be aware, however, that a credit rating is not a recommendation by the ratin organization or any other person to buy, sell or hold securities and may be subject to revisions or withdraw at any time by the assigning rating organization.

## Use of Proceeds

The net proceeds from the issue of the Bonds, expected to amount to approximately U.S.$98,500,000 prior to the deduction of transaction expenses, will be used to make a deposit with a Swiss banking institution, which will make the Swiss Loan to the Lakah Holding Company. The Lakah Holding Company will, in turn, make funds available to each of the Subsidiary Guarantors. Ultimately, the funds will be used principally to expand the businesses of certain of the Subsidiary Guarantors in the Medical Care Group, to pay-down or collateralize existing indebtedness of the Lakah Holding Company and for general working capital purposes of the Lakah Group. In particular, the Lakah Holding Company intends to use the proceeds to: (i) fund the acquisition of medical equipment for leasing; (ii) finance its activities in the medical disposable products business; and (iii) expand the number of medical facilities for which Medical Centers Management Company, S.A.E., a non-Guarantor Subsidiary of the Lakah Holding Company, provides management services.

# The Issuer

## General

Lakah Funding Limited is a company incorporated in the British Virgin Islands on October 11, 1999 un the International Business Companies Act (CAP 291) as a company with limited liability. The Issuer has b registered with the Registrar of International Business Companies in the British Virgin Islands. registration number is 347651. The Issuer has no subsidiaries. The principal office of the Issuer is located c/o CITCO B.V.I. Limited, CITCO Building, Wickhams Cay, P.O. Box 662, Road Town, Tortola, Bri Virgin Islands.

The Issuer was established as a special purpose vehicle solely to issue the Bonds and similar debt instrume to finance the business activities of the Lakah Group and to engage in activities incidental thereto. The Iss does not have and is not expected to have any significant general assets and will not engage in any busi other than as described herein.

## Business

The business activities in which the Issuer may engage are limited by its Memorandum of Association and Indenture to (i) issuing the Bonds, entering into related agreements, including the Indenture, the Subscrip Agreement, the Administration Agreement, documents relating to the granting of a charge in connection the Swiss Loan and all other agreements necessary or advisable in connection with its obligations under Bonds; (ii) as and to the extent permitted by the Terms and Conditions of the Bonds, issuing other securities, in one or more series, guaranteed by the Lakah Holding Company and/or one or more o Subsidiaries, the proceeds of which will be used to finance the business activities of the Lakah Group, pled; or assigning the net proceeds thereof to secure loans to the Lakah Holding Company and/or one or more c Subsidiaries and entering into related agreements; and (iii) engaging in activities incidental thereto. Issuer's Memorandum of Association further provides, and the Issuer has covenanted in the Indenture, t so long as the Bonds are outstanding, it will not declare any dividends or have any subsidiaries.

## Share Ownership; Directors

The total authorized capital of the Issuer is U.S. $1,000, divided into 100 ordinary shares having a par v of U.S. $10 per share; all such shares have been issued, are fully paid-up and non-assessable and are owne the Lakah Holding Company. There have been no changes in the capital of the Issuer since the date c incorporation. Each of the directors of the Issuer is also a director of the Lakah Holding Company.

## Administrative Agent

Pursuant to the Administration Agreement, the Issuer has delegated certain ministerial and administr: duties with respect to the Issuer to CITCO B.V.I. Limited (the *"Administrative Agent"*). The Administr: Agent will provide accounting, clerical and administrative services to the Issuer. The Administrative A may, but will be under no obligation to, employ third parties to provide services (including those listed ab to the Issuer. It is expected that the Administrative Agent will delegate certain of its administr: responsibilities to other parties, including its affiliates. The Administrative Agent's offices are at CITCO B Limited, CITCO Building, Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands.

**The Issuer**

**Financial Statements**

The Issuer is not required by British Virgin Islands law to prepare or publish financial statements. Since the date of its incorporation, no financial statements of the Issuer have been prepared.

The table below sets out the unaudited capitalization and long-term indebtedness of the Issuer as at December 6, 1999 (assuming issuance of the Bonds).

| Unaudited capitalization of the Issuer | (U.S.$) |
|---|---|
| **Share capital** | |
| 1,000 fully-paid, ordinary shares having a par value of U.S.$10 each ........................................................ | 10,000 |
| **Long-term indebtedness** | |
| The Bonds ............................................................................................................................................... | 100,000,000 |
| Total ........................................................................................................................................................ | 110,000,000 |

# Capitalization of the Lakah Holding Company

**Liabilities and Shareholders' Equity**

The following table sets forth, on a consolidated basis, the Lakah Holding Company's (i) cash, c: equivalents and short-term investments, (ii) long-term indebtedness and (iii) capitalization, in each case, a: June 30, 1999 on an actual basis and as adjusted to reflect the Capital Increase on a fully paid-in basis and issuance of the Bonds. The information set forth is derived from, and should be read in conjunction with, audited consolidated financial statements of the Lakah Holding Company as at and for the six-month per ended June 30, 1999, which are included elsewhere in this Offering Circular.

|  | As at June 30, 1999 Actual U.S.$[2] | As Adjuste L |
|---|---|---|
| Cash, cash equivalents and short-term investments | 35,803,773 | 69,636, |
| Long-term debt, net of current portion | 234,253,678[3] | 334,253, |
| Minority interests | 7,284,618 | 22,355, |
| Shareholders' equity | 382,079,025 | 474,726, |
| Reserves, retained earnings | — |  |
| Total capitalization | 659,421,094 | 900,971. |

Notes:

(1)  *As adjusted to reflect the Capital Increase of 35 million shares and the issuance of the Bonds.*

(2)  *Solely for the convenience of the reader, the translation of Egyptian pounds to U.S. Dollars has been made at the ra U.S.$1 = E£3.40.*

(3)  *Consists principally of the E£400 million (U.S. $117.6) bonds issued on April 5, 1999.*

Save as provided above, there has been no change in the issued or paid-in share capital of the Lakah Hol Company nor has there been any material change in the consolidated long-term indebtedness shareholders' equity of the Lakah Holding Company since June 30, 1999.

