**Lakah Holding Company**

| | Name of the Company[2] | Name of the Seller | Number of Transferred shares | Price per share[1] E£ | Total Amount E£ |
|---|---|---|---|---|---|
| June 10, 1999 ............... | Scandinavian | The Lakah Holding Company | 391,950 | 100 | 39,195,000 |
| June 15, 1999 ............... | Delta Sound Co | IIC | 1,000 | 25 | 25,000 |
| June 15, 1999 ............... | House of Art | IIC | 3,000 | 25 | 75,000 |
| June 15, 1999 ............... | Irena Arts Production | IIC | 2,500 | 25 | 62,500 |
| June 15, 1999 ............... | First Power | IIC | 50,000 | 25 | 1,250,000 |
| June 16, 1999 ............... | International Co for Touristic and Real Estate | IIC | 20,000 | 50 | 1,000,000 |
| June 16, 1999 ............... | Suez Corporation for Iron Works | IIC | 4,998 | 219 | 1,094,452 |

*Notes:*

(1)  *Price per share is equal to the paid-in portion of the par value of the relevant shares, which is 25 per cent. for all of the companies, except for Scandinavian, which is fully paid, and International Co for Touristic and Real Estate, which is paid-in as to 50 per cent.*

(2)  *All transfers have been entered into with the Lakah Family or affiliates thereof. See "The Lakah Family Group of Companies."*

## Share Capital and Issuance of GDSs

On June 28, 1999, the Board of Directors of the Lakah Holding Company authorized the Capital Increase from E£1,149,880,000 to E£1,499,880,000 through the issuance of 35 million shares, resulting in a total outstanding capital stock of 149,988,000 shares. Messrs Ramy Lakah and Michel Lakah each subscribed for 17,500,000 shares and each paid in E£17.5 million representing ten per cent. of the par value of the shares purchased by him. The CMA approved the issuance of the shares on June 30, 1999. On August 1, 1999, 11,666,667 GDSs, each representing three shares, par value E£10 per share, of the Lakah Holding Company, were issued pursuant to the Global Offering of GDSs, which raised U.S.$102,500,000. The GDSs were sold by Messrs Ramy Lakah and Michel Lakah. The net proceeds of the Global Offering were used by Messrs Ramy Lakah and Michel Lakah to pay the balance of the Capital Increase and to reimburse themselves for the 10 per cent. portion of the Capital Increase funded by them prior to the issue date of the GDSs.

As at the date of this Offering Circular, Mr. Ramy Lakah, Mr. Michel Lakah and Banque du Caire, S.A.E. own 38.3 per cent., 30.7 per cent. and 7.66 per cent. of the Lakah Holding Company's shares, respectively. Immediately following the Global Offering, purchasers of GDSs in the Global Offering held, in aggregate, GDSs representing approximately 23 per cent. of Lakah Holding Company shares.

## Indebtedness

On April 5, 1999, the Lakah Holding Company issued its E£400,000,000 11 per cent. bonds due 2006. The bonds have a domestic rating of AA- issued by Nile Rating, a member of the Fitch IBCA Group. A summary of the main terms and conditions is set out below:

| | |
|---|---|
| Principal Amount: .................................... | E£400,000,000 |
| Interest: ................................................ | 11 per cent. per annum |
| Issue Price: ........................................... | 100 per cent. |
| Maturity: .............................................. | April 5, 2006 |
| Issue Date: ............................................ | April 5, 1999 |
| Guarantee: ............................................ | Banque du Caire, S.A.E. as to interest and principal |
| Payment of Interest: ................................. | Semi annual, each January 1 and July 1, commencing July 1, 1999 |
| Payment and Prepayment: ........................... | At maturity, unless accelerated or prepaid at the option of the Lakah Holding Company commencing at the end of the fifth year. Minimum prepayment amount is E£1 million or any multiple thereof. |

Banque du Caire, S.A.E. has secured the Lakah Holding Company's reimbursement obligation with respect to the guarantee by a pledge on 800,000 shares of Medequip and 400,000 shares of TMSE. The Lakah Holding Company has agreed in the Subscription Agreement to procure a release of the pledge as a condition to the purchase by the Managers of the Bonds.

**Lakah Holding Company**

The proceeds of these domestic bonds were distributed as follows:

| To: | As at April 30, 1999 | Use of Proceeds |
|---|---|---|
| Medequip | E£ 66,500,501 | Pay down existing debt |
| ICC | E£ 35,000,000 | Upgrading fluorescent tube line |
| IIC | E£100,000,000 | E£81 million to buy a detergent factory |
| | | E£19 million for the acquisition of real prop |

As at June 30, 1999, an additional E£158 million was loaned by the Lakah Holding Company to Medeq resulting in an aggregate amount loaned to Medequip of approximately E£225 million. The additional fu loaned to Medequip are expected to be utilized principally for the purchase of additional medical equipr for on-leasing.

The repayment obligations of the relevant Subsidiaries to the Lakah Holding Company are evidence promissory notes with respective maturities matching the debt service obligations of the relevant Subsidiar the Lakah Holding Company.

**Recent Developments**

**Helio Medical Company, S.A.E.**

Pursuant to a series of transactions, the last of which occurred on August 15, 1999, Lakah Holding Comp acquired 98 per cent. of the issue share capital of Helio Medical Company, S.A.E. ("Helio") formerly ca Heliolab, S.A.E., an Egyptian joint stock company with commercial register number 313606. At the da this Offering Circular, Lakah Holding Company's total investment in Helio is E£130 million of w E£65 million was paid to the sellers of shares in Helio and E£65 million subscribed for the issue of new sh in Helio. As at the date of this Offering Circular, Helio has an authorized share capital of E£500 mi divided into 5 million shares, par value E£100 each, of which 1.3 million shares have been issued and are paid.

Helio was established in 1998 by a group of Egyptian doctors for the purpose of owning and operati number of renal dialysis centers located throughout Egypt primarily in response to the high incidence of r failure in Egypt. Currently Helio owns or leases 50 sites which Helio is in the process of equipping with r dialysis equipment, all of which is expected to be owned by Helio. In a manner similar to MCMC's opera of CT scanning clinics (see "Medical Centres Management Company S.A.E. — Products and Services"), E expects to reach agreement with private and public sector healthcare providers whereby such health providers will guarantee that a minimum number of patients per day will be treated at Helio's renal dia centres for a fixed price per treatment payable to Helio. As with MCMC, in order to provide patients necessary clinical care and diagnostic consultation, Helio expects to subcontract the provision of clinical treatment services to doctors who will assume full responsibility for patient care.

Helio's current plans provide that at least 20 centers will be operational by January, 2000 and all 50 c centers by December 2000.

**Intermedica**

Pursuant to a purchase agreement dated September 15, 1999, as amended (the "Purchase Agreeme between the Lakah Holding Company and Messrs Ramy Lakah and Michel Lakah (together, "Purchasers") and Messrs Hatem El Sweify and Sameh El Sweify (together, the "Sellers"), the Purchasers acquired a 51 per cent. stake in two partnerships, Intermedica for Manufacturing of Medical Supplies Intermedica for Distribution of Medical Supplies owned by the Sellers for a purchase consideratic E£30.6 million paid in full upon execution of the Purchase Agreement. The IMMS and IDMS partners which were valued, for purposes of the transactions contemplated by the Purchase Agreemen E£60 million, are currently in the process of being converted into an Egyptian joint stock company, named Intermedica, S.A.E. ("Intermedica"), which is expected to have an initial capital of E£60 millior to conduct the business currently undertaken by each of IMMS and IDMS. Upon the establishme Intermedica, the Lakah Holding Company will own approximately 51 per cent. of the share capit Intermedica, representing their interests acquired in the partnerships. Immediately following the establish of Intermedica, the capital of the joint stock company will be increased by E£75 million and the L

**Lakah Holding Company**

Holding Company and the Sellers will, respectively, subscribe E£37.74 million and E£37.26 million for the issue of the new shares in Intermedica resulting from the capital increase. After giving effect to the capital increase, Intermedica will have an authorized share capital of E£250 million divided into 2,500,000 shares of par value E£100 each, of which 1,350,000 shares will be issued and fully paid, and the Purchasers and the Sellers will own 51 per cent. and 49 per cent. of such shares, respectively. In the event that any consents to the change of the structure and control of IDMS are required from IDMS's suppliers of medical consumer products and are not received by Intermedica within three months from the date on which the Purchasers have acquired ownership of the shares referred to above, the Purchasers will be entitled to treat the Purchase Agreement as rescinded and the Sellers have undertaken to reimburse to the Purchasers, upon notice of rescission, the entire purchase consideration paid by them.

The principal activity of IMMS is the manufacture and sale of various medical disposable products, in particular, dressings and bandages. It is one of the leading manufacturers of medical disposable products in Egypt. IMMS has recently introduced new products to its product range including IV infusion sets. IMMS is actively seeking other opportunities to manufacture medical disposables in Egypt. In 1998 approximately 15 per cent. of IMMS's sales were exported to other countries in the Middle East, principally Saudi Arabia, Yemen and Kuwait.

The principal business activity of IDMS is as distributor in Egypt of more than 7 leading international manufacturers of medical disposable products including Beckton Dickinson B.V., 3M Egypt, Seton Scholl Healthcare Group Plc and disposable products manufactured by IMMS. Based on financial information supplied to management of Lakah Holding Company, of IDMS's sales in the first half of 1999, 20 per cent. was attributable to IMMS products, 60 per cent. attributable to Beckton Dickinson products, 10 per cent. attributable to Seton Scholl and others products and 10 per cent. was attributable to 3M products. Certain of the contracts governing IDMS's distribution arrangements grant IDMS exclusive rights to distribute the relevant products in Egypt. With limited exceptions, the distribution agreements are renewable annually, impose minimum sales quotas and do not place restrictions on end user prices.

Based on information supplied to management of Lakah Holding Company, the combined 1998 sales of IMMS and IDMS were approximately E£20 million.

IDMS has a centralized warehouse and administration operation based in Cairo and four regional distribution centers owned or leased by IDMS. Transport is provided by 65 vehicles all owned by IDMS. IDMS operates a computerized stock management programme which has been in operation for over ten years. The stock management programme enables, inter alia, central management to receive from each regional distribution center detailed sales and credit reports every 15 days.

Upon the establishment of Intermedica, Messrs. Hatem and Sameh El Sweify will become managing directors of the manufacturing and distribution divisions of Intermedica, respectively.

**Strategy**

The Lakah Holding Company believes that the on-going liberalization of the Egyptian economy, and the development of the economies of countries throughout the rest of the Middle East and North/West Africa, continue to create new business opportunities in the health care, medical and industrial sectors. The Lakah Holding Company intends to capitalize on its market position, expertise, reputation and financial resources and on these opportunities as they arise by expanding into selected markets and developing new activities and services to complement its existing operations.

The Lakah Holding Company believes that each of the Subsidiaries in the Medical Care Group holds the leading position in its respective market segment in Egypt as follows: Medequip in the supply and leasing of medical equipment and turnkey hospital projects; TMSE in the supply and leasing of medical imaging equipment; MCMC in the management of medical imaging equipment for medical facilities; and Quest in the construction finishing of medical facilities. The Lakah Holding Company's objective is that such Subsidiaries maintain and improve on their market positions. The Lakah Holding Company intends to implement the following strategies to meet its objectives with respect to the Medical Care Group:

■ to expand its medical care operations in Egypt, the rest of the Middle East and North/West Africa, including, in particular, in Turkey and Algeria;

**Lakah Holding Company**

- to expand the range of products covered to include the manufacture and distribution of medical disposa products in Egypt, the rest of the Middle East and North/West Africa;

- to increase the scale of its leasing operations of medical equipment, particularly with respect to equipm with a value of less than U.S.$200,000 per unit;

- to increase the number of medical facilities for which MCMC provides management services;

- to further develop management services to provide complete hospital management; and

- to translate know-how gained from construction projects in the medical field to construction of ot "utility" type buildings.

The Lakah Holding Company intends to implement the following strategies to meet its objectives with res to the Industrial Group:

- to ensure that its industrial operations remain at the forefront of technology in the region;

- to pursue the construction of a plant for the manufacture of HBI, an iron ore substitute used in production of steel billet;

- to develop low-cost, energy efficient industrial operations; and

- to comply with and, where possible, exceed domestic environmental norms and regulations.

## Subsidiary Guarantors

**MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.**

**Overview**

Medequip is principally involved in the following two business activities: (i) sale and leasing, together with after-sales servicing of medical equipment and (ii) turnkey supply of medical equipment and related construction activities. Medequip is believed by management to be the largest supplier of medical equipment and contractor or turnkey medical facilities in Egypt. "Turnkey" is understood to mean the complete supply and equipping of a medical facility ("Equipment Turnkey"), which may also include construction of such facility ("Construction Turnkey"), on a fixed price, date certain basis. Construction consists of the partial or complete construction, renovation or upgrade of a medical facility. Turnkey contracts that have a construction element are substantially similar to standard construction contracts in that changes in specifications, requirements or timing allow for adjustments in price and delivery schedule.

The chart below sets out Medequip's organizational structure:



Since the Government's declaration and commitment made in 1952 that every Egyptian should have free access to healthcare, there has been an increasing demand in Egypt for medical goods and equipment, as well as for turnkey operations (see *"The Egyptian Health and Medical Sectors"*). As a result of this demand, international medical equipment manufacturers became increasingly interested in accessing the Egyptian market. Medequip capitalized on the opportunities available by identifying leading international medical equipment companies seeking to penetrate the Egyptian market and entered into distribution agreements with such companies. Medequip currently represents ten leading international manufacturers of medical equipment in Egypt.

In 1985, Medequip commenced its Equipment Turnkey activities as a subcontractor to international turnkey operators. In 1990, Medequip was awarded its first Equipment Turnkey contract for the Abou El Rish Student Hospital. As a result of its existing relationships with medical equipment suppliers, Medequip estimates that, together with the medical imaging equipment supplied by TMSE, its sister company (which distributes medical imaging equipment manufactured by Toshiba), it can directly cover up to 80 per cent. of the total equipment needs of a hospital.

Medequip initially contracted with third parties for the installation of the equipment sold by it. As the pre-installation work required by Medequip grew in volume, complexity and cost, rather than continuing to subcontract such work to third parties, Medequip began the construction line of its business. This enabled it to reduce installation costs and provide an integrated service to its customers. The evolution of this pre-installation construction business led to the Construction Turnkey business Medequip currently undertakes.

