# Clearing and Settlement

The information set forth below is subject to any change in or reinterpretation of the rules, regulations and procedures of DTC, Euroclear or Cedelbank (together, the "Clearing Systems") in effect for the time being. Investors wishing to use the facilities of any of the Clearing Systems must check the rules, regulations and procedures of the relevant Clearing System in effect at the time being. None of the Issuer, any Guarantor or the Trustee will have any responsibility for the performance by DTC, Euroclear or Cedelbank or their respective participants or indirect participants of their respective obligations under the rules, regulations and procedures governing their operations.

**DTC**

DTC has advised the Issuer as follows: DTC is a limited purpose trust company established in May 1973 and organized under the laws of the State of New York, a member of the United States Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to Section 17A of the Exchange Act. DTC was created to hold securities for its participants ("DTC Participants") and to facilitate the clearance and settlement of securities transactions between DTC Participants through electronic book-entries, thereby eliminating the need for physical movement of certificates. DTC Participants include securities brokers and dealers, banks, trust companies, and clearing corporations. Indirect access to the DTC system also is available to others such as banks, brokers, dealers, and trust companies that clear through or maintain a custodial relationship with a DTC Participant either directly or indirectly ("Indirect Participants"). DTC is owned by a number of its participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc.

Under the rules, regulations, and procedures creating and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers of Bonds among DTC Participants on whose behalf it acts with respect to Bonds accepted into DTC's book-entry settlement system as described below (the "DTC Bonds") and to receive and transmit distributions of the principal amount and interest on the DTC Bonds. DTC Participants and Indirect Participants with which beneficial owners of DTC Bonds ("Owners") have accounts with respect to the DTC Bonds similarly are required to make book-entry transfers and receive and transmit such payments on behalf of their respective Owners. Accordingly, although Owners who hold DTC Bonds through DTC Participants or Indirect Participants will not possess Bonds, the Rules, by virtue of the requirements described above, provide a mechanism by which such Owners will receive payments and will be able to transfer their interests with respect to the Bonds.

Because DTC may only act on behalf of DTC Participants, who in turn act on behalf of Indirect Participants, any Owner desiring to pledge its beneficial interest in a DTC Bond to persons or entities that do not participate in DTC, or otherwise to take actions with respect to such interest, may be affected by the lack of a physical certificate evidencing such interest.

DTC will take any action permitted to be taken by an Owner only at the direction of one or more DTC Participants to whose account with DTC such Owner's DTC Bonds are credited. Additionally, DTC has advised the Issuer that it will take such actions with respect to any percentage of the beneficial interest of Owners who hold Bonds through DTC Participants or Indirect Participants only at the direction of and on behalf of DTC Participants whose account holders include undivided interests that satisfy any such percentage.

To the extent permitted under applicable law and regulations, DTC may take conflicting actions with respect to other undivided interests to the extent that such actions are taken on behalf of DTC Participants whose account holders include such undivided interests.

**Euroclear and Cedelbank**

Euroclear and Cedelbank have advised the Issuer as follows:

Euroclear and Cedelbank hold securities for participating organizations and facilitate the clearance and settlement of securities transactions between their respective participants through electronic book-entry changes in accounts of such participants. Euroclear and Cedelbank provide to their participants, among other

things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Euroclear and Cedelbank interface with domestic securities markets. Euroclear and Cedelbank participants are financial institutions such as underwriters, securities brokers and dealers, banks, trust companies and certain other organizations. Indirect access to Euroclear and Cedelbank is also available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Euroclear or Cedelbank participant, either directly or indirectly.

Euroclear is operated by Morgan Guaranty Trust Company of New York, Brussels office as operator of the Euroclear system (the "Euroclear Operator"), under contract with Euroclear Clearance System Société Cooperative, a Belgian cooperative corporation (the "Cooperative"). All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator, not the Cooperative. The Cooperative establishes fundamental policies for Euroclear on behalf of Euroclear participants. The Euroclear Operator is regulated and examined by the Board of Governors of the Federal Reserve System, the New York State Banking Department and the Belgian Banking Commission.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the terms and conditions governing use of Euroclear, the related operating procedures of the Euroclear system and applicable Belgian law (collectively, the "*Euroclear Terms and Conditions*"). The Euroclear Terms and Conditions govern transactions of securities and cash within Euroclear, withdrawal of securities and cash from the system, and receipts of payments with respect to securities in the system. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Euroclear Terms and Conditions only on behalf of Euroclear account holders, and has no record of or relationship with persons holding through Euroclear account holders.

**Initial Settlement in Relationship to DTC Bonds**

Upon the issue of a Regulation S Global Bond and/or a Restricted Global Bond deposited with DTC or a custodian therefor, DTC or its custodian, as the case may be, will credit, on its internal system, the respective principal amount of the individual beneficial interest represented by such relevant DTC Bond or Bonds to the accounts of persons who have accounts with DTC. Such accounts initially will be designated by or on behalf of the Manager. Ownership of a beneficial interest in a DTC Bond will be limited to DTC Participants, including Euroclear and Cedelbank, or Indirect Participants. Ownership of beneficial interests in DTC Bonds will be shown on, and the transfer of that ownership will be effected only through, records maintained by DTC or its nominee (with respect to interests of DTC Participants) and the records of DTC Participants (with respect to interests of Indirect Participants).

Euroclear and Cedelbank will hold omnibus positions on behalf of their participants through customers' securities accounts for Euroclear and Cedelbank on the books of their respective depositories, which in turn will hold such positions in customers' securities accounts in such depositories' names on the books of DTC.

Investors that hold their interests in a DTC Bond will follow the settlement procedures applicable to global bond issues. Investors' securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors that hold their interests in a DTC Bond through Cedelbank or Euroclear accounts will follow the settlement procedures applicable to conventional Eurobonds, except that there will be no "lock-up" required by U.S. Treasury Regulations. The interests will be credited to the custody accounts on the settlement date against payment in same-day funds.

**Secondary Market Trading in Relation to DTC Bonds**

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date. Although DTC, Euroclear and Cedelbank have agreed to the following procedures in order to facilitate transfers of interests in Global Bonds deposited with DTC or a custodian therefor among participants of DTC, Euroclear and Cedelbank, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. Neither the Issuer nor any agent of the Issuer will have any responsibility for the performance by DTC, Euroclear or Cedelbank or their

respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Trading between DTC Participants**
Secondary market trading between DTC Participants will be settled using the procedures applicable to global bond issues in same-day funds.

**Trading between Cedelbank and/or Euroclear Participants**
Secondary market trading between participants in Cedelbank ("Cedelbank Participants") and/or participants in Euroclear ("Euroclear Participants") will be settled using the procedures applicable to conventional Eurobonds in same-day funds.

**Trading between Euroclear or Cedelbank Accountholders**
If an Owner holding in Euroclear or Cedelbank sells to a third party that wishes to hold such Bond in either Euroclear or Cedelbank, the trade will be settled using either Euroclear or Cedelbank and procedures applicable to conventional Eurobonds.

**Trading between Euroclear or Cedelbank Seller and DTC Purchaser**
Due to time zone differences in their favor, Euroclear Participants and Cedelbank Participants may employ their customary procedures for transactions in which interests in DTC Bonds are to be transferred by the respective clearing system, through its respective depositary, to a DTC Participant. The seller will send instructions to Euroclear or Cedelbank through a Euroclear Participant or Cedelbank Participant, as the case may be, at least one Business Day prior to settlement. In these cases, Euroclear or Cedelbank will instruct its respective depositary to deliver the interest in the DTC Bond to the DTC Participant's accounts against payment. Payment will include interest (if any) accrued on such beneficial interest in such Bond being transferred from and including the immediately preceding date for the payment of interest to but excluding the settlement date. The payment will then be reflected in the account of the Euroclear Participant or Cedelbank Participant the following day, and receipt of the cash proceeds in the Euroclear Participant's or Cedelbank Participant's account would be back valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Euroclear Participant or Cedelbank Participant have a line of credit in its respective clearing system and elect to be in debit in anticipation of receipt of the sale proceeds in its account, the back valuation will extinguish any overdraft charges incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Euroclear Participant's or Cedelbank Participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Euroclear and Cedelbank to purchase interests in the DTC Bond from DTC Participants for delivery to Euroclear Participants or Cedelbank Participants should note that these trades would automatically fail on the sale side unless affirmative action is take. At least three techniques should be readily available to eliminate this potential problem:

(a) borrowing through Euroclear or Cedelbank for one day (until the purchase side of the day trade is reflected in their Euroclear or Cedelbank accounts) in accordance with the clearing system's customary procedures;

(b) borrowing the interests in the United States from a DTC Participant no later than one day prior to settlement, which would give the interests sufficient time to be reflected in their Euroclear or Cedelbank account in order to settle the sale side of the trade; or

(c) staggering the value date for the buy and sell sides of the trade so that the value date for the purchase from the DTC Participant is at least one day prior to the value date for the sale to the Euroclear Participant or Cedelbank Participant.

**Trading between DTC Seller and Euroclear or Cedelbank Purchaser**
When interests are to be transferred from the account of a DTC Participant to the account of a Euroclear Participant or Cedelbank Participant, the purchaser will send instructions to Euroclear or Cedelbank through a Euroclear Participant or Cedelbank Participant, as the case may be, at least one Business Day prior to settlement. Euroclear or Cedelbank, as the case may be, will instruct its respective depositary to receive such

interest against payment. Payment will include interest (if any) accrued on such beneficial interest in such DTC Bond being transferred from and including the immediately preceding date for the payment of interest to but excluding the settlement date. Payment will then be made by the depositary to the DTC Participant's account against delivery of the interest in such DTC Bond. After settlement has been completed, the interest will be credited to the respective Clearing System, and by the Clearing System, in accordance with its usual procedures, to the Euroclear Participant's or Cedelbank Participant's account. The securities credit will appear the next day (European time) and the cash indebtedness will be back valued to, and any interest on such DTC Bond will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (i.e. the trade fails), the Euroclear and Cedelbank cash indebtedness will be valued instead as of the actual settlement date.

Euroclear Participants and Cedelbank Participants will need to make available to the respective Clearing System the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as such participants would for any settlement occurring within Euroclear or Cedelbank. Under this approach, such participants may take on credit exposure to Euroclear or Cedelbank until the interests in the DTC Bond(s) are credited to their accounts one day later.

Alternatively, if Euroclear or Cedelbank has extended a line of credit to a Euroclear Participant or Cedelbank Participant, as the case may be, such accountholder may elect not to preposition funds and allow that credit line to be drawn upon to finance settlement. Under this procedure, Euroclear Participants or Cedelbank Participants purchasing interests in DTC Bond(s) would incur overdraft charges for one day, assuming they cleared the overdraft when the interests in the Bond(s) were credited to their accounts. However, any interest on such Bonds would accrue from the value date. Therefore, in many cases the investment income on the interest in such Bond(s) earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although this result will depend on each participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC Participants can employ their usual procedures for transferring Global Bonds to the respective depositories of Euroclear or Cedelbank for the benefit of Euroclear Participants or Cedelbank Participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC Participants, a cross-market transaction will settle no differently than a trade between two DTC Participants.

Secondary trading in long-term certificates and debentures of corporate issuers is generally settled in clearing house or next-day funds. In contrast, DTC Bonds held through DTC Participants or Indirect Participants will trade in DTC's Same-Day Funds Settlement System until maturity, and secondary market trading activity in such DTC Bonds will therefore be required by DTC to settle in immediately available funds. No assurance can be given as to the effect, if any, of settlements in immediately available funds on trading activity in such DTC Bonds.

# Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions

As a result of the following restrictions, purchasers of Bonds in the United States are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of such Bonds.

Each prospective purchaser of Bonds offered otherwise than in reliance on Regulation S under the Securities Act (the "Restricted Bonds"), by accepting delivery of this Offering Circular, will be deemed to have represented and agreed as follows:

(1) Such offeree acknowledges that this Offering Circular is personal to such offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire Bonds other than pursuant to Rule 144A or Section 4(2) of the Securities Act or in offshore transactions in accordance with Regulation S. Distribution of this Offering Circular, or disclosure of any of its contents, to any person other than such offeree and those persons, if any, retained to advise such offeree with respect thereto is unauthorized, and any disclosure of any of its contents, without the prior written consent of the Issuer, is prohibited.

