574-6178/894637

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In the matter of the application of                          :

                                                                          07 CV 2799 (MGC)(FM)
RAMY LAKAH and MICHEL LAKAH,                   :

                              Petitioners,             :

for a judgment pursuant to Article 75 of the           :
C.P.L.R. staying the arbitration commenced by

                                                             :

UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING                       :
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN,             :

                              Respondents.            :
-----------------------------------------------------------X

PETITIONERS' REPLY MEMORANDUM
IN SUPPORT OF STAYING ARBITRATION
AND OPPOSING THE MOTION TO COMPEL ARBITRATION

LESTER SCHWAB KATZ & DWYER, LLP
120 Broadway
New York, New York  10271
212  964-6611

*Attorneys for Petitioners*
*RAMY LAKAH and MICHEL LAKAH*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

OVERVIEW OF ARGUMENTS ........................................................................... 1

   A.   Neither of The Lakahs Personally Signed An
       Arbitration Agreement ................................................................................ 1

   B.   Respondents' Specious Arguments That The
       Lakahs Committed Frauds .......................................................................... 2

ARGUMENT ...................................................................................................... 6

   POINT I .......................................................................................................... 6

      RAMY AND MICHEL LAKAH ARE NOT
      PARTIES, IN THEIR CAPACITY AS
      INDIVIDUALS, TO AN AGREEMENT TO
      ARBITRATE ............................................................................................. 6

   POINT II ......................................................................................................... 7

      THERE WAS NO FRAUD, SO
      RESPONDENTS MAY NOT PIERCE
      THE CORPORATE VEIL .......................................................................... 7

        1.    Respondents' Misstatements
            Regarding the Law of Piercing the
            Corporate Veil ................................................................................... 7

        2.    Each of Respondents' Claims of
            Purported "Fraud" is a Fiction ........................................................... 9

            A.   The Market
                 Manipulation/Artificial
                 Inflation Fraud Fiction ............................................................. 9

                 (i)  HCFI's Value was
                      Properly Calculated and
                      Reported .......................................................... 9

i

   (ii) The Vacatur of the Asset
    Freeze of the Alleged
    "Co-conspirators" ..................................................................11

  B. The Alleged Fraudulent Sale of
   ASF Assets and Blocking of
   Notes Fraud...........................................................................12

  C. The Purported Successor
   Company Frauds ....................................................................15

  D. The Real Cause of the
   Eurobond Default as
   Confirmed by PWC................................................................17

POINT III......................................................................................................18

UBS HAS NOT PROPERLY PLEADED
FRAUD FOR PURPOSES OF PIERCING
THE CORPORATE VEIL ...........................................................................18

 1. Corporate Formalities: .............................................................18

 2. Under-capitalization:.................................................................20

 3. Personal Use of Funds: ............................................................20

 4. Overlap in Ownership: .............................................................21

 5. Corporate Entities Sharing Offices: .........................................22

 6. Business Discretion:..................................................................22

 7. Arms Length Dealing:...............................................................22

 8. Independent Profit Center: ........................................................23

 9. Payment of Corporate Debts by
  Individuals: ...............................................................................23

 10. Use of Corporate Property by
  Individuals for Personal Purposes:...........................................23

ii

POINT IV .................................................................................................................23

    RESPONDENTS' STATUTE OF
    LIMITATIONS ARGUMENT IS SPECIOUS:
    THE LAKAHS NEVER AGREED TO
    ARBITRATE .......................................................................................................23

CONCLUSION ........................................................................................................ 25

iii

# TABLE OF AUTHORITIES

**Page**

Cases

American Fuel Corp. v. Utah Energy Dev. Co.,
   122 F.3d 130 (2d Cir. 1997)...................................................................7, 8

Billy v. Consolidated Machine Tool Corp.,
   51 N.Y.2d 152, 432 N.Y.S.2d 879 (1980) ...................................................22

Care Environmental Corp. v. M2 Technologies, Inc.,
   No. CV-05-1600 (CPS), 2006 WL 148913
   (E.D.N.Y. Jan. 18, 2006) ...................................................................8

Freeman v. Complex Computing Co.,
   119 F.3d 1044 (2d Cir.1997)...................................................................8

General Textile Printing & Processing Corp. v.
   Expromtorg International Corp.,
   891 F.Supp. 946 (S.D.N.Y. 1995) ...........................................................8

Goldblatt v. Englander Com., L.L.C.,
   No. 06 Civ. 3208 (RWS) 2007 WL 148699
   (S.D.N.Y. Jan. 22, 2007)...................................................................8

Kaplan v. First Options of Chicago, Inc.,
   19 F.3d 1503 (3rd Cir. 1994), aff'd, 514 U.S. 938 (1995) ................................7

Kinetic Instruments, Inc. v. Lares,
   802 F.Supp. 976 (S.D.N.Y. 1992) ...........................................................8

Matarasso v. Cont. Cas. Co.,
   56 N.Y.2d 264, 451 N.Y.S.2d 703 (1982) ...................................................23

Matter of Allstate Ins. Co. (Richards),
   178 A.D.2d 142, 576 N.Y.S.2d 577 (1st Dep't 1991).................................23, 24

Morgan v. Nikko Sec. Co. Intern., Inc.,
   691 F. Supp. 792 (S.D.N.Y. 1988) ...........................................................24

Morris v. New York State Dept. of Taxation and Finance,
   82 N.Y.2d 135, 603 N.Y.S.2d 807 (1993)...................................................7, 8

iv

Sahu v. Union Carbide Corp.,
    No. 04 Civ. 8825 (JFK), 2006 WL 3377577
    (S.D.N.Y. Nov. 20, 2006) ...................................................................................8, 21, 22

