# MINTZ LEVIN

Gilbert A. Samberg | 212 692 6804 | gasamberg@mintz.com

Chrysler Center
666 Third Avenue
New York, NY 10017
212-935-3000
212-983-3115 fax
www.mintz.com

August 9, 2007

BY HAND
Hon. Miriam G. Cedarbaum
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street (Room 1330)
New York, NY 10007

Re:  In re Ramy Lakah, *et ano.* v. UBS, *et al.,* 07-CV-2799 (MGC) (FM)/ Motion by Respondents-Cross-Petitioners for an Order Directing the Issuance of a Subpoena to Carl Baker Pursuant to 28 U.S.C. §1783

Dear Judge Cedarbaum:

We represent the Respondents-Cross-Petitioners, who have moved for an Order Directing the Issuance of a Subpoena to non-party witness Carl Baker Pursuant to 28 U.S.C. §1783 (the "Motion"). The Petitioners, Ramy and Michel Lakah (the "Lakahs"), have consented to the motion.

As requested by the Court during a conference on August 2, 2007, we submit this letter to supplement the papers in support of the pending Motion. Among other things, we provide herewith for your information, a list of subject areas regarding which Mr. Baker -- a former officer and director of at least two of the focal Lakah companies -- will be deposed.

Background

Underlying this proceeding is an international arbitration under American Arbitration Association ("AAA") rules. In the instant proceeding, you have before you (a) a Petition by the Lakahs to stay the arbitration as against them, and (b) a Cross-Petition by the claimants in the arbitration to compel the Lakahs to arbitrate.

The impetus for the underlying arbitration is the virtually complete default in payments on a US$100 million Eurobond by its Issuer and Guarantors, which are Egyptian companies owned and controlled by the Lakahs. Our clients' Cross-Petition to compel arbitration is based on, *inter alia*, conventional theories supporting arbitrability, including piercing the corporate veils of the Eurobond Guarantors for purposes of determining arbitrability as against their dominant shareholders, the Lakahs. The conduct that we plan to show is in essence covert, and in all such matters there is a

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

BOSTON | WASHINGTON | NEW YORK | STAMFORD | LOS ANGELES | PALO ALTO | SAN DIEGO | LONDON

4111467v.3
29763-002

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

August 9, 2007
Page 2

palpable imbalance between the parties with regard to access to evidence. Moreover, most of the relevant conduct for present purposes took place in Egypt. Therefore, the Cross-Petitioners' need for the liberal discovery contemplated by Rule 26 in order to be able to fully present their position at the anticipated trial is naturally greater than in a simpler domestic commercial matter.

Discovery of Baker is Necessary in the Interest of Justice

Each of the Issuer and Guarantors are Egyptian companies. So far as we know, their officers and directors were and are, with two exceptions, Egyptians. (*See* Samberg Decl.[1] Ex. 6 at pp. 71-72; Transcript of Court Conference held August 2, 2007 at 35-36.) Egypt is not a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.

Baker was a senior member of management and a director of guarantor Holding Company for Financial Investments (Lakah Group), S.A.E. ("HCFI"), which was the parent of the other Guarantors. (Samberg Decl. Ex. 1 at ¶ 6.) The Offering Circular that was issued in connection with the Eurobonds, dated December 6, 1999, lists Baker as among HCFI's "Directors and Senior Management," and states that he held positions as "Board Member & Investor Relations." (Samberg Decl. Ex. 6 at pp. 71-72) The Offering Circular also states that, from 1996 to 1998, Mr. Baker served as vice president for business development of guarantor Trading Medical System Egypt, S.A.E. ("TMSE"). *Id.* at p. 72.

Baker was clearly in a position to know facts relevant to piercing the corporate veil -- *e.g.*, whether HCFI or TMSE observed corporate formalities, whether the Lakahs diverted corporate assets for their personal use, etc.

Baker is a U.S. citizen residing in France. Discovery of information from Baker will not be possible without a subpoena issued by this Court. Taking discovery from Carl Baker is necessary in the interest of justice (a) to enable cross-petitioners to gather evidence supporting their clients' several arguments for piercing the corporate veil; and (b) to reveal other avenues for producing such evidence.

The "'interest of justice' element [of 28 U.S.C. §1783] must be considered in light of the circumstances of the particular case and, more importantly, the posture of the case when the issue arises."[2] The following facts, in addition to those cited above, are relevant to the "interest of justice" consideration here:

---

[1] Declaration, dated April 16, 2007, of Gilbert Samberg (the "Samberg Decl.").
[2] *Klesch & Co., Ltd. v. Liberty Media Corp.*, 217 F.R.D. 517, 524 (D. Colo. 2003) ("the requested subpoena [pursuant to 28 U.S.C. § 1783] is consistent with the liberal discovery contemplated by Rule 26 and is, therefore, necessary in the interest of justice."); *Estate of Yaron Ungar v. Palestinian Auth.*, 412 F. Supp.2d 328, 333-34 (S.D.N.Y. 2006).

