Gilbert A. Samberg (GS-2610)
Kevin N. Ainsworth (KA-8493)
David L. Barres (DB-2129)
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
(212) 935-3000
(212) 983-3115 (facsimile)

*Attorneys for Respondents UBS AG, Exporters Insurance Company, Ltd.,
Arab Banking Corporation, National Bank of Abu Dhabi and National Bank of Oman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In the Matter of the Application of              )
                                                 )
RAMY LAKAH and MICHEL LAKAH,                     )
                                                 )
                              Petitioners,       )
                                                 )
For a judgment pursuant to Article 75 of         )    07-CV-2799 (MGC) (FM)
the C.P.L.R. staying the arbitration             )
commenced by                                     )    **DECLARATION OF**
                                                 )    **GILBERT A. SAMBERG**
UBS AG, EXPORTERS INSURANCE                      )
COMPANY, LTD., ARAB BANKING                      )
CORPORATION, NATIONAL BANK OF ABU                )
DHABI and NATIONAL BANK OF OMAN,                 )
                                                 )
                              Respondents.       )
---------------------------------------------------------------x

     GILBERT A. SAMBERG, pursuant to 28 U.S.C. § 1746, states and declares as follows:

     1.    I am a member of Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., attorneys for Respondents-Cross-Petitioners UBS AG ("UBS"), Exporters Insurance Company, Ltd., Arab Banking Corporation, Ltd., National Bank of Abu Dhabi, and National Bank of Oman (collectively, "Respondents" or "Bondholders"). I make this

4259039v.2
29763-002

declaration in support of the Respondents' Motion for Issuance of a Subpoena to Ahmed Mounir El-Bardai under 28 U.S.C. § 1783. My firm asked petitioners' counsel to consent to the relief requested in this motion, but they declined.

2. I make this declaration based on my personal knowledge, except where otherwise indicated, in which case I will identify the other source of information.

3. As the Court already knows from prior proceedings herein, this docket concerns a petition by Ramy Lakah and Michel Lakah (sometimes referred to herein as the "Lakahs") to avoid participating in the international arbitration styled UBS AG, et al. v. Lakah Funding Limited, et al., AAA No. 50 148 T 00251 06, which is pending before the American Arbitration Association in New York City. The arbitration arises out of the default on a Eurobond issued on December 8, 1999 in the principal amount of $100,000,000, bearing interest at 12% per year, and having a maturity date of December 8, 2004 (the "Eurobonds" or "Bonds"). The Bonds were issued by Lakah Funding Limited (the "Issuer") and guaranteed by Holding Company for Financial Investments (Lakah Group), S.A.E. ("HCFI") and its subsidiaries Medequip for Trading and Contracting, S.A.E. ("Medequip"), Trading Medical System Egypt, S.A.E. ("TMSE"), and Arab Steel Factory, S.A.E. ("ASF") (collectively, the "Guarantors"). The Guarantors are all Egyptian corporations controlled by the Lakahs. Among other bases for their obligation to arbitrate, respondent Bondholders seek to pierce the corporate veils of the Guarantor-signatories of the arbitration agreements to bind their dominant owners, the Lakahs.

4. Mr. El-Bardai was for several years, commencing at the beginning of 2000, the Chairman of Banque du Caire ("BdC"), one of the largest Egyptian banks.

2

BdC was a significant shareholder of Guarantor HCFI and held a seat on its Board of Directors, and BdC was the principal bank of the Lakah Group companies, including the Guarantors. Mr. El-Bardai is a witness with information regarding the relationships of each of the Lakahs to the Guarantor companies, including the fraudulent activities of the Lakahs in their operations of those companies. That information supports, *inter alia*, piercing the corporate veil.

**I.      My Communications With Mr. El-Bardai**

5.      I have communicated with Mr. El-Bardai. I had been informed, and he confirmed, that he is a citizen of the United States and of Egypt, that he resides in Egypt, and that he intends to continue residing in Egypt.

6.      Mr. El-Bardai confirmed that he had been the Chairman of the Board of BdC, one of the three largest banks in Egypt, from approximately January 2000 through January 2006.

