BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE  NEXT PCN: 003.00.00.00 — Page/graphics valid (12/03/1999 08:58) U41077  002.00.00.00  62X

DECEMBER 6, 1999



## Lakah Funding Limited

(incorporated under the International Business Companies Act (CAP 291) of the British Virgin Islands)

*Issuer*

## Holding Company for Financial Investments (Lakah Group), S.A.E.
## Medequip for Trading and Contracting, S.A.E.
## Trading Medical System Egypt, S.A.E.
## Arab Steel Factory, S.A.E.

(each a joint stock company incorporated in Egypt)

*Guarantors*

**U.S.$100,000,000**

**12 per cent. Bonds due 2004**

**Issue Price 99.50 per cent.**

---

**Warburg Dillon Read**

### Barclays Capital

**Arab Banking Corporation (B.S.C.)**          **The National Commercial Bank**

**Banque Libanaise pour Le Commerce S.A.L.**

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 004.00.00.00 -- Page is valid, no graphics    U41077  003.00.00.00  28X

**IMPORTANT NOTICE**

Lakah Funding Limited, a company organized under the International Business Company Act (CAP 291) of the British Virgin Islands (the "Issuer"), is issuing its U.S.$100,000,000 12 per cent. Bonds due 2004 (the "Bonds"), which will be unconditionally and irrevocably guaranteed, on a joint and several basis, pursuant to a guarantee (the "Guarantee"), made by each of Holding Company for Financial Investments (Lakah Group), S.A.E. (the "Lakah Holding Company") and three of its operating subsidiaries, Medequip for Trading and Contracting, S.A.E. ("Medequip"), Trading Medical System Equipment, S.A.E. ("TMSE") and Arab Steel Factory, S.A.E. ("Arab Steel"). The Lakah Holding Company, Medequip, TMSE and Arab Steel are hereinafter sometimes referred to individually as a "Guarantor" and collectively as the "Guarantors"; the Lakah Holding Company is hereinafter sometimes referred to individually as the "Parent Guarantor"; and Medequip, TMSE and Arab Steel are hereinafter sometimes referred to individually as a "Subsidiary Guarantor" and collectively as the "Subsidiary Guarantors". The Bonds will be issued pursuant to an indenture dated as of December 8, 1999 (as amended from time to time, the "Indenture") among the Issuer, the Guarantors and The Bank of New York, acting through its principal corporate trust office in New York City, as the trustee for the holders from time to time of the Bonds (in such capacity and any successor to it in such capacity, the "Trustee").

The Issuer and the Guarantors, having made all reasonable inquiries, confirm that this Offering Circular contains or incorporates all information with respect to the Issuer, the Guarantors, the Lakah Holding Company and its Subsidiaries (as defined below) taken as a whole (the "Lakah Group"), the Bonds and the Guarantee, which is material in the context of the issue and offering of the Bonds and the Guarantee; that such information is true and accurate in all material respects and is not misleading in any material respect; that the opinions and intentions expressed in this Offering Circular with regard to such information are honestly held; and that there are no other facts the omission of which would make this Offering Circular as a whole or any such information or the expression of any such opinions or intentions misleading in any material respect; provided that this confirmation does not extend to information set out under the heading "— The Arab Republic of Egypt", which is given as general information and has been extracted from publicly available information and as to which the Issuer and the Guarantors accept responsibility only for the accurate extraction of such information from publicly available sources. Except as aforesaid, the Issuer and the Guarantors accept responsibility for the information contained in this document.

It is a condition to the issuance of the Bonds that the Bonds be rated at least BB+ by Fitch IBCA Limited ("Fitch IBCA").

See "Certain Investment Factors" for a discussion of certain factors to be considered in connection with an investment in the Bonds.

The Managers (as defined below) have not independently verified the accuracy or completeness of the information contained in this Offering Circular and, accordingly, make no representation, warranty or undertaking (express or implied) with respect to, and do not accept any responsibility for (and hereby disclaim any liability for), the accuracy or completeness of this Offering Circular or any other information provided by the Issuer or the Guarantors, or any other person, in connection with the Bonds or their distribution or the Guarantee.

No person has been authorized to give any information or to make any representations other than those contained in this Offering Circular, the Subscription Agreement (as defined below), the Indenture or the Guarantee and, if given or made, such information or representations must not be relied upon as having been authorized. This Offering Circular does not constitute an offer to sell, or a solicitation of an offer to buy, Bonds in any circumstances in which such offer or solicitation is not authorized or is unlawful.

The distribution of this Offering Circular and the offer or sale of Bonds may be restricted by law in certain jurisdictions. No action has been taken by the Issuer, the Guarantors, the Managers or any other person which would permit a public offering of any Bonds or distribution of this document in any jurisdiction where action for that purpose is required. Accordingly, no Bonds may be offered or sold, directly or indirectly, and neither this Offering Circular nor any advertisement or other offering material may be distributed or published in any jurisdiction, except under circumstances that will result in compliance with any applicable securities laws and regulations, and each Manager has represented that all offers and sales by it will be made

2

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 005.00.00.00 — Page is valid, no graphics    U41077 004.00.00.00 44X

on the same terms. Without limiting the foregoing, there are restrictions on the offer and sale of Bonds and/or the distribution of this Offering Circular and any other documents relating to the offering of Bonds in the United States, the United Kingdom, Egypt and the British Virgin Islands. For a further description of certain restrictions on offers and sales of Bonds and on distribution of this Offering Circular, see "*Subscription and Sale*" and "*Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions.*"

NEITHER THE BONDS NOR THE GUARANTEE HAS BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS, AND NEITHER MAY BE OFFERED, SOLD OR DELIVERED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON (AS SUCH TERMS ARE DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT TO QUALIFIED INSTITUTIONAL BUYERS (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144A, AND TO CERTAIN PERSONS IN OFFSHORE TRANSACTIONS IN RELIANCE ON REGULATION S UNDER THE SECURITIES ACT. PROSPECTIVE PURCHASERS ARE HEREBY NOTIFIED THAT SELLERS OF THE BONDS MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A. FOR CERTAIN RESTRICTIONS ON RESALES, SEE "NOTICE TO PURCHASERS AND HOLDERS OF RESTRICTED BONDS AND TRANSFER RESTRICTIONS." FURTHERMORE, NONE OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY OR ANY REGULATORY AUTHORITY OR AGENCY OF ANY OTHER JURISDICTION, INCLUDING, WITHOUT LIMITATION, THE CAPITAL MARKET AUTHORITY OF EGYPT, HAS RECOMMENDED OR APPROVED OF THE BONDS OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

In making an investment decision regarding the Bonds offered hereby, prospective investors must rely on their own examination of the Issuer and the Guarantors and of the terms of the offering, including the merits and risks involved. The offering is being made on the basis of this Offering Circular. Any decision to purchase Bonds in the offering must be based on the information contained herein. Investors should be aware that they may be required to bear the financial risk of this investment for an indefinite period of time.

The delivery of this Offering Circular does not at any time imply that the information contained herein is correct at any time subsequent to the date hereof or that any other information supplied in connection herewith is correct as of any time subsequent to the date indicated in the document containing the same.

Application has been made (i) for the Bonds to be listed on the Luxembourg Stock Exchange and (ii) for the Bonds offered and sold in reliance on Rule 144A under the Securities Act to be designated as eligible for trading on the Portal Market[SM], a subsidiary of The Nasdaq Stock Market, Inc.

The Bonds are being offered by UBS AG, acting through its division Warburg Dillon Read ("Warburg Dillon Read"), Barclays Bank PLC., Arab Banking Corporation (B.S.C.), The National Commercial Bank, Banque Libanaise pour Le Commerce S.A.L. (collectively, the "Managers"), subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. Bonds offered otherwise than in reliance on Regulation S under the Securities Act may be offered by Warburg Dillon Read through their respective agents in the United States.

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 006.00.00.00 — Page is valid, no graphics    U41077 005.00.00.00 32X

**NOTICE TO NEW HAMPSHIRE RESIDENTS**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED ("RSA"), WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF THE STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER SUCH RSA CHAPTER 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT ANY EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE OF THE STATE OF NEW HAMPSHIRE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

In connection with the offering of the Bonds, Warburg Dillon Read may engage in transactions that stabilize or maintain the market price of the Bonds at a level which might otherwise not prevail, including purchases of Bonds to stabilize their market price or to cover some or all of a short position in the Bonds and the imposition of penalty bids. Such transactions, if commenced, may be discontinued at any time. All such transactions will be carried out in accordance with all applicable laws and regulations. See *"Subscription and Sale."*

BOWNE OF LONDON     12/01/1999 21:38     BL/SM     CUMULATIVE     NEXT PCN: 007.00.00.00 — Page is valid, no graphics     U41077  006.00.00.00  20X

## Available Information

So long as any Bonds remain Outstanding and are "restricted securities" within the meaning of Rule 144A(a)(3) under the Securities Act, if the Issuer or a Guarantor, as the case may be, at any time is neither subject to Section 13 or 15(d) of the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a holder or beneficial owner of a Bond, the Issuer and each Guarantor will promptly furnish or cause to be furnished to such holder or beneficial owner, to a prospective purchaser of such Bond designated by such holder or beneficial owner or to the Trustee or any relevant Paying Agent for delivery to such holder or beneficial owner or prospective purchaser, as the case may be, in order to permit compliance by such holder or beneficial owner with Rule 144A under the Securities Act in connection with the resale of such Bond by such holder or beneficial owner, such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision), and the Issuer and each Guarantor will otherwise comply with the requirements of Rule 144A(d)(4) under the Securities Act.

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 008.00.00.00 — Page is valid, no graphics    U41077  007.00.00.00  24X

# Enforcement of Foreign Judgements; Arbitration and Service of Process in Egypt

Each of the Guarantors is a joint stock company incorporated in Egypt. The directors of each Guarantor are individuals resident in, or companies incorporated in, Egypt. A substantial portion of the assets of each of the Guarantors and their directors is located in Egypt. It may not be possible for investors to effect service of process within the United States or elsewhere upon the Guarantors or their directors or for such persons to enforce against any of them in United States courts judgements obtained in United States courts predicated upon the civil liability provisions of the federal securities laws of the United States.

The Bonds, the Guarantee and the Indenture will provide that any dispute or difference whatsoever between the Issuer or any Guarantor, as the case may be, and the Trustee or a Holder of Bonds arising out of or in connection with the Bonds, the Guarantee or the Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules of Arbitration, unless the Trustee or such Holder elects that such dispute or difference be resolved by litigation rather than arbitration. For the benefit of the Trustee or any Holder that elects to resolve any such dispute or difference by litigation and for the benefit of the Trustee or of any Holder seeking to confirm an arbitral award with respect to such a dispute or difference, the Issuer and the Guarantors will each submit to the non-exclusive jurisdiction of the courts of the State of New York and of the United States sitting in New York City, in the Borough of Manhattan, for the purposes of any suit, action or proceeding to resolve such a dispute or difference or seeking to confirm such an arbitral award, as the case may be. See *"Terms and Conditions of the Bonds — 18. Arbitration"* and *"— 19. Governing Law; Submission to Jurisdiction."*

In accordance with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, to which Egypt is a signatory, a court in Egypt is required by law to enforce, without re-examination of the merits of the case or re-litigation of the matters arbitrated upon, except as provided in such Convention, a final and conclusive arbitral award rendered in accordance with applicable provisions of Egyptian law.

Enforcement of foreign judgements in Egypt is subject to the following conditions:

(i)  the foreign courts rendering the relevant judgement must offer reciprocal treatment to judgements obtained in the courts of Egypt; if such reciprocal treatment is not offered by the court where judgement is obtained, the Egyptian courts will re-examine the merits of the case in the same manner as that adopted by such courts;

(ii)  the courts of Egypt are not exclusively competent to hear the dispute which constituted the object of the foreign judgement while the foreign courts are shown to have been competent to hear the dispute in accordance with their own respective laws;

(iii)  the parties to the dispute were duly notified and properly represented in the proceedings;

(iv)  the foreign judgement is final and conclusive in accordance with the relevant law; and

(v)  the foreign judgement does not conflict with a prior Egyptian judgement in the same case and is not contrary to public order or morality in Egypt.

BOWNE OF LONDON     12/02/1999 20:28     BL/SM   CUMULATIVE   NEXT PCN: 010.00.00.00 -- Page is valid, no graphics     U41077  009.00.00.00 29X

# Summary

The following is a summary of certain information contained elsewhere in this Offering Circular. It does not purport to be complete and is qualified in its entirety by the more detailed information appearing elsewhere in this Offering Circular. Capitalized terms used herein have the same meanings given to them elsewhere in this Offering Circular.

**Overview of the Lakah Group**

The Lakah Holding Company is a holding company incorporated in Egypt on November 29, 1998 under Law 95 of 1992. The Lakah Holding Company conducts its business through eight operating subsidiaries (the "Subsidiaries"), organized into two principal groups: the Medical Care Group, comprised of companies (including, among others, Medequip and TMSE) active in the supply and leasing of medical equipment, the management of medical imaging equipment for medical facilities, turnkey hospital projects and other construction works; and the Industrial Group, comprised of companies (including, among others, Arab Steel) active in the manufacture of steel billet and lighting products, transportation using heavy trucks and real estate, including the ownership and leasing of a detergent manufacturing facility. A majority of the issued share capital of the Lakah Holding Company is owned by Messrs Ramy Lakah and Michel Lakah.

As at June 30, 1999, on a consolidated basis, the Lakah Holding Company had total assets of approximately E£2 billion (U.S.$703 million) and shareholders' equity of approximately E£1 billion (U.S.$382 million). For the first six months of 1999, on a consolidated basis, the Lakah Holding Company generated total revenues of approximately E£744 million (U.S.$219 million) and had net income of approximately E£114 million (U.S.$42 million). In 1998 on a pro forma consolidated basis, which gives effect to the Restructuring (as defined below), the Lakah Holding Company generated total revenues of approximately E£650 million (U.S.$191 million) (E£674 million (U.S.$198 million) on an actual basis before the Restructuring) and had net income of approximately E£86 million (U.S.$25 million) (E£93 million (U.S.$27 million) on an actual basis before the Restructuring). See *"Selected Financial and Operating Information"* and *"Management's Discussion and Analysis of Financial Condition and Results of Operations."*

On June 28, 1999, the Board of Directors of the Lakah Holding Company resolved to increase its issued share capital from E£1,149,880,000 to E£1,499,880,000 through the issuance of 35 million shares (the "Capital Increase"). On August 1, 1999, 11,666,667 global depositary shares ("GDSs"), each representing three shares, par value E£10 per share, of the Lakah Holding Company, were issued pursuant to a global offering of GDSs (the "Global Offering"), which raised U.S.$102,500,000. The net proceeds of the Global Offering were applied to the Capital Increase. See *"Lakah Holding Company — Share Capital and Issuance of GDSs."*

Pursuant to a series of transactions, the last of which occurred on August 15, 1999, the Lakah Holding Company acquired 98 per cent. of the issued share capital of Helio Medical Company, S.A.E., an Egyptian joint stock company, which owns and operates renal dialysis centers located throughout Egypt. At the date of this Offering Circular, the Lakah Holding Company has invested E£130 million in Helio Medical Company, S.A.E. See *"Lakah Holding Company — Recent Developments — Helio Medical Company, S.A.E."* In addition, pursuant to a purchase agreement dated September 15, 1999, as amended, the Lakah Holding Company and Messrs Ramy Lakah and Michel Lakah have acquired approximately 51 per cent. of the ownership interests in two partnerships, Intermedica for Manufacturing of Medical Supplies ("IMMS") and Intermedica for Distribution of Medical Supplies ("IDMS"), which are involved in the manufacture, sale and distribution of medical disposable products. The IMMS and IDMS partnerships are currently in the process of being converted into a single Egyptian joint stock company, to be named Intermedica, S.A.E. ("Intermedica"). Based on information supplied to management of the Lakah Holding Company, the combined 1998 sales of IMMS and IDMS were approximately E£20 million. The aggregate consideration paid in connection with this acquisition was E£30.6 million. Following the establishment of Intermedica, the Lakah Holding Company is expected to contribute an additional E£37.74 million to subscribe for new shares to be issued upon an increase in the capital of the joint stock company, while the sellers of the IMMS and IDMS interests, which will retain a 49 per cent. ownership stake in Intermedica, are expected to make a corresponding capital contribution. See *"Lakah Holding Company — Recent Developments — Intermedica".*

The Lakah Holding Company's registered office is located at 68, Merghany Street, Heliopolis, Cairo, Egypt.

UOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 009.00.00.00 -- Page is valid, no graphics    U41077 008.00.00.00 47X

# Financial and Other Information

In this document, all references to "Egyptian pounds," "E£" or "L.E." are to the currency of Egypt (E£1.00 equals 100 piasters); all references to "U.S. Dollars," "Dollars," "$" and "U.S.$" are to the currency of the United States of America. All references to "Egypt" and the "Republic" are to the Arab Republic of Egypt and all references to the "Government" are to the Government of Egypt. All references to "m($^2$)" are to square meters.

The consolidated audited financial statements and the pro forma consolidated financial statements of the Lakah Holding Company included herein have been prepared in accordance with Egyptian laws and regulations and include all information required by International Accounting Standards ("IAS"). The audited financial statements of the Subsidiary Guarantors included herein have been prepared in accordance with Egyptian laws and regulations and include all information required by Egyptian Accounting Standards ("EAS"). Financial statements for the six-month period ended June 30, 1999 are not necessarily indicative of the results for the year ending December 31, 1999. Cherif Mohamed Hammouda, a member of RSM International, and Mostafa Shawki & Co Deloitte & Touche, the auditors of the Lakah Holding Company, have advised the Lakah Holding Company that there are no material differences between EAS and IAS as they pertain to the financial statements included herein. IAS differs in certain significant respects from U.S. generally accepted accounting principles ("U.S. GAAP"). For a narrative description of the principal differences between IAS and U.S. GAAP relevant to the Lakah Holding Company and its Subsidiaries, see "*Annex A — Summary of Certain Significant Differences between IAS and U.S. GAAP.*"

The U.S. Dollar equivalent information presented herein has been calculated using the rate of U.S.$1.00 = E£3.40, is provided solely for the convenience of the readers of this Offering Circular and should not be construed as implying that the Egyptian pound amounts represent, or could have been or could be converted into, U.S. Dollars at such rate of exchange at any time. The exchange rate between U.S. Dollars and Egyptian pounds was U.S.$1.00 = E£3.41 on December 31, 1998 and U.S.$1.00 = E£3.4127 on September 30, 1999, as reported by Datastream. See "*Annex B — The Arab Republic of Egypt — Exchange Rate*". The Federal Reserve Bank of New York does not certify for customs purposes a noon buying rate for cable transfers in Egyptian pounds.

As a result of rounding adjustments, the figures or percentages in a column may not add up to the total for such column.

## TABLE OF CONTENTS

| | |
|---|---|
| Available Information ............................ 5 | Lakah Holding Company............................ 35 |
| Enforcement of Foreign Judgements and Service of Process in Egypt........................ 6 | Terms and Conditions of the Bonds ............. 80 |
| Financial and Other Information .................... 7 | Form of the Bonds ........................................ 104 |
| Summary ......................................... 8 | Clearing and Settlement ......................... 107 |
| Certain Investment Factors............................ 13 | Notice to Purchasers and Holders of Restricted Bonds and Transfer |
| Use of Proceeds ............................ 19 | Restrictions .................................. 111 |
| The Issuer ............................ 20 | Taxation................................. 114 |
| Capitalization of the Lakah Holding Company ...................... 22 | Subscription and Sale ..................... 117 |
| | General Information...................... 120 |
| Selected Financial and Operating Information for the Lakah Group ............. 23 | Index to Financial Statements ...................... F-1 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group ................ 26 | Annex A — Summary of Certain Significant Differences Between IAS and U.S. GAAP.. A-1 |
| | Annex B — The Arab Republic of Egypt ..... B-1 |

BOWNE OF LONDON    12/03/1999 08:35    BL/SM   CUMULATIVE   NEXT PCN: 011.00.00.00 — Page is valid, no graphics    U41077 010.00.00.00 38X

**Terms of the Bonds**

| | |
|---|---|
| Issuer: | Lakah Funding Limited, a company incorporated under the International Business Companies Act (CAP 291) of the British Virgin Islands. The business activities in which the Issuer may engage are limited by its Memorandum of Association and the Indenture. See "The Issuer — Business". The Issuer's Memorandum of Association further provides, and the Issuer has covenanted in the Indenture, that, so long as the Bonds are Outstanding, it will not declare any dividends or have any subsidiaries. |
| Guarantors: | Holding Company for Financial Investments (Lakah Group), S.A.E.; Medequip for Trading and Contracting, S.A.E.; Trading Medical System Equipment, S.A.E.; and Arab Steel Factory, S.A.E. The other Subsidiaries of the Lakah Holding Company are not guarantors of, and otherwise have no direct liability for, the Bonds. |
| Issue: | 12 per cent. Bonds due 2004 |
| Aggregate Principal Amount: | U.S.$100,000,000 |
| Issue Price: | 99.50 per cent. |
| Issue Date: | December 8, 1999 (the "Issue Date"). |
| Maturity Date: | December 8, 2004 (the "Maturity Date"). |
| Guarantee: | Pursuant to the Guarantee, the Guarantors will, jointly and severally, unconditionally and irrevocably guarantee the obligations of the Issuer in respect of the Bonds and otherwise under the Indenture. See "The Guarantee." |
| Status and Ranking: | The Bonds will constitute direct, general, unconditional, unsubordinated, and subject to the Issuer's negative pledge covenant, unsecured obligations of the Issuer and will rank *pari passu* in priority of payment, without any preference among themselves, with all other present and future unsecured and unsubordinated indebtedness of the Issuer, except for any obligations that may be preferred by provisions of law that are both mandatory and of general application. |
| | The obligations of each Guarantor under the Guarantee will constitute direct, general, unconditional, unsubordinated, and subject to the negative pledge covenant of each Guarantor, unsecured obligations of such Guarantor and will rank pari passu in priority of payment with all other present and future unsecured and unsubordinated indebtedness of such Guarantor, except for any obligations that may be preferred by provisions of law that are both mandatory and of general application. |
| Payment Currency: | U.S. Dollars. |
| Use of Proceeds: | The net proceeds from the issue of the Bonds, expected to amount to approximately U.S.$98,500,000 prior to the deduction of transaction expenses, will be used by the Issuer to make a deposit with a Swiss banking institution, which will make a loan (the "Swiss Loan") to the Parent Guarantor. The Parent Guarantor will, in turn, on-lend funds to each Subsidiary Guarantor. Ultimately, the funds will be used principally to expand the business of the Subsidiary Guarantors primarily in the Medical Care Group, to pay-down or collateralize existing indebtedness of the Lakah Holding Company and for general working capital purposes of the Lakah Group. See "*Use of Proceeds*". |

9

BOWNE OF LONDON   12/03/1999 07:12   BL/SM   CUMULATIVE   NEXT PCN: 012.00.00.00 – Page is valid, no graphics   U41077  011.00.00.00  36X

| | |
|---|---|
| **Interest:**........................................ | Interest on the Bonds is payable semi-annually in arrear on June 8 and December 8 in each year. |
| **Interest Rate:**.............................. | 12 per cent. per annum ("30/360 basis") |
| **Negative Pledge and Other Covenants of the Guarantors:**...... | The Guarantors will agree in the Indenture and the Guarantee to observe certain covenants, including (i) a negative pledge; (ii) limitations on certain transactions between the Guarantors and parties related thereto; (iii) restrictions on disposals of assets; (iv) restrictions on consolidation, merger and transfers of assets; and (v) the maintenance of certain financial ratios. In addition, the Lakah Holding Company will agree to certain limitations on its ability to pay dividends and make other distributions in respect of its capital stock and to procure that sufficient funds are at all times made available to the Issuer to enable it to meet its obligations in respect of the Bonds. See "*The Guarantee*." |
| **Cross Default and other Events of Default:**................................. | The Terms and Conditions of the Bonds contain customary events of default, including a cross default in respect of Indebtedness (as defined in the Terms and Conditions of the Bonds) of the Issuer and the Guarantors. See "*Terms and Conditions of the Bonds — Events of Default*." |
| **Withholding Tax:**........................ | All payments of principal and interest in respect of the Bonds, whether paid directly by the Issuer, by any Guarantor under the Guarantee or otherwise, shall be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within the British Virgin Islands or Egypt or any political subdivision or any authority thereof or therein having power to tax, unless such withholding or deduction is required by law. In the event that any such withholding or deduction is required to be made by the Issuer, the Issuer shall, subject to certain exceptions, pay such Additional Amounts (as defined below) as will result in receipt by the holders of Bonds of such amounts as would have been received by them had no such withholding or deduction been required. Similarly, pursuant to the Guarantee, the Guarantors have agreed, subject to certain exceptions, to indemnify the Holders against, and to reimburse the Holders for, any such taxes that are required to be deducted or withheld. See "*Terms and Conditions of the Bonds — Additional Amounts and Taxes*" "*Guarantee*." |
| **Redemption for Taxation:**............ | The Bonds may be redeemed at the option of the Issuer in whole, but not in part, at any time if, as a result of any actual change in any law, regulation or ruling of the British Virgin Islands or Egypt, as the case may be, or any political subdivision or other authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws or regulations, which change or amendment becomes effective on or after the Issue Date, the Issuer has or will become obliged to pay Additional Amounts as provided in Condition 7 or any Guarantor has or will become obligated to indemnify any Person in respect of taxes pursuant to the Guarantee, in any case, in excess of the amounts that are otherwise payable pursuant to Condition 7 or the relevant provisions of the Guarantee as of the Issue Date, and such obligation cannot be avoided by the Issuer or any Guarantor taking reasonable measures available to it. |

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 013.00.00.00 — Page is valid, no graphics    U41077 012.00.00.00 27X

The redemption price will equal 100 per cent. of the principal amount of the Bonds, plus accrued but unpaid interest to the date of redemption. See "*Terms and Conditions of the Bonds — Additional Amounts and Taxes*".

**Form of Bonds:**..........................  Bonds sold outside the United States to non-U.S. persons within the meaning of Regulation S under the Securities Act will initially be represented by a single, permanent global Bond in registered form (the "Regulation S Global Bond"), which will be deposited on or about the Issue Date with a common depositary outside the United States, registered in the name of a nominee of Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear system ("Euroclear"), and Cedelbank, in each case for the accounts of Cedelbank and Euroclear.

Bonds sold to qualified institutional buyers ("QIBs") as defined in and in reliance upon Rule 144A as referred to in, and subject to the transfer restrictions described in, "*Notice to Purchasers and Holders of Restricted Bonds and Transfer Restrictions,*" will initially be represented by a single, permanent global restricted Bond in registered form (the "Restricted Global Bond" and, together with the Regulation S Global Bonds, the "Global Bonds"), which will be deposited with The Depository Trust Company ("DTC"), or a custodian therefor and registered in the name of a nominee of DTC, on or about the Issue Date.

Bonds represented by Global Bonds deposited with DTC or a custodian for DTC will trade in DTC's same-day funds settlement system and secondary market trading activity in such Bonds will therefore settle in immediately available funds. Beneficial interests in a Global Bond deposited with DTC or a custodian for DTC will be shown on, and transfers thereof will be effected only through, records maintained by DTC and its direct or indirect participants, including Cedelbank and Euroclear. See "*Clearing and Settlement.*"

**Denominations:** ..........................  Bonds sold outside the United States to non-U.S. persons within the meaning of, and in reliance on, Regulation S under the Securities Act (including Bonds in definitive registered form issued in exchange for interests in the Regulation S Global Bond in accordance with Condition 3 of the Bonds) will be issued, and beneficial interests in the Regulation S Global Bond may be transferred, in denominations of U.S.$10,000 and higher integral multiples of U.S.$10,000.

Bonds sold to QIBs in reliance on Rule 144A (including Bonds in definitive registered form issued in exchange for the Restricted Global Bond in accordance with Condition 3 of the Bonds) will be issued, and beneficial interests in the Restricted Global Bond may be transferred, in denominations of U.S.$100,000 and higher integral multiples of U.S.$10,000.

**Selling Restrictions:** ...................  United States, United Kingdom, Egypt, the British Virgin Islands and other applicable jurisdictions in connection with the offering and sale of the Bonds. See "*Subscription and Sale.*"

**Rating:**..........................  It is a condition to the issuance of the Bonds that the Bonds be rated at least BB+ by Fitch IBCA. Prospective purchasers of Bonds should be aware, however, that a credit rating is not a recommendation by the rating organization or any other person to buy, sell or hold securities and may be subject to revisions or withdrawal at any time by the assigning rating organization.

BOWNE OF LONDON    12/03/1999 05:35    BL/SM    CUMULATIVE    NEXT PCN: 014.00.00.00 — Page is valid, no graphics    U41077 013.00.00.00 31X -

| | |
|---|---|
| Governing Law: | The Bonds, the Guarantee and the Indenture will be governed by, and construed in accordance with, the laws of the State of New York. |
| **Arbitration; Submission to Jurisdiction:** | The Bonds, the Guarantee and the Indenture will provide that any dispute or difference whatsoever between the Issuer or any Guarantor, as the case may be, and the Trustee or a Holder of Bonds arising out of or in connection with the Bonds, the Guarantee or the Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Rules of Arbitration, unless the Trustee or such Holder elects that such dispute or difference be resolved by litigation rather than arbitration. For the benefit of the Trustee or any Holder that elects to resolve any such dispute or difference by litigation and for the benefit of the Trustee or any Holder seeking to confirm an arbitral award with respect to such a dispute or difference, each of the Issuer and the Guarantors has submitted to the non-exclusive jurisdiction of the courts of the State of New York and of the United States sitting in New York City, in the Borough of Manhattan, for the purposes of any suit, action or proceeding to resolve such a dispute or difference or seeking to confirm such arbitral award, as the case may be. |
| Listing and Trading: | Application has been made (i) for the Bonds to be listed on the Luxembourg Stock Exchange and (ii) for the Bonds offered and sold in reliance on Rule 144A to be designated as eligible for trading on the Portal Market$^{SM}$, a subsidiary of The Nasdaq Stock Market, Inc. |
| **Trustee, Transfer Agent in New York and Registrar:** | The Bank of New York, acting through its principal corporate trust office in New York City |
| **Paying Agent and Transfer Agent in London:** | The Bank of New York, London branch |
| **Paying Agent and Transfer Agent in Luxembourg and Listing Agent:** | Banque Internationale à Luxembourg S.A. |

BOWNE OF LONDON    12/03/1999 08:35    BL-SM    CUMULATIVE    NEXT PCN: 037.00.00.00 – Page/graphics valid (12/03/1999 08:58)  U41077  036.00.00.00  33X

# Lakah Holding Company

**Overview**

The Lakah Holding Company is a holding company incorporated in Egypt on November 29, 1998 under Law 95 of 1992, a majority of the outstanding shares of which are owned by Messrs Ramy Lakah and Michel Lakah. The Lakah Holding Company conducts its business through eight operating Subsidiaries, organized into the Medical Care Group, comprised of companies active in the supply and leasing of medical equipment, the management of medical imaging equipment for medical facilities, turnkey hospital projects and other construction works, namely Medequip for Trading & Contracting, S.A.E., Trading Medical System Egypt, S.A.E., Medical Centers Management Company, S.A.E. ("MCMC"), Quest Consult, S.A.E. ("Quest"), and the Industrial Group, comprised of companies active in the manufacture of steel billet, lighting products, transportation using heavy trucks and real estate, including the owning and leasing of a detergent manufacturing facility, namely Arab Steel Factory, S.A.E., Amitrade for Commerce & Contracting, S.A.E. ("Amitrade"), Industrial Consumer Company, S.A.E. ("ICC") and Industrial Investment Company, S.A.E. ("IIC"). The Lakah Holding Company believes that as of the date of this Offering Circular it has the largest paid-in issued share capital of companies listed on CASE.

