Exhibit F

896594896594

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In the Matter of the Application of                    07-CV-2799

RAMY LAKAH and MICHEL LAKAH,                    **REPLY DECLARATION
                                                OF BRIAN MURPHY**

                           Petitioners,

              -against-

for a judgment pursuant to Article 75 of the
C.P.L.R. staying the arbitration commenced by

UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING
CORPORATION, NATIONAL BANK OF ABU
DHABI and NATIONAL BANK OF OMAN,

                       Respondents.

-------------------------------------------------------x

Brian Murphy, declares:

1.      I was a member of the Board of The Holding Company for Financial Investments ("Lakah Group") ("HCFI"). I acted as a consultant to HCFI from 1998 to 2001, when I ceased being a Board member. I have detailed knowledge of HCFI's capitalization, management and finances as well as its operational and corporate procedures. I helped put these procedures in place and I helped supervise HCFI's and its subsidiaries' compliance with same. I was also directly involved in the FITCH IBCA's ratings for the HCFI's Global Depository Reserve and the Eurobond that is the subject of underlying arbitration.    In a comprehensive review of all our companies by PriceWaterhouseCoopers (London) ("PWC"), after HCFI was unable to make certain coupon payments to respondents.

1

2.    I submit this reply declaration in support of the application of Ramy Lakah and Michel Lakah to obtain an order staying the arbitration that respondents (claimants in the underlying arbitration) have filed against them. Specifically, I make this declaration to describe: (1)  the capital condition of HCFI and the companies under its holding company umbrella, (2)  the transparency of HCFI's capital structure and (3)  how and why HCFI decided to sell certain assets of one of the HCFI subsidiaries, Arab Steel Factory, S.A.E. ("ASF") (and why doing so was permitted, under the relevant documents).  I write also to (4) explain certain aspects of the early trading of ASF, Medequip for Trading, S.A.E., and Trading Medical Systems Egypt, S.A.E. ("TMSE"), which  respondents mis-state,  (5) correct misrepresentations respondents have made regarding the reasons Ramy Lakah and Michel Lakah left Egypt  (6)  explain why they are disinclined to  return to Egypt (7) to correct certain misrepresentations respondents make in their papers regarding Ramy Lakah and (8)  state the facts under which the Draeger representation was terminated.

## My Background with the HCFI Companies

3.    I worked for twenty three years with Siemens Medical Engineering Group-Germany, a global leader, manufacturing and supplying high technology medical systems.  My responsibilities included the setup and management of Siemens Medical Engineering Group operations throughout the Middle East, and North  and South Africa.  I was a member of the planning and oversight committee responsible for restructuring all Siemens Medical Engineering operations throughout Europe, the Middle East and Africa in close liaison with Boston Consult.

4.    In 1996, I retired from Siemens to become an independent consultant primarily involved in   the field of Healthcare and business management and primarily involved in Business Process Engineering.  I lived in the Middle East for twenty six years.

5.    I have known Mr. Ramy Lakah since 1990.  I met him when I was living in Egypt and responsible for Siemens Medical Engineering activities in Egypt and Sudan.

**My Responsibilities Regarding HCFI Formalities and Business Structure**

6.    In 1997, the   Lakahs retained me   to advise them and their companies regarding   the development of their Toshiba healthcare business ("TMSE").

7.    As a result of the rapid growth of the Lakah's healthcare operations, it was necessary to restructure their business and  business processes, which I oversaw.

8.    In 1998, I was responsible for overseeing all the HCFI companies and I was appointed to HCFI's board with the particular role of coordinating strategic planning for them.

9.    My duties, for each company, included, among other things:

- Review of each company's profile to assure it was consistent with its individual business model and adequate, at both a business and financial level, to achieve its business goals.

- Review of all existing organizational structures for HCFI and all its subsidiaries, to formulate and recommend improvements to bring the companies within modern Western business standards and, upon board approval, to help implement, with each company's individual management, changes to organization structures.

Case 1:07-cv-02799-MGC     Document 18     Filed 07/09/2007     Page 4 of 46

- Establish human resource procedures and regulations for each company.

- Introduce company handbooks, for each entity.

- Review all existing business processes, formulate possible improvements and upon board approval, implement, together with the company management, the necessary changes.

10.     I undertook the above tasks for each HCFI subsidiary and established the following formalities and business procedures for each of them:

- Updated signature protocols were put in place, consistent with each company's organizational structure, enabling efficient execution of each subsidiary's business processes without involvement of high level HCFI management.

- Each company engaged in its own business, pursuant to these protocols, without substantial intrusion or oversight by HCFI senior managers.

- Job function guidelines were established for each function within each company and, under these guidelines, each employee was empowered to act, within the framework of the signature protocol, without the need for HCFI management engagement. This was the case at all subsidiary entities.

- Employees at the subsidiary companies acted, pursuant to these guidelines, with very substantial discretion and freedom from top down intrusion of senior HCFI managers.

11.     Attached under Ex. MU_1, MU_2 are copies of company handbooks for two of the companies which show company profiles, organization structures, human resource profiles, signature mandates and job function guidelines.

**Why HCFI Wanted to be Able to Satisfy Western Formalities**

12.     HCFI's purpose in implementing each of the above processes for its subsidiaries was to enable each company to run on its own without involvement of senior HCFI management. This goal was constantly repeated by

4

Ramy Lakah in meetings that I personally attended. HCFI's goal, per Ramy Lakah's vision, was to serve as an example, in Egypt, of an indigenous company that could meet Western business standards and be capable of attracting foreign investment to the Middle East.

13.    This was our Board's vision — to help bring Egypt into the 21st Century through adoption of Western business practices and procedures.

14.    It was my responsibility to help HCFI and each subsidiary to function under Western level governance standards.

**HCFI's Compliance with Formalities, Separate
Existence and Business Discretion.**

15.    Each HCFI company did, in fact, operate with minimal HCFI management involvement by the time HCFI conducted its first public offering, in August, 1999, which was three months prior to the UBS Eurobond Offering, which occurred, in December, 1999.

16.    By August, 1999, contracts and purchase orders for each of the HCFI subsidiaries were being entered into without the advice of HCFI managers and the renewal of agency agreements were being negotiated without the involvement of senior HCFI officers.

17.    In December, 1999, the HCFI subsidiaries were fundamentally independent and operating under the control of their own elected Boards and senior managers and operating through their own signature protocols, following their own corporate by-laws and their own procedures.

5

**The Capital Condition of HCFI**

18.    HCFI was a holding company comprised of eight companies, four servicing the medical industry, and four involved in different industrial enterprises. (Ex.MU_26).   HCFI was established on November 29, 1998 and quickly became successful.

19.    By August 1, 1999, just eight months after HCFI was established, HCFI raised $102,500,000 by going public in Europe though the Luxembourg Stock Exchange.

20.    Four months later, on December 6, 1999, HCFI, as issuer, through UBS and its bondholder syndicate, conducted the first Eurobond Offering in Middle East.

21.    In December, 1999, HCFI was a successful, well capitalized company, viewed, by both the media and public, as the model for future Egyptian conglomerates.

**The Financial Transparency of the HCFI Companies.**

22.    Unlike some companies that generate cash flow from financial maneuverings, HCFI's cash flow was a function of its manufacturing and  sale of hard goods, its construction of medical facilities, and its distribution of products of major medical suppliers throughout the Middle East.  It also received payments in consideration of   technical services its subsidiary companies provided to customers, e.g., maintaining and repairing medical equipment and updating software for technology products.

23.    None of the HCFI companies engaged in any type of financial maneuvering that might make review of the detail of their financial condition

difficult to understand. There was nothing in any of these companies to mask, cloud or inhibit an accurate diligence review or audit. In fact, HCFI and its companies were double audited, to assure total accuracy of their financial condition. (Ex.MU_27_(Offering Circular Back Cover)). The auditors that reviewed the HCFI companies were among the finest in the world. The audit history of the HCFI entities is discussed in the accompanying declaration of one of our auditors.

