Gilbert A. Samberg (GS-2610)
Kevin N. Ainsworth (KA-8493)
David L. Barres (DB-2129)
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
(212) 935-3000
(212) 983-3115 (facsimile)

*Attorneys for Respondents UBS AG, Exporters Insurance Company, Ltd.,
Arab Banking Corporation, National Bank of Abu Dhabi and National Bank of Oman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| In the Matter of the Application of | ) |
| | ) |
| RAMY LAKAH and MICHEL LAKAH, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| For a judgment pursuant to Article 75 of the C.P.L.R. staying the arbitration commenced by | ) ) ) |
| | ) |
| UBS AG, EXPORTERS INSURANCE COMPANY, LTD., ARAB BANKING CORPORATION, NATIONAL BANK OF ABU DHABI and NATIONAL BANK OF OMAN, | ) ) ) ) |
| | ) |
| Respondents. | ) |

07-CV-2799 (MGC) (FM)

-------------------------------------------------------------x


# MEMORANDUM OF LAW IN SUPPORT OF
# RESPONDENTS-CROSS-PETITIONERS' MOTION FOR ISSUANCE OF
# SUBPOENA TO AHMED MOUNIR EL-BARDAI UNDER 28 U.S.C. § 1783

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTORY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................... 4

    A.    The Underlying Arbitration, and This Action to Determine Arbitrability ................................................................................. 4

    B.    The Lakahs' Domination, Control, and Misuse of the Guarantor Corporations ........................................................................... 6

    C.    Mr. El-Bardai, a Witness to the Lakahs' Wrongdoing ................... 9

ARGUMENT ............................................................................................... 11

I.    THE TESTIMONY OF MR. EL-BARDAI IS NECESSARY IN THE INTEREST OF JUSTICE ...................................................................... 11

    A.    Mr. El-Bardai Is Likely to Possess Discoverable Information Relevant to Piercing the Corporate Veil. .................................... 12

    B.    Mr. El-Bardai Is Likely to Possess Discoverable Information Relevant to Petitioners' Arguments in This Proceeding. ............ 16

II.    IT IS NOT POSSIBLE TO OBTAIN MR. EL-BARDAI'S TESTIMONY IN ADMISSIBLE FORM, OR THE PRODUCTION OF HIS DOCUMENTS, WITHOUT HIS PERSONAL APPEARANCE AS A WITNESS ............................ 18

CONCLUSION ............................................................................................ 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

CSI Investment Partners II, L.P. v. Cendant Corp., 00 Civ. 1422 (DAB),
    2006 U.S. Dist. LEXIS 11015 (S.D.N.Y. Mar. 15, 2006)...........................................18

Estate of Ungar v. Palestinian Authority, 412 F. Supp. 2d 328
    (S.D.N.Y. 2006)...........................................................................................11, 16, 18

Freeman v. Complex Computing Co., 119 F.3d 1044 (2d Cir. 1997).............................12

Klesch & Co. v. Liberty Media Corp., 217 F.R.D. 517 (D. Colo. 2003) ...................11, 18

SEC v. Sandifur, No. C05-1631 C, 2006 WL 3692611 (W.D. Wash.
    Dec. 11, 2006)......................................................................................12, 15, 16, 18

William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,
    933 F.2d 131, 138 (2d Cir. 1991) ...........................................................................12


**Statutes and Rules**

Fed. R. Civ. P. 26(b) ....................................................................................................11

9 U.S.C. § 4 ...................................................................................................................2

9 U.S.C. § 206 ...............................................................................................................2

28 U.S.C. § 1783 ..........................................................................................1-4, 6, 11, 15

28 U.S.C. § 1783(a).................................................................................................11 18

Respondents-Cross-Petitioners UBS AG ("UBS"), Exporters Insurance Company, Ltd., Arab Banking Corporation, National Bank of Abu Dhabi, and National Bank of Oman (collectively, "Respondents" or "Bondholders") respectfully submit this memorandum of law and the Declaration of Gilbert A. Samberg, dated March 10, 2008 ("Samberg Decl."), in support of their motion for an order under 28 U.S.C. § 1783 directing the issuance of a subpoena to AHMED MOUNIR EL-BARDAI ("El-Bardai"), a citizen of the United States (and of Egypt) residing in Egypt. Petitioners' counsel refused to consent to the issuance of this subpoena to a non-party witness.

