A

Gilbert A. Samberg (GS-2610)
Kevin N. Ainsworth (KA-8493)
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
(212) 935-3000
(212) 983-3115 (facsimile)

*Attorneys for Respondents UBS AG, Exporters Insurance Company, Ltd.,
Arab Banking Corporation, National Bank of Abu Dhabi and National Bank of Oman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| In the Matter of the Application of ) | |
| ) | |
| RAMY LAKAH and MICHEL LAKAH, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| For a judgment pursuant to Article 75 of ) | |
| the C.P.L.R. staying the arbitration ) | |
| commenced by ) | 07-CV-2799 (MGC) (FM) |
| ) | |
| UBS AG, EXPORTERS INSURANCE ) | |
| COMPANY, LTD., ARAB BANKING ) | |
| CORPORATION, NATIONAL BANK OF ABU ) | |
| DHABI and NATIONAL BANK OF OMAN, ) | |
| ) | |
| Respondents. ) | |

-------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF MOTION BY RESPONDENTS-
CROSS-PETITIONERS FOR AN ORDER DIRECTING THE ISSUANCE OF
A SUBPOENA TO CARL BAKER PURSUANT TO 28 U.S.C. §1783**

Gilbert A. Samberg (GS-2610)
Kevin N. Ainsworth (KA-8493)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
The Chrysler Center
666 Third Avenue, 25th Floor
New York, New York  10017
(212) 935-3000

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

INTRODUCTORY STATEMENT ...........................................................1

STATEMENT OF FACTS ....................................................................4

  A.    THE PARTIES ...........................................................................4

  B.    ARBITRATION AGREEMENTS IN THE BOND TRANSACTION
       DOCUMENTS ...........................................................................6

  C.    PIERCING THE CORPORATE VEIL(S) .......................................7

      1.  The Lakahs Had Complete Control of the Bond Guarantors and
         Issuer .................................................................................7

      2.  The Lakahs Used the Guarantors as Mere Instrumentalities ....9

      3.  The Lakahs Used Their Domination and Control of the
         Guarantors to Perpetrate Frauds Against the Respondents-
         Bondholders .......................................................................10

          a.  Egyptian governmental regulatory and justice agencies have
            investigated and are prosecuting the Lakahs for financial and
            securities frauds that affected Respondents. ....................10

             i.     Securities Fraud .......................................................10

             ii.    Banking Fraud ..........................................................11

             iii.   The Lakahs Are Being Prosecuted Criminally in
                 Egypt for Pertinent Financial and Securities
                 Frauds .....................................................................12

             iv.   Petitioner Ramy Lakah is Being Investigated
                 Criminally For Financial Fraud in France ..................12

           b.  The Lakahs' Clandestine Stripping of the Guarantors' Assets ...........13

             i.     Clandestine Sale of ASF's Assets ............................13

              ii.    Clandestine Evisceration of TMSE and Medequip ...14

      4.  The Bondholders' Investigations and Discovery........................15

  D.    CARL BAKER.............................................................................15

ARGUMENT ............................................................................................. 16

POINT I    A SUBPOENA SHOULD ISSUE TO CARL BAKER ................................ 16

A.    DISCOVERY FROM BAKER IS NECESSARY IN THE INTEREST
      OF JUSTICE ............................................................................... 18

   1.   Respondents Have Begun Presenting Evidence Requiring the
        Piercing of Corporate Veil(s) ...................................................... 18

      a.   The Lakahs Personally Dominated and Controlled the
           Guarantors ......................................................................... 18

      b.   The Lakahs Used Their Domination and Control of the
           Guarantors to Perpetrate Financial Frauds on the
           Bondholders ....................................................................... 23

         i.    Securities Fraud ........................................................ 24

         ii.   Banking Fraud ........................................................... 25

         iii.  The Lakahs Are Being Prosecuted Criminally in
               Egypt For Pertinent Financial and Securities
               Frauds ....................................................................... 26

      c.   The Lakahs' Fraudulent Manipulation and Use of the
           Guarantor Companies Caused Harm to the Respondents ................. 26

      d.   Piercing the Corporate Veil is Required to Prevent a Fraud
           and Because to Do Otherwise Would Permit the Lakahs to
           Avoid Legal Liability for Fraud ................................................. 27

         i.    Clandestine Sale of ASF's Assets ............................... 31

         ii.   Clandestine Evisceration of Medequip and TMSE ................. 33

   2.   Baker Is Very Likely To Have Discoverable Information Not
        Obtainable from Other Sources ................................................... 34

B.    IT IS NOT POSSIBLE TO OBTAIN BAKER'S TESTIMONY IN
      ADMISSIBLE FORM WITHOUT HIS PERSONAL APPEARANCE
      OR TO OBTAIN PRODUCTION OF DOCUMENTS IN ANY
      OTHER MANNER ....................................................................... 35

CONCLUSION ......................................................................................... 35

ii

## TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

Am. Fuel Corp v. Utah Energy Dev. Co. Inc.,
    122 F.3d 130 (2d Cir. 1997) ....................................................................... 18, 19, 20

Am. Protein Corp. v. AB Volvo,
    844 F.2d 56 (2d Cir. 1988) .......................................................................... 29

Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.,
    230 F. Supp 2d 439 (S.D.N.Y. 2002) ........................................................ 33

Estate of Yaron Ungar v. Palestinian Auth.,
    412 F. Supp. 2d 328 (S.D.N.Y. 2006) ....................................................... 18

Freeman v. Complex Computing Co.,Inc.,
    119 F.3d 1044 (2d Cir. 1997) ..................................................................... 18, 20

Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.,
    891 F. Supp. 946 (S.D.N.Y. 1995) ............................................................ 27, 29, 30

Golub v. Kidder,Peabody & Co., Inc.,
    No. 89 Civ. 5903, 2000 WL 1024688 (S.D.N.Y. July 25, 2000) ................ 18

Kinetic Instruments, Inc. v. Lares,
    802 F. Supp. 976 (S.D.N.Y. 1992) ............................................................ 27, 28, 29

Klesch & Co., Ltd. v. Liberty Media Corp.,
    217 F.R.D. 517 (D. Colo. 2003) ................................................................. 18, 34

Mag Portfolio Consultant, GMBH v. Merlin Biomed Group, LLC,
    268 F.3d 58 (2d Cir. 2001) .......................................................................... 20

Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.,
    757 F.2d 1256 (Fed. Cir. 1985) ................................................................. 27

Mobius Mgmt. Sys. Inc. v. Technologic Software Concepts, Inc.,
    No. 02 Civ. 2820, 2002 WL 31106409 (S.D.N.Y. Sept. 20, 2002) ............... 19, 32, 33

Weinreich v. Sandhaus,
    850 F. Supp. 1169 (S.D.N.Y. 1994) .......................................................... 29

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,
    933 F.2d 131 (2d Cir. 1991) ....................................................................... 19

**STATUTES**

28 U.S.C. §1783 ..................................................................................................................17

Respondents-Cross-Petitioners UBS AG ("UBS"), Exporters Insurance Company, Ltd. ("EIC"), Arab Banking Corporation ("ABC"), National Bank of Abu Dhabi ("NBAD"), and National Bank of Oman ("NBO") (collectively "Respondents" or the "Bondholders") submit this memorandum in support of their motion for an order, pursuant to 28 U.S.C. §1783, directing the issuance of a subpoena to Carl Baker ("Baker"), a citizen of the United States residing in France.  **[The Petitioners do not object to the issuance of the said subpoena, and therefore will submit no opposition to this motion.]**

## INTRODUCTORY STATEMENT

On June 8, 2006, the Bondholders commenced an arbitration proceeding (the "Arbitration") against Petitioners Ramy Lakah and Michel Lakah (the "Lakahs"), as well as against several of their companies -- Lakah Funding Limited ("LFL") (the "Issuer"); Holding Company for Financial Investments (Lakah Group), S.A.E. ("HCFI"), Trading Medical System Egypt, S.A.E. ("TMSE"), Medequip for Trading and Contracting, S.A.E. ("Medequip"), and Arab Steel Factory, S.A.E. ("ASF") (each a "Guarantor," collectively the "Guarantors"); Medical Technology, S.A.E. ("MedTech"), Technowave, S.A.E. ("Technowave"), and Life Care Technology, S.A.E. ("Life Care," along with MedTech and Technowave, the "Successor Companies") -- by filing with the American Arbitration Association a Demand for Arbitration and Statement of Claim (the "Demand for Arbitration").  The Arbitration arises from defaults by the Issuer and Guarantors on their

obligations to repay the principal ($100,000,000) and all but two interest payments on their Eurobond.[1]

The Bondholders seek in this proceeding to compel the Lakahs to arbitrate their dispute pursuant to a written arbitration agreement. The Lakahs assert that they are not signatories to the arbitration agreement and that the Arbitration should be stayed as against them. The Bondholders have presented to the Court, among other things, evidence that the Lakahs should be held bound by (i) an arbitration agreement signed by the Issuer and the Guarantors (because piercing the corporate veils of one or more of the Guarantors is justified), and (ii) an arbitration clause in an agreement signed by each of the Lakahs in his personal capacity.