# Selected Financial and Operating Information for the Lakah Group

The following information has been derived from, should be read in conjunction with, and is qualified in its entirety by reference to: (i) the audited consolidated financial statements of the Lakah Holding Company as at and for the six-month period ended June 30, 1999; (ii) the unaudited consolidated pro forma financial statements of the Lakah Holding Company as at and for the twelve-month period ended December 31, 1998, which have been prepared on the basis that the Restructuring occurred at the beginning of 1998 (see "*Lakah Holding Company — Restructuring*"); (iii) the audited financial statements of the Subsidiary Guarantors as at and for the twelve-month periods ended December 31, 1996, 1997 and 1998 and for the six-month period ended June 30, 1998 and 1999; and (iv) the other information included elsewhere in this Offering Circular. The financial information referred to in (i) and (ii) above has been prepared in accordance with IAS and reflects inter-company eliminations and the financial information referred to in (iii) above has been prepared in accordance with EAS. Cherif Mohamed Hammouda, a member of RSM International, and Mostafa Shawki & Co Deloitte & Touche, the Lakah Holding Company's auditors, have advised the Lakah Holding Company that there are no material differences between EAS and IAS as they pertain to the financial statements of the Lakah Holding Company and its Subsidiaries. IAS differs in certain significant respects from U.S. GAAP. For a narrative description of the principal differences between IAS and U.S. GAAP relevant to the Lakah Holding Company, see "*Annex A: Summary of Certain Significant Differences Between IAS and U.S. GAAP.*" The information provided for the six-month period ended June 30, 1999 is not necessarily indicative of the results for the year ending December 31, 1999. See "*Management's Discussion and Analysis of Financial Condition and Results and Operations of the Lakah Group.*"

**Selected Financial and Operating Information for the Lakah Group**

## COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP) S.A.E.[1]

**CONSOLIDATED BALANCE SHEET**
**As of June 30, 1999**

| | 30-6-99 U.S.$[2] | 30-6-99 EE | 31-12-98 EE | Pro forr 31-12- |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current Assets** | | | | |
| Cash and Cash Equivalent............... | 35,803,773 | 121,732,827 | 18,165,619 | 60,292,5 |
| Debtors — Short Term Balances (net)[3]..... | 146,907,290 | 499,484,787 | 506,392,231 | 495,668,8 |
| Inventory .......................................... | 88,171,914 | 299,784,506 | 194,697,123 | 194,697,1 |
| Work in Progress............................. | 50,882,286 | 172,999,774 | 109,353,565 | 104,770,3 |
| Total Current Assets....................... | 321,765,263 | 1,094,001,894 | 828,608,538 | 855,428,8 |
| **Long Term Assets** | | | | |
| Accounts Receivables — Long Term[4] ....... | 53,843,891 | 183,069,229 | 167,640,320 | 167,640,3 |
| Long Term Investment...................... | 96,780,052 | 329,052,176 | 262,135,125 | 258,628,0 |
| Fixed Assets — (net)...................... | 132,919,071 | 451,924,840 | 394,603,343 | 354,338,0 |
| Projects under Construction .......... | 12,357,585 | 42,015,790 | 164,982,129 | 136,506,2 |
| Goodwill.......................................... | 76,058,795 | 258,599,902 | 248,020,160 | 252,776,6 |
| Deferred Expenses — (net)............ | 9,182,188 | 31,219,440 | 38,361,296 | 34,340,0 |
| Total Long Term Assets ................. | 381,141,581 | 1,295,881,377 | 1,275,742,373 | 1,204,229,3 |
| Total Assets.................................... | 702,906,844 | 2,389,883,271 | 2,104,350,911 | 2,059,658,2 |
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| Due to Banks.................................. | 36,427,809 | 123,854,551 | 171,858,623 | 171,858,6 |
| Current Portion of Long Term Debt.......... | 12,955,244 | 44,047,830 | 36,448,677 | 36,448,6 |
| Creditors Short Term Balances[5] ............... | 9,858,372 | 33,518,466 | 178,828,069 | 177,951,6 |
| Other Credit Balances .................. | 4,227,941 | 14,375,000 | 12,933,747 | |
| Provisions[6]...................................... | 15,820,156 | 53,788,531 | 22,682,664 | 22,655,5 |
| Total Current Liabilities ............... | 79,289,523 | 269,584,378 | 422,751,780 | 408,914,5 |
| **Long Term Liabilities** | | | | |
| Long Term Loans ........................... | 43,077,207 | 146,462,505 | 224,917,977 | 197,470, |
| Bonds[7]............................................ | 191,176,471 | 650,000,000 | 250,000,000 | 250,000, |
| Creditors — Long Term Balances ............. | — | — | 13,459,153 | 13,459, |
| Total Long Term Liabilities....................... | 234,253,678 | 796,462,505 | 488,377,130 | 460,929, |
| Minority Interest........................... | 7,284,618 | 24,767,702 | 43,342,001 | 39,934, |
| **Shareholders' Equity** | | | | |
| Issued and Subscribed capital ..... | 441,141,176 | 1,499,880,000 | 1,149,880,000 | 1,149,880, |
| Unpaid Installments....................... | (92,647,059) | (315,000,000) | — | |
| Paid up Capital.............................. | 348,494,118 | 1,184,880,000 | 1,149,880,000 | 1,149,880, |
| Net Profit for the Period............... | 33,584,908 | 114,188,686 | — | |
| Total Shareholders' Equity ........... | 382,079,025 | 1,299,068,686 | 1,149,880,000 | 1,149,880, |
| Total Liabilities and Shareholders' Equity.. | 702,906,844 | 2,389,883,271 | 2,104,350,911 | 2,059,658, |