Medequip takes advantage of the expertise and experience of the other Subsidiaries in order to provide a comprehensive service to its customers. In this respect, Medequip contracts with Quest for the

## Subsidiary Guarantors

electromechanical and finishing work on turnkey projects, with TMSE for the supply of medical im:
equipment for Equipment Turnkey projects and with Amitrade for the supply of elevators and escalat

In 1998, Medequip commenced a number of non-medical construction projects, namely the construction
four star hotel at Sharm El Sheik and of Phase I of the Heliopolis Oasis Project described below.

In 1998, Medequip had total revenues of approximately E£253 million (U.S.$74.5 million) divided as foll

- approximately E£150 million (U.S.$44 million) related to medical equipment sales, of w
  approximately E£60 million (U.S.$17 million) were direct sales and approximately E£90 mi
  (U.S.$26 million) were sales made in connection with Equipment Turnkey projects (equipment
  include leasing income); and

- approximately E£103 million (U.S.$30 million) related to Construction Turnkey.

In 1998, Medequip generated net income of approximately E£20 million (U.S.$5.9 million). For the
month period ended June 30, 1999, Medequip had total revenues of approximately E£330 mi.
(U.S.$97 million) and net income of approximately E£44 million (U.S.$12 million).

### History

Medequip traces its origins to a sole proprietorship company also called Medequip owned by Dr. Raym
Lakah. The sole proprietorship was initially engaged in the representation of American Optical Compan
manufacturer of medical monitoring equipment. Subsequent to Dr. Lakah's death in 1985, his son, Mr. R·
Lakah, assumed control of the business of that company. In December 1994, Medequip was established
joint stock company under Law 159 of 1981 with Commercial Register number 286521 and gradu
assumed the affairs of the sole proprietorship. In December 1998, substantially all of the shares of Medeo
were transferred to the Lakah Holding Company. The shares of Medequip have been listed on CASE s
December 31, 1997.

As of the date of this Offering Circular, Medequip's authorized capital is E£200 million, of which one mil.
shares, par value E£100 per share, are issued and fully paid. As of the date of this Offering Circular,
Lakah Holding Company owns 97.8 per cent. of Medequip shares.

### Products and Services

*Medical Equipment Sales.* The management believes that Medequip enjoys the highest or second higl
market share in Egypt for each equipment type distributed by it and the highest overall market share in s·
of medical equipment in Egypt. During 1998, the following equipment distributed by Medequip is estima
by the management to have had the following market shares in Egypt:

| Equipment Type | Manufacturer | Estimated Mai sh (per ce |
|---|---|---|
| Cardiovascular Ultrasound | Hewlett Packard | |
| Cardiology | Hewlett Packard | |
| Patient Monitoring | Hewlett Packard | |
| Neonatal Ventilation | Draeger Medizintechnik | |
| Physical Medicinie | Enraf Nonius | |

**Subsidiary Guarantors**

Medequip acts as distributor in Egypt for the following leading international manufacturers and product categories:

**Hewlett Packard (USA)**
Patient physiological monitoring system
Cardiovascular imaging system
General purpose imaging system
Cardiology products
Obstetric care systems
Clinical information systems

**Draeger (Germany)**
Anesthesia machines
Intensive care ventilators
Emergency care products
Pediatric medical products
Medical architectural systems
Gas management systems
North American Draeger medical products

**Olympus (Japan)**
Fiber optic endoscopy systems
Video endoscopy systems
Surgical endoscopy systems
Endotherapy instruments

**Dornier Medtech-Medical (Germany)**
Lithotripter systems
Surgical laser units

**Enraf Nonius (Netherlands)**
Physical medicine equipment
Rehabilitation equipment
Hydrotherapy systems
Fitness equipment

**Oldelft (Netherlands)**
Mass chest scanning systems
Radiography systems

**Subtil Crepieux Crepieux (France)**
Central sterilization systems
Steam autoclaves
Hot air ovens
Ultrasound instrument sterilization units

**Racia Alvar Electronics (France)**
EEG machines
EMG machine

**B. Braun Melsungen (Germany)**
Hemodialysis equipment

**A.J.M.-Angenieux (France)**
Operating theaters lamps
Mobile emergency operating light

Certain of the contracts governing these distribution arrangements grant Medequip exclusive rights to distribute the relevant products in Egypt. Even where no such exclusive distribution rights are expressly granted in the relevant distribution agreement, by virtue of Medequip's registration on form S14 with the Ministry of Commerce and Supply (which entitles Medequip to act as exclusive importer into Egypt of the relevant product), Medequip, in effect, acts as the exclusive distributor of the relevant products in Egypt. With limited exceptions, the distribution agreements are renewable annually, impose minimum sales quotas and do not place restrictions on end user prices. To date, Medequip has not had material disputes with any of the manufacturers it represents nor, so far as Medequip is aware, has there been any "grey market" sales, or direct sales by a manufacturer it represents, into Egypt.

Medequip groups its equipment sales according to function into five segments. The percentage of 1998 annual sales attributable to Medequip's total equipment sales for each segment is set out below:

| | |
|---|---|
| Operating Theatres | 24 per cent. |
| Intensive Care | 25 per cent. |
| Neonatal Intensive Care | 10 per cent. |
| Physical Medicine | 12 per cent. |
| Imaging | 7 per cent. |
| General | 22 per cent. |

Medequip believes that the after-sales service and support it provides in respect of equipment supplied are key elements of its success and differentiate it from its competitors. Medequip has its main office facilities and a service center in Cairo and maintains sales and servicing facilities in Alexandria, Mansoura and Luxor, which

**Subsidiary Guarantors**

allow it to cover the entire Egyptian territory. Service is provided pursuant to warranty claims, which generally covered by Medequip on behalf of and at the expense of the relevant manufacturer, under a serv contract or on a fee basis. Due to the resources dedicated to after-sale support services, Medequip is able offer complete service contracts and warranty service, which minimize the amount of "down time" machine. Medequip believes that it maintains an above-average industry supply of available spare parts the equipment it supplies. Annual service contract charges (including spare parts) range from seven per ce to ten per cent. of the total cost of the equipment. Revenues generated from service contract fees : attributable to sales revenues and not separately indicated. However, Medequip estimates that approximat five per cent. of its total sales for 1998 are attributable to service contract fees.

The types of advanced systems distributed by Medequip require both physicians and operators to keep abre: of the latest technological developments and also the most effective application of their equipment in a giv clinical circumstance. To meet this requirement, Medequip employs physicians as well as internationa experienced applications support personnel to assist physicians and operators in deriving optimal use of th equipment. Medequip's management believes it is the only such company to provide locally-based clinic specialists.

*Turnkey Activities.* The first Equipment Turnkey project undertaken by Medequip was the supply equipment to the Abou El Rish Student Hospital in 1990. Thereafter, Medequip was successful in obtaini other Equipment Turnkey projects commencing with the Equipment Turnkey project for the Petrojet Hospi in 1992 and the Equipment Turnkey project for El Hekma in Mansoura in 1994. By 1996, Medequip h been awarded additional turnkey contracts for 13 hospitals and seven oncology centers, some of whic having a construction element, were also Construction Turnkey projects.

Through the end of 1998, Medequip had completed turnkey projects for more than 40 hospitals, 20 clini and 35 medical centers, primarily in Egypt but also in the rest of the Middle East. Medequip estimates that has been successful in obtaining medical turnkey projects representing approximately 70 per cent. in value terms of all medical turnkey projects awarded in Egypt during 1998. Set out below are examples of hospita completed by Medequip on a turnkey basis:

- Dar Al Fouad — This privately owned 80-bed specialized hospital for cardio vascular disease is affiliate with the Cleveland Clinic in the United States. The Equipment Turnkey contract was awarded following a international tender with a pre-qualification stage. Medequip was the only Egyptian company which pr qualified and was awarded the contract at a price of approximately E£36 million (U.S.$10.6 million). Th contract was completed in 1998.

- El Fayoum Hospital — This 300-bed general hospital, owned by the Health Insurance Organization, wa constructed and equipped by Medequip on an Equipment and Construction Turnkey basis. This proje had initially been awarded to another contractor but was suspended for a period of twelve years for nor performance by the contractor. It was re-tendered in 1997 and awarded to Medequip at a price E£32 million (U.S.$9.4 million). The project was completed in early 1999.

Projects in progress include:

- 6th of October University Hospital — When completed, this will be the first private university hospital i Egypt. The Construction Turnkey contract for this 320-bed facility was awarded to Medequip in 1998 at price of approximately E£83 million (U.S.$24.4 million) and was fully paid against a letter of guarante prior to the commencement of construction.

- The Medicenter Specialized Hospitals — When completed, this hospital, which is owned by MCMC, sister company of Medequip, will consist of several clinics each dedicated to a clinical specialty. Each clini will be fully equipped with necessary medical equipment and supplies for its specialty. MCMC intends t sell each clinic to medical specialists and provide various centralized medical services. The Constructio Turnkey contract for this hospital was awarded to Medequip in 1998 at a price of approximatel E£52 million (U.S.$15.3 million).

## Subsidiary Guarantors

As a result of its existing relationships with medical equipment suppliers, Medequip estimates that, together with the medical imaging equipment supplied by TMSE, it can directly cover up to 80 per cent. of the total equipment needs of a hospital.

Medequip initially contracted with third parties for pre-installation work necessary for the installation of the equipment sold by it. As pre-installation work required by Medequip grew in volume, complexity and cost, rather than continue to subcontract such work to third parties, Medequip began the construction line of its business, thus enabling it to provide an integrated service to its customers. The evolution of this pre-installation construction business led to the Construction Turnkey business Medequip currently undertakes.

Medequip takes advantage of the expertise and experience of the other Subsidiaries in order to provide a comprehensive service to its customers. In this respect, Medequip contracts with Quest for the electromechanical aspects of the finishing work on its Construction Turnkey projects, with TMSE for the supply of medical imaging equipment and with Amitrade for the supply of Toshiba elevators and escalators.

The majority of turnkey projects are awarded after a tender bid by a consortium generally comprising a construction company, medical supply company and a company providing electromechanical and other finishing works. As Medequip, together with TMSE, Quest and Armitrade, is able to provide an integrated range of equipment and services, with associated cost savings, management estimates Medequip is able to offer prices for turnkey projects, which according to its management are often 10-15 per cent. less than consortia competing for the same tender.

The Government has rated the construction division of Medequip as an "A" level contractor enabling it to participate in all types of Government tenders for construction projects in Egypt. It is believed that only 14 construction companies in Egypt have received this highest rating designation.

*Other Construction Activities.* The construction expertise gained by Medequip through the construction of hospitals has provided Medequip with the opportunity to diversify from its primary focus and traditional customer base into other "utility building" construction such as hotels and other commercial projects. Medequip thus optimizes utilization of its professional staff, technical know-how and construction equipment.

In 1998, Medequip entered into a construction agreement with Scandinavian for the construction of a five star Swiss Hotel in Naama Bay, Sharm El Sheik. In addition, in October 1998, Medequip was awarded a contract by Société Oasis of Heliolopolis, a company in which the Lakah Family has a significant interest in the amount of E£460 million, for the construction of Phase I of the Heliopolis Oasis Project. See *"The Lakah Family Group of Companies"*. Revenues from non-medical related construction are expected to increase significantly.

*Leasing Activities.* Since 1996, Medequip recognized that a major obstacle to the growth of private sector involvement in the health care sector was the high capital costs of medical equipment required by private hospitals and medical centers. By providing customers with leasing options for such equipment, Medequip has been able to secure new customers who would otherwise not have been able to provide quality medical equipment in order to provide diagnosis and treatment to their patients. Medequip has made available to its customer base a number of leasing options. Leasing arrangements are flexible and arranged for terms from three to five years. Medequip was the first Egyptian company to offer financing options to purchasers of medical equipment, excluding sales pursuant to Equipment Turnkey contracts. Medequip estimates that, in 1998, approximately 25 per cent. of its sales were financed through leasing. See *"General Information Applicable to Subsidiaries — Leasing."*

## Strategy

Medequip's objective is to consolidate and improve on its position as one of the leading suppliers of medical equipment and related construction activities in Egypt.

Spending by the Ministry of Health and Population for the upgrading of medical care facilities is expected to increase at an average rate over the next five years of 15 per cent. per annum. The development of the economies of other countries in the Middle East continues to create new opportunities. Medequip intends to capitalize on these developments and intends to implement key strategies to meet its objectives, in particular:

**Subsidiary Guarantors**

- to expand the range of products distributed by it to include the manufacturing and distribution of m
  disposable products in Egypt, the rest of the Middle East and North/West Africa;

- to increase the scale of its leasing operations;

- to continue to emphasize efficiency, quality control and service with respect to its construction act

- to translate know-how gained from construction projects in the medical field to construction of
  "utility" type buildings; and

- to maintain and develop its customer service and support functions as it believes these activities affe
  competitive advantage over other companies in the same sector and that, by maintaining high cu:
  satisfaction levels, repeat business can be secured.

## Distribution

Medequip has distributorship agreements with ten of the leading suppliers of medical equipment. Med
leading three distributorships are with Hewlett Packard, Draeger and Keymed (in respect of Ol
equipment), which accounted, respectively, for approximately 25 per cent., 20 per cent. and 20 per c
Medequip's equipment sales for 1998. Generally, under these agreements, a price list is established, '
annual basis, in December for the following year. Discounts can be granted on a case by case basis fo
volume orders. Medequip believes that its high volume purchases have increased its purchasing power v
suppliers, resulting in volume discounts and rebates, and favorable policies and promotional allov
Terms of payment to suppliers range from 90 to 120 days from the date of invoice. Customs duties an
taxes together average 15 per cent. of the invoice price.

## Customers

*Medical Equipment.* The following table shows the distribution of Medequip's customers for r
equipment sales (excluding sales pursuant to Equipment Turnkey projects) during 1998:

| Type of Customer | (p |
|---|---|
| Public Sector Hospitals[1][2] ................................................................................ | |
| University Hospitals ........................................................................................ | |
| Military Hospitals ............................................................................................ | |
| Private Sector Customers[3] .............................................................................. | |

*Notes:*
(1)  *Includes purchases by Health Insurance Organizations and Health Governates.*
(2)  *Other than public university hospitals and military hospitals.*
(3)  *Includes medical doctors and private hospitals.*

Medequip expects that the private sector's portion of sales will increase as a result of the Goven
liberalization policy, the increasing availability of attractive leasing options to private customers a
establishment of new private university hospitals.

Approximately 80 per cent. of Medequip's equipment sales during 1998 (including sales pursu
Equipment Turnkey projects) were effected through open tenders or tenders with pre-quali
requirements, with the balance effected through direct orders from customers.