(2) Such offeree agrees to make no photocopies of this Offering Circular or any documents referred to herein.

Each purchaser of Restricted Bonds will be deemed to have represented and agreed as follows (terms used in the following paragraphs that are not defined therein will have the meaning given to them in Rule 144A or in Regulation S, as the case may be):

(1) In the case of Bonds purchased and sold pursuant to Rule 144A under the Securities Act, the purchaser is a QIB, is aware that the sale of Bonds to it is being made in reliance on Rule 144A and is acquiring such Bonds for its own account or for the account of a QIB, as the case may be.

(2) The purchaser understands that the Restricted Bonds are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, that such Bonds have not been and will not be registered under the Securities Act or under applicable securities laws of the States and other jurisdictions of the United States and that (A) prior to the date (the "Resale Restriction Termination Date") which is two years after the later of the Issue Date and the last date on which the Issuer or any Guarantor or any affiliate of the Issuer or any Guarantor was the owner of a Bond (or any predecessor of such Bond), it may not resell, pledge or otherwise transfer any such Bonds, except (i) to a person who the seller reasonably believes is a QIB in a transaction meeting the requirements of Rule 144A; (ii) in an offshore transaction (as such term is defined in Regulation S) complying with Rule 904 of Regulation S; (iii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available); or (iv) pursuant to an effective registration statement under the Securities Act; and in each of cases (i) through (iv) in accordance with any applicable securities laws of the States and other jurisdictions of the United States; and that (B) the purchaser will, and each subsequent holder of such Bonds is required to, notify any purchaser from it of such Bonds of the resale restrictions referred to in subparagraph (A) above.

(3) The purchaser understands that the Restricted Bonds will bear a legend to the following effect (with appropriate insertions or modifications relating to the identity of the Issuer) (the "Restricted Bonds Legend") unless the Issuer determines otherwise in compliance with applicable law:

THIS BOND (OR ITS PREDECESSOR) AND THE GUARANTEE WERE ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE SECURITIES LAWS OF THE STATES AND OTHER JURISDICTIONS OF THE UNITED STATES, AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. THIS BOND MAY ONLY BE SOLD IN ACCORDANCE WITH THE INDENTURE, COPIES OF WHICH ARE AVAILABLE FOR INSPECTION AT THE OFFICES OF THE TRUSTEE AND EACH PAYING AGENT. EACH PURCHASER OF THIS BOND THAT IS A QUALIFIED

INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IS HEREBY NOTIFIED THAT THE SELLER OF THIS BOND MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

THE HOLDER OF THIS BOND AGREES FOR THE BENEFIT OF LAKAH FUNDING LIMITED (THE "ISSUER") AND EACH OF HOLDING COMPANY FOR FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E., MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E., TRADING MEDICAL SYSTEM EQUIPMENT, S.A.E. AND ARAB STEEL FACTORY, S.A.E. (THE "GUARANTORS") THAT (A) PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") WHICH IS TWO YEARS AFTER THE LATER OF THE ISSUE DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY GUARANTOR OR ANY AFFILIATE OF THE ISSUER OR ANY GUARANTOR WAS THE OWNER OF THIS BOND (OR ANY PREDECESSOR OF SUCH BOND), THIS BOND MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A; (II) IN AN OFFSHORE TRANSACTION COMPLYING WITH THE PROVISIONS OF RULE 904 OF REGULATION S UNDER THE SECURITIES ACT; (III) PURSUANT TO THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE); OR (IV) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT; AND IN EACH OF CASES (I) THROUGH (IV) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF THE STATES AND OTHER JURISDICTIONS OF THE UNITED STATES; AND THAT (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER OF THIS BOND IS REQUIRED TO, NOTIFY ANY PURCHASER FROM IT OF THIS BOND OF THE RESALE RESTRICTIONS REFERRED TO IN CLAUSE (A) ABOVE.

THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE. THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS BOND FROM IT OF THE TRANSFER RESTRICTIONS REFERRED TO IN THIS PARAGRAPH. NO REPRESENTATION CAN BE MADE AS TO AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT FOR RESALE OF THIS BOND.

IF REQUESTED BY THE ISSUER OR ANY GUARANTOR, THE HOLDER AGREES TO PROVIDE THE INFORMATION NECESSARY TO DETERMINE WHETHER THE TRANSFER OF THIS BOND IS PERMISSIBLE UNDER THE SECURITIES ACT AND UNDER APPLICABLE SECURITIES LAWS OF THE STATES AND OTHER JURISDICTIONS OF THE UNITED STATES. THIS BOND AND ANY RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS BOND TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFER OF RESTRICTED SECURITIES GENERALLY. THE HOLDER OF THIS BOND SHALL BE DEEMED BY THE ACCEPTANCE OF THIS BOND TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

After the Resale Restriction Date, a Restricted Bond may be exchanged for a Bond not bearing the Restricted Bond's Legend but bearing the following legend upon certification by the transferor in the form set forth in the Indenture that the transfer of any such Restricted Bond has been made in accordance with Rule 904 under the Securities Act:

THIS BOND (OR ITS PREDECESSOR) AND THE GUARANTEE WERE ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE SECURITIES LAWS OF THE STATES AND OTHER JURISDICTIONS OF THE UNITED STATES, AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE

UNITED STATES. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

No representation can be made as to availability of the exemption provided by Rule 144 under the Securities Act for the resale of Restricted Bonds.

# Taxation

The following summary should not be viewed as legal or tax advice and is based on taxation laws in force at the date of this Offering Circular. Prospective investors should consult their own advisors on the taxation and other implications of their acquiring, holding or disposing of Bonds under the laws of the various jurisdictions that may be applicable to them.

## Egyptian Taxation

The comments below are of a general nature only and are based on the provisions currently in force in the Egyptian Republic. They describe the principal tax consequences of receipt of interest and sale of the Bonds for Holders who are not residents of Egypt. They should not be viewed as tax advice. Holders of Bonds who are in doubt as to their personal tax position should consult their professional advisers.

### Payments by the Issuer

Under current Egyptian law, interest and other amounts payable in respect of the Bonds by the Issuer to a Holder who is not a resident of Egypt will not be subject to taxation in Egypt.

### Payments under the Guarantee

Under current Egyptian law, payments of interest required to be made by a Guarantor under the Guarantee will be subject to withholding tax at the rate of 32 per cent. Pursuant to the Guarantee, each Guarantor has agreed, subject to certain exceptions, that it will (i) deduct or withhold the full amount of Egyptian Taxes required to be paid in respect of any payment made by it under the Guarantee and pay such amount to the relevant taxing authorities and (ii) upon the demand of a Holder (or the Trustee on behalf of such Holder), pay to the account of such Holder (or the account of the Trustee for the benefit of such Holder), an amount sufficient to indemnify such Holder fully against, and to reimburse such Holder for, the amount deducted or withheld.

Egyptian counsel has advised that the indemnification for Egyptian Taxes agreed to by the Guarantors is valid and enforceable, notwithstanding that contractual provisions for the payment by one party of taxes levied on another party may not be valid under current Egyptian law.

### Loan Payments

Pursuant to Article 11 of the Double Taxation Treaty between Egypt and Switzerland, published in the Egyptian Gazette on November 17, 1988, interest and other amounts payable by the Parent Guarantor to the Swiss banking institution acting as lender in respect of the Swiss Loan will not be subject to taxation in Egypt.

### Capital Gains Tax

Capital gains realized upon the sale or other disposition of Bonds are not subject to taxation in Egypt.

### Inheritance Taxes

No inheritance or similar tax is imposed in Egypt.

### Stamp Duties

No stamp, registration or similar duties or taxes will be payable in the Egyptian Republic by Holders in connection with the issue of the Bonds. A nominal tax of E£ 3 will be assessed in connection with the making of the Guarantee.

## British Virgin Islands Taxation

Under current British Virgin Islands laws, (i) the Issuer is not subject to income or corporation taxes in the British Virgin Islands; (ii) payments of principal and interest in respect of, and gains derived from the sale of, Bonds are not subject to taxation in the British Virgin Islands; and (iii) withholding is not currently required on payments to Holders. The Issuer has been further advised by its British Virgin Islands counsel that, as a matter of British Virgin Islands law, it is able to pay such Additional Amounts as may be required to compensate for any amounts withheld from payments to Holders in respect of Egyptian Taxes.

In the event that any such withholding or deduction is required, the Issuer and the Guarantors are obliged, subject to certain standard exceptions, to pay Additional Amounts to Holders so that the net amount received

by each of the Holders is equal to the amount it would have received had no withholding on account of BVI Taxes been made. *See "Terms and Conditions of the Bonds — 7. Additional Amounts and Taxes"*.

**United States Taxation**

The following is a general discussion of the material United States federal income tax consequences of the acquisition, ownership and disposition of Bonds to beneficial owners thereof that are U.S. Holders (as defined below). This discussion is based on currently existing provisions of the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Department regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect on the date hereof and all of which are subject to change, possibly on a retroactive basis. This discussion applies only to initial beneficial owners that purchase Bonds upon original issuance at the initial offering price thereof, and is limited to initial beneficial owners that hold Bonds and exchange Bonds as capital assets.

As used herein, the term "U.S. Holder" means a beneficial owner of a Bond that is, for U.S. federal income tax purposes,

(i) a citizen or resident of the United States,

(ii) a corporation or partnership created or organized in or under the laws of the United States or any State thereof, including the District of Columbia, or

(iii) an estate or trust described in Section 7701(a)(30) of the Code.

Payments of Interest

In general, interest on a Bond will be taxable to a U.S. Holder as ordinary income at the time it accrues, or is actually or constructively received, in accordance with the U.S. Holder's method of accounting for U.S. federal income tax purposes. The Issuer anticipates that the Bonds will be issued without original issue discount ("OID") within the meaning of Section 1273 of the Code and the following discussion so assumes.

Sale, Exchange or Retirement of the Notes or Exchange Notes

Upon the sale, exchange, redemption, retirement at maturity or other taxable disposition of a Bond, a U.S. Holder generally will recognize taxable gain or loss equal to the difference between (1) the sum of cash plus the fair market value of all other property received on such disposition (except to the extent such cash or property is attributable to accrued but unpaid interest, in which case, it will be taxable as ordinary income), and (2) such U.S. Holder's adjusted tax basis in the Bond.

Gain or loss recognized on the disposition of a Bond generally will be capital gain or loss. Such capital gain or loss will be long-term capital gain or loss if at the time of such disposition the U.S. Holder's holding period for the Bond is more than one year. In the case of a U.S. Holder that is an individual, estate or trust "net capital gain" (i.e., the excess of net long-term capital gain over net short-term capital loss) is generally subject to a reduced rate of U.S. federal income tax. The deductibility of capital losses is subject to limitations.

THE U.S. FEDERAL TAX DISCUSSION SET FORTH ABOVE IS INCLUDED FOR GENERAL INFORMATION ONLY AND MAY NOT BE APPLICABLE DEPENDING UPON A U.S. HOLDER'S PARTICULAR SITUATION. IT IS NOT INTENDED TO CONSTITUTE A COMPLETE ANALYSIS OF ALL OF THE TAX CONSEQUENCES RELATING TO THE OWNERSHIP OF THE BONDS GENERALLY OR THAT MAY BE RELEVANT TO PARTICULAR BENEFICIAL OWNERS IN LIGHT OF PERSONAL CIRCUMSTANCES OR TO CERTAIN TYPES OF BENEFICIAL OWERNS SUBJECT TO SPECIAL RULES. U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES TO THEM OF THE OWNERSHIP AND DISPOSITION OF THE BONDS, INCLUDING THE TAX CONSEQUENCES UNDER THE TAX LAWS OF THE UNITED STATES, STATES, LOCALITIES, COUNTRIES OTHER THAN THE UNITED STATES AND ANY OTHER TAXING JURISDICTIONS AND THE POSSIBLE EFFECTS OF CHANGES IN SUCH TAX LAWS.