Thrift Drug, Inc. v. Universal Prescription Adm'rs,
    131 F.3d 95 (2d Cir. 1997).........................................................................................8

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,
    933 F.2d 131 (2d Cir. 1991).......................................................................................18

LESTER SCHWAB KATZ & DWYER LLP   •   120 BROADWAY   •   NEW YORK, NY 10271-10071

## PRELIMINARY STATEMENT

Petitioners Ramy Lakah and Michel Lakah (the "Lakahs") submit this reply memorandum in support of staying arbitration against them on the ground that they did not agree to arbitrate and in opposition to the respondents' motion to compel them to arbitrate. Our motion to stay arbitration should be granted. Neither of respondents' arguments to compel arbitration holds up. Neither of the Lakahs signed an agreement to arbitrate in a personal capacity. The purported "frauds" permitting respondents to pierce the veil to assert their claims against the Lakahs personally are conclusively refuted by the accompanying reply declarations of neutral fact witnesses,[1] who dispel the conjecture and surmise respondents supply, and by the public record.

## OVERVIEW OF ARGUMENTS

A.    Neither of The Lakahs Personally Signed An Arbitration Agreement

The Lakahs are not bound to arbitrate because they did not sign an arbitration agreement in their personal capacities. The arbitration provision requires only that the issuer and the guarantors must arbitrate their disputes with Respondents.

The Lakahs are neither issuers nor guarantors. The single page the Lakahs signed in a personal capacity states that the Lakahs are bound by only one covenant, a one-paragraph non-compete clause, and nothing else. Respondents make no meaningful response on these points. The real focus of respondents' case is their attempt to pierce the corporate veil.

---

[1]   Former HCFI directors Brian Murphy, auditor Sherif George Halim of Arab Chartered Accountants – RSM Egypt (two separate declarations), attorney Gamil Halim, the Lakahs' Egyptian counsel, Dr. Ibrahim Ahmed Ibrahim, an attorney and professor of law. Michel Lakah also submits a reply declaration.

LESTER SCHWAB KATZ & DWYER LLP  •  120 BROADWAY  •  NEW YORK, NY 10271-10071

B.    Respondents' Specious Arguments That The Lakahs Committed Frauds

Respondents argue that the Lakahs committed three frauds using their "domination and control" of the issuer and guarantors warranting disregard of the corporate shield.

First, respondents claim that before the Eurobond Offering, the Lakahs manipulated the stock market in Egypt to inflate the value of their companies' stock, thereby inflating the value of HCFI. Respondents say this artificial valuation induced them to buy the Eurobonds. See Samberg Declaration, Ex. 18, ¶ 4. Respondents further assert that the Cairo Market Authority ("CMA") concluded that a fraud occurred, and on that basis, Egypt's courts froze the assets of the Lakahs and their co-conspirators.

The reply declaration of Sherif George Halim, an audit manager for RSM, explains exactly how and why HCFI's capital increased as it did, how it was accounted for, consistent with Egyptian and international auditing standards, and that respondents' accusations are baseless. Notably, HCFI and its subsidiaries were double-audited by internationally recognized top-six auditors, RSM International and Deloitte & Touche.

Attorney Gamil Halim (no relation to Sherif George Halim), a lawyer for the Lakahs in Egypt, explains that the asset freeze was imposed solely on the suspicion of a CMA researcher, because the Lakahs were out of the country (as stated by one of the courts that vacated the freeze against one of the parties that allegedly "colluded" with the Lakahs). In fact, Egypt's courts vacated the freeze orders against the purported "colluding parties" after more than three years of investigation. The vacaturs were for lack of evidence supporting the freezes. The market manipulation trading fraud is a fiction, demonstrated by people with personal knowledge and no axe to grind, HCFI's auditors. The freeze of the Lakahs' assets will be vacated when the Lakahs appear

2

personally in the Egyptian court, as a matter of law, according to the Galim Halim declaration.

Second, respondents argue the Lakahs committed fraud by selling certain assets of a subsidiary called Arab Steel Factory, S.A.E. ("ASF"): (1) supposedly without notice to and the consent of the bondholders, (2) supposedly selling those assets for less than fair market value, (3) supposedly seizing £E100 million and causing it to "vanish," and (4) supposedly directing $70 million of the sale proceeds in the form of notes to a "favored creditor," Banque du Caire, a no longer existing Egyptian national bank.

None of this is true. The ASF asset sale was permitted under the bond documents because less than substantially all of ASF's assets were sold and because the funds received for the assets were to be invested in the other guarantor companies. The bond trustee authorized the ASF asset sale and confirmed the bond resolution authorizing it was sufficient, in direct response to HCFI's written request for confirmation that no notice or consent was required, facts respondents' papers fail to mention. The ASF assets were sold at fair market value, as shown by the declaration of HCFI's former director involved in the sale, Brian Murphy, and ASF's auditors, who prepared balance sheets for HCFI and ASF, which were published in Egypt, without objection. These documents and the testimony provided explain exactly what happened to the monies coming into the companies from the sale, showing the assets were sold above their fair market value.

£E100 million did not "vanish," as respondents contend. The £E100 million (roughly US $30 million) was the cash consideration for ASF asset sale. That money went into Medequip for Trading, S.A.E. ("Medequip") to purchase replacement assets,

3

consistent with the bond obligations, as Brian Murphy and Sherif George Halim explain and support in their reply declarations and exhibits.

The note consideration was not "directed" to Banque du Caire. Banque du Caire, exercising a previously granted power of attorney, placed the notes in a "blocked account." HCFI did not know Banque du Caire was planning to exercise its power of attorney, but respondents should have known, based on documents they received from Banque du Caire, which they never showed or otherwise called to the attention of HCFI or to the Lakahs.