4111467v.3
29763-002

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

August 9, 2007
Page 3

1. The Lakahs have consented to the issuance of the subpoena to Baker;

2. The Respondents-Cross-Petitioners are non-Egyptian bondholders who were all outsiders to the activities of the Issuer and Guarantors;

3. There were, to our knowledge, only two non-Egyptian officers or directors of the Issuer and Guarantors; the Lakahs have proffered one of them (Brian Murphy) as a witness by way of a declaration filed July 9, 2007 (the "Murphy Declaration"); and the Respondents-Cross-Petitioners seek discovery from the only other such director/officer;

4. Respondents-Cross-Petitioners want to examine Baker concerning matters that he witnessed during his stint as a director and officer of two of the defaulting Guarantors;

5. This proceeding has arisen in connection with an international arbitration concerning, inter alia, fraud and clandestine activities by the Lakahs to conceal their misuse of the corporate assets of the Issuer and Guarantors to the detriment of their creditors -- the Respondents-Cross-Petitioners;

6. The Respondents-Cross-Petitioners seek to recover in excess of $100 million on claims that the Issuer and the Guarantors defaulted on their payment obligations not long after the issuance of the Eurobonds;

7. The Lakahs have admitted that the Issuer and Guarantors defaulted on the Eurobond payments beginning in 2001 (see Murphy Decl. ¶80); and

8. The Issuer and Guarantors have been stripped of their assets by the Lakahs so that they became unable to pay amounts due on the Eurobonds (see Samberg Decl. ¶¶42-51).

It is axiomatic that the Federal Rules of Civil Procedure provide for liberal discovery,[3] and there is no reason why that fundamental principle should be abandoned in this case. "The Federal Rules of Civil Procedures seek to further the interests of justice by minimizing surprise at trial and ensuring wide ranging discovery of information."[4] Rule 26(b) permits discovery "regarding any matter ... that is relevant to the claim or defense of any party" and discovery of any information that "appears reasonably calculated to lead to the discovery of admissible evidence."[5]

---

[3] See, e.g., Klesch, 217 F.R.D. at 523-24; Fed. R. Civ. P. 26.
[4] See Klesch, 217 F.R.D. at 523 (citing Fed. R. Civ. P. 26(b)(1)).
[5] Id.

4111467v.3
29763-002

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

August 9, 2007
Page 4


      In sum, Respondents-Cross-Petitioners request that the Court grant the pending motion on consent regarding taking discovery from Mr. Baker.[6]

Respectfully submitted,

*/s/ Gilbert A. Samberg*

Gilbert A. Samberg

cc:    Lester Schwab Katz & Dwyer LLP
        Attn.:  Dennis M. Rothman, Esq.
               Lawrence A. Steckman, Esq.
        (via E-mail and Telecopy)

---

[6] Indeed, the type of discovery sought in this instance would in principle be permitted by the rules governing the underlying arbitration as well. See AAA Commercial Arbitration Rules R-31 ("An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party …."); AAA Procedures for Large, Complex Commercial Disputes L-3 ("At the preliminary hearing the matters to be considered shall include … the procedure for the issuance of subpoenas.").

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

August 9, 2007
Page 5

## Carl Baker: Deposition Subjects

1. The conduct of the business, and the identities and conduct of the officers, directors, and board of Guarantor HCFI and of each of its subsidiary Guarantors.

2. The conduct of Ramy Lakah relative to the Guarantor companies.

3. The conduct of Michel Lakah relative to the Guarantor companies.

4. The balance sheets of the respective Guarantors.

5. The relationships among the respective Guarantor companies.

6. Medical Technology S.A.E. (a successor of Guarantor TMSE)

7. TechnoWave S.A.E. (a successor of Guarantor Medequip)

8. Life Care Technology S.A.E. (a successor of Guarantor Medequip)

9. Oversight mechanism(s) with respect to the use of corporate funds of HCFI, TMSE, and the other Guarantors.

10. Use of the assets of one Guarantor as security to obtain financing for other Guarantors.

11. The Lakahs' use of corporate funds for their personal benefit, including but not limited to the use of funds for Ramy Lakah's political campaign in or about 2000.

12. Efforts in 1999 to bring HCFI and the other Guarantors "within modern Western business standards," and "Western formalities" as described in the Murphy Declaration.

13. HCFI's undisclosed plans in 1999 for the sale of guarantor Arab Steel or its assets.

14. The sale of guarantor Arab Steel Factory (or of its assets) immediately after the issuance of the Eurobond.

15. Communications with Banque du Caire concerning guarantor Arab Steel Factory in 1999 to 2001.

16. The disposition of the proceeds of HCFI's sale of guarantor Arab Steel Factory assets.

17. Communications with third parties concerning guarantor Arab Steel Factory.

4111467v.3
29763-002

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

August 9, 2007
Page 6

18. The alleged "financial transparency" of HCFI and its subsidiaries, as described in the Murphy Declaration.

19. The capitalization of HCFI and its subsidiaries in 1999-2000.

20. Purported incentive plan awards of stock to employees in Arab Steel Factory, Medequip, and TMSE in 1998-1999.

21. The Lakahs' conspiracy with their securities brokerage company, Al Eman Company for Financial Brokerage ("AlEman"), to establish fake trading accounts and conduct fictitious trades of Lakah company securities in order to pump up the prices of the stocks of Arab Steel Factory, TMSE, and Medequip.

22. The transfer of the inflated stocks of guarantors Arab Steel Factory, TMSE, and Medequip to HCFI.

23. The Lakah's use of forged bank certificates of deposit obtained from Misr International Bank.

24. HCFI's plans, before and after the issuance of the Eurobonds, for the proceeds of the Eurobonds.

25. Witness Brian Murphy's role within HCFI and the other Guarantors.

26. The transfer of assets, contract rights, or business opportunities from any Guarantor without adequate consideration.

27. The Guarantors' communications with PricewaterhouseCoopers.

4111467v.3
29763-002