7.      Although he did not disclose any details, Mr. El-Bardai confirmed the public information (a) that, when he began his tenure at BdC, the bank already was a major investor in HCFI, and it had extended loans and guarantee facilities to the Guarantors and to the Lakahs totaling hundreds of millions of Egyptian Pounds ("E£"); and (b) that BdC's dealings with the Lakahs and their companies had resulted in the bank's suffering substantial losses.

8.      Mr. El-Bardai also indicated that, when he became Chairman of BdC, BdC reviewed the conditions of the Lakah Group of companies (including the Guarantors) and their prior dealings with BdC. Moreover, according to materials in the

4259039v.2
29763-002

investigative files of the Egyptian Public Prosecutor, the reviews evidently considered, among other things, suspected fraudulent activities of the Lakahs and the Guarantor companies, including (but not limited to) suspected collusion between the Lakahs and one or more BdC employees (including at BdC's Sarwat Branch) regarding the issuance of one or more false bank certificates of deposit that were used by the Lakahs as bases to falsify the financial statements of the Guarantor companies, among others. (Mr. El-Bardai did not disclose details of any of those investigations.)

9.  Mr. El-Bardai indicated that he had met with Ramy Lakah on a few occasions to discuss, among other things, BdC's position as an investor in HCFI, aspects of Ramy Lakah's sale of ASF or of its assets, as well as the outstanding financing facilities of BdC to various Lakah Group companies. Mr. El-Bardai did not disclose any details of those meetings.

10. Mr. El-Bardai has indicated to me that he would not testify voluntarily in this action, and that he would testify only if compelled by a subpoena.

II. **Other Sources of Information Regarding Mr. El-Bardai and His Former Employer, Banque du Caire**

   A. **The Offering Circular**

11. There are also documents in the record of this case that confirm Mr. El-Bardai's importance as a witness.

12. Attached as <u>Exhibit A</u> is a true and accurate copy of the Offering Circular, dated December 6, 1999, that was issued by the Issuer and Guarantors to market the Lakah Eurobond to potential investors, including Respondents herein. Among other things, the Offering Circular contains audited financial statements of the Guarantors

through June 30, 1999. (Because the Offering Circular is a very long document, only the portions relevant to this motion are included in Exhibit A here. However, Respondents submitted a complete copy of the Offering Circular to the Court on April 16, 2007 in support of their Cross-Petition to Compel Arbitration.)

13.  In the Offering Circular, the Guarantors confirm, first, that BdC was the primary lender to HCFI during the period up to and including the issuance of the Eurobond. BdC's financing facilities to HCFI and its subsidiaries included:

(a)  Long-term loans to Medequip and TMSE, with outstanding balances exceeding E£53,000,000 as of June 30, 1999 (*See*, Ex. A, pp. F-45 to F-46);[1]

(b)  Short-term loans (*i.e.*, loans included in Current Liabilities) to Medequip, with an outstanding balance of E£7,500,000 as of December 31, 1998 (*id.* at F-20, F-16);

(c)  Short-term loans (*i.e.*, loans included in Current Liabilities) to TMSE with an outstanding balance of E£44,800,000 as of December 31, 1998 (*id.* at F-27, F-23);

(d)  Guarantee as to interest and principal of HCFI's issuance of 7-year bonds in principal amount of E£400,000,000, bearing interest at 11% per year, with maturity date of April 5, 2006 (*id.* at 37); and

(e)  Guarantee as to interest and principal of ASF's issuance of 7-year bonds in principal amount of E£250,000,000, bearing interest at 11% per year, with maturity date of September 29, 2005 (*id.* at 58).

---

[1]  On the Eurobond closing date of December 8, 1999, the exchange rate was approximately E£3.145 Egyptian Pounds per US Dollar. See, www.oanda.com.

5

14. BdC's guarantees of HCFI's and ASF's bond offerings, described in the preceding two subparagraphs, were secured by HCFI's pledges of 800,000 shares of Medequip and 400,000 shares of TMSE. (*See*, Ex. A, pp. 37, 58.)

15. Also, BdC was a major shareholder of HCFI, owning 10% of its issued and outstanding shares as of December 31, 1998 (*see*, Ex. A, p. F-14), and 7.67% of its shares (after dilution by HCFI's GDR offering) as of June 30, 1999 (*id.* at F-46). Indeed, BdC was the largest shareholder of HCFI after petitioners Ramy and Michel Lakah (who together owned approximately 90% of the company's shares pre-dilution). (*Id.* at F-14, F-46.) As such, BdC held a seat on HCFI's Board of Directors. (*Id.* at pp. 71-72.)