The chart below sets out the organizational structure of the Lakah Holding Company.



As at June 30, 1999 on a consolidated basis, the Lakah Holding Company had total assets of approximately E£2 billion (U.S.$703 million) of which 48 per cent. was attributable to Subsidiaries in the Medical Care Group and 52 per cent. was attributable to Subsidiaries in the Industrial Group, and shareholders' equity of approximately E£1 billion (U.S.$382 million). In 1998 on a pro forma consolidated basis, giving effect to the Restructuring, the Lakah Holding Company generated total revenues of approximately E£650 million (U.S.$191 million) (E£674 million (U.S.$198 million) on an actual basis before the Restructuring) of which 64 per cent. was generated by Subsidiaries in the Medical Care Group and 36 per cent. was generated by Subsidiaries in the Industrial Group. For the first six months of 1999, on a consolidated basis, the Lakah Holding Company generated total revenues of approximately E£744 million (U.S.$219 million). The Lakah Holding Company's consolidated pro forma net income for 1998 was approximately E£86 million (U.S.$25 million) (E£93 million (U.S.$27 million) on an actual basis before the Restructuring) of which 60 per cent. was attributable to Subsidiaries in the Medical Care Group and 40 per cent. was attributable to Subsidiaries in the Industrial Group. For the six-month period ended June 30, 1999 on a consolidated basis, net income was approximately E£114 million (U.S.$ 34 million) of which 54 per cent. was attributable to Subsidiaries in the Medical Care Group and 46 per cent. was attributable to Subsidiaries in the Industrial Group. See "Selected Financial and Operating Information for the Lakah Group" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of the Lakah Group". As at June 30, 1999, the Lakah Holding Company and the Subsidiaries had 3,205 employees (including part time employees and independent contractors, whose numbers are not reflected in the employee figures for the Subsidiaries) of whom 25 were employed by the Lakah Holding Company, 825 by Subsidiaries in the Medical Care Group and 2,355 by Subsidiaries in the Industrial Group. The Lakah Holding Company's registered office is located at 68, Merghany Street, Heliopolis, Cairo, Egypt.

BOWNE OF LONDON    12/01/1999 21:38    BL/SM    CUMULATIVE    NEXT PCN: 038.00.00.00 – Page is valid, no graphics    U41077  037.00.00.00 20X

## Lakah Holding Company

### History

The Lakah Holding Company was incorporated in 1998 as a joint stock company for a term of 25 years, which may be extended as permitted by law.

Following is a summary of events leading up to and including the establishment of the Lakah Holding Company:

| | |
|---|---|
| 1960s:........................................ | The Lakah Family represents various suppliers of medical equipment throughout Egypt and also has interests in the Egyptian steel industry. |
| 1985: ....................................... | Upon the death of Dr. Raymond Lakah, his son, Mr. Ramy Lakah, assumes control of the medical equipment and steel industry activities and soon thereafter is joined by his brother, Mr. Michel Lakah, in running the family business activities. Family business activities expand to include construction activities, the management of medical facilities and various investments in industry. |
| mid-1990s:.................................. | Establishment of a number of joint stock companies (including the Subsidiaries) directly held by the Lakah Family through which the Lakah Family business activities are conducted. |
| November 1998:........................... | The Lakah Family commences transfer of its interests in each of the Subsidiaries and in Scandinavian Company for Investment and Touristic Development, S.A.E. ("Scandinavian") to a new holding company (Lakah Holding Company) controlled by the Lakah Family. |
| December 1998: .......................... | Lakah Holding Company has an authorized share capital of E£5 billion and issued share capital of E£1,149,880,000 divided into 114,988,000 shares, par value E£10 each; Lakah Holding Company shares are listed on CASE; Banque du Caire S.A.E. acquires 11,498,800 shares representing 10 per cent. of the issued share capital of Lakah Holding Company. |
| April 1999: .................................. | Lakah Holding Company issues E£400,000,000 11 per cent. bonds due 2006. |
| June 1999: ................................... | Lakah Holding Company completes the Restructuring (described below) and effects the Capital Increase of 35 million shares at par value, increasing the issued share capital to E£1,499,800,000. |
| July 1999:.................................... | 11,666,667 global depositary shares ("GDSs") each representing 3 shares of the Lakah Holding Company are issued in a global offering. The net proceeds from the issuance of the GDSs are applied in payment of the Capital Increase. |
| August 1999:................................ | GDSs listed on Luxembourg Stock Exchange. |

### Restructuring

In June 1999, the Lakah Holding Company decided that it should focus on and expand two distinct business areas, namely medical care and related construction activities and industrial activities. From a balance sheet perspective, the Lakah Holding Company regards the Subsidiaries in the Industrial Group with significant fixed asset values as counterbalancing its Subsidiaries in the Medical Care Group, which have lower value fixed assets but generally generate higher levels of income. As the first stage of implementing this strategy, the Lakah Holding Company decided to divest from its group Scandinavian and companies in the portfolio of IIC whose activities were unrelated to medical care or non-industrial. Between June 10 and June 16, 1999, the following share transfers or agreements to transfer shares (the "Restructuring") were made or entered into:

BOWNE OF LONDON    12/01/1999 21:38    BL/SM    CUMULATIVE    NEXT PCN: 039.00.00.00 – Page is valid, no graphics    U41077  038.00.00.00  25X

**Lakah Holding Company**

| | Name of the Company [2] | Name of the Seller | Number of Transferred shares | Price per share [1] E£ | Total Amount E£ |
|---|---|---|---|---|---|
| June 10, 1999 ............... | Scandinavian | The Lakah Holding Company | 391,950 | 100 | 39,195,000 |
| June 15, 1999 ............... | Delta Sound Co | IIC | 1,000 | 25 | 25,000 |
| June 15, 1999 ............... | House of Art | IIC | 3,000 | 25 | 75,000 |
| June 15, 1999 ............... | Irena Arts Production | IIC | 2,500 | 25 | 62,500 |
| June 15, 1999 ............... | First Power | IIC | 50,000 | 25 | 1,250,000 |
| June 16, 1999 ............... | International Co for Touristic and Real Estate | IIC | 20,000 | 50 | 1,000,000 |
| June 16, 1999 ............... | Suez Corporation for Iron Works | IIC | 4,998 | 219 | 1,094,452 |

Notes:

(1)  *Price per share is equal to the paid-in portion of the par value of the relevant shares, which is 25 per cent. for all of the companies, except for Scandinavian, which is fully paid, and International Co for Touristic and Real Estate, which is paid-in as to 50 per cent.*

(2)  *All transfers have been entered into with the Lakah Family or affiliates thereof. See "The Lakah Family Group of Companies."*

**Share Capital and Issuance of GDSs**

On June 28, 1999, the Board of Directors of the Lakah Holding Company authorized the Capital Increase from E£1,149,880,000 to E£1,499,880,000 through the issuance of 35 million shares, resulting in a total outstanding capital stock of 149,988,000 shares. Messrs Ramy Lakah and Michel Lakah each subscribed for 17,500,000 shares and each paid in E£17.5 million representing ten per cent. of the par value of the shares purchased by him. The CMA approved the issuance of the shares on June 30, 1999. On August 1, 1999, 11,666,667 GDSs, each representing three shares, par value E£10 per share, of the Lakah Holding Company, were issued pursuant to the Global Offering of GDSs, which raised U.S.$102,500,000. The GDSs were sold by Messrs Ramy Lakah and Michel Lakah. The net proceeds of the Global Offering were used by Messrs Ramy Lakah and Michel Lakah to pay the balance of the Capital Increase and to reimburse themselves for the 10 per cent. portion of the Capital Increase funded by them prior to the issue date of the GDSs.

As at the date of this Offering Circular, Mr. Ramy Lakah, Mr. Michel Lakah and Banque du Caire, S.A.E. own 38.3 per cent., 30.7 per cent. and 7.66 per cent. of the Lakah Holding Company's shares, respectively. Immediately following the Global Offering, purchasers of GDSs in the Global Offering held, in aggregate, GDSs representing approximately 23 per cent. of Lakah Holding Company shares.

**Indebtedness**

On April 5, 1999, the Lakah Holding Company issued its E£400,000,000 11 per cent. bonds due 2006. The bonds have a domestic rating of AA– issued by Nile Rating, a member of the Fitch IBCA Group. A summary of the main terms and conditions is set out below:

| | |
|---|---|
| Principal Amount:................................... | E£400,000,000 |
| Interest:................................................ | 11 per cent. per annum |
| Issue Price:.......................................... | 100 per cent. |
| Maturity:.............................................. | April 5, 2006 |
| Issue Date:........................................... | April 5, 1999 |
| Guarantee:........................................... | Banque du Caire, S.A.E. as to interest and principal |
| Payment of Interest:.............................. | Semi annual, each January 1 and July 1, commencing July 1, 1999 |
| Payment and Prepayment:...................... | At maturity, unless accelerated or prepaid at the option of the Lakah Holding Company commencing at the end of the fifth year. Minimum prepayment amount is E£1 million or any multiple thereof. |

Banque du Caire, S.A.E. has secured the Lakah Holding Company's reimbursement obligation with respect to the guarantee by a pledge on 800,000 shares of Medequip and 400,000 shares of TMSE. The Lakah Holding Company has agreed in the Subscription Agreement to procure a release of the pledge as a condition to the purchase by the Managers of the Bonds.

BOWNE OF LONDON    12/02/1999 21:32    BL/SM    CUMULATIVE    NEXT PCN: 040.00.00.00 — Page is valid, no graphics    U41077 039.00.00.00 38X

**Lakah Holding Company**

The proceeds of these domestic bonds were distributed as follows:

| To: | As at April 30, 1999 | Use of Proceeds |
|---|---|---|
| Medequip | E£ 66,500,501 | Pay down existing debt |
| ICC | E£ 35,000,000 | Upgrading fluorescent tube line |
| IIC | E£100,000,000 | E£81 million to buy a detergent factory |
| | | E£19 million for the acquisition of real property |

As at June 30, 1999, an additional E£158 million was loaned by the Lakah Holding Company to Medequip, resulting in an aggregate amount loaned to Medequip of approximately E£225 million. The additional funds loaned to Medequip are expected to be utilized principally for the purchase of additional medical equipment for on-leasing.

The repayment obligations of the relevant Subsidiaries to the Lakah Holding Company are evidenced by promissory notes with respective maturities matching the debt service obligations of the relevant Subsidiary to the Lakah Holding Company.

**Recent Developments**

**Helio Medical Company, S.A.E.**

Pursuant to a series of transactions, the last of which occurred on August 15, 1999, Lakah Holding Company acquired 98 per cent. of the issue share capital of Helio Medical Company, S.A.E. ("Helio") formerly called Heliolab, S.A.E., an Egyptian joint stock company with commercial register number 313606. At the date of this Offering Circular, Lakah Holding Company's total investment in Helio is E£130 million of which E£65 million was paid to the sellers of shares in Helio and E£65 million subscribed for the issue of new shares in Helio. As at the date of this Offering Circular, Helio has an authorized share capital of E£500 million divided into 5 million shares, par value E£100 each, of which 1.3 million shares have been issued and are fully paid.

Helio was established in 1998 by a group of Egyptian doctors for the purpose of owning and operating a number of renal dialysis centers located throughout Egypt primarily in response to the high incidence of renal failure in Egypt. Currently Helio owns or leases 50 sites which Helio is in the process of equipping with renal dialysis equipment, all of which is expected to be owned by Helio. In a manner similar to MCMC's operation of CT scanning clinics (see "Medical Centres Management Company S.A.E. — Products and Services"), Helio expects to reach agreement with private and public sector healthcare providers whereby such healthcare providers will guarantee that a minimum number of patients per day will be treated at Helio's renal dialysis centres for a fixed price per treatment payable to Helio. As with MCMC, in order to provide patients with necessary clinical care and diagnostic consultation, Helio expects to subcontract the provision of clinical and treatment services to doctors who will assume full responsibility for patient care.

Helio's current plans provide that at least 20 centers will be operational by January, 2000 and all 50 of its centers by December 2000.

**Intermedica**

Pursuant to a purchase agreement dated September 15, 1999, as amended (the "Purchase Agreement"), between the Lakah Holding Company and Messrs Ramy Lakah and Michel Lakah (together, the "Purchasers") and Messrs Hatem El Sweify and Sameh El Sweify (together, the "Sellers"), the Purchasers have acquired a 51 per cent. stake in two partnerships, Intermedica for Manufacturing of Medical Supplies and Intermedica for Distribution of Medical Supplies owned by the Sellers for a purchase consideration of E£30.6 million paid in full upon execution of the Purchase Agreement. The IMMS and IDMS partnerships, which were valued, for purposes of the transactions contemplated by the Purchase Agreement, at E£60 million, are currently in the process of being converted into an Egyptian joint stock company, to be named Intermedica, S.A.E. ("Intermedica"), which is expected to have an initial capital of E£60 million and to conduct the business currently undertaken by each of IMMS and IDMS. Upon the establishment of Intermedica, the Lakah Holding Company will own approximately 51 per cent. of the share capital of Intermedica, representing their interests acquired in the partnerships. Immediately following the establishment of Intermedica, the capital of the joint stock company will be increased by E£75 million and the Lakah

BOWNE OF LONDON    12/02/1999 22:19    BL/SM    CUMULATIVE    NEXT PCN: 041.00.00.00 -- Page is valid, no graphics    U41077  040.00.00.00  29X

**Lakah Holding Company**

Holding Company and the Sellers will, respectively, subscribe E£37.74 million and E£37.26 million for the issue of the new shares in Intermedica resulting from the capital increase. After giving effect to the capital increase, Intermedica will have an authorized share capital of E£250 million divided into 2,500,000 shares of par value E£100 each, of which 1,350,000 shares will be issued and fully paid, and the Purchasers and the Sellers will own 51 per cent. and 49 per cent. of such shares, respectively. In the event that any consents to the change of the structure and control of IDMS are required from IDMS's suppliers of medical consumer products and are not received by Intermedica within three months from the date on which the Purchasers have acquired ownership of the shares referred to above, the Purchasers will be entitled to treat the Purchase Agreement as rescinded and the Sellers have undertaken to reimburse to the Purchasers, upon notice of rescission, the entire purchase consideration paid by them.