24.    Over its very short history, HCFI and its subsidiary companies were repeatedly audited, reviewed and vetted by the Egyptian regulatory authorities, including the Cairo Markets Authority ("CMA"), by Egyptian banks (including a national bank, Banque du Caire ("BDC")), by well known rating services (including Fitch IBCA and Nile Rating), and by a highly respected United States law firm (specifically, Dewey Ballantine), in connection with multiple public financings.

25.    HCFI was repeatedly found to be very strong, on a capital basis, as set forth in equity research reports and ratings; I know this because I was directly involved in many of these audits and reviews.

**HCFI, Auditor Diligence and Audits.**

26.    More specifically, during 1999, I was responsible for coordinating our companies' meetings with various rating agencies, in particular FITCH IBCA, regarding the rating of the HCFI and its debt. I was physically present during substantial parts of the due diligence process carried out by FITCH IBCA, for both the companies' local rating (obtained in connection with our local bond offerings) and our international rating obtained in connection with our Eurobond.

27.    Between May, 1999 and December, 1999, HCFI was audited and vetted seven times, by the Egyptian regulators, by our rating agency, by an Egyptian Bank (BDC), exactly as detailed in Ramy Lakah's moving affidavit, the detail of which I confirm, here. I was present at one of the diligence reviews conducted by the law firm Dewey Ballantine and I attach the due diligence checklist they used in both of their diligence audits. (Ex. MU_3)

28.    None of these vettings found any "undercapitalization," as confirmed by the high ratings they gave our companies. (Ex. MU_4, MU_5)

29.    Indeed, the ratings we received repeatedly confirmed that HCFI and its subsidiaries were financially stable, well run entities.

30.    The quality of the HCFI operation can also be seen from the contents of the various equity research carried out, during 1999, by leading investment banks including one of the respondents UBS Warburg Dillon Read, (Ex.MU_18, MU_19, MU_20)

**UBS Approaches HCFI Seeking an Issuer for the First
Eurobond Offering in the Middle East.**

31.    In the summer of 1999, Mr. Adel Kamber, an officer of UBS, A.G. ("UBS") met with us and told us UBS wanted to be the first Western banking entity to conduct a Eurobond Offering in the Middle East. Mr. Camille Abousleiman, of Dewey Ballantine, was with him. Mr. Kamber stated that UBS had learned about us from Mr. Abousleiman who had been involved in our prior Luxebourg IPO andboth stated they knew we were a top notch, financially stable and successful company. They stated they wanted our companies to act as

issuer for a Eurobond Offering. We were very interested because more capital would permit us to further expand our medical-side businesses.

32.     At that time, this was particularly important to us because we were looking to restructure or divest ourselves of the industrial side companies, which our consultants had advised we exit.     For example, in mid-1999, we met with a Fitch IBCA committee in London chaired by Mr. James Goodgame, who told us our rating was being compromised due to our involvement in steel and the diversity of the businesses in which we were involved. Mr. Goodgame strongly urged us to focus on our medical businesses. At that time we were strongly considering leaving the industrial markets, particularly steel, due to over-capacity, on a world-wide basis, as reported in major publications.

33.     Many international publications at that time were predicting that the steel industry would be experiencing severe problems. See, e.g., MEED Report (1999) Ex. MU_22 (urging us to exit the steel industry).

34.     We wanted to focus on the medical businesses because our advisors counseled that our then existing diversification was limiting our ability to exploit our natural strengths, impairing potential global investment in our companies.

**The UBS Swiss Loan – HCFI Agrees to Buy $37 Million of its own Bonds.**

35.     During the very last days of November  1999, UBS officer, Mr. Patrick O'Brien,  told Ramy Lakah and me that there was a serious problem with the offering. He stated that, based on the offering road show, it was evident that the underwriting  would not raise $100 million; indeed, he stated that only $63 million would be subscribed.

Case 1:07-cv-02799-MGC    Document 18    Filed 07/09/2007    Page 10 of 46

36.    Mr. O'Brien was very unhappy. He stated that if UBS were not successful in bringing to market a fully subscribed first Eurobond Offering, it would hamper UBS' plans to access the Middle East, as a major lender and source of financing for the entire region. Mr. O'Brien stated UBS viewed this as a very serious matter. He also told us that UBS had a possible solution.

37.    Mr. O'Brien told us that UBS was willing to make HCFI an unsecured loan of $37 million if HCFI would agree to buy $37 million of its own bonds, the largest allocation in the Eurobond Offering. Mr. O'Brien explained that if HCFI bought its own bonds, the bonds could later be sold, by UBS, into the market, for a profit, after the bond closing. These statements were made by Mr. O'Brien and, also, UBS officer, Mr. Mohammed Samakkia, and they were made to Ramy Lakah and to me. See also Ramy Lakah Affidavit at ¶ 17, n. 1.

38.    Both of these UBS officers told us that if HCFI bought $37 million of its own bonds, the offering would be "fully subscribed" at $100 million. UBS would just not mention that HCFI had taken out as part of a "Swiss loan" from a "Swiss bank" $37 million to buy its own bonds.

39.    We said we would consider their offer and get back to them.

40.    Ultimately, HCFI agreed to accept a $37 million loan from UBS, believing its purchase of the $37 million was necessary to making the bond offering a success (in fact the loan was for $100 million with $63 million being raised via by the then bond syndicate members).

41.    In effect, UBS convinced HCFI that it should become the largest bondholder with $37 million allocation although UBS itself was at the time holding

only in or about $3 million in bonds.  UBS, in its papers, now claims it holds $17,420,000 in bonds.  We are unaware under what circumstances it acquired the additional $14,420,000.  After HCFI, Barclay's Bank was the second largest bondholder, with $25 million.  Barclay's has not sued HCFI nor any of its subsidiaries.

**UBS Alters the Documentation and Structures the "Swiss Loan."**

42.    Dewey    Ballantine    immediately    began    altering    the    bond documentation so that instead of the bond proceeds being paid directly to HCFI, the funds from the offering would be funneled into a "Swiss Bank" so that a "Swiss Loan" could make a loan to HCFI.  The bond documents do not indicate that the "Swiss Bank" is UBS.

43.    The bond documents do not indicate the "Swiss Loan" included an integrated $37 million UBS financing to HCFI, at UBS' request.

44.    Despite its central role in the UBS Offering, the Swiss Loan agreement, constituting almost 40% of the monies UBS claimed it raised "in the $100 million offering," was not included as document in the UBS closing binder.

45.    The offering documents nowhere disclose that the Swiss Loan was the vehicle by which HCFI became the largest bondholder of the HCFI issue. Skeletal reference to the "Swiss Loan," but not its function (or that UBS is actually the referenced "Swiss Bank") occur at OC at 9, 16, 19,  20 (Ex. MU_27) There is no question that UBS, Warburg and Dewey all knew the purpose of the $37 million loan – to allow UBS to represent that it had succeeded in raising $100 million in the first Middle East Eurobond.

**BDC's Modification of the December 3**
**Letter and UBS Failure to Disclose Same.**

46.    The most critical document in this case is a December 3, 1999
letter, on Dewey Ballantine letterhead. The purpose of this letter was to obtain
BDC's agreement to release the pledges on certain collateral shares and to
release certain borrowing restrictions. This was in exchange for a cash payment,
to be taken from the bond proceeds, of $35 million, more than one full third of all
the monies  UBS was supposed to be raising in the Eurobond Offering.
(Ex.MU_29). UBS undertook to directly interface with BDC after the language
HCFI wanted was carefully worked out and memorialized in a letter dated
December 3, 1999.  From December 3 to December 8, the date of the bond
closing, HCFI did not communicate with BDC regarding the December 3 letter.
All that UBS, acting through Warburg and Dewey, was supposed to be doing
regarding this letter was getting it signed by BDC. This was supposed to be a
simple administrative task and we were relying on UBS to do that for our benefit,
as incipient bondholders, and as their client, as well, and to facilitate the bond
offering for the benefit of the bond syndicate members, including respondents.