## INTRODUCTORY STATEMENT

On June 8, 2006, the Bondholders commenced an arbitration against petitioners Ramy Lakah and Michel Lakah (sometimes referred to herein as the "Lakahs"), as well as against several of their companies -- Lakah Funding Limited (the "Issuer"); Holding Company for Financial Investments (Lakah Group), S.A.E. ("HCFI"), Trading Medical System Egypt, S.A.E. ("TMSE"), Medequip for Trading and Contracting, S.A.E. ("Medequip"), and Arab Steel Factory, S.A.E. ("ASF") (each a "Guarantor," collectively the "Guarantors"); Medical Technology, S.A.E. ("MedTech"), Technowave, S.A.E. ("Technowave"), and Life Care Technology, S.A.E. ("Life Care," along with MedTech and Technowave, the "Successor Companies") -- arising from defaults by the Issuer and Guarantors on a $100,000,000 Eurobond issued in December 1999.

In this proceeding, the Lakahs seek to stay the arbitration as against them, and the Bondholders seek to compel the Lakahs to arbitrate the dispute pursuant to a written arbitration agreement. The Lakahs assert that the arbitration should be stayed as against them because they did not sign an arbitration agreement. However, the

Bondholders have presented to the Court evidence that, among other things, the corporate veils of one or more of the Guarantors should be pierced, so that the Lakahs -- the dominant owners of the Guarantors -- are bound by the arbitration agreements signed by the Guarantors.

In their prior applications to this Court,[1] Respondents presented initial evidence -- from Egyptian governmental agency investigations and a criminal prosecution of the Lakahs -- that the Lakahs used their control over the Issuer and Guarantors to artificially inflate the balance sheets and apparent value of each company, for the purpose of fraudulently inducing the Respondents-Bondholders to purchase the Eurobond. Respondents have also made an initial showing that, subsequent to the issuance of the Bonds, the Lakahs gutted the operating company Guarantors (ASF, TMSE, and Medequip) so that they were unable to meet their payment obligations in relation to the Bonds and became judgment-proof.

During the first judicial conference on May 31, 2007, the Court recognized that the Respondents' veil-piercing arguments warranted discovery concerning, <u>inter alia</u>, (a) the Lakahs' control over the Issuer and Guarantors, and (b) the frauds committed by the Lakahs.  At that time, Respondents pointed out the natural inequality among the parties regarding access to evidence concerning the Lakahs' inherently covert conduct, which conduct largely constitutes the grounds for piercing the corporate veils of the Guarantors.

---

[1]   On April 16, 2007, Respondents cross-petitioned to compel arbitration under 9 U.S.C. §§ 4 and 206.  On July 9, 2007, Respondents moved for issuance of a subpoena to Carl Baker under 28 U.S.C. § 1783.

As part of that discovery, Respondents' now move this Court for an order, pursuant to 28 U.S.C. § 1783, directing the issuance of a subpoena to Mr. El-Bardai, a citizen of the United States who resides in Egypt.  The taking of evidence from Mr. El-Bardai is necessary in the interest of justice.  The available evidence indicates:

- Mr. El-Bardai became the Chairman of Banque du Caire ("BdC" or the "Bank") in or about January 2000;

- BdC was a major shareholder of HCFI and had a seat on HCFI's board of directors during a critical period in 1999 and 2000 (and likely thereafter);

- BdC was the largest creditor and guarantor bank of the Lakah Group of companies, including the Guarantors;

- Mr. El Bardai's tenure included a retrospective investigation by BdC of (a) the Lakah Group of companies generally, and (b) of allegations of fraud within BdC in collusion with Ramy Lakah, relating to the debts owed by his companies; and

- Mr. El-Bardai was in a position to know the terms reached between Ramy Lakah and BdC regarding the sale of the assets of ASF (a Guarantor of the Eurobond) in February 2000 -- a sale that furthered the Lakahs' scheme to strip the Guarantors of their assets and render them judgment-proof against the Bondholders -- and about the disappearance of the proceeds of that sale.

As the Chairman of BdC during a critical period -- January-February 2000 -- and having been privy to BdC's investigations in its capacity as a substantial investor and principal financier of the Lakah companies, Mr. El-Bardai was well-situated to know facts relevant to piercing the corporate veil of the Guarantors.