Included in the Bondholders' application to this Court is initial evidence, from Egyptian governmental agency investigations of the Lakahs and from an Egyptian criminal prosecution of the Lakahs, that the Lakahs, through their control over the Issuer and the Guarantors, used various means to artificially inflate the balance sheets of Guarantor HCFI and the apparent value of each of the Guarantors for the purpose of fraudulently inducing the Respondents-Bondholders to purchase the Lakah Eurobonds. The Bondholders have also made an initial showing that, subsequent to the issuance of the Bonds, the Lakahs gutted the operating company Guarantors (*i.e.*, ASF, TMSE, and Medequip) so that they were unable to meet their payment obligations in relation to the Bonds and became judgment-proof.

---

[1]    On or about December 8, 1999, the Issuer issued a US$100,000,000 5-year 12%/annum Eurobond, which was guaranteed jointly and severally by the Guarantors (the "Eurobond" or the "Bonds").

2

This Court recognized during our first conference on May 31, 2007 that the Bondholders' veil-piercing arguments in this proceeding warrant discovery concerning, *inter alia*, (a) the Lakahs' control over the Issuer and Guarantors, and (b) the frauds committed by the Lakahs.  (At that time, we also pointed out the natural inequality among the parties with respect to access to evidence concerning the covert conduct by the Lakahs that largely constitutes the grounds for piercing the corporate veils of the Guarantors.)  As part of that discovery, the Bondholders now move this Court for an order, pursuant to 28 U.S.C. §1783, directing the issuance of a subpoena to Mr. Baker, a citizen of the United States who is currently reportedly residing in France.

The taking of evidence from Mr. Baker is necessary in the interest of justice.  The available evidence indicates that he was a senior member of management of Guarantor HCFI;[2] that he was a "Board Member & Investor Relations" of HCFI;[3] and that "Baker served as vice president for business development of [Guarantor] TMSE."[4]  Baker, therefore, was in a position to know facts relevant to piercing the corporate veils of the Issuer and/or one or more of the Guarantors -- *e.g.*, whether Guarantors HCFI and TMSE observed corporate formalities; whether the Lakahs diverted corporate assets for their personal use; etc.

Since it is not possible to obtain Baker's testimony in admissible form without his personal appearance, or to obtain the production of the requested document(s) in any

---

[2]    Declaration of Gilbert A. Samberg, dated April 16, 2007 ("Samberg Decl."), Ex. 1 at ¶ 6.

[3]    Samberg Decl. Ex. 6 at pp. 71-72.

[4]    *Id.* at 72.

other manner, and since Baker is a U.S. Citizen residing in France, a subpoena should issue pursuant to 28 U.S.C. §1783.

## STATEMENT OF FACTS

On or about December 8, 1999, Lakah Funding Limited (the "Issuer"), a special purpose B.V.I. corporation, issued a 5-year $100,000,000 Eurobond, with interest payable semi-annually in arrears. The Bonds were guaranteed by HCFI, Medequip, TMSE and ASF *per aval* (*i.e.,* as primary obligors). (*E.g.,* Samberg Decl. ¶ 5 and Ex. 6).

After interest payments were made on or about June 8 and December 8, 2000, no further payment of Bond interest, nor any payment of principal, nor any payment of any other kind, was made by the Issuer or any of the Guarantors. (*Id.* ¶ 6.) Thus, the Issuer and the Guarantors have been in default on their principal and interest payment obligations since June 8, 2001.

**A.    The Parties**

Respondents are holders of the defaulted Eurobond. UBS AG is a Swiss corporation, having its head offices in Zurich and Basel, Switzerland, and having a branch in New York, among other places. (Samberg Decl. ¶ 14). Exporters Insurance Company, Ltd. is a corporation organized in Bermuda, having its registered seat in Hamilton, Bermuda. (*Id.*) Arab Banking Corporation is a corporation organized in the Kingdom of Bahrain, having its head office in Manama, and having a branch in New York, among other places. (*Id.*) National Bank of Abu Dhabi is a corporation organized in the United Arab Emirates, having its head office in the Emirate of Abu Dhabi. (*Id.*).

4

National Bank of Oman is a corporation organized in the Sultanate of Oman, having its head office in Muscat. (*Id.*)

Guarantors HCFI, Medequip, TMSE and ASF are Egyptian companies. (*Id.* Ex. 6.) The Issuer is a special purpose vehicle formed in the British Virgin Islands. (*Id.*) At the time of the Bond transaction, the Issuer and three of the Guarantors (ASF, Medequip and TMSE) were each wholly-owned or virtually wholly-owned subsidiaries of "Parent Guarantor" HCFI. (*Id.* ¶ 24.)

Petitioner Ramy Lakah (a/k/a Ramy Raymond Lakah a/k/a Ramy Ramon Lakah) is an individual citizen of Egypt and of France. (*Id.* ¶ 16.) After having been a domiciliary of Egypt from birth, he became a domiciliary of France in or about 2001, and then recently reportedly moved his residence to England. He reportedly left both Egypt and, more recently, France, under the duress of distinct criminal investigations of various financial and securities frauds and related improprieties, which have resulted thus far in a criminal prosecution in Egypt (*see Id.* ¶ 16 and Exs. 11, 20, 24). The assets in Egypt of Mr. Lakah (and of his family) have been frozen by order of a Cairo Criminal Court. (*Id.*) (As is described further below, those criminal frauds are relevant here.)[5]

Petitioner Michel Lakah (a/k/a Michel Raymond Lakah a/k/a Michel Raymon Lakah) is an individual citizen of Egypt. After having been a domiciliary of Egypt from birth, he became a domiciliary of Canada in or about 2001. He currently resides in

---

[5]    We note also that Petitioner Ramy Lakah remains the subject of an outstanding Interpol alert, which was requested by the Egyptian authorities in connection with the Petitioner's criminal conviction for writing business checks that drew on a bank account with insufficient funds, which is a criminal offense in Egypt. (Samberg Decl. ¶ 57 and Ex. 25.)

Montréal, Canada. (*Id.* ¶ 17.)  He reportedly left Egypt under the duress of a criminal investigation, which resulted in a criminal prosecution for financial and securities frauds and related improprieties (*Id.* ¶ 16 and Ex. 11, 24).  The assets in Egypt of Mr. Lakah (and of his family) have been frozen by order of a Cairo Criminal Court.  (*Id.* ¶ 41 and Ex. 20.)  (Those criminal frauds are relevant here.)

**B.**    **Arbitration Agreements in the Bond Transaction Documents**[6]

    Section 110 of the Indenture provides in pertinent part as follows:

> "(a) [A]ny dispute or difference whatsoever arising between the Issuer or any Guarantor… and…a Holder of Bonds…arising out of or in connection with the Bonds, the Guarantee or this Indenture shall be finally settled by submission to arbitration by the American Arbitration Association under its Commercial Arbitration Rules, as at the time in force, by a panel of three arbitrators appointed in accordance with such rules."

> (b) The place of the arbitration shall be New York, New York or London, England; the language of the arbitration shall be English; and the appointing authority shall be the American Arbitration Association."