Selected Financial and Operating Information for the Lakah Group

**HOLDING COMPANY FOR FINANCIAL INVESTMENTS
LAKAH GROUP (S.A.E.)**

**CONSOLIDATED INCOME STATEMENT
For The Period From January 1, 1999 To June 30, 1999**

| | 30-6-99[2]<br>US $ | 30-6-99<br>E£ | 31-12-98<br>E£ | Proforma<br>31-12-98<br>E£ |
|---|---|---|---|---|
| Net Sales.............................................. | 218,862,540 | 744,132,637 | 674,363,025 | 649,908,794 |
| **Less** | | | | |
| Cost of Sales........................................ | (143,968,929) | (489,494,360) | (450,768,617) | (439,003,194) |
| Gross Profit.......................................... | 74,893,611 | 254,638,277 | 223,594,408 | 210,905,600 |
| **Less** | | | | |
| General and Administrative Expenses ........ | 13,005,745 | 44,219,534 | 40,239,567 | 40,239,567 |
| Financing Expenses.............................. | 10,967,098 | 37,288,132 | 57,929,846 | 57,929,846 |
| Depreciation and Amortization .................. | 3,738,834 | 12,712,034 | 1,495,703 | 1,495,703 |
| Foreign Exchange Loss ............................ | 43,264 | 147,096 | 353,010 | 353,010 |
| Provision for Doubtful Debts .................... | 1,894,588 | 6,441,599 | 4,997,615 | 4,997,615 |
| Total Expenses..................................... | 29,649,528 | 100,808,395 | 105,015,741 | 105,015,741 |
| Net Profit for the Period before Minority<br>Interest and Income Taxes...................... | 45,244,083 | 153,829,882 | 118,578,667 | 105,889,859 |
| Minority Interest.................................. | (980,408) | (3,333,386) | (4,368,275) | (4,219,614) |
| Provision for Income Taxes........................ | (10,678,768) | (36,307,810) | (20,980,046) | (15,650,747) |
| Net Profit for the Period............................ | 33,584,908 | 114,188,686 | 93,230,346 | 86,019,498 |
| Earning Per Share........................................ | 0.22 | 0.76 | 0.81 | 0.75 |

*Notes:*

(1) *The Lakah Holding Company was incorporated in Egypt on November 29, 1998. The financial statements presented for the fiscal year ended December 31, 1998 and the six-month period ended June 30, 1999 reflect the consolidated financial performance of its eight majority held subsidiaries.*

(2) *The Lakah Holding Company maintains its accounts in Egyptian pounds. Translation of Egyptian pounds into U.S. Dollars has been based on an exchange rate of U.S.$1 = E£3.40 (the exchange rate on December 31, 1998). Such translation is only provided as guidance to the reader. On June 30, 1999, the exchange rate was U.S.$1 = E£3.4129.*

(3) *Consists mainly of trade receivables due within one year, other debit balances, letters of credit and letters of guarantee and cash margins under letters of guarantee.*

(4) *Represents long-term lease receivables related to the leasing of medical equipment and which are due within periods ranging from one year to five years.*

(5) *Consists mainly of accounts payable, notes payable and other credit balances.*

(6) *Represents provisions for corporate taxes.*

(7) *Represents the E£250 million 11 per cent. bonds due 2005 issued by Arab Steel in September 1997 and the E£400 million 11 per cent. bonds due 2006 issued by the Lakah Holding Company in April 1999.*

# Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group

The following discussion and analysis prepared by management has been derived from, and should be read conjunction with, and is qualified in its entirety by reference to: (i) the audited consolidated finan statements of the Lakah Holding Company as at and for the six-month period ended June 30, 1999; (ii) unaudited consolidated pro forma financial statements of the Lakah Holding Company as at and for twelve-month period ended December 31, 1998, which have been prepared on the basis that the Restructu occurred at the beginning of 1998 (see *"Lakah Holding Company — Restructuring"*); (iii) the aud financial statements of the Subsidiary Guarantors as at and for the twelve-month periods ended December 1996, 1997 and 1998 and for the six-month periods ended June 30, 1998 and 1999; and (iv) the o information included elsewhere in this Offering Circular. The financial information referred to in (i) (ii) above has been prepared in accordance with IAS and reflects inter-company eliminations and the finan information referred to in (iii) above has been prepared in accordance with EAS. Cherif Moha Hammouda, a member of RSM International, and Mostafa Shawki & Co Deloitte & Touche, the La Holding Company's auditors, have advised the Lakah Holding Company that there are no mate differences between EAS and IAS as they pertain to the financial statements included in this Offering Circu IAS differs in certain significant respects from U.S. GAAP. For a narrative description of the princ differences between IAS and U.S. GAAP relevant to the Lakah Holding Company, see *"Annex A: Summar Certain Significant Differences Between IAS and U.S. GAAP."* The information provided for the six-mo period ended June 30, 1999 is not necessarily indicative of the results for the year ending December 31, 1.

## The Lakah Holding Company

The Lakah Holding Company is a holding company incorporated under Egyptian Law 95 of 1992, whic majority owned by Messrs Ramy Lakah and Michel Lakah. The Lakah Holding Company conduct business through eight operating Subsidiaries, organized into two principal groups: the Medical Care Gr comprised of companies active in the supply and leasing of medical equipment, the management of me imaging equipment for medical facilities, turnkey hospital projects and other construction works; and Industrial Group, comprised of companies active in the manufacture of steel billet and lighting prod transportation using heavy trucks and real estate, including the ownership and leasing of a deter manufacturing facility. The Lakah Holding Company believes that, at the date of this Offering Circular, i the largest paid-in issued share capital of companies listed on CASE.

In 1998 on a pro forma consolidated basis, which gives effect to the Restructuring, the Lakah Hol Company generated total revenues of approximately E£650 million (E£674 million on an actual basis be the Restructuring) of which 64 per cent. was generated by Subsidiaries in the Medical Care Group and 3 cent. was generated by Subsidiaries in the Industrial Group. For the first six months of 1999 on a consolid basis, the Lakah Holding Company generated total revenues of approximately E£744 million represen 110 per cent. of the Lakah Holding Company's revenues in 1998. The revenue performance in the firs months of 1999 reflects an increase in revenues of the Subsidiaries in the Medical Care Group, resu primarily from an increase in the volume of turnkey hospital projects comprised of both building equipping of hospitals, increased sales of medical equipment and the sale of four clinics from the Medic Specialized Hospitals, and growth in revenues of Subsidiaries in the Industrial Group, primarily increased sales by Arab Steel of steel billet as a consequence of it being able to increase its production vol in 1999. Historically, the Subsidiaries of the Lakah Holding Company have greater revenues in the first of the year than the second reflecting seasonal healthcare payments from the public sector (prior financial year end in June) and a general slow down in business conditions in the second half of the (mainly due to holidays in the July-August period and Ramadam).