*Turnkey.* The following table shows the distribution of Medequip's customers for turnkey |
during 1998:

| Type of Customer | (p |
|---|---|
| Public Sector Customers[1] ............................................................................... | |
| Private Sector Customers[2] .............................................................................. | |

*Notes:*
(1)  *Includes purchases by Health Insurance Organizations and Health Governates.*
(2)  *Includes medical doctors and private hospitals.*

## Subsidiary Guarantors

More than 90 per cent. of turnkey projects executed by Medequip are awarded on the basis of open tenders or tenders with pre-qualification requirements.

### Payment Terms

*Equipment.* Medequip's payment terms for sale of medical equipment generally provide for a 50 per cent. down payment upon award of the tender or placement of the order against delivery by Medequip of a letter of guarantee, 40 per cent. upon delivery and the balance of 10 per cent. upon installation. The respective percentages may vary depending on the relevant customer's relationship with Medequip.

*Turnkey Projects.* Payment terms for Equipment Turnkey contracts generally provide for an advance payment of up to 50 per cent. or more of the price, up to 40 per cent. of the price upon delivery and the remaining ten per cent. of the price after the preliminary certificate of acceptance for the facility delivery. Generally, payment terms for turnkey contracts, including Construction Turnkey, provide for payment of 25 per cent. to 50 per cent. of the price upon award of the contract and the remainder on a progress billing basis subject to a ten per cent. retainer issued upon delivery of a certificate of acceptance. To date, Medequip has not been in material default on any Equipment Turnkey or Construction Turnkey project. In addition, to date, Medequip has not experienced payment delays or defaults by its customers.

### Sales and Marketing

The table below shows the breakdown of Medequip's revenues for the years 1996, 1997 and 1998 and the six-month period ended June 30, 1999:

| | December 31, | | | June 30, |
| | 1996 | 1997 | 1998 | 1999 |
| | | | E£ (millions) | |
|---|---|---|---|---|
| **Medical Equipment** | | | | |
| Sales | 126 | 115 | 89 | 152 |
| Lease receivables[1] | 25 | 45 | 63 | 46 |
| Construction | 19 | 40 | 102 | 132 |
| Total | 170 | 200 | 254 | 330 |

Note:

[1] *Represents the non-discounted aggregate amounts payable in respect of equipment leases entered into during the relevant period.*

As at June 30, 1999, the aggregate value of turnkey projects awarded to Medequip but in respect of which no work has commenced amounted to approximately E£200 million (U.S.$58.5 million). This excludes the value of turnkey projects currently in progress.

As of June 30, 1999, Medequip employed a direct sales force of 23 sales professionals who cover the territory of Egypt and who have primary responsibility for maintaining relationships with existing customers and identifying and soliciting new customers. A sales professional will deal specifically with the products of one manufacturer. Medequip has established an extensive distribution network and branch office infrastructure to cover Egypt.

Medequip trains its sales professionals through an ongoing training program supported by the relevant manufacturers. The marketing policy developed for the products of each manufacturer is designed and set through an annual business plan. Marketing is implemented through selected advertising, sponsoring seminars and meetings, participating in major exhibitions and sponsoring national medical events.

**Subsidiary Guarantors**

## Competition

*Medical Equipment.* To encourage the Egyptian health care and medical sectors to utilize the late technological developments in medicine and equipment, the Egyptian Government, in 1996, bann importation of pre-owned medical equipment. The following table shows the main products supplied Medequip and the estimated market shares for such products and competing products:

| Supplier | Product | Market share (per cent.) | Competitors |
|---|---|---|---|
| Hewlett Packard | Patient Monitoring | 60 | Space labs (20%), Marquette (5%), Datacope (5%), Others (10%) |
| | Ultrasound imaging | 60 | Advanced Technology Laboratories (15%), OTE (10%), Acuson (5%) |
| | Cardiology | 45 | Physio (15%), Heliga (10%), Fukoda (10%), Burdik' (10%), Others (10%) |
| Draeger Medizintechnik | Anesthesia | 35 | Ohmeda (40%), Blease (5%), Datex (5%), Others (15%) |
| | Intensive care ventilators | 35 | Bennet (40%), Bird (20%), Datex (5%) |
| | Neonatal care | 45 | Atom (20%), Airshield (15%), Ohmeda (5%), Others (15%) |
| | Medical Architectural/ Gas Management | 40 | Medap (20%), Hirom (15%), Ohmeda (5%), Others (20%) |
| Olympus Optical Company | Flexible Endoscopy | 70 | Pentax (15%), Fujinon (10%), Others (5%) |
| | Surgical Endoscopy | 25 | Storz (40%), Wolf (15%), Sericon (5%) Others (15%) |
| Enraf Nonius | Miscellaneous | 71 | Tanlury (10%), Unighy (5%), EMS (3%) |

*Construction Turnkey.* Competition in the medical construction industry exists from local competito primarily Alkan, Urban Development, Delta Construction, ADAM, El Gomhoreyya and Specialized Produ Construction. Medequip believes, that while other construction companies may seek to expand into medi construction projects, their inability to provide medical equipment as part of a turnkey project, the capi cost and lack of specialist knowledge in the medical field make their entry into the market unlikely in the ne term. International contractors with medical turnkey project experience have not shown interest in Egy primarily as the liability of contracts extends to 15 years following project completion according to Egypti law and, as medical turnkey projects are small in value relative to other utility projects available globally, t costs associated with maintaining a presence for this period are high relative to revenues.

## Indebtedness

As at June 30, 1999, Medequip had outstanding long-term debt, net of the current portion of long-term de of approximately E£327 million (U.S.$96 million) of which approximately E£225 million (U.S.$66 millio was due to the Lakah Holding Company and short-term debt, including the current portion of long-ter debt, of approximately E£118 million (U.S.$35 million). Since June 30, 1999, there has been no mater change in outstanding indebtedness of Medequip.

## Capital Expenditure

Medequip's capital expenditure budget from 1996 to 1998 consisted mainly of costs in respect of vehicles a office furnishings and office equipment. Medequip has a nominal capital budget for 1999.

## Employees

As at June 30, 1999, Medequip had 149 full-time employees. Approximately 400 additional persons a employed in a construction labor capacity.

## Tax Status

The net profits of Medequip, after deduction of an amount equal to a percentage of its issued share capital December 31 of the relevant fiscal year, such percentage being equal to the discount rate announced by C for December 31 of the relevant fiscal year (currently being 12.25 per cent. per annum), are subject to a f tax rate of 40 per cent. per annum.

Subsidiary Guarantors

## TRADING MEDICAL SYSTEM EGYPT, S.A.E.

### Overview

The primary business activity of TMSE is marketing, importing, re-exporting, distributing, installing and servicing sophisticated medical imaging equipment. This equipment is supplied by Toshiba Medical Company, formerly known as Toshiba Corporation, Medical Systems Division ("Toshiba"), of Japan, and distributed throughout Egypt, the rest of the Middle East, North/West Africa and Turkey. TMSE is the exclusive distributorship with Toshiba for the following Toshiba product lines, namely, diagnostic X-ray computer tomography ("CT") scanners, magnetic resonance imaging ("MRI") systems, diagnostic nuclear medicine systems, diagnostic ultrasound systems, diagnostic X-ray systems and therapy simulator systems.

TMSE estimates that in the period from 1987 to 1998 the market share of Toshiba products in the Egyptian medical imaging equipment market increased from one per cent. to 42 per cent. TMSE sales in 1998 were approximately E£136.7 million (U.S.$40.2 million) and the following table shows the respective geographical segmentation:

| Region | Sales Per cent. |
| --- | --- |
| Egypt | 64 |
| Middle East (excluding Egypt), North & West Africa | 17 |
| Turkey | 19 |

Of total TMSE sales in 1998, the following table shows the respective equipment modality segmentation:

| Product | Sales Per cent. |
| --- | --- |
| CT Scanners | 35 |
| MRI Scanners | 17 |
| Nuclear Medicine Systems | 6 |
| Ultrasound Systems | 12 |
| X Ray and Therapy Planning Systems | 30 |

In 1998, TMSE had net profits of approximately E£12.5 million (U.S.$3.7 million). For the six-month period ended June 30, 1999, TMSE had revenues of approximately E£124 million (U.S.$37 million) and net profits of approximately E£16 million (U.S.$5 million).

TMSE estimates that Toshiba is the third largest global supplier of medical imaging equipment after General Electric Medical Systems ("General Electric") and Siemens Medical Systems ("Siemens"). In Egypt, Toshiba has been the leader in the medical imaging equipment market since 1995. TMSE's predecessor company completed the first sale in Egypt of a Toshiba CT scanning system in 1988 to the Mansoura Radiology Center. In 1991, TMSE's predecessor company was awarded the first tender from the public sector to supply a CT scanning system for the Port Said Governate. In addition to sales, TMSE provides its customers with both clinical application specialists and servicing and maintenance professionals to enhance performance and maximize the "up time" of the imaging equipment supplied.

As a result of its successful operations in Egypt, Toshiba extended TMSE's exclusive distribution rights for Toshiba imaging equipment to the Middle East and North/West Africa in 1994 and to Turkey in 1996.

TMSE regularly conducts business with other Subsidiaries. TMSE provides Medequip with Toshiba medical equipment as part of certain Equipment Turnkey projects undertaken by Medequip and provides MCMC with all of the CT scanners and other imaging modalities for the medical centers and specialty hospitals supplied and managed by MCMC. Pre-installation work associated with the supply of TMSE imaging equipment is carried out by Quest as the environment for these products needs to be specially outfitted. In 1998, sales to other Subsidiaries represented approximately 20 per cent. of total sales for Egypt. Sales by TMSE to Subsidiaries are offered on the same terms and conditions as sales to unrelated parties, including payment terms, delivery and servicing arrangements.

49

**Subsidiary Guarantors**

**History**

TMSE traces its origins to a company established in 1990 under the name Trading Medical System Egyp S.A.E. and owned by Mr. Ramy Lakah. The original TMSE company was established to acquire the exclusiv distribution rights for Toshiba medical imaging equipment, which were previously held, since 1987, t Medequip. The decision to separate the Toshiba medical imaging business from Medequip activities was direct result of the growth and specialization of the medical imaging business and a desire to provide focused approach to this market. In 1994, TMSE was incorporated as a joint stock company under Law 1! of 1981 with Commercial Register number 286523. In December 1998, substantially all of the shares TMSE were transferred to the Lakah Holding Company. The shares of TMSE have been listed on CASE sin December 31, 1997.

As of the date of this Offering Circular, TMSE's authorized share capital is E£100 million, of which 500,0( shares, with a par value E£100 per share, are issued and fully paid. As of the date of this Offering Circul: the Lakah Holding Company owns 97.6 per cent. of TMSE shares.

**Products and Services**

*Product Lines:* The Toshiba medical imaging product lines for which TMSE acts as exclusive distributor ε as follows:

**Computer Tomography.** A CT scanner is a whole body scanner which utilizes slip-ring technology for t continuous rotation of the X-ray tube and detectors in order to process axial images of the patient as well volumetric data. In early 1999, Toshiba introduced new technology using multi-slice detectors, which TM expects will lead to an increased market share in the global high-end CT market. TMSE believes that with installed units it has 47 per cent. of the Egyptian CT market of 189 installed units. Siemens Medical Syster its leading competitor in this market, is estimated to have 34 installed units.

**Magnetic Resonance Imaging.** MRI is a system, which offers advanced fast scan sequences, comprehens vascular imaging and unique fat suppression techniques with superior imaging quality. Toshiba has chanç its MRI product line completely over the last five years, introducing new technologies enabling it to offer M systems with high-end advanced clinical applications. For example, Toshiba is the only company worldw to offer an MRI technology utilizing super conductive open magnets. TMSE installed its first MRI systen 1994 and believes, that with 17 installed units, it has 39 per cent. of the Egyptian MRI market of 45 instal units. General Electric, its leading competitor in this market, is estimated to have 15 installed units.

**Nuclear Medicine.** Nuclear medicine systems are capable of single proton emission computer tomograp whole body, dynamic and static acquisitions used for cardiac pool, myocardial analysis, brain analysis, kid analysis, pulmonary ventilation analysis, gall bladder ejection fraction, gastric emptying, uptake rates thyroid, liver and bone. TMSE installed its first Gamma Camera in 1993. TMSE management believes t with 19 installed units, it has 35 per cent. share of the Egyptian nuclear medicine systems market of installed units. Siemens Medical Systems, its leading competitor in this market, is estimated to have installed units.

**Ultrasound.** This Toshiba product line includes a wide range of ultrasound products ranging from port: black and white ultrasounds to general purpose digital color doppler. TMSE believes that with 125 insta units, it has a 48 per cent. market share of the Egyptian high-end doppler ultrasound market of 256 insta units, although reliable statistics for the low-end ultrasound market in Egypt are unavailable and difficul estimate.

**X-ray and Angiography Systems.** X-ray devices include several diagnostic configurations, ranging from sir radiology units to state of the art digital remote controlled tilting tables. Toshiba offers a complete rang products in this segment. Angiography systems are used for the diagnosis and treatment of vascular diseas the brain, heart and peripheral blood vessels. TMSE believes that with 17 installed angiography units, it t 30 per cent. share of the Egyptian angiography market of 56 installed units and is second only to Ph Medical Systems ("Philips Medical Systems"), which is believed to have an estimated 33 per cent. ma share.

**Therapy Simulator Units.** Therapy simulator units are both X-ray and CT based. They are utilized ir localization of tumors as part of the treatment planning for the radiation therapy process. TMSE believes

**Subsidiary Guarantors**

the only supplier in the Egyptian market of CT based simulators having installed eight CT based units. TMSE has concentrated on the CT based units as it believes CT to be the future of the treatment process. TMSE also provides X-ray based systems and estimates that it has supplied approximately ten per cent. of the Egyptian X-ray based systems market of 20 installed units.

*Service and Clinical Support.* In sales of Toshiba products, TMSE has dedicated significant resources to its clinical support, servicing and maintenance of equipment sold. TMSE has recognized that after-sales service and clinical support, coupled with maintaining an above industry average inventory of spare parts, should increase the "up time" and the operational life of the equipment and as a consequence enhance consumer satisfaction and increased loyalty. TMSE believes that its competitors do not provide such a level of support, service and maintenance. TMSE employs qualified and highly specialized engineers trained to service the sophisticated pieces of equipment. Engineers are trained in Egypt, Europe and the United States and in Japan where they can work directly with the Toshiba factory engineers. TMSE estimates that its after-sales support has enabled it to maintain an average of over 90 per cent. "up time" per piece of equipment. Annual service contract fees to customers generally range from between seven per cent. to ten per cent. of the sales price of the equipment. TMSE currently maintains four sales and service centers throughout Egypt. Servicing of medical equipment elsewhere in its territory is handled by TMSE's sub-distributors and is supported by additional professionals located in the "Center of Competence" in Cairo.