**Proposed EU Withholding Tax Directive**

In May 1998, the European Commission presented to the Council of Ministers of the European Union a proposal to oblige Member States to adopt either a "withholding tax system " or an "information reporting

system" in relation to interest, discounts and premiums. It is unclear whether this proposal will be adopted, and if it is adopted, whether it will be adopted in its current form. The "withholding tax system" would require a paying agent established in a Member State to withhold tax at a minimum rate of 20 per cent. from any interest, discount or premium paid to an individual resident in another Member State unless such an individual presents a certificate obtained from the tax authorities of the Member State in which he is resident confirming that those authorities are aware of the payment due to that individual. The "information reporting system" would require a Member State to supply, to the other Member States, details of any payment of interest, discount or premium made by paying agents within its jurisdiction to an individual resident in another Member State. For these purposes, the term "paying agent" is widely defined and includes an agent who collects interest, discounts or premiums on behalf of an individual beneficially entitled thereto. If this proposal is adopted, it will not apply to payments of interest, discounts and premiums made before January 1, 2001.

# Subscription and Sale

**Subscription**

The Managers have, pursuant to a Subscription Agreement dated as of December 6 1999 (the "Subscription Agreement") among the Issuer, the Guarantors and the Managers, agreed, subject to the satisfaction of certain conditions, to purchase the Bonds at 99.50 per cent. of their principal amount plus accrued interest, if any. The Issuer has agreed to pay to the Managers a combined management and underwriting commission of 0.5 per cent. and a selling commission of 0.5 per cent., respectively, of the principal amount of the Bonds. In addition, the Issuer has agreed to reimburse certain expenses incurred by the Managers in connection with the issue of the Bonds. The Subscription Agreement entitles the Managers to terminate it in certain circumstances prior to payment being made to the Issuer.

**Selling Restrictions**

General

No action has been or will be taken in any jurisdiction by the Issuer, any Guarantor or any Manager that would permit a public offering of the Bonds, or possession, circulation or distribution of this Offering Circular, in preliminary or final form, or any amendment or supplement hereto or any other offering or publicity material relating to the Bonds, in any country or jurisdiction where action for that purpose is required. The offer and sale of Bonds, and the delivery of this Offering Circular, are restricted by law in certain jurisdictions and Bonds may not be offered or sold, and this Offering Circular may not be distributed, in any jurisdiction under circumstances where such offer, sale or distribution would be prohibited or restricted by law. Each Manager will comply with all applicable laws and regulations in each jurisdiction in which it acquires, offers, sells or delivers Bonds or has in its possession or distributes any offering documents or any amendment or supplement thereto or any other offering or publicity material.

Without limiting the foregoing, prospective purchasers of Bonds should be aware of the following restrictions:

United States

The Bonds and the Guarantee have not been and will not be registered under the Securities Act or any state securities laws and may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons except in accordance with Regulation S or pursuant to certain transactions exempt from the registration requirements of the Securities Act and applicable state securities laws.

Each Manager has represented and agreed that, except as permitted by the Subscription Agreement, it will not offer, sell or deliver Bonds (i) as part of its distribution at any time and (ii) otherwise until 40 days after the later of the date on which Bonds were first offered to Persons other than distributors in reliance on Regulation S and the Issue Date, within the United States or to, or for the account or benefit of, U.S. persons except that certain offers, sales and deliveries of Bonds may be made by one of the Managers in the United States to U.S. persons that are QIBs in transactions exempt from the registration requirements of the Securities Act and applicable state securities laws, and it will have sent to each dealer to which it sells Bonds in reliance on Regulation S during such 40-day restricted period a confirmation or other notice setting forth the restrictions on offers and sales of the Bonds within the United States or to, or for the account or benefit of, U.S. persons. Terms used in the preceding paragraph and in this paragraph have the meanings given to them by Regulation S under the Securities Act.

In addition, until the expiration of the 40-day period referred to above, an offer or sale of Bonds within the United States by the Managers (whether or not participating in the offering) may violate the registration requirements of the Securities Act if such offer or sale is made otherwise than pursuant to Rule 144A or another exemption from registration under the Securities Act or the requirements of applicable state securities laws.

Each Manager has acknowledged and agreed that, except as permitted by the Subscription Agreement, it will not offer, sell or deliver Bonds as part of its distribution at any time within the United States or to United States persons. Each purchaser of Bonds is hereby notified that the offer and sale of Bonds may be made in reliance upon the exemption from the registration requirement of the Securities Act provided by Rule 144A.

United Kingdom

Each Manager has represented and agreed that (i) it has not offered or sold and, prior to the date six months after the date of issue of the Bonds, will not offer or sell any Bonds to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995 (as amended); (ii) it has complied and will comply with all applicable provisions of the Financial Services Act 1986 with respect to anything done by it in relation to the Bonds in, from or otherwise involving the United Kingdom; and (iii) it has only issued or passed on and will only issue or pass on to any person in the United Kingdom any document received by it in connection with the issue of the Bonds if that person is of a kind described in Article 11 (3) of the Financial Services Act 1986 (Investment Advertisements) (Exemptions) Order 1996 (as amended) or is a person to whom such document may otherwise lawfully be issued or passed on.

Egypt

Each Manager has represented and agreed that it has not offered or sold, and will not offer or sell, any of the Bonds using any form of general solicitation or general advertising or in a public offering in Egypt.

The British Virgin Islands

No invitation may be made to any person resident in the British Virgin Islands to subscribe for the Bonds.

General

Each Manager has agreed that it will (to the best of its knowledge and belief) comply with all applicable securities laws and regulations in force in any jurisdiction in which it purchases, offers, sells or delivers Bonds or possesses or distributes this Offering Circular and will obtain any consent, approval or permission required by it for the purchase, offer, sale or delivery by it of Bonds under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such purchases, offers, sales or deliveries and neither the Issuer nor any of the Guarantors shall have any responsibility therefor.

Purchasers of Bonds sold by the Managers may be required to pay stamp taxes and other charges in accordance with the laws and practices of the country of purchase in addition to the offering price and accrued interest, if any.

None of the Issuer, any Guarantor or any Manager represents that the Bonds may at any time lawfully be sold in compliance with any applicable registration or other requirements in any jurisdiction, or pursuant to any exemption available thereunder, or assumes any responsibility for facilitating such sale.

Although application has been made to list the Bonds on the Luxembourg Stock Exchange, the Bonds constitute a new issue of securities with no established trading market. The Managers may make a market in the Bonds, but are not obligated to do so and may discontinue any market-making, if commenced, at any time without notice. No assurance can be given as to the liquidity of the trading markets for the Bonds. Bonds issued and sold in reliance on Rule 144A have been designated for trading in the PORTAL system of the National Association of Securities Dealers, Inc.

One of the Guarantors intends to purchase Bonds as part of their initial distribution and the Guarantors may purchase additional Bonds from time to time thereafter. The Indenture provides that any Bond purchased and held by or for the account of any Guarantor shall be deemed not to be Outstanding for various purposes specified in the Indenture, including the right to attend and vote at any meeting of the Holders.

In connection with the offering of the Bonds, Warburg Dillon Read may engage in transactions that stabilize or maintain the market price of the Bonds at a level which might otherwise not prevail, including purchases of Bonds to stabilize their market price or to cover some or all of a short position in the Bonds and the imposition of penalty bids. Such transactions, if commenced, may be discontinued at any time. All such transactions will be carried out in accordance with all applicable laws and regulations.

# General Information

1. Application has been made to list the Bonds on the Luxembourg Stock Exchange. In connection with and prior to the listing of the Bonds on the Luxembourg Stock Exchange, the constituent documents of the Issuer and each Guarantor, respectively, and a legal notice relating to the issue of the Bonds will be deposited with the Chief Registrar of the District Court in Luxembourg ("*Greffier en Chef du Tribunal d'Arrondissement de et à Luxembourg*") where such documents will be available for inspection and where copies of such documents will be obtainable upon request. Bonds issued and sold in reliance on Rule 144A have been designated for trading in the PORTAL system of the National Association of Securities Dealers, Inc.

2. The issue of the Bonds and the making of the Guarantee have been authorized by all necessary action (corporate or otherwise) on the part of the Issuer and each Guarantor, respectively. Without limiting the generality of the foregoing, the issue of the Bonds was authorized by the Board of Directors of the Issuer on December 6, 1999 and the giving of the Guarantee by each Guarantor was authorized by a resolution of the Board of Directors of each Guarantor adopted on October 6, 1999.

3. All necessary consents, approvals, registrations, authorizations or other orders of regulatory authorities required under the laws and regulations of the British Virgin Islands and Egypt, as the case may be, prior to the issuance of the Bonds by the Issuer and the giving of the Guarantee by the Guarantors have been obtained.

4. Since the date of its incorporation, no financial statements of the Issuer have been prepared. The Issuer is not required by British Virgin Islands law to prepare or publish financial statements.

5. The auditors of the Lakah Holding Company, Cherif Mohamed Hammouda, a member of RSM International, and Mustafa Shawki & Co Deloitte & Touche, have audited the annual consolidated financial statements of the Lakah Holding Company as at and for the twelve-month period ended December 31, 1998 and the semi-annual consolidated financial statements of the Lakah Holding Company as at and for the six-month period ended June 30, 1999; Cherif Mohamed Hammouda, a member of RSM International, has also audited the separate annual financial statements of each of the Subsidiary Guarantors as at and for the twelve-month periods ended December 31, 1996, 1997 and 1998 (if applicable) and the separate semi-annual financial statements of each of the Subsidiary Guarantors as at and for the six-month periods ended June 30, 1998 and 1999. Such auditors have given and have not withdrawn their written consent to the distribution of this Offering Circular with the inclusion herein of their reports and references to their name in the form and context in which they appear.

6. Except as disclosed in this Offering Circular, since June 30, 1999, there has been no material adverse change in the condition (financial or otherwise), business affairs or prospects of any Guarantor individually or of the Lakah Group taken as a whole.

7. Neither the Issuer nor any Guarantor, nor any Subsidiary of a Guarantor, is involved in any litigation or arbitration proceedings which are material in the context of the issue of the Bonds nor so far as the Issuer or any Guarantor is aware is any such litigation or arbitration pending or threatened.

8. So long as the Bonds are listed on the Luxembourg Stock Exchange, the Issuer will maintain a Paying Agent in Luxembourg. The name of the Paying Agent initially appointed in Luxembourg is set forth at the end of the Offering Circular.

9. So long as any Bond is Outstanding, the Indenture, the Guarantee and the Paying Agency Agreement or copies thereof, may be inspected during normal business hours at the specified offices of the Trustee, the Paying Agent in London and the Paying Agent in Luxembourg.

10. So long as any Bond is Outstanding, copies of the following documents (together with English translations thereof) may be obtained during normal business hours at the specified office of the Paying Agent in Luxembourg: (a) the constituent documents of the Issuer and of each Guarantor, respectively,

(b) the most recently audited annual consolidated financial statements of the Lakah Holding Company and its Subsidiaries and the most recently audited separate annual financial statements of each of the Subsidiary Guarantors; and (c) the most recently available interim financial statements of each Guarantor and its consolidated Subsidiaries (if any). The Lakah Holding Company prepares quarterly unaudited consolidated financial statements, but does not publish non-consolidated financial statements.

11. For so long as the Bonds are listed on the Luxembourg Stock Exchange, all notices to be given to Bondholders or will also be published in a leading daily newspaper of general circulation in Luxembourg, which is expected to be the *Luxemburger Wort*, and for so long as the Bonds are listed on the Luxembourg Stock Exchange, Banque Internationale à Luxembourg S.A. will serve as intermediary between the Luxembourg Stock Exchange and persons connected with the issue and listing of the Bonds.

12. The Bonds have been accepted for clearance through Euroclear and Cedelbank with a Common Code of 010507870. The International Securities Identification Number (ISIN) for the Bonds is XS0105075708. In addition, Bonds purchased pursuant to Rule 144A have been accepted for trading in book-entry form by DTC under CUSIP number 507376AA9.

(b) the most recently audited annual consolidated financial statements of the Lakah Holding Company and its Subsidiaries and the most recently audited separate annual financial statements of each of the Subsidiary Guarantors; and (c) the most recently available interim financial statements of each Guarantor and its consolidated Subsidiaries (if any). The Lakah Holding Company prepares quarterly unaudited consolidated financial statements, but does not publish non-consolidated financial statements.