Specifically, respondent UBS A.G., acting through its Warburg Dillon & Reed division and through the bond managers' counsel, Dewey Ballantine, prepared a two-page letter dated December 3, 1999 for Banque du Caire's signature to release certain collateral and borrowing restrictions it held as security in connection with two prior bond offerings on the Cairo Exchange for HCFI and ASF. The HCFI entities co-drafted the December 3 letter and, through their counsel, who vetted all the bond documents, approved the document, as drafted. Unknown to HCFI or its counsel, on about December 6, 1999, after the letter was submitted to Banque du Caire for signature by UBS/Warburg, Banque du Caire placed a warning on the December 3 letter stating that it was keeping "all its other rights vis à vis Arab Steel Factory."

This letter was apparently slipped into the bond documents just prior to the December 8 bond closing at Dewey Ballantine's office. The alternation was never revealed to the issuer, the guarantors, or the Lakahs.

The alteration of the December 3 letter, for reasons discussed in the Gamil Halim reply declaration, was not discovered by HCFI until October, 2006, more than six years

4

after it happened.  Unaware of Banque du Caire's warning, Ramy Lakah signed, on behalf of HCFI, the bond closing documents at Dewey Ballantine's office on December 8, 1999.

Acting under the rights that it attempted to warn all bond offering participants it might exercise back on December 6, on December 13, 1999, just five days after the bond closing, Banque du Caire imposed a pledge on ASF's assets, without any further effort to provide notice to ASF or HCFI.

HCFI and ASF first learned of the pledge in late January or early February, 2000, from the then potential purchaser of certain of ASF's assets.  HCFI raised the issue of the pledge to Dewey Ballantine, which had handled the Banque du Caire documents.  Dewey Ballantine advised that Banque du Caire's action was unlawful. When ASF sold the asset, Banque du Caire placed part of the consideration, $70 million in (cash-equivalent) notes, into a "blocked account," preventing HCFI and ASF from transferring them to Medequip, for expansion capital, and preventing those funds from being used to help pay the coupon on the bonds.  None of the above facts are consistent with respondents' fraud theory.

Third, respondents argue the Lakahs transferred the assets of the guarantors to "successor" companies in order to avoid paying the bondholders.  Two of the three guarantors have shown they have no relationship to either of the Lakahs. Their documents confirm just what the Lakahs stated in their affidavits initially filed in the state court, prior to removal to this Court.  Respondents' declarations come from disgruntled, former employees, one of whom has been twice convicted of theft.  Judgments against him are annexed to the reply declaration of Michel Lakah.  Their second witness was

5

sued by the Lakahs for theft of company property and succeeded in obtaining return of same. Documentation regarding same is annexed. <u>See</u> Michel Lakah Reply Declaration.

The claims of fraud are a complete fabrication.

Respondents' arguments are mere speculation, sheep in wolves' clothing.

Auditor Sherif George Halim and former director Brian Murphy provide extraordinary detail and documents on how the HCFI companies complied with corporate formalities. None of the indicia of complete "domination and control" is present.

Indeed, the facts show overwhelmingly that these companies were separate entities that honored their formalities and made highly professional efforts to keep their business separate from the Lakahs. Respondents are trying to force the Lakahs into this case for the straightforward reason that they doubt their ability to collect on judgments against the issuer and the guarantors. Respondents' fears of uncollectability do not justify their false claims.

**ARGUMENT**

**POINT I**

**RAMY AND MICHEL LAKAH ARE NOT PARTIES, IN THEIR CAPACITY AS INDIVIDUALS, TO AN AGREEMENT TO ARBITRATE**

Respondents' argument that the Lakahs must arbitrate is specious. First, Ramy Lakah signed the bond documents in his capacity as a corporate officer, not in his individual capacity. Ramy and Michel signed only one page of the bond documents in their personal capacities, but this provides no comfort to respondents.

The Indenture, by its express terms, requires arbitration only between the Guarantors and the Issuer, on the one hand, and the respondents, on the other hand. <u>See</u> Indenture, Ex. MU_36 to the Murphy Reply Declaration (arbitration clause at 15, §

6

110). The Lakahs are neither guarantors nor issuer. Hence, they are not bound to arbitrate with respondents. Also, the non-compete covenant that the Lakahs personally signed reads: "Accepted and Agreed solely for purposes of § 1005(c)(ii)." Reply Declaration, Ex. MU_36 at 52. Section 1005 does not contain an arbitration provision.

The Lakahs, in their individual capacities, expressly rejected the application of every term and every paragraph of the Indenture, other than Section 1005(c)(ii).

Those individual signatures, affixed for that very limited purpose, do not constitute an agreement to arbitrate under any plausible interpretation -- to the contrary, they absolutely clear that the Lakahs did not agree to arbitrate with these respondents and respondents' arguments on this point should be rejected. See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1514-15 (3rd Cir. 1994), aff'd, 514 U.S. 938 (1995).

## POINT II

### THERE WAS NO FRAUD, SO RESPONDENTS MAY NOT PIERCE THE CORPORATE VEIL

1.    Respondents' Misstatements Regarding the Law of Piercing the Corporate Veil

Respondents argue that all they need show to pierce the corporate veil is complete domination or a fraud, but not both. They are wrong. They must show both. The authorities they cite are no longer good law.