16. Thus, when Mr. El-Bardai became the Chairman of BdC in January 2000 (approximately one month after the Eurobond offering), BdC was the major financier, guarantor, and non-Lakah shareholder of HCFI. Therefore, Mr. El-Bardai was in a position to have detailed information about the Lakahs' conduct of the business of the Guarantors, as well as about the development of the financial conditions of the Lakah companies, the Lakahs, etc. via various nefarious conduct of the Lakahs.

### B. The Sale of Arab Steel Factory

17. As more fully explained in my declaration of April 16, 2007 in support of Respondents' Cross-Petition to Compel Arbitration (*see*, ¶¶ 42-48 & exhibits cited therein), and in Respondents' Memorandum of Law in Support of Motion for an Order Directing the Issuance of Subpoena to Carl Baker under 28 U.S.C. § 1783, dated July 9, 2007 (*see*, pp. 13-14, 31),[2] the Lakahs clandestinely stripped ASF of its assets and

---

[2] My declaration of April 16, 2007 was filed with the Court in support of Respondents' Cross-Petition to Compel Arbitration. Respondents also used that declaration to support their

thereby rendered ASF a judgment-proof shell corporation approximately two months after issuance of the Eurobond. Not surprisingly, ASF later defaulted on its payment obligations as a Guarantor of the Eurobond.

18. Attached as <u>Exhibit B</u> is a true and accurate copy of the correspondence, dated January 26, 2000, from Ramy Lakah to Bank of New York (the Eurobond Trustee) and Dewey Ballantine (counsel to UBS), informing them that the Lakah Group "is in advance [*sic*] negotiations for the sale" of ASF. Attached hereto as <u>Exhibit C</u> is a true and accurate copy of a certification, dated February 16, 2000, by Ramy Lakah and Michel Lakah to Bank of New York, in which the Lakahs certified to the Trustee that, *inter alia*, the sale of ASF was completed on that day.

19. Attached hereto as <u>Exhibit D</u> is a true and accurate copy of an excerpt from a report, dated July 18, 2001, prepared by PricewaterhouseCoopers ("PwC") at the request of the Euro bondholders after the Issuer and Guarantors had defaulted on the Eurobond. (Petitioners filed a copy of this entire report with the Court as Exhibit 6 to the Reply Declaration of Brian Murphy, dated July 9, 2007 ("Murphy Reply Decl."), in opposition to Respondents' cross-petition to compel arbitration.)

20. The PwC report indicates that the business and operating assets of ASF were sold for E£321,000,000, consisting of E£100,000,000 of cash and E£221,000,000 of notes payable over six years. (*See*, Ex. D, p. 58.) The notes were deposited in BdC,

---

motion under 28 U.S.C. § 1783 for issuance of a subpoena to Carl Baker (the "Baker motion"). For the convenience of the Court, a copy of Respondents' Memorandum of Law in support of the Baker motion is attached as an Appendix to the Memorandum of Law supporting this motion.

7

and BdC paid the proceeds into a blocked deposit account and applied them to repay HCFI's (not ASF's) obligations to the bank. (*Id.*)

21. Only two months before all or virtually all of ASF's assets were sold for E£321,000,000, the Guarantors had represented in the Offering Circular that the assets of ASF were worth almost double that amount, E£597,200,000. (*See*, Ex. A, p. F-62.)

22. In exchange for the payment of $35,000,000 (coming indirectly from the proceeds of the Eurobond offering), BdC agreed to release the pledged shares of Medequip and TMSE, and to release ASF from a restriction against borrowing money from other banks. (*See*, Ex. D, p. 57, 4th-6th bullet points.) Within days after the Eurobond offering, BdC exercised a Power of Attorney, which ASF had given to BdC a year earlier, in order to create a lien in favor of BdC on all of ASF's assets. (*Id.* at 57, last bullet point.)