The principal activity of IMMS is the manufacture and sale of various medical disposable products, in particular, dressings and bandages. It is one of the leading manufacturers of medical disposable products in Egypt. IMMS has recently introduced new products to its product range including IV infusion sets. IMMS is actively seeking other opportunities to manufacture medical disposables in Egypt. In 1998 approximately 15 per cent. of IMMS's sales were exported to other countries in the Middle East, principally Saudi Arabia, Yemen and Kuwait.

The principal business activity of IDMS is as distributor in Egypt of more than 7 leading international manufacturers of medical disposable products including Beckton Dickinson B.V., 3M Egypt, Seton Scholl Healthcare Group Plc and disposable products manufactured by IMMS. Based on financial information supplied to management of Lakah Holding Company, of IDMS's sales in the first half of 1999, 20 per cent. was attributable to IMMS products, 60 per cent. attributable to Beckton Dickinson products, 10 per cent. attributable to Seton Scholl and others products and 10 per cent. was attributable to 3M products. Certain of the contracts governing IDMS's distribution arrangements grant IDMS exclusive rights to distribute the relevant products in Egypt. With limited exceptions, the distribution agreements are renewable annually, impose minimum sales quotas and do not place restrictions on end user prices.

Based on information supplied to management of Lakah Holding Company, the combined 1998 sales of IMMS and IDMS were approximately E£20 million.

IDMS has a centralized warehouse and administration operation based in Cairo and four regional distribution centers owned or leased by IDMS. Transport is provided by 65 vehicles all owned by IDMS. IDMS operates a computerized stock management programme which has been in operation for over ten years. The stock management programme enables, inter alia, central management to receive from each regional distribution center detailed sales and credit reports every 15 days.

Upon the establishment of Intermedica, Messrs. Hatem and Sameh El Sweify will become managing directors of the manufacturing and distribution divisions of Intermedica, respectively.

**Strategy**

The Lakah Holding Company believes that the on-going liberalization of the Egyptian economy, and the development of the economies of countries throughout the rest of the Middle East and North/West Africa, continue to create new business opportunities in the health care, medical and industrial sectors. The Lakah Holding Company intends to capitalize on its market position, expertise, reputation and financial resources and on these opportunities as they arise by expanding into selected markets and developing new activities and services to complement its existing operations.

The Lakah Holding Company believes that each of the Subsidiaries in the Medical Care Group holds the leading position in its respective market segment in Egypt as follows: Medequip in the supply and leasing of medical equipment and turnkey hospital projects; TMSE in the supply and leasing of medical imaging equipment; MCMC in the management of medical imaging equipment for medical facilities; and Quest in the construction finishing of medical facilities. The Lakah Holding Company's objective is that such Subsidiaries maintain and improve on their market positions. The Lakah Holding Company intends to implement the following strategies to meet its objectives with respect to the Medical Care Group:

* to expand its medical care operations in Egypt, the rest of the Middle East and North/West Africa, including, in particular, in Turkey and Algeria;

BOWNE OF LONDON    12/01/1999 21:38    BL/SM    CUMULATIVE    NEXT PCN: 042.00.00.00 – Page is valid, no graphics    U41077 041.00.00.00 20X

**Lakah Holding Company**

- to expand the range of products covered to include the manufacture and distribution of medical disposable products in Egypt, the rest of the Middle East and North/West Africa;

- to increase the scale of its leasing operations of medical equipment, particularly with respect to equipment with a value of less than U.S.$200,000 per unit;

- to increase the number of medical facilities for which MCMC provides management services;

- to further develop management services to provide complete hospital management; and

- to translate know-how gained from construction projects in the medical field to construction of other "utility" type buildings.

The Lakah Holding Company intends to implement the following strategies to meet its objectives with respect to the Industrial Group:

- to ensure that its industrial operations remain at the forefront of technology in the region;

- to pursue the construction of a plant for the manufacture of HBI, an iron ore substitute used in the production of steel billet;

- to develop low-cost, energy efficient industrial operations; and

- to comply with and, where possible, exceed domestic environmental norms and regulations.

BOWNE OF LONDON    12/01/1999 21:38    BL/SM    CUMULATIVE    NEXT PCN: 056.00.00.00 -- Page is valid, no graphics    U41077 055.00.00.00 24X

## Subsidiary Guarantors

To encourage the Egyptian health care and medical sectors to utilize the latest technological developments in medicine and equipment, the Egyptian government banned, in 1996, importation of pre-owned medical equipment. The following table shows the main Toshiba products supplied by TMSE and the estimated market shares of such products and competing products in 1998:

| Product | Market share (per cent.) | Competitors |
|---|---|---|
| CT Scanner | 46 | Philips (24%), GE (14%), Siemens (11%) |
| MRI Systems | 39 | GE (33%), Siemens (13%), Philips (11%), Hitaichi (4%) |
| Nuclear Medicine Systems | 35 | Siemens (25%), GE (17%), Sopha (9%), Philips (8%) |
| X Ray and Angiography Systems | 30 | Philips (33%), GE (16%), Siemens (14%) |

*Note:*

(1)  *In 1998, TMSE also supplied Toshiba ultrasound systems, which represented 48 per cent. of the Egyptian ultrasound market. Competitors in the ultrasound market include Esaôte, ATL, Hitachi and GE.*

### Indebtedness
As at June 30, 1999, TMSE had outstanding long-term debt of approximately E£39 million (U.S.$11 million) and short-term debt of approximately E£65 (U.S.$19 million). Since June 30, 1999, there has been no material change in outstanding indebtedness.

### Capital Expenditure
TMSE's capital expenditure budget from 1996 to 1998 consisted mainly of costs in respect of vehicles and office furnishings and office equipment. TMSE has a nominal capital budget for 1999.

### Employees
As at June 30, 1999, TMSE had 156 full-time employees.

### Tax Status
The net profits of TMSE after deduction of a percentage of its issued share capital at December 31 of the relevant fiscal year, such percentage being equal to the discount rate announced by CBE for December 31 of the relevant fiscal year (currently being 12.25 per cent. per annum), are subject to a flat tax rate of 40 per cent. per annum.

## ARAB STEEL FACTORY, S.A.E.

### Overview
Arab Steel is one of the leading manufacturers in Egypt of steel billet. Billet is the raw material required for the manufacture of steel rebars (which are steel reinforcement bars used for strengthening concrete in the construction industry), angles and beams. In 1998, Arab Steel produced 240,000 tons of billet, had approximately E£187 million (U.S.$55 million) in sales and approximately E£29 million (U.S.$8.5 million) in net profits. During the six-month period ended June 30, 1999, Arab Steel produced approximately 142 thousand tons of billet, had approximately E£99 million (U.S.$29 million) in sales and approximately E£29 million (U.S.$8 million) in net profits. As at June 30, 1999, Arab Steel's total fixed assets were approximately E£229 million (U.S.$67 million).

### History
On December 17, 1994, Arab Steel was incorporated as a joint stock company under Law 159 of 1981 with Commercial Register number 286522. On October 19, 1995, Arab Steel transferred its head office to the 10th of Ramadan City and changed its Commercial Register number to 556. In 1998, substantially all of the shares of Arab Steel were transferred to the Lakah Holding Company. Arab Steel's shares have been listed on CASE since June 1, 1998.

As at the date of this Offering Circular, Arab Steel's authorized capital is E£750 million divided into 75 million shares with a par value of E£10 per share, of which 25 million shares are issued and fully paid. As of the date of this Offering Circular, the Lakah Holding Company owns 97.9 per cent. of Arab Steel shares.

BOWNE OF LONDON    12/01/1999 21:38    BL/SM   CUMULATIVE   NEXT PCN: 057.00.00.00 ~ Page is valid, no graphics    U41077 056.00.00.00 23X

**Subsidiary Guarantors**

The Lakah Family has been connected with the steel business in Egypt since the early 1960s. For 20 years, the Lakah Family controlled a company which operated a rolling mill producing rebars situated in Alexandria, but which is no longer operational. In 1993 and 1994, there was significant demand for steel billet in Egypt, and a lack of domestic production capacity to meet such demand. Due to this shortage, the rolling mill owned by the Lakah Family in Alexandria was unable to operate at full capacity and given this and the lack of domestic capacity, the Lakah Family decided to establish and use Arab Steel as a corporate vehicle to invest in the construction of a steel meltshop to produce billet. In 1995, Arab Steel commenced pre-installation and construction of the meltshop. The meltshop commenced operation in 1997. See *"Production Facilities."*

**Egyptian Market for Billet and Competition**

Billet is the raw material required for the production of rebars, angles and beams used in the construction industry. Rebar producers roll the billet into rebars using rolling mill facilities. As a consequence, billet demand in Egypt is dependent upon the Egyptian demand for rebars, which, following the growth of the Egyptian construction industry, has increased from approximately 1.8 million tons in 1992 to approximately 4.5 million tons in 1998, of which approximately 3.7 million tons were produced in Egypt. In 1998, it is estimated that approximately 800,000 tons of rebars were imported into Egypt representing 17 per cent. of domestic demand. Arab Steel believes domestic producers of rebars have competitive advantages over non-Egyptian rebar suppliers as a consequence of customer preference to deal with local producers, better continuity of supply from local producers, pricing advantages due to lower transport costs and the existence of tariffs imposed on importation of rebars, other than from Libya. Arab Steel does not expect Egypt to reduce tariffs on rebars in the near future.

Egyptian market demand for billet has increased from approximately 1.9 million tons in 1992 to approximately 3.8 million tons in 1998, of which 2.5 million tons were produced in Egypt. In 1998, 1.3 million tons of billet were imported into Egypt representing 34 per cent. of domestic demand. Arab Steel believes the competitive advantages enjoyed by rebar producers apply equally to domestic producers of billet.

Egypt's Law 161 of 1998 permits the imposition of fines on importers to restrict dumping activities into Egypt. A number of billet and rebar producers, including Arab Steel, have filed anti-dumping proceedings with the Anti-Dumping Office of the Egyptian Ministry of Trade against suppliers from the Ukraine, Romania, Latvia, Turkey and certain other countries.

Arab Steel believes that it is currently the only producer of billet in Egypt for sale to third parties. Substantially all other billet produced in Egypt is produced by manufacturers of rebars as part of their integrated production process. Arab Steel believes that its billet production of 240,000 tons in 1998 represented six per cent. of 1998 domestic billet production, which was led by Alexandria National Steel Dekhela, S.A.E. ("ANSDK") with 900,000 tons (23 per cent.) and Egyptian Iron and Steel, S.A.E. with 805,000 tons (21 per cent.), respectively. A second meltshop, with anticipated nominal capacity of approximately 600,000 tons per annum of steel billet, is currently being constructed by one of the other steel manufacturers in Egypt and is expected to commence production for sale of third parties in 2000.

**Strategy**

Arab Steel's principal objective is to increase production levels to reach 90 per cent. of its meltshop's maximum optimal production capacity. Additional strategic objectives include:

* to continue to improve on efficiency of operations;

* to enhance the production process;

* to deliver the East Port Said Project described below;

* to maintain tight control over its credit exposure to customers; and

* to comply with, and where possible, exceed domestic norms and regulations in line with the Lakah Holding Company's overall environmental policy.

BOWNE OF LONDON    12/01/1999 21:38    BL/SM    CUMULATIVE    NEXT PCN: 058.00.00.00 — Page is valid, no graphics    U41077  057.00.00.00  19X

**Subsidiary Guarantors**

**Production Facilities**

On May 26, 1995, Arab Steel acquired a site of approximately 33,500m$^2$ in the industrial zone in the 10th of Ramadan City for construction of a meltshop with capacity to produce 400,000 tons of billet per year. A meltshop uses an electric arc furnace to melt steel scrap, directly reduced iron ("DRI") and hot-briquetted iron ("HBI") and casts the resulting molten steel into billet. In May 1995, Arab Steel acquired a 55 ton electric arc furnace manufactured by Demag, a German company, and a four strand continuous billet caster manufactured by Rocop, a U.S. company. The facility has an annual capacity of 400,000 tons of billet per year. The facility is supported by a variety of auxiliary equipment, including two power stations, a water treatment plant, an oxygen plant, workshops, steel scrap storage facilities, product storage warehouses, a laboratory and administrative offices. The total purchase, installation and refurbishing costs of the meltshop (excluding the cost of auxiliary equipment) amounted to approximately E£156 million and were financed principally through shareholder loans and short term bank borrowings. In 1998, these shareholder loans were converted into equity and the short term bank borrowings were refinanced through the issue of bonds. See *"Indebtedness"*. Arab Steel's meltshop has a maximum production capacity of 400,000 tons per annum. Arab Steel received a license to operate the meltshop and started production of steel billet in October 1997. The quality management systems of the meltshop are awaiting compliance assessment but Arab Steel considers that it will qualify for certification as being compliant with ISO 9000 quality requirements. ISO certification is not a pre-requisite for the sale of billet provided by Arab Steel. Arab Steel's meltshop is designed for operation on a 24 hours a day, seven days a week basis excluding annual maintenance shutdowns and unscheduled down times. Arab Steel commenced production on a test basis during the last quarter of 1997. During 1998, the meltshop operated at approximately 60 per cent. of nominal capacity producing approximately 240,000 tons of steel billet. In the first four months of 1999, Arab Steel produced approximately 89,000 tons of steel billet and expects capacity utilization of approximately 70 per cent. of nominal capacity for 1999. As production efficiencies are improved, Arab Steel estimates that it will be capable of producing approximately 360,000 tons of steel billet in 2001 representing capacity utilization of 90 per cent. of nominal capacity. Production to date has been in line with the meltshop's installation specifications.

**Real Property**

Under current applicable Egyptian law, title to land in industrial areas such as the 10th of Ramadan City may only be initially transferred to purchasers upon completion by the purchaser of an investment project in the form agreed by the relevant new communities authority, commencement of operations relating to such investment, and receipt of the necessary regulatory approvals, including a building permit, a permanent operating license, a hand-over certificate and an environmental compliance certificate.

Arab Steel currently occupies and has the right to acquire the following properties:

- a 33,500m$^2$ parcel located in the 10th of Ramadan City, which is the site of the meltshop and for which full payment has been made by Arab Steel. No registration in favor of Arab Steel has been effected to date because, until June 1, 1999, Arab Steel was not in possession of an environmental compliance certificate. That certificate has since been obtained and Arab Steel is currently in the process of completing all necessary formalities for registration; management anticipates that all registration formalities will be completed within 12 months of the date of this Offering Circular;

- a 150,000m$^2$ parcel located in the 10th of Ramadan City, which is currently used by Arab Steel as a storage site for steel scrap and other raw materials for billet production. Pursuant to a preliminary sales contract between Arab Steel and the Prosecutor General of Egypt as successor of the former bankrupt owner, the Prosecutor General irrevocably empowered Mr. Ramy Lakah, both in his capacity as Arab Steel's chairman and personally, to irrevocably act on behalf of the Prosecutor General to register this parcel in the name of Arab Steel;

- a 35,300m$^2$ parcel located in the 10th of Ramadan City for which full payment has been made by Arab Steel. This parcel is currently used by Arab Steel as a storage site for steel scrap and other materials for billet production. Arab Steel will be eligible to register the parcel in its name once it has completed the relevant investment project agreed with the new communities authority. Arab Steel does not have any current intention to complete such investment on this parcel and as such has not applied for the required certificates.