47.    That is not what happened. Instead of executing the document as
drafted, on  December 6, BDC, in different typeface, typed onto this same
December 3 letter, the following words: "Agreed and accepted noting that we
keep all our other rights vis a vis arab steel factory." (Ex.MU_29).  This change
was made, as indicated on respondents' own exhibits 6 and 7, and, as shown on
Exhibit 7, the documents were sent back to Dewey Ballantine with a direction
from BDC as follows: "TO BE DELIVERED TO:  HOLDING COMPANY FOR

FINANCIAL INVESTMENTS (LAKAH GROUP), S.A.E ("LAKAH GROUP")[,] MR.
RAMY RAYMOND LAKAH [,] AND MR. MICHEL RAYMOND LAKAH." These
documents were never received by any of these parties.

48.    If I had known this language had been typed on these this crucial
documents by BDC, it would have caused me (or any other HCFI officer who
realized same) to heed the warning that  BDC provided. At that time, it was
providing all the HCFI companies with their primary bank facilities. This typed in
warning was a disclosure that BDC was planning to obtain new security for its
guarantees. This was brand new information obtained in the context of the UBS
Offering – if BDC chose not to act, its own security for the its prior  Local Bond
guarantees could end up in a junior position to UBS. BDC had not previously
acted to pledge any other HCFI or ASF assets, since the Local Bonds were first
offered.

49.    Had I known what BDC had typed onto these two December 6
documents that BDC directed be sent to HCFI or to the Lakahs,  I would have
immediately advised each member of the HCFI Board and ASF Board that  this
language was  a red flag of potential problems with BDC; effectively, a threat that
it had  plans  to act; potentially  to  our companies' very  serious detriment,
byasserting  "other rights"

50.    Specifically, I would not have voted in favor of the UBS Offering if I
knew of the [December 6] language that BDC placed on the December 3 letter.
The  importance  of   the  modifications   BDC  made  on  these  documents  is

discussed in the reply declaration of expert Dr. Ibrahim Ahmed Ibrahim, to which I direct the Court.

51.     At that time, between December 3 and December 8, 1999, I was having daily conversations with the Board members and no one mentioned any modification of any of the BDC correspondence which HCFI, itself, helped draft. The sequence of events is particularly important. After we helped co-draft the December 3 letter, it was double reviewed by our counsel. We then contacted Camille Abousleiman, on or about December 3, to advise him that it was fine and that it should be sent to BDC. At that time, Ramy Lakah and I expected that if BDC wanted any changes (or made any), we would have been notified, immediately, by UBS. This was especially important to us because the closing was scheduled for December 8.

**The December Bond Closing at Dewey Ballantine's Office.**

52.     During early December, 1999, I was present in London at Dewey's office to help finalize the remaining closing documents. I worked very closely with Mr. Camille Abousleiman and other senior Dewey attorneys.

53.     Neither Mr. Abousleiman nor any of the other attorneys, nor any other party acting for Warburg, the  UBS division acting as bond manager, mentioned that any changes had been made to the documents  to effect the release of collateral by BDC, including, most critically, the December 3 letter.

54.     We were there, together, discussing all of the documents that still had to be addressed, but no one mentioned the changes to the December 3 letter.

55.    Had I learned of these changes prior to the closing, I would never have permitted the this offering to go forward. At a minimum, HCFI would have immediately tried to re-negotiate terms with BDC; but we would never have accepted the risks of moving forward with BDC warning that it still had "rights" vis a vis ASF.

56.    The economics of the transation, moreover, would have made closing the Offering economically irrational.  At the same time we were paying BDC $35 million out of the bond proceeds (to release the pledges and borrowing restrictions on ASF) we had also agreed to UBS' request to accept a UBS loan to buy $37 million of our own bonds,  BDC had tried to warn everyone participating in the bond offering that it had "other rights"  in the very document that memorialized our payment of $35 million to free ASF from the ASF borrowing restrictions and  pledges that had been BDC's  security, two days before the UBS closing.

57.    UBS never advised us that this had occurred, despite the fact that HCFI, was paying $35 million to BDC. Dewey Balllantine advised BONY, by telephone and email (without attachments) that BDC fulfilled its obligations and instructed BONY to release the $35 million to BDC (Ex.MU_25).

**The sale of ASF and HCFI's Discovery of BDC's Imposition of a Pledge.**

58.    After the bond closing, we began to look in earnest for a potential purchaser of certain ASF assets that we wanted to sell.  In early February, 2000, the party that would ultimately buy the ASF assets,  Egypt Steel Group ("Egypt Steel"), told us  they had discovered in their due diligence that BDC had imposed

Case 1:07-cv-02799-MGC    Document 18    Filed 07/09/2007    Page 16 of 46

a pledge on ASF's assets on or around December 13, 1999 (just five days after the bond offering closed).

59.    Mr. Lakah and I were shocked and we  immediately contacted Sayed Zahran, who was a BDC branch director.  He told us that BDC had imposed a pledge on ASF's assets because the bank decided to take security on its outstanding guarantees on ASF's prior local bond offering.

60.    Mr Zahran  told us that  BDC had the ability to pledge the ASF assets under their existing (1998) power of attorney and under the Eurobond documents the bank had signed.

61.    Mr. Lakah and I immediately called Mr. Camille Abousleiman, who had handled the offering on behalf of the bond managers. In particular, he had handled  all issues involving  the BDC documents including obtaining the release of collateral that was a critical part of the bond transaction, as shown in the December 3, 1999 letter.

62.    Mr. Abousleiman told us ASF's assets could not be pledged under the bond documents and that any such act by BDC would be actionable.  He later confirmed these very same statements, in writing, after the ASF sale, on March 2, 2000 (Ex.MU_30):

> TO:        Mr. Ramy Lakah
> FROM:    Camille Abousleiman
> DATE:     March 2, 2000
> RE:         Banque du Caire
>
> Please find attached various documents signed by Banque du Caire in connection with the removal of the pledge on the shares of Arab Steel. As you will recall, the amount of U.S. $35 million was paid to Banque du Caire from the proceeds of the bond offering as consideration for its removal of the pledge.

> Please be advised that any attempts by Banque du
> Caire to reinstate the pledge would constitute a
> breach of Banque du Caire's commitments made in
> connection with the issuance of the bonds; in addition
> it would expose Banque du Caire to serious and
> credible claims for significant damages on the
> grounds that it acted fraudulently and in bad faith in
> obtaining payment of the initial U.S. $35 million in
> consideration for the release of the pledge.

63.    In fact, there was no prior pledges to be re-instated on ASF's assets. All that existed were borrowing restrictions and pledges on certain shares of stock. At the time we were having our early conversations (in late January or early February), ASF had already signed the contract to sell a portion of its assets to Egypt Steel.

64.    We continued on with the sale process in February, 2000, based on respondents' own legal position, as expressed to us, orally and later in writing, by Mr. Abousleiman, that BDC's own position regarding the asset pledge was in error and that it (BDC) could face an action, if it did not desist.

**The ASF Asset Sale Closes – Where the Monies Went.**

65.    The ASF sale closed on or about February 16, 2000.

66.    Mr. Samberg states that LE100 million just "vanished," suggesting it ended up in the pockets of Ramy Lakah and Michel Lakah.   See Samberg Declaration at ¶ 44.

67.    In fact, the location of every Egyptian pound is clearly set forth in the ASF and HCFI balance sheets (Ex.MU_31) and (Ex.MU_32) (English translation balance sheets) and Ex.MU_33 and Ex.MU_34 (English translation notes), which were approved by the CMA and published in the national press,

17

Case 1:07-cv-02799-MGC    Document 18    Filed 07/09/2007    Page 18 of 46

without any objection, by any party, including respondents. (Ex.MU_35 Arabic Balance Sheet publication).

68.    Specifically, the cash proceeds of the sale, LE100 million, was paid to ASF and transferred to Medequip to expand Medequip's healthcare business, as indicated in the respective balance sheets of each of these companies. (Ex.MU_31), (Ex.MU_32), (Ex.MU_33) (Ex.MU_34) (Ex.MU_35).