Mr. El-Bardai is unwilling to testify without a subpoena.  Because it is not possible to obtain Mr. El-Bardai's testimony in admissible form without his personal appearance, or to obtain relevant documents in his possession in any other manner, the Court should issue a subpoena pursuant to 28 U.S.C. § 1783.

## STATEMENT OF FACTS

The facts of this case have been presented in detail in Respondents' prior submissions to the Court.  The issues in this motion are very similar to those raised in Respondents' motion, dated July 9, 2007, for issuance of a subpoena to Carl Baker under 28 U.S.C. § 1783.  To avoid unnecessary repetition, Respondents have attached, as an Appendix hereto, a copy of the Memorandum of Law in Support of the Motion by Respondents-Cross-Petitioners for an Order Directing the Issuance of a Subpoena to Carl Baker Pursuant to 28 U.S.C. § 1783 (the "Baker Memorandum").  On pages 4-16, the Baker Memorandum sets forth all of the background facts (which are incorporated herein by reference) that are common to both that motion and the present motion.  The evidentiary support is contained primarily in the Declaration of Gilbert A. Samberg, dated April 16, 2007 ("Samberg Prior Decl."), and the exhibits thereto, which Respondents filed in support of their Cross-Petition to Compel Arbitration.  That evidence is now supplemented with the Samberg Declaration of March 10, 2008.

In light of these prior filings, this memorandum will only summarize the background facts of this case, and will focus on the facts relating to Mr. El-Bardai, a key witness whose testimony cannot be obtained without the Court's assistance.

### A.     The Underlying Arbitration, and This Action to Determine Arbitrability

On December 8, 1999, Lakah Funding Limited, a special-purpose British Virgin Islands corporation, issued a 5-year $100,000,000 Eurobond with interest payable semi-annually at the rate 12% per year.  The Bonds were guaranteed by HCFI and its wholly-owned subsidiaries Medequip, TMSE and ASF, all of which are Egyptian corporations.

The brothers Ramy Lakah and Michel Lakah, petitioners herein, are the dominant shareholders of the Guarantors. The Issuer and Guarantors defaulted on the entire amount of principal, and on all interest accruing since December 8, 2000.

Respondents are holders of the defaulted Eurobond in total principal amount of approximately $47,420,000. On June 8, 2006, Respondents commenced an arbitration entitled <u>UBS AG et al. v. Lakah Funding Limited et al</u>., AAA No. 50 148 T 00251 06, before the American Arbitration Association, International Centre for Dispute Resolution, in New York City. In their Demand for Arbitration and Statement of Claim, Respondents asserted claims against the Issuer, Guarantors, Successor Companies, and the Lakahs for breach of contract, fraud, and other claims arising from or in connection with the Eurobond default. Respondents demanded arbitration pursuant to the arbitration clauses contained in various Eurobond transaction documents, including the Indenture, Terms and Conditions of the Bond, and Guarantee.

On or about March 20, 2007, the Lakahs filed a petition in New York state court to stay the Arbitration against them, claiming that they did not agree to arbitrate. After removing to this Court, Respondents filed their Cross-Petition to Compel Arbitration on April 16, 2007. In this proceeding, Respondents will demonstrate that the Lakahs are obligated to arbitrate because, <u>inter alia</u>, they are bound (via piercing of corporate veils) by the arbitration agreements signed by the Guarantors. (Respondents also intend to establish the Lakah's obligation to arbitrate based on other grounds, which are not pertinent to this motion, including the Lakahs' being parties to the Indenture in their individual capacities.) Although discovery and Respondents' investigations are not yet

5

complete, Respondents already have uncovered significant evidence supporting piercing of the corporate veil.

At the judicial conference of January 8, 2008, the Court informed the parties that it will grant Respondents' similar motion to issue a subpoena to Carl Baker, a United States citizen residing in France, pursuant to 28 U.S.C. § 1783.[2]  Respondents now move for issuance of a subpoena to Mr. El-Bardai under the same statute.

## B.    The Lakahs' Domination, Control, and Misuse of the Guarantor Corporations

As fully explained in the prior applications, the Lakahs dominated and controlled the Guarantors and used them to perpetrate frauds on the Bondholders.  (See Baker Memorandum, Appendix pp. 7-15; Samberg Prior Decl. ¶¶ 20-54.)  The key facts are briefly summarized below.