Section 18 of the Terms and Conditions of the Bonds (*see* Samberg Decl. Ex. 8) and Section 13 of the Guarantee set forth substantially similar arbitration clauses (*see Id.* Ex. 9).

---

[6]    The "Bond Transaction Documents" are:  (a) the Offering Circular, dated December 6, 1999, relative to the Bonds (the "Offering Circular" or "OC") (*see* Samberg Decl., Ex. 6); (b) the Regulation "S" Global Bond (*see Id.* Ex. 7), including the Terms and Conditions of the Bonds ("TCB") (*see Id.* Ex. 8); (c) the Guarantee, dated as of December 8, 1999, made jointly and severally by each of the Guarantors to and in favor of the Trustee for the benefit of the bondholders (*see Id.* Ex. 9); and (d) the Indenture, dated as of December 8, 1999, among the Issuer, the Guarantors, and The Bank of New York, acting through its principal corporate trust office in New York City, as Trustee (the "Trustee"), for the benefit of the bondholders, providing for the issuance of the Bonds (the "Indenture") (*see Id.* Ex. 10).

Ramy Lakah was the sole authorized signatory, and the sole signatory, on behalf of the Issuer and each of the Guarantors of all of the Bond Transaction Documents. (Samberg Decl. ¶ 16 and Ex. 12.)

Each of the Lakahs is a signatory party to the Indenture in his individual capacity, having each agreed to one of the covenants therein (*see* Indenture § 1005(c)(ii), the "Lakah Family Undertaking").  (Samberg Decl. ¶¶ 16, 17, 18 and Ex. 10 at pp. 55, 62.) (That covenant was essential to assure the viability of the Guarantees.)

**C.**    **Piercing the Corporate Veil(s)**

      1.    The Lakahs Had Complete Control of the Bond Guarantors and Issuer

The Lakahs declared without reservation during the period in question that "the Lakah family remains firmly in control of The Lakah Group. . . ." (Samberg Decl. ¶ 20 and Ex. 14.)

In the Offering Circular regarding the Eurobonds, Lakahs formally confirmed their complete ownership control of the Lakah Group companies via their holding company, HCFI:

> As at the date hereof [December 6, 1999], Messrs.  Ramy Lakah and Michel Lakah owned approximately 70 per cent. of the outstanding shares of the Lakah Holding Company [HCFI].  These shareholders are able to exert substantial control over the Lakah Holding Company [HCFI] and, as long as they directly or indirectly own such shares, *they will have the ability to elect all of the Lakah Holding Company's directors, to cast a majority of the votes with respect to virtually all matters submitted to a vote of Lakah Holding Company's shareholders and to prevent a change in the control of the Lakah Holding Company* ([HCFI]."

(Samberg Decl. ¶ 21 and Ex. 6 [OC] at 16) (emphasis added).

7

In addition to their control as dominant shareholders, the Lakahs were the principal officers and directors of HCFI and of the other Guarantors. (*Id.* ¶ 25 and Exs. 6, 10). With respect to HCFI, for example, Ramy Lakah served as Chairman and CEO, and Michel Lakah served as Vice-Chairman and Co-CEO. (*Id.*) With respect to Medequip, Ramy Lakah served as Chairman and a Managing Director, while Michel Lakah also served as Vice-Chairman and a Managing Director. (*Id.* ¶ 25 and Ex. 1, Ex. D at 2). Hence, PricewaterhouseCoopers observed in July, 2001, after a review (but not an audit) of the Lakah Group based on the Lakahs' input, that "Ramy Lakah is the dominant individual within the [Lakah] Group." (*Id.* ¶ 26 and Ex. 15 [PWC Rpt.] at 42.)

The Lakahs' control of HCFI meant that they also had complete control of the other Guarantors and of the Issuer, inasmuch as HCFI owned 97.8% of Medequip's shares, 97.6% of TMSE's shares, 97.9% of ASF's shares, and 100% of LFL's shares. (*Id.* ¶ 24 and Ex. 6) Indeed, in instances where HCFI owned less than 100% of the shares of a subsidiary, Ramy Lakah and Michel Lakah each individually owned a portion of the remaining shares of those subsidiaries as well. (*See Id.* Ex. 6 [OC] at F-54, F-60, F-66.)

In connection with the Eurobond offering, Ramy Lakah was the sole authorized signatory, and the sole signatory in fact, of all of the Bond Transaction Documents on behalf of each of the Issuer and the several Guarantors (*See Id.* ¶ 16 and Exs. 6-10, 12).

Further facts in this regard are adduced below.

8

2.     <u>The Lakahs Used the Guarantors as Mere Instrumentalities</u>

The Lakahs dominated and controlled the Issuer and the Guarantors, and utilized the Guarantors as mere instrumentalities of their personal wills.  The following are pertinent in that regard:

a.     At least three of the Guarantors were operated by the Lakahs from the same office and each received mail at the same address -- 68 El Merghany Street, Heliopolis, Cairo.  (*E.g.,* Samberg Decl. ¶ 28 and Ex. 16.)  All of the Guarantors (and all other Lakah Group companies) used a single common "Lakah Group" website.  (*Id.*)

b.     In addition to the Lakahs' positions as directors of each and senior-most officers of each, there was substantial other overlap in officers and directors among the Guarantors (Affidavit of Ramy Lakah, dated March 6, 2007, in support of petition to stay arbitration [the 'Lakah Aff."] at ¶ 40).

c.     Corporate formalities were not observed:

• Board Meetings were not held (*see, e.g.,* Samberg Decl. ¶ 30 and Ex. 1 ¶¶36-38);

• Because the Lakahs manipulated the memberships of their companies' boards of directors, and rarely if ever held board meetings, public filings listing corporate directors were falsified or a listed board member might not even be aware that he had been "appointed" as such by the Lakahs.  *See, e.g.,* appointment of Dr. Amgad Zarif as a member of the Board of Medequip, regarding which Dr. Zarif was never informed.  (*Id.*, Ex. D at 6);

• The Guarantors, which were represented to be capitalized at roughly $450,000,000 and worth a multiple of that amount (*Id.* ¶ 31 and Ex. 6), had no oversight mechanism(s) with respect to the use of corporate funds (*see, e.g., Id.* Ex. 1).

9

    d.      The Lakahs intermingled funds and obligations of the various Guarantors:

> - The Lakahs used the assets of one Guarantor as security to obtain debt financing for other Guarantors. For example, a local bond was issued by ASF in 1998 with a guarantee by Banque du Caire. The guarantee facility for the benefit of ASF was secured by HCFI's pledges of 800,000 shares of Medequip and 400,000 shares of TMSE that HCFI owned. (*See* Samberg Decl. ¶ 33 and Ex. 6, OC at 58). Later, in order to recover those pledged shares, HCFI paid US$35,000,000 to Banque du Caire out of loan financing that it had received, which loan was collateralized by the proceeds of the Eurobond issue. (*See Id.* Ex. 6 [OC] at 58, Ex.17 [PWC Rpt.] at 56-59).

    e.      The Lakahs made no distinctions between corporate and personal funds:

> - It was common knowledge among Lakah employees that the Lakahs used corporate funds -- particularly the revenues of their medical distribution businesses -- to support their lavish lifestyles of mansions, automobiles and private jets (*see Id.,* Samberg Decl. ¶ 33, Exs. 1, 2);
>
> - Ramy Lakah used the revenues of the Guarantors to fund his political campaign for the Egyptian parliament in 2000 (*see id.*);

3.      The Lakahs Used Their Domination and Control of the Guarantors to Perpetrate Frauds Against the Respondents-Bondholders

    a.      Egyptian governmental regulatory and justice agencies have investigated and are prosecuting the Lakahs for financial and securities frauds that affected Respondents.

        i.    Securities Fraud

In October 2000, the CMA -- a regulatory agency analogous to the Securities and Exchange Commission -- determined that the Lakahs violated Egyptian banking and securities laws by their fraudulent manipulation of and then fraudulent