In 1998, on a pro forma consolidated basis, the Lakah Holding Company's net income was approxim E£86 million (E£93 million on an actual basis before the Restructuring) of which approximately 60 per was attributable to Subsidiaries in the Medical Care Group and 40 per cent. was attributable to Subsid in the Industrial Group. For the first six months of 1999, on a consolidated basis, net income approximately E£114 million, which represents 132 per cent. of the Lakah Holding Company's net inco 1998, of which 54 per cent. was attributable to Subsidiaries in the Medical Care Group and 46 per attributable to Subsidiaries in the Industrial Group. The net income performance in the first six mont 1999 reflects the increase in revenues referred to above, the decline in direct cost of sales and managem

**Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group**

ability to control its indirect costs. The increase in net income is attributable to economy of scale efficiencies, a reduction in the use of external subcontractors, increases in margins and an increase in the volume of the production of billets.

As at June 30, 1999 on a consolidated basis, the Lakah Holding Company had total assets of approximately E£2 billion of which 48 per cent. was attributable to Subsidiaries in the Medical Care Group and 52 per cent. was attributable to Subsidiaries in the Industrial Group. Arab Steel, with its large production facility, represented 25 per cent. of the total assets of the Lakah Holding Company at that date. As at June 30, 1999 on a consolidated basis and December 31, 1998 on a pro forma consolidated basis, total long term assets were approximately E£1 billion. As at June 30, 1999 on a consolidated basis and December 31, 1998 on a pro forma consolidated basis, current assets were approximately E£1 billion.

As at June 30, 1999 on a consolidated basis and December 31, 1998 on a pro forma consolidated basis, Lakah Holding Company shareholders' equity amounted to approximately E£1.3 billion and E£1.1 billion, respectively. The increase reflects the Global Offering, as defined herein.

As at June 30, 1999 on a consolidated basis and December 31, 1998 on a pro forma consolidated basis, current liabilities of the Lakah Holding Company were approximately E£270 million and approximately E£409 million, respectively. As at June 30 1999 on a consolidated basis and December 31, 1998 on a pro forma consolidated basis, long term liabilities amounted to approximately E£796 million and approximately E£461 million, respectively. As at June 30, 1999 on a consolidated basis and December 31, 1998 on a consolidated pro forma basis, total liabilities were approximately E£2.4 billion and approximately E£2 billion, respectively, of which long term debt represented approximately 80 per cent. and 54 per cent. as at June 30, 1999 and December 31, 1998, respectively. The increase in long-term debt reflects the Lakah Holding Company's issue in April 1999 of E£400 million 11 per cent. bonds due 2006.

The Lakah Holding Company currently conducts all of its manufacturing activities in, and derives a significant portion of sales from, Egypt. The economy of Egypt has been characterized by significant Government involvement through direct ownership of enterprises and extensive regulation of market conditions, including foreign investment, and foreign trade and financial services. In 1991, the Government commenced an economic reform program, the objectives of which are macroeconomic stability, financial sector reform and the reduction of price distortions and obstacles to foreign trade. This economic reform program, which has the support of the IMF and the World Bank, has significantly improved the performance of the Egyptian economy since 1991. Egypt experienced positive real GDP growth averaging 4.9 per cent. in a five year period from June 30, 1993 to June 30, 1998, and the World Bank forecasts that real GDP growth will continue at an annual rate of four to five per cent. over the next five years.

## MEDEQUIP

### Results of Operations

June 30, 1999 versus June 30, 1998
*Net sales.* Medequip's sales in the first six months of 1999 were approximately E£330 million compared to approximately E£175 million for the same period in 1998. The sales performance in the first six months of 1999 reflects the increased volume of medical equipment sold and leased and higher revenues from turnkey projects awarded during 1998 and executed in the first six months of 1999 primarily due to (i) an increase in the Ministry of Health and Population's budget for health care spending, (ii) an increase in the number of projects to upgrade existing private hospitals and (iii) an increase in investments in private hospitals and medical centers.

*Cost of sales.* Medequip's cost of sales in the first six months of 1999 was approximately E£230 million compared to approximately E£130 million for the same period in 1998. Medequip's cost of sales as a percentage of sales fell to 70 per cent. in the first six months of 1999, compared to 74 per cent. for the same period in 1998. This percentage decrease reflects primarily the decline in volume of subcontracted work, an increase in the utilization of in-house facilities and an improvement of margins on sales of equipment.

**Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group**

*Gross profit.* Medequip's gross profit in the first six months of 1999 was approximately E£100 million compared to approximately E£45 million for the same period in 1998. Gross profit as a percentage of sales was 30 per cent. during the first six months of 1999 compared to 26 per cent. for the same period in 1998. This percentage increase resulted primarily from the increase in sales and the decline in direct costs to sales.

*General and administrative expenses.* Medequip's general and administrative expenses were approximately E£23 million in the first six months of 1999 compared to approximately E£15 million for the same period in 1998. General and administrative expenses as a percentage of sales were seven per cent. for the first six months of 1999 compared to nine per cent. for the same period in 1998.

*Net operating profit (before interest and finance expenses).* Medequip's net operating profit (before interest and finance expenses) was approximately E£51 million in the first six months of 1999 compared to approximately E£25 million for the same period in 1998.

*Interest and finance expense.* Medequip's interest and finance expense in the first six months of 1999 was approximately E£7 million compared to approximately E£10 million for the same period in 1998. Interest and finance expense as a percentage of sales was two per cent. in the first six months of 1999 compared to six per cent. for the same period in 1998. This percentage increase resulted primarily from a reduction in bank borrowings financed primarily by the loan of approximately E£58 million from the Lakah Holding Company to Medequip in April 1999.

*Net profit.* As a result of the foregoing, Medequip's net profit was approximately E£44 million in the first six months of 1999 compared to approximately E£15 million for the same period in 1998.

1998 versus 1997

*Net sales.* Medequip's sales in 1998 were approximately E£254 million, which represents 126 per cent. of Medequip's sales of approximately E£201 million in 1997. The sales performance in 1998 reflects an increase in the number of turnkey projects awarded and executed following Medequip's completion of the hospital in Sharm Al Sheik.

*Cost of sales.* Medequip's cost of sales in 1998 was approximately E£186 million, which represents 114 per cent. of Medequip's cost of sales of approximately E£163 million in 1997. Medequip's cost of sales as percentage of sales fell to 74 per cent. in 1998 compared to 81 per cent. in 1997. This percentage decrease was due primarily to management's efficiency in reducing its direct costs through less dependence on sub contractors for certain items in hospital turnkey projects.