The advanced systems supplied by TMSE require both physicians and operators to keep abreast of the latest technological developments and also employ the most effective application of their equipment in a given clinical circumstance. To meet this requirement, TMSE employs physicians as well as internationally experienced applications support personnel to assist physicians and operators in deriving optimal use of their imaging equipment. TMSE management believes it is the only such company to provide locally-based clinical support specialists.

*Leasing Activities.* Since 1996, TMSE has recognized that a major obstacle to the growth of private sector involvement in the health care sector is the high capital cost of medical equipment required. By providing customers with leasing options for such equipment, TMSE has been able to secure new customers who would otherwise not have been able to provide such high quality medical equipment in order to diagnose and treat their patients. TMSE has made available to its customer base a number of leasing options. Leasing arrangements are flexible and arranged for terms from three to five years. TMSE estimates that, in 1998, approximately 30 per cent. of its sales were financed through leasing. See *"General Information Applicable to Subsidiaries — Leasing."*

**Strategy**

TMSE's objective is to consolidate and improve its position as one of the leading suppliers of sophisticated medical imaging equipment in Egypt.

Spending by the Ministry of Health and Population for the upgrading of medical care facilities is expected to increase, over the next five years, at an average rate of 15 per cent. per annum. The development of the economies of other countries in the Middle East, North/West Africa and Turkey continues to create new opportunities. TMSE intends to capitalize on these by implementing key strategies to meet its objectives, in particular:

• to increase the volume of products in other countries in the Middle East, North/West Africa and Turkey;

• to increase the scale of its leasing operations;

• to increase its sales of Toshiba's high end scanning equipment in Egypt;

• to maintain and develop its customer service and support functions as it believes these activities afford it a competitive advantage over other companies in the same sector; and

• to evaluate the opportunity to represent Toshiba in other markets including Algeria and Nigeria where political obstacles have, until recently, limited international suppliers from entering the market directly.

**Subsidiary Guarantors**

## Distribution

TMSE's exclusive distribution agreement with Toshiba (the "Distribution Agreement") provides for mir
sales quotas which TMSE has consistently achieved. A term of the Distribution Agreement is that
agrees not to, directly or indirectly, purchase, import, sell or otherwise deal with any goods, whi
competitive with or similar to Toshiba products in the region, unless otherwise mutually agreed b
parties, or attempt to solicit orders outside of the defined territory. The Distribution Agreement do
stipulate an end-user price. A 12-month warranty from the date of installation (or 16 months from the
the bill of lading) is given by Toshiba on each piece of imaging equipment. TMSE is also required,
imaging equipment it sells, to provide installation, service and maintenance. A force majeure clause is in
in the Distribution Agreement and provides that either party may terminate the Distribution Agreer
failure or delay caused by force majeure continues for six months or more.

In addition to Egypt, TMSE is the exclusive distributor of Toshiba medical imaging products in the res
Middle East, North/West Africa and Turkey. Toshiba medical equipment has a worldwide reputati
excellence and TMSE has taken advantage of this to enter these markets, generating sales and build
customer base in both the public and private sectors. TMSE has entered into sub-distribution agreemen
experienced local representatives in each country within its territory. TMSE estimates the accessible r
imaging market to be in excess of U.S.$30 million annually in North/West Africa, U.S.$110 million ar
in the Middle East (excluding Egypt) and U.S.$70 million annually in Turkey.

TMSE also acts as a regional distribution center, through a duty-free zone in Port Said, Egypt,
equipment to its network of independent sub-distributors throughout its distribution territory. Sub
minor exceptions, the sub-distribution agreements provide the sub-distributor with sales rights to the T
imaging product lines within its territory. The sub-distribution agreements also provide for minimu
quotas and contain terms similar to those in the Distribution Agreement.

The sub-distributor of TMSE in Turkey is T.M.S.T. Tibbi Sistemler Ticaret ve Servis A.S. ("TMST").
is a wholly owned subsidiary of Medequip France, S.A. ("Medequip France"), a company owned
Lakah Family. TMST has several regional sales and service centers located throughout Turkey and r
product shipments both directly from Japan and from TMSE through a duty free zone in Istanbul. Th
of the sub-distribution agreement between TMSE and TMST are substantially similar to the terms in
other sub-distribution agreements.

Although TMSE is the exclusive distributor of Toshiba medical imaging products in the distribution te
Toshiba has reserved the right to engage, directly or indirectly, in certain sales transactions regarding
medical products.

## Customers

The customer base for TMSE encompasses Egypt, the rest of the Middle East, North/West Africa and
which together comprise a region with a total population base of more than 220 million people. Th
TMSE supplies has the lowest spending per capita on health care in the world. In Africa, spending o
as a percentage of GDP is estimated at around one per cent., compared to a global average of six p

The customer base of TMSE in Egypt is generally divided between (i) the public sector, which include
Insurance Organizations, Health Municipalities, the Cairo Organization for Healthcare, University H
and Military Hospitals, and (ii) the private sector, which includes private physician groups and
insurers. TMSE sales in 1998 had a customer segmentation in accordance with the shown table:

| Customers | Public Sector[1] (per cent.) | Publi q |
|---|---|---|
| Egypt | 62 | |
| Middle East (other than Egypt) | 64 | |
| North and West Africa | 97 | |
| Turkey | 84 | |

Notes:

(1)  *Includes purchases by Health Insurance Organizations and Health Municipalities*

(2)  *Includes medical doctors and private hospitals.*

**Subsidiary Guarantors**

## Payment Terms

TMSE's payment terms for sale of equipment generally provide for a down payment upon award of the tender or placement of the order against delivery by TMSE of a letter of guarantee, with the balance due on delivery, except for approximately ten per cent. which is paid upon installation.

Sales outside Egypt are executed by confirmed and irrevocable letters of credit opened in favor of TMSE by the sub-distributor. Alternatively, a wire transfer of 70 per cent. of the total amount of the sale can be wired to TMSE in advance with the remaining 30 per cent. to be paid to TMSE within 30 days from date of invoice. Customers located outside Egypt are not permitted to utilize lease financing for their purchases.

Sales throughout the distribution region are made either through a closed tender where a firm price must be bid, open tender where prices are determined after negotiation with the customer or direct sales calls. 1998 sales in Egypt were effected approximately 3.5 per cent. through closed tender, 6.5 per cent. through open tender and 70 per cent. through direct sales calls. Sales are managed by sub-distributors in countries outside of Egypt and are supervised by area sales managers.

## Sales and Marketing

The table below shows the breakdown of TMSE's revenues for the years 1997 and 1998 and the six-month period ended June 30, 1999:

| | 1997 | 1998 | June 30, 1999 |
| --- | --- | --- | --- |
| | | | E£ (millions) |
| **Egypt** | | | |
| Sales | 49.2 | 50.2 | 47 |
| Lease Receivables[1] | 32.8 | 37.8 | 31 |
| Sales outside Egypt | 35.0 | 50.0 | 46 |
| Total | 117.0 | 138.0 | 124 |

*Note*

(1) *Represents the non-discounted aggregate amounts payable in respect of equipment leases entered into during the relevant period.*

As at June 30, 1999, TMSE employed a direct sales force of 20 sales professionals who cover the territory of Egypt and who have primary responsibility for maintaining relationships with existing customers and identifying and soliciting new customers. TMSE has established an extensive distribution network and branch office infrastructure to cover Egypt.

TMSE trains its sales professionals through an ongoing training program supported by Toshiba. The marketing policy developed for the various Toshiba products is designed and set through an annual business plan. Marketing is implemented through selected advertising, sponsoring seminars and meetings, participating in major exhibitions and sponsoring national medical events.

## Competition

Toshiba, Siemens Medical Systems, General Electric and Philips Medical Systems are the leading manufacturers of the medical imaging equipment business worldwide. Competition within individual markets is dictated by history in the area and current installed volume. General Electric remains a significant competitor in the Egyptian medical equipment market, with a high-end product line and an organizational structure, which has permitted it to achieve the number one market share worldwide. The competition in the Middle East and North/West Africa is limited to Siemens Medical Systems and Philips Medical Systems as a result of their long history in the area and their large installed volume. In Turkey, Siemens Medical Systems is the market leader with competition from Philips Medical Systems.

**Subsidiary Guarantors**

To encourage the Egyptian health care and medical sectors to utilize the latest technological developmen
medicine and equipment, the Egyptian government banned, in 1996, the import of pre-owned me
equipment. The following table shows the main Toshiba products supplied by TMSE and the estim
market shares of such products and competing products in 1998:

| Product | Market share (per cent.) | Competitors |
|---|---|---|
| CT Scanner........................................ | 46 | Philips (24%), GE (14%), Siemens (11%) |
| MRI Systems ..................................... | 39 | GE (33%), Siemens (13%), Philips (11%), Hitaichi (4% |
| Nuclear Medicine Systems................. | 35 | Siemens (25%), GE (17%), Sopha (9%), Philips (8%) |
| X Ray and Angiography Systems...... | 30 | Philips (33%), GE (16%), Siemens (14%) |

*Note:*

*(1)  In 1998, TMSE also supplied Toshiba ultrasound systems, which represented 48 per cent. of the Egyptian ultrasound x*
*Competitors in the ultrasound market include Esaóte, ATL, Hitachi and GE.*

**Indebtedness**

As at June 30, 1999, TMSE had outstanding long-term debt of approximately E£39 million (U.S.$11 m:
and short-term debt of approximately E£65 (U.S.$19 million). Since June 30, 1999, there has be
material change in outstanding indebtedness.

**Capital Expenditure**

TMSE's capital expenditure budget from 1996 to 1998 consisted mainly of costs in respect of vehicle
office furnishings and office equipment. TMSE has a nominal capital budget for 1999.

**Employees**

As at June 30, 1999, TMSE had 156 full-time employees.

**Tax Status**

The net profits of TMSE after deduction of a percentage of its issued share capital at December 31
relevant fiscal year, such percentage being equal to the discount rate announced by CBE for December
the relevant fiscal year (currently being 12.25 per cent. per annum), are subject to a flat tax rate of 40 pe
per annum.

## ARAB STEEL FACTORY, S.A.E.

**Overview**

Arab Steel is one of the leading manufacturers in Egypt of steel billet. Billet is the raw material required
manufacture of steel rebars (which are steel reinforcement bars used for strengthening concrete
construction industry), angles and beams. In 1998, Arab Steel produced 240,000 tons of bille
approximately E£187 million (U.S.$55 million) in sales and approximately E£29 million (U.S.$8.5 mil
net profits. During the six-month period ended June 30, 1999, Arab Steel produced approx
142 thousand tons of billet, had approximately E£99 million (U.S.$29 million) in sales and approx
E£29 million (U.S.$8 million) in net profits. As at June 30, 1999, Arab Steel's total fixed asset
approximately E£229 million (U.S.$67 million).

**History**

On December 17, 1994, Arab Steel was incorporated as a joint stock company under Law 159 of 19:
Commercial Register number 286522. On October 19, 1995, Arab Steel transferred its head office to t
of Ramadan City and changed its Commercial Register number to 556. In 1998, substantially all of th
of Arab Steel were transferred to the Lakah Holding Company. Arab Steel's shares have been listed o
since June 1, 1998.

As at the date of this Offering Circular, Arab Steel's authorized capital is E£750 million divid
75 million shares with a par value of E£10 per share, of which 25 million shares are issued and fully
of the date of this Offering Circular, the Lakah Holding Company owns 97.9 per cent. of Arab Stee

**Subsidiary Guarantors**

The Lakah Family has been connected with the steel business in Egypt since the early 1960s. For 20 years, the Lakah Family controlled a company which operated a rolling mill producing rebars situated in Alexandria, but which is no longer operational. In 1993 and 1994, there was significant demand for steel billet in Egypt, and a lack of domestic production capacity to meet such demand. Due to this shortage, the rolling mill owned by the Lakah Family in Alexandria was unable to operate at full capacity and given this and the lack of domestic capacity, the Lakah Family decided to establish and use Arab Steel as a corporate vehicle to invest in the construction of a steel meltshop to produce billet. In 1995, Arab Steel commenced pre-installation and construction of the meltshop. The meltshop commenced operation in 1997. See *"Production Facilities."*

**Egyptian Market for Billet and Competition**

Billet is the raw material required for the production of rebars, angles and beams used in the construction industry. Rebar producers roll the billet into rebars using rolling mill facilities. As a consequence, billet demand in Egypt is dependent upon the Egyptian market demand for rebars, which, following the growth of the Egyptian construction industry, has increased from approximately 1.8 million tons in 1992 to approximately 4.5 million tons in 1998, of which approximately 3.7 million tons were produced in Egypt. In 1998, it is estimated that approximately 800,000 tons of rebars were imported into Egypt representing 17 per cent. of domestic demand. Arab Steel believes domestic producers of rebars have competitive advantages over non-Egyptian rebar suppliers as a consequence of customer preference to deal with local producers, better continuity of supply from local producers, pricing advantages due to lower transport costs and the existence of tariffs imposed on importation of rebars, other than from Libya. Arab Steel does not expect Egypt to reduce tariffs on rebars in the near future.

Egyptian market demand for billet has increased from approximately 1.9 million tons in 1992 to approximately 3.8 million tons in 1998, of which 2.5 million tons were produced in Egypt. In 1998, 1.3 million tons of billet were imported into Egypt representing 34 per cent. of domestic demand. Arab Steel believes the competitive advantages enjoyed by rebar producers apply equally to domestic producers of billet.

Egypt's Law 161 of 1998 permits the imposition of fines on importers to restrict dumping activities into Egypt. A number of billet and rebar producers, including Arab Steel, have filed anti-dumping proceedings with the Anti-Dumping Office of the Egyptian Ministry of Trade against suppliers from the Ukraine, Romania, Latvia, Turkey and certain other countries.

Arab Steel believes that it is currently the only producer of billet in Egypt for sale to third parties. Substantially all other billet produced in Egypt is produced by manufacturers of rebars as part of their integrated production process. Arab Steel believes that its billet production of 240,000 tons in 1998 represented six per cent. of 1998 domestic billet production, which was led by Alexandria National Steel Dekheila, S.A.E. ("ANSDK") with 900,000 tons (23 per cent.) and Egyptian Iron and Steel, S.A.E. with 800,000 tons (21 per cent.), respectively. A second meltshop, with anticipated nominal capacity of approximately 600,000 tons per annum of steel billet, is currently being constructed by one of the other steel manufacturers in Egypt and is expected to commence production for sale of third parties in 2000.

**Strategy**

Arab Steel's principal objective is to increase production levels to reach 90 per cent. of its meltshop's maximum optimal production capacity. Additional strategic objectives include:

● to continue to improve on efficiency of operations;

● to enhance the production process;

● to deliver the East Port Said Project described below;

● to maintain tight control over its credit exposure to customers; and

● to comply with, and where possible, exceed domestic norms and regulations in line with the Lakah Holding Company's overall environmental policy.