11. For so long as the Bonds are listed on the Luxembourg Stock Exchange, all notices to be given to Bondholders or will also be published in a leading daily newspaper of general circulation in Luxembourg, which is expected to be the *Luxemburger Wort*, and for so long as the Bonds are listed on the Luxembourg Stock Exchange, Banque Internationale à Luxembourg S.A. will serve as intermediary between the Luxembourg Stock Exchange and persons connected with the issue and listing of the Bonds.

12. The Bonds have been accepted for clearance through Euroclear and Cedelbank with a Common Code of 010507870. The International Securities Identification Number (ISIN) for the Bonds is XS0105075708. In addition, Bonds purchased pursuant to Rule 144A have been accepted for trading in book-entry form by DTC under CUSIP number 507376AA9.

# Index to Financial Statements


| | Page |
|---|---|
| **Annual Financial Statements** | |
| LAKAH HOLDING COMPANY | |
| Reports of Auditors | F-2 |
| Consolidated Balance Sheet as at December 31, 1998. | F-4 |
| Consolidated Income Statement for the year ending December 31, 1998. | F-5 |
| Statement of Cash Flows for the year ended December 31, 1998. | F-6 |
| Notes to the Consolidated Financial Statements | F-7 |
| MEDEQUIP | |
| Report of Auditor | F-15 |
| Balance Sheet as at December 31, 1996, 1997 and 1998. | F-16 |
| Income Statement for the periods ended December 31, 1996, 1997 and 1998. | F-17 |
| Statement of Cash Flows for the periods ended December 31, 1997 and 1998. | F-18 |
| Notes to the Financial Statements | F-19 |
| TMSE | |
| Report of Auditor | F-22 |
| Balance Sheet as at December 31, 1996, 1997 and 1998. | F-23 |
| Income Statement for the periods ended December 31, 1997 and 1998. | F-24 |
| Statement of Cash Flows for the periods ended December 31, 1997 and 1998. | F-25 |
| Notes to the Financial Statements | F-26 |
| ARAB STEEL | |
| Report of Auditor | F-29 |
| Balance Sheet as at December 31, 1996, 1997 and 1998. | F-30 |
| Income Statement for the period ended December 31, 1998 | F-31 |
| Statement of Cash Flows for the periods ended December 31, 1997 and 1998. | F-32 |
| Notes to the Financial Statements | F-33 |
| **Interim Financial Statements** | |
| LAKAH HOLDING COMPANY | |
| Reports of Auditors | F-36 |
| Consolidated Balance Sheet as at June 30, 1999. | F-38 |
| Consolidated Income Statement for the period from January 1, 1999 to June 30, 1999. | F-39 |
| Statement of Cash Flows for the period from January 1, 1999 to June 30, 1999. | F-40 |
| Notes to the Consolidated Financial Statements | F-41 |
| MEDEQUIP | |
| Report of Auditor | F-48 |
| Financial Position as at June 30, 1999. | F-49 |
| Income Statement for the period from January 1, 1999 to June 30, 1999. | F-50 |
| Notes to the Financial Statements | F-51 |
| TMSE | |
| Report of Auditor | F-55 |
| Financial Position as at June 30, 1999. | F-56 |
| Income Statement for the period from January 1, 1999 to June 30, 1999. | F-57 |
| Notes to the Financial Statements | F-58 |
| ARAB STEEL | |
| Report of Auditor | F-61 |
| Financial Position as at June 30, 1999. | F-62 |
| Income Statement for the period from January 1, 1999 to June 30, 1999. | F-63 |
| Notes to the Financial Statements | F-64 |
| **Pro Forma Unaudited Financial Statements** | |
| LAKAH HOLDING COMPANY | |
| Reports of Accountants | F-67 |
| Pro-Forma Consolidated Balance Sheet as at December 31, 1998. | F-69 |
| Pro-Forma Consolidated Income Statement for the year ending December 31, 1998. | F-70 |
| Basis of Preparation | F-71 |

# Auditor's Report

**Cherif Mohamed Hammouda**
Chartered Accountant
Member of RSM International



To the Board of Directors of Holding Company for Financial Investments (Lakah Group), S.A.E.

We have audited the accompanying consolidated balance sheet of Holding Company for Financial Investments (Lakah Group), S.A.E. and its subsidiaries as at December 31, 1998 and the related consolidated statements of income and cash flows for the year then ended. These consolidated financial statements are the responsibility of the Company's management. It is our responsibility to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with International Auditing Standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the report of the other auditors provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Holding Company for Financial Investments (Lakah Group), S.A.E. as at December 31, 1998, and the results of their operations and their cash flows for the year then ended in conformity with International Accounting Standards and comply with applicable Egyptian laws and regulations.

Cherif Hammouda

FESAA-FIFA-FEST
R.A.A. 14260

9 September, 1999

# Independent Auditors' Report

**Mostafa Shawki & Co**
**Deloitte & Touche**

153 Mohamed Farid St.
Bank Misr Tower
P.O. Box 2095
Cairo 11511

Telephone: (02) 391.7299
(02) 392.6000
Facsimile: (02) 393.9430
Email: mshawki@mshawki.com

To the Board of Directors of
The Holding Company for Financial Investments
(Lakah Group),
S.A.E.

We have audited the accompanying consolidated balance sheet of the Holding Company for Financial Investments (Lakah Group), S.A.E. as of December 31, 1998 and the related consolidated statements of income and cash flows for the year then ended. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit. We did not audit the financial statements of the eight subsidiaries explained in Note No. 1 (consolidated subsidiaries) which statements were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to the eight subsidiaries, is based solely on the reports of such other auditors.

We conducted our audit in accordance with International Standards on Auditing. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit and the reports of the other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audit and the reports of the other auditors, such consolidated financial statements present fairly, in all material respects the financial position of the Holding Company for Financial Investments Lakah Group (S.A.E.) as of December 31, 1998 and the results of their operations and their cash flows for the year then ended in conformity with International Accounting Standards and in compliance with applicable Egyptian laws and regulations.

Mostafa Shawki & Co
Deloitte & Touche
27 September, 1999

**Deloitte Touche Tohmatsu**

**HOLDING COMPANY FOR FINANCIAL INVESTMENTS**
**(LAKAH GROUP), S.A.E.**

**CONSOLIDATED BALANCE SHEET**
**as at December 31, 1998**

| | Notes | Consolidated L.E. | Consolidated U.S.$ |
|---|---|---|---|
| **Assets** | | | |
| **Current Assets** | | | |
| Cash and Cash Equivalents | (3) | 18,165,619 | 5,342,829 |
| Debtors — Short Term Balances (Net) | (4) | 506,392,231 | 148,938,891 |
| Inventory | (2-4)(5) | 194,697,123 | 57,263,860 |
| Work in progress | | 109,353,565 | 32,162,814 |
| Total Current Assets | | 828,608,538 | 243,708,394 |
| **Long Term Assets** | | | |
| Accounts Receivables — Long Term | (6) | 167,640,320 | 49,305,976 |
| Long Term Investments | (2-5)(7) | 262,135,125 | 77,098,566 |
| Fixed Assets — (Net) | (2-6)(8) | 394,603,343 | 116,059,807 |
| Projects under Construction | (9) | 164,982,129 | 48,524,156 |
| Goodwill | (10) | 248,020,160 | 72,947,106 |
| Deferred Expenses — (Net) | (2-7) | 38,361,296 | 11,282,734 |
| Total Long Term Assets | | 1,275,742,373 | 375,218,345 |
| Total Assets | | 2,104,350,911 | 618,926,739 |
| **Liabilities** | | | |
| **Current Liabilities** | | | |
| Due to Banks | (11) | 171,858,623 | 50,546,654 |
| Current Portion of Long Term Debt | (15) | 36,448,677 | 10,720,199 |
| Creditors Short Term Balances | (12) | 178,828,069 | 52,596,491 |
| Other Credit Balances | (13) | 12,933,747 | 3,804,043 |
| Provisions | (14) | 22,682,664 | 6,671,372 |
| Total Current Liabilities | | 422,751,780 | 124,338,759 |
| **Long Term Liabilities** | | | |
| Long Term Loans | (15) | 224,917,977 | 66,152,346 |
| Bonds | (16) | 250,000,000 | 73,529,412 |
| Creditors-Long Term Balances | (17) | 13,459,153 | 3,958,574 |
| Total Long Term Liabilities | | 488,377,130 | 143,640,332 |
| Minority Interest in Subsidiary Companies | | 43,342,001 | 12,747,648 |
| **Shareholders' Equity** | | | |
| Issued and Paid up Capital | (18) | 1,149,880,000 | 338,200,000 |
| Total Shareholders' Equity | | 1,149,880,000 | 338,200,000 |
| Total Liabilities and Shareholders' Equity | | 2,104,350,911 | 618,926,739 |

*The accompanying notes are an integral part of the financial statements.*

*The auditor's report is attached.*

*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = L.E.3.40*

**HOLDING COMPANY FOR FINANCIAL INVESTMENTS**
**(LAKAH GROUP), S.A.E.**

**CONSOLIDATED INCOME STATEMENT**
**For the Year Ending December 31, 1998**

| | Notes | Consolidated L.E. | Consolidated U.S.$ |
|---|---|---|---|
| Net Sales | | 674,363,025 | 198,342,066 |
| **Less** | | | |
| Cost of Sales | | (450,768,617) | (132,579,005) |
| Gross Profit | | 223,594,408 | 65,763,061 |
| **Less** | | | |
| General and Administrative Expenses | | (40,239,567) | (11,835,167) |
| Financing Expenses | | (57,929,846) | (17,038,190) |
| Depreciation and Amortization | | (1,495,703) | (439,913) |
| Foreign Exchange Loss | | (353,010) | (103,826) |
| Provision for Doubtful Debts | | (4,997,615) | (1,469,886) |
| Total Expenses | | (105,015,741) | (30,886,982) |
| Net Profit for the Period before Minority Interest and Income Taxes | | 118,578,667 | 34,876,079 |
| Minority Interest | | (4,368,275) | (1,284,787) |
| Provision for Income Taxes | | (20,980,046) | (6,170,602) |
| Net Profit For The Year | (23) | 93,230,346 | 27,420,690 |
| Earnings per Share | (20) | 0.81 | 0.24 |

*Auditor's report attached.*

*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = LE.3.40*

**HOLDING COMPANY FOR FINANCIAL INVESTMENTS**
**(LAKAH GROUP), S.A.E.**

**STATEMENT OF CASH FLOWS**
**For the Year Ending December 31, 1998**

| | 12.31.98 L.E. | 12.31.98 U.S.$ |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net Profit before Taxation | 118,578,667 | 34,876,079 |
| Adjustments for | | |
| Depreciation and Amortization | 1,495,703 | 439,912 |
| Provisions | 4,997,615 | 1,469,887 |
| Net Operating Profit before Working Capital Changes | 125,071,985 | 36,785,878 |
| Increase in Inventory | (194,697,123) | (57,263,860) |
| Increase in Work in Progress | (109,353,565) | (32,162,814) |
| Increase in Debtors | (511,389,846) | (150,408,778) |
| Increase in Creditors Short Term | 178,828,069 | 52,596,491 |
| Increase in Other Credit Balances | 12,933,747 | 3,804,043 |
| Increase in Due to Banks | 171,858,623 | 50,546,654 |
| Increase in Accounts Receivable — Long Term | (167,640,320) | (49,305,976) |
| Increase in Provisions | 1,702,618 | 500,770 |
| Net Cash (used in) Operating Activities | (492,685,812) | (144,907,592) |
| **Cash Flows from Investing Activities** | | |
| Purchase of Fixed Assets | (395,748,796) | (116,396,705) |
| Increase in Project Under Construction | (164,982,129) | (48,524,156) |
| Increase in Deferred Expenses | (38,711,546) | (11,385,749) |
| Increase in Long Term Investments | (262,135,125) | (77,098,566) |
| Increase in Goodwill | (341,250,506) | (100,367,796) |
| Net Cash (used in) Investing Activities | (1,202,828,102) | (353,772,971) |
| **Cash Flows from Financing Activities** | | |
| Issue of Share Capital | 1,149,880,000 | 338,200,000 |
| Long Term Loans | 224,917,977 | 66,152,346 |
| Bonds | 250,000,000 | 73,529,412 |
| Minority Interests | 38,973,726 | 11,462,861 |
| Creditors — Long Term Balances | 13,459,153 | 3,958,574 |
| Increase in Current Portion of Long Term Debt | 36,448,677 | 10,720,199 |
| Net Cash Provided by Financing Activities | 1,713,679,533 | 504,023,392 |
| Net Increase in Cash and Cash Equivalents | 18,165,619 | 5,342,829 |
| Cash in Hand and at Banks at the Beginning of Year | — | — |
| Cash in Hand and at Banks at the End of Year | 18,165,619 | 5,342,829 |

*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = LE. 3.40*

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
## For the Year Ended December 31, 1998

### 1 — The Company

The Holding Company for Financial Investments (Lakah Group), S.A.E. was incorporated in Egypt on November 29, 1998 under Law 95 of 1992 and its regulations. The purpose of the company is to participate in the formation of companies using securities, or increasing their capital. The company is allowed to form or join with other companies operating in any business field, and companies that help such companies achieve their target, inside or outside Egypt. Also the company is allowed to merge with or acquire existing companies according to the company's operating procedures. The company's first legal financial statements are to be prepared for the period from November 29, 1998 to December 31, 1999.