"Fraud" and "domination" must be shown or the court may not pierce the veil. Morris v. New York State Dept. of Taxation and Finance, 82 N.Y.2d 135, 140, 603 N.Y.S.2d 807 (1993). The Second Circuit followed Morris in American Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130 (2d Cir. 1997) and applied this rule repeatedly:

> [W]e have interpreted Carte Blanche to require, in order to pierce the corporate veil, "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party

7

seeking to pierce the veil." <u>American Fuel Corp. v. Utah Energy Dev. Co.</u>, 122 F.3d 130, 134 (2d Cir.1997)(emphasis added); <u>see</u> <u>Freeman v. Complex Computing Co.</u>, 119 F.3d 1044, 1052-1053 (2d Cir.1997). This test comports with the law of corporate veil piercing as stated most recently by the New York Court of Appeals. <u>See</u> <u>Morris v. New York State Dep't of Taxation and Finance</u>, 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160-61 (1993).

<u>Thrift Drug, Inc. v. Universal Prescription Adm'rs</u>, 131 F.3d 95, 97 (2d Cir. 1997).

Attempts to pierce the veil are rejected if the plaintiff cannot prove both prongs. <u>E.g.</u>, <u>Sahu v. Union Carbide Corp.</u>, 2006 WL 3377577, *10 (S.D.N.Y. 2006)("[P]laintiffs actually offer no evidence that supports the second prong of New York's veil-piercing test. On such a record, summary judgment is appropriate."); <u>Care Environmental Corp. v. M2 Technologies, Inc.</u>, 2006 WL 148913, *12-*13 (E.D.N.Y. 2006)(veil piercing claim denied where "plaintiff argues that it may prevail based only on a showing of fraud without a showing of domination."); <u>Goldblatt v. Englander Com., L.L.C.</u>, 2007 WL 148699, *6 (S.D.N.Y. 2007)(same).

Each of these recent cases has expressly rejected the argument that either of the two prongs is sufficient to pierce the veil.

Respondents citation of <u>Kinetic Instruments, Inc. v. Lares</u>, 802 F.Supp. 976 (S.D.N.Y. 1992) and <u>General Textile Printing & Processing Corp. v. Expromtorg International Corp.</u>, 891 F.Supp. 946 (S.D.N.Y. 1995) does not reflect the current standard and should be ignored.

Respondents' failure to state the current standard is disingenuous.

8

2.    Each of Respondents' Claims of Purported "Fraud" is a Fiction

None of the three purported frauds claimed by respondents withstands scrutiny.

A.    *The Market Manipulation/Artificial Inflation Fraud Fiction*

(i)    HCFI's Value was Properly Calculated and Reported

Respondents' primary claim is that the Lakahs manipulated the market to fraudulently inflate the value of HCFI stock before the Eurobond Offering. They argue that the large increase in HCFI's capital in December 1998 can be explained only by fraud. See Samberg declaration, ¶ 34 (arguing an asset freeze imposed on the Lakahs in Egypt in connection with trading of the HCFI subsidiary company shares shows a fraud occurred). The rapid rise in the market price of HCFI stock was due to a series of routine business transactions, as shown by HCFI's auditors' declaration. The key events are:

- In November 1998 Ramy Lakah, Michel Lakah and Farouk Abd El Samiaa deposited £E3 million in MiBank as HCFI's initial capital. HCFI was to be the holding company for eight Lakah Group enterprises. See Sherif George Halim Reply Declaration [No. 2] at ¶ 4.

- Between December 1 and December 6, 1998, Michel and Ramy Lakah transferred about 97% of their shares in all eight of their companies into HCFI. Sherif Reply Declaration [No. 2] at ¶ 5. Ramy's and Michel's 97% shareholders' equity in the subsidiaries was calculated by auditors to be £E953,545,952. Id. at ¶ 5. This is stated in the balance sheet for the subsidiaries dated December 31, 1998. Id., referring to Exs. 2-8. Stock in subsidiaries that were trading was counted at market value; stock that

9

could not be valued by market price was transferred at book value. Id. at
¶6.

- The consideration for the transfer by the Lakahs was recorded as "credit balances" due from HCFI to the Lakahs. Id. at ¶ 7.  HCFI's shareholders passed a resolution increasing HCFI's capital to £E1,149,880,000, to reflect the credit balances.  Id. at ¶¶ 7- 8.   The shareholders' credit balances were then cancelled and the Lakahs were issued HCFI shares equal to the value of the securities that they transferred to HCFI.  Id. at ¶7, referencing his Ex. 9.

- The Lakahs had given their employees incentive stock in certain of the HCFI  subsidiary companies.   The employee-shareholders created a trading market in the shares.  Trading increased the value of the shares. See Murphy Reply Declaration at  ¶185.  The trading securities were transferred to HCFI at market value, not book value, resulting in, roughly, an additional 17% increase in value, only for those shares.   This conformed to Egyptian and international auditing standards.  See Sherif George Halim Reply Declaration [No. 2- at ¶ 8.

That is how the HCFI shares increased in value – not through a fraud.

Egypt's courts reached the same conclusion.  See Gamil Halim Reply Declaration at ¶¶ 5–18, referencing his Exs. GH_1 and GH_2.

10

(ii)    The Vacatur of the Asset Freeze of the Alleged "Co-conspirators"

Respondents try to bolster their claim arguing that the value of HCFI was inflated by fraud, specifically that the Lakahs acquired false bank certificates in collusion with Misr International Bank ("Misr"), and a trading fraud with AI Eman Brokerage for Financial Investments. Samberg Declaration, ¶¶ 34-41. Respondents rely chiefly on a freeze of the assets of the persons involved in the purported misconduct, identified in a report issued by a consultant to the Cairo Market Authority ("CMA"). See Gamil Halim Reply Declaration at ¶¶5-6.