23. Because BdC held a lien on the assets of ASF, HCFI could not have sold the assets of ASF in February 2000 without BdC's release of that lien. Furthermore, BdC's permission was required prior to the sale of ASF's assets. Attached as <u>Exhibit E</u> is a true and accurate copy of a memorandum dated February 18, 2000 from Dewey Ballantine to various parties, with attached minutes of a meeting of HCFI's Board of Directors on February 10, 2000. (Petitioners previously filed this document with the Court as Exhibit 41 to the Murphy Reply Declaration.) HCFI's Board minutes indicate (a) that HCFI, not ASF, made the decision to sell ASF's assets, and (b) that the sale of ASF's assets was subject to the prior approval of BdC. (*See*, Ex. E, next to last page.) Indeed, Ramy Lakah did seek Mr. El-Bardai's (*i.e.*, BdC's) permission for the ASF asset sale.

24. From these documents, it is clear that Mr. El-Bardai also very probably has knowledge from the perspective of HCFI's Board of Directors concerning (a) the Eurobond offering of December 1999, and (b) the sale of ASF, which was already in advanced negotiations in January 2000 and completed in February 2000.

25. The surreptitious and then sudden sale of guarantor ASF's assets was a major element in the Lakahs' scheme to defraud the Bondholders by rendering ASF judgment-proof and incapable of meeting its payment obligations to the Bondholders. By virtue of his becoming Chairman of BdC in January 2000, Mr. El-Bardai also would have been privy to BdC's information about its involvement in the Eurobond offering of December 1999, and its obtaining the lien on ASF's assets in that same month.

C. **Testimony and Documents Submitted by Petitioners**

26. Mr. El-Bardai's importance as a witness is confirmed by declaration testimony and documents submitted by Petitioners themselves in this proceeding.

27. Attached as Exhibit F is a true and accurate copy of the Murphy Reply Declaration (without exhibits). Petitioners filed this declaration with the Court in opposition to Respondents' Cross-Petition to Compel Arbitration. Mr. Murphy described himself as a former director of HCFI with "detailed knowledge of HCFI's capitalization, management and finances as well as its operational and corporate procedures." (See, Ex. F, ¶ 1.)

28. Mr. Murphy states that BdC audited HCFI, the parent Guarantor, between May and December 1999. (Murphy Reply Decl. ¶ 27.)

29.     Mr. Murphy also described his view as to why the Lakah Group defaulted on the Eurobond and collapsed financially. He blamed the Eurobond default on, *inter alia*, certain actions of BdC. (*See, e.g., id.* ¶¶ 80-83, 117-18.) For example, Mr. Murphy indicated that BdC created a lien on all of ASF's assets on December 13, 1999, pursuant to the Power of Attorney previously granted by ASF to BdC (*id.* ¶¶ 58-60), and then used that lien as a basis to seize the proceeds of the sale of ASF's assets. According to Mr. Murphy, BdC thus caused HCFI to be deprived of over $100,000,000 of expected capital in December 1999 and early 2000. (*Id.* ¶¶ 80-83.)

30.     Mr. Murphy further stated that BdC, after using its lien to deprive HCFI of much-needed capital, refused to cooperate with HCFI and to continue financing existing projects. (*Id.* ¶ 171.)

31.     Thus, through the Murphy Reply Declaration and their other papers in this proceeding, Petitioners place much of the blame for the Eurobond default on BdC. It thus appears that Petitioners confirm that BdC had an intimate knowledge of the affairs of the Guarantor companies at the time of the Eurobond offering and of the sale of ASF. Therefore, BdC's then Chairman is very probably an important witness to the matters at issue in this proceeding.

32.     Mr. Murphy also declared that the Prime Minister of Egypt appointed Mr. El-Bardai the "President" of BdC in January 2000. Mr. Murphy then alleged that Mr. El-Bardai was convicted of forgery in November 2003. (*Id.* ¶ 164.) Although Respondents dispute Mr. Murphy's gratuitous charge that Mr. El-Bardai was convicted of any crime, the fact that Petitioners felt compelled to preemptively attack Mr. El-Bardai in such a manner only underscores Mr. El-Bardai's importance as a witness.

### III. Conclusion

33. Mr. El-Bardai resides in Cairo, Egypt.

34. Based on my communications with Mr. El-Bardai, it will not be possible to obtain his valuable testimony for use in this proceeding unless the Court issues a subpoena under 28 U.S.C. § 1783 directing him to appear for a deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 7, 2008.

_____
GILBERT A. SAMBERG