56

BOWNE OF LONDON    12/01/1999 21:38    BL/SM    CUMULATIVE    NEXT PCN: 059.00.00.00 — Page is valid, no graphics    U41077 058.00.00.00 22X

**Subsidiary Guarantors**

The aggregate price paid by Arab Steel for all three parcels amounted to approximately E£49 million (U.S.$14.42 million).

**Raw Materials**

The raw materials used by Arab Steel for the production of steel billet are steel scrap or scrap substitutes (DRI and HBI). In 1998, Arab Steel did not use any DRI or HBI in respect of steel billet production. Steel scrap is sourced locally, often from the shipyards in Alexandria and the Egyptian Railway Authorities, but if not available locally is imported. In 1998, approximately 80 per cent. of steel scrap used by Arab Steel was purchased locally and approximately 20 per cent. of the steel scrap used by Arab Steel was purchased from Amitrade. Arab Steel seeks to maintain a stock of steel scrap sufficient to meet its anticipated production for the next six months in order to protect it against adverse changes in the price for steel scrap. Cost of steel scrap constituted between 35 and 40 per cent. of the total production costs of Arab Steel for the year ended December 31, 1998. In 1998, the average price paid by Arab Steel for steel scrap was approximately E£300 per ton. Other raw materials or operating supplies required by Arab Steel, including lime, ferro alloys, refractories, carbon and graphite electrodes, are obtained either from Amitrade or directly from other suppliers. In the year ended December 31, 1998, the cost of raw materials purchased by Arab Steel from its sister company Amitrade for production of billet amounted to approximately E£10 million representing 9.3 per cent. of cost of sales for the period. Since the commencement of operations, Arab Steel has obtained adequate quantities of such raw materials and supplies to permit efficient billet production. An average profit margin of 15 per cent. is charged by Amitrade on sales to Arab Steel.

**Customers**

Arab Steel's customers for steel billet are Egyptian manufacturers producing rebars, beams and angles. In 1998, Arab Steel's largest customer was Contrasteel, S.A.E. ("Contrasteel"), the entity procuring billet for ANSDK, Egypt's largest steel producer. During that year, Contrasteel purchased approximately 180,000 tons directly from Arab Steel representing 75 per cent. of Arab Steel's production for that year pursuant to a fixed price contract, subject to adjustment.

In October 1998, a new sales policy was adopted by Arab Steel whereby Arab Steel began to sell a significant proportion of its production to Amitrade, which Amitrade then on-sells to manufacturers of rebars, beams and angles, including ANSDK. In 1998, Amitrade purchased, for on-sale, steel billet produced by Arab Steel in the amount of approximately E£22.5 million representing 12 per cent. of Arab Steel's total sales for the same period. Arab Steel offers no sales discounts to Amitrade. Other customers of Arab Steel include Al Saied, El Garhy and Suez Company for Metallurgic Industries, S.A.E ("Suez").

Arab Steel grants payment terms to its customers for up to 120 days. Payment obligations are generally secured by post dated checks and in certain circumstances by letters of credit. A credit investigation is generally performed.

Prices are generally quoted ex-factory, however some customers request prices including freight, in which case, subject to availability, Arab Steel contracts with Universal for Heavy Transport, S.A.E. ("Universal"), a sister company, to provide freight services, which are provided at market rates.

**Energy Supply and Water**

The meltshop obtains electricity from the Egyptian Electricity Authority ("EEA"), which is currently the sole electricity supplier in Egypt. The average cost of electricity supplied to Arab Steel's mill during the six-month period ended June 30, 1999 was approximately E£0.16 (U.S.$0.05) per kilowatt hour. In the event of any interruption in the EEA electricity supply, Arab Steel has two backup power stations to ensure continuity of energy supply.

Water is supplied for manufacturing and other purposes from the local governate, which is adequate for the requirements of the meltshop.

**Environmental Matters**

Arab Steel is subject to Law 4 of 1994 and its Executive Regulations, which with effect from February 1998 have governed various aspects of land, air and water pollution and, in particular, the discharge of contaminants that may be emitted into the air and discharged into the waterways, and the disposal of solid and/or hazardous waste.

BOWNE OF LONDON    12/01/1999 21:38    BL/SM    CUMULATIVE    NEXT PCN: 060.00.00.00 — Page is valid, no graphics    U41077 059.00.00.00 26X

## Subsidiary Guarantors

In April 1999, Arab Steel completed the installation of a de-dusting plant. Water recycling systems have been incorporated in the various manufacturing processes that require cooling water in order to minimize fresh water intake. Effluent from the mill is delivered for drainage after completing sedimentation treatment. In June 1999, the Egyptian Environmental Affairs Agency issued an environmental compliance certificate. Management believes Arab Steel's meltshop meets applicable Egyptian environmental requirements in all material respects.

### East Port Said Project

Arab Steel estimates that demand from international steel manufacturers for HBI will increase significantly. Currently Egyptian and European demand for HBI is largely met from manufacturers in Iran, Mexico, India, Qatar and Venezuela. In addition to the costs of production, these manufacturers incur additional delivery costs, which, for deliveries to Europe, are estimated to be U.S.$20-25 per ton. A Libyan manufacturer has lower delivery costs to Europe but has limited production capacity.

Arab Steel has identified a site at East Port Said, an industrial zone established in 1997 three kilometers east of Port Said on the Mediterranean coast. This site has access through the port to imported iron ore and access to quantities of water and natural gas used in the production of HBI. Arab Steel has estimated that the position of this site will allow manufacture and sale of HBI to Egyptian and European steel manufacturers at prices, including delivery costs, which will be competitive with the other major exporters to Egypt and Europe.

On August 12, 1997, Arab Steel and Messrs Ramy Lakah and Michel Lakah, as co-founders, established an Egyptian joint stock company, ACIS, with an authorized capital of E£250 million divided into 2.5 million shares of par value E£100 each, all of which are fully paid-in. 1.2 million of these shares are owned by Arab Steel and 1.3 million are owned together by Messrs Ramy and Michel Lakah. Messrs Ramy Lakah and Michel Lakah agreed to transfer all of their shares to Arab Steel for an amount equal to the paid-in par value.

ACIS has been granted an allocation by the new communities authority of East Port Said (a Government entity) over 1 million square meters of land at East Port Said. ACIS has deposited approximately E£2 million with the new communities authority as a downpayment. The acquisition cost for the parcel of land has not yet been finalized with the new communities authority but is expected to be approximately E£6 million. As of December 31, 1998, ACIS had invested a total of approximately E£80 million in respect of feasibility studies, infrastructure for the site and land costs. Arab Steel estimates total project costs will be approximately E£600 million and expects to finance a large portion of the project on a non-recourse finance basis to Arab Steel and other companies in the Lakah Group. ACIS intends to enter into a contract with a construction company to construct, manage and operate an HBI production plant with a capacity to produce approximately 650,000 tons of HBI per annum at the East Port Said site. It is anticipated that approximately 40 per cent. of such HBI production will be purchased by Arab Steel and/or Amitrade to partially meet the raw material requirements of Arab Steel. No assurance can be given that finance can be secured on the basis described above, that the project will be successful or that ACIS will not discontinue the project.

### Indebtedness

On September 29, 1998, Arab Steel issued its E£250,000,000 11 per cent. bonds due 2005. A summary of the main terms and conditions is set out below:

| | |
|---|---|
| Principal Amount: | E£250,000,000 |
| Interest: | 11 per cent. per annum |
| Maturity: | September 29, 2005 |
| Issue Price: | 100 per cent. |
| Issue Date: | September 29, 1998 |
| Guarantee: | Banque du Caire, S.A.E. as to interest and principal. |
| Use of Proceeds: | Reimbursement of debt and funding future expansion plans. |
| Payment of Interest: | Semi annual, each January 1 and July 1, commencing January 1, 1999. |
| Payment and Prepayment: | At maturity, unless accelerated or prepaid at the option of the Lakah Holding Company commencing at the end of the fifth year. Minimum prepayment amount is E£1 million or any multiple thereof. |

Banque du Caire, S.A.E. has secured the Lakah Holding Company's reimbursement obligation with respect to the guarantee by a pledge on 800,000 shares of Medequip and 400,000 shares of TMSE. The Lakah Holding Company has agreed in the Subscription Agreement to procure a release of the pledge from the shares as a condition to the purchase by the Managers of the Bonds.

BOWNE OF LONDON     12/01/1999 21:38     BL/SM     CUMULATIVE     NEXT PCN: 061.00.00.00 -- Page is valid, no graphics     U41077 060.00.00.00 22X

**Subsidiary Guarantors**

As at June 30, 1999, Arab Steel had other outstanding long-term debt, excluding the current portion of long-term debt, of approximately E£250 million (U.S.$74 million) and short-term debt, including the current portion of long-term debt, of approximately E£39 million (U.S.$12 million). Since June 30, 1999, there has been no material change in Arab Steel's indebtedness.

**Capital Expenditure**

Arab Steel's capital expenditures from 1996 to 1998 consisted primarily of costs in respect of:

- the acquisition of real property;

- the acquisition of an electric arc furnace and continuous casting line; and

- its investment in ACIS.

Arab Steel's capital expenditure budget for 1999 is approximately E£19.4 million divided as follows:

|  | Budget Amount E£ (million) |
| --- | --- |
| De-dusting plant | 12 |
| Power station | 7 |
| Others | 0.4 |

**Employees**

As at June 30, 1999, Arab Steel had 352 full-time employees.

**Tax Status**

Arab Steel's location in 10th of Ramadan City entitles it to a ten year tax holiday of which one and a half years have elapsed.

BOWNE OF LONDON    12/01/1999 21:38  HL/SM   CUMULATIVE   NEXT PCN: 073.00.00.00 — Page is valid, no graphics    U41077  072.00.00.00  14X

# Directors and Senior Management

**Directors**

The by-laws of the Lakah Holding Company provide that it will be managed by a Board of Directors consisting of a minimum of three members and a maximum of 15 members ("Directors"). The term of Board membership is initially five years and thereafter three years, subject to renewal. The Board may appoint Directors, including the Chairman, to serve as Managing Directors of the Lakah Holding Company whose duties and responsibilities are determined by the Board.

The members of the Lakah Holding Company's Board of Directors, their principal past affiliations and certain other information are set forth below.

| Name | Age | Position |
|---|---|---|
| Ramy Raymond Lakah[1] | 35 | Chairman & Co-CEO |
| Michel Raymond Lakah[1] | 31 | Vice Chairman & Co-CEO |
| Farouk Hassan[1] | 54 | Board Member & Vice President |
| Ramy Oda Pacha[2] | 35 | Board Member & Senior Executive Vice President |
| Mohamed Khadr[2] | 35 | Board Member & Senior Executive Vice President |
| Medhat Sobhy[2] | 44 | Board Member & Vice President Treasurer |
| Abdel Kader Farid[2] | 49 | Board Member & Vice President Investment |
| Ismail Abdoun[2] | 43 | Board Member & CFO |
| Gamal Anwar El Sadat[2] | 46 | Board Member & Vice President |
| Banque du Caire, S.A.E.[2] represented by Badawi Hassanein | 53 | Board Member |
| Brian Anthony Murphy[2] | 47 | Board Member & Strategic Planning |
| Samy Toutoungi[2] | 39 | Board Member |
| Carl Baker[2] | 50 | Board Member & Investor Relations |

*Notes:*
(1)  *Board appointment effective December 7, 1998*
(2)  *Board appointment effective July 26, 1999*

*Mr. Ramy Raymond Lakah.* Mr. Lakah was chairman of the board of Medequip from its inception in 1984 to 1998. He was born on November 10, 1963.

*Mr. Michel Raymond Lakah.* From 1989 to 1998, Mr. Michel Lakah was vice chairman of Medequip. He was born on May 26, 1968 and in 1989 he received a Bachelor of Arts in Commerce from Ain Shams University.

*Mr. Farouk Hassan.* From 1992 to 1998, Mr. Hassan served as a consultant to Medequip and TSME. He was born on November 14, 1944 and in 1967 he received his B.Sc. in Engineering from Ain Shams University.

*Mr. Ramy Oda Pacha.* From 1997 to 1998, Mr. Oda Pacha was senior executive vice president of TSME and MCMC. He was general manager for TMSE from 1992 to 1997 and served as a board member for TMSE from 1995 to 1997. He was born on November 30, 1963 and in 1986 he received a B.Sc. in Engineering from Ain Shams University.

*Mr. Mohamed Khadr.* From 1997 to 1998, Mr. Khadr was senior executive vice president of Medequip. Prior to that, he was sales manager for Medequip from 1990 to 1997. He was born on November 13, 1963 and in 1986 he received his B.Sc. in Engineering from Ain Shams University.

*Mr. Medhat Sobhy.* From 1977 to 1996, Mr. Sobhy was external auditor for Hanna & Hanna and Wagner & Partners, credit and marketing officer for MAIB Bank, credit & marketing instructor for National Commercial Bank, Saudi Arabia and senior marketing manager for Egyptian American Bank. He was born on August 19, 1954 and in 1976 he received a B.Sc. in Commerce from Ain Shams University.

BOWNE OF LONDON    13/01/1999 21:38    BL/SM    CUMULATIVE    NEXT PCN: 074.00.00.00 -- Page is valid, no graphics    U41077 073.00.00.00 13X

### Directors and Senior Management

**Mr. Abdel Kader Farid.** From 1986 to 1996, Mr. Farid was vice president of ZAS Aviation and from 1975 to 1986 he was cash management & banking supervisor of Mobil Oil Egypt. Mr. Farid was born on March 3, 1950 and in 1973 he received his Bachelor of Arts in Economics and Political Science from Cairo University.

**Mr. Ismail Abdoun.** From 1981 to 1998, Mr. Abdoun was a corporate banking senior manager for Arab African International Bank, a corporate banking manager for Qatar National Bank and marketing deputy director for Egyptian American Bank. He was born on March 3, 1956 and in 1981 he received his Bachelor of Arts in Commerce and Business Administration from Cairo University.

**Mr. Gamal Anwar El Sadat.** From 1980 to 1986, Mr. Sadat served as vice president of Osman Group; from 1986 to 1992, he served as an investment banker with a New York investment bank, Furman Selz; and, from 1992, he served as Vice President and Board member of the Osman Group. He was born November 14, 1956 and received in 1997 his B.Sc. in Engineering from Cairo University.

**Mr. Badawi Hassanein.** Mr. Hassanein is also a member of the board of directors of Banque du Caire, S.A.E. He was born on June 3, 1946 and in 1968 he received his Bachelor of Arts in Commerce from Cairo University.

**Mr. Brian Anthony Murphy.** From 1980 to 1998, Mr. Murphy served as general manager for Siemens Medical Systems Corp. — Middle East and South Africa, and, from 1975 to 1980, he served as technical manager for Siemens Medical Systems Corp. — Ireland. He was born on June 11, 1952 and in 1975 he received his Third Level Electrical Engineering Diploma from Dublin University.

**Mr. Samy Toutoungi.** Since 1998, Mr Toutoungi has served as Vice President and CEO of Medequip. From 1981 to 1998, Mr. Toutoungi served as Sales Manager of Medequip. He was born on September 2, 1959 and in 1981 he received his B.Sc. in Biochemistry from Ain Shams University.