69.    The remaining LE231,280,000 cash equivalent notes (approximately US$70 million), was supposed to be infused, for medical business expansion, into the medical companies of HCFI, which were guarantor companies. Instead, BDC, using a power of attorney it held from ASF's Local Bond Offering in 1998, which it had not previously used or stated it intended to use, blocked ASF or HCFI from monetizing them, for the benefit of the guarantor entities or their obligations to respondents.

70.    BDC deposited these notes in ASF's account, but ASF could not use them because the account was "blocked" by BDC, to preserve the notes as collateral for its own obligations.

**There was No ASF Asset Fraud.**

71.    Respondents argue they should be able to "pierce the corporate veil" because they claim a fraud occurred in connection with ASF. This is pure fiction. There was no fraud.

72.    We continued to speak to them and the other bondholders, keeping all of them completely up to date, through Camille Abousleiman, who continued to deny the legitimacy of any purported BDC pledge on ASF's assets, as set forth in his March 2, 2000 letter. (Ex.MU_30).    Notably, although Mr.

18

Abousleiman's March 2 letter states that he sent documents relevant to the pledge, he did not send HCFI any such documents.

73.    Although Mr. Abousleiman loosely referred in his March 2 letter to BDC "reinstating" the pledge on the "ASF shares," the pledge imposed on or about December 13 was a brand new pledge being imposed on ASF assets, not its shares, under a pre-existing power of attorney

74.    At the time Ramy Lakah and I had these conversations with Mr. Abousleiman, neither Ramy Lakah nor I had any idea that BDC had placed a warning on the altered December 3 letter (respondents Ex. 6) or the December 6 document (Ex. 7).

75.    I believed, at that time, that all the bond documents were in the exact same condition they were in when HCFI's officers co-drafted them .

76.    The BDC warning typed on the December 3 letter disclosed a very serious risk to the financial basis of the entire transaction. UBS, which, acting through Dewey, took sole responsibility for getting the December 3 letter signed by BDC, was responsible for not telling us about what BDC had warned. Instead, it authorized the release of $35 million to BDC, despite BDC's warning.

77.    There was a red flag of potential problems in this transaction that the bond managers knew about, but never disclosed to us. In Mr. Samburg's declaration at 18, he states that BDC included a "counter-signature" and "additionally inscribed" text in lieu of executing the document Dewey had sent it. Although Mr. Samburg pretends that the counter-signature "apparently added" by BDC was "consistent" with the Dewey letter, he is really acknowledging that UBS,

Case 1:07-cv-02799-MGC    Document 18    Filed 07/09/2007    Page 20 of 46

acting through Dewey, was aware warning BDC placed on the document, but did not disclose it to HCFI because of its "consistency." The changes, however, were not "consistent" from the perspective of the risks that HCFI was undertaking -- $35 million to BDC plus $37 million to buy our own bonds – these were material, undisclosed changes that UBS chose not to disclose to us, contrary to the direction of BDC, which directed that the documents be sent to us. See respondents exhibit 7.

78.    HCFI did not learn of the December 3 warning until October, 2006, as detailed in the declaration of HCFI's attorney in Egypt, Mr. Gamil Halim, who discovered same. Mr. Halim has provided a declaration explaining how and when he obtained a copy of the December 3 letter, specifically, the version with the BDC warning.

**The Consequences of BDC's Pledge of ASF Assets.**

79.    After March, 2000, HCFI made repeated efforts to try to induce BDC to release the notes ASF obtained as part consideration for its sale of certain l assets to Egypt Steel, but BDC refused to do so.

80.    HCFI defaulted on its obligation to pay interest to respondents not because HCFI or its subsidiaries were "undercapitalized" or because of a "fraud." The primary reason for HCFI's default was described in the PWC Report (Ex.MU_6) which refers to the BDC "problem." That problem was, in fact, BDC's blocking HCFI's and ASF's ability to use capital equivalent to approximately LE105 million (roughly US$70 million which was received from the buyer of certain ASF assets while retaining HCFI's payment of $35 million cash (obtained from HCFI, upon the bond closing)). The PWC Report also identified a

number of circumstances relating to Egyptian economy and the failure of the Egyptian public sector organisations to make payments due and owing the HCFI companies, as well, but it did not identify any fraud. See PWC report (Ex.MU_6 page 46-47). Respondents need to fabricate a fraud to give their piercing the veil motion facial plausibility – but their motion utterly disregards the conclusion of the PWC Report, as well other facts inconvenient for the story they are trying to present as a reality.

81.     Had HCFI been able  to access the $70 million in notes,  the difficulties resulting in this litigation  (and the underlying arbitration) could easily have been avoided.

82.     Plainly, there was no fraud and HCFI always acted in with good faith. In January, 2001, as a result of BDC's blocking HCFI's use of the note consideration , HCFI realized it would not be able to make its scheduled June, 2001 coupon payment to Respondents.  HCFI did not hide this fact from the Respondents – we immediately advised them and the other bondholders of the problem and requested an emergency meeting  to discuss the it, and to see if any solution could be found.

83.     In January, 2001, six months prior to any default, a meeting was held in Cairo, which was  attended by the largest bondholder, Barclay's Bank, which has not sued HCFI or initiated any proceedings, of any sort, against it. Some or all of the  minority bond holders, i.e., the respondents in this case attended.  I chaired the meeting, the purpose of which was to find a business solution to the difficulty created, primarily, by BDC.

Case 1:07-cv-02799-MGC    Document 18    Filed 07/09/2007    Page 22 of 46

84.    Until the arbitration demand was filed, none of the bondholders, individually or collectively, initiated any request to accelerate repayment of the bond. None took any action seeking repayment, and, after Medequip filed for insolvency, none asserted any claims in the Medequip bankruptcy.

**The Purported ASF Sale Fraud.**

85.    Respondents argue they did not know HCFI intended to sell Arab Steel Factory, S.A.E. ("ASF") and that they would not have participated in the Eurobond Offering if they did know this.

86.    Their position is inconsistent with the bond documents which permit the sale of assets, under defined conditions.

87.    Specifically, we demanded that the bondholders include very specific provisions in the Indenture (Ex.MU_36_Indenture) to let HCFI to sell assets, specifically under Annex A, Terms and Conditions of the Bonds, Section 13, providing assets could be disposed of for fair market value: "where the proceeds of the disposal are to be reinvested in the purchase of replacement assets, which are comparable or superior as to type, value or quality." (Emphasis added).

88.    Here the assets were sold at fair market value and they were "to be" invested into HCFI subsidiaries, including Medequip and TMSE.

89.    HCFI intended to infuse all the consideration received from Egypt Steel to expand the medical company subsidiaries which were guaranteeing the bonds.

90.    Counsel Samberg argues, at paragraph 48 of his Declaration, that ASF's total value was represented in the Offering Circular (Ex.MU_27) to be

LE597 million but that HCFI obtained only LE331 million for its sale of "all of ASF's operating assets." Thus, he argues, ASF must not have obtained fair market value for the sale and thus, HCFI must have breached that condition. Therefore, he argues, HCFI was required to provide notice to and receive the consent of the bondholders to the sale. His argument is specious.

91.    It attempts to cause this court to believe HCFI sold all ASF's assets when, in fact, HCFI sold only a portion of its assets. That is why the numbers do not correspond. See Ex.MU_37, ASF sale contract at 12-13, Article 2.1-2.3).

92.    Specifically, in January-February, 2000, the National Bank of Egypt sent two appraisal companies to determine the value of the assets ASF was selling, as memorialized in the ASF Sales Contract (Ex. MU_37_ASF Sales Contract), an ASF General Assembly Resolution dated February 5, 2000 (Ex. MU_38), and an HCFI Board Resolution dated February 10, 2000 (Ex. MU_39), as follows:

> The Meeting was chaired by Mr. Ramy Raymond Michel Lakah (the Chairman) who explained that ASF, one of the subsidiaries of the Company, held extensive negotiations with the Egyptian company for [unable to translate the full technical name of the company] for the purpose of selling certain assets of ASF consisting of the land on which its factory is built in industrial zone A3 in the 10[th] of Ramadan City, including certain equipment and improvements which are built on the property. Article 2.1-2.3)(Emphasis added).