The Lakahs' owned approximately 90% of the shares of HCFI, which in turn owned over 97% of the shares of Medequip, TMSE, and ASF.  The Lakahs had and exercised the power to make all significant company decisions including the appointment and "de-selection" of directors and the approval of corporate transactions, and they functioned as the principal officers and directors of all four Guarantors. (Samberg Prior Decl. ¶¶ 20-26.)

For all practical purposes, these companies were mere instrumentalities of the Lakahs' wills.  The Lakahs operated the companies from the same office.  The

---

[2]    More recently, the Court indicated that it thought the Baker motion had become moot, because it may have been under the impression that the witness was cooperating with his deposition.  We then clarified that that was not the case, and that the order regarding the issuance of a subpoena to Mr. Baker was necessary to obtain his testimony.

companies had significantly overlapping officers and directors, including the Lakahs themselves. The companies failed to observe corporate formalities. They rarely held board meetings, and they had no oversight mechanisms regarding the use of corporate funds. On multiple occasions, the Lakahs used the assets of one Guarantor to obtain financing for other Guarantors (such as pledging HCFI's shares of Medequip and TMSE as collateral for BdC's guarantee of ASF's bond issuance). The Lakahs also used corporate funds to support their ultra-luxurious lifestyles and to fund Ramy Lakah's campaign for the Egyptian Parliament. (Id. ¶¶ 20-33.) Most importantly, the Lakahs used their domination and control of the Guarantors to engage in fraud.

After an investigation, the Egyptian Capital Market Authority ("CMA"), an agency similar to our SEC, concluded that the Lakahs conducted fictitious trades to pump up the share prices of the subsidiary Guarantors' stock, including sales through fake brokerage accounts and sales back and forth between the Lakahs themselves. This trading caused the stock prices of Medequip, TMSE, and ASF to increase by 78-100%, and then the Lakahs transferred those shares to their holding company, HCFI, thus inflating its balance sheet value. (Id. ¶¶ 34-37.)

Furthermore, after an investigation, the Egyptian Administrative Control Authority ("ACA") concluded that the Lakahs engaged in banking fraud by colluding with officers at Misr International Bank and (separately) at BdC to issue false bank certificates of deposit. These certificates were used to fictitiously inflate the apparent capital of the Guarantors. (Id. ¶¶ 38-39.)

The CMA and ACA reported that these activities, by which the Lakahs fraudulently inflated the financial statements of the Guarantors, enabled the Lakahs' (via

those companies) to obtain hundreds of millions of dollars of additional financing that was never repaid. (Id. ¶ 40.) Relying in part on the agency investigations, the Egyptian Public Prosecutor brought criminal charges against the Lakahs for, inter alia, fraudulent manipulation of financial information. In January 2003, the Cairo Criminal Court issued a judgment freezing the assets of the Lakahs and their families based on evidence presented by the CMA, ACA, and Public Prosecutor. The prosecution of the Lakahs remains pending. Ramy Lakah and Michel Lakah reportedly fled Egypt respectively in 2001 and 2000, and are now residing in England and Canada, respectively. (Id. ¶¶ 41, 56-57; Baker Memorandum, Appendix pp. 12, 26.)

Ramy Lakah is also being investigated by the authorities in France for financial fraud, including misuse of company property through the transfer of approximately €14,000,000 from one of his French companies to one of his English companies. (Id. ¶¶ 58-59.)

After using the Guarantors to commit securities and banking fraud to obtain financing and investment funding, the Lakahs surreptitiously stripped the Guarantors of their assets to render them judgment-proof shells. After the initial Eurobond interest payment default in June 2001, the Lakahs transferred the assets and businesses of Medequip and TMSE to the seemingly-unrelated Successor Companies (MedTech, Technowave, and Life Care) without consideration. (Id. ¶¶ 42-48.) More importantly for purposes of this motion, the Lakahs acted with BdC's permission to sell the assets of guarantor ASF in February 2000, only two months after the Eurobond issue, and to dispose of all of the proceeds of that sale. ASF too was thus left an empty shell.