10

misrepresentations concerning the apparent values of Lakah-controlled companies, including HCFI, TMSE, Medequip, and ASF. (Samberg Decl. ¶ 36 and Ex. 19). For example, the CMA determined that in 1998, the Lakahs conspired with their securities brokerage company, AlEman Company for Financial Brokerage ("AlEman"), to establish fake trading accounts and conduct fictitious trades of Lakah company securities in order to pump up the prices of the stocks in question. This scheme included the buying and selling back and forth between Ramy and Michel Lakah of their shares of the respective companies. (Id.) The CMA found, *inter alia*, that the sham transactions engaged in by the Lakahs resulted in "economically unjustified" increases (a) of the stock price of ASF by almost 100%; (b) of the stock price of TMSE by 81.65%; and (c) of the stock price of Medequip by 78%. Furthermore, in each case, immediately following the fraudulent and artificial stock price increase, the shares of stock were transferred from Ramy Lakah and Michel Lakah to HCFI. (Id.) The purpose of the sham transactions was to artificially inflate the apparent balance sheet value of the parent company, HCFI. (The resulting fraudulently-inflated financials of HCFI became the basis of the representations made in the Eurobond Offering Circular, which in turn induced the Respondents to purchase the Eurobonds. Id.)

ii.     Banking Fraud

In addition to securities fraud, an investigation by the Egyptian Administrative Control Authority ("ACA") concluded that the Lakahs colluded with one or more officers of Misr International Bank to obtain forged bank certificates of deposit in very substantial amounts. (Samberg Decl. ¶¶ 38-39 and Ex. 18). The false bank certificates too were

11

used to fictitiously inflate the apparent capital of the Guarantors in order to make them more attractive to lenders and investors like Respondents. (*Id.*)

According to the ACA, the Lakahs' scheme successfully elicited tens of millions of dollars in additional financing, including sizeable loans both to the Guarantors and to the Lakahs personally, that were never paid. (*Id.*) The ACA concluded that as a result of this fraud, the Lakahs personally converted millions in loan funds.

   iii.  The Lakahs Are Being Prosecuted Criminally in
       Egypt for Pertinent Financial and Securities Frauds

In January 2003, the Cairo Criminal Court (North District Circuit 19) issued a judgment freezing the assets of the Lakahs (and of their families) in Egypt based on evidence presented by the CMA, by the ACA, and by the Egyptian Public Prosecutor General (the "Public Prosecutor"). (Samberg Decl. ¶ 41 and Ex. 20). The Public Prosecutor also apparently charged the Lakahs with, *inter alia*, fraudulent manipulation of financial information concerning the Lakah Group. The criminal prosecution of the Lakahs reportedly has not been concluded.

   iv.  Petitioner Ramy Lakah is Being Investigated
       Criminally For Financial Fraud in France

Since not later than December 2005, Petitioner Ramy Lakah has been under criminal investigation by a Paris Magistrate for misuse of company property consisting of "dubious fund transfers" between one of his French companies and one of his related English companies. Approximately €14,000,000 was said to have been found thus far to have been transferred. (Samberg Decl. ¶ 58 and Ex. 26.)

Also in 2005, Petitioner Ramy Lakah was reportedly being investigated for an unexplained transfer of €200,000 from his French-based company, Air Horizons, to an unrelated Lakah-owned U.K. company, Trading Medical System Ltd. (Samberg Decl. ¶ 59 and Ex. 27.)

> ### b.   The Lakahs' Clandestine Stripping of the Guarantors' Assets

After perpetrating securities and bank frauds utilizing the Guarantor companies to obtain financing and investment funding from various sources, including Respondents, the Lakahs surreptitiously stripped the Guarantors of their assets in order to render them judgment-proof shells.

> ### i.   Clandestine Sale of ASF's Assets

Approximately 1 ½ months after the Eurobond issue, on January 26, 2000, Ramy Lakah, as Chairman and CEO of the Lakah Group (*i.e., HCFI*), advised the Eurobond Trustee that "the Holding Company for Financial Investment (Lakah Group) is in advance [sic] negotiations for the sale of its steel business... ." (Samberg Decl. ¶ 42 and Ex. 21.) Upon review of the matter, the Trustee opined to the Lakahs that their pending transaction required, in accordance with the Bond Transaction Documents, notice to and the consents of the Eurobond holders. (Samberg Decl. ¶ 42 and Ex. 22.) The Lakahs provided no such notice (and sought no such consents).[7] (*Id.*)

Instead, on February 16, 2000, Ramy Lakah, as Chairman and CEO of HCFI, and Michel Lakah, as Vice-Chairman and Co-CEO of HCFI, certified to the Eurobond Trustee that ASF had sold "certain of its assets" as of February 16, 2000; that "the

---

[7]   Nothing regarding the imminent sale of all of ASF's assets had been disclosed to the Petitioners in the Offering Circular for the Eurobonds. (Samberg Decl. ¶ 46 and Ex. 6.)

assets sold by ASF... were sold for Fair Market Value... and the purchase price received in connection with the ASF Sale was received, in full, by ASF simultaneously with their disposal of the subject assets, 100% in cash." The Lakahs further certified that "the ASF Sale does not constitute a sale of 'all or substantially all' of the assets of any Guarantor, including ASF or the Company [*i.e.,* HCFI]... ." (*Id.* ¶ 43 and Ex. 23.)

In fact, the assets that were sold comprised all of ASF's operating assets, and the sale price of approximately E£331,000,000 consisted of approximately E£100,000,000 in cash and approximately E£231,000,000 in promissory notes, maturing sequentially, and avalized by the National Bank of Egypt. (*See Id.* ¶ 44 and Ex. 17). Furthermore, the E£100,000,000 in cash disappeared and the promissory notes were apparently diverted to another creditor of the Lakah Group, without challenge or objection by the Lakahs. Thus, within approximately two months of the Eurobond offer, one of the three operating company Guarantors had effectively been gutted by the Lakahs. The Respondents were left with the empty shell of ASF, which of course later defaulted on its Bond payment obligations as a Guarantor.

ii.    Clandestine Evisceration of TMSE and Medequip

After the initial Eurobond interest payment default in June 2001, and during the tenor of the Bonds, the Lakahs surreptitiously transferred, without consideration, the assets and businesses of TMSE and of Medequip to seemingly-unrelated Successor Companies (MedTech, Technowave and Life Care). (Samberg Decl. ¶ 49-51; *Id.* Ex. 1 at ¶¶ 11-12, 20-28). The business and assets of TMSE were transferred without consideration to MedTech (Samberg Decl. ¶ 50; *Id.* Ex. 1 at ¶¶ 11-12, 21), and the business and assets of Medequip were transferred to Technowave and Life Care. (*Id.*)

14

As a result, TMSE and Medequip were eviscerated and became incapable of fulfilling their obligations as Guarantors to the Bondholders (including Respondents).

The Lakahs reportedly directly, indirectly or beneficially owned and/or controlled the Successor Companies.  (Samberg Decl. ¶ 51.)

### 4.    The Bondholders' Investigations and Discovery

The Respondents are in the midst of pertinent investigations in the Middle East, in Europe, and elsewhere.  (Samberg Decl. ¶ 52.)  For example, in Egypt, after lengthy and arduous efforts, the Respondents have been granted access to relevant investigative and prosecutorial reports and records from the CMA, the ACA, and other governmental agencies charged with investigating the Lakahs.  (*Id.* ¶ 53.)  In addition to the evidentiary materials proffered herewith (*see* Samberg Decl.), the Respondents have thus far received from the Egyptian Public Prosecutor's office a substantial volume of certified copies of documents from its files concerning the fraud investigation and prosecution of the Lakahs.  (*Id.* ¶ 54)  Those documents are being translated.

Moreover, other investigations outside of Egypt are in progress.

## D.    **Carl Baker**

Baker was a senior member of management of HCFI.  (Samberg Decl. Ex. 1 at ¶ 6.)  The Offering Circular, dated December 6, 1999, identifies Baker as "Board Member & Investor Relations."  (Samberg Decl. Ex. 6 at pp. 71-72.)

The Offering Circular also describes Baker as follows:

> From 1996 to 1998, Mr. Baker served as vice president for business development of TMSE. ... He was born on December 2, 1949 and in 1974 he received a Ph.D. in

> Education in Medicine from the University of Oklahoma and
> in 1975 he received his Ed.D., also in Education in Medicine,
> from the University of Texas.