*Gross profit.* Medequip's gross profit in 1998 was approximately E£67 million, which represents 179 per cent. of Medequip's gross profit of approximately E£38 million in 1997. Gross profit as a percentage of sale was 26 per cent. during 1998 compared to 19 per cent. in 1997. This percentage increase resulted primarily from the increase in sales and a reduction in direct cost of sales.

*General and administrative expenses.* Medequip's general and administrative expenses were approximately E£26 million in 1998, which represents 119 per cent. of Medequip's general and administrative expenses of approximately E£22 million in 1997. General and administrative expenses as a percentage of sales were ten per cent. during 1998 compared to 11 per cent. in 1997.

*Net operating profit (before interest and finance expenses).* Medequip's net operating profit (before interest and finance expenses) was approximately E£42 million in 1998, which represented 276 per cent. of its net operating profit of approximately E£15 million in 1997.

*Interest and finance expense.* Medequip's interest and finance expense in 1998 was approximately E£15 million, which represents 179 per cent. of its interest and finance expenses of approximately E£8 million in 1997. Interest and finance expense as a percentage of sales was six per cent. in 1998 compared to four per cent. in 1997. This percentage increase resulted primarily from an increase in bank borrowings, primarily long term facilities of approximately E£46 million to finance working capital needs for Medequip's growing business.

**Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group**

*Net profit.* As a result of the foregoing, Medequip's net profit was approximately E£20 million in 1998, which represented 483 per cent. of its net profit of approximately E£4 million in 1997.

**1997 versus 1996**

*Net sales.* Medequip's sales in 1997 were approximately E£201 million, which represents 118 per cent. of Medequip's sales of approximately E£170 million in 1996. The increased sales figure in 1997 reflects the growth in Medequip's performance primarily in hospital turnkey projects, notably Dar el Fouad and Applicators Hospital.

*Cost of sales.* Medequip's cost of sales in 1997 was approximately E£163 million, which represents 101 per cent. of Medequip's cost of sales of approximately E£162 million in 1996. Medequip's cost of sales as a percentage of sales fell to 81 per cent. in 1997 compared to 95 per cent. in 1996. This percentage decrease was due primarily to management's ability to control its direct costs, in particular through less dependence on sub-contractors.

*Gross profit.* Medequip's gross profit in 1997 was approximately E£38 million, which represents 437 per cent. of Medequip's gross profit of approximately E£9 million in 1996. Gross profit as a percentage of sales was 19 per cent. during 1997 compared to five per cent. in 1996. This percentage increase resulted primarily from the increase in sales and a decline in direct costs to sales.

*General and administrative expenses.* Medequip's general and administrative expenses were approximately E£22 million in 1997, which represents 641 per cent. of Medequip's general and administrative expenses of approximately E£3 million in 1996. General and administrative expenses as a percentage of sales were 11 per cent. during 1997 compared to two per cent. in 1996. The percentage increase resulted primarily from the rise in indirect costs, in particular increased salary costs, primarily due to business growth.

*Net operating profit (before interest and finance expenses).* Medequip's net operating profit (before interest and finance expenses) was approximately E£15 million in 1997, which represented 283 per cent. of its net operating profit of approximately E£5 million in 1996.

*Interest and finance expense.* Medequip's interest and finance expense in 1997 was approximately E£8 million, which represents approximately 200 per cent. of its interest and finance expenses of approximately E£4 million in 1996. Interest and finance expense as a percentage of sales was four per cent. in 1997 compared to three per cent. in 1996. This percentage increase resulted primarily from the increase in bank borrowings to meet the growing needs of the business.

*Net profit.* As a result of the foregoing, Medequip's net profit was approximately E£4 million in 1997, which represented 373 per cent. of its net profit of approximately E£1 million in 1996.

**Liquidity and Capital Resources**

As at June 30, 1999, Medequip had total assets of approximately E£614 million versus approximately E£444 million and approximately E£171 million as at December 31, 1998 and 1997, respectively. The increase in assets reflects an increase in inventory and work in progress and growth in the number of turnkey contracts.

As at June 30, 1999, long-term assets were approximately E£129 million compared to approximately E£111 million and approximately E£50 million as at December 31, 1998 and 1997, respectively. Lease receivables in respect of equipment leased by Medequip represented 92 per cent., 89 per cent. and 80 per cent. of total long-term assets as at June 30, 1999 and December 31, 1998 and 1997, respectively.

Current assets were approximately E£485 million, approximately E£234 million and approximately E£121 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. Inventory and receivables represented 41 per cent., 41 per cent. and 31 per cent. of total current assets as at June 30, 1999 and December 31, 1998 and 1997, respectively. The decrease in the first six months of 1999 primarily reflects a reduction in advance payments to suppliers.

**Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group**

Current liabilities were approximately E£118 million, approximately E£74 million and approxima E£47 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. Outstanding debt repays within the relevant year in respect of long-term loans and short-term bank borrowings represented 64 cent., 62 per cent. and 32 per cent. of total current liabilities as at June 30, 1999 and December 31, 1998. 1997, respectively. The increase in outstanding debt repayable reflects greater reliance on bank borrowi required to finance working capital needs and a decrease in accounts payable and creditors' short-t balances in absolute terms.

Shareholders' equity was approximately E£168 million, approximately E£124 million and approxima E£24 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. The increase in 1 reflected an increase in paid-in share capital of E£80 million and net profit for 1998 of approxima E£20 million.

In 1998, Medequip generated its liquidity requirements from two sources: paid-in capital of E£80 million long-term bank borrowings of approximately E£45 million. As at December 31, 1998, Medequip approximately E£4 million cash-in-hand and at banks. In 1997, Medequip generated its liqui requirements from two sources: long-term bank borrowings of approximately E£35 million and short-t bank borrowings of approximately E£2 million.

Total cash used in investment activities in 1998 of approximately E£124 million represented prim financing costs of approximately E£59 million related to the acquisition of equipment subsequently on-le and financing costs of approximately E£65 million related to inventory and receivables. Of approxima E£41 million used in 1997 for investment activities, approximately E£40 million represented financing related to the acquisition of equipment subsequently on-leased.