Subsidiary Guarantors

## Production Facilities

On May 26, 1995, Arab Steel acquired a site of approximately 33,500m$^2$ in the industrial zone in the 10th of Ramadan City for construction of a meltshop with capacity to produce 400,000 tons of billet per year. meltshop uses an electric arc furnace to melt steel scrap, directly reduced iron ("DRI") and hot-briquette iron ("HBI") and casts the resulting molten steel into billet. In May 1995, Arab Steel acquired a 55 to electric arc furnace manufactured by Demag, a German company, and a four strand continuous billet caste manufactured by Rocop, a U.S. company. The facility has an annual capacity of 400,000 tons of billet po year. The facility is supported by a variety of auxiliary equipment, including two power stations, a wate treatment plant, an oxygen plant, workshops, steel scrap storage facilities, product storage warehouses, laboratory and administrative offices. The total purchase, installation and refurbishing costs of the meltsho (excluding the cost of auxiliary equipment) amounted to approximately E£156 million and were finance principally through shareholder loans and short term bank borrowings. In 1998, these shareholder loans wei converted into equity and the short term bank borrowings were refinanced through the issue of bonds. So "*Indebtedness*". Arab Steel's meltshop has a maximum production capacity of 400,000 tons per annum. Ara Steel received a license to operate the meltshop and started production of steel billet in October 1997. Tl quality management systems of the meltshop are awaiting compliance assessment but Arab Steel conside that it will qualify for certification as being compliant with ISO 9000 quality requirements. ISO certification not a pre-requisite for the sale of billet provided by Arab Steel. Arab Steel's meltshop is designed for operatic on a 24 hours a day, seven days a week basis excluding annual maintenance shutdowns and unschedule down times. Arab Steel commenced production on a test basis during the last quarter of 1997. During 199 the meltshop operated at approximately 60 per cent. of nominal capacity producing approximate 240,000 tons of steel billet. In the first four months of 1999, Arab Steel produced approximately 89,000 to: of steel billet and expects capacity utilization of approximately 70 per cent. of nominal capacity for 1999. production efficiencies are improved, Arab Steel estimates that it will be capable of producing approximate 360,000 tons of steel billet in 2001 representing capacity utilization of 90 per cent. of nominal capacit Production to date has been in line with the meltshop's installation specifications.

## Real Property

Under current applicable Egyptian law, title to land in industrial areas such as the 10th of Ramadan City m only be initially transferred to purchasers upon completion by the purchaser of an investment project in t form agreed by the relevant new communities authority, commencement of operations relating to su investment, and receipt of the necessary regulatory approvals, including a building permit, a permane operating license, a hand-over certificate and an environmental compliance certificate.

Arab Steel currently occupies and has the right to acquire the following properties:

- a 33,500m$^2$ parcel located in the 10th of Ramadan City, which is the site of the meltshop and for which f payment has been made by Arab Steel. No registration in favor of Arab Steel has been effected to di because, until June 1, 1999, Arab Steel was not in possession of an environmental compliance certifica That certificate has since been obtained and Arab Steel is currently in the process of completing necessary formalities for registration; management anticipates that all registration formalities will completed within 12 months of the date of this Offering Circular;

- a 150,000m$^2$ parcel located in the 10th of Ramadan City, which is currently used by Arab Steel as a stora site for steel scrap and other raw materials for billet production. Pursuant to a preliminary sales contr between Arab Steel and the Prosecutor General of Egypt as successor of the former bankrupt owner, Prosecutor General irrevocably empowered Mr. Ramy Lakah, both in his capacity as Arab Steel's chairm and personally, to irrevocably act on behalf of the Prosecutor General to register this parcel in the na of Arab Steel;

- a 35,300m$^2$ parcel located in the 10th of Ramadan City for which full payment has been made by Ai Steel. This parcel is currently used by Arab Steel as a storage site for steel scrap and other materials billet production. Arab Steel will be eligible to register the parcel in its name once it has completed relevant investment project agreed with the new communities authority. Arab Steel does not have a current intention to complete such investment on this parcel and as such has not applied for the requi certificates.

**Subsidiary Guarantors**

The aggregate price paid by Arab Steel for all three parcels amounted to approximately E£49 million (U.S.$14.42 million).

**Raw Materials**

The raw materials used by Arab Steel for the production of steel billet are steel scrap or scrap substitutes (DRI and HBI). In 1998, Arab Steel did not use any DRI or HBI in respect of steel billet production. Steel scrap is sourced locally, often from the shipyards in Alexandria and the Egyptian Railway Authorities, but if not available locally is imported. In 1998, approximately 80 per cent. of steel scrap used by Arab Steel was purchased locally and approximately 20 per cent. of the steel scrap used by Arab Steel was purchased from Amitrade. Arab Steel seeks to maintain a stock of steel scrap sufficient to meet its anticipated production for the next six months in order to protect it against adverse changes in the price for steel scrap. Cost of steel scrap constituted between 35 and 40 per cent. of the total production costs of Arab Steel for the year ended December 31, 1998. In 1998, the average price paid by Arab Steel for steel scrap was approximately E£300 per ton. Other raw materials or operating supplies required by Arab Steel, including lime, ferro alloys, refractories, carbon and graphite electrodes, are obtained either from Amitrade or directly from other suppliers. In the year ended December 31, 1998, the cost of raw materials purchased by Arab Steel from its sister company Amitrade for production of billet amounted to approximately E£10 million representing 0.3 per cent. of cost of sales for the period. Since the commencement of operations, Arab Steel has obtained adequate quantities of such raw materials and supplies to permit efficient billet production. An average profit margin of 15 per cent. is charged by Amitrade on sales to Arab Steel.

**Customers**

Arab Steel's customers for steel billet are Egyptian manufacturers producing rebars, beams and angles. In 1998, Arab Steel's largest customer was Contrasteel, S.A.E. ("Contrasteel"), the entity procuring billet for ANSDK, Egypt's largest steel producer. During that year, Contrasteel purchased approximately 180,000 tons directly from Arab Steel representing 75 per cent. of Arab Steel's production for that year pursuant to a fixed price contract, subject to adjustment.

In October 1998, a new sales policy was adopted by Arab Steel whereby Arab Steel began to sell a significant proportion of its production to Amitrade, which Amitrade then on-sells to manufacturers of rebars, beams and angles, including ANSDK. In 1998, Amitrade purchased, for on-sale, steel billet produced by Arab Steel in the amount of approximately E£22.5 million representing 12 per cent. of Arab Steel's total sales for the same period. Arab Steel offers no sales discounts to Amitrade. Other customers of Arab Steel include Al Saied, El Garhy and Suez Company for Metallurgic Industries, S.A.E ("Suez").

Arab Steel grants payment terms to its customers for up to 120 days. Payment obligations are generally secured by post dated checks and in certain circumstances by letters of credit. A credit investigation is generally performed.

Prices are generally quoted ex-factory, however some customers request prices including freight, in which case, subject to availability, Arab Steel contracts with Universal for Heavy Transport, S.A.E. ("Universal"), a sister company, to provide freight services, which are provided at market rates.

**Energy Supply and Water**

The meltshop obtains electricity from the Egyptian Electricity Authority ("EEA"), which is currently the sole electricity supplier in Egypt. The average cost of electricity supplied to Arab Steel's mill during the six-month period ended June 30, 1999 was approximately E£0.16 (U.S.$0.05) per kilowatt hour. In the event of any interruption in the EEA electricity supply, Arab Steel has two backup power stations to ensure continuity of energy supply.

Water is supplied for manufacturing and other purposes from the local governate, which is adequate for the requirements of the meltshop.

**Environmental Matters**

Arab Steel is subject to Law 4 of 1994 and its Executive Regulations, which with effect from February 1998 have governed various aspects of land, air and water pollution and, in particular, the discharge of contaminants that may be emitted into the air and discharged into the waterways, and the disposal of solid and/or hazardous waste.

**Subsidiary Guarantors**

In April 1999, Arab Steel completed the installation of a de-dusting plant. Water recycling syster
incorporated in the various manufacturing processes that require cooling water in order to m
water intake. Effluent from the mill is delivered for drainage after completing sedimentation t
June 1999, the Egyptian Environmental Affairs Agency issued an environmental complianc
Management believes Arab Steel's meltshop meets applicable Egyptian environmental require
material respects.

**East Port Said Project**

Arab Steel estimates that demand from international steel manufacturers for HBI will increase
Currently Egyptian and European demand for HBI is largely met from manufacturers in Iran, N
Qatar and Venezuela. In addition to the costs of production, these manufacturers incur addit
costs, which, for deliveries to Europe, are estimated to be U.S.$20-25 per ton. A Libyan mar
lower delivery costs to Europe but has limited production capacity.

Arab Steel has identified a site at East Port Said, an industrial zone established in 1997 three kilc
Port Said on the Mediterranean coast. This site has access through the port to imported iron ore
quantities of water and natural gas used in the production of HBI. Arab Steel has estimated th:
of this site will allow manufacture and sale of HBI to Egyptian and European steel manufactu
including delivery costs, which will be competitive with the other major exporters to Egypt a

On August 12, 1997, Arab Steel and Messrs Ramy Lakah and Michel Lakah, as co-founders,
Egyptian joint stock company, ACIS, with an authorized capital of E£250 million divided ir
shares of par value E£100 each, all of which are fully paid-in. 1.2 million of these shares are c
Steel and 1.3 million are owned together by Messrs Ramy and Michel Lakah. Messrs Ramy Lal
Lakah agreed to transfer all of their shares to Arab Steel for an amount equal to the paid-in

ACIS has been granted an allocation by the new communities authority of East Port Said
entity) over 1 million square meters of land at East Port Said. ACIS has deposited approximat
with the new communities authority as a downpayment. The acquisition cost for the parcel of l
been finalized with the new communities authority but is expected to be approximately E£€
December 31, 1998, ACIS had invested a total of approximately E£80 million in respect of fe:
infrastructure for the site and land costs. Arab Steel estimates total project costs will be
E£600 million and expects to finance a large portion of the project on a non-recourse financ
Steel and other companies in the Lakah Group. ACIS intends to enter into a contract with
company to construct, manage and operate an HBI production plant with a capac
approximately 650,000 tons of HBI per annum at the East Port Said site. It is anticipated tha
40 per cent. of such HBI production will be purchased by Arab Steel and/or Amitrade to p:
raw material requirements of Arab Steel. No assurance can be given that finance can be secu
described above, that the project will be successful or that ACIS will not discontinue the pr

**Indebtedness**

On September 29, 1998, Arab Steel issued its E£250,000,000 11 per cent. bonds due 2005. A
main terms and conditions is set out below:

| | |
|---|---|
| Principal Amount:................. | E£250,000,000 |
| Interest:................................ | 11 per cent. per annum |
| Maturity: ............................. | September 29, 2005 |
| Issue Price:........................... | 100 per cent. |
| Issue Date: ........................... | September 29, 1998 |
| Guarantee: ........................... | Banque du Caire, S.A.E. as to interest and principal. |
| Use of Proceeds:................... | Reimbursement of debt and funding future expansion plans. |
| Payment of Interest:............. | Semi annual, each January 1 and July 1, commencing January 1, 1! |
| Payment and Prepayment: ...... | At maturity, unless accelerated or prepaid at the option of the Laka |
| | Company commencing at the end of the fifth year. Minimum prepa |
| | E£1 million or any multiple thereof. |

Banque du Caire, S.A.E. has secured the Lakah Holding Company's reimbursement obligati
the guarantee by a pledge on 800,000 shares of Medequip and 400,000 shares of TMSE. T
Company has agreed in the Subscription Agreement to procure a release of the pledge fr
condition to the purchase by the Managers of the Bonds.

## Subsidiary Guarantors

As at June 30, 1999, Arab Steel had other outstanding long-term debt, excluding the current portion of long-term debt, of approximately E£250 million (U.S.$74 million) and short-term debt, including the current portion of long-term debt, of approximately E£39 million (U.S.$12 million). Since June 30, 1999, there has been no material change in Arab Steel's indebtedness.

## Capital Expenditure

Arab Steel's capital expenditures from 1996 to 1998 consisted primarily of costs in respect of:

* the acquisition of real property;

* the acquisition of an electric arc furnace and continuous casting line; and

* its investment in ACIS.

Arab Steel's capital expenditure budget for 1999 is approximately E£19.4 million divided as follows:

|  | Budget Amount E£ (million) |
| --- | --- |
| De-dusting plant | 12 |
| Power station | 7 |
| Others | 0.4 |

## Employees

As at June 30, 1999, Arab Steel had 352 full-time employees.

## Tax Status

Arab Steel's location in 10th of Ramadan City entitles it to a ten year tax holiday of which one and a half years have elapsed.

# Other (Non-Guarantor) Subsidiaries

## AMITRADE FOR COMMERCE & CONTRACTING, S.A.E. ("Armitrade")

### Overview

Amitrade's principal activity is trading in raw materials used in the Egyptian steel industry and, in particula the manufacture of steel billet and rebars. In addition, on January 14, 1999, Amitrade entered into a exclusive distribution agreement to sell Toshiba elevators, escalators and moving walkways.

In 1998, Amitrade had sales of approximately E£80.5 million (U.S.$23.7 million) and net profits approximately E£6.5 million (US$1.9 million). For the six-month period ended June 30, 1999, Amitrade h sales of approximately E£140 million (U.S.$41 million) and net profits of approximately E£8 milli (U.S.$2 million).

In 1998, Amitrade had sales to Arab Steel of approximately E£10.7 million (U.S.$3.1 million) representi approximately 13 per cent. of Amitrade's total sales in 1998. In 1998, Amitrade had sales attributable to bil produced by Arab Steel of approximately E£22 million (U.S.$6.47 million) representing 27.5 per cent. Amitrade's total sales for 1998.

### History and Activities

Amitrade was established on December 13, 1995 as a joint stock company under Law 159 of 1981 w Commercial Register number 292992. In 1998, substantially all of the shares of Amitrade were transferred the Lakah Group. Amitrade's shares have been listed on CASE since October 14, 1998.

As of the date of this Offering Circular, Amitrade's authorized capital is E£100 million of which 500,C shares par value E£100 per share, are issued and fully paid. As of the date of this Offering Circular, the Lak Holding Company owns 97.0 per cent. of Amitrade shares.