At December 31, 1998, the Holding Company for Financial Investments (Lakah Group), S.A.E., hereunder called the "Parent Company" owns the following consolidated subsidiaries:

| | % of Shares |
|---|---|
| Trading Medical Systems Egypt, S.A.E. | 97.60% |
| Medequip for Trading and Contracting, S.A.E. | 97.80% |
| Amitrade for Trading and Contracting, S.A.E. | 97.02% |
| Industrial Investment Company S.A.E. | 97.98% |
| Scandinavian for Investment and Touristic Development, L.t.d | 97.98% |
| Arab Steel Factory, S.A.E | 97.92% |
| American Company for Marketing, S.A.E | 97.95% |
| Quest Consult, S.A.E | 97.46% |
| Medical Centers Management — S.A.E. | 97.98% |

### 2 — Significant Accounting Policies

The significant accounting policies adopted in the preparation of the consolidated financial statements are set out below.

#### 2 — 1 Foreign Currency Translation

The subsidiaries' accounts are maintained in Egyptian pounds. Transactions denominated in foreign currencies were translated using the prevailing exchange rates as at December 31, 1998 declared by the free foreign exchange market. At the balance sheet date, assets and liabilities denominated in foreign currencies are translated at the exchange rates prevailing at that date. The exchange differences are recorded in the income statement.

#### 2 — 2 Basis of preparing the financial statements

The financial statements of the subsidiary companies are prepared according to the Egyptian Accounting Standards. The consolidated financial statements are prepared according to the International Accounting Standards. The Parent Company's financial statements include the balances of assets and liabilities of the nine companies as at December 31, 1998, as well as sales, cost of sales and operating expenses for the period from January 1, 1998 to December 31, 1998, except for the American Company for Marketing which capitalized all expenses, listed as Deferred Expenses in the financial statements.

#### 2 — 3 Principles of Consolidation

The consolidated financial statements include all subsidiaries controlled by the Parent Company.

The basis of the consolidation is as follows:

- All intragroup balances and transactions are eliminated.

- Minority Interest represents equity held by other shareholders in subsidiary companies controlled by the parent company. It appears as a separate item in the consolidated financial statements and is calculated as net assets and results of operations of subsidiaries attributable to interest, which are not owned, directly or indirectly by the parent company.



- The cost of acquisition is allocated as follows:

  (a) The fair value of the assets and liabilities acquired as at the date of the exchange to the extent of the Parent Company's interest obtained in the exchange transactions.

  (b) The excess of the cost of acquisition over the Parent Company's interest in the fair value of the identifiable assets and liabilities acquired as at the date of acquisition is recognized as goodwill and amortized over a period of 20 years starting from January 1, 1999.

  (c) The excess of the Parent Company's interest in the fair value of the identifiable assets and liabilities at the date of acquisition over the acquisition cost is recognized as a negative goodwill and amortized over a period of 20 years starting from January 1, 1999.

  (d) Affiliates of subsidiary companies owned by more than 50 per cent. and controlled by the subsidiaries are consolidated on the same basis.

2 — 4 Inventories
Inventories of raw material, spare parts and supplies are stated at cost. Inventories of finished goods are stated at the lower of cost and net realizable value. Cost is determined by using the average cost method.

2 — 5 Long-Term Investments
Long-Term Investments in companies, which are not controlled by the Parent Company, are recorded at actual cost at the date of acquisition.

2 — 6 Fixed Assets and Depreciation
Fixed Assets are recorded at the historical cost and are depreciated by using the straight-line method over the estimated productive life for each type of asset at the following annual rates:

| **Assets** | **Annual Rates** |
|---|---|
| Buildings and Construction | 2.5% – 10% |
| Machinery and Equipment | 5% – 10% |
| Vehicles | 20% – 25% |
| Tools and Supplies | 10% – 20% |
| Furniture and Office Equipment | 10% – 25% |

2 — 7 Deferred Expenses
Deferred Expenses represent corporate establishment and pre-operating expenses. These expenses are amortized using the straight-line method over a five-year period (20 per cent.) starting from the first financial year.

2 — 8 Cash Flow Statement
Cash Flow Statement is prepared using the indirect method.

2 — 9 Taxation
A tax provision is formed to meet tax obligations based on detailed studies for each claim. Due to the nature of the Egyptian tax laws and legislation, applying the principles of the deferred taxes, according to the International Accounting Standards "Taxes on Income", will not usually result in any material deferred tax liabilities. Further, if the application results in deferred tax, assets will be recognized in the financial statements whenever there is a sufficient assurance that these assets will be realized in the foreseeable future.

**3 — Cash and Cash Equivalents**

Cash and Cash Equivalents as at December 31, 1998 amounting to L.E.18,165,619 represent the following:

| | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Banks Current Accounts — L.E. | 7,286,630 | 2,143,126 |
| Banks Current Accounts — U.S.$ | 365,578 | 107,523 |
| Cash in Hand | 3,685,317 | 1,083,917 |
| Bank Deposit | 4,684,000 | 1,377,647 |
| Letters of Guarantee (Cash Margins) | 2,144,094 | 630,616 |
| | 18,165,619 | 5,342,829 |

**4 — Debtors — Short Term Balances**

Debtors Short Term Balances as at December 31, 1998 amounting to L.E.506,392,231 represented the following:

| | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Letters of Credit | 51,216 | 15,064 |
| Accounts Receivables | 163,926,633 | 48,213,716 |
| Lease Receivables | 27,704,392 | 8,148,351 |
| Tax Authority | 626,908 | 184,384 |
| Debtors | 86,413,790 | 25,415,821 |
| Guarantee Deposits | 63,000,000 | 18,529,412 |
| Suppliers Debit Balances | 102,821,830 | 30,241,715 |
| Letters of Guarantee | 4,674,776 | 1,374,934 |
| Other Debit Balances | 62,475,301 | 18,375,087 |
| | 511,694,846 | 150,498,484 |
| Less — Provision for Doubtful Debts | (5,302,615) | (1,559,593) |
| | 506,392,231 | 148,938,891 |

**5 — Inventory**

Inventory balance as at December 31, 1998 amounting to L.E.194,697,123 represented the following:

| | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Raw-Material and Scrap | 137,187,544 | 40,349,278 |
| Supplies | 1,279,325 | 376,272 |
| Spare Parts | 14,198,246 | 4,175,955 |
| Packing Materials | 78,335 | 23,040 |
| Work in Progress | 163,361 | 48,047 |
| Finished Goods | 41,790,312 | 12,291,268 |
| | 194,697,123 | 57,263,860 |

**6 — Accounts Receivables — Long Term**

Accounts Receivables — Long Term represent Lease Receivables for Medical Equipment amounting to L.E.167,640,320 for more than one year. An additional portion, due in 1999 amounting to L.E.27,704,392 are included in the current assets under Debtors Short-Term Balances.

**7 — Long Term Investments**

Long Term Investments balance as at December 31, 1998 amounting to L.E.262,135,125 represents the following:

| | Investment Ratio % | 1998 L.E. | 1998 U.S.$ |
|---|---|---|---|
| **Associated Companies:** | | | |
| First Power — *Egyptian Joint Stock Co.* | 50% | 1,250,000 | 367,647 |
| Irena for Art Production — *Egyptian Joint Stock Co.* | 50% | 62,500 | 18,382 |
| House of Art — *Egyptian Joint Stock Co.* | 60% | 75,000 | 22,059 |
| Suez Company for Iron Works — *Egyptian Joint Stock Co.* | 50% | 54,722,625 | 16,094,890 |
| Total Associated Companies | | 56,110,125 | 16,502,978 |
| **Other Companies:** | | | |
| Delta Sound Company — *Egyptian Joint Stock Co.* | 40% | 25,000 | 7,353 |
| International Co. for Touristic and Real Estate — *Egyptian Joint Stock Co.* | 10% | 1,000,000 | 294,118 |
| Arab Cast Iron & Steel products Factory — *Egyptian Joint Stock Co.* | 49% | 124,000,000 | 36,470,588 |
| Total Other Companies | 100% | 125,025,000 | 36,772,059 |
| Detergent Factory — Industrial Investment Company — *Egyptian Joint Stock Co.** | | 81,000,000 | 23,823,529 |
| Grand Total | | 262,135,125 | 77,098,566 |

* *The factory is rented to a third party (Newlit)*

**8 — Fixed Assets (Net)**

Fixed Assets (Net) as at December 31, 1998 amounting to L.E.394,603,343 comprise the following:

| | Cost at 12.31.98 L.E. | Accumulated Depreciation till 12.31.98 L.E. | Net Book Value As of 12.31.98 L.E. | Net Book Value As of 12.31.98 U.S.$ |
|---|---|---|---|---|
| Land | 139,067,556 | — | 139,067,556 | 40,902,222 |
| Buildings and Construction | 44,938,399 | 1,992,054 | 42,946,345 | 12,631,278 |
| Machinery and Equipment | 199,462,363 | 16,165,705 | 183,296,658 | 53,910,783 |
| Tools and Supplies | 422,363 | 32,152 | 390,211 | 114,768 |
| Furniture and Office Equipment | 4,936,902 | 1,344,971 | 3,591,931 | 1,056,450 |
| Vehicles | 32,163,858 | 6,853,216 | 25,310,642 | 7,444,306 |
| Total | 420,991,441 | 26,388,098 | 394,603,343 | 116,059,807 |

**9 — Projects Under Construction**

Projects Under Construction as at December 31, 1998 amounting to L.E.164,982,129 represent the costs incurred for developing projects that are still under progress at the financial statements date, which comprises the following projects:

| | L.E. | U.S.$ |
|---|---|---|
| Lamp Production Line — American Company for Marketing | 13,349,586 | 3,926,349 |
| Acryline Factory — Quest Consult | 24,750,476 | 7,279,552 |
| Back House — Arab Steel Factory | 18,219,188 | 5,358,585 |
| Swiss Hotel (Sharm El-Sheikh — Construction) — Scandinavian | 17,085,550 | 5,025,162 |
| Swiss Hotel (Sharm El-Sheikh — Infrastructure) — Scandinavian | 11,390,368 | 3,350,108 |
| Parking Area and Service Centers — Universal High Load Trucking | 80,186,961 | 23,584,400 |
| | 164,982,129 | 48,524,156 |

**10 — Goodwill**

Goodwill, net of negative goodwill, amounting to L.E.248,020,160 resulted from the acquisition of several percentages of the Parent Company subsidiaries, which comprises the following:

| | L.E. | U.S.$ |
|---|---|---|
| Arab Steel Factory | 202,338,200 | 59,511,235 |
| Industrial Consumer Company | 32,734 | 9,628 |
| Amitrade for Commerce & Contracting | (6,269,546) | (1,843,984) |
| Quest Consult | (9,100,977) | (2,676,758) |
| Industrial Investment Company | (9,137,143) | (2,687,396) |
| Medical Centers Management | (1,587,193) | (466,821) |
| Scandinavian for Investment and Touristic Development | (7,207,846) | (2,119,955) |
| Trading Medical Systems | 23,626,136 | 6,948,864 |
| Medequip for Trading and Contracting | 55,325,795 | 16,272,293 |
| | 248,020,160 | 72,947,106 |