The freeze, however, is evidence of nothing more than a researcher's suspicion that actors in the alleged fraud "colluded" improperly. Id.    The freeze was only a precaution imposed by the court because the Lakahs were out of the country at the time the researcher reported his suspicions, as one of the courts itself noted. Id. at ¶6.    No complaint was filed against Ramy or Michel Lakah regarding AI Eman Brokerage for Financial Investors or Misr International Bank. Gamil Halim Reply Declaration at ¶ 7. No indictment was filed against them by the public prosecutor. Id. at ¶ 8.

No one was tried for the purported wrongdoing in the four years the freeze was in place. Id. at ¶ 9. Two of the purported "co-conspirators" applied to vacate the freeze.[2] Egypt's courts have twice determined no evidence sufficient to justify the freeze orders had been produced by the prosecutor to justify them. Id. at ¶ 11.

On March 14, 2005, the Judicial Court of Cairo dismissed all allegations against Mohammed Naguib Ibrahim  and vacated the asset freeze on him, his wife and his children. Id. at  ¶ 12, attaching Ex. GH_1 (judgment, with certified translation).    The Cairo Court judgment regarding the lack of evidence against Misr Bank has been

11

available since at least March, 2005, Id. at ¶15. Two others, Mohammed Sabri Abdel
Gayyed and Ayman Mohammed Sabri Abdel Gayyed, were accused of "collusion" with
Ramy and Michel Lakah. Id. at ¶ 16. On April 8, 2007, the Judicial Court of Giza
vacated the seizure order against them arising from suspicions of trading improperly with
Ramy Lakah and Michel Lakah through AIEman Company for Financial Brokerage
("AIEman"). Id. at ¶ 16 (citing GH_2, with translation).

If and when the Lakahs apply in person in Egypt to dismiss the allegations against
them and lift their freeze orders – the application must be made in person, not by a
lawyer, Reply Declaration of Galim Halim at ¶13. Their application must be granted, as a
matter of Egyptian law. Id. at ¶¶ 13, 17. The continuing death threats against the Lakahs
and their families by al Qaeda and other Islamic fundamentalists make it inadvisable for
the Lakahs to return to Egypt for this purpose. See Reply declaration of Brian Murphy at
¶¶ 153, 180.

B.    *The Alleged Fraudulent Sale of ASF Assets and Blocking of Notes Fraud*

Respondents claim that HCFI and ASF sold substantially all of the assets of ASF
in February 2000 and that doing so was a fraud. This allegation, like the trading fraud
allegation discussed above, has no basis in fact.

Specifically, HCFI decided to sell certain assets of Arab Steel Factory S.A.E.
("ASF") because of a global over-capacity for steel production. See Murphy Reply
Declaration at ¶¶ 32-34. HCFI had begun considering this sale before meeting with UBS
to discuss the Eurobond offering. Id. at ¶ 32. In fact, HCFI was considering a substantial
restructuring that would have divested the holding company's industrial companies to
focus on its medical businesses. Murphy Reply Declaration at ¶ 32 (citing Ex.MU 22

---

[2]    HCFI is advised the third person died prior to making an application.

LESTER SCHWAB KATZ & DWYER LLP  •  120 BROADWAY  •  NEW YORK, NY 10271-10071

(Offering Circular at 69 (indicating HCFI was considering a restructuring of the industrial side of the holding company))). HCFI insisted that the terms of the Eurobond offering permit HCFI to sell assets, and they did. Id. at ¶ 87 (citing Murphy Ex. 36).

In January and February 2000, HCFI prepared documents for the sale of some of ASF's assets to the Egypt Steel Group. Murphy Reply Declaration at ¶ 92. The National Bank of Egypt sent two appraisal companies to determine the value of the assets ASF was selling. Id. The book value of the fixed assets was the same as the figure contained in the Offering Circular drafted by the Respondents. Id. at ¶ 93. On January 26, 2000, HCFI advised the Bank of New York, the Eurobond Trustee, and Dewey Ballantine, counsel to the bond managers, that HCFI was in advanced negotiations for the sale of certain ASF assets. Id. at ¶ 94.

On February 16, 2000, HCFI certified to Bank of New York that the sale, in the amount of approximately $100 million, was complete. Id. at ¶ 95. HCFI received approximately $30 million in cash, and $70 million in notes guaranteed by the National Bank of Egypt, which were the equivalent of cash. Id. at ¶ 96. Dewey Ballantine wrote to Ramy on February 17, 2000 advising that because ASF was retaining other assets, there was a "strong likelihood that [Bank of New York] would accept the resolutions [regarding the sale] as drafted," Id. at ¶98, without requiring bondholder consent.

No consent was required. On February 24, 2000. the Bank of New York confirmed that the resolutions were acceptable. Id. at ¶¶ 101-103. Contrary to Respondents' assertions, ASF sold only a portion of its assets, id. at ¶ 92, and it sold those assets for fair market value. Id. at ¶ 99. Following the sale, the ASF assets retained by HCFI were valued at £E614 million, as shown on ASF's balance sheet as of December

LESTER SCHWAB KATZ & DWYER LLP  •  120 BROADWAY  •  NEW YORK, NY 10271-10071

31, 2000, certified by the CMA and published in Egypt's national newspapers. Id. at ¶ 97; see also MU_42 (Arabic) and MU _31 (English).

HCFI first learned Banque du Caire had imposed a pledge on ASF's assets in early February 2000, from Egypt Steel. Egypt Steel, in the course of its due diligence, learned that Banque du Caire had pledged ASF's assets on or about December 13, 1999, just after the bond closing. Murphy Reply Declaration at ¶ 58. HCFI then asked Sayed Zahran, branch director of Banque du Caire, whether it had done so and learned from him that Banque du Caire had used a 1998 power of attorney to impose the pledge, and that, according to Sayed Zahran, the bank's imposition of the pledge was permitted under the Eurobond Offering documents. Id. at ¶ 60.