**Mr. Carl Baker.** From 1996 to 1998, Mr. Baker served as vice president for business development of TMSE. Prior to that, from 1993 to 1996, he was international sales manager of Toshiba and, from 1984 to 1993, was a specialist in Toshiba Medical Systems. He was born on December 2, 1949 and in 1974 he received a Ph.D. in Education in Medicine from the University of Oklahoma and in 1975 he received his Ed.D., also in Education in Medicine, from the University of Texas.

The business address of each of the foregoing persons is 68, Merghany Street, Heliopolis, Cairo, Egypt.

### Senior Management

Overall management of the Lakah Holding Company is the responsibility of the Chairman of the Board of Directors of the Lakah Holding Company.

The key executives of the Lakah Holding Company's Subsidiaries are:

| Name | Position |
| --- | --- |
| Samy Toutoungy | President — Medequip |
| Adel El Shourbagy | President — TMSE |
| Hamdy Mansy | President — MCMC |
| Karim Nada | President — Quest |
| Mohamed Dabbah | President — Arab Steel |
| Sherif Fawzi | President — Amitrade |
| Reda Moussa | President — ICC |
| Ahmed El Ashmawi | President — IIC |

### Transactions with Directors

There have not been during the current or immediately preceding fiscal year of the Lakah Holding Company any transactions between the Lakah Holding Company and any Director of the Lakah Holding Company, which were or are unusual in their nature or significant to the business of the Lakah Holding Company, and no such transactions from any prior period remain in any respect outstanding or unperformed. There are no outstanding loans or guarantees granted or provided by the Lakah Holding Company to or for the benefit of any of the Directors.

BOWNE OF LONDON    12/01/1999 21:38    BL/SM    CUMULATIVE    NEXT PCN: 075.00.00.00 -- Page is valid, no graphics    U41077 074.00.00.00 14X

## Directors and Senior Management

### Remuneration

No remuneration was paid to Directors by the Lakah Holding Company for the year ended December 31, 1998. The Lakah Holding Company was incorporated on November 29, 1998. The Lakah Holding Company does not provide for a stock option plan but does provide for payment of bonuses to its employees provided certain targets are exceeded.

### Auditors

The Lakah Holding Company has appointed Cherif Mohamed Hammouda, chartered accountant, a member of RSM International, and Mostafa Shawki & Co Deloitte & Touche to serve as its independent auditors.

BOWNE OF LONDON    12/03/1999 08:35    BL SM   CUMULATIVE   NEXT PCN: 123.00.00.00 -- Page is valid, no graphics    U41077  122.00.00.00  30X

# Index to Financial Statements

|                                                                                           | Page |
|-------------------------------------------------------------------------------------------|------|
| **Annual Financial Statements**                                                           |      |
| LAKAH HOLDING COMPANY                                                                      |      |
| Reports of Auditors                                                                        | F-2  |
| Consolidated Balance Sheet as at December 31, 1998.                                        | F-4  |
| Consolidated Income Statement for the year ending December 31, 1998.                       | F-5  |
| Statement of Cash Flows for the year ended December 31, 1998.                              | F-6  |
| Notes to the Consolidated Financial Statements                                            | F-7  |
| MEDEQUIP                                                                                   |      |
| Report of Auditor                                                                          | F-15 |
| Balance Sheet as at December 31, 1996, 1997 and 1998.                                      | F-16 |
| Income Statement for the periods ended December 31, 1996, 1997 and 1998.                   | F-17 |
| Statement of Cash Flows for the periods ended December 31, 1997 and 1998.                  | F-18 |
| Notes to the Financial Statements                                                         | F-19 |
| TMSE                                                                                       |      |
| Report of Auditor                                                                          | F-22 |
| Balance Sheet as at December 31, 1996, 1997 and 1998.                                      | F-23 |
| Income Statement for the periods ended December 31, 1997 and 1998.                         | F-24 |
| Statement of Cash Flows for the periods ended December 31, 1997 and 1998.                  | F-25 |
| Notes to the Financial Statements                                                         | F-26 |
| ARAB STEEL                                                                                 |      |
| Report of Auditor                                                                          | F-29 |
| Balance Sheet as at December 31, 1996, 1997 and 1998.                                      | F-30 |
| Income Statement for the period ended December 31, 1998.                                   | F-31 |
| Statement of Cash Flows for the periods ended December 31, 1997 and 1998.                  | F-32 |
| Notes to the Financial Statements                                                         | F-33 |
| **Interim Financial Statements**                                                          |      |
| LAKAH HOLDING COMPANY                                                                      |      |
| Reports of Auditors                                                                        | F-36 |
| Consolidated Balance Sheet as at June 30, 1999.                                            | F-38 |
| Consolidated Income Statement for the period from January 1, 1999 to June 30, 1999.        | F-39 |
| Statement of Cash Flows for the period from January 1, 1999 to June 30, 1999.              | F-40 |
| Notes to the Consolidated Financial Statements                                            | F-41 |
| MEDEQUIP                                                                                   |      |
| Report of Auditor                                                                          | F-48 |
| Financial Position as at June 30, 1999.                                                    | F-49 |
| Income Statement for the period from January 1, 1999 to June 30, 1999.                     | F-50 |
| Notes to the Financial Statements                                                         | F-51 |
| TMSE                                                                                       |      |
| Report of Auditor                                                                          | F-55 |
| Financial Position as at June 30, 1999.                                                    | F-56 |
| Income Statement for the period from January 1, 1999 to June 30, 1999.                     | F-57 |
| Notes to the Financial Statements                                                         | F-58 |
| ARAB STEEL                                                                                 |      |
| Report of Auditor                                                                          | F-61 |
| Financial Position as at June 30, 1999.                                                    | F-62 |
| Income Statement for the period from January 1, 1999 to June 30, 1999.                     | F-63 |
| Notes to the Financial Statements                                                         | F-64 |
| **Pro Forma Unaudited Financial Statements**                                              |      |
| LAKAH HOLDING COMPANY                                                                      |      |
| Reports of Accountants                                                                     | F-67 |
| Pro-Forma Consolidated Balance Sheet as at December 31, 1998.                              | F-69 |
| Pro-Forma Consolidated Income Statement for the year ending December 31, 1998.             | F-70 |
| Basis of Preparation                                                                      | F-71 |

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 124.00.00.00 — Page/graphics valid (12/03/1999 08:58)    U41077    123.00.00.00    33X

## Auditor's Report

### Cherif Mohamed Hammouda

**Chartered Accountant**
**Member of RSM International**



To the Board of Directors of Holding Company for Financial Investments (Lakah Group), S.A.E.

We have audited the accompanying consolidated balance sheet of Holding Company for Financial Investments (Lakah Group), S.A.E. and its subsidiaries as at December 31, 1998 and the related consolidated statements of income and cash flows for the year then ended. These consolidated financial statements are the responsibility of the Company's management. It is our responsibility to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with International Auditing Standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the report of the other auditors provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Holding Company for Financial Investments (Lakah Group), S.A.E. as at December 31, 1998, and the results of their operations and their cash flows for the year then ended in conformity with International Accounting Standards and comply with applicable Egyptian laws and regulations.

Cherif Hammouda

FESAA-FIFA-FEST
R.A.A. 14260

9 September, 1999

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 125.00.00.00 — Page/graphics valid (12/03/1999 08:58) U41077  124.00.00.00 29X

## Independent Auditors' Report

## Mostafa Shawki & Co
## Deloitte & Touche

153 Mohamed Farid St.
Bank Mist Tower
P.O. Box 2095
Cairo 11511

Telephone: (02) 391.7299
(02) 392.6000
Facsimile: (02) 393.9430
Email: mshawki@mshawki.com

To the Board of Directors of
The Holding Company for Financial Investments
(Lakah Group),
S.A.E.

We have audited the accompanying consolidated balance sheet of the Holding Company for Financial Investments (Lakah Group), S.A.E. as of December 31, 1998 and the related consolidated statements of income and cash flows for the year then ended. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit. We did not audit the financial statements of the eight subsidiaries explained in Note No. 1 (consolidated subsidiaries) which statements were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to the eight subsidiaries, is based solely on the reports of such other auditors.

We conducted our audit in accordance with International Standards on Auditing. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit and the reports of the other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audit and the reports of the other auditors, such consolidated financial statements present fairly, in all material respects the financial position of the Holding Company for Financial Investments Lakah Group (S.A.E.) as of December 31, 1998 and the results of their operations and their cash flows for the year then ended in conformity with International Accounting Standards and in compliance with applicable Egyptian laws and regulations.

Mostafa Shawki & Co
Deloitte & Touche
27 September, 1999

## Deloitte Touche
## Tohmatsu

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 126.00.00.00 -- Page is valid, no graphics    U41077 125.00.00.00 22X

# HOLDING COMPANY FOR FINANCIAL INVESTMENTS
## (LAKAH GROUP), S.A.E.

### CONSOLIDATED BALANCE SHEET
### as at December 31, 1998

| | Notes | Consolidated L.E. | Consolidated U.S.$ |
|---|---|---|---|
| **Assets** | | | |
| **Current Assets** | | | |
| Cash and Cash Equivalents | (3) | 18,165,619 | 5,342,829 |
| Debtors — Short Term Balances (Net) | (4) | 506,392,231 | 148,938,891 |
| Inventory | (2-4)(5) | 194,697,123 | 57,263,860 |
| Work in progress | | 109,353,565 | 32,162,814 |
| Total Current Assets | | 828,608,538 | 243,708,394 |
| **Long Term Assets** | | | |
| Accounts Receivables — Long Term | (6) | 167,640,320 | 49,305,976 |
| Long Term Investments | (2-5)(7) | 262,135,125 | 77,098,566 |
| Fixed Assets — (Net) | (2-6)(8) | 394,603,343 | 116,059,807 |
| Projects under Construction | (9) | 164,982,129 | 48,524,156 |
| Goodwill | (10) | 248,020,160 | 72,947,106 |
| Deferred Expenses — (Net) | (2-7) | 38,361,296 | 11,282,734 |
| Total Long Term Assets | | 1,275,742,373 | 375,218,345 |
| Total Assets | | 2,104,350,911 | 618,926,739 |
| **Liabilities** | | | |
| **Current Liabilities** | | | |
| Due to Banks | (11) | 171,858,623 | 50,546,654 |
| Current Portion of Long Term Debt | (15) | 36,448,677 | 10,720,199 |
| Creditors Short Term Balances | (12) | 178,828,069 | 52,596,491 |
| Other Credit Balances | (13) | 12,933,747 | 3,804,043 |
| Provisions | (14) | 22,682,664 | 6,671,372 |
| Total Current Liabilities | | 422,751,780 | 124,338,759 |
| **Long Term Liabilities** | | | |
| Long Term Loans | (15) | 224,917,977 | 66,152,346 |
| Bonds | (16) | 250,000,000 | 73,529,412 |
| Creditors-Long Term Balances | (17) | 13,459,153 | 3,958,574 |
| Total Long Term Liabilities | | 488,377,130 | 143,640,332 |
| Minority Interest in Subsidiary Companies | | 43,342,001 | 12,747,648 |
| **Shareholders' Equity** | | | |
| Issued and Paid up Capital | (18) | 1,149,880,000 | 338,200,000 |
| Total Shareholders' Equity | | 1,149,880,000 | 338,200,000 |
| Total Liabilities and Shareholders' Equity | | 2,104,350,911 | 618,926,739 |

*The accompanying notes are an integral part of the financial statements.*
*The auditor's report is attached.*
*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of*
  *U.S.$1.00 = L.E.3.40*

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 127.00.00.00 — Page is valid, no graphics    U41077  126.00.00.00  24X

## HOLDING COMPANY FOR FINANCIAL INVESTMENTS
### (LAKAH GROUP), S.A.E.

### CONSOLIDATED INCOME STATEMENT
#### For the Year Ending December 31, 1998

| | Notes | Consolidated L.E. | Consolidated U.S.$ |
|---|---|---|---|
| Net Sales | | 674,363,025 | 198,342,066 |
| Less | | | |
| Cost of Sales | | (450,768,617) | (132,579,005) |
| Gross Profit | | 223,594,408 | 65,763,061 |
| Less | | | |
| General and Administrative Expenses | | (40,239,567) | (11,835,167) |
| Financing Expenses | | (57,929,846) | (17,038,190) |
| Depreciation and Amortization | | (1,495,703) | (439,913) |
| Foreign Exchange Loss | | (353,010) | (103,826) |
| Provision for Doubtful Debts | | (4,997,615) | (1,469,886) |
| Total Expenses | | (105,015,741) | (30,886,982) |
| Net Profit for the Period before Minority Interest and Income Taxes | | 118,578,667 | 34,876,079 |
| Minority Interest | | (4,368,275) | (1,284,787) |
| Provision for Income Taxes | | (20,980,046) | (6,170,602) |
| Net Profit For The Year | (23) | 93,230,346 | 27,420,690 |
| Earnings per Share | (20) | 0.81 | 0.24 |

*Auditor's report attached.*

*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = LE.3.40*

BOWNE OF LONDON    12/03/1999 08:35    0L/SM    CUMULATIVE    NEXT PCN: 128.00.00.00 -- Page is valid, no graphics    U41077  127.00.00.00 27X

## HOLDING COMPANY FOR FINANCIAL INVESTMENTS
## (LAKAH GROUP), S.A.E.

### STATEMENT OF CASH FLOWS
### For the Year Ending December 31, 1998

| | 12.31.98 L.E. | 12.31.98 U.S.$ |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net Profit before Taxation | 118,578,667 | 34,876,079 |
| Adjustments for | | |
| Depreciation and Amortization | 1,495,703 | 439,912 |
| Provisions | 4,997,615 | 1,469,887 |
| Net Operating Profit before Working Capital Changes | 125,071,985 | 36,785,878 |
| Increase in Inventory | (194,697,123) | (57,263,860) |
| Increase in Work in Progress | (109,353,565) | (32,162,814) |
| Increase in Debtors | (511,389,846) | (150,408,778) |
| Increase in Creditors Short Term | 178,828,069 | 52,596,491 |
| Increase in Other Credit Balances | 12,933,747 | 3,804,043 |
| Increase in Due to Banks | 171,858,623 | 50,546,654 |
| Increase in Accounts Receivable — Long Term | (167,640,320) | (49,305,976) |
| Increase in Provisions | 1,702,618 | 500,770 |
| Net Cash (used in) Operating Activities | (492,685,812) | (144,907,592) |
| **Cash Flows from Investing Activities** | | |
| Purchase of Fixed Assets | (395,748,796) | (116,396,705) |
| Increase in Project Under Construction | (164,982,129) | (48,524,156) |
| Increase in Deferred Expenses | (38,711,546) | (11,385,749) |
| Increase in Long Term Investments | (262,135,125) | (77,098,566) |
| Increase in Goodwill | (341,250,506) | (100,367,796) |
| Net Cash (used in) Investing Activities | (1,202,828,102) | (353,772,971) |
| **Cash Flows from Financing Activities** | | |
| Issue of Share Capital | 1,149,880,000 | 338,200,000 |
| Long Term Loans | 224,917,977 | 66,152,346 |
| Bonds | 250,000,000 | 73,529,412 |
| Minority Interests | 38,973,726 | 11,462,861 |
| Creditors — Long Term Balances | 13,459,153 | 3,958,574 |
| Increase in Current Portion of Long Term Debt | 36,448,677 | 10,720,199 |
| Net Cash Provided by Financing Activities | 1,713,679,533 | 504,023,392 |
| Net Increase in Cash and Cash Equivalents | 18,165,619 | 5,342,829 |
| Cash in Hand and at Banks at the Beginning of Year | — | — |
| Cash in Hand and at Banks at the End of Year | 18,165,619 | 5,342,829 |

*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of U.S.$1.00 = LE. 3.40*

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 129.00.00.00 -- Page is valid, no graphics    U41077  L28.00.00.00 26X

**Holding Company for Financial Investments (Lakah Group), S.A.E.**

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
### For the Year Ended December 31, 1998

### 1 — The Company

The Holding Company for Financial Investments (Lakah Group), S.A.E. was incorporated in Egypt on November 29, 1998 under Law 95 of 1992 and its regulations. The purpose of the company is to participate in the formation of companies using securities, or increasing their capital. The company is allowed to form or join with other companies operating in any business field, and companies that help such companies achieve their target, inside or outside Egypt. Also the company is allowed to merge with or acquire existing companies according to the company's operating procedures. The company's first legal financial statements are to be prepared for the period from November 29, 1998 to December 31, 1999.