93.    As indicated on ASF's balance sheets which were included in the Offering Circular for the Euro Bonds, ASF's fixed assets were being sold, not its total assets.    (Ex.MU_27_OC at F-66, note 9 to financial statements which represented the book value of what HCFI sold of the ASF assets).    In addition to

23

Case 1:07-cv-02799-MGC    Document 18    Filed 07/09/2007    Page 24 of 46

the Offering Circular, which respondents themselves drafted, see also ASF's Balance Sheet and Auditor's Report of December 31, 2000 (Ex.MU_31) and (Ex.MU_37_sale contract for the identified Assets), which contain the same numbers.

94.    On January 26, 2000, HCFI advised Mr. Gamal Moharam of the Bank of New York ("BONY"), which was the Eurobond Trustee, and Camille Abousleiman, that HCFI was in advanced negotiations for the sale of certain ASF assets. (Ex.MU_40).

95.    By letter dated February 16, 2000 (Ex.MU_41), HCFI provided an officer's certificate to BONY indicating the sale was complete as of February 16, 2000, and provided information, including that the sale of the subject assets was for LE331 million (equivalent to approximately $100 million).

96.    The purchase price was comprised of LE100 million in cash (equivalent to approximately $30 million) and LE231 million in notes (equivalent to approximately $70 million), guaranteed by the National Bank of Egypt, and, therefore, deemed equivalent to cash, less costs.

97.    The ASF balance sheet as of December 31, 2000 (Ex. MU_31) indicates that the remaining ASF assets. That balance sheet was certified by the CMA and published in Egypt's national newspapers, without any objections from any party, including respondents. See (Ex. MU_42 Arabic and Ex.  MU_43 English translation).

98.    On February 17, 2000, Mr. Abousleiman and Louise Roman Bernstein, both from Dewey, wrote Ramy Lakah and Mohamed Kader, stating

that because ASF was retaining assets, including the East Port Said Project, there was a "strong likelihood that it [BONY] would accept the resolutions as drafted," in other words, without requiring any bondholder "consent." See (Ex. MU_44).

99.    By letter dated February 18, 2000, Mr. Abousleiman forwarded a request from HCFI to BONY asking it to confirm that no bondholder approval was required for consummation of the sale and asking it to withdraw its prior letter indicating that such consent "may be required." HCFI made this request because BONY's prior correspondence was unclear in saying consent "may be required," which seemed improper, under the documents HCFI executed, given the assets were to be sold at above their fair market value with the proceeds to be infused into the medical subsidiaries (Ex. MU_41).

100.   Counsel Samberg, at ¶42 of his Declaration, states that "the Trustee indicated to the Petitioners that their pending transaction required, in accordance with the Bond Transaction Documents, notice to and the consent of the Eurobond holders," citing annexed Ex. 22 to the Samberg Declaration (Emphasis added). Mr. Samberg, however, mis-quotes Ex. 22. It actually says that after conferencing the matter with its attorneys: "The Bank of New York ("BONY") is of the view that such action may require bondholder consent and compliance with a number of conditions precedent. . . You may want to consult with your counsel. . . ". (Emphasis added).

101.   Mr. Samberg disregards the phrase "may require," replacing it with the single word "required," completely changing the meaning of actual text BONY

25

used. BONY used the word "may" for a reason; it was not sure whether the transaction required consent.

102.    In fact, HCFI believed consent was not required and BONY ultimately agreed with us. Ms. Louise Roman Bernstein of Dewey Ballantine, by memorandum dated February 24, 2000 (Ex.MU_45) confirmed that Mr. Trevor Blewer, of the Bank of New York had:

> advised that the Officers' Certificate and Board resolution submitted to the Trustee are acceptable to the Bank of New York for purpose of the covenants set forth in the term and condition of the Bonds and the Indenture.

103.    There is, therefore, no basis for respondents' assertion that HCFI secretly and improperly sold the ASF assets, in violation of the consent provisions of the bond agreements.

104.    The PWC Report (Ex. MU_6 page 46-47), was the result of the review by PWC, after three full months of investigation with fourteen professionals. It determined that the real cause of the default was (1) the fact that the Egyptian public sector organisations had bounced checks to the HCFI companies, (2) the fact that the Egyptian market had undergone adverse economic changes and, most importantly, (3) the fact that there was the "problem with BDC." I personally met with these audit professionals on a daily basis during the three month investigation and they were given the opportunity to review every single document they wished to see.

**The Pledges BDC Imposed Were New Pledges.**

105.    Through the closing date, December 8, 1999, no pledges existed on any of the ASF assets.

Case 1:07-cv-02799-MGC     Document 18     Filed 07/09/2007     Page 27 of 46

106.    BDC, after the UBS Offering closed imposed pledges on ASF's assets and did, subsequently, prevent HCFI and ASF from accessing roughly $70 million cash-equivalent notes to help address its debt obligations.

107.    HCFI's access to needed financing was cut off.

108.    HCFI had massive interest coupon payments to make to the bondholders, and a $37 million debt to UBS undertaken as part of the "Swiss Loan." Ordinary business debts that were mounting as a result of adverse market conditions which were very accurately outlined in the PWC Report (Ex.MU_6) which is discussed in more detail, below.

109.    The "BDC "problem" was HCFI's loss of access to $70 million in urgently needed capital.

110.    This situation that would never have arisen, but for UBS' failure to tell us, before December 8, that there was new, material information – a change in the bond documents of December 3 (respondents' exhibit 6) and December 6 (respondents' exhibit 7 (which was never sent to us)).

111.    UBS induced us to close the UBS Offering in which HCFI by secreting this information knowing full well our company was obligating itself to pay BDC $35 million while, simultaneously, becoming a borrower of $37 million, owed to UBS, through the Swiss Loan.

112.    HCFI contacted its rating agency to advise of the problem and HCFI's rating, unsurprisingly declined, causing a technical default under the bond documentation (MU_7)

Case 1:07-cv-02799-MGC    Document 18    Filed 07/09/2007    Page 28 of 46

**The PWC Report.**

113.    As a follow up to the January 2001 meeting and during a meeting held in London in or about February, 2001, , PriceWaterhouseCoopers (London) ("PWC") was retained, at HCFI's expense, to determine, definitively, what had occurred and to make proposals. HCFI, at resondents' demand, paid PWC in excess of $500,000 for the work.

114.    PWC, with a team of fourteen multilingual auditors and consultants, spent three months in Cairo interviewing individual managers and employees.

115.    I personally coordinated and supported the PWC team, during their review in Egypt.

116.    PWC prepared a lengthy report,  the "PWC Report." (Ex. MU_6). We provided PWC with full cooperation and access to all requested documentation, with no limitations on any financial information. They interviewed every senior manager and all our financial officers.

117.    In July, 2001, I attended a meeting with the Bondholders, in London, during which PWC presented its findings and conclusions , as detailed in the PWC Report.  Particular attention is called to pages 6-7, and 46-47. The Report states that the problems which afflicted our companies and caused the default were (1) the Egyptian public sector organisations bouncing checks to our companies, (2) the Egyptian economy going through an adverse cycle (particularly in the medical sector), and the "BDC Problem." There is no mention on any of these pages (or any other pages of the Report) of any improperly disclosed under-capitalization problem.  There is no mention of any misrepresentation regarding any finances of any guarantor company or HCFI.

118.   The PWC Report does not identify any causal relationship between any  allegedly  improper  act  by  Ramy  Lakah  or  Michel  Lakah  and  the  bond default.  See  PWC Report at  48 and 49 (Ex. MU_6).

119.   Following this meeting and within the guidelines outlined in the PWC  Report,  we  met  with  the  bondholders  on  several  occasions  in  Cairo, London, and Bahrain, trying to resolve this matter, at a business level, but were unable to reach agreement.

120.   In 2000, 2001 and 2002, I personally coordinated and attended all meetings between HCFI and the bondholders, as we tried to find a workable solution . We almost reached one. Arab Banking Corporation (ABC), a minority bondholder with 10% interest in the bonds, however, vetoed a solution that was reached during 2002, despite the fact all other parties (90% Bondholders and ourselves) had agreed to a business resolution.