8

In the Offering Circular dated December 6, 1999, the Lakahs represented to the Bondholders that the assets of ASF had a value of E£597,200,000.  On February 16, 2000, HCFI sold the assets of ASF to Egypt Steel for E£321,000,000, consisting of E£100,000,000 in cash and E£221,000,000 in notes payable over six years.  (Samberg Decl. ¶¶ 20-21 & Ex. A, p. F-62; Ex. D, p. 58.)  The Lakahs then falsely certified to the Eurobond Trustee that the assets of ASF "were sold for Fair Market Value" and that the purchase price "was received, in full, by ASF simultaneously with the disposal of the subject assets, 100% in cash."  (Id., Ex. C, p. 1.)  The E£100,000,000 in cash disappeared, and the notes apparently were diverted to BdC to pay the obligations of other Lakah Group companies, including HCFI, to BdC.  (Samberg Decl. ¶ 20 & Ex. D, p. 58.)

Because BdC held a lien on all assets of ASF, and because of ASF's prior commitments to BdC, the sale could not have been completed without the consent of BdC.  (Id. ¶ 23 & Ex. E, next to last page.)  The sale resulted in ASF being left an empty shell that could not meet its obligations to the Bondholders.  None of the proceeds of that sale ever were available to satisfy those obligations.

**C.    Mr. El-Bardai, a Witness to the Lakahs' Wrongdoing**

During the focal time period, BdC was a major shareholder of HCFI, owning between 7.67 and 10% of HCFI's shares, and held a seat on the Board of HCFI. (Samberg Decl. ¶¶ 15-16 & Ex. A, pp. 71-72.)  BdC was also the largest financier to the Lakah Group of companies.  In 1998-99, BdC extended loans and guarantees to the Guarantors worth hundreds of millions of Egyptian pounds.  They included loans to Medequip and TMSE totaling over E£105,000,000; a guarantee of HCFI's local bond

issue of E£400,000,000; and a guarantee of ASF's local bond issue of E£250,000,000. (Id. ¶ 13 & Ex. A.)

Mr. El-Bardai was the Chairman of BdC from January 2000 through January 2006. (Id. ¶ 6.) When he became Chairman, BdC reviewed the conditions and operations of the Lakah Group of companies, including the Guarantors, and their prior dealings with BdC. Among other things, the reviews examined suspected fraudulent activities of the Lakahs and the Guarantors, including suspected collusion with one or more BdC employees (including those at BdC's Sarwat Branch) regarding the issuance of false bank certificates that were used to falsify the financial statements of the Guarantors and other companies. (Id. ¶¶ 8, 28.)

On a few occasions, Mr. El-Bardai met with Ramy Lakah to discuss, among other things, the sale of ASF or its assets, and BdC's outstanding loans and facilities to various Lakah Group companies. The sale of ASF was in advanced negotiations by January 26, 2000 and was completed on February 16, 2000, during Mr. El-Bardai's term as Chairman of BdC. (Id. ¶¶ 6, 9, 18 & Exs. B-C.) Because BdC held a lien on ASF's assets, BdC was able to negotiate terms with the Lakahs whereby the bank released its lien on ASF and received at least two-thirds of the proceeds of that sale. (Id. ¶¶ 9, 19-24 & Ex. D, pp. 57-58; Ex. E, next to last page.) The specific terms are not known to Respondents.

Mr. El-Bardai is a dual citizen of the United States and Egypt and resides only in Egypt. He is unwilling to testify without a subpoena. (Id. ¶¶ 5, 10, 33-34.)

## **ARGUMENT**

The Court may subpoena a United States citizen residing in a foreign country if it finds that the witness' testimony or document production (1) "is necessary in the interest of justice," and (2) "it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner."  28 U.S.C. § 1783(a) (2000).  These two requirements are easily satisfied here.

### **I.**

### **THE TESTIMONY OF MR. EL-BARDAI IS NECESSARY IN THE INTEREST OF JUSTICE**

When determining whether the issuance of a subpoena "is necessary in the interest of justice," courts may consider many factors, including the nature of the proceedings, the nature of the testimony or evidence sought, the convenience of the witness, and other factors bearing on the reasonableness of requiring a person abroad to appear as a witness.  Estate of Ungar v. Palestinian Authority, 412 F. Supp. 2d 328, 333-34 (S.D.N.Y. 2006) (citing legislative history).  However, when construing section 1783, the issuance of a subpoena is "in the interest of justice" if it falls within the scope of discovery permitted by Federal Rule of Civil Procedure 26(b); namely, if it seeks information relevant to any party's claim or defense or appears reasonably calculated to lead to the discovery of admissible evidence.  See, e.g., Klesch & Co. v. Liberty Media Corp., 217 F.R.D. 517, 523-24 (D. Colo. 2003) (issuing subpoena to witness in Germany whose deposition "may present relevant information or, at the very least, may lead to the discovery of admissible evidence"); Ungar, 412 F. Supp. 2d at 333 (agreeing

11

with standard stated in <u>Klesch</u>, and issuing subpoena to witness in Egypt); <u>SEC v.</u>

<u>Sandifur</u>, No. C05-1631 C, 2006 WL 3692611, at *3 (W.D. Wash. Dec. 11, 2006)

(applying same standard to issue deposition subpoena to witness in Luxembourg).