*Id.* at p. 72.

Baker, therefore, was in a position to know facts relevant to piercing the

corporate veil -- *e.g.,* whether HCFI or TMSE observed corporate formalities, whether

the Lakahs diverted corporate assets for their personal use, etc.  Moreover, Baker is a

citizen of he United States and a native of Texas.  (Declaration of Gilbert A. Samberg,

dated July **3**, 2007 ("Samberg Decl. II") ¶ 5.)

Baker reportedly ended his affiliation with the Lakah Group sometime during

2001.  (*Id.*)

Baker resides at Villa Vinaigrier, 7 Boulevard Corne d'or, 06230 Villefranche-sur-

Mer, France.  (*Id.* ¶ 4.)  Baker has been largely unresponsive to communications by

counsel for the Bondholders seeking information from him.  (*Id.* ¶ 3.)

**ARGUMENT**

**POINT I**

**<u>A SUBPOENA SHOULD ISSUE TO CARL BAKER</u>**

Section 1783 of Title 28 authorizes the issuance of a subpoena to a U.S. citizen

abroad.  It provides in relevant part as follows:

> (a) A court of the United States may order the issuance of a
> subpoena requiring the appearance as a witness before it, or
> before a person or body designated by it, of a national or
> resident of the United States who is in a foreign country, or
> requiring the production of a specified document or other
> thing by him, if the court finds that particular testimony or the
> production of the document or other thing by him is

16

> *necessary in the interest of justice, and … that it is not*
> *possible to obtain his testimony in admissible form without*
> *his personal appearance or to obtain the production of the*
> *document or other thing in any other manner.[8]*

Accordingly, the issuance of a subpoena for testimony and/or document production may be ordered when (a) necessary in the interest of justice and (b) the testimony is not otherwise obtainable in admissible form or the production of the documents in question is not obtainable in any other manner.

Discovery from Baker is necessary, in the interest of justice, to Respondents' cross-motion to compel arbitration. That motion relies, in part, on Respondents' right to pierce the corporate veil of the Guarantors. The veil-piercing analysis involves evaluation of, *inter alia*, mostly hidden evidence that (i) the Lakahs dominated the Issuer and Guarantors with respect to the subject matter of the Arbitration; (ii) their domination was used to commit a fraud or wrong against Respondents; and (iii) the fraud or wrong injured the Respondents.

While Respondents have gathered evidence demonstrating each of those factors, Respondents were outsiders and not privy to the clandestine actions of the Lakahs. Respondents ought to be permitted to take discovery, where feasible, of persons who were on the inside. Baker is one such person.

Baker's position as a former senior member of management and board member of HCFI very probably afforded him knowledge of facts that are relevant to the veil-piercing analysis. Obtaining his testimony and the documents that may be in his

---

[8]    28 U.S.C. §1783 (emphasis added).

17

possession are necessarily in the interest of justice.[9] Moreover, it is not possible to obtain his testimony in admissible form without his personal appearance for deposition, nor is it possible to obtain the production of documents in his possession, custody or control in any other manner.

## A.    Discovery from Baker Is Necessary in the Interest of Justice

Respondents seek discovery from Baker in order to obtain evidence supporting the veil-piercing analysis.

### 1.    Respondents Have Begun Presenting Evidence Requiring the Piercing of Corporate Veil(s)

If, *arguendo*, the Lakahs are viewed solely as non-signatories of the pertinent arbitration agreements, the corporate veils of certain of the undisputed signatories should be pierced, and the Lakahs should be compelled to arbitrate because (i) they dominated the Guarantors with respect to the subject matter of the Arbitration; (ii) their domination was used to commit a fraud or wrong against Respondents; (iii) and the fraud or wrong injured the Respondents.[10]

#### a.    The Lakahs Personally Dominated and Controlled the Guarantors

Whether the corporate veil is pierced on an alter ego theory to reach an individual shareholder, or to reach another corporate entity, the veil piercing analysis is

---

[9]    *See Klesch & Co., Ltd. v. Liberty Media Corp.*, 217 F.R.D. 517, 524 (D. Colo. 2003) ("the requested subpoena is consistent with the liberal discovery contemplated by Rule 26 and is, therefore, necessary in the interest of justice."); *Estate of Yaron Ungar v. Palestinian Auth.*, 412 F. Supp. 2d 328, 333-34 (S.D.N.Y. 2006).

[10]    *See Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1052 (2d Cir. 1997) (and citations therein); *Golub v. Kidder, Peabody & Co.*, No. 89 Civ. 5903, 2000 WL 1024688 at *3 (S.D.N.Y. July 25, 2000); *cf. Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997).

the same.[11] The following factors, among others, are pertinent to the Court's determination that the Lakahs dominated one or more of the Guarantors (or the Issuer):[12]

(1)    disregard of corporate formalities;

(2)    inadequate capitalization;

(3    intermingling of funds;

(4)    overlap in ownership, officers, directors, and personnel;

(5    common office space, address and telephone numbers of corporate entities;

(6)    the degree of discretion shown by the allegedly dominated corporation;

(7)    whether the dealings between the entities are at arm's-length;

(8)    whether the corporations are treated as independent profit centers;

---

[11]    *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 140 (2d Cir. 1991). For example, in *Passalacqua*, as here, members of the Resnick family operated a real estate business consisting of various partnerships and corporations, all controlled either directly or indirectly by Resnick family members. Plaintiff sought to pierce the corporate veil to hold liable both the corporate parent as well as the Resnicks individually on an alter ego theory. *See* 933 F.2d at 140. In determining whether there was sufficient evidence of domination and control by *either* the corporate parent or the Resnicks, the Second Circuit considered the typical factors and eventually cited, among other things, evidence of undercapitalization; common offices and staff; overlapping management and directors; a failure to regard corporations as independent profit centers; and insider transactions. The *Passalacqua* court found sufficient bases to pierce the veil to reach *both* the corporate parent and the Resnicks individually.

[12]    The issue of arbitrability in this case is governed by Federal law. In relation to that ultimate question of arbitrability, "although the law of the state of incorporation typically governs alter ego claims, 'where the parties have agreed to the application of the forum law their consent concludes the choice of law inquiry.'" *Mobius Mgmt. Sys., Inc. v. Technologic Software Concepts, Inc.*, No. 02 Civ. 2820, 2002 WL 31106409, at *3 (S.D.N.Y. Sept. 20, 2002), citing *Am. Fuel Corp v. Utah Energy Dev. Co. Inc.*, 122 F.3d 130, 134 (2d Cir. 1997).

Here, as in *Mobius*, the agreements in question each contain a New York choice of law provision. (*See* Samberg Decl. Ex.8 [TCB] § 19(a); Ex. 9 [Guarantee] § 14(a); Ex. 10 [Indenture] § 111(a).)

(9)    payment or guarantee of the corporation's debts by the dominating entity;

(10)    and intermingling of property between the entities.[13]

The Lakahs were and are the principal officers, directors and controlling shareholders of HCFI, owning at least 70 percent of the company's outstanding shares.[14]  The Lakahs' substantial ownership allowed them to unilaterally elect <u>all</u> of HCFI's directors, to control all matters subject to voting approval, and to prevent any change in control.  (Samberg Decl. ¶ 21 and Ex.6).  The Lakahs' ownership control extended also to the Guarantors as HCFI's wholly-owned subsidiaries.

In addition to their control as dominant shareholders, the Lakahs were the principal officers and directors of the other Guarantors.[15]  Hence, PricewaterhouseCoopers observed in July 2001, after a review of the Lakah Group based on the Lakahs' input, that "Ramy Lakah is the dominant individual within the [Lakah] Group." The Lakahs also declared without reservation during the period in question that "the Lakah family remains firmly in control of The Lakah Group... ." It was not surprising, therefore, to find that Ramy Lakah was the sole authorized signatory and the sole signatory in fact of all of the Bond Transaction Documents on behalf of each of the Issuer and the various respective Guarantors.