## TMSE

### Results of Operations

June 30, 1999 versus June 30, 1998
*Net sales.* TMSE's net sales in the first six months of 1999 were approximately E£124 million compare approximately E£100 million for the same period in 1998. Sales in the first six months of 1999 r sustained growth in business activity primarily in Egypt, Turkey and Jordan and increased sales of "high MRI scanners.

*Cost of sales.* TMSE's cost of sales in the first six months of 1999 was approximately E£89 million comp to approximately E£77 million for the same period in 1998. TMSE's cost of sales as a percentage of sale: 71 per cent. in the first six months of 1999 compared to 77 per cent. for the same period in 1998. percentage reduction in the cost of sales was effected by TMSE's management's ability to achieve l margins from suppliers.

*Gross profit.* TMSE's gross profit in the first six months of 1999 was approximately E£36 million comp to approximately E£23 million for the same period in 1998. Gross profit as a percentage of sales was 2 cent. in the first six months of 1999 compared to 23 per cent. for the same period in 1998.

*General and administrative expenses.* TMSE's general and administrative expenses were approxin E£9 million in the first six months of 1999 compared to approximately E£6 million for the same peri 1998. General and administrative expenses as a percentage of sales were seven per cent. in the first six m of 1999 compared to six per cent. for the same period in 1998.

*Net operating profit (before interest and finance expenses).* TMSE's net operating profit (before interes finance expenses) was approximately E£26 million in the first six months of 1999 compared to approxin E£16 million for the same period in 1998. This increase reflects better margins on sales.

*Interest and finance expense.* TMSE's interest and finance expense in the first six months of 199! approximately E£3 million compared to approximately E£3 million for the same period in 1998. Intere:

**Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group**

finance expense as a percentage of sales remained constant at three per cent. in the first six months of 1999 and 1998.

*Net profit.* As a result of the foregoing, TMSE's net profit was approximately E£16 million in the first six months of 1999 compared to approximately E£10 million for the same period in 1998.

**1998 versus 1997**
*Net sales.* TMSE's sales in 1998 were approximately E£139 million, which represents 118 per cent. of TMSE's 1997's sales of approximately E£117 million in 1997. The increased sales in 1998 reflect the growth in sales of medical equipment due to the demand for radiology in the private and public sector.

*Cost of sales.* TMSE's cost of sales in 1998 was approximately E£104 million, which represents 111 per cent. of TMSE's cost of sales of approximately E£93 million in 1997. TMSE's cost of sales as a percentage of sales fell to 75 per cent. in 1998 compared to 80 per cent. in 1997. This percentage decrease reflects management's ability to realize greater economies in carrying out finishing work and to reduce its direct costs through acquiring discounts from its suppliers for volume sales.

*Gross profit.* TMSE's gross profit in 1998 was approximately E£35 million, which represents 148 per cent. of TMSE's gross profit of approximately E£24 million in 1997. Gross profit as a percentage of sales was 25 per cent. during 1998 compared to 20 per cent. in 1997. This percentage increase resulted primarily from an increase in sales as well as a decrease in direct cost of sales.

*General and administrative expenses.* TMSE's general and administrative expenses were approximately E£9 million in 1998, which represents 111 per cent. of TMSE's general and administrative expenses of approximately E£8 million in 1997. General and administrative expenses as a percentage of sales remained constant at approximately six per cent. in 1998 and 1997.

*Net operating profit (before interest and finance expenses).* TMSE's net operating profit (before interest and finance expenses) was approximately E£24 million in 1998, which represented 179 per cent. of its net operating profit of approximately E£14 million in 1997.

*Interest and finance expense.* TMSE's interest and finance expense in 1998 was approximately E£6 million, which represents 117 per cent. of its interest and finance expenses of approximately E£5 million in 1997. Interest and finance expense as a percentage of sales remained constant at four per cent. in 1998 and 1997.

*Net profit.* As a result of the foregoing, TMSE's net profit was approximately E£13 million in 1998, which represented 208 per cent. of its net profit of approximately E£6 million in 1997.

**1997 versus 1996**
*Net sales.* TMSE's sales in 1997 were approximately E£117 million, which represents 825 per cent. of TMSE's sales of approximately E£14 million in 1996. The sales performance in 1997 reflects the growth in business primarily through acquiring a distribution agreement for the supply of Toshiba medical equipment in Turkey, as well as significant orders from the Egyptian public sector.

*Cost of sales.* TMSE's cost of sales in 1997 was approximately E£93 million, which represents 834 per cent. of TMSE's cost of sales of approximately E£11 million in 1996. TMSE's cost of sales as a percentage of sales remained constant at 80 per cent. in 1997 and 1996.

*Gross profit.* TMSE's gross profit in 1997 was approximately E£24 million, which represents 768 per cent. of TMSE's gross profit of approximately E£3 million in 1996. Gross profit as a percentage of sales remained constant at 20 per cent. in 1997 and 1996.

*General and administrative expenses.* TMSE's general and administrative expenses were approximately E£8 million in 1997, which represents 426 per cent. of TMSE's general and administrative expenses of approximately E£2 million in 1996. General and administrative expenses as a percentage of sales were seven per cent. in 1997 compared to 13 per cent. in 1996. The percentage decrease reflects management's success in reducing its indirect costs despite the increase in sales.

**Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group**

*Net operating profit (before interest and finance expenses).* TMSE's net operating profit (before interest and finance expenses) was approximately E£14 million in 1997 compared to approximately E£1 million in 1996

*Interest and finance expense.* TMSE's interest and finance expense in 1997 was approximately E£5 million compared to approximately E£0.4 million in 1996. Interest and finance expense as a percentage of sales was four per cent. in 1997 compared to three per cent. in 1996. This percentage increase reflects the rise in bank borrowing to meet the growth in sales.

*Net profit.* As a result of the foregoing, TMSE's net profit was approximately E£6 million in 1997, compared to approximately E£0.5 million in 1996.

### Liquidity and Capital Resources

As at June 30, 1999, TMSE had total assets of approximately E£186 million versus approximately E£153 million and approximately E£141 million as at December 31, 1998 and 1997, respectively.

Long-term assets were approximately E£68 million, approximately E£73 million and approximately E£82 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. Lease receivables in respect of equipment leased by TSME represented approximately 95 per cent. of total long-term assets as at June 30, 1999 and December 31, 1998 and 1997, respectively.