Amitrade was established initially to act as the trading arm of Arab Steel to procure the supply of r materials to Arab Steel and on-sell steel billet produced by Arab Steel. Amitrade now provides trading servi to more than five steel manufacturers in Egypt ranging from procurement of raw materials and spare pa such as steel scrap, sponge iron, refractory bricks and graphite electrodes, to marketing and distribution steel products, such as billet and rebars. By trading with other steel manufacturers, Amitrade has opportunity to increase its sales volumes and to reduce its dependence on Arab Steel. In September 19 Amitrade replaced Arab Steel as the supplier of steel billet to Contrasteel by entering into a one year sup agreement pursuant to which Contrasteel agreed to buy 180,000 tons of steel billet at a fixed price whic subject to minor price adjustments. Contrasteel's payment obligations are secured by letters of credit ope through reputable Egyptian banks. During the period from October 1, 1998 to June 30, 1999, Amitrade delivered approximately 60,000 tons of steel billet to Contrasteel leaving a balance of approxima 120,000 tons to be delivered before September 30, 1999.

Amitrade has entered into additional contracts including the following:

- in November 1998, Amitrade entered into a contract with Al Saied Company to supply raw materials additives. As of the date of this Offering Circular, Amitrade has supplied raw materials and additives v a value of approximately E£15 million, payment being made in cash within 60 days of presentatio invoice; and

- in November 1998, Amitrade entered into a contract with Al Saied Company for the supply of 42,000 of steel billet for a fixed price, payment being made in cash within 60 days of presentation of invoic

Pursuing its strategy to diversify from trading in steel-related raw materials and products in 1998, Amit commenced distribution of elevators manufactured by Toshiba. In view of its initial success, Amitrade ent into an exclusive distributorship agreement with Toshiba on January 14, 1999 to sell, install and mair Toshiba-produced escalators, elevators and moving walkways. The exclusive distributorship agreement i: an initial term of two years renewable by notice from Amitrade to Toshiba at any time for a further two y

**Other (Non-Guarantor) Subsidiaries**

In the event of notice of termination by Toshiba, the term is automatically extended for a further 12 months following the date of termination.

The demand for escalators, elevators and moving walkways in Egypt is increasing as a direct consequence of the increased level of construction activities in Egypt. The escalator, elevator and moving walkway market in Egypt can be divided into a lower and higher-end segment. The higher-end segment includes hospitals, hotels, office buildings, airports and high-end residential and commercial centers. Conventional buildings would be considered in the lower end. Toshiba's products fall within the higher-end segment.

Amitrade estimates that the elevator market in Egypt will grow at the rate of ten per cent. per annum through December 31, 2005. Approximately sixty five per cent. of the Egyptian elevator market is supplied by international manufacturers namely, Otis, Shindler, Marryat and Scott, Hans, Mitsubishi, Dover, Thyssen and Haushann.

It is anticipated that Amitrade will supply elevators, escalators and moving walkways to the Subsidiaries and other entities controlled by the Lakah Family. Amitrade's customer for the supply of Toshiba elevators was Scandinavian.

**Strategy**

Amitrade's objective is to consolidate and improve on its position as one of the leading trading companies in Egypt. The development of the Egyptian economy and of economies throughout the Middle East continues to create new business opportunities and Amitrade intends to capitalize on these opportunities as they arise by expanding into selected markets. Amitrade intends to implement the following strategies to meet its objectives, in particular:

• to expand its trading services to other areas, such as special steel, aluminum, glass, cement and other heavy industry operations;

• to expand its geographical coverage, including other countries in the Middle East; and

• to maintain tight control over its credit exposure to customers and developing highly qualified employees with relevant specialist skills.

**Payment Terms**

Amitrade grants payment terms to its customers for up to 120 days. Payment obligations are generally secured by post dated checks and in certain circumstances by letters of credit. A credit investigation is generally performed.

**Indebtedness**

At at June 30, 1999, Amitrade had no long-term debt and outstanding short-term debt of approximately E£27 million (U.S.$8 million). Since June 30, 1999, there has been no material change in outstanding indebtedness.

**Capital Expenditure**

Amitrade's capital expenditure in 1997 and 1998 consisted primarily of costs relating to the acquisition of land used for storage of scrap steel. Amitrade has a nominal capital expenditure budget for 1999.

**Competition**

Trading companies, which are competitors of Amitrade in the Egyptian market, include El Nasr Co. for Import/Export, Arab Co. for Foreign Trade and El Mahareeth Wal Handessa.

**Employees**

As at June 30, 1999, Amitrade had 24 full-time employees.

**Status**

The net profits of Amitrade after deduction of an amount equal to a percentage of its issued share capital at December 31 of the relevant fiscal year, such percentage being equal to the discount rate announced by CBE

**Other (Non-Guarantor) Subsidiaries**

for December 31 of the relevant fiscal year (currently being 12.25 per cent. per annum), are subjec
tax rate of 40 per cent. per annum.

## INDUSTRIAL CONSUMER COMPANY, S.A.E. ("ICC")

### Overview

ICC's principal activity is the manufacture and sale of general lighting shell ("GLS") lamps. For the s
period ended June 30, 1999, ICC had, on an unconsolidated basis, sales of approximately E£2
(U.S.$7 million) and net profits of approximately E£2 million (U.S.$0.6 million). In June 1£
commenced commercial production of fluorescent lamps.

ICC estimates that it currently has eight per cent. of the GLS lamp market in Egypt and is the secor
manufacturer in Egypt. ICC's production facility is one of two such factories operating in Egypt, wl
an integrated manufacturing process from glass manufacture and assembly to packaging. Demand fo
products in Egypt is estimated to have increased from 110 million units in 1995 to 128 million units

ICC also has four recently established subsidiaries:  Arab Industry for Light Metal Works, S.A.
Industry for Wood Production, S.A.E., Arab Industry for Aluminum, S.A.E. and Arab Indu
Electronics, S.A.E., whose respective activities are metal forging, carpentry and the manufacture of a
products and electrical fittings. Each of these subsidiaries leases surplus space in the lighting factory fr

### History

On December 5, 1995, ICC was established as a joint stock company under Law 159 of 19
Commercial Register number 292833. In June 1999, the Company changed its name from The *A*
Company for Marketing, S.A.E. to Industrial Consumer Company, S.A.E.

As of the date of this Offering Circular, ICC's authorized capital is E£100 million divided into 1,
shares of par value E£100 each, of which 500,000 shares are issued and fully paid. As of the dat
Offering Circular, the Lakah Holding Company owns 98.0 per cent. of ICC shares. The shares of IG
been listed on CASE since November 25, 1998.

### Background to Lighting Industry Sector

Growth in construction in Egypt, particularly construction related to the creation of new industri:
resorts and city suburbs, together with the extension of electricity distribution to cover all Egypt as pa
Egyptian government's current five-year plan, has resulted in a significant increase in the demand for
products in Egypt. In 1994, Neasa, S.A.E. ("Neasa"), which was then a joint venture company betw
Egyptian government and a company in the Philips group, produced GLS lamps representing 74 per
the Egyptian GLS lamp market. Despite the growing market for lighting products in Egypt and ba:
importation such as high transport costs, breakages from transportation, imposition of significant ↓
duties on all imports and anti-dumping taxes on imports from certain countries such as China, b
Neasa's market share had declined to 47 per cent. ICC believes that Neasa, which at the date of this G
Circular is owned by the Egyptian government, has lost market share to imports from the
international lighting producers such as GE Lighting and Philips and low quality products from Chi
estimates the 1999 market demand for GLS lamps and fluorescent lamps in Egypt to be 117 milli
19.5 million units, respectively.

*Acquisition of the Al Sherif Factory.* In 1997, the lighting factory Al Sherif, located at 10th of Ramada
was available to acquire from the Prosecutor General of Egypt as successor of the former bankrupt
ICC concluded, that in addition to Neasa, there was an opportunity for another local manufacturer to
substantial share of the lighting market in Egypt.

Although then operating at minimum capacity and at a loss, the Al Sherif factory had a number of at
assets, including a glass furnace capable of producing 22 tons of glass per day, a line for the produc
fluorescent lamps (which, although then not operating, had modern horizontal fluorescent l
technology) and real estate for future expansion.

## Other (Non-Guarantor) Subsidiaries

In October 1997, ICC entered into a preliminary sales contract for the purchase of the Al Sherif factory with the Prosecutor General of Egypt for approximately E£40 million (U.S.$11.7 million). ICC took possession of the factory in January 1998 and made payment of the purchase price in June 1998. The Prosecutor General irrevocably empowered Mr. Ramy Lakah, both in his then capacity as ICC's Chairman and personally, to act on behalf of the Prosecutor General to register the land and building comprising the Al Sherif factory in the name of ICC. Title to the land and building has not to date been registered in the name of ICC pending confirmation of certain tax exemptions.

Following ICC's acquisition of the Al Sherif factory, ICC took action to: (i) improve production efficiencies, (ii) implement quality control procedures to enhance product quality and (iii) introduce a brand name, "Candella," as part of a marketing program for its lighting products. ICC estimates that in 1999 it can gain 14 per cent. of the GLS lamp and 27 per cent. of the fluorescent lamp markets in Egypt. In addition, ICC has targeted other countries in the Middle East and Africa for sale of its lighting products, taking advantage of various free-trade agreements entered with Egypt.

ICC is actively pursuing a number of acquisition opportunities, licensing and technical assistance arrangements and joint venture agreements in connection with its lighting operations.

*Lighting Products.* ICC's lighting products comprise GLS lamps (25, 40, 60, 75 and 100 watt) and fluorescent lamps (18 and 36 watt). New products ICC intends to enhance produce in the near future include candle lamps, night lamps (7 and 15 watt) and additional fluorescent lamps. All such products are marketed under the "Candella" trade name. ICC has applied for registration of the trademark "Candella."

*Lighting Production Facilities.* The total area of the lighting factory is 60,000m², including 18,000m² of covered area.

The glass factory comprises a covered area of 2,835m², a batch plant (four stories) of 132m² and an open area for the storage of glass and raw materials of 2,600m². The glass factory's furnace has a production capacity of 22 tons per day. This glass furnace and those at Neasa are the only furnaces of their type operating in Egypt. Additionally, the glass factory has a tube-draw line with production capacity of ten tons per day and a shell-blowing machine with production capacity of five tons per day.

The assembly factory comprises a covered area of 6,120m² with a GLS assembly line with capacity of 2,000 units per hour, a GLS assembly line with capacity of 2,600 units per hour and a fluorescent lighting line with capacity of 2,000 units per hour. The assembly factory has space available for four additional assembly lines and ICC anticipates adding two GLS assembly lines as and when demand increases.

In addition, there is a separate building of 1,050m² for utilities, storage of 3,390m² for components, spare parts and the finished product and an administration building near to the assembly factory. The factory also has state-of-the-art laboratories to ensure that the lighting products produced meet international specifications and standards.

Despite having modern technology (including the capability of horizontal assembly) supplied by Tungsram, the Hungarian subsidiary of GE Lighting, the fluorescent lighting line was not operational when ICC acquired the factory as the then local management was unable to operate the equipment and had a number of contractual disputes with Tungsram, which resulted in Tungsram failing to provide technical assistance and support. Since ICC's acquisition of the lighting factory, Tungsram has been providing ICC with technical assistance and support, the fluorescent lighting line is now operational and trial production was completed in June 1999.

*Raw Materials and Components.* All raw materials necessary for the production of glass are available in Egypt and of a grade allowing the factory to produce glass of the highest quality. Additional components necessary for the production of lamps, including filaments, caps, exhaust tubes and flares, which in aggregate comprise 40 per cent. to 50 per cent. of the production costs, are imported and subject to customs duty. All components are available and ICC is not dependent on any one supplier.

**Other (Non-Guarantor) Subsidiaries**

*Lighting Product Customers.* Wholesalers account for 90 per cent. of ICC's lighting sales with the balance sales being purchased by retail customers. Sales are generally made by ICC against a cash down-payment 25 per cent. of the purchase price, with balance due within 45 days of the date of invoice.

**ICC's Subsidiaries**

Pending expansion of the lighting assembly lines, the lighting factory has spare floor capacity. In December 1998 and January, 1999, ICC established four subsidiaries, in each case 99.9 per cent. owned by ICC: Arab Industry for Light Metal Works, S.A.E. ("AILM"), Arab Industry for Electronics, S.A.E. ("AIE"), Arab Industry for Wood Production, S.A.E. ("AIW") and Arab Industry for Aluminum, S.A.E. ("AIA"), which manufacture metal forging, carpentry, aluminum products and electrical equipment in workshops utilizing this spare capacity. Each company has a short-term lease with ICC for use of its workshop. The subsidiary companies produce wooden doors and window frames, grilles, hand rails and aluminum products for principally to other companies in the Lakah Group. The subsidiary companies did not commence operations until January 1999. For the six-month period ended June 30 1999, aggregate sales of the subsidiary companies were approximately E£25 million (U.S.$7 million) and aggregate net profits of the subsidiary companies were approximately E£2 million (U.S.$0.6 million).

**Environmental Matters**

ICC is subject to Law 4 of 1994 and its Executive Regulations, which with effect from February 1998 governed various aspects of land, air and water pollution, and, in particular, the discharge of contaminants that may be emitted into the air and discharged into the waterways and the disposal of solid and/or hazardous waste. Management believes ICC meets applicable Egyptian environmental laws and regulations in material respects.

**Indebtedness**

As at June 30, 1999, ICC had outstanding long-term debt, net of the current portion of long-term debt approximately E£35 million (U.S.$10 million), of which approximately E£35 million (U.S.$10 million due to the Lakah Holding Company. Since June 30, 1999, there has been no material change in outstanding indebtedness.

**Capital Expenditure**

ICC's capital expenditure budget in 1998 consisted primarily of costs in respect of its acquisition of Al Sherif factory for approximately E£40 million (U.S.$11.7 million). ICC's capital expenditure budget 1999 is approximately E£12.2 million (U.S.$3.6 million) for upgrading the fluorescent tube line maintenance of the GLS line's at the Al Sherif factory.

**Employees**

As at June 30, 1999, ICC had 397 full-time employees.

**Tax Status**

ICC originally enjoyed a ten year tax holiday, which has now elapsed. The net profits of ICC, after deduction of an amount equal to a percentage of its issued share capital at December 31 of the relevant fiscal year, percentage being equal to the discount rate announced by CBE for December 31 of the relevant fiscal (currently being 12.25 per cent. per annum), are subject to a flat tax rate of 40 per cent. per annum.

# INDUSTRIAL INVESTMENT COMPANY, S.A.E. ("IIC")

**Overview**

IIC, which was formerly called Empain for Real Estate Investment, S.A.E., is a company which invests Egyptian industrial concerns and real estate. As of the date of this Offering Circular, IIC owns and leases leading privately owned detergents plant in Egypt, owns a controlling interest in Universal, the leading privately owned heavy freight truck company operating in Egypt, owns 49 per cent. of the share capital Suez, which produces steel rebars, beams and angles, and owns real estate in Cairo. In June 1999, as the Restructuring, shares in a number of companies owned by IIC were transferred.