**11 — Due to Banks**

Due to Banks balance as at December 31, 1998 amounting to L.E.171,858,623 represents the following:

| | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Bank Overdrafts | 34,604,719 | 10,177,858 |
| Islamic Banks Morabhat | 34,764,234 | 10,224,775 |
| Banks Refinance of Letters of Credit | 102,489,670 | 30,144,021 |
| | 171,858,623 | 50,546,654 |

**12 — Creditors — Short Term Balances**

Creditors — Short Term Balances as at December 31, 1998 amounting to L.E.178,828,069 represent the following:

| | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Notes Payable | 10,695,641 | 3,145,777 |
| Creditors | 30,155,583 | 8,869,289 |
| Accounts Payable | 97,157,194 | 28,575,645 |
| Other Credit Balances | 40,819,651 | 12,005,780 |
| | 178,828,069 | 52,596,491 |

**13 — Other Credit Balances**

Other Credit Balances as at December 31, 1998 amounting to L.E.12,933,747 comprise the following:

| | L.E. | U.S.$ |
|---|---|---|
| Current Account — Scandinavian for Investment and Touristic Development | 4,933,747 | 1,451,102 |
| Partners Loans (Non-Interest Bearing) — Scandinavian for Investment and Touristic Development | 8,000,000 | 2,352,941 |
| | 12,933,747 | 3,804,043 |

**14 — Provisions**

Provisions amounting to L.E.22,682,664 are for corporate tax and against other tax claims.

**15 — Long Term Loans**

The subsidiaries have obtained loan facilities from various lending institutions. Total amounts, as reported in the consolidated balance sheet as at December 31, 1998, are L.E.36,448,677 in the form of Short Term Loans and L.E. 224,917,977 in the form of Long Term loans as follows:

| Notes | Amount Of Outstanding Long Term Portion | Interest Rates | Currency | Lending Institution | Company |
|---|---|---|---|---|---|
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 60 months) | 28,828,211 | 1% over LIBOR 0.75% Commission on Highly Debit Balance Monthly Charged | USD | Banque du Caire | Medequip For Trading & Contracting |
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 60 months) | 1,561,781 | 13.50% 0.75% Commission on Highly Debit Balance Monthly Charged | L.E. | Banque du Caire | Medequip For Trading & Contracting |
| Assignment of proceeds for contracts exceeding one year | 81,687,396 | 12.50% 0.1% Commission on Highly Debit Balance Monthly Charged | L.E. | National Bank of Egypt | Medequip For Trading & Contracting |
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 6 year) | 22,620,163 | 0.75% over LIBOR 0.1% Commission on Highly Debit Balance Monthly Charged | USD | National Bank of Egypt | Medequip For Trading & Contracting |
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 60 months) | 5,911,632 | 12.50% 0.6% Commission on Highly Debit Balance Monthly Charged | L.E. | Egyptian British Bank | Medequip For Trading & Contracting |
| Pledge of medical equipment insurance of 120% endorsement of promissory notes (Maturity 60 months) | 5,185,520 | LE 11% and or 1% over LIBOR 0.6% Commission on Highly Debit Balance Monthly Charged | USD or L.E. | Arab African Bank | Medequip For Trading & Contracting |
| Subtotal | 145,794,703 | | | | |
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes | 10,022,219 | 12.25% 0.75% Commission on Highly Debit Balance Monthly Charged | L.E | Banque du Caire | Trading Medical Systems |
| Term Loan To finance receivables with maturity Up To 1 Year Up To 2 Years Up To 3 Years | 1,820,546 | LE 12% and or 1.5% Over Libor 1.35% Commission on Highly Debit Balance Monthly Charged | USD or L.E. | Export Development Bank of Egypt | Trading Medical Systems |
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 60 months) | 4,566,732 | LE 11% and or 1% Over LIBOR 0.6% Commission on Highly Debit Balance Monthly Charged | USD or L.E. | Arab African Bank | Trading Medical Systems |
| Subtotal | 16,409,497 | | | | |
| Mortgage of Real Estate | 12,033,170 | 15% | LE | Arab Land Bank | Empian For Real Estate Investment |
| | 5,928,398 | 15% | LE | Arab Land Bank | |
| Subtotal | 17,961,568 | | | | |

| Notes | Amount Of Outstanding Long Term Portion | Interest Rates | Currency | Lending Institution | Company |
|---|---|---|---|---|---|
| Loan U.S.$ 8,072,887 with an international bank for a term of 7.5 years including 2.5 years grace period Payable in semi-annual installments starting from December 2000. | 27,447,816 | 1.5% over LIBOR Commission 0.6% P.A. 0.6% Commission on Highly Debit Balance Monthly Charged 50,000 LE./P.A Yearly Management Fee | USD | Misr Iran Bank Syndicate: 1-Misr Iran Bank 2-MIBank 3-Cairo Barclays 4-Arab International Bank 5-Delta Bank 6-Arab Bank 7-Arab International Bank | Scandanavian for Touristic and Real Estate Investment |
| Subtotal | 27,447,816 | | | | |
| Unsecured Loan | 4,667,603 | 13% | L.E. | Banque du Caire | Arab Steel Factory |
| Subtotal | 4,667,603 | | | | |
| Pledge on Machinery | 8,918,841 | 13% | L.E. | Banque du Caire | American Company for Marketing |
| Subtotal | 8,918,841 | | | | |
| 5 Years Term Loan | 3,717,949 | 14% | L.E. | Egyptian British Bank | Universal Trucking Company |
| Subtotal | 3,717,949 | | | | |
| Total | 224,917,977 | | | | |

The current portion of the above-mentioned long-term loans has reached L.E.36,448,677 and is included under separate caption in the balance sheet (current portion of long term debt).

**16 — Bonds**

Bonds amounting to L.E.250,000,000 were issued by Arab Steel Factory S.A.E. These bonds are non-convertible into marketable common stock, and they hold a fixed annual interest rate of 11 per cent. The subscription period started in July 1998 for 7 years.

**17 — Creditors — Long Term Balances**

Creditors — Long Term Balances as at December 31, 1998 amounting to L.E.13,459,153 comprise the following:

| | L.E. | U.S.$ |
|---|---|---|
| Sales Tax on Capital Machinery and Equipment — Arab Steel Factory S.A.E | 2,819,015 | 829,122 |
| Long Term Notes Payable — International High Load Trucking S.A.E. | 10,640,138 | 3,129,452 |
| | 13,459,153 | 3,958,574 |

**18 — Issued & Paid-Up Capital**

The authorized capital amounts to L.E. 5,000,000,000. The subscribed, issued and paid-up capital amounting to L.E. 1,149,880,000 is divided into 114,988,000 shares at a par value of L.E. 10 each as follows:

| Name of Shareholders | % of Participation | No. of Shares | Amount in L.E. |
|---|---|---|---|
| a) Founders: | | | |
| Ramy Lakah | 0.33% | 1,000 | 10,000 |
| Michel Lakah | 0.33% | 1,000 | 10,000 |
| Farouk Abdel Samei | 0.16% | 500 | 5,000 |
| b) Subscribers: | | | |
| Ramy Lakah | 49.59% | 57,492,750 | 574,927,500 |
| Michel Lakah | 39.59% | 45,993,950 | 459,939,500 |
| Banque du Caire | 10.00% | 11,498,800 | 114,988,000 |
| | 100.00% | 114,988,000 | 1,149,880,000 |

**19 — Commitments and Contingent Liabilities**

Letters of Guarantee issued by banks for the Group's accounts in favor of others as at December 31,1998 amounted to L.E. 55 million with a cash margin of L.E. 2,144,094

**20 — Earnings Per Share**

Earnings per Share are calculated as follows:

| | L.E. | U.S.$ |
|---|---|---|
| Net Profit for the year | 93,230,346 | 27,420,690 |
| Number of Shares | 114,988,000 | 114,988,000 |
| Earnings per Share | 0.81 | 0.24 |

**21 — Subsidiary Companies**

The financial statements of Industrial Investment Company S.A.E. are consolidated with those of Universal High Load Trucking S.A.E in which Industrial Investment Company S.A.E. owns a majority holding share exceeding 77.49 per cent.

**22 — Subsequent Events**

As at the Balance Sheet date, subsequent events comprise the sale of Financial Long-Term Investments in full on June 15, 1999, which were included in the Long-Term Investment account of one of the subsidiary companies (Industrial Investment Company S.A.E.) analyzed as follows:

| Description | No. of Shares | Sale Price/Share L.E. | Total L.E. |
|---|---|---|---|
| Investment in Irena for Art Production Company | 2,500 | 25 | 62,500 |
| Investment in Delta Sound Company | 1,000 | 25 | 25,000 |
| Investment in House of Art Company | 3,000 | 25 | 75,000 |
| | | | 162,500 |

**23 — Net Profit for the Year**

The Profit for the year amounting to L.E. 93,230,346 (U.S.$ 27,420,690) was directly credited to the Goodwill as it represents the net results of operations of the eight subsidiaries before acquisition.

## Auditor's Report

**Cherif Mohamed Hammouda**
*Chartered Accountant*
Member of RSM International



To the shareholders of Medequip for Trading and Contracting, S.A.E.

We have audited the financial statements of Medequip for Trading and Contracting, S.A.E. which comprise the balance sheets as at December 31, 1996, 1997 and 1998 and the income statements for the periods ended December 31, 1996, 1997 and 1998 and the statement of cash flows for the periods ended December 31, 1997 and 1998. These financial statements are the responsibility of the company's management. It is our responsibility to express an opinion on these financial statements, based on our audit.

We conducted our audit in accordance with International Standards on Auditing. Such standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the position of Medequip for Trading and Contracting, S.A.E. as at December 31, 1996, 1997 and 1998 and the results of its operations and its cash flows for the years then ended in conformity with Egyptian Accounting Standards and comply with applicable Egyptian laws and regulations.

We obtained all data and explanations which we deemed necessary for our audit. Our audit provides us with reasonable assurance that during the year, the Company's accounting records were maintained as required by law and the statute of the company and are in agreement with the accompanying financial statements.