Mr. Lakah immediately called Camille Abousleiman of Dewey Ballantine, who had handled the Banque du Caire documents. Mr Abousleiman, lead counsel for UBS and the bond managers, said that ASF's assets could not be pledged under the bond documents and that Banque du Caire's pledge would be actionable. Id. at ¶ 62, citing MU_30. Abousleiman later confirmed that advice to Ramy Lakah in writing. Id.

HCFI continued its negotiations with Egypt Steel, believing Banque du Caire could be compelled to release the sale proceeds to HCFI. Id. at ¶ 64.

The ASF asset sale closed on or about February 16, 2000. Id. at ¶ 65.

The proceeds of the sale, $30 million in cash, and $70 million in cash-equivalent notes did not, as respondents contend "vanish." Every pound from the sale is accounted for in the ASF and HCFI balance sheets annexed as Ex. MU_31, MU_32 and Ex. MU_33, and MU_34 to the Murphy Reply Declaration. Those balance sheets were

14

approved by the CMA, published in the Egyptian national press, without any objection. Murphy Reply Declaration at ¶67, citing Ex. MU 35.

The cash part of the sale, £E100 million, was paid to ASF and transferred to Medequip to expand its healthcare business, consistent with the disposal of assets provision of the Offering Circular for the bond offering. Murphy Reply Declaration at ¶ 68, citing Ex. MU_31, Ex. MU_32, Ex. MU_33, MU_34 and MU_35. The remaining £E231,280,000 cash equivalent notes were to be put into Medequip, for medical business expansion. Murphy Reply Declaration at ¶¶68-69.

Contrary to HCFI's expectations, Banque du Caire, using a power of attorney granted in 1998 in connection with an ASF local bond offering on the Cairo Exchange, which it had not theretofore been exercised, pledged ASF's assets on or about December 13, 2000. When the notes received in the asset sale were transferred to ASF's Banque du Caire account, the bank blocked ASF from using them, Murphy Reply Declaration, ¶¶ 69-70, preventing them from benefiting the guarantor companies or allowing to help meet obligations to respondents.

C.    *The Purported Successor Company Frauds*

Respondents' allegations that Technowave Trading Company, S.A.E. ("Technowave"), Medical Technology S.A.E. ("MedTech") and Life Care Technology, S.A.E. ("Life Care") are successors to the guarantors have no basis. Technowave and MedTech have asserted in the arbitration that they are not "successors." Copies of their arbitration submissions are annexed as Exs. ML_1 through ML_3 to the Reply Declaration of Michel Lakah.

15

In its arbitration papers, Technowave's Chairman Mohamed Khadr explains that Technowave is an Egyptian stock company founded in 2000. It is not owned or controlled by HCFI, Lakah Funding Limited, Ramy Lakah or Michel Lakah. Technowave is not the successor of Medequip Trading and Contracting, S.A.E. ("Medequip"). Neither Medequip nor any of the HCFI companies transferred assets to Technowave. Technowave's paid-in capital as of December 31, 2005 was only £E500,000 (approximately US$87,000). If the HCFI guarantor entities had actually transferred assets, it capital would have been enormously greater. The documents are dispositive.

MedTech's arbitration submission shows that it has no relationship with Ramy or Michel Lakah, nor with any of their companies, including HCFI and Lakah Funding Ltd. MedTech states that it is not the successor of Trading Medical System Egypt, S.A.E., ("TMSE"), which was the sole distributor for Toshiba Medical Systems Corporation. TMSE suffered from the financial complications affecting HCFI. Toshiba was forced to find a new distributor, and entered a relationship with MedTech. Toshiba assisted in the formation of the company. There were no transfers of assets from TMSE or any of the HCFI Companies to MedTech. As of December 31, 2005, the total value of MedTech's fixed assets was only £E2,596.000 (approximately US$ 450,000). Again, the documents are dispositive.

Life Care Technology, S.A.E. ("Life Care"), has not appeared in the arbitration, but its Chairman Amgad Zarif has supplied a declaration denying that it is a successor to Medequip. Although Mr. Zarif was formerly employed by Medequip, he claims to have had a business relationship with Draeger, a German supplier of medical equipment,

16

predating his employment at Medequip. Draeger began using Medequip as its exclusive distributor when Mr. Zarif joined Medequip, and he served as Draeger's primary contact at Medequip throughout his employment there. Mr. Zarif claims he left Medequip in December 1999 after Medequip stopped serving as Draeger's distributor.

Michel Lakah explains in his reply declaration that Zarif was asked to resign from Medequip because he failed to disclose that he had been twice convicted of theft of public property and sentenced to substantial jail time. Michel Lakah Reply Declaration at ¶ 14 (citing Exs. ML_5 and ML_6).[3] Life Care continues to be Draeger's exclusive distributor and agent in Egypt. There is no basis for the assertion that Life Care is a successor to any HCFI company.

### D.    The Real Cause of the Eurobond Default as Confirmed by PWC

It was clear that the loss of $70 million would have catastrophic consequences for HCFI. Rather than hiding from respondents, HCFI contacted them six months prior to an expected default in June, 2001. Murphy Reply Declaration at ¶82-84. HCFI consulted with the bondholders, trying to reach a business resolution, but was unsuccessful.

Prior to the default, the bondholders demanded that PriceWaterhouseCoopers (London) ("PWC") be retained, at the issuer's expense, to prepare a report on the financial status of the HCFI companies involved in the Eurobond Offering and to definitively determine why the default occurred and to recommend possible solutions. Id. at ¶ 113.

After three months of investigation with fourteen auditors and staff, Id. at ¶ 114, PWC concluded that the default was the result of (1) changes in the Egyptian markets, (2)

---

[3]  The facts concerning the termination of the Draeger distribution agreement and the appointment of Life Care as a new distributor are dealt with in the Murphy Reply Declaration.