At December 31, 1998, the Holding Company for Financial Investments (Lakah Group), S.A.E., hereunder called the "Parent Company" owns the following consolidated subsidiaries:

|  | % of Shares |
| --- | --- |
| Trading Medical Systems Egypt, S.A.E. | 97.60% |
| Medequip for Trading and Contracting, S.A.E. | 97.80% |
| Amitrade for Trading and Contracting, S.A.E. | 97.02% |
| Industrial Investment Company S.A.E. | 97.98% |
| Scandinavian for Investment and Touristic Development, L.t.d | 97.98% |
| Arab Steel Factory, S.A.E. | 97.92% |
| American Company for Marketing, S.A.E. | 97.95% |
| Quest Consult, S.A.E. | 97.46% |
| Medical Centers Management — S.A.E. | 97.98% |

### 2 — Significant Accounting Policies

The significant accounting policies adopted in the preparation of the consolidated financial statements are set out below.

### 2 — 1 Foreign Currency Translation

The subsidiaries' accounts are maintained in Egyptian pounds. Transactions denominated in foreign currencies were translated using the prevailing exchange rates as at December 31, 1998 declared by the free foreign exchange market. At the balance sheet date, assets and liabilities denominated in foreign currencies are translated at the exchange rates prevailing at that date. The exchange differences are recorded in the income statement.

### 2 — 2 Basis of preparing the financial statements

The financial statements of the subsidiary companies are prepared according to the Egyptian Accounting Standards. The consolidated financial statements are prepared according to the International Accounting Standards. The Parent Company's financial statements include the balances of assets and liabilities of the nine companies as at December 31, 1998, as well as sales, cost of sales and operating expenses for the period from January 1, 1998 to December 31, 1998, except for the American Company for Marketing which capitalized all expenses, listed as Deferred Expenses in the financial statements.

### 2 — 3 Principles of Consolidation

The consolidated financial statements include all subsidiaries controlled by the Parent Company.

The basis of the consolidation is as follows:

- All intragroup balances and transactions are eliminated.

- Minority Interest represents equity held by other shareholders in subsidiary companies controlled by the parent company. It appears as a separate item in the consolidated financial statements and is calculated as net assets and results of operations of subsidiaries attributable to interest, which are not owned, directly or indirectly by the parent company.

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 130.00.00.00 — Page is valid, no graphics    U41077  129.00.00.00 23X

**Holding Company for Financial Investments (Lakah Group), S.A.E.**

- The cost of acquisition is allocated as follows:

  (a)  The fair value of the assets and liabilities acquired as at the date of the exchange to the extent of the Parent Company's interest obtained in the exchange transactions.

  (b)  The excess of the cost of acquisition over the Parent Company's interest in the fair value of the identifiable assets and liabilities acquired as at the date of acquisition is recognized as goodwill and amortized over a period of 20 years starting from January 1, 1999.

  (c)  The excess of the Parent Company's interest in the fair value of the identifiable assets and liabilities at the date of acquisition over the acquisition cost is recognized as a negative goodwill and amortized over a period of 20 years starting from January 1, 1999.

  (d)  Affiliates of subsidiary companies owned by more than 50 per cent. and controlled by the subsidiaries are consolidated on the same basis.

**2 — 4 Inventories**
Inventories of raw material, spare parts and supplies are stated at cost. Inventories of finished goods are stated at the lower of cost and net realizable value. Cost is determined by using the average cost method.

**2 — 5 Long-Term Investments**
Long-Term Investments in companies, which are not controlled by the Parent Company, are recorded at actual cost at the date of acquisition.

**2 — 6 Fixed Assets and Depreciation**
Fixed Assets are recorded at the historical cost and are depreciated by using the straight-line method over the estimated productive life for each type of asset at the following annual rates:

| Assets | Annual Rates |
| --- | --- |
| Buildings and Construction | 2.5% – 10% |
| Machinery and Equipment | 5% – 10% |
| Vehicles | 20% – 25% |
| Tools and Supplies | 10% – 20% |
| Furniture and Office Equipment | 10% – 25% |

**2 — 7 Deferred Expenses**
Deferred Expenses represent corporate establishment and pre-operating expenses. These expenses are amortized using the straight-line method over a five-year period (20 per cent.) starting from the first financial year.

**2 — 8 Cash Flow Statement**
Cash Flow Statement is prepared using the indirect method.

**2 — 9 Taxation**
A tax provision is formed to meet tax obligations based on detailed studies for each claim. Due to the nature of the Egyptian tax laws and legislation, applying the principles of the deferred taxes, according to the International Accounting Standards "Taxes on Income", will not usually result in any material deferred tax liabilities. Further, if the application results in deferred tax, assets will be recognized in the financial statements whenever there is a sufficient assurance that these assets will be realized in the foreseeable future.

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 131.00.00.00 – Page is valid, no graphics    U41077  130.00.00.00  24X

**Holding Company for Financial Investments (Lakah Group), S.A.E.**

### 3 — Cash and Cash Equivalents

Cash and Cash Equivalents as at December 31, 1998 amounting to L.E.18,165,619 represent the following:

|  | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Banks Current Accounts — L.E. | 7,286,630 | 2,143,126 |
| Banks Current Accounts — U.S.$ | 365,578 | 107,523 |
| Cash in Hand | 3,685,317 | 1,083,917 |
| Bank Deposit | 4,684,000 | 1,377,647 |
| Letters of Guarantee (Cash Margins) | 2,144,094 | 630,616 |
|  | 18,165,619 | 5,342,829 |

### 4 — Debtors — Short Term Balances

Debtors Short Term Balances as at December 31, 1998 amounting to L.E.506,392,231 represented the following:

|  | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Letters of Credit | 51,216 | 15,064 |
| Accounts Receivables | 163,926,633 | 48,213,716 |
| Lease Receivables | 27,704,392 | 8,148,351 |
| Tax Authority | 626,908 | 184,384 |
| Debtors | 86,413,790 | 25,415,821 |
| Guarantee Deposits | 63,000,000 | 18,529,412 |
| Suppliers Debit Balances | 102,821,830 | 30,241,715 |
| Letters of Guarantee | 4,674,776 | 1,374,934 |
| Other Debit Balances | 62,475,301 | 18,375,087 |
|  | 511,694,846 | 150,498,484 |
| Less — Provision for Doubtful Debts | (5,302,615) | (1,559,593) |
|  | 506,392,231 | 148,938,891 |

### 5 — Inventory

Inventory balance as at December 31, 1998 amounting to L.E.194,697,123 represented the following:

|  | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Raw-Material and Scrap | 137,187,544 | 40,349,278 |
| Supplies | 1,279,325 | 376,272 |
| Space Parts | 14,198,246 | 4,175,955 |
| Packing Materials | 78,335 | 23,040 |
| Work in Progress | 163,361 | 48,047 |
| Finished Goods | 41,790,312 | 12,291,268 |
|  | 194,697,123 | 57,263,860 |

### 6 — Accounts Receivables — Long Term

Accounts Receivables — Long Term represent Lease Receivables for Medical Equipment amounting to L.E.167,640,320 for more than one year. An additional portion, due in 1999 amounting to L.E.27,704,392 are included in the current assets under Debtors Short-Term Balances.

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 132.00.00.00 -- Page is valid, no graphics    U41077 i31.00.00.00 23X

**Holding Company for Financial Investments (Lakah Group), S.A.E.**

### 7 — Long Term Investments

Long Term Investments balance as at December 31, 1998 amounting to L.E.262,135,125 represents the following:

| | Investment Ratio % | 1998 L.E. | 1998 U.S.$ |
|---|---|---|---|
| **Associated Companies:** | | | |
| First Power — *Egyptian Joint Stock Co.* | 50% | 1,250,000 | 367,647 |
| Irena for Art Production — *Egyptian Joint Stock Co.* | 50% | 62,500 | 18,382 |
| House of Art — *Egyptian Joint Stock Co.* | 60% | 75,000 | 22,059 |
| Suez Company for Iron Works — *Egyptian Joint Stock Co.* | 50% | 54,722,625 | 16,094,890 |
| Total Associated Companies | | 56,110,125 | 16,502,978 |
| **Other Companies:** | | | |
| Delta Sound Company — *Egyptian Joint Stock Co.* | 40% | 25,000 | 7,353 |
| International Co. for Touristic and Real Estate — *Egyptian Joint Stock Co.* | 10% | 1,000,000 | 294,118 |
| Arab Cast Iron & Steel products Factory — *Egyptian Joint Stock Co.* | 49% | 124,000,000 | 36,470,588 |
| Total Other Companies | 100% | 125,025,000 | 36,772,059 |
| Detergent Factory — Industrial Investment Company — *Egyptian Joint Stock Co.* * | | 81,000,000 | 23,823,529 |
| Grand Total | | 262,135,125 | 77,098,566 |

\* *The factory is rented to a third party (Newlit)*

### 8 — Fixed Assets (Net)

Fixed Assets (Net) as at December 31, 1998 amounting to L.E.394,603,343 comprise the following:

| | Cost at 12.31.98 L.E. | Accumulated Depreciation till 12.31.98 L.E. | Net Book Value As of 12.31.98 L.E. | Net Book Value As of 12.31.98 U.S.$ |
|---|---|---|---|---|
| Land | 139,067,556 | — | 139,067,556 | 40,902,222 |
| Buildings and Construction | 44,938,399 | 1,992,054 | 42,946,345 | 12,631,278 |
| Machinery and Equipment | 199,462,363 | 16,165,705 | 183,296,658 | 53,910,783 |
| Tools and Supplies | 422,363 | 32,152 | 390,211 | 114,768 |
| Furniture and Office Equipment | 4,936,902 | 1,344,971 | 3,591,931 | 1,056,450 |
| Vehicles | 32,163,858 | 6,853,216 | 25,310,642 | 7,444,306 |
| Total | 420,991,441 | 26,388,098 | 394,603,343 | 116,059,807 |

### 9 — Projects Under Construction

Projects Under Construction as at December 31, 1998 amounting to L.E.164,982,129 represent the costs incurred for developing projects that are still under progress at the financial statements date, which comprises the following projects:

| | L.E. | U.S.$ |
|---|---|---|
| Lamp Production Line — American Company for Marketing | 13,349,586 | 3,926,349 |
| Acryline Factory — Quest Consult | 24,750,476 | 7,279,552 |
| Back House — Arab Steel Factory | 18,219,188 | 5,358,585 |
| Swiss Hotel (Sharm El-Sheikh — Construction) — Scandinavian | 17,085,550 | 5,025,162 |
| Swiss Hotel (Sharm El-Sheikh — Infrastructure) — Scandinavian | 11,390,368 | 3,350,108 |
| Packing Area and Service Centers — Universal High Load Trucking | 80,186,961 | 23,584,400 |
| | 164,982,129 | 48,524,156 |

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 133.00.00.00 -- Page is valid, no graphics    U41077 132.00.00.00 18X

**Holding Company for Financial Investments (Lakah Group), S.A.E.**

**10 — Goodwill**

Goodwill, net of negative goodwill, amounting to L.E.248,020,160 resulted from the acquisition of several percentages of the Parent Company subsidiaries, which comprises the following:

|  | L.E. | U.S.$ |
|---|---|---|
| Arab Steel Factory | 202,338,200 | 59,511,235 |
| Industrial Consumer Company | 32,734 | 9,628 |
| Amitrade for Commerce & Contracting | (6,269,546) | (1,843,984) |
| Quest Consult | (9,100,977) | (2,676,758) |
| Industrial Investment Company | (9,137,143) | (2,687,396) |
| Medical Centers Management | (1,587,193) | (466,821) |
| Scandinavian for Investment and Touristic Development | (7,207,846) | (2,119,955) |
| Trading Medical Systems | 23,626,136 | 6,948,864 |
| Medequip for Trading and Contracting | 55,325,795 | 16,272,293 |
|  | 248,020,160 | 72,947,106 |

**11 — Due to Banks**

Due to Banks balance as at December 31, 1998 amounting to L.E.171,858,623 represents the following:

|  | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Bank Overdrafts | 34,604,719 | 10,177,858 |
| Islamic Banks Morabhat | 34,764,234 | 10,224,775 |
| Banks Refinance of Letters of Credit | 102,489,670 | 30,144,021 |
|  | 171,858,623 | 50,546,654 |

**12 — Creditors — Short Term Balances**

Creditors — Short Term Balances as at December 31, 1998 amounting to L.E.178,828,069 represent the following:

|  | 1998 L.E. | 1998 U.S.$ |
|---|---|---|
| Notes Payable | 10,695,641 | 3,145,777 |
| Creditors | 30,155,583 | 8,869,289 |
| Accounts Payable | 97,157,194 | 28,575,645 |
| Other Credit Balances | 40,819,651 | 12,005,780 |
|  | 178,828,069 | 52,596,491 |

**13 — Other Credit Balances**

Other Credit Balances as at December 31, 1998 amounting to L.E.12,933,747 comprise the following:

|  | L.E. | U.S.$ |
|---|---|---|
| Current Account — Scandinavian for Investment and Touristic Development | 4,933,747 | 1,451,102 |
| Partners Loans (Non-Interest Bearing) — Scandinavian for Investment and Touristic Development | 8,000,000 | 2,352,941 |
|  | 12,933,747 | 3,804,043 |

**14 — Provisions**

Provisions amounting to L.E.22,682,664 are for corporate tax and against other tax claims.