121.   We acted in good faith throughout the entire process.  None of our conduct is consistent with a party engaging in fraud or trying to hide from its obligations – we were facing them, day by day, with full transparency and disclosure.  At that time, however, we did not know that  UBS was aware of the warning BDC typed  on the December 3 and December 6 documents.

**The Barclay's Bank Investigation**

122.   In October, 2006, HCFI's attorney in Egypt, Galim Halim, received a package at his office address. It contained, along with the December 3 letter (with  the typed BDC Warning), a sixteen page facsimile dated February 18, 2002.  The facsimile states that it was sent from Mr. Jonathan M. Ravan of Barclay's Bank "Business Support Specialist Team" to "UBS Warburg," Standard

Bank, National Commercial Bank, Ecoban, Arab Banking Corporation, Bank of Oman, and National Bank of Abu Dhabi (Ex. MU_8).

123.    The facsimile indicates that each of the Claimant Bondholders received via this same facsimile, inter alia: (1) recommendations from Barclay's internal legal counsel, (2) an email from Arab Banking Corporation regarding their meeting with BDC, and  (3) a letter to the bondholders regarding Ramy Lakah.

124.    The February 18, 2002 recommendation letter makes absolutely clear that the bondholders understood that Ramy Lakah denied, from the very beginning, ever granting any post-bond closing permission to BDC to pledge the ASF assets.  The memorandum states, in relevant part:

| To | Bob Byrne |
|---|---|
| Copy | Edward Lightfoot, Jonathan Raven, · John Featherstone, Richard Hickson |
| From | Nathan Carr |
| Date | February 2002 |
| Subject | The Lakah Connection: Recovery recommendation |

Executive Summary

[T]he business and operating assets of one of the guarantors, the Arab Steel Factory S.A.E. ("ASF") were sold in January 2000 for LE 321 million.  LE100 million was paid in cash with the remainder due in notes payable over six years, guaranteed by the National Bank of Egypt.  The cash proceeds have been claimed by Banque du Caire pursuant to a pledge apparently granted by the Lakah group of companies, and they are also intending to claim the proceeds of the notes in due course. (Emphasis added).

- The first issue is whether Banque du Caire are entitled to claim this pledge which puts them in the position of a secured creditor or whether this pledge is

open to attack in which case the ASF proceeds would
be available to all creditors.

*      *      *

Banque du Caire

- <u>Ramy Lakah contends that the pledge (over
  the assets and sale proceeds of ASF) was
  obtained without his knowledge and consent</u>.
  (Emphasis added).

*      *      *

- The question is whether Banque du Caire are
  entitled to retain both the LE100 million
  proceeds and the proceeds of the notes
  pursuant to the pledge.

*      *      *

ABC's meeting with Banque du Caire

- Representatives of ABC recently met with Banque du
  Cair to discuss the pledge, an e-mail highlighting the
  upshot of the meeting is attached.

- At the meeting Banque du Caire confirmed that the
  pledge was taken with the full co-operation and
  knowledge of Lakah and was obtained in accordance
  with Egyptian banking practice.

Proposed Action is respect of Banque du Caire

*      *      *

2) If we were to pursue this aspect further more
   information is needed in respect of the taking of the
   pledge and the exposure of the Lakah Group to
   Banque du Caire. We need to know the validity of the
   pledge and the basis on which Banque du Caire are
   holding the proceeds of the ASF assets. Presumably
   the key documents are in Arabic and therefore it is
   proposed that the Bank's litigation team in Egypt
   works in conjunction with the Litigation Team in
   Lombard Street to ascertain the relevant facts.

125. The memorandum ends by noting the then existing economic
turbulence in Egypt.

31

126.  The above memorandum is inaccurate in many respects.  The LE100 million cash (approximately $30 million) was infused into HCFI subsidiary Medequip, as permitted under the Offering Circular disposal of assets provision.

127.  Although BDC asserted that Ramy Lakah "apparently granted" a pledge, the letter Mr. Abousleiman sent Ramy Lakah on March 2, 2000, responding to Ramy's inquiries and complaints about BDC's conduct, shows Mr. Lakah was not co-operating in BDC's pledging of assets. To the contrary, he was actively seeking guidance from bond counsel in response to HCFI's discovery that a pledge had been imposed, which HCFI believed to have been improperly imposed, given what he knew about the documents that HCFI co-drafted.

128.  In meetings I personally attended I, along with Ramy Lakah, urged the bondholders to sue BDC, believing, at that time, that BDC had acted improperly.  At that time, none of us were aware that the bond mangers had agreed to accept altered documents from BDC that constituted notice to them that BDC was asserting "other rights," potentially to our detriment, not only as the obligated party on the bonds, but in our capacity as a bondholder holding the largest allocation of bonds and, also, in our capacity as a party owing UBS another $37 million, via the "Swiss Loan."

129.  We did not see these documents until October, 2006 when Mr Gamil Halim, an Egyptian attorney, brought them to our attention.

130.  Respondents state that we should have known the content of these documents because they were in the closing binder but the truth is that we

32

helped draft them and we knew what they said and, most importantly, what they did not say.

131.    But we did not know that BDC changed the documents for its own purposes and that UBS, aware of the warning in both the December 3 letter and the December 6 document, decided not to tell us about it.

132.    By memorandum dated February 5, 2002 (Enclosure of the February 18th 2002 fax) from Mr. Carr, Barclays Legal advisor to Bob Byrne, Barclays Head of Remedial Unit (Ex. MU_8), explained that, based on Barclay's investigation, (1) the Lakahs problems resulted from the Egyptian public sector organisations not paying for work performed due to economic turbulence (not from fraud), (2) that Ramy Lakah, in 2002, had explained that BDC, following receipt of deposit of funds, caused ASF to grant a pledge over ASF's assets, using a power of attorney, (a fact also stated in the PWC report of July 2001 Ex. MU_6 page 57 and known to the bondholders since the publication of the report July 2001) and (3) that BDC was refusing to release the pledge that it asserted via its power of attorney, as follows:

> **Background Facts**
>
> The Lakah Groups difficulties largely stem from the fact that they have done L70M of work for the Egyptian government which has not been paid for due to lack of liquidity and ongoing economic turbulence in Egypt. (Emphasis added).
>
> It is alleged by Ramy Lakah that, following receipt of the deposit, Banque du Caire caused ASF to grant a pledge over ASF's assets in favor of Banque du Caire, using a power of attorney. . .
>
> According to Ramy Lakah, the Group was not in default of its obligations to either local banks (other) or the bondholders when the sale of ASF was completed. . .

Despite the Group requesting Banque du Caire to release pledges held on non-Eurobond guarantee assets and shares (or to release the Notes) Banque du Caire is keeping the proceeds of the Notes and maintaining the shares pursuant to the pledge over ASF.

**Framework Agreement**

ABC have met with Banque du Caire to discuss the position regarding the pledge allegedly made in respect of the sale proceeds of ASF. Banque du Caire have confirmed that a pledge was made over ASF's assets, in favor of Banque du Caire, however, this was done by Ramy Lakah's full involvement and consent.

133.    An attached flow chart indicated a pledge was asserted over the proceeds of sale, being held by BDC.

134.    To be absolutely clear, the only ASF power of attorney was granted in connection with the Local Bonds, not granted after the UBS Offering closing. To the best of my knowledge, neither Ramy Lakah nor any HCFI officer cooperated in any pledging of ASF assets, after the bond closing and I was dealing with these issues on a daily basis. On information and belief, BDC used its power of attorney which it had held since ASF had conducted its first local bond offering . Respondents, on this motion, completely disregard the results of the Barclay's investigation as to causation of the default, pretending it does not exist, just as they disregard the PWC Report's conclusion, despite the fact they were the ones who commissioned the report.