There can be no doubt that the discovery sought from Mr. El-Bardai meets this

standard.

**A.    Mr. El-Bardai Is Likely to Possess Discoverable**
**Information Relevant to Piercing the Corporate Veil.**

The primary factual issues in this proceeding concern whether the corporate veils

of the Guarantors should be pierced to hold the Lakahs -- their dominant shareholders --

bound by their agreements to arbitrate.  To determine whether to pierce the corporate

veil, the Court must consider whether the Lakahs dominated any of the Guarantors, and

whether they used that control to commit fraud or wrongdoing.  <u>See</u> <u>William</u>

<u>Passalacqua Builders, Inc. v. Resnick Developers South, Inc.</u>, 933 F.2d 131, 138 (2d

Cir. 1991).  To determine whether sufficient control exists, relevant factors include, <u>inter</u>

<u>alia</u>, the disregard of corporate formalities, inadequate capitalization, intermingling of

funds and other property, overlap in executive personnel, degree of discretion exercised

by the dominated corporation, whether corporations are treated as independent profit

centers, and payment or guarantee of debts by the dominating entity.  <u>Freeman v.</u>

<u>Complex Computing Co.</u>, 119 F.3d 1044, 1053 (2d Cir. 1997).

As the former Chairman of BdC -- a significant shareholder and the principal

bank of the Lakah Group -- Mr. El-Bardai has knowledge of many of those factors.  BdC

was knowledgeable regarding the affairs of the Guarantors and of the Lakahs.  BdC

was the primary financier of the Guarantors, having extended loans and guarantees to

them of hundreds of millions of Egyptian Pounds at the time of the Bond offering. In several of those transactions, the assets of one Guarantor were used to secure the obligations to BdC of another Guarantor, a factor that supports veil-piercing. (Samberg Decl. ¶¶ 13-14 & Ex. A.)

BdC was a major shareholder of HCFI in 1998-2000 and, indeed, was the <u>only</u> major shareholder aside from the Lakahs themselves. (<u>Id</u>. ¶ 15 & Ex. A, pp. F-14, F-46.) BdC appointed a member of the Board of HCFI, the parent Guarantor. (<u>Id</u>. ¶¶ 15-16 & Ex. A, pp. 71-72.) BdC therefore (a) possessed information about the Guarantors' finances; (b) knew to what extent the affairs of the Guarantors were controlled by the Lakahs; (c) and knew whether HCFI was observing corporate formalities, such as holding regular board meetings.

Because Mr. El-Bardai was the Chairman of BdC, it can reasonably be inferred that he possessed the bank's information about the Guarantors. He also has knowledge of relevant facts based on his personal dealings with the Lakah Group. Among other things, he met several times with Ramy Lakah to discuss the Lakah Group's affairs. (<u>Id</u>. ¶ 9.) When he became Chairman of BdC, Mr. El-Bardai was privy to the banks' investigations into suspected fraudulent activities of the Lakahs and their companies. One of the subjects of his investigation was the collusion of BdC employees with the Lakahs to issue a false certificate of deposit, which the Lakahs used to inflate the capital (and therefore the apparent value) of the Guarantors on their financial statements in the Offering Circular. The Lakahs used those falsified financial statements to induce the Bondholders to invest in the Eurobond. (<u>Id</u>. ¶¶ 8, 12; Samberg Prior Decl. ¶¶ 34-41.) BdC's investigation into the aforementioned banking fraud

13

probably gave Mr. El-Bardai information about how the Lakahs used their control of the Guarantors to commit fraud on the Bondholders (as well as other creditors, like BdC). Mr. El-Bardai also has personal knowledge regarding another transaction that is relevant to piercing the corporate veil: the sale of the assets of ASF (and the disposal of the sale proceeds), which gutted ASF and rendered it incapable of serving as a Guarantor of the Eurobond.