---

[13]    *Freeman, supra* 119 F.3d at 1053; *accord, Mag Portfolio Consultant, GMBH v. Merlin Biomed Group, LLC,* 268 F.3d 58, 63 (2d Cir. 2001); *see, e.g., Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.,* 122 F.3d 130, 134 (2d Cir. 1997).

[14]    The Lakah Group website (available at http://www.lakah-group.com/mainfrm.htm) indicates that together the Lakahs owned 90% of HCFI.  (Samberg Decl. ¶ 22 and Ex. 14).

[15]    The Lakahs concede that there was substantial other overlap as well among the officers and directors of the Guarantors.  (Lakah Decl. ¶ 40.)

The Lakahs have, among other things, disregarded corporate formalities and separateness, intermingled corporate funds and other assets, diverted corporate proceeds for their personal use, pledged the assets of one company to secure the debts of another, and have acted to strip the assets of companies within their control in order to avoid legal liability.

The Guarantor companies were established and treated as mere instrumentalities of the Lakahs. All of the Guarantors (and all of the other Lakah Group companies) use a single common "Lakah Group" website. Three of the Guarantors [and the Issuer] were operated by the Lakahs from the same office, and each received mail at the same address -- 68 El Merghany Street, Heliopolis, Cairo.

Furthermore, consistent with the Lakahs' domination of all of the Guarantors, starting with HCFI, (a) board meetings of the respective corporations were typically not held; (b) nominal membership in the boards of directors became meaningless, as evidenced by the fact that the board had appointed members who were never informed of their "appointments".

So too, the Guarantors, each of which were represented to be worth hundreds of millions of dollars, had no oversight mechanisms with respect to the use of corporate funds. Hence, the Lakahs could and did make use of corporate funds of the Guarantors for myriad personal purposes. Thus, it was common knowledge among Lakah employees that the Lakahs used the funds of the companies -- particularly the revenues of their medical distribution businesses (Medequip and TMSE) -- to support their lavish lifestyles of mansions, automobiles, and private jets, as well as to fund Ramy Lakah's political campaign for the Egyptian Parliament in 2000.

21

The Lakahs transferred and otherwise utilized assets among the Guarantors as if they were interchangeable. For example, the Lakahs used the assets of HCFI as security to obtain debt financing for the other Guarantors. Thus, when ASF issued a E£250,000,000 bond in 1998 with a guarantee by Banque du Caire, the guarantee facility for the benefit of ASF was secured by HCFI's pledges to Banque du Caire of 800,000 shares of Medequip and 400,000 shares of TMSE that HCFI (not ASF) owned. Later, in order to recover those pledge shares, HCFI paid US$35 million to Banque du Caire out of loan financing that HCFI had received, which loan had been collateralized by the proceeds of the Eurobond issue by LFL.

A former employee of one of the Guarantors (Medequip) has provided some insight regarding the actual operation of that company. Dr. Amgad Zarif indicates that Medequip did not observe corporate formalities (Samberg Decl., Ex. 1 at ¶ 37). For example, according to Dr. Zarif, the Lakahs were the exclusive decisionmakers at Medequip, and they alone decided what tasks would be performed by company management. (*Id.* at ¶ 24). In sum, the Lakahs operated their companies exclusively as a family affair. Furthermore, Dr. Zarif makes clear that the Lakahs' discretionary use of funds was not limited to their myriad corporate ventures, but was openly diverted to fund the Lakahs' lavish lifestyle of mansions, expensive cars and private jets, and to build a warchest for Ramy Lakahs' political ambitions. (Samberg Decl. at ¶ 32 and Ex. 1 at ¶ 33; Ex. 2 at 4).[16]

---

[16]  Thus, any representations by the Lakahs concerning a robust independent management structure of each of the Guarantors would be pure fiction.

22

Finally, the capitals of the Issuer and of most of the Guarantors were apparently stripped by the Lakahs, so that they became inadequately capitalized. First, the Issuer (LFL) had virtually no capital or assets at inception, and apparently has been left with no capital or assets currently. Indeed, LFL was "struck off the register" of BVI companies on May 1, 2001 by the BVI Financial Services Commission (Registry of Corporate Affairs) for failure to pay the requisite periodic license fee. (Samberg Decl. ¶ 60 and Ex. 28.) Moreover, all of the operating assets of Guarantor Arab Steel Factory were sold in February 2000, shortly after the issuance of the Eurobond, and the proceeds (ca. £E331,000,000) were diverted from ASF. In addition, the assets and businesses of the two other operating Guarantors -- TMSE and Medequip -- were transferred to other companies without consideration in or about 2002. Thus, each of these companies was deliberately stripped of its capital or had inadequate capital from inception.

      b.     The Lakahs Used Their Domination and Control of the Guarantors to Perpetrate Financial Frauds on the Bondholders

Making use of their domination and control of the Guarantors, the Lakahs engaged in fraudulent conduct (a) in order to induce the Respondents to purchase Eurobonds, and then (b) to hollow-out the Guarantors so that they would be unable to satisfy their financial obligations to the Respondents.

Specifically, the Lakahs fraudulently inflated the stated earnings and values of the Guarantors as a means of attracting financing and investment, including the Respondents' investments in the Eurobond. The Lakahs arbitrarily and surreptitiously eviscerated at least two of the Guarantors (TMSE and Medequip) and caused their businesses and assets to be transferred without consideration to other companies that

23

they beneficially owned and controlled.  And they caused another Guarantor (ASF) to sell all of its operating assets only two months after the issuance of the Bonds (for to approximately half of the amount that they had represented in the OC was ASF's value) (*see Id.* Ex. 6), and then diverted the proceeds of that sale away from ASF and beyond the Respondents' reach.

The Lakahs' pertinent frauds upon Respondents prior to the issuance of the Eurobonds have been the subject of, among other things, investigations and prosecution by Egyptian financial and securities regulators and the Egyptian Public Prosecutor General.

> i.    Securities Fraud

In October 2000, The Egyptian Capital Markets Authority[17] (the "CMA") determined that the Lakahs violated Egyptian banking and securities laws by fraudulently manipulating the stock prices and balance sheet values of HCFI, TMSE, Medequip, and ASF.  (*See* Samberg Decl. ¶¶ 34-39 and Exs. 18-19.)  The CMA found, for example, that between January and June 1998, the Lakahs conspired with their securities brokerage company, AlEman Company for Financial Brokerage ("AlEman"), in order to pump up the prices of the stocks in question.  This scheme included the buying and selling back and forth between Ramy and Michel Lakah of their shares of the respective companies.  (*Id.*)  The CMA found, <u>inter alia</u>, that the sham transactions engaged in by the Lakahs resulted in "economically unjustified" increases (a) of the stock price of ASF by almost 100%; (b) of the stock price of TMSE by 81.65%; and

---

[17]    The CMA is the principal securities regulatory agency in Egypt, and is the equivalent of the SEC.  (*See, e.g.,* Lakah Aff. ¶29).

(c) of the stock price of Medequip by 78%. Furthermore, in each case, immediately following the fraudulent and artificial stock price increase, the shares of stock were transferred from Ramy Lakah and Michel Lakah to HCFI. (*Id.*) The purpose of the sham transactions was to artificially inflate the apparent balance sheet value of the parent company, HCFI.

The resulting fraudulently-inflated financials of HCFI became the basis of the representations made in the Offering Circular regarding the Eurobonds, which in turn induced the Respondents to purchase the Eurobonds.

The results of the CMA's investigation became a part of the bases for a criminal prosecution of the Lakahs by the Egyptian Public Prosecutor.

ii.    <u>Banking Fraud</u>

Furthermore, the ACA conducted its own investigation and concluded that the Lakahs colluded with one or more officers at Misr International Bank to obtain forged bank certificates. (Samberg Decl. ¶¶ 38-40 and Ex. 18). The false certificates were used to fictitiously inflate the apparent value of the Guarantors in order to make them more attractive to lenders and investors like Respondents. According to the ACA, the Lakahs' scheme successfully elicited tens of millions of dollars in additional financing, including sizeable loans both to the Guarantors and to the Lakahs personally that were never repaid. The ACA concluded that as a result of this fraud the Lakahs personally converted millions in loan funds.