Current assets were approximately E£118 million, approximately E£81 million and approximately E£58 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. Inventory, receivables and other debit balances represented 83 per cent., 93 per cent. and 91 per cent. of total current assets as at June 30, 1999 and December 31, 1998 and 1997, respectively. Other current assets included cash-in-hand and at banks, letters of credit and letters of guarantee cash margins.

Current liabilities were approximately E£65 million, approximately E£70 million and approximately E£60 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. Outstanding short-term bank borrowings represented 62 per cent., 64 per cent. and 45 per cent. of total current liabilities as June 30, 1999 and December 31, 1998 and 1997, respectively.

Shareholders' equity was approximately E£82 million, approximately E£67 million and approximately E£24 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. The increase in 199 reflects an increase in paid-in share capital of approximately E£30 million and net profit for 1998 approximately E£13 million.

In 1998, TMSE generated its liquidity requirements from three sources: paid-in capital of E£30 million, short term bank borrowings of approximately E£13 million and the collection of long term receivables approximately E£9 million. As at December 31, 1998, TMSE had approximately E£3 million cash-in-hand and at banks. In 1997, TMSE generated its liquidity requirements primarily from two sources: long-term bank borrowings of approximately E£57 million and a supplier's credit of approximately E£29 million. As December 31, 1997, TMSE had approximately E£3 million cash-in-hand and at banks.

Total cash used in investment activities in 1998 was approximately E£51 million and was used primarily reduce long term bank borrowings. Total cash used in investment activities in 1997 was approximat E£88 million and was used primarily to reduce short-term borrowing and to finance in part the acquisition medical equipment for on-leasing.

### Arab Steel

### Results of Operations

June 30, 1999 versus June 30, 1998
*Net sales.* Arab Steel's sales in the first six months of 1999 were approximately E£99 million compared approximately E£107 million for the same period in 1998. The decline in net sales in the first six months 1999 reflects lower billet prices in the first six months of 1999 compared to the same period in 19

**Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group**

notwithstanding increased production volumes. During the first six months of 1999, production volumes for Arab Steel were approximately 142 tons of billet compared to approximately 124 tons during the same period of 1998.

*Cost of sales.* Arab Steel's cost of sales in the first six months of 1999 was approximately E£60 million compared to approximately E£66 million for the same period in 1998. Arab Steel's cost of sales as a percentage of net sales remained constant at approximately 61 per cent. in the first six months of 1999 and 1998.

*Gross profit.* Arab Steel's gross profit in the first six months of 1999 was approximately E£30 million compared to approximately E£35 million for the same period in 1998. Gross profit as a percentage of total sales was 30 per cent. during the first six months of 1999 compared to 32 per cent. for the same period in 1998.

*General and administrative expenses.* Arab Steel's general and administrative expenses were approximately E£2 million in the first six months of 1999 compared to approximately E£1 million for the same period in 1998. General and administrative expenses as a percentage of sales were two per cent. during the first six months of 1999 compared to one per cent. in for the same period in 1998.

*Net operating profit (before interest and finance expenses).* Arab Steel's net operating profit (before interest and finance expenses) was approximately E£27 million in the first six months of 1999 compared to approximately E£33 million for the same period in 1998. Net operating profit as a percentage of sales represented 27 per cent. of total sales during the first six months of 1999 and 30 per cent. for the same period in 1998.

*Interest and finance expense.* Arab Steel's interest and finance expense in the first six months of 1999 was approximately E£16 million compared to approximately E£11 million for the same period in 1998. Interest and finance expense as a percentage of sales was 16 per cent. in the first six months of 1999 compared to 10 per cent. for the same period in 1998.

*Net profit.* As a result of the foregoing, Arab Steel's net profit was approximately E£29 million in the first six months of 1999 compared to approximately E£22 million for the same period in 1998. The increase in net profits despite the decline in net sales reflects the extraordinary gain received by Arab Steel in the first six months of 1999 of approximately E£18 million being monies received from insurers under a settlement claim made by Arab Steel in 1998 for loss of profits due to contamination of gas supplied to the factory.

**Liquidity and Capital Resources**

As at June 30, 1999, Arab Steel had total assets of approximately E£597 million versus approximately E£560 million and approximately E£378 million as at December 31, 1998 and 1997, respectively.

Long-term assets were approximately E£374 million, approximately E£374 million and approximately E£245 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. Fixed assets comprised 61 per cent., 56 per cent. and 89 per cent. of total long-term assets as at June 30, 1999 and December 31, 1998 and 1997, respectively. Long-term investments, primarily in respect of the establishment and capitalization in 1998 of a subsidiary company, Arab Cast Iron & Steel Production, S.A.E. ("ACIS"), comprised 33 per cent. of total long-term assets as at June 30, 1999 and December 31, 1998.

Current assets were approximately E£223 million, approximately E£186 million and approximately E£133 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. Inventory and receivables represented 63 per cent., 62 per cent. and 55 per cent. of total current assets as at June 30, 1999 and December 31, 1998 and 1997, respectively. Other current assets included debts, short-term balances, letters of credit, advances to suppliers and cash-in-hand at banks.

Current liabilities were approximately E£39 million, approximately E£24 million and approximately E£97 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. Outstanding debt repayable within the relevant year in respect of short-term bank borrowings represented 56 per cent., 65 per cent. and 80 per cent. of total current liabilities as at June 30, 1999 and December 31, 1998 and 1997, respectively. The

**Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group**

decrease in outstanding debt as at June 30, 1999 and December 31, 1998 versus December 31, 1997 refle[...] less reliance on bank borrowings required to finance liquidity needs.

Shareholders' equity was approximately E£308 million, approximately E£279 million and approximate[...] E£123 million as at June 30, 1999 and December 31, 1998 and 1997, respectively. The increase in the first [...] months of 1999 reflected an increase in retained profit of approximately E£29 million and an increase in pa[...] in share capital of E£230 million.

In 1998, Arab Steel generated its liquidity requirements from two sources: paid-in capital of E£230 mill[...] and proceeds from its bond issue on September 29, 1998 of E£250 million. See *"Arab Steel Factory Fact[...] S.A.E."* As at December 31, 1998, Arab Steel had approximately E£2 million cash-in-hand and at bank[...]