For the six-month period ended June 30, 1999 and the twelve-month period ended December 31, 1998 had, on an unconsolidated basis, revenues of approximately E£6 million (U.S.$2 million) and E£8

**Other (Non-Guarantor) Subsidiaries**

(U.S.$3 million), respectively, and net profits of approximately E£19 million (U.S.$6 million) and E£7 million (U.S.$2 million), respectively.

### History

On December 3, 1995, IIC was established as a joint stock company under Law 159 of 1981 with Commercial Register number 292792. In June 1999, the Company changed its name from Empain for Real Estate Investment, S.A.E. to Industrial Investment Company, S.A.E.

As at the date of this Offering Circular, IIC has an authorized share capital of E£250 million (U.S.$73.5 million) divided into 2,500,000 shares of par value E£100 each (U.S.$29.42), of which 1,280,000 shares are issued and fully paid. As at the date of this Offering Circular, the Lakah Holding Company owns 98.0 per cent. of ICC shares. IIC's shares have been listed on CASE since August 20, 1998.

### Strategy

IIC's principal objectives are long-term capital appreciation from its industrial assets and current income through its real estate investments.

### Detergent Factory

*Overview.* IIC's detergent factory, which has the largest production capacity of privately owned detergent plants in Egypt, was acquired on October 1, 1997 by IIC from the Prosecutor General of Egypt as successor of the former bankrupt owner for approximately E£81 million (U.S.$23.8 million). The factory, which comprises production facilities for the manufacture of detergent, sodium silicate and packaging of detergent products, administration offices, warehouses and a laboratory, is a full line detergent manufacturing facility and is currently leased for a five year term by IIC to Newleet Egypt, a Company unrelated to the Lakah Family.

*Detergent Market in Egypt.* Local production of detergent in Egypt increased from 72 million tons in 1986 to 107 million tons in 1996, while demand rose from 79 million tons in 1986 to 111 million tons in 1996. The gap between demand and supply is covered through import of detergent mainly through the Port Said Free Zone. Given the growth of the Egyptian population (estimated at 2.2 per cent. per annum) and movement away from manual washing to automatic washing, IIC believes demand for detergents produced domestically will continue to increase.

*Acquisition of Detergent Factory.* IIC, recognizing the growing demand for detergents in Egypt and the attractiveness of a modern factory with significant capacity, entered into a contract to acquire the factory when it became available for acquisition in October 1997. The factory was then operated by Lever Egypt and ICC negotiated termination of the lease in favor of Lever Egypt as a condition to it taking possession and control of the factory. ICC assumed effective control of the factory on January 1, 1999, following termination of the Lever Egypt lease.

*Strategy.* IIC believes the factory is an attractive asset. In the event the existing lease with Newleet Egypt is terminated or not renewed by either party, IIC would consider whether to seek another lessee or directly operate the factory.

*The Factory.* The factory was constructed at the 10th of Ramadan City and erected on an area of 60,000m². The factory comprises a substance plant, which produces substances needed for the detergent production process, with a maximum production capacity of 7,000 tons per annum; a production of powdered detergents plant, which produces low-foam powder for fully automatic and semi-automatic washing machines and powder for hand washing, as well as powder for dishwasher machines and detergents that have special use in hospitals, with a maximum production capacity of 36,000 tons per annum; a liquid detergent plant, which produces liquids for cleaning dishes, floors, carpets and glass, hair shampoo and fabric softeners, with a maximum production capacity of 12,000 tons per annum; and a sodium silicate plant, which produces sodium silicate substances used for producing detergents, paper adhesives and soil stabilization, with a maximum production capacity of 12,000 tons per annum. The factory also has mixing, perfuming and packaging facilities. The factory site also includes administration offices, laboratories for quality assurance, research and development and buildings for warehouses.

**Other (Non-Guarantor) Subsidiaries**

*Lease of Factory.* The existing lease agreement between IIC and Newleet Egypt, which was effective March 1999, provides for an annual lease payment by Newleet Egypt of initially approximately E£10 milli (U.S.$2.9 million) per year increasing by 15 per cent. annually. The term of the lease is five years. Under t terms of the lease, Newleet Egypt is responsible for all operating costs of the factory, including utilities ar maintenance of the facility, and is obliged to ensure that the factory complies with all environmental laws. / at the date of this Offering Circular, no employee of IIC or any other member of the Lakah Group is second or otherwise contracted to perform services for Newleet Egypt.

**Universal for Heavy Transport, S.A.E. ("Universal")**

*Overview.* Universal is an Egyptian joint stock company, which provides transportation by heavy trucks Egypt. Universal is the leading transport company using heavy trucks in Egypt in terms of volume of freig Universal estimates total demand for freight delivered by heavy trucks in Egypt in 1999 at approximate 32 million tons and truck freight capacity at approximately 25 million tons. IIC owns 97 per cent. of t issued share capital of Universal. In 1998 and the six-month period ended June 30, 1999, Universal h revenues of approximately E£25.8 million (U.S.$7.6 million) and approximately E£17 milli (U.S.$5 million), respectively. As at December 31, 1998 and June 30, 1999, Universal's net assets we approximately E£103 million (U.S.$30.3 million) and approximately E£110 million (U.S.$32 millio respectively.

*Business Strategy.* Universal's objectives are to consolidate and improve its leading market position in t Egyptian heavy truck market and to explore expanding its operations to other countries in the Middle Ea Universal intends to implement key strategies to meet its objectives, in particular, to maintain a fleet of w serviced, modern and reliable heavy vehicles, to increase use of computer technology for tracking a logistical management and to secure long term freight contracts.

*Operations.* Universal currently operates 50 Mercedes Benz 50-ton trucks manufactured under license Egypt comprising models 3838 and 3331, of which 30 are leased and the balance owned by Universal subj to charges. As of June 30, 1999, payments due in respect of truck leasing contracts amounted approximately E£28 million (U.S.$ 8.2 million) and borrowings secured by charges over the trucks amount to approximately E£6.026 million (U.S.$ 1.772 million). All trucks in Universal's fleet are less than 18 mon old. The freight prices charged by Universal are variable, depending on distance traveled, freight carrie quality of roads and length of freight contract. Cargo transported includes a wide range of goods, particular, steel scrap, steel products, cement, building materials and bottled water. In 1998, approximat 16 per cent. of Universal's total freight volume was attributable to contracts with Amitrade. With effect fro January 1, 1999, the Egyptian government introduced a sales tax on freight chargeable at the rate of five cent. of the value of freight services supplied. Universal is currently constructing three service centers greater Cairo for the repair and service of vehicles owned by it and by third parties.

Universal's location in 10th of Ramadan City entitles it to a ten year tax holiday of which three years h elapsed. Universal currently employs 221 people.

**Suez Company for Metallurgic Industries, S.A.E. ("Suez")**

*Overview.* Suez was incorporated on August 3, 1995 as a joint stock company and, at the date of t Offering Circular, Suez' authorized capital is E£50 million divided into 500,000 shares, par value E£100 share, all of which are issued and fully paid. IIC owns 49 per cent. of the issued share capital of Suez, with balance of the shares owned by, and control of Suez vested in, members of a family unrelated to the Lak Family.

*Operations.* Suez' principal activity is the manufacture of rebars, rolls, angles and beams sold primarily to construction industry. Suez owns a rolling mill facility with a capacity to produce 150,000 tons of st products per annum. The rolling mill received its license to commence production in mid 1998 a commenced production in September 1998. As at the date of this Offering Circular, the steel mill is operat at 70 per cent. of nominal capacity. The rolling mill is situated on a parcel of land of 100,000m$^2$, which v acquired by Suez during 1996.

The rolling mill is located approximately three kilometers from the Gulf of Suez Industrial Free Zo Although all of the current production of the rolling mill is sold domestically, the rolling mill's position n the port of Adabia provides Suez with convenient access to a port for export sales should domestic dem

**Other (Non-Guarantor) Subsidiaries**

decrease. In addition to construction occurring in the Gulf of Suez Industrial Free Zone, the new tourist developments in Ain El-Sokhana, Ras Seder and Marsa Alam require significant quantities of rebars and rolls, a significant portion of which Suez is expected to supply given its proximity to these developments.

Suez's location in the Gulf of Suez Industrial Free Zone entitles it to a ten year tax holiday of which three years have elapsed.

**Real Estate Investment**
ICC currently leases two real estate properties, details of which are set below.

Morad Street Building Number 39
The property, which is located in Heliopolis, is occupied as a garage and was acquired by IIC in 1997 for approximately E£100,000 (U.S.$29,000). The property was originally acquired by Mr. Ramy Lakah to ICC on May 29, 1997 and sold by Mr. Ramy Lakah pursuant to a preliminary sales contract dated July 1, 1997 for the original acquisition price. IIC entered into a lease agreement with Jouman Travel as lessee for a period of three years, renewable, commencing on January 1, 1998, with a monthly rent of approximately E£40,000 (U.S.$11,770) for the first rental year with an annual increase of ten per cent. The lessee is responsible for electricity, water and gas payments and for compliance with all applicable regulations. The lessee is not permitted to sublease the property.

Orouba Street Building
The property, which is located in Heliopolis, comprises a three-story palace, basement, garages and a garden. The property was registered in the name of IIC on May 2, 1998. IIC entered into a lease agreement with the Arab Factory for Food Productions as lessee for a period of three years, renewable, commencing on January 1, 1998 with a monthly rent of U.S.$60,000 for the first rental year with an annual increase of ten per cent. The lessee is responsible for electricity, water and gas payments and for compliance with all applicable regulations. The lessee is not permitted to sublease the property.

**Indebtedness**
As at June 30, 1999, IIC had, on an consolidated basis, outstanding long-term debt of approximately E£105 million (U.S.$31 million) of which approximately E£100 million (U.S.$29 million) was due to the Lakah Holding Company. Since June 30, 1999, there has been no material change in outstanding indebtedness.

**Capital Expenditure**
IIC's capital expenditure in 1997 and 1998 consisted primarily of the costs in respect of its acquisitions of shares in Suez and of the detergent factory, amounting in aggregate to approximately E£135 million (U.S.$40 million).

IIC's capital expenditure budget for 1999 is approximately E£124 million (U.S.$36.5 million) primarily in respect of the cost of ICC's acquisition of the detergent factory.

**Tax Status**
The net profits of IIC, after deduction of an amount equal to a percentage of its issued share capital at December 31 of the relevant fiscal year, such percentage being equal to the discount rate announced by CBE on December 31 of the relevant fiscal year (currently being 12.25 per cent. per annum), are subject to a flat rate tax of 40 per cent.

# General Information Applicable to Subsidiaries in the Lakah Group

### Currency Risk Exposure

*Medequip.* To mitigate currency risk exposure in respect of equipment purchases, Medequip generally attempts to purchase U.S. Dollars on a spot or forward basis (generally for periods of six months or less) at or around the date the relevant purchase order is entered into. With respect to construction activities, Medequip has minimal currency risk as almost all costs related to construction activities are denominated in Egyptian pounds.

*TMSE.* Recently almost all purchases of equipment from Toshiba have been made by TMSE in U.S. Dollars. Sales and leasing of equipment made in Egypt are made in Egyptian pounds. To mitigate currency risk exposure, TMSE will either acquire U.S. Dollars by entering into forward contracts or, immediately following execution of a purchase contract with Toshiba, pay U.S. Dollars and place such U.S. Dollars on short term deposit until required. As payment to Toshiba is generally made at or shortly after the sale or leasing of the relevant equipment, TMSE's currency risk exposure is minimal.

*Arab Steel.* Arab Steel has minimal currency risk exposure as almost all costs related to the production of steel billet are denominated in Egyptian pounds.

### Leasing

Since 1996, the Lakah Holding Company and Medequip recognized that a major obstacle to the growth of private sector involvement in the health care sector was the high capital costs of medical equipment required by private hospitals and medical centers. As such, Medequip and TMSE developed leasing programs to attract private customers who would otherwise not have been able to purchase or lease quality medical equipment in order to provide diagnosis and treatment to their patients. Medequip is believed to be the first Egyptian Company to have offered leasing options to purchasers of medical equipment.

The leasing activities of Medequip and TMSE have been steadily expanding since 1996. The table below sets out the non-discounted aggregate amounts payable to Medequip and TMSE as the case may be, in respect of equipment leases entered into during the years 1996, 1997 and 1998 and the six-month period ended June 30 1999:

| | December 31, | | June 30, |
| 1996 | 1997 | 1998 | 1999 |
| | (E£ millions) | | |
| --- | --- | --- | --- |
| 25 | 77.8 | 100.8 | 77 |

To date, all leases have been entered into with private customers for original terms not exceeding four years. Medequip or TMSE retains title to the equipment, which is transferred to the relevant lessee at the expiration of the lease, after payment of all amounts due to the lessor. Leases are denominated in Egyptian pounds and the lessees' payment obligations in respect of leases covering equipment with a value of less than E£700,000 (U.S.$206,000) are generally guaranteed up to 95 per cent. of those obligations by a local insurance company. The lessors retain the right to turn off the equipment in case of default in payment.

Medequip and TMSE generally take general provisions ranging from two per cent. to five per cent. of the amounts payable under each lease to protect against non payment risks. To date, neither Medequip no TMSE has repossessed or attempted to repossess any of its equipment subject to leases. However, each of them had to restructure the terms of certain leases by extending the term thereof by not more than one year. No reduction in the implied interest rate was granted.

The Lakah Holding Company intends to continue to capitalize on its financial strength to further expand it leasing operations and is in the process of setting up a dedicated leasing unit.

**General Information Applicable to Subsidiaries in the Lakah Group**

**Potential Reorganization**

Management of the Lakah Holding Company is considering the possibility of implementing a plan of reorganization pursuant to which the shares of some or all of the Subsidiaries in the Industrial Group may be transferred to another entity, which would be owned at least 51 per cent. by, and controlled by, the Parent Guarantor and/or the Lakah Family. Any such reorganization would not affect the Guarantee. No decision has been taken by the Board of Directors in this respect.

**Governmental Regulation**

The government body in Egypt responsible for environmental regulation is the Egyptian Environmental Affairs Agency. It is anticipated that environmental laws and regulations in Egypt will become increasingly stringent in the near future and that Egyptian environmental law and policy eventually will require more universal application in Egypt of the strict environmental standards presently applied in the United States and Western European countries.

The Subsidiaries in the Medical Care Group are not involved in any manufacturing activities and, as such, are not currently subject to any Egyptian laws regulating environmental activities. Furthermore, responsibility for disposal of hazardous medical wastes is generally the responsibility of the medical care provider.