Cherif Hammouda

FESAA-FIFA-FEST
R.A.A. 14260

9 September, 1999

**MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.**

**BALANCE SHEET**
**as at December 31, 1996, 1997 and 1998**

| | Notes | 12.31.98 U.S.$ | 12.31.98 L.E. | 12.31.97 L.E. | 12.31.96 L.E. |
|---|---|---|---|---|---|
| **Long Term Assets** | | | | | |
| Fixed Assets (Net) | (2A,3) | 1,142,696 | 3,885,167 | 3,714,060 | 863,005 |
| Deferred Expenses (Net) | | 775,565 | 2,636,922 | 3,405,998 | 8,179,895 |
| Investment in Marketable Securities | | 1,570,929 | 5,341,160 | 3,113,400 | — |
| Lease Receivables | | 29,064,284 | 98,818,566 | 40,054,305 | — |
| Total Long Term Assets | | 32,553,475 | 110,681,815 | 50,287,763 | 9,042,900 |
| **Current Assets** | | | | | |
| Inventory | (2B) | 20,253,560 | 68,862,103 | 24,376,653 | 22,607,824 |
| Work in Progress | | 19,930,377 | 67,763,280 | 36,244,927 | 22,457,182 |
| Accounts Receivables | (4) | 8,004,508 | 27,215,327 | 13,250,477 | 29,072,413 |
| Lease Receivables | (5) | 4,418,056 | 15,021,392 | 5,722,044 | — |
| Debtors — Short Term Balances | (6) | 6,960,779 | 23,666,648 | 18,018,847 | 34,066,555 |
| Advance Payment to Suppliers | | 7,837,933 | 26,648,971 | 18,560,478 | 58,478,969 |
| Letters of Credit | | — | — | — | 4,665,769 |
| Cash in Hand and at Banks | (7) | 1,295,304 | 4,404,033 | 4,423,541 | 38,651,709 |
| Total Current Assets | | 68,700,516 | 233,581,755 | 120,596,967 | 210,000,421 |
| Total Assets | | 101,253,991 | 344,263,570 | 170,884,730 | 219,043,321 |
| **Current Liabilities** | | | | | |
| Due to Banks | (8) | 2,752,062 | 9,357,010 | 15,131,577 | 12,798,434 |
| Current Portion of Long Term Loans | | 10,720,199 | 36,448,677 | — | — |
| Accounts Payable | | 2,755,973 | 9,370,309 | 13,552,275 | 120,889,740 |
| Notes Payable | | — | — | — | 114,967 |
| Provisions | (9) | 2,881,126 | 9,795,829 | 6,251,044 | — |
| Creditors — Short Term Balances | | 2,783,363 | 9,463,432 | 11,762,271 | 357,733 |
| Total Current Liabilities | | 21,892,723 | 74,435,257 | 46,697,167 | 134,160,874 |
| Working Capital | | 46,807,794 | 159,146,498 | 73,899,800 | 75,839,547 |
| Total Investments | | 79,361,269 | 269,828,313 | 124,187,563 | 84,882,447 |
| **Shareholder's Equity** | | | | | |
| Issued and Paid-Up Capital | (10) | 29,411,765 | 100,000,000 | 20,000,000 | 20,000,000 |
| Legal Reserve | | 353,436 | 1,201,681 | — | — |
| Retained Earnings | | 6,715,273 | 22,831,929 | 4,187,563 | 84,553 |
| Total Shareholder's Equity | | 36,480,474 | 124,033,610 | 24,187,563 | 20,084,553 |
| **Long Term Liabilities** | | | | | |
| Loans | | — | — | — | — |
| Long Term Loans | | 42,880,795 | 145,794,703 | 100,000,000 | 64,797,894 |
| Total Long Term Liabilities | | 42,880,795 | 145,794,703 | 100,000,000 | 64,797,894 |
| Total Liabilities and Shareholder's Equity | | 101,253,991 | 344,263,570 | 170,884,730 | 219,043,321 |
| Total Finance of Working Capital and Long Term Assets | | 79,361,269 | 269,828,313 | 124,187,563 | 84,882,447 |

*The accompanying notes are an integral part of the financial statements.*

*The auditor's report is attached.*

Note: *Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = L.E.3.40.*

**MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.**
**(LAKAH GROUP), S.A.E.**

**INCOME STATEMENT**
**for the periods ended December 1996, 1997 and 1998**

| | Notes | 12.31.1998 U.S.$ | 12.31.1998 L.E. | 12.31.1997 L.E. | 12.31.1996 L.E. |
|---|---|---|---|---|---|
| Sales | | 74,557,922 | 253,496,936 | 200,968,717 | 170,327,137 |
| Excess Leasing Amortization Cost of Sales | | (54,777,963) | (186,245,073) | (163,418,676) | (161,706,251) |
| Gross Profit | | 19,779,960 | 67,251,863 | 37,550,041 | 8,620,886 |
| **Add** | | | | | |
| Other Income | | 332,163 | 1,129,355 | 228,882 | 225,290 |
| Maintenance Revenue | | 641,149 | 2,179,905 | 284,261 | — |
| | | 20,753,272 | 70,561,123 | 38,063,184 | 8,846,176 |
| **Less** | | | | | |
| General and Administrative Expenses | | (7,642,277) | (25,983,742) | (21,828,801) | (3,366,463) |
| Financing Expenses | | (4,330,428) | (14,723,456) | (8,165,227) | (4,326,062) |
| Provisions for Doubrful Accounts | | (682,678) | (2,321,106) | (980,537) | — |
| Foreign Exchange Differences | | (62,367) | (212,049) | (36,202) | (30,733) |
| Total Expenses | | 12,717,751 | 43,240,353 | 31,010,767 | 7,723,258 |
| Net Profit before Tax | | 8,035,521 | 27,320,770 | 7,052,417 | 1,122,918 |
| Income Tax Provision | | 2,198,448 | 7,474,723 | 2,949,407 | — |
| Net Profit after Tax | | 5,837,073 | 19,846,047 | 4,103,010 | 1,122,918 |

*The accompanying notes are an integral part of the financial statements.*

*The auditor's report is attached.*

*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = L.E.3.40.*

**MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.**

**STATEMENT OF CASH FLOWS**
**for the periods ended December 31, 1997 and 1998**

| | 96 - 97 | 97 - 98 |
|---|---|---|
| **Cash Flow From Operation** | | |
| Net Profit after Tax | 4,187,563 | 22,831,929 |
| Posted Profit | (84,553) | (4,187,563) |
| Depreciation | — | 653,346 |
| Provisions and Reserves | 3,929,944 | 10,997,510 |
| Net Operating Profit Before Change in Working Capital | 8,032,954 | 30,295,222 |
| Change in Working Capital | (36,218,365) | (95,062,035) |
| Net Cash after Operations | (28,185,411) | (64,766,813) |
| **Cash From Investing Activities** | | |
| Change in Fixed Assets | (2,851,055) | (824,453) |
| Intangibles | 4,773,897 | 769,076 |
| Long Term Lease Receivables | (40,054,305) | (58,764,261) |
| Change in Long Term Investments | (3,113,400) | (2,227,760) |
| Net Cash from Invesring Activities | (41,244,863) | (61,047,398) |
| **Cash From Financing Activities** | | |
| Change in Paid-in Capital | — | 80,000,000 |
| Change in Long Term Loans | 35,202,106 | 45,794,703 |
| Net Cash from Financing Activities | 35,202,106 | 125,794,703 |
| Net Cash Flow | (34,228,168) | (19,508) |
| Opening Balance | 38,651,709 | 4,423,541 |
| Ending Balance | 4,423,541 | 4,404,033 |

## NOTES TO THE FINANCIAL STATEMENTS

### 1) The Company

Medequip for Trading and Contracting S.A.E., ("Medequip") was incorporated on October 12, 1994 under the Law 159 of 1981. Medequip is principally involved in the following two business activities (i) the sale of medical equipment and (ii) the construction of medical facilities and related construction activities.

### 2) Significant Accounting Policies

The significant accounting policies adopted in the preparation of the financial statements are set out below.

a) Basis of Preparation of Financial Statements

The accounts are prepared on the basis of historical cost in accordance with Egyptian Accounting Standards.

b) Fixed Assets

Fixed Assets are carried at historical cost and are depreciated using the straight-line method over their expected useful lives, according to the following annual rates:

| Assets | Annual Rates |
|---|---|
| Vehicles | 25% |
| Electrical Equipment | 12.5% |
| Furniture | 6% |
| Office Equipment | 12.5% |
| Telephone Switch Pager | 12.5-25% |
| Decoration | 20% |
| Tools and Fixtures | 12.5% |
| Computers | 12.5% |

c) Inventory

Inventory is stated at the lower of cost or net realizable value using the first-in first-out method.

d) Other Assets

Other Assets represent formation costs incurred for the purpose of establishing the company. These costs are amortized using the straight-line method over a five-year period (20 per cent.).

### 3) Fixed Assets

| | Cost as at 12.31.98 | Accumulated Depreciation as at 12.31.98 | Net Value as at 12.31.98 | Net Value as at 12.31.97 | Net Value as at 12.31.96 |
|---|---|---|---|---|---|
| Vehicles | 3,031,258 | 974,105 | 2,057,154 | 2,202,969 | 272,864 |
| Electrical Equipment | 669,737 | 167,915 | 501,822 | 363,102 | 356,628 |
| Furniture | 1,403,860 | 315,087 | 1,088,773 | 1,014,171 | 164,585 |
| Office Equipment | 116,390 | 28,729 | 87,661 | 48,834 | |
| Telephone Switch and Pager | 115,124 | 28,035 | 87,089 | 65,456 | 55,079 |
| Tools and Fixtures | 71,079 | 8,411 | 62,668 | 19,527 | 13,849 |
| | 5,407,449 | 1,522,281 | 3,885,167 | 3,714,060 | 863,005 |

**4) Accounts Receivables**

Accounts Receivables comprise the following:

| | 12.31.98 L.E. |
|---|---|
| Ministry of Health | 6,395,931 |
| Ministry of Defence | 3,375,948 |
| Private Medical Centers | 2,806,241 |
| Several Hospitals | 14,637,207 |
| | 27,215,327 |

**5) Lease Receivables**

Lease Receivables represent leasing activity for supplying doctors private practices and medical centers with medical equipment and related spare parts. Average lease terms are five years.

**6) Debtors — Short Term Balances**

Debtors — Short Term Balances comprise the following:

| | 12.31.98 L.E. |
|---|---|
| Sales Tax | 5,763,936 |
| Withholding Tax | 2,484,365 |
| Deposits with Others | 1,487,265 |
| Prepaid Expenses | 1,743,526 |
| Other Debtors | 12,187,556 |
| | 23,666,648 |

**7) Cash in Hand and at Banks**

| | 12.31.98 L.E. | 12.31.97 L.E. | 12.31.96 L.E. |
|---|---|---|---|
| Letters of Guarantee | 1,746,087 | 2,249,854 | 6,917 |
| Banks — Current Accounts | 2,321,878 | 2,168,198 | 11,064,055 |
| Cash in Hand | 336,068 | 5,489 | 27,580,737 |
| | 4,404,033 | 4,423,541 | 38,651,709 |

**8) Due to Banks**

| | 12.31.9 L.E. | 12.31.97 L.E. |
|---|---|---|
| Banque du Caire | 7,460,903 | 12,680,770 |
| Islamic Banks | 1,896,107 | 2,450,807 |
| | 9,357,010 | 15,131,577 |

**9) Provisions**

| | 12.31.98 L.E. | 12.31.97 L.E. |
|---|---|---|
| Doubtful Lease Receivables | 2,321,106 | 980,537 |
| Income Tax | 7,474,723 | 5,270,507 |
| | 9,795,829 | 6,251,044 |

**10) Capital**

As at December 31, 1998 the Paid-Up Capital totals L.E. 100,000,000 divided into 1,000,000 shares of L.E. 100 per share as follows:

| Shareholder's Name and Nationality | Percentage of Participation | Number of Shares | Amount in L.E. 98 | Amount In L.E. 97 | Amount In L.E. 96 |
|---|---|---|---|---|---|
| Holding Company for Financial Investments (Lakah Group), S.A.E ......... | 97.80% | 978,000 | 97,800,000 | — | — |
| Mr. Ramy Lakah — Egyptian .................... | 1.00% | 10,000 | 1,000,000 | 9,900,000 | 9,900,000 |
| Mr. Michel Lakah — Egyptian.................. | 1.00% | 10,000 | 1,000,000 | 9,900,000 | 9,900,000 |
| Mr. Farouk Abdel Samie — Egyptian ....... | 0.01% | 50 | 5,000 | 5,000 | 5,000 |
| Mr. Samy Toutoungy — Egyptian............. | 0.20% | 1,950 | 195,000 | 195,000 | 195,000 |
| | 100% | 1,000,000 | 100,000,000 | 20,000,000 | 20,000,000 |

**10) Capital**

As at December 31, 1998 the Paid-Up Capital totals L.E. 100,000,000 divided into 1,000,000 shares of L.E. 100 per share as follows:

| Shareholder's Name and Nationality | Percentage of Participation | Number of Shares | Amount in L.E. 98 | Amount in L.E. 97 | Amount in L.E. 96 |
|---|---|---|---|---|---|
| Holding Company for Financial Investments (Lakah Group), S.A.E ......... | 97.80% | 978,000 | 97,800,000 | — | — |
| Mr. Ramy Lakah — Egyptian .................. | 1.00% | 10,000 | 1,000,000 | 9,900,000 | 9,900,000 |
| Mr. Michel Lakah — Egyptian.................. | 1.00% | 10,000 | 1,000,000 | 9,900,000 | 9,900,000 |
| Mr. Farouk Abdel Samie — Egyptian ....... | 0.01% | 50 | 5,000 | 5,000 | 5,000 |
| Mr. Samy Toutoungy — Egyptian............. | 0.20% | 1,950 | 195,000 | 195,000 | 195,000 |
| | 100% | 1,000,000 | 100,000,000 | 20,000,000 | 20,000,000 |

# Auditor's Report

Cherif Mohamed Hammouda
Chartered Accountant
Member of RSM International



To the shareholders of Trading Medical System Egypt, S.A.E.