LESTER SCHWAB KATZ & DWYER LLP  •  120 BROADWAY  •  NEW YORK, NY 10271-10071

the failure of the Egyptian government to make millions of dollars of payments that it owed the HCFI companies and (3) the problem with Banque du Caire. Id. at ¶ 109, 117 citing Ex. MU_6 (PWC Report at 46, 48-49, 54-57).   PWC did not identify any fraud by anyone as a cause of the bond default.  The PWC Report was the eighth financial review of the Lakah companies, as explained in the Murphy Reply Declaration at ¶¶116-117, and Ramy Lakah's moving affidavit filed in support of his state court petition.

**POINT III**

**UBS HAS NOT PROPERLY PLEADED  FRAUD
FOR PURPOSES OF PIERCING THE CORPORATE VEIL**

The demand for arbitration at paragraphs  92-98 states "piercing the corporate veil" as a basis for compelling arbitration.  That is an extraordinary remedy invoked only where an injured party proves allegations that the would-be defendants exercised actual and complete dominion over an entity and used that "domination" to commit fraud.

Ten factors are reviewed to make this determination. See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991). None of Respondents arguments are colorable.

1.    Corporate Formalities:

HCFI and its subsidiaries scrupulously followed all corporate formalities required by their organizational documents. See auditor Sherif George Halim Reply Declaration No. 1 at ¶¶11-23; Murphy Reply Declaration at ¶¶ 6-17.

One of Mr. Murphy's roles at HCFI was to supervise bringing the HCFI entities into compliance with Western standards. Id. at ¶14.  To do this, Mr. Murphy, inter alia, established human resource procedures and regulations, introduced company handbooks for each entity, made improvements  to business processes, including updated signature

18

protocols to enable efficient execution of business processes without high level HCFI management involvement. Id.  ¶¶15-17. These protocols authorized and empowered employees to act, within their authority, with broad discretion to do their jobs, free of HCFI senior managers, which he testifies they did. Id.

The companies were double audited by two auditors; depending on the year, the audit teams came from Deloitte & Touche and RSM International.  Sherif Halim Reply Declaration No. 1, at ¶¶1-10.  RSM was charged with seeing that required formalities were maintained. Id. at ¶11. RSM attended all shareholder meetings, id. at ¶12, and assured minutes were taken, signed, and "legalized" by the Egyptian authorities. Id. at ¶13. RSM made sure that board meetings and annual shareholder meetings were held for HCFI and its subsidiaries, timely notices of meeting were sent, quorum rules were observed, votes were properly taken and recorded, minutes were taken, and all actions were "legalized." Id. at ¶14.

Sherif George Halim confirms all meetings were properly and timely noticed, and that notice was properly published in the newspapers. He provides samples of the notices given, and details the dates of annual and extraordinary shareholder meetings.  He supplies us with the number of meetings held for HCFI and ASF, id. at ¶16-21, and confirms that quorums were maintained. Id. at ¶22. All actions were taken pursuant to strict signature protocols and all were registered in the commercial register, identifying who, at each company, by year, had signature authority. Id. at 23-24. Each of the boards of the HCFI subsidiaries had more than 50% non-HCFI senior personnel. Id. at ¶¶ 25, 30. Plainly, the HCFI Entities made extraordinary efforts to comply with corporate

LESTER SCHWAB KATZ & DWYER LLP  ·  120 BROADWAY  ·  NEW YORK, NY 10271-10071

formalities, highly unusual for entities in this part of the world, and to keep their personal businesses separate from their company businesses.

Claims to the contrary by Respondents "witnesses" are false.

2.    <u>Under-capitalization:</u>

Respondents' undercapitalization argument is based on the mistaken hypothesis that a fraud occurred in the valuation of HCFI. Auditor Sherif Halim details exactly how HCFI's capital grew from the time the company was established to and through the Eurobond Offering, without "artificial inflation." <u>See</u> Sherif George Halim Reply Declaration No. 2 at ¶8.    The company was very strong financially, as stated in Ramy Lakah's moving affidavit. <u>See</u> <u>also</u> Murphy Reply Declaration at ¶ 25.    The reply declaration of Galim Halim annexes the Egyptian judgments (and translations) that have vacated the asset freezes of the Lakahs purported "co-conspirators" for lack of any proof of wrongdoing, despite almost four years of access to all HCFI's documents. <u>See</u> Gamil Halim Reply Declaration at ¶¶5-17 (annexing Exhibits GH_1 and GH_2).

3.    <u>Personal Use of Funds:</u>

Respondents use the affidavits of two former employees to support their argument that the Lakah brothers improperly used corporate funds to pay personal expenses. Aside from the fact that HCFI's auditors' reports for 1999 and 2000 make clear that no improper transfers were made from HCFI or its subsidiaries to personal accounts of the Lakahs, the PWC Report, commissioned by the respondents and the other syndicate members, identifies no unauthorized transfers to the Lakahs, nor to any related individuals or entities. The PWC Report, Ex. MU_6 to the Brian Murphy Reply Declaration, identifies HCFI's problem with Banque du Caire as one of three main

20

reasons for the default – the other two relate to the Egyptian economy, globally, and to the failure of the Egyptian government to pay HCFI millions of dollars that were then due and owing. None of this has anything to do with a fraud.

As Michel Lakah's Declaration explains, Respondents' witness Zarif, who says it is "well-known" that the Lakahs used company money for personal uses, is, in fact, a two time convicted felon. See Michel Lakah Reply Declaration at ¶14. In fact, HCFI fired Zarif when it learned of Zarif's criminal past, which Zarif had not disclosed to HCFI when he was hired. Zarif's company, Life Care, is the only named respondent in the underlying arbitration that has not put in responsive papers; on information and belief, his testimony is a quid pro quo.