BOARD OF LONDON    12/03/1999 08:35    BL/SM   CUMULATIVE   NEXT PCN: 134,00,00,00 -- Page is valid, no graphics    U41077  133.00.00.00  21 X

**Holding Company for Financial Investments (Lakah Group), S.A.E.**

**15 — Long Term Loans**

The subsidiaries have obtained loan facilities from various lending institutions. Total amounts, as reported in the consolidated balance sheet as at December 31, 1998, are L.E.36,448,677 in the form of Short Term Loans and L.E. 224,917,977 in the form of Long Term loans as follows:

| Notes | Amount Of Outstanding Long Term Portion | Interest Rates | Currency | Lending Institution | Company |
|---|---|---|---|---|---|
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 60 months) | 28,828,211 | 1% over LIBOR 0.75% Commission on Highly Debit Balance Monthly Charged | USD | Banque du Caire | Medequip For Trading & Contracting |
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 60 months) | 1,561,781 | 13.50% 0.75% Commission on Highly Debit Balance Monthly Charged | L.E. | Banque du Caire | Medequip For Trading & Contracting |
| Assignment of proceeds for contracts exceeding one year | 81,687,396 | 12.50% 0.1% Commission on Highly Debit Balance Monthly Charged | L.E. | National Bank of Egypt | Medequip For Trading & Contracting |
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 6 year) | 22,620,163 | 0.75% over LIBOR 0.1% Commission on Highly Debit Balance Monthly Charged | USD | National Bank of Egypt | Medequip For Trading & Contracting |
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 60 months) | 5,911,632 | 12.50% 0.6% Commission on Highly Debit Balance Monthly Charged | L.E. | Egyptian British Bank | Medequip For Trading & Contracting |
| Pledge of medical equipment insurance of 120% endorsement of promissory notes (Maturity 60 months) | 5,185,520 | LE 11% and or 1% over LIBOR 0.6% Commission on Highly Debit Balance Monthly Charged | USD or L.E. | Arab African Bank | Medequip For Trading & Contracting |
| Subtotal........................................ | 145,794,703 | | | | |
| Pledge of medical equipment insurance of 120% Endorsement of promissary notes | 10,022,219 | 12.25% 0.75% Commission on Highly Debit Balance Monthly Charged | L.E | Banque du Caire | Trading Medical Systems |
| Term Loan To finance receivables with maturity Up To 1 Year Up To 2 Years Up To 3 Years | 1,820,546 | LE 12% and or 1.5% Over Libor 1.35% Commission on Highly Debit Balance Monthly Charged | USD or L.E. | Export Development Bank of Egypt | Trading Medical Systems |
| Pledge of medical equipment insurance of 120% Endorsement of promissory notes (Maturity 60 months) | 4,566,732 | LE 11% and or 1% Over LIBOR 0.6% Commission on Highly Debit Balance Monthly Charged | USD or L.E. | Arab African Bank | Trading Medical Systems |
| Subtotal.................................... | 16,409,497 | | | | |
| Mortgage of Real Estate | 12,033,170 | 15% | LE | Arab Land Bank | Empian For Real Estate Investment |
| | 5,928,398 | 15% | LE | Arab Land Bank | |
| Subtotal.................................... | 17,961,568 | | | | |

BOWNE OF LONDON    18bp 1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 135.00.00.00 — Page is valid, no graphics    U41077  134.00.00.00 21X

**Holding Company for Financial Investments (Lakah Group), S.A.E.**

| Notes | Amount Of Outstanding Long Term Portion | Interest Rates | Currency | Lending Institution | Company |
|---|---|---|---|---|---|
| Loan U.S.S 8,072,887 with an international bank for a term of 7.5 years including 2.5 years grace period Payable in semi-annual installments starting from December 2000. | 27,447,816 | 1.5% over LIBOR Commission 0.6% P.A. 0.6% Commission on Highly Debit Balance Monthly Charged 50,000 LE./P.A Yearly Management Fee | USD | Misr Iran Bank Syndicate: 1-Misr Iean Bank 2-MIBank 3-Cairo Barclays 4-Arab International Bank 5-Delta Bank 6-Arab Bank 7-Arab International Bank | Scandanavian for Touristic and Real Estate Investment |
| Subtotal............................ | 27,447,816 | | | | |
| Unsecured Loan ................. | 4,667,603 | 13% | L.E. | Banque du Caire | Arab Steel Factory |
| Subtotal............................ | 4,667,603 | | | | |
| Pledge on Machinery................ | 8,918,841 | 13% | L.E. | Banque du Caire | American Company for Marketing |
| Subtotal............................ | 8,918,841 | | | | |
| 5 Years Term Loan ................. | 3,717,949 | 14% | L.E. | Egyptian British Bank | Universal Trucking Company |
| Subtotal............................ | 3,717,949 | | | | |
| Total ................................ | 224,917,977 | | | | |

The current portion of the above-mentioned long-term loans has reached L.E.36,448,677 and is included under separate caption in the balance sheet (current portion of long term debt).

**16 — Bonds**

Bonds amounting to L.E.250,000,000 were issued by Arab Steel Factory S.A.E. These bonds are non-convertible into marketable common stock, and they hold a fixed annual interest rate of 11 per cent. The subscription period started in July 1998 for 7 years.

**17 — Creditors — Long Term Balances**

Creditors — Long Term Balances as at December 31, 1998 amounting to L.E.13,459,153 comprise the following:

| | L.E. | U.S.S |
|---|---|---|
| Sales Tax on Capital Machinery and Equipment — Arab Steel Factory S.A.E ................ | 2,819,015 | 829,122 |
| Long Term Notes Payable — International High Load Trucking S.A.E................ | 10,640,138 | 3,129,452 |
| | 13,459,153 | 3,958,574 |

BOWNE OF LONDON     12/03/1999 08:35     BL/SM     CUMULATIVE     NEXT PCN: 136.00.00.00 -- Page is valid, no graphics     U41077 135.00.00.00 24X

**Holding Company for Financial Investments (Lakah Group), S.A.E.**

### 18 — Issued & Paid-Up Capital

The authorized capital amounts to L.E. 5,000,000,000. The subscribed, issued and paid-up capital amounting to L.E. 1,149,880,000 is divided into 114,988,000 shares at a par value of L.E. 10 each as follows:

| Name of Shareholders | % of Participation | No. of Shares | Amount in L.E. |
|---|---|---|---|
| a) Founders: | | | |
| Ramy Lakah | 0.33% | 1,000 | 10,000 |
| Michel Lakah | 0.33% | 1,000 | 10,000 |
| Farouk Abdel Samei | 0.16% | 500 | 5,000 |
| b) Subscribers: | | | |
| Ramy Lakah | 49.59% | 57,492,750 | 574,927,500 |
| Michel Lakah | 39.59% | 45,993,950 | 459,939,500 |
| Banque du Caire | 10.00% | 11,498,800 | 114,988,000 |
| | 100.00% | 114,988,000 | 1,149,880,000 |

### 19 — Commitments and Contingent Liabilities

Letters of Guarantee issued by banks for the Group's accounts in favor of others as at December 31,1998 amounted to L.E. 55 million with a cash margin of L.E. 2,144,094

### 20 — Earnings Per Share

Earnings per Share are calculated as follows:

| | L.E. | U.S.$ |
|---|---|---|
| Net Profit for the year | 93,230,346 | 27,420,690 |
| Number of Shares | 114,988,000 | 114,988,000 |
| Earnings per Share | 0.81 | 0.24 |

### 21 — Subsidiary Companies

The financial statements of Industrial Investment Company S.A.E. are consolidated with those of Universal High Load Trucking S.A.E in which Industrial Investment Company S.A.E. owns a majority holding share exceeding 77.49 per cent.

### 22 — Subsequent Events

As at the Balance Sheet date, subsequent events comprise the sale of Financial Long-Term Investments in full on June 15, 1999, which were included in the Long-Term Investment account of one of the subsidiary companies (Industrial Investment Company S.A.E.) analyzed as follows:

| Description | No. of Shares | Sale Price/Share L.E. | Total L.E. |
|---|---|---|---|
| Investment in Irena for Art Production Company | 2,500 | 25 | 62,500 |
| Investment in Delta Sound Company | 1,000 | 25 | 25,000 |
| Investment in House of Art Company | 3,000 | 25 | 75,000 |
| | | | 162,500 |

### 23 — Net Profit for the Year

The Profit for the year amounting to L.E. 93,230,346 (U.S.$ 27,420,690) was directly credited to the Goodwill as it represents the net results of operations of the eight subsidiaries before acquisition.

BOWNE OF LONDON    12/03/1999 08:35    BL/SM    CUMULATIVE    NEXT PCN: 137.00.00.00 — Page/graphics valid (12/03/1999 08:50)    U41077    136.00.00.00    27X

## Auditor's Report

**Cherif Mohamed Hammouda**

**Chartered Accountant**

**Member of RSM International**



To the shareholders of Medequip for Trading and Contracting, S.A.E.

We have audited the financial statements of Medequip for Trading and Contracting, S.A.E. which comprise the balance sheets as at December 31, 1996, 1997 and 1998 and the income statements for the periods ended December 31, 1996, 1997 and 1998 and the statement of cash flows for the periods ended December 31, 1997 and 1998. These financial statements are the responsibility of the company's management. It is our responsibility to express an opinion on these financial statements, based on our audit.

We conducted our audit in accordance with International Standards on Auditing. Such standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the position of Medequip for Trading and Contracting, S.A.E. as at December 31, 1996, 1997 and 1998 and the results of its operations and its cash flows for the years then ended in conformity with Egyptian Accounting Standards and comply with applicable Egyptian laws and regulations.

We obtained all data and explanations which we deemed necessary for our audit. Our audit provides us with reasonable assurance that during the year, the Company's accounting records were maintained as required by law and the statute of the company and are in agreement with the accompanying financial statements.

Cherif Hammouda

FESAA-FIFA-FEST
R.A.A. 14260

9 September, 1999

BOWNE OF LONDON   12/03/1999 08:35   BL/SM   CUMULATIVE   NEXT PCN: 138.00.00.00 — Page is valid, no graphics   U41077  137.00.00.00 22X

## MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.

### BALANCE SHEET
### as at December 31, 1996, 1997 and 1998

| | Notes | 12.31.98 U.S.$ | 12.31.98 L.E. | 12.31.97 L.E. | 12.31.96 L.E. |
|---|---|---|---|---|---|
| **Long Term Assets** | | | | | |
| Fixed Assets (Net) | (2A,3) | 1,142,696 | 3,885,167 | 3,714,060 | 863,005 |
| Deferred Expenses (Net) | | 775,565 | 2,636,922 | 3,405,998 | |
| Investment in Marketable Securities | | 1,570,929 | 5,341,160 | 3,113,400 | 8,179,895 |
| Lease Receivables | | 29,064,284 | 98,818,566 | 40,054,305 | |
| Total Long Term Assets | | 32,553,475 | 110,681,815 | 50,287,763 | 9,042,900 |
| **Current Assets** | | | | | |
| Inventory | (2B) | 20,253,560 | 68,862,103 | 24,376,653 | 22,607,824 |
| Work in Progress | | 19,930,377 | 67,763,280 | 36,244,927 | 22,457,182 |
| Accounts Receivables | (4) | 8,004,508 | 27,215,327 | 13,250,477 | 29,072,413 |
| Lease Receivables | (5) | 4,418,056 | 15,021,392 | 5,722,044 | — |
| Debtors — Short Term Balances | (6) | 6,960,779 | 23,666,648 | 18,018,847 | 34,066,555 |
| Advance Payment to Suppliers | | 7,837,933 | 26,648,971 | 18,560,478 | 58,478,969 |
| Letters of Credit | | — | — | — | 4,665,769 |
| Cash in Hand and at Banks | (7) | 1,295,304 | 4,404,033 | 4,423,541 | 38,651,709 |
| Total Current Assets | | 68,700,516 | 233,581,755 | 120,596,967 | 210,000,421 |
| Total Assets | | 101,253,991 | 344,263,570 | 170,884,730 | 219,043,321 |
| **Current Liabilities** | | | | | |
| Due to Banks | (8) | 2,752,062 | 9,357,010 | 15,131,577 | 12,798,434 |
| Current Portion of Long Term Loans | | 10,720,199 | 36,448,677 | | |
| Accounts Payable | | 2,755,973 | 9,370,309 | 13,552,275 | 120,889,740 |
| Notes Payable | | — | — | — | 114,967 |
| Provisions | (9) | 2,881,126 | 9,795,829 | 6,251,044 | |
| Creditors — Short Term Balances | | 2,783,363 | 9,463,432 | 11,762,271 | 357,733 |
| Total Current Liabilities | | 21,892,723 | 74,435,257 | 46,697,167 | 134,160,874 |
| Working Capital | | 46,807,794 | 159,146,498 | 73,899,800 | 75,839,547 |
| Total Investments | | 79,361,269 | 269,828,313 | 124,187,563 | 84,882,447 |
| **Shareholder's Equity** | | | | | |
| Issued and Paid-Up Capital | (10) | 29,411,765 | 100,000,000 | 20,000,000 | 20,000,000 |
| Legal Reserve | | 353,436 | 1,201,681 | | |
| Retained Earnings | | 6,715,273 | 22,831,929 | 4,187,563 | 84,553 |
| Total Shareholder's Equity | | 36,480,474 | 124,033,610 | 24,187,563 | 20,084,553 |
| **Long Term Liabilities** | | | | | |
| Loans | | — | — | — | — |
| Long Term Loans | | 42,880,795 | 145,794,703 | 100,000,000 | 64,797,894 |
| Total Long Term Liabilities | | 42,880,795 | 145,794,703 | 100,000,000 | 64,797,894 |
| Total Liabilities and Shareholder's Equity | | 101,253,991 | 344,263,570 | 170,884,730 | 219,043,321 |
| Total Finance of Working Capital and Long Term Assets | | 79,361,269 | 269,828,313 | 124,187,563 | 84,882,447 |

*The accompanying notes are an integral part of the financial statements.*
*The auditor's report is attached.*
Note: *Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of*
*U.S.$1.00 = L.E.3.40.*

BOWNE OF LONDON    12/03/14:55    BL/SM    CUMULATIVE    NEXT PCN: 139.00.00.00 — Page is valid, no graphics    U41077 138.00.00.00 26X

**MEDEQUIP FOR TRADING AND CONTRACTING, S.A.E.
(LAKAH GROUP), S.A.E.**

**INCOME STATEMENT**
**for the periods ended December 1996, 1997 and 1998**

| | Notes | 12.31.1998 U.S.$ | 12.31.1998 L.E. | 12.31.1997 L.E. | 12.31.1996 L.E. |
|---|---|---|---|---|---|
| Sales | | 74,557,922 | 253,496,936 | 200,968,717 | 170,327,137 |
| Excess Leasing Amortization Cost of Sales | | (54,777,963) | (186,245,073) | (163,418,676) | (161,706,251) |
| Gross Profit | | 19,779,960 | 67,251,863 | 37,550,041 | 8,620,886 |
| **Add** | | | | | |
| Other Income | | 332,163 | 1,129,355 | 228,882 | 225,290 |
| Maintenance Revenue | | 641,149 | 2,179,905 | 284,261 | — |
| | | 20,753,272 | 70,561,123 | 38,063,184 | 8,846,176 |
| **Less** | | | | | |
| General and Administrative Expenses | | (7,642,277) | (25,983,742) | (21,828,801) | (3,366,463) |
| Financing Expenses | | (4,330,428) | (14,723,456) | (8,165,227) | (4,326,062) |
| Provisions for Doubtful Accounts | | (682,678) | (2,321,106) | (980,537) | — |
| Foreign Exchange Differences | | (62,367) | (212,049) | (36,202) | (30,733) |
| Total Expenses | | 12,717,751 | 43,240,353 | 31,010,767 | 7,723,258 |
| Net Profit before Tax | | 8,035,521 | 27,320,770 | 7,052,417 | 1,122,918 |
| Income Tax Provision | | 2,198,448 | 7,474,723 | 2,949,407 | — |
| Net Profit after Tax | | 5,837,073 | 19,846,047 | 4,103,010 | 1,122,918 |

*The accompanying notes are an integral part of the financial statements.*
*The auditor's report is attached.*
*Note: Solely for the convenience of the reader, the translation of Egyptian pounds into U.S. Dollars has been made at the rate of*
*U.S.$1.00 = L.E.3.40.*