135.    As set forth in an email memorandum from Jonathan Raven to Nathan Carr on February 18, 2002 (Ex. MU_8), concerning a meeting held between the Arab Bank Corporation ("ABC") and BDC, the author makes clear the bank took the position that it did use a power of attorney to assert control

34

over the ASF assets, stating Ramy Lakah had "not objected" to use of the power

of attorney (rather than granted same, post-UBS Offering). The memo states, in

relevant part:

> From: Raven, Jonathan M: LgrBusLondon
> Sent:  18 February 2002 14:14
> To:    Carr, Nathan: Legal
> Subject: ABC meeting with Banque du Caire
>
> Senior management of ABC had a meeting with Banque du
> Caire and AIB on Sunday 27[th]. . .
>
> *    Suing BDC for their stance in the ASF/Power of
>      Attorney issue would be a waste of time and probably
>      counter-productive.  In any event, despite R.L.'s
>      protestations to the contrary, BDC maintain that he
>      never objected to the P.O.A. being utilized.

136.   Part of this is very true.  Ramy Lakah did not object to the power

being utilized to lien the ASF assets, in December, 1999, because none of us

knew it was being utilized at all – we only learned that a plege existed when

Egypt Steel discovered the December 13, 1999 pledge in late January or early

February, 2000, and told us.

137.   BDC's blocking of HCFI's ability to use the note consideration

severely compromised HCFI's ability to repay the bondholders – it was a loss of

$70 million capital at a time that it was critically needed, as indicated.

**Egypt's Courts have held there was no Securities or Bank Fraud.**

138.   Respondents' main argument for piercing the corporate veil is that,

supposedly, Ramy Lakah and Michel Lakah committed securities and bank fraud,

in Egypt, resulting in an artificial inflation of the value of their companies, inducing

the bondholders to make a loan to an "undercapitalized company."

139.   An Egyptian court did freeze their assets, in 2003, but that freeze was based on a "report" from a researcher at Cairo Markets Authority that did nothing more than articulate the researcher's suspicion that three named persons and Ramy Lakah and Michel Lakah "colluded" to engage in purported bank and securities fraud.

140.   I lack personal knowledge of these events and therefore direct the Court to the declaration of attorney, Gamil Halim, who dealt with this matter in Egypt, for Ramy Lakah and Michel Lakah, but note the following, based on Mr. Halim's declaration.

141.   The freeze order was granted, as detailed in a subsequent decision of the court dismissing the claim against the Lakahs purported "co-conspirators."

142.   Mr. Samburg fails to mention that  no actual complaint was ever filed against Ramy or Michel regarding either Al Eman Brokerage for Financial Investments or Misr International Bank.

143.   Mr. Samburg fails to mention that no indictment has ever been filed against either of the Lakahs in connection with this matter by the public prosecutor.

144.   Mr. Samburg fails to mention that no findings of wrongdoing in these matters have been made by any Egyptian court.

145.   Mr. Samburg fails to mention that Egypt's prosecutor general, after four years, failed to bring an actual case against either of them or any of the other persons supposedly involved.

146.   Indeed, there has never been a trial of any of the allegations against Ramy Lakah or Michel Lakah or any of the purported "co-conspirators."

147.   On separate application of the purported "co-conspirators" in the alleged wrongdoing Egypt's courts have twice, separately, determined no evidence exists sufficient to justify continuing the freeze orders against the parties seeking a vacatur.  The freeze orders against each of the purported "co-conspirators" have already been vacated.

148.   Based on these court judgments – not on bare suspicions or allegations – as detailed by Mr. Gamil Halim, as a matter of Egyptian law, the Lakahs will   be fully vindicated, subject only to them making a personal appearance in the Egyptian Court to request dismissal, which, for reasons detailed below, they are prudently disinclined to do, at this time.

**The Political Situation in Egypt as Pertains to Ramy Lakah.**

149.   Respondents have grossly misrepresented who Mr. Lakah is. They have tried to portray him as a criminal, largely by proffering specious allegations that have already been found insufficient by Egypt's courts.   Ramy Lakah is, in fact, a former member of the Egyptian Parliament and the once-Vice Chair of its Foreign Affairs Committee.   Ramy is the only Melkite-Christian to have been democratically elected to the overwhelmingly Islamic Egyptian Parliament.

150.   I have personal knowledge of the following statements as I have worked very closely with him throughout his political efforts on behalf of the Human Rights community in Egypt.   It is these efforts that are a direct, contributing cause of his problems in this case.

151.   Respondents assert Ramy and Michel fled Egypt to avoid the consequences of the subject "fraud" in Egypt.  I know they fled Egypt for other reasons, having nothing to do with Egypt's courts have already found to be false accusations. I have personal knowledge of this matter because I was with Ramy Lakah when he  left Egypt.   He left because of religious and political circumstances in Egypt, at that time, which circumstances were clearly and correctly outlined in the United States Department of State Country Report on Human Rights and Practices (2001) (Ex. MU_9)

152.   Briefly, Ramy Lakah, a devout, practicing Christian, became actively involved in the human rights movement in Egypt and the Middle East and joined many organizations whose goals were to liberalize Egypt's economy and to democratize Egypt.   His views regarding these matters are very well known throughout Egypt and the Middle East and, also, to human rights organizations in the United States. See, e.g., "Freedom House" (Ex. MU_10) (Nina Shea Report, discussing his work) (Ex. MU_11)

153.   In Egypt in 1997, assassins from the organization Al-Gam'a al-Islamiyya, affiliated with Osama Bin Laden's organization, murdered 58 Swiss and Japanese tourists in Luxor, Egypt (Ex. MU_12).  This organization publicly stated it wanted to take over Egypt and shortly thereafter, an Egyptian newspaper, Al Destour, published an Al-Qaeda list of three individuals targeted for assassination by them, in Egypt.  Ramy Lakah was on that list.  (Ex. MU_13).

154.   The Egyptian government provided special security for him and his family, as they did for the other threatened individuals. Ramy did not have private

bodyguards, as alleged in the Respondents' affidavits, only those provided by the Egyptian government.

155.   In 1999, Ramy joined "The Egyptian Organization for Human Rights in Egypt" ("EOHR") and became a member of its Board of Trustees. He signed one of the most important reports about torture in Egypt's prisons and police stations "The Seventh EOHR Report on Torture and Ill-treatment inside Police Stations in Egypt." (Ex. MU_14 ) Ramy Lakah's name appears on the Report's front page, along with the names of seventeen signatories, many of whom have been or are presently in jail, in Egypt.

156.   For his human rights work, Ramy was nominated as an advisor to the Patriach of the Catholic Church in Egypt, Cardinal Stephanos II.

157.   He subsequently arranged the visit of Pope John Paul II to Egypt and neighboring countries and, for the first time in an Arab country, a Christian Mass (in a public stadium) took place and the event was televised in Egypt.

158.   In 2000, the Patriarch of Jerusalem awarded Ramy Lakah the "Cross of Jerusalem," the highest honor it awards to lay persons.

159.   In 2001, Pope John Paul II awarded Ramy Lakah the Papal Order of Saint Gregory the Great, for service.  None of this is consistent with the biased picture that Respondents try to present as a greedy, international criminal.

160.   Ramy Lakah decided to run for a political seat in his district in Cairo where a large majority of the voters were Muslim. (Ex. MU_15)

Case 1:07-cv-02799-MGC    Document 18    Filed 07/09/2007    Page 40 of 46

161.    Most critically, he ran against a high level governmental official, Mr. Abdel Ahad Gamal El Dine, who was related to Egypt's then Prime Minister Mr. Atef Obeid.

162.    Ramy launched his unofficial campaign in or about January 2000 and officially launched, as an independent, in or about April, 2000.

163.    From the time that he was running for office it appeared that public sector organisations were placing obstacles to the operations of HCFI's businesses.

164.    In January 2000, the Prime Minister appointed Ahmed Mounir Al-Bardahi as the President of BDC.  In fact, Mr. Bardahi was later convicted of forgery on November 22, 2003. (Ex. MU_23)

165.    On November 8, 2000, Ramy received more than 62% of the popular vote in a district that is 90% Muslim, becoming the first Christian to be elected by popular vote since the 1952 military takeover in Egypt.