Only two months after the Lakahs represented, in the Offering Circular, that the assets of ASF were worth E£597,200,000, they sold the assets of ASF to an unaffiliated third party for E£321,000,000. (Samberg Decl. ¶¶ 20-21 & Ex. A, p. F-62; Ex. D, p. 58.)[3] (This fact alone is sufficient to raise an inference of fraud in the inducement, as it shows that the Lakahs had also falsified the stated value of ASF in the Offering Circular.) Further compounding the fraud, none of the sale proceeds were returned to ASF to pay the Bondholders. The E£100,000,000 disappeared (and possibly was misappropriated by the Lakahs for their personal use), and the notes reportedly were paid to the account of BdC to satisfy other obligations of the Lakah Group. (Id. ¶ 20 & Ex. D, p. 58.)

From the available information, it appears that BdC held a lien on all of the assets of ASF, and that ASF had certain restrictions that it was bound by BdC to observe, and therefore that ASF could not sell its assets without BdC's consent. (Id. ¶¶ 22-23 & Ex. E, next to last page.) It can be safely assumed that the purchaser of ASF's assets, Egypt Steel (which has no known relationship to the Lakah Group), would

---

[3] Furthermore, Ramy Lakah falsely certified to the Eurobond Trustee that ASF received the proceeds entirely in cash, simultaneously with the disposal. (Samberg Decl., Ex. C, p. 1.) In fact, the payment was E£100,000,000 in cash and E£221,000,000 in notes payable over six years. (Id., Ex. D, p. 58.)

not have purchased those assets without the release of BdC's lien.  The sale of ASF was in advanced negotiations by January 26, 2000 and completed by February 16, 2000.  Mr. El-Bardai already was Chairman of BdC during that period.  (Id. ¶ 6 & Exs. B-C.)

As the Chairman of BdC at that time, Mr. El-Bardai had access to information regarding the sale of ASF's assets.  Indeed, Ramy Lakah approached him in early 2000 to discuss the sale of ASF.  (Id. ¶ 9.)  Mr. El-Bardai knows what secret terms were agreed between HCFI and BdC that resulted in the lifting of BdC's lien on the assets, and in the transfer of at least two-thirds of the proceeds of the sale to BdC.  He may well know what happened (or, at least, what was agreed to happen) to the E£100,000,000 of cash proceeds that is unaccounted for.

Mr. El-Bardai's knowledge regarding of the surreptitious sale of ASF's assets would be enough, by itself, to justify issuing a subpoena under section 1783, because that transaction is one of the core elements of the Lakahs' fraudulent scheme that supports piercing the corporate veil.  See Sandifur, 2006 WL 3692611, at *4 (issuing subpoena to witness to mortgage transactions "that form the core of the SEC's case").

In any event, as explained above, Mr. El-Bardai also has knowledge of many other facts relevant to piercing the corporate veil.  His service as Chairman of BdC began in January 2000, only one month after the Eurobond was issued on December 8, 1999.  When he became Chairman, BdC reportedly gathered information regarding the workings of the Lakah Group; eventually investigated allegations that the Lakahs committed fraud on BdC in collusion with one or more employees of BdC; received information regarding the Lakah Group's surreptitious plan to sell ASF or its assets; was

15

drawn into negotiations with Ramy Lakah in January-February 2000 regarding the lifting of BdC's lien on the assets of ASF; and knew about the diversion of the proceeds of the sale of ASF's assets away from Guarantor ASF and into the hands of BdC and others. It therefore is necessary and in the interest of justice to obtain Mr. El-Bardai's testimony and documents.

Finally, in deciding whether to issue the subpoena, a court should consider "the nature of the proceedings." Ungar, 412 F. Supp. 2d at 333-34; Sandifur, 2006 WL 3692611, at *3. This action concerns piercing of the corporate veil based on mostly hidden evidence of (1) the Lakahs' domination and control of the Issuer and Guarantors; (2) their use of that control to commit fraud and wrongdoing; and (3) their infliction of injury on the Bondholders through their fraud and wrongdoing. Although Respondents have gathered evidence to support veil-piercing, they were outsiders and not privy to the clandestine actions of the Lakahs. Respondents need to take discovery of a person, like Mr. El-Bardai, who has both direct and indirect knowledge of the events at issue.

Respondents therefore have compelling reasons to take Mr. El-Bardai's deposition. He has discoverable information, about largely hidden matters, that cannot be obtained otherwise. The issuance of a subpoena to him is necessary in the interest of justice.