The ACA also referred the matter to the Public Prosecutor for criminal prosecution.

25

       iii.     The Lakahs Are Being Prosecuted Criminally in Egypt
               For Pertinent Financial and Securities Frauds

In January 2003, the Cairo Criminal Court (North District Circuit 19) issued a judgment freezing the assets of the Lakahs (and of their families) in Egypt based on evidence presented by the CMA, by the ACA, and by the Egyptian Public Prosecutor. (Samberg Decl. ¶ 41 and Ex. 20). The Public Prosecutor also apparently charged the Lakahs with, inter alia, fraudulent manipulation of financial information concerning the Lakah Group.

To evade the Egyptian prosecution,[18] the Lakahs fled Egypt in 2001.[19]

       c.     The Lakahs' Fraudulent Manipulation and Use of the
              Guarantor Companies Caused Harm to the Respondents

As a result of the Lakahs' aforesaid manipulation and misuse of the Guarantor companies as their instrumentalities, the Respondents were fraudulently induced to purchase the Bonds, upon which the same Issuer and Guarantor companies later defaulted. Respondents thus were injured severely.

---

[18] That the Lakahs fled Egypt to avoid criminal prosecution in Egypt was widely reported. (See Samberg Decl. ¶ 56 and Ex. 24.) So, too, it was widely believed in Egypt at the time that Ramy Lakah ran for a seat in Parliament in 2000 that his motivation (like that of some of his similarly situated peers) was to attain the immunity from criminal prosecution that is gained with a Parliamentary seat. (See id.)

[19] Moreover, while in exile, Ramy Lakah's fraudulent mis-use of the corporate form has continued. Specifically, he is currently under investigation by a Paris Magistrate regarding alleged "dubious fund transfers" of more than €14 million from his insolvent French publishing company to a related U.K. entity that is in better financial condition. (Samberg Decl. ¶ 58 and Ex. 26). Also in 2005, Petitioner Ramy Lakah was reportedly being investigated for an unexplained transfer of €200,000 from his French-based company, Air Horizons, to an unrelated Lakah-owned U.K. company, Trading Medical System Ltd. (Id. ¶ 59 and Ex.27.)

On this basis, the Court may and should pierce the corporate veil(s) of the Guarantors to compel the Lakahs to arbitrate in their individual capacities.

      d.    Piercing the Corporate Veil is Required to Prevent a Fraud and Because to Do Otherwise Would Permit the Lakahs to Avoid Legal Liability for Fraud

Alternatively, this Court should pierce the corporate veil(s) of the Guarantors to reach the Lakahs in order to prevent their fraud from injuring Respondents and because to do otherwise would permit the Lakahs to avoid legal liability for their frauds -- *e.g.,* for their surreptitious hollowing out of all of the operating Guarantors (ASF, Medequip, and TMSE) so that they became (a) unable to satisfy their obligations as Guarantors to Respondents; and (b) judgment-proof shells.[20]

Where fraud is the basis to pierce the corporate veil, it is unnecessary to show such factors as disregard of corporate formalities, undercapitalization, or the intermingling of assets.[21] The Court in *Kinetic Instruments* had occasion to "pierce the corporate veil" of a California corporation (Lares Research, Inc.) in order to establish jurisdiction over its principal shareholder (and president), Craig Lares.[22] The Court did

---

[20]   *Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976, 986 (S.D.N.Y. 1992); *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1264 (Fed. Cir. 1985).

[21]   *See Kinetic Instruments*, 802 F. Supp. at 985-86; *Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 891 F. Supp. 946 (S.D.N.Y. 1995). Only showings of (1) substantial ownership and (2) the perpetration of a fraud causing harm to a third party are required. *Kinetic Instruments*, 802 F. Supp. at 985.

[22]   The court was considering a motion to dismiss by the individual defendant, Craig Lares. (The plaintiff corporation had brought a separate action against the corporation, Lares Research, previously.) In the case then at bar, plaintiff Kinetic was asserting that the corporation's principal shareholder and president were personally liable for the acts of patent infringement in question. *Kinetic Instruments*, 802 F. Supp. at 980.

so on the grounds of equity and fairness, noting that a court "may use it's equitable powers to 'pierce the corporate veil' to prevent fraud and injustice."[23]

The basis for the <u>Kinetic</u> court's determination to "pierce the corporate veil" were: (1) "[p]ost tort activity . . . conducted to strip the corporation of its assets in anticipation of impending legal liability," and (2) substantial ownership of stock of a corporation by one individual.[24] The court agreed that "when preserving the corporate entity would permit a shareholder to avoid legal liability, 'this is precisely the situation in which courts feel most comfortable in using their equitable powers to sweep away the strict legal separation between corporation and stockholders.'"[25]

The specific facts upon which the court based its determination were: (1) that the individual defendant was the president of the corporation in question (Lares Research, Inc.); (2) that the individual defendant owned over 70% of its shares, (3) that plaintiff alleged that the individual "controls" the corporation, and (4) that plaintiff alleged that defendant had threatened that even if plaintiff won the lawsuit against the corporation, the individual defendant had taken measures to see that plaintiff Kinetic would never get anything.[26]

The court took pains to point out that it was not basing its decision on other (alter-ego theory related) factors, noting that the plaintiff had not made any allegations

---

[23] *Id.* at 985, 986.

[24] *Id.* at 985.

[25] *Id.* at 986.

[26] *Kinetic Instruments*, 802 F. Supp. at 986. The individual defendant denied the plaintiff-corporation's allegations, but that was irrelevant in the context of the motion to dismiss on jurisdictional grounds that was then before the court.

28

concerning (a) inadequate capitalization of Lares Research, (b) intermingling of the corporation's finances with those of the defendant, (c) lack of corporate formalities, or (d) that the corporation had been established to perpetrate the alleged transgression (a patent infringement).[27]

The Court in *General Textile Printing & Processing Corp. v. Expromtorg International Corp.*, applied the same rule and analysis to reach the same result in a diversity suit regarding an alleged breach of contract.[28] In that case, General Textile sued Expromtorg and its president and principal shareholder, Razouvaev, for breach of contract.[29] The individual moved to dismiss for lack of jurisdiction. The court applied "the fraud prong" of the corporate veil-piercing doctrine to achieve an equitable result, and thereby found that it had jurisdiction over the individual.[30]

The *General Textile* court confirmed that the existence of post-tort activity conducted to strip the corporation of its assets in anticipation of legal liability, "together with substantial ownership of a stock of a corporation by one individual will support piercing the corporate veil for jurisdictional purposes on grounds of equity unfairness."[31] The Court found that the following factors were sufficient in that regard: (1) the individual was a major stockholder (indeed, the sole stockholder in that case) of the corporation; (2) the individual defendant was the president of the corporation; and,

---

[27]  *Id.* at 985-86.

[28]  891 F. Supp. 946 (S.D.N.Y. 1995).

[29]  *Id.* at 948.

[30]  In *General Textile* also, the issue was personal jurisdiction over an individual shareholder/officer of the corporate defendant in the context of a motion to dismiss. Personal jurisdiction over the corporation was not in dispute.

[31]  *Id.* at 950, citing *Weinreich v. Sandhaus*, 850 F. Supp. 1169, 1170 (S.D.N.Y. 1994) (citing *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988)).

(3) the individual had <u>made</u> <u>threats</u> to the effect that "if he had any problem in continuing his business through Expromtorg, he would simply open up a new company to continue his business."[32]  On that basis, and treating as true plaintiff's allegations in that regard, the individual defendant's motion to dismiss for lack of personal jurisdiction was denied.[33]

In the instant case, the Lakahs' dominant ownership and control position in the Parent Guarantor, HCFI, and in turn in the other Guarantors and the Issuer, is well-established.  (Samberg Decl. ¶ 24, Ex. 6)  The findings of the CMA and the ACA, and the January 2003 Judgment of the Cairo Criminal Court confirm that the Lakahs have used the Guarantors to defraud lenders and investors, including the Respondents. Moreover, the Lakahs have not merely threatened, but have acted to strip the Guarantors of their assets (i) so that they became unable to fulfill their contractual obligations and (ii) in anticipation of their legal liability.  (*see* discussion, *infra*.)