Total cash used in investment activities in 1998 was approximately E£250 million, of which approxima[...] E£124 million was invested in ASIC and approximately E£126 was used to purchase inventory, provide cr[...] to customers and decrease accounts payable. Of approximately E£287 million used in 1997 for investm[...] activities, approximately E£158 million was used to acquire property, machinery and equipment.

# Lakah Holding Company

**Overview**

The Lakah Holding Company is a holding company incorporated in Egypt on November 29, 1998 under Law 95 of 1992, a majority of the outstanding shares of which are owned by Messrs Ramy Lakah and Michel Lakah. The Lakah Holding Company conducts its business through eight operating Subsidiaries, organized into the Medical Care Group, comprised of companies active in the supply and leasing of medical equipment, the management of medical imaging equipment for medical facilities, turnkey hospital projects and other construction works, namely Medequip for Trading & Contracting, S.A.E., Trading Medical System Egypt, S.A.E., Medical Centers Management Company, S.A.E. ("MCMC"), Quest Consult, S.A.E. ("Quest"), and the Industrial Group, comprised of companies active in the manufacture of steel billet, lighting products, transportation using heavy trucks and real estate, including the owning and leasing of a detergent manufacturing facility, namely Arab Steel Factory, S.A.E., Amitrade for Commerce & Contracting, S.A.E. ("Amitrade"), Industrial Consumer Company, S.A.E. ("ICC") and Industrial Investment Company, S.A.E. ("IIC"). The Lakah Holding Company believes that as of the date of this Offering Circular it has the largest paid-in issued share capital of companies listed on CASE.

The chart below sets out the organizational structure of the Lakah Holding Company.



As at June 30, 1999 on a consolidated basis, the Lakah Holding Company had total assets of approximately E£1 billion (U.S.$703 million) of which 48 per cent. was attributable to Subsidiaries in the Medical Care Group and 52 per cent. was attributable to Subsidiaries in the Industrial Group, and shareholders' equity of approximately E£1 billion (U.S.$382 million). In 1998 on a pro forma consolidated basis, giving effect to the Restructuring, the Lakah Holding Company generated total revenues of approximately E£650 million (U.S.$191 million) (E£674 million (U.S.$198 million) on an actual basis before the Restructuring) of which 64 per cent. was generated by Subsidiaries in the Medical Care Group and 36 per cent. was generated by Subsidiaries in the Industrial Group. For the first six months of 1999, on a consolidated basis, the Lakah Holding Company generated total revenues of approximately E£744 million (U.S.$219 million). The Lakah Holding Company's consolidated pro forma net income for 1998 was approximately E£86 million (U.S.$25 million) (E£93 million (U.S.$27 million) on an actual basis before the Restructuring) of which 60 per cent. was attributable to Subsidiaries in the Medical Care Group and 40 per cent. was attributable to Subsidiaries in the Industrial Group. For the six-month period ended June 30, 1999 on a consolidated basis, net income was approximately E£114 million (U.S.$ 34 million) of which 54 per cent. was attributable to Subsidiaries in the Medical Care Group and 46 per cent. was attributable to Subsidiaries in the Industrial Group. See *"Selected Financial and Operating Information for the Lakah Group"* and *"Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group"*. As at June 30, 1999, the Lakah Holding Company and the Subsidiaries had 3,205 employees (including part time employees and independent contractors, whose numbers are not reflected in the employee figures for the Subsidiaries) of whom 25 were employed by the Lakah Holding Company, 825 by Subsidiaries in the Medical Care Group and 2,355 by Subsidiaries in the Industrial Group. The Lakah Holding Company's registered office is located at 68, Merghany Street, Heliopolis, Cairo, Egypt.

**Lakah Holding Company**

**History**

The Lakah Holding Company was incorporated in 1998 as a joint stock company for a term of 25 years which may be extended as permitted by law.

Following is a summary of events leading up to and including the establishment of the Lakah Holdin Company:

| | |
|---|---|
| 1960s:............................................. | The Lakah Family represents various suppliers of medical equipmer throughout Egypt and also has interests in the Egyptian steel industry. |
| 1985: ............................................. | Upon the death of Dr. Raymond Lakah, his son, Mr. Ramy Lakal assumes control of the medical equipment and steel industry activities an soon thereafter is joined by his brother, Mr. Michel Lakah, in running th family business activities. Family business activities expand to includ construction activities, the management of medical facilities and variou investments in industry. |
| mid-1990s:................................... | Establishment of a number of joint stock companies (including th Subsidiaries) directly held by the Lakah Family through which the Laka Family business activities are conducted. |
| November 1998:............................ | The Lakah Family commences transfer of its interests in each of th Subsidiaries and in Scandinavian Company for Investment and Tourist Development, S.A.E. ("Scandinavian") to a new holding company (Laka Holding Company) controlled by the Lakah Family. |
| December 1998: ............................ | Lakah Holding Company has an authorized share capital of E£5 billic and issued share capital of E£1,149,880,000 divided into 114,988,0( shares, par value E£10 each; Lakah Holding Company shares are liste on CASE; Banque du Caire S.A.E. acquires 11,498,800 shar representing 10 per cent. of the issued share capital of Lakah Holdii Company. |
| April 1999:.................................... | Lakah Holding Company issues E£400,000,000 11 per cent. bonds d 2006. |
| June 1999:..................................... | Lakah Holding Company completes the Restructuring (described belo and effects the Capital Increase of 35 million shares at par valt increasing the issued share capital to E£1,499,800,000. |
| July 1999:...................................... | 11,666,667 global depositary shares ("GDSs") each representing 3 shar of the Lakah Holding Company are issued in a global offering. The t proceeds from the issuance of the GDSs are applied in payment of t Capital Increase. |
| August 1999:................................. | GDSs listed on Luxembourg Stock Exchange. |

**Restructuring**

In June 1999, the Lakah Holding Company decided that it should focus on and expand two distinct busin areas, namely medical care and related construction activities and industrial activities. From a balance sh perspective, the Lakah Holding Company regards the Subsidiaries in the Industrial Group with significa fixed asset values as counterbalancing its Subsidiaries in the Medical Care Group, which have lower va fixed assets but generally generate higher levels of income. As the first stage of implementing this strategy, Lakah Holding Company decided to divest from its group Scandinavian and companies in the portfolio of whose activities were unrelated to medical care or non-industrial. Between June 10 and June 16, 1999, following share transfers or agreements to transfer shares (the "Restructuring") were made or entered in