Each Subsidiary has issued an Environmental Impact Awareness Declaration as a company policy and is in adherence to such policy.

**Insurance**

Each Subsidiary maintains insurance in such amounts and against such risks as it deems prudent in relation to the markets where it operates, although no assurance can be given that such insurance will be sufficient under all circumstances to protect a Subsidiary against significant claims for damages.

The Subsidiaries have been advised by Egyptian counsel that, in cases where a Subsidiary manages or equips a medical facility, any legal liability with respect to the diagnosis or treatment of the patient is the responsibility of the physician providing the clinical service and not of the Subsidiary.

**Litigation**

Neither the Lakah Holding Company nor the Subsidiaries are involved in any litigation or, to management's knowledge, are subject to the threat of litigation that may have a material adverse effect on its financial condition or results of operation. The professionals that provide clinical services to patients assume full risk for medical malpractice liability.

**Employee Relations**

None of the employees of any of the Subsidiaries is covered by a labor contract or collective bargaining agreement. Egyptian law does not oblige factories or businesses to accept or form unions or other types of collective bargaining units. The law in this regard relies principally on general policies and contracts in place between individual employers and employees. The Subsidiaries maintain compensation, benefit and work environment policies intended to assist in attracting and retaining qualified personnel. The majority of salaried employees are covered by employment contracts. Employees without an employment contract are employed pursuant to the Egyptian labor law. Each Subsidiary considers its employee relations to be excellent.

**Year 2000 Compliance**

The Year 2000 issue is the result of computer programs using two digits rather than four to define the applicable year. Because of this programming convention, software, hardware or firmware may recognize a date using "00" as the year 1900 rather than the year 2000. This could result in system failures, miscalculations or errors causing disruptions of operations or other business problems, including, among others, a temporary inability to process transactions, send invoices or engage in similar normal business activities.

**General Information Applicable to Subsidiaries in the Lakah Group**

The local network of each of the Subsidiaries within the Lakah Group has been developed with consideration of Year 2000 compliance. The service software, financial package and quotation programs used by the Lakah Holding Company are all Year 2000 compliant.

All suppliers of medical equipment to companies within the Lakah Group are required to ensure that such equipment is Year 2000 compliant.

# Directors and Senior Management

## Directors

The by-laws of the Lakah Holding Company provide that it will be managed by a Board of Directors consisting of a minimum of three members and a maximum of 15 members ("Directors"). The term of Board membership is initially five years and thereafter three years, subject to renewal. The Board may appoint Directors, including the Chairman, to serve as Managing Directors of the Lakah Holding Company whose duties and responsibilities are determined by the Board.

The members of the Lakah Holding Company's Board of Directors, their principal past affiliations and certain other information are set forth below.

| Name | Age | Position |
|------|-----|----------|
| Ramy Raymond Lakah[1] | 35 | Chairman & Co-CEO |
| Michel Raymond Lakah[1] | 31 | Vice Chairman & Co-CEO |
| Farouk Hassan[1] | 54 | Board Member & Vice President |
| Ramy Oda Pacha[2] | 35 | Board Member & Senior Executive Vice President |
| Mohamed Khadr[2] | 35 | Board Member & Senior Executive Vice President |
| Medhat Sobhy[2] | 44 | Board Member & Vice President Treasurer |
| Abdel Kader Farid[2] | 49 | Board Member & Vice President Investment |
| Ismail Abdoun[2] | 43 | Board Member & CFO |
| Gamal Anwar El Sadat[2] | 46 | Board Member & Vice President |
| Banque du Caire, S.A.E.[2] | | |
|    represented by Badawi Hassanein | 53 | Board Member |
| Brian Anthony Murphy[2] | 47 | Board Member & Strategic Planning |
| Samy Toutoungi[2] | 39 | Board Member |
| Carl Baker[2] | 50 | Board Member & Investor Relations |

*Notes:*

(1) *Board appointment effective December 7, 1998*

(2) *Board appointment effective July 26, 1999*

Mr. *Ramy Raymond Lakah.* Mr. Lakah was chairman of the board of Medequip from its inception in 1984 to 1998. He was born on November 10, 1963.

Mr. *Michel Raymond Lakah.* From 1989 to 1998, Mr. Michel Lakah was vice chairman of Medequip. He was born on May 26, 1968 and in 1989 he received a Bachelor of Arts in Commerce from Ain Shams University.

Mr. *Farouk Hassan.* From 1992 to 1998, Mr. Hassan served as a consultant to Medequip and TSME. He was born on November 14, 1944 and in 1967 he received his B.Sc. in Engineering from Ain Shams University.

Mr. *Ramy Oda Pacha.* From 1997 to 1998, Mr. Oda Pacha was senior executive vice president of TSME and MTMC. He was general manager for TMSE from 1992 to 1997 and served as a board member for TMSE from 1995 to 1997. He was born on November 30, 1963 and in 1986 he received a B.Sc. in Engineering from Ain Shams University.

Mr. *Mohamed Khadr.* From 1997 to 1998, Mr. Khadr was senior executive vice president of Medequip. Prior to that, he was sales manager for Medequip from 1990 to 1997. He was born on November 13, 1963 and in 1988 he received his B.Sc. in Engineering from Ain Shams University.

Mr. *Medhat Sobhy.* From 1977 to 1996, Mr. Sobhy was external auditor for Hanna & Hanna and Wagner & Partners, credit and marketing officer for MAIB bank, credit & marketing instructor for National Commercial Bank, Saudi Arabia and senior marketing manager for Egyptian American Bank. He was born on August 19, 1954 and in 1976 he received a B.Sc. in Commerce from Ain Shams University.

**Directors and Senior Management**

*Mr. Abdel Kader Farid.* From 1986 to 1996, Mr. Farid was vice president of ZAS Aviation and from 1975 to 1986 he was cash management & banking supervisor of Mobil Oil Egypt. Mr. Farid was born on March 3, 1950 and in 1973 he received his Bachelor of Arts in Economics and Political Science from Cairo University.

*Mr. Ismail Abdoun.* From 1981 to 1998, Mr. Abdoun was a corporate banking senior manager for Arab African International Bank, a corporate banking manager for Qatar National Bank and marketing deputy director for Egyptian American Bank. He was born on March 3, 1956 and in 1981 he received his Bachelor of Arts in Commerce and Business Administration from Cairo University.

*Mr. Gamal Anwar El Sadat.* From 1980 to 1986, Mr. Sadat served as vice president of Osman Group; from 1986 to 1992, he served as an investment banker with a New York investment bank, Furman Selz; and, from 1992, he served as Vice President and Board member of the Osman Group. He was born November 14, 1956 and received in 1997 his B.Sc. in Engineering from Cairo University.

*Mr. Badawi Hassanein.* Mr. Hassanein is also a member of the board of directors of Banque du Caire, S.A.E. He was born on June 3, 1946 and in 1968 he received his Bachelor of Arts in Commerce from Cairo University.

*Mr. Brian Anthony Murphy.* From 1980 to 1998, Mr. Murphy served as general manager for Siemens Medical Systems Corp. — Middle East and South Africa, and, from 1975 to 1980, he served as technical manager for Siemens Medical Systems Corp. — Ireland. He was born on June 11, 1952 and in 1975 he received his Third Level Electrical Engineering Diploma from Dublin University.

*Mr. Samy Toutoungi.* Since 1998, Mr Toutoungi has served as Vice President and CEO of Medequip. From 1981 to 1998, Mr. Toutoungi served as Sales Manager of Medequip. He was born on September 2, 1959 and in 1981 he received his B.Sc. in Biochemistry from Ain Shams University.

*Mr. Carl Baker.* From 1996 to 1998, Mr. Baker served as vice president for business development of TMSE. Prior to that, from 1993 to 1996, he was international sales manager of Toshiba and, from 1984 to 1993, was a specialist in Toshiba Medical Systems. He was born on December 2, 1949 and in 1974 he received a Ph.D. in Education in Medicine from the University of Oklahoma and in 1975 he received his Ed.D., also in Education in Medicine, from the University of Texas.

The business address of each of the foregoing persons is 68, Merghany Street, Heliopolis, Cairo, Egypt.

**Senior Management**

Overall management of the Lakah Holding Company is the responsibility of the Chairman of the Board of Directors of the Lakah Holding Company.

The key executives of the Lakah Holding Company's Subsidiaries are:

| Name | Position |
| --- | --- |
| Samy Toutoungy | President — Medequip |
| Adel El Shourbagy | President — TMSE |
| Hamdy Mansy | President — MCMC |
| Karim Nada | President — Quest |
| Mohamed Dabbah | President — Arab Steel |
| Sherif Fawzi | President — Amitrade |
| Reda Moussa | President — ICC |
| Ahmed El Ashmawi | President — IIC |

**Transactions with Directors**

There have not been during the current or immediately preceding fiscal year of the Lakah Holding Company any transactions between the Lakah Holding Company and any Director of the Lakah Holding Company, which were or are unusual in their nature or significant to the business of the Lakah Holding Company, and no such transactions from any prior period remain in any respect outstanding or unperformed. There are no outstanding loans or guarantees granted or provided by the Lakah Holding Company to or for the benefit of any of the Directors.

**Directors and Senior Management**

**Remuneration**

No remuneration was paid to Directors by the Lakah Holding Company for the year ended December 31, 1998. The Lakah Holding Company was incorporated on November 29, 1998. The Lakah Holding Company does not provide for a stock option plan but does provide for payment of bonuses to its employees provided certain targets are exceeded.

**Auditors**

The Lakah Holding Company has appointed Cherif Mohamed Hammouda, chartered accountant, a member of RSM International, and Mostafa Shawki & Co Deloitte & Touche to serve as its independent auditors.

# The Egyptian Health Care and Medical Sectors

The information set forth in this section with respect to the Egyptian health care and medical sectors has been extracted from official or other public sources. Such information has not been independently verified by the Issuer, the Guarantors or the managers or any of their respective affiliates or advisors.

In recent years, Egypt has experienced significant advancements in its health care and medical sectors. Changes in healthcare policy have resulted in an increase of healthcare to citizens at all levels, ranging from primary care to sophisticated specialties. This increase has been achieved through improvements not only in patient care, but increased health insurance coverage, better facilities, advancements in pharmaceutical research and administration and wellness education programs.

**Background**

The development of Egypt's healthcare industry has received international recognition. According to the United Nations Industrial Development Organization (UNIDO), Egypt is considered one of the outstanding countries in the field of healthcare. As a result of Egypt's commitment of major human and financial resources to provide good healthcare to both urban and rural areas, Egypt was awarded the World Health Organization Prize. It was also awarded the World Rotary's award in recognition of its role in child vaccinations. Egypt's anti-bilharzi program was used by the Rotary as a model campaign.

This recognition is the culmination of over 15 years of efforts by Egypt to increase the sophistication and availability of healthcare. In 1981, total investments in the industry were approximately E£800 million. By 1995, that figure had risen to approximately E£1.015 billion. By 1997, the total investments in the health care sector were approximately E£3.288 billion. The Ministry of Health and Population has set out its objective for healthcare in Egypt through a series of 5-year plans. Egypt is now in the middle of the fourth 5-year plan, which began in 1997 and concludes at the end of 2001. In the last year of this plan, the investment in healthcare is projected to be approximately E£8.7 billion. During the period 1981-1994, the number of available treatment beds rose from 84,163 to 109,700 and the number of physicians more than doubled to 108,000, with more than 12,000 of those new physicians practicing in rural areas. Insurance coverage increased dramatically, and the production of drugs, which had been non-existent, became an approximately E£2.7 billion industry by 1995.

The table below illustrates these and other health achievements over the period from 1981/2 to 1994/5:

| Item | 1981/2 | 1994/5 |
|---|---|---|
| Investments | E£0.8 billion | E£10.15 billion |
| **Health services** | | |
| Beds | 84,163 | 109,700 |
| Public and central hospitals | 169 | 208 |
| Public and central hospital beds | 21,149 | 31,300 |
| Rural hospital beds | 1,111 | 3,202 |
| Rural health units | 1,880 | 2,185 |
| Rural hospitals | 39 | 126 |
| Rural sector beds | 7,584 | 9,500 |
| **Volume of manpower for these services** | | |
| Number of physicians | 52,159 | 108,000 |
| Dentists | 6,814 | 18,500 |
| Pharmacists | 17,571 | 33,500 |
| Nursing staff, basic healthcare | 60,129 | 124,500 |
| Development of manpower | physicians/nurses | physicians/nurses |
| Rural sector | 2,370/7,110 | 14,408/65,645 |
| Urban centers | 1,175/854 | 16,034/11,402 |
| Maternity and childcare | —/— | 1,561/2,600 |
| **Health services buildings** | | |
| Rural units | 17,890 | 28,902 |
| Health groups | 551 | 2,733 |
| Rural hospitals | 20 | 744 |
| Urban health centers | 116 | 939 |
| Maternity and childcare | 246 | 954 |
| Health insurance | 2.7 million employees | 7.7 million, plus 12 million students |
| **Treatment organizations** | | |
| Treatment centers | — | 12 hospitals, 4,771 beds |
| Production of drugs | — | E£2.7 billion |
| Blood centers | — | 212 centers |

*Source: Egyptian State Information Service*

## The Egyptian Health Policy

The healthcare policy in Egypt is aimed at providing care to citizens at a variety of levels, beginning with primary care and first-aid and progressing to specialty medicine. This multi-gradated system is aimed at creating completely integrated healthcare. This system is based upon a number of key policy goals such as: (i) to increase the number and quality of healthcare facilities, including rural facilities and emergency care medical units and ambulance stations; (ii) to increase the level of performance of physicians and nurses by training them both in Egypt and abroad; (iii) to extend healthcare insurance and to integrate family planning and population issues, and to complement these programs with contributions from charities and private organizations; (iv) to encourage an increase in the local production of medical supplies and pharmaceuticals; (v) to increase the quality control of pharmaceuticals, not only of the final product, but of the manufacturing, distribution and marketing aspects of the industry as well; (vi) to provide an increased level of information through updated databases and information centers; and (vii) to expand urgent healthcare services in order to confront disasters and accidents.

Tangible evidence of the increase in healthcare technology can be seen in such high-level medical centers as the Nasser Institute, Al-Haram Hospital and Sharm Al-Sheikh Hospital, which have increasingly focused on doctor training. Other medical centers, such as the one-day surgery centers in Al-Marg, Nasr City, Samalout, Qiena and Wadi Al-Natron, are being upgraded for the 21st century with goals aimed at serving high-demand areas, alleviating costs to both patients and the State and introducing advanced concepts in healthcare.