We have audited the financial statements of Trading Medical System Egypt, S.A.E. which comprise the balance sheets as at December 31, 1996, 1997 and 1998 and the income statements for the periods ended December 31, 1996, 1997 and 1998 and the statements of cash flows for the periods ended December 31, 1997 and 1998. These financial statements are the responsibility of the company's management. It is our responsibility to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with International Standards on Auditing. Such standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the position of Trading Medical System Egypt, S.A.E. as at December 31, 1996, 1997 and 1998 and the results of its operations and its cash flows for the years then ended in conformity with Egyptian Accounting Standards and comply with applicable Egyptian laws and regulations.

We obtained all data and explanations which we deemed necessary for our audit. Our audit provides us with reasonable assurance that during the year, the company's accounting records were maintained as required by law and the statute of the company and are in agreement with the accompanying financial statements.

Cherif Hammouda

FESAA-FIFA-FEST
R.A.A. 14260

September 9, 1999

## TRADING MEDICAL SYSTEM EGYPT, S.A.E.

### BALANCE SHEET
### as at December 31, 1996, 1997 and 1998

| | (Notes) | 12.31.98 U.S.$ | 12.31.98 L.E. | 12.31.97 L.E. | 12.31.96 L.E. |
|---|---|---|---|---|---|
| **Long Term Assets** | | | | | |
| Fixed Assets (Net) | (2B-3) | 1,119,706 | 3,807,000 | 4,245,133 | 1,136,499 |
| Deferred Expenses | | — | — | — | 1,698,808 |
| Lease Receivables | (4) | 20,241,692 | 68,821,754 | 78,150,759 | |
| Total Long Term Assets | | 21,361,398 | 72,628,754 | 82,395,892 | 2,835,307 |
| **Current Assets** | | | | | |
| Inventory | (2C) | 9,080,054 | 30,872,182 | 32,203,868 | 37,123,760 |
| Accounts Receivables | | 1,836,969 | 6,245,694 | 5,089,272 | 35,321,976 |
| Lease Receivables | | 3,730,294 | 12,683,000 | 11,164,354 | — |
| Letters of Credit | | — | — | — | 28,003,674 |
| Debtors Short Term Balances | (5) | 7,393,778 | 25,138,846 | 4,444,613 | 1,164,513 |
| Letters of Guarantee (Cash Margin) | | 929,235 | 3,159,400 | 2,450,520 | 3,211,635 |
| Cash in Hand and at Banks | (6) | 805,882 | 2,740,000 | 2,881,345 | 20,229,831 |
| Total Current Assets | | 23,776,212 | 80,839,121 | 58,233,972 | 125,055,389 |
| **Current Liabilities** | | | | | |
| Due to Banks | (7) | 13,182,338 | 44,819,950 | 27,219,526 | 97,015,254 |
| Creditors Short-term | | 3,850,939 | 13,093,194 | 18,959,955 | 9,711 |
| Notes Payable | | — | — | — | 3,343,849 |
| Advanced Payments | | — | — | — | 9,376,968 |
| Accounts Payable | | 918,351 | 3,122,392 | 9,577,880 | — |
| Provisions | (8) | 2,749,879 | 9,349,587 | 4,211,897 | — |
| Total Current Liabilities | | 20,701,507 | 70,385,123 | 59,969,258 | 109,745,782 |
| Working Capital | | 3,074,705 | 10,453,998 | (1,735,286) | 15,309,607 |
| Total Investments | | 24,436,104 | 83,082,752 | 80,660,606 | 18,144,914 |
| **Shareholders' Equity** | | | | | |
| Issued and Paid-Up Capital | (9) | 14,705,882 | 50,000,000 | 20,000,000 | 20,000,000 |
| Legal Reserve | | 404,706 | 1,376,000 | 207,467 | |
| Retained Earnings | | 4,499,193 | 15,297,255 | 3,941,870 | (1,855,086) |
| Total Shareholder's Equity | | 19,609,781 | 66,673,255 | 24,149,337 | 18,144,914 |
| **Long Term Liabilities** | | | | | |
| Long Term Loans | | 4,826,323 | 16,409,497 | 56,511,269 | — |
| Total Long Term Liabilities | | 4,826,323 | 16,409,497 | 56,511,269 | — |
| Total Finance of Working Capital and Long Term Assets | | 24,436,104 | 83,082,752 | 80,660,606 | 18,144,914 |

*The accompanying notes are an integral part of the financial statements.*

*The auditor's report is attached*

*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = L.E. 3.40.*

**TRADING MEDICAL SYSTEM EGYPT, S.A.E.**

**INCOME STATEMENT**
**for the periods ended December 31, 1997 and 1998**

| | 12.31.98 U.S.$ | 12.31.98 L.E | 12.31.97 L.E | 12.31.96 L.E |
|---|---|---|---|---|
| Sales | 40,832,597 | 138,830,830 | 117,182,469 | 14,235,485 |
| Cost of Sales | (30,449,706) | (103,529,000) | (93,350,695) | (11,165,389) |
| Gross Profit | 10,382,891 | 35,301,830 | 23,831,774 | 3,070,096 |
| **Less** | | | | |
| General and Administrative Expenses | 2,641,590 | 8,981,407 | 8,117,251 | 1,929,826 |
| Financing Expenses | 1,750,294 | 5,951,000 | 5,110,069 | 397,390 |
| Provision for Doubtful Debts | 516,179 | 1,755,009 | 1,875,195 | |
| Depreciation of Fixed Assets | 138,155 | 469,726 | 388,133 | 253,981 |
| **Total Expenses** | 5,046,218 | 17,157,142 | 15,490,648 | 2,581,197 |
| **Add** | | | | |
| Creditors Interests | | | | 42,909 |
| Net Profit before Taxes | 5,336,673 | 18,144,688 | 8,341,126 | 531,808 |
| Income Tax Provision | 1,653,168 | 5,620,770 | 2,336,702 | — |
| Net Profit after Taxes | 3,683,505 | 12,523,918 | 6,004,424 | 531,808 |

*The accompanying notes are an integral part of the financial statements.*

*The auditor's report is attached*

*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = L.E.3.40.*

**TRADING MEDICAL SYSTEM EGYPT, S.A.E.**

**STATEMENT OF CASH FLOWS**
**for the periods ended December 31, 1997 and 1998**

| | 96 - 97 | 97 - 98 |
|---|---|---|
| **Cash Flow from Operation** | | |
| Net Profit after Tax | 3,941,870 | 15,297,255 |
| Posted Profit | 1,855,086 | (3,941,870) |
| Depreciation | 388,133 | 469,726 |
| Provisions & Reserves | 4,419,364 | 8,751,779 |
| Net Operating Profit before Change in Working Capital | 10,604,453 | 20,576,890 |
| Change in Working Capital | (4,515,490) | (19,913,875) |
| Net Cash after Operations | 6,088,963 | 663,015 |
| **Cash from Investing Activities** | | |
| Change in Fixed Assets | (3,496,767) | (31,593) |
| Intangibles | 1,698,808 | — |
| Long Term Lease Receivables | (78,150,759) | 9,329,005 |
| Net Cash from Investing Activities | (79,948,718) | 9,297,412 |
| **Cash From Financing Activities** | | |
| Change in Paid-in Capital | — | 30,000,000 |
| Change in Long Term Loans | 56,511,269 | (40,101,772) |
| Net Cash from Financing Activities | 56,511,269 | (10,101,772) |
| Net Cash Flow | (17,348,486) | (141,345) |
| Opening Balance | 20,229,831 | 2,881,345 |
| Ending Balance | 2,881,345 | 2,740,000 |

## NOTES TO THE FINANCIAL STATEMENTS

### 1) The Company

Trading Medical System Egypt, S.A.E. ("TMSE") was incorporated on December 17, 1994. Under the Law 159 of 1981. TMSE is involved in marketing, importing, re-exporting, distributing, installing and servicing sophisticated medical imaging equipments.

### 2) Significant Accounting Policies

The significant accounting policies adopted in the preparation of the financial statements are set our below.

a) Basis of Preparation of Financial Statements

The accounts are prepared on the basis of historical cost in accordance with Egyptian Accounting Standards.

b) Foreign Currency Translation

TMSE maintains its accounts in Egyptian pounds. Transactions denominated in foreign currencies are translated to Egyptian pounds using the prevailing free market rates at the transaction date. Monetary assets and liabilities denominated in foreign currencies are translated to Egyptian Pounds using the exchange rates prevailing at the year end. Translation differences are included in the Income Statement.

c) Fixed Assets

Fixed Assets are stated at historical cost and are depreciated using the straight-line method over their estimated productive lives, according to the following annual rates.

| Fixed Assets | Annual Rates |
|---|---|
| Vehicles | 25% |
| Electrical Equipment | 12.5% |
| Furniture | 6-20% |
| Iron Safe | 12.5% |
| Telephone Switch and Pager | 12.5% |
| Decoration | 20% |
| Tools and Fixtures | 12.5% |
| Computers | 12.5% |
| Decoration | 20% |

d) Inventory

Inventory is stated at the lower of cost or net realizable value using the first-in first-out method.

### 3) Fixed Assets

| | Cost as at 12.31.98 L.E. | Accumulated depreciation as at 12.31.98 L.E. | Net Value as at 12.31.98 L.E. | Net Value as at 12.31.97 L.E. |
|---|---|---|---|---|
| Vehicles | 3,548,816 | 784,668 | 2,764,148 | 3,079,079 |
| Electrical Equipment | 296,038 | 65,456 | 230,582 | 240,582 |
| Furniture | 1,105,375 | 598,177 | 507,197 | 607,198 |
| Iron Safe | 17,247 | 3,813 | 13,433 | 14,535 |
| Telephone Switch & Pager | 312,681 | 69,136 | 243,545 | 253,545 |
| Fire Equipment | 4,076 | 901 | 3,175 | 3,275 |
| Tools & Fixtures | 57,600 | 12,680 | 44,920 | 46,920 |
| | 5,341,832 | 1,534,833 | 3,807,000 | 4,245,133 |

### 4) Lease Receivables

TMSE entered into lease contracts through which it leases certain equipment to its clients (Lessees). The leased equipment title passes to the lessee at the end of the lease term (up to five years). Lease receivables represents the total lease payments to be received.

### 5) Debtors Short Term Balances

| | 12.31.98 L.E. | 12.31.97 L.E. |
|---|---|---|
| Sales Tax | 6,408,135 | — |
| Withholding Tax | 3,743,582 | — |
| Deposits with Others | 920,282 | — |
| Prepaid Expenses | 9,074,601 | — |
| Accrued Revenue | 4,992,246 | — |
| Advance Payments to Suppliers | — | 4,444,613 |
| | 25,138,846 | 4,444,613 |

### 6) Cash in hand and at Banks

| | 12.31.98 L.E. | 12.31.97 L.E. | 12.31.96 L.E. |
|---|---|---|---|
| Banks — Current Accounts | 2,568,000 | 2,450,516 | 20,217,217 |
| Cash in Hand | 172,000 | 430,829 | 12,614 |
| | 2,740,000 | 2,881,345 | 20,229,831 |

### 7) Due To Banks

| | 12.31.98 L.E. | 12.31.97 L.E. | 12.31.96 L.E. |
|---|---|---|---|
| Banque du Caire | 44,819,950 | 2,214,358 | — |
| Islamic Banks | — | 25,005,168 | 20,053,574 |
| Other Financial Institutions | — | — | 76,961,680 |
| | 44,819,950 | 27,219,526 | 97,015,254 |

### 8) Provisions

| | 12.31.98 L.E. | 12.31.97 L.E. |
|---|---|---|
| Income Tax Provision | 7,594,579 | 236,702 |
| Provision for Doubtful Debts | 1,755,009 | 1,875,195 |
| | 9,349,587 | 2,111,897 |