Witness Haigh was fired as the CEO of Eurotechniques Greece, a company owned by Ramy and Michel Lakah, for inappropriate behavior when he stopped attending meetings and coming to work, as HCFI documents show. See Michel Lakah Reply Declaration at ¶16 citing Ex. ML_8. Haigh subsequently absconded with company property, forcing the company to file a law suit against him, after which he returned the property. Id. As detailed in the Michel Lakah Reply Declaration, neither Zarif nor Haigh was in a position to have any knowledge of HCFI finances, nor the Lakahs' financing, but both have axes to grind against the Lakahs and their companies. Id. at ¶¶14-16.

4.     Overlap in Ownership:

Respondents dwell on the Lakahs' ownership of substantial shares in the issuer as a sign of domination of the guarantors. Mere ownership is never enough to show "domination," within the meaning of piercing the corporate veil under New York and New York federal law. See, e.g., Sahu v. Union Carbide Corp., 2006 WL 3377577, at *4

(S.D.N.Y. 2006) ("In New York, mere ownership of a controlling number of shares in the subsidiary is "never" enough on its own to demonstrate the level of direct intervention necessary for veil piercing," quoting <u>Billy v. Consolidated Machine Tool Corp.</u>, 51 N.Y.2d 152, 163 (1980)).

     5.    <u>Corporate Entities Sharing Offices:</u>

Each of the Lakah Group companies had its own office, address, stationery, bank accounts, phone numbers, facsimile numbers and logo. <u>See</u> Affidavits of Ramy Lakah at ¶ 41, Michel Lakah at ¶ 15.

     6.    <u>Business Discretion:</u>

Each HCFI subsidiary that acted as a guarantor operated as an independent entity with its own business decision-making structure. The Lakahs did not interfere in their day-to-day operations. <u>See</u> Affidavit of Ramy Lakah at 42; Murphy Reply Declaration at ¶¶ 15-17.

     7.    <u>Arms Length Dealing:</u>

Messrs. Lakah dealt with all with the HCFI Entities on an arms-length basis, on normal business terms. Neither Ramy nor Michel Lakah accepted a loan, in any amount, from any of the guarantors or from HCFI, and neither used corporate assets for personal purposes. <u>See</u> Affidavits of Ramy Lakah at ¶39, Michel Lakah at ¶16. The audit/diligence reviews conducted by the CMA, Dewey Ballentine, Fitch IBCA and PWC (Egypt) (prior to and after default) and PWC (London) (post-default) found no fault with either of the Lakah brothers interaction with HCFI, before, during and after the UBS Offering. <u>See</u> Affidavits of Ramy Lakah at 43, Michel Lakah at 16; Sherif Halim Declaration No. 1 at ¶31-34.

22

8.    Independent Profit Center:

Each Lakah Group subsidiary had its own financial reporting process, its own balance sheets and income statements, and its own tax statement and annual auditor's reports. See Affidavits of Ramy Lakah at ¶ 44, Michel Lakah at ¶ 15; Sherif George Halim Reply Declaration No. 1 at ¶¶ 31-34.

9.    Payment of Corporate Debts by Individuals:

Before the UBS Offering, Messrs. Lakah paid no corporate obligations with their personal monies. Ramy Lakah used personal assets to fund the Lakah Group companies only once after their initial capitalization; when Lakah Group's cash flow was compromised by UBS, as stated above. See Affidavits of Ramy Lakah at ¶ 45, Michel Lakah at ¶ 17.

10.    Use of Corporate Property by Individuals for Personal Purposes:

As the auditing reports for HCFI show, Messrs. Lakah never used corporate property for any personal use. See Affidavits of Ramy Lakah at ¶ 46, Michel Lakah at ¶ 18. No credible evidence exists to the contrary.

## POINT IV

### RESPONDENTS' STATUTE OF LIMITATIONS ARGUMENT IS SPECIOUS: THE LAKAHS NEVER AGREED TO ARBITRATE

The twenty day period in which to object to arbitration under CPLR 7503 does not apply because neither of the Lakahs agreed to arbitrate. The Lakahs' application is, perforce, timely. See Matarasso v. Continental Casualty Co., 56 N.Y.2d 264, 267-268, 451 N.Y.S.2d 703, 704-705 (1982) (statute's time limit assumes existence of a "party" to an arbitration agreement; absent agreement to arbitrate, CPLR 7503 limitation inapplicable); Matter of Allstate Ins. Co. (Richards), 178 A.D.2d 142, 576 N.Y.S.2d 577

LESTER SCHWAB KATZ & DWYER LLP  •  120 BROADWAY  •  NEW YORK, NY 10271-10071

(1st Dep't 1991); <u>Morgan v. Nikko Sec. Co. Intern., Inc.</u>, 691 F. Supp. 792, 798-99

(S.D.N.Y. 1988).  Thus, the Lakahs are not subject to the CPLR 7503 time limit.

LESTER SCHWAB KATZ & DWYER LLP  •  120 BROADWAY  •  NEW YORK, NY 10271-10071

## CONCLUSION

The Arbitration should be stayed as to Ramy and Michel Lakah.

Dated:      New York, New York      LESTER SCHWAB KATZ & DWYER, LLP
             July 9, 2007               120 Broadway
                                  New York, New York  10271
                                  212 -341-4279
                                  Attorneys for Petitioners
                                  RAMY LAKAH and MICHEL LAKAH


                                  _____/S/_____
                                  Lawrence Steckman

Dennis Rothman
   On the brief

25