166.    The High Committee of the Election Board investigated Ramy's spending on the election, as it does  every candidate, determining he did not exceed the spending limit authorized by Egyptian law.  It found he was legitimately elected without any violation of spending limits (which are limited to LE10,000 approximately $ 3,500).  Witness Amgad Zarif who theorizes that Ramy Lakah used HCFI funds for his campaign, has no personal knowledge of any of this and no basis for his statements.

167.    From the time of his election in November, 2000, through July, 2001 when I left Egypt with Mr. Lakah, certain entities conducted a campaign to discredit him and expel him from Parliament.

168.    For example, public sector organisations stopped paying HCFI companies millions of dollars in monies that were due and owing, as confirmed in the PWC Report. (Ex. MU_6 PWC report at 52 and 53)

169.    For example, public sector organisations sent HCFI checks that bounced, causing HCFI substantial prejudice, preventing HCFI from managing its cash flow and running its businesses in the ordinary course, as confirmed in the PWC Report.  (Ex. MU_6 PWC Report at 53 and Ex. MU_16 sample of bounced public sector organizations' checks).

170.    For example, a public sector organisation cancelled a major project, Sharq el-Tafria, which was to produce iron or steel, despite the fact HCFI companies (particularly, ASF) already invested millions in the project, by unilaterally (and without any stated reason) suddenly removing our authorization to build the plant. This was completely unprecedented for HCFI companies which had never had an authorization removed. It resulted in massive losses.

171.    BDC stopped cooperating with HCFI and refused to continue financing existing projects.  As detailed in the PWC reportHCFI was  not in default at the time BDC stopped financing our projects.

172.    During this same period, Mr Lakah's prior political opponent in his district, Mr.Abdel Ahad Gamal El Dine, brought an administrative case before the Egyptian courts arguing that because Mr. Ramy Lakah held a dual citizenship

Case 1:07-cv-02799-MGC    Document 18    Filed 07/09/2007    Page 42 of 46

with France, he should be removed from Parliament. Despite the fact there was no existing law that required such removal, a special judgment was obtained from an administrative court (Ex. MU_17) holding that even though there was no law regarding dual nationals, the court, nevertheless, was ruling he must be expelled from Parliament, on that ground.

173.    The administrative judge was appointed by the government. <u>See</u> Report on the matter of appointed judges. (Ex. MU_9).

174.    In July, 2001, having been removed from Parliament by a "selective" application of the law (Ex.MU_17) , and HCFI businesses being more and more seriously attacked and compromised by BDC's improper acts, Mr. Lakah, fearing for his family's security and his own security (Ex. MU_9) decided to leave Egypt, at that time, for those reasons and those reasons alone.

175.    In 2003, the Lakahs learned that the prosecutor general in Egypt had made allegations against them to freeze their family assets, as detailed in the accompanying Gamil Halim reply declaration. The facts are fully detailed by the Freedom House Report (Ex. MU_11) one of the most well respected Human Rights organizations of the United States. (Ex. MU_10).

176.    As detailed above and in the Reply Declaration of Gamil Halim, who attaches the relevant judgments, with translations, after years of investigation, the case of purported "collusion" to engage in securities fraud and bank fraudwas dropped for lack of any sufficient evidence against each persons who supposedly wrongfully "colluded" to engage in improper trading or fraud, with the Lakahs.

**Respondents' Smear Campaign**

177.   Respondents engage in a smear campaign to try to bias this Court, citing purported wrongs that have nothing to do with case. In a continuous effort to injure Ramy, an Interpol Alert was filed against him for alleged non-payment of HCFI checks.

178.   In fact, these checks related to a tax liability judgment and certain checks issued to BDCBoth judgments were issued in absentia. Respondents have not advised this Court, however, that both judgments underlying the Interpol Alerts are vacated, see the Reply Declaration of Gamil Halim and exhibits, just as they failed to advise this court that Egypt's courts have issued merits-dismissals of the collusion claims against the parties with which the Lakahs supposedly "colluded," as discussed below

179.   Respondents also assert Mr. Lakah is being investigated in France. As it happens, I was living in France at the time in question and Mr. Lakah's activities are personally known to me.

180.   The referred to "investigations" occurred shortly after Mr. Lakahs newspaper, France Soir, published certain cartoons in Paris, causing Islamic fundamentalists to riot, as reported throughout the world's newspapers and media. Despite the fact Mr. Lakah fired the editor, who chose, unilaterally, to publish same, showing remarkable insensitivity. The riots continued as did thedeath threats made against Mr. Lakah.A google search of his name and the words "death threat" will indicate same.

43

181.    The Respondents rely on blogs and other unsubstantiated sources, but not one single finding of any court, that has examined the facts, of any allegation of wrongdoing.

182.    This French investigation, of course, has nothing to do with the Eurobond Offering and is just more "smear" by the Respondents who lack any credible evidence of any fraud committed by either of the Lakahs.

**Respondents' Allegations of Market Manipulation**

183.    Respondents argue that the market value of certain HCFI trading subsidiaries very quickly increased in value, suggesting impropriety must have occurred.  The explanation for the increase in value is set forth in detail in one of the two  declarations submitted by auditor Sherif George Halim, of RSM, one of the double auditors of each of the HCFI companies, to which I direct the court.

184.    I make the following statements which are not included in the auditor's declaration.  To create an incentive for employees of ASF, Medequip, and TMSE to work hard for their companies, and for themselves, the Lakah's decided to and did award their employees stock in these HCFI companies.

185.    The stock of the trading subsidiaries began to increase in value, as the employees created a trading market for them.  The trading on the Cairo Exchange of these securities was a basis upon which goodwill was reflected in the company balance sheets, as detailed in the reply declaration of Sherif George Halim.

The Claimant Declaration of Amgad Zarif – Draeger / Lifecare

186.    Lastly, I make this declaration to respond to certain statements made by Mr. Amgad Zarif, a purported "witness" for respondents, whose statements do not accurately represent what occurred in connection with a certain distribution agreement had by HCFI subsidiary Medequip and company called Draeger. I was acting as a consultant to Mr. Michel Lakah regarding the Draeger distribution agreement and have personal knowledge of same.

187.    The substance of Amgad Zarif's declaration concerning the termination of the Draeger representation with Medequip is false. The facts are as follows:

(a)    As of 1998, Draeger was negotiating with Medequip to restructure its existing distribution agreement to that of a joint venture. (Ex. MU_24) and (Ex. MU_25).

(b)    Draeger wanted to have a direct control over its operations in Egypt. There was a problem. At that time, under Egyptian law, it was not possible for a foreign entity to have majority control over an Egyptian company. It was common, at that time, for foreign companies to use Egyptian proxies to run their companies.

(c)    Drager approached HCFI and advised that it intended to use a local company though which to do business and sought our assistance. Draeger wanted to change the form of the existing agreement because it had a change in business strategy. Specifically, it needed to separate the Draeger business from Medequip's main business due to forthcoming competition issues with one of Medequip's major suppliers, Hewlett Packard.

(d)    HCFI agreed to set up, for Draeger, a separate Egyptian company which Draeger would manage, through Zarif. Medequip would continue to be treated as a privileged end-user for turnkey projects and would have certain international distribution rights, (Ex. MU_26).

(e)    Additionally, a final distribution payment of Euro 625,000 was made.

45

Case 1:07-cv-02799-MGC     Document 18     Filed 07/09/2007     Page 46 of 46

(f)     This agreement benefited Medequip and HCFI. Annual business HCFI was doing with HP was three to four times the magnitude of business being done with Draeger. The long term benefits to HCFI and its subsidiaries were substantially better than with Draeger.

(g)     To the best of my knowledge Zarif never paid any amounts to any shareholders for the transfer of LifeCare shares, into his name, and the transaction was a "paper transaction" realized on final settlement of the distribution termination fee with HCFI.

188.   The statements Zarif makes are, on information and belief, made in an effort to remove his company, Lifecare, from the underlying arbitration. They do not accurately describe the events that actually occurred.

189.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Montreal, Canada on July 9, 2007.

Brian Murphy