**B.    Mr. El-Bardai Is Likely to Possess Discoverable Information
         Relevant to Petitioners' Arguments in This Proceeding.**

In opposition to Respondents' Cross-Petition to Compel Arbitration, the Lakahs submitted declaration testimony and documents denying that the financial collapse of

the Guarantors was caused by any fraud or wrongdoing of the Lakahs. Instead, they contend that BdC is primarily to blame for the Eurobond default. (Samberg Decl. ¶¶ 29-30 & Ex. F, ¶¶ 80-83, 117-18.)

According to the Lakahs' chief reply witness, Brian Murphy, BdC unexpectedly asserted a lien on all assets of ASF shortly after the Eurobond was issued. Then BdC used that lien to seize the bulk of the proceeds of the sale of ASF, thus leaving the Guarantors without the capital needed to fund their operations and pay their debts. (Id. ¶¶ 29-31 & Ex. F, ¶¶ 46-60, 80-83, 117-18, 164, 171.)

Although Respondents believe these accusations will prove to have absolutely no merit, they underscore Mr. El-Bardai's importance as a witness. Mr. El Bardai can testify regarding any arrangements between BdC and the Lakahs concerning the disposal of the proceeds of the sale of ASF. He also should know the circumstances under which BdC asserted its lien on ASF's assets, and whether it was done with the Lakahs' knowledge or approval.

To summarize, the Lakahs' claim that BdC caused the Guarantors to default on the Eurobond, while Respondents claim that the Lakahs caused their injury by fraud in the inducement, etc., by using their control of the Guarantors to inflate and misrepresent the value of those companies to the Bondholders, and then strip them of their assets. Because Mr. El-Bardai has knowledge of facts relating directly to this dispute, it is necessary and in the interest of justice to issue a subpoena to obtain his testimony.

## II.

### IT IS NOT POSSIBLE TO OBTAIN MR. EL-BARDAI'S TESTIMONY IN ADMISSIBLE FORM, OR THE PRODUCTION OF HIS DOCUMENTS, WITHOUT HIS PERSONAL APPEARANCE AS A WITNESS

Mr. El-Bardai is a citizen of the United States residing in Egypt. Respondents' counsel has requested his cooperation, but he is unwilling to testify except in compliance with a subpoena. (Samberg Decl. ¶¶ 5, 10, 33-34.) Accordingly, it is not possible to obtain his testimony in admissible form without his personal appearance, or to obtain any pertinent documents in his control in any other manner.

This Court has the power to issue a subpoena compelling Mr. El-Bardai to appear for a deposition in the United States or in Egypt. See 28 U.S.C. § 1783(a); Ungar, 412 F. Supp. 2d at 335 (granting motion to subpoena witness in Egypt, but reserving as to time and place of deposition); Klesch, 217 F.R.D. at 524 (granting motion to issue subpoena for witness in Germany, at a time and place convenient for counsel and the witness, in case involving fraud and related claims); Sandifur, 2006 WL 3692611, at *5 (issuing subpoena for deposition in Luxembourg, in case involving securities and accounting fraud); CSI Investment Partners II, L.P. v. Cendant Corp., 00 Civ. 1422 (DAB), 2006 U.S. Dist. LEXIS 11015, *10-15 & n.2 (S.D.N.Y. Mar. 15, 2006) (issuing subpoena to witness in England, giving witness the option of appearing for deposition in London, in case involving accounting fraud). Because Mr. El-Bardai's testimony is necessary in the interest of justice, and cannot be obtained without a Court-ordered subpoena, the Court should issue a subpoena for his deposition.

## CONCLUSION

For all of the reasons stated above, Respondents-Cross-Petitioners respectfully request that this Court enter an order directing the issuance of a subpoena to Mr. El-Bardai, in the form annexed to the Notice of Motion.

Dated:  April 8, 2008
       New York, New York

                    MINTZ, LEVIN, COHN, FERRIS,
                    GLOVSKY AND POPEO, P.C.

                    By:

                    Gilbert A. Samberg (GS-2610)
                    Kevin N. Ainsworth (KA-8493)
                    David L. Barres (DB-2129)
                    Chrysler Center
                    666 Third Avenue
                    New York, New York 10017
                    (212) 935-3000
                    (212) 983-3115 (facsimile)

4246424v.4