Therefore, if this Court does not pierce the corporate veils of the Guarantors so that Lakahs are called upon to answer Respondents claims in arbitration, the potential exists for the Lakahs to have received roughly US$100,000,000 from the Eurobond purchasers (including Respondents), to have eviscerated the nominal corporate Guarantors of repayment, and to walk away unscathed, or to cause Respondents substantial additional unwarranted expense and the risk of inconsistent results from having to re-litigate their arbitration claims in a different forum as against Ramy Lakah and Michel Lakah.

---

[32]  *Gen. Textile*, 891 F. Supp. at 950.

[33]  *Id.* at 950 n.3, 951.

30

i.    Clandestine Sale of ASF's Assets

Approximately one and one-half months after the Eurobond issue, on January 26, 2000, Ramy Lakah, as Chairman and CEO of the Lakah Group (*i.e.,* HCFI), advised the Eurobond Trustee that "the Holding Company for Financial Investment (Lakah Group) is in advance [sic] negotiations for the sale of its steel business... ." Upon review of the matter, the Trustee opined to the Lakahs that their pending transaction required, in accordance with the Bond Transaction Documents, notice to and the consents of the Eurobond holders. The Lakahs provided no notice and sought no consents.

Instead, on February 16, 2000, Ramy Lakah, as Chairman and CEO of HCFI, and Michel Lakah, as Vice-Chairman and Co-CEO of HCFI, certified to the Eurobond Trustee that ASF had sold "certain of its assets" as of February 16, 2000; that "the assets sold by ASF... were sold for Fair Market Value... and the purchase price received in connection with the ASF Sale was received, in full, by ASF simultaneously with their disposal of the subject assets, 100% in cash." The Lakahs further certified that "the ASF Sale does not constitute a sale of 'all or substantially all' of the assets of any Guarantor, including ASF or the Company [*i.e.,* HCFI]... ." (*Id.* ¶ 43 and Ex. 23.)

In fact, the assets that were sold comprised all of ASF's operating assets, and the sale price of approximately E£331,000,000 was paid approximately E£100,000,000 in cash and approximately E£231,000,000 in promissory notes, maturing sequentially, and avalized by the National Bank of Egypt. Furthermore, the E£100,000,000 in cash disappeared and the promissory notes were apparently diverted to another creditor of the Lakah Group, without challenge or objection by the Lakahs.

31

Thus, within approximately two months of the Eurobond offer, one of the three operating company Guarantors had effectively been gutted by the Lakahs.[34]  The Respondents were left with the empty shell of ASF, which of course later defaulted on its Bond payment obligations as a Guarantor, and became effectively judgment-proof.

In *Mobius Management Systems, Inc. v. Technologic Software Concepts, Inc.*, evidence was submitted to an arbitrator (1) that an individual -- not a signatory to an arbitration agreement -- was the president and majority shareholder of the corporation that had signed the arbitration agreement; (2) that the corporation had defaulted on its payment obligations; (3) that the corporation had sold its assets to a third party; and (4) that the corporation had used the proceeds for purposes other than to repay all of its creditors.[35]  Furthermore, (5) it was reportedly merely <u>alleged</u> in the subsequent judicial proceeding that the individual had received a small portion of the proceeds of the sale of the assets.  The arbitrator had deemed the claims in question to be arbitrable against the individual non-signatory shareholder, based upon piercing the veil of the corporate respondent to reach its alter ego shareholder, and rendered an award against the individual.  The individual non-signatory shareholder challenged the award by challenging the arbitrator's jurisdiction over him -- *i.e.,* the arbitrability issue.  The Court

---

[34]  Although the Bond Transaction Documents indicated that the steel business of Guarantor ASF was quite substantial and would serve as security for the Bonds, the Lakahs surreptitiously sold the means of conducting that business, and the proceeds of that sale disappeared without objection or opposition by the Lakahs.  Moreover, it is clear from the timing of the transaction that the Lakahs had merely dangled ASF as an inducement for prospective Bond investors, while fraudulently concealing their intention to eviscerate ASF almost immediately after the sale of the Bonds.

[35]  2002 WL 31106409 at *1 (S.D.N.Y. Sept. 20, 2002).

declined to disturb the award, applying a "manifest disregard for the law" standard of review of the arbitrability issue.[36]

ii.    Clandestine Evisceration of Medequip and TMSE

In or about 2002, after the initial payment default and during the tenor of the Bonds, at the direction of the Lakahs and without the knowledge or consent of the Bondholders, the assets and businesses of the two remaining operating Guarantors -- TMSE and Medequip -- were transferred to companies with close ties to the Lakahs. (*See, e.g.*, Samberg Decl. ¶ 51 and Ex. 1 at ¶¶ 3, 8, 16, 17, 19, 22, 28). TMSE's business and assets were transferred without consideration to MedTech, and the business and assets of Medequip were transferred to two entities: Technowave and Life Care. Again, these covert transfers left the Respondents without a viable Guarantor and left only judgment-proof shells.[37]

Where a shareholder conceives of and directs a plan to nullify his company's contractual obligations, veil piercing is appropriate under New York law. *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 230 F. Supp. 2d 439, 460 (S.D.N.Y. 2002).

In light of the above, and in the interest of equity and fairness, this Court must pierce the corporate veil and hold that dominant shareholders Ramy Lakah and Michel Lakah are bound by the arbitration agreement(s) entered into by the Guarantor companies that they used and then stripped so purposefully.

---

[36]   *Id.* at *3.

[37]   The Issuer (LFL) too is merely a shell. Before the issuance of the Bonds in December 1999, the Issuer had virtually no capital or assets. Moreover, after the Bonds were issued, Lakah Funding was "struck off the register" of BVI companies by the BVI Financial Services Commission (Registry of Corporate Affairs) in May 2001 for failure to pay the requisite periodic license fee.

33

2.     Baker Is Very Likely To Have Discoverable
       Information Not Obtainable from Other Sources

Baker is a former Lakah Group employee. He was apparently in a position to observe conduct that is relevant to the veil-piercing analysis. He was represented to have been a senior member of management and a director of HCFI. (Samberg Decl. Ex. 1 at ¶ 6.) He was also represented to have been a vice president for business development of TMSE. (*Id.*; Samberg Decl. Ex. 6 (Offering Circular) at 71-72.)

Baker's testimony and documents that may be in his possession likely will show the absence of corporate formalities within the companies in the Lakah Group; may show the Lakahs' diversion of corporate assets for their personal uses; may include details concerning the surreptitious sale of ASF's assets and the disposition of the funds received from that sale; and may include information with respect to the transfer of . TMSE's business, without consideration, to one or more of the Successor Companies.

Since the discovery sought from Baker is consistent with the scope of discovery contemplated by Rule 26 of the Federal Rules of Civil Procedure and may present relevant evidence or lead to the discovery of relevant evidence for present purposes, it is necessary to obtain it in the interest of justice.[38]

---

[38] *See Klesch & Co.*, *supra*, 217 F.R.D. at 524 ("the requested subpoena is consistent with the liberal discovery contemplated by Rule 26 and is, therefore, necessary in the interest of justice.").

**B.    It Is Not Possible To Obtain Baker's Testimony in Admissible Form Without His Personal Appearance Or To Obtain Production of Documents in Any Other Manner**

It is not possible to obtain Baker's testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner.

Baker is a resident of the United States living in France.  Counsel for the Respondents has attempted to gain his cooperation, and he has been unresponsive. Samberg Decl. II ¶ 3.  Accordingly, it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner.

**CONCLUSION**

For the reasons set forth above, Respondents-Cross-Petitioners respectfully request that this Court enter an order directing the issuance of a subpoena to Baker, a citizen of the United States residing in France, in the form annexed to the Notice of Motion.

Dated:   July 9, 2007
        New York, New York

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.

By: _____

Gilbert A. Samberg (GS-2610)
Kevin N.  Ainsworth (KA-8493)
Chrysler Center
666 Third Avenue
New York, New York 10017
(212) 935-3000
(212) 983-3115 (facsimile)

35