```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
RAMY LAKAH and MICHEL LAKAH,

                    Petitioners,          OPINION

          -against-                       07 Civ. 2799 (MGC)


UBS AG, EXPORTERS INSURANCE
COMPANY, LTD., ARAB BANKING
CORPORATION, NATIONAL BANK OF ABU
DHABI, and NATIONAL BANK OF OMAN,

                    Respondents.

---------------------------------X

APPEARANCES:

          FRANKFURT KURNIT KLEIN & SELZ, P.C.
          Attorney for Petitioner Michel Lakah
          488 Madison Avenue
          New York, NY 10022

          By: Ronald C. Minkoff, Esq.
              Jeremy S. Goldman, Esq.
              Sarah S. Park

          SCHRADER & SCHOENBERG, LLP
          Attorneys for Petitioner Ramy Lakah
          711 Third Avenue, Ste. 1803
          New York, NY 10017

          By: Bruce A. Schoenberg, Esq.

          MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
          Attorneys for Respondents
          666 Third Avenue, 25th Floor
          New York, New York 10017

          By: Gilbert A. Samberg, Esq.
              Kevin N. Ainsworth, Esq.
              David L. Barres, Esq.
              Todd Rosenbaum, Esq.
```

**Cedarbaum, J.**

This action to stay arbitration was commenced in the Supreme Court of New York County on March 20, 2007 by Petitioners Ramy and Michel Lakah.  Respondents UBS AG, Exporters Insurance Co., Ltd., Arab Banking Corp., National Bank of Abu Dhabi, and National Bank of Oman removed the case to this court on April 6, 2007 and cross moved to compel arbitration on April 16, 2007.  Respondents pursued discovery for five and a half years, attempting to show that the guarantors on a bond issued by Lakah Funding Limited are alter egos of the petitioners and that the arbitration clauses, signed only on behalf of Lakah Funding Limited and those guarantors, bind Michel and Ramy Lakah as if they were signatories on their own behalf.  Following discovery, Respondents raised the threshold argument that this action should be dismissed as time-barred under NY CPLR §7503(c).  That motion to dismiss the suit as untimely was denied on May 22, 2013. On the merits, Respondents now argue in what amounts to a summary judgment motion that Michel and Ramy Lakah should be compelled to arbitrate on the basis of veil piercing and estoppels theories.   For the reasons that follow, that motion is denied.

BACKGROUND

On December 6, 1999, Lakah Funding Limited offered a five-year, $100 million Eurobond.  On December 8, 1999, an indenture

was executed for the benefit of the bondholders. The indenture involved Lakah Funding Limited -- the Issuer -- and four guarantors: Holding Company for Financial Investments, S.A.E. ("HCFI"); Medequip for Trading and Contracting, S.A.E. ("Medequip"); Trading Medical System Egypt, S.A.E. ("TMSE"); and Arab Steel Factory, S.A.E. ("ASF").[1] Ramy Lakah signed the indenture on behalf of those five parties either as their chairman or their attorney in fact.

On the same day, those guarantors jointly and severally guaranteed the Eurobond as primary obligors. Ramy Lakah signed the guarantee on behalf of all four guarantors as their chairman or attorney in fact. Both parties agree that the actual bond issuance took place on December 8, 1999. While both the guarantee and the indenture contained arbitration clauses, neither Lakah signed the clauses in his personal capacity.

### DISCUSSION

In motions to compel or to stay arbitration brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4 (2000), "the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is

---

[1] Collectively these companies are referred to as the "Lakah Group."

necessary." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003) (citations omitted).

## I.   Admissibility of Evidence

On summary judgment "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  In support of their motion, Respondents rely heavily on various reports from, and testimony provided by, Egyptian prosecutors and other government entities, as well as documents from Egyptian banks found in the files of the Egyptian government.  The Lakahs have objected on grounds of authentication and hearsay.

### A. Authentication

The Lakahs argue that various government reports, bank records, and bank reports are inadmissible because they have not been properly authenticated.  "The bar for authentication of evidence is not particularly high . . . [T]he standard for authentication is one of 'reasonable likelihood' and is 'minimal.'"  United States v. Gagliardi, 506 F.3d 140, 151 (2d. Cir. 2007) (citations omitted).  "Generally a document is properly authenticated if a reasonable juror could find in favor of authenticity."  Id. (citing United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004)).

4

The evidence Respondents submit meets this standard.  The various government reports qualify as self authenticating pursuant to Rule 902, under which foreign public documents are self authenticating if "accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester [or other foreign official]." Fed. R. Evid. 902(3).  Because Respondents include documents containing a stamp and signature from the New York Consulate General of Egypt as well as a handwritten "Legalization No.," the certification requirements of Rule 902 are met.  Respondents admit that two government documents which are purported letters from Egypt's Capital Markets Authority ("CMA") are not self authenticating.  However, the Arabic originals contain the logo of the CMA (in Arabic and in English), and a lawyer for Respondents' counsel certifies that the letters in question are true and accurate copies.  This is sufficient to authenticate the documents under Rule 901.

With respect to the various bank records and reports, one of Respondents' lawyers has declared under oath that such documents are authentic and accurate; Respondents have therefore "prodcuce[d] evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Finally, the Lakahs object that Exhibit 92, a handwritten letter signed "Ramy Raymond Lakah" and written on Lakah Group

letterhead lacks authenticity.  However, the letterhead of
Exhibit 92 matches those in a number of additional exhibits that
have not been objected to by the Lakahs, Respondents declare
that the recipient's address and fax number on the exhibit
correspond to information for UBS, and Respondents declare on
information and belief that the letter was provided to outside
counsel from the files of UBS.  This is sufficient.

### B. Hearsay

#### 1. Government Reports

The Lakahs object on hearsay grounds to the admissibility
of various government reports, all of which are related to a
potential prosecution of the Lakahs in Egypt which was
ultimately dropped by the Egyptian authorities.  Respondents
argue that such reports are admissible under the hearsay
exception for public records, which in civil cases includes
"factual findings from a legally authorized investigation" as
long as "neither the source of information nor other
circumstances indicate a lack of trustworthiness."  Fed. R.
Evid. 803(8). To establish admissibility under this exception,
the party introducing the evidence must prove that the evidence
"contains factual findings based on a factual investigation,"
after which "the party opposing the admission of evidence . . .
has the burden of showing untrustworthiness." Ariza v. City of
New York, 139 F.3d 132, 134 (2d Cir. 1998).

Although the government reports contain factual findings from a legally authorized investigation by the Egyptian government, the government reports must be excluded because the Lakahs have established that the documents lack indicia of trustworthiness.  "When evaluating the trustworthiness of a factual report, we look to (a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems." Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000).

While the Lakahs do not present sufficient affirmative evidence to establish that the investigations were untimely or that the officials were unqualified, they do carry their burden in demonstrating that no hearings occurred and that motivational concerns are present. Indeed, Respondents concede that no hearings took place.  With respect to motivational concerns, the Lakahs present evidence that Ramy Lakah joined an Egyptian human rights organization in 1999 and won public office as an opposition candidate on November 8, 2000, not long before the first investigatory report was publicized.  Public sector organizations stopped paying HCFI money that was due and cancelled projects.  Banque Du Caire, which was staffed by a Mubarak loyalist, began undertaking a number of actions to hamper the Lakahs' business.  The Lakahs attach a State

Department Country Report from 2005 (which is clearly admissible under Rule 803(8), Bridgeway, 201 F.3d at 142-43) attesting to Egypt's use of extreme measures against political opponents. The Lakahs' role in the opposition in an authoritarian country, the measures taken against them, and the suspicious timing of the investigations all cast serious doubt about the motivations behind the investigations.  Although such evidence is indirect and circumstantial, the Lakahs have made a sufficient showing that a suspicious motive for the publication of the reports exists, and Respondents have not rebutted that evidence through, for example, declarations from investigators as to how their investigations started, testimony from any of the civilian complainants who allegedly sparked the CMA investigation, or testimony from any of the banks the Lakahs allegedly settled with as to the facts of the settlement and why it happened when it did.  Because of the absence of hearings and the lack of trustworthiness, the government reports do not fall into the public records exception and must be excluded from consideration at this stage.

### 2. Private Bank Records and Investigatory Reports Obtained from Government Files

The Lakahs next argue that the private bank records and investigatory reports collected by Egypt's Public Prosecutor's Office ("PPO") and relied upon by Respondents constitute

inadmissible hearsay.  Respondents persuasively counter that at least several of these records -- specifically, those signed by the Lakahs (exhibits 133, 156-57, and 161-64) -- are admissible as party admissions under Rule 801(d)(2).

A statement is not hearsay if it "is offered against an opposing party and . . . was made by the party in an individual or representative capacity."  Fed. R. Evid. 801(d)(2).  These documents, which are submitted as evidence of the Lakahs' comingling of assets, include instructions from the Lakahs to the banks authorizing them to make all necessary transfers between and among the accounts of the Guarantor companies, other Lakah Group companies, and Lakah-owned enterprises as well as an instruction from Michel Lakah to Banc du Cair to issue a check to Medequip for E£2,100,000 from his personal account.  They are thus offered by Respondents against the opposing party and were made by the Lakahs in a representative capacity, fulfilling the requirements for admissibility under Rule 801(d)(2).

The bank records and investigatory reports which the Lakahs did not sign, however, present a more complicated question.  Many such documents are Egyptian bank records produced from the files of Egypt's Public Prosecutor.  Respondents concede that they are unable to obtain custodial declarations from the banks that created these documents and therefore seek their admission

under the residual hearsay exception, Rule 807, rather than the business records exception.

To qualify for the residual hearsay exception, a document must have "circumstantial guarantees of trustworthiness," be "offered as evidence of a material fact," be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," and it must be the case that "admitting it will best serve the purposes of [the] rules and the interests of justice." Fed. R. Evid. 807(a). In addition, documents are only admissible if "the proponent gives an adverse party reasonable notice of the intent to offer the statements and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b).

The bank records and investigatory reports obtained from the Egyptian government agencies cannot be admitted under Rule 807 because their admission would not best serve purposes of the Rules of Evidence and the interests of justice. In the context of deciding whether to admit privately-generated public records via the public records exception, the Second Circuit has stated that "the admission of privately-generated, business records without further foundation, even though the records were found in the possession of a foreign government agency, would in all probability be an abuse of the discretion by the trial court."

10

United States v. Doyle, 130 F.3d 523, 547 (2d Cir. 1997).  This reasoning applies here.  Respondents may not use the residual exception, which is to be used "very rarely, and only in exceptional circumstances," Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991), to create an end-run around the holding of Doyle; indeed, it would "be a major step judicially to forge a new, hybrid exception to the hearsay rule by combining these two distinct varieties of admissibly hearsay simply to correct the [Proponent's] failing to offer a witness who could present the foundation necessary for the admission of the documents under the business records exception."  Doyle, 130 F.3d at 547.  Thus, the bank records and reports collected by the various Egyptian government agencies are inadmissible under Rule 807.[2]

### 3. Foda Translations

The Lakahs next object to the admission of documents translated from Arabic to English by Tamin Hassan Foda.  Rule 604 states that an interpreter "must be qualified and must give an oath or affirmation to make a true translation."  Fed. R.

---

[2] Respondents argue that the Lakahs have waived any objection to various government reports by citing to several of them in passing and attaching two reports to a declaration and expert report.  See Lakah Mem. at 57, 74, 91, 92; Taha Expert Opinion Ex. 29; Nour Decl. Ex. B.  This argument fails.  The case law to which Respondents cite is inapposite; the Lakahs have vehemently objected to the use of such reports and have not manifested an adoption or belief in their truth.  Cf. Fed. R. Evid. 801(d)(2)(V).

Evid. 604.  Even assuming this rule applies to the translation
of documents rather than simply to interpretation of witnesses
on the stand, Davis v. SpeechWorks Int'l., Inc., No. 03-CV-
0533S(F), 2006 WL 2828856, at *2-3 (W.D.N.Y. Sept. 29,
2006)(applying Rule 604 to translated documents),the Lakahs have
not established that the evidence should be excluded.

Specifically, they argue that the translations did not
contain an "oath or affirmation" certifying their accuracy and
claim that Foda is biased because he is an attorney at the Al-
Kamel Law Offices, Respondents' Egyptian counsel.

Respondents cure the first objection by submitting a
supplemental declaration in which Foda swears to the
translations' accuracy.  Foda Reply Decl. ¶ 9.  The Lakahs offer
no credible evidence of bias on the part of Foda, taking issue
only with Foda's insertion of bracketed words into one
translation and with his allegedly incorrect translation of the
phrase "affect prices" as "inflate prices" in another document.
The fact that Foda used brackets for the additional words he
inserted shows that he was not trying affirmatively to mislead
the court.  The second alleged error does not seem sufficient to
prove that Foda's translations are wrong or the result of bias.
In the context of a translation of a defendant's words by a
government employee, the Second Circuit explained that the
translation would not be hearsay if there was "no motive to

12

mislead and no reason to believe the translation is inaccurate." United States. v. Da Silva, 725 F.2d 828, 832 (2d Cir. 1983). The same is true of Foda's translation.

The Lakahs also argue that the evidence must be excluded because Foda was visually impaired at the time he translated many documents, a fact which Respondents do not dispute. Surprisingly, the Lakahs nevertheless themselves rely upon Mr. Foda's translations in several instances, attaching them as exhibits to various declarations, see, e.g., Minkoff Decl. Exs. 63, 99, 103; Nour Decl. Ex. B, without providing counter-translations.  Foda testified that while he was visually impaired, he was aided by his assistant, Heba El-Kayel, who would help him to read the documents and take his dictations. The Lakahs have provided no evidence to suggest that El-Kayel's transcriptions are in any way inaccurate (nor have they provided counter translations), and Foda has certified that he accurately translated what was given to him.  The documents are admissible.

### 4. Imburgia Report

The Lakahs next move to exclude the entire expert report of Basil Imburgia.  They argue that Imburgia improperly relies upon various investigatory reports rather than actual underlying data (such as brokerage account statements or trading tickets) in forming his conclusions.  Rule 702 requires that expert testimony be "based on sufficient facts or data" to be

13

admissible.  Fed. R. Evid. 702(b).  It is true that much of
Imburgia's report simply summarizes the government reports, bank
records, and other documents which have already been deemed
inadmissible.  These parts of the expert report are thus also
inadmissible: an expert may not introduce otherwise inadmissible
hearsay into evidence at trial by "simply summarizing an
investigation by others that is not part of the record."  United
States v. Dukagjini, 326 F.3d 45, 54 (2d Cir. 2002); see also
United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008).

While the Lakahs have not demonstrated that the parts of
Imburgia's reports which rely upon admissible documents lack a
sufficient factual basis, ultimately this dispute is much ado
about nothing:  at the summary judgment stage, the relevant
question is whether the Respondents have carried their burden of
showing there is no dispute of material fact.  Fed. R. Civ. P.
56.  Imburgia's opinion testimony is of limited significance at
this juncture, and it is clear that Respondents' efforts to
import facts through his summaries are improper.

## II.  Substantive Arguments

Respondents argue that even if all the evidence for which
the Lakahs have raised evidentiary objections is excluded -- and
indeed, much of it must be -- they nevertheless have established
sufficient undisputed facts to compel the Lakahs to arbitrate.
The Second Circuit recognizes five common law theories for

binding nonsignatories such as the Lakahs to arbitration agreements: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Thomson-CSF, S.A. v. Am. Arbitration Assoc., 64 F.3d 773, 776 (2d Cir. 1995). Respondents rely upon the latter two grounds.

**A.   Applicable Law**

This proceeding falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards and is thus governed by Chapter 2 of the FAA.  To fall under the Convention, "(1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope." Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 92 (2d Cir. 1999); see also 9 U.S.C. § 202.  Here, the relevant written agreements involve foreign citizens (the various companies owned by the Lakahs), are commercial in nature, and provide for arbitration in New York or London, both cities located in Convention signatories.  Thus, this proceeding meets the standard described in Smith/Enron and is governed by the Convention.

In exercising jurisdiction under Chapter 2 of the FAA, courts have "compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement

to arbitrate is enforceable." Smith/Enron, 198 F.3d at 96. In deciding whether a non-signatory should be bound to an arbitration agreement, "[i]t is American federal arbitration law that controls." Sarhank Grp. v. Oracle Corp., 404 F.3d 657, 662 (2d Cir. 2005). The Lakahs argue that New York law, designated in the agreement's choice of law provision, should govern the present dispute, citing to Motorola Credit Corp. v. Uzan, which applied a choice of law clause to the question of which law governs the validity of an agreement to arbitrate, 388 F.3d 39, 50-51 (2d Cir. 2004). However, the Second Circuit more recently clarified in Republic of Ecuador v. Chevron Corp., that the application of state law in cases "where there is little connection to the forum[,] . . . would introduce a degree of parochialism and uncertainty into international arbitration that would subvert the goal of simplifying and unifying international arbitration law," 638 F.3d 384, 392 (2d. Cir. 2011) (alterations in original) (quoting Smith/Enron, 198 F.3d at 96) (internal quotation marks omitted). The court accordingly applied federal law to determine the arbitrability of waiver and estoppel claims. Id. As in Chevron Corp., there is little connection to New York in the present dispute. All the relevant events occurred in Egypt. Federal arbitration law governs.

**B. Veil-Piercing**

In the context of veil-piercing claims, the disagreement between the parties regarding the application of federal common law versus New York state law (designated in the choice of law clause) is ultimately of little consequence.  Thomson explained that courts will allow veil-piercing "in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary."  Id. at 777 (emphasis added) (quoting Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 26 (2d Cir. 1993)) (internal quotation marks omitted). However, a later Second Circuit case regarding a motion to compel arbitration stated that under New York law, a court may pierce the corporate veil where "1) the owner exercised complete domination over the corporation with respect to the transaction at issue, and 2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 63 (2d Cir. 2001) (emphasis added) (internal quotation marks omitted); see also TNS Holdings, Inc. v. MKI Sec. Corp., 92 N.Y.2d 335, 339, (1998)("Evidence of domination alone does not suffice without an additional showing that it led to inequity, fraud or malfeasance."). Thomson's quote from Carte Blanch itself was part of its description of New York law, so it is clear that the Second Circuit's common law standard is taken directly from New York law.  To the extent federal common

law is to be viewed as independent of New York law, an older and
therefore binding Second Circuit case unnoticed by Thomson and
Carte Blanche held, regarding a motion to compel a non-party to
arbitrate, that a showing of domination is not enough unless
"such control was used to perpetrate a fraud or something akin
to fraud." Interocean Shipping Co. v. Nat'l Shipping & Trading
Corp., 523 F.2d 527, 539 (2d Cir. 1975).  Since the federal and
New York standards appear to be one and the same, the federal
common law standard should correctly be read as requiring both
domination and fraud.

        In determining whether one entity dominates another, courts
consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate
> capitalization; (3) intermingling of funds; (4) overlap
> in ownership, officers, directors, and personnel; (5)
> common office space, address and telephone numbers of
> corporate entities; (6) the degree of discretion shown by
> the allegedly dominated corporation; (7) whether the
> dealings between the entities are at arm[']s length; (8)
> whether the corporations are treated as independent
> profit centers; (9) payment or guarantee of the
> corporation's debts by the dominating entity, and (10)
> intermingling of property between the entities.

Portfolio Consult, 268 F.3d at 63 (quoting Freeman v.
Complex Computing Co., 119 F.3d 1044, 1053 (2d Cir. 1997)).
Those seeking to pierce the corporate veil "bear a heavy burden"
of showing that veil piercing is warranted.  TNS Holdings, 92
N.Y.2d at 339.  It is important to distinguish between a parent
dominating its subsidiaries, which would only suffice to pierce

18

the parent's corporate veil, and individuals "who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends," which would justify piercing the veil against those individuals.  Walkovsky v. Carlton, 18 N.Y.2d 414, 418 (1966).

Applying the veil-piercing factors to the present case, it becomes clear that Respondents do not carry their burden.  At the outset, it should be noted that Respondents do not allege that the guarantors shared common offices, addresses, and telephone numbers; they do not allege that the guarantors intermingled property; and they do not allege that the guarantors were not independent profit centers.  In fact, the Lakahs present evidence that the guarantor companies had separate offices and mostly undisputed evidence that Medequip, TMSE, and ASF had different areas of specialization and that all three companies reported significant revenue in 1999.  Indeed, several of the declarations Respondents submit support the idea that Medequip and TMSE, at a minimum, were real businesses with substantial revenue of their own.  Thus, there appears to be no dispute that the three companies were real businesses with a significant amount of real cash flow.  The remaining factors merit additional analysis.

### 1. Overlap in Ownership Officers, Directors and Personnel

It is undisputed that the Lakahs were involved in each guarantor company and that they played a role in important decisions.  At the time of the Eurobond offering, the Lakahs owned approximately 70% of HCFI; by 2007, they owned 90%.  Ramy Lakah was appointed chairman of HCFI at the time of its formation in 1998 and Michel Lakah was appointed vice chairman. The other guarantors were subsidiaries of HCFI, over which HCFI exerted control.  Ramy and Michel Lakah also served as chairman and vice chairman, respectively, of subsidiaries Medequip (from 1996 until at least 2006) and ASF (from 1995 until 1999; at the time the Eurobond was signed they were no longer members of the board but still had the power to bind the company in dealings). At the time of the Eurobond offering the chairman of TMSE was Adel El Shourbagy; from mid-2000 on, either Michel or Ramy Lakah are listed as chairman. It is therefore undisputed that there was overlap in ownership of the relevant corporations.

### 2. Degree of Discretion

Despite the overlap in ownership, it is undisputed that the guarantor companies had separate titular management and there is evidence to at least raise a question of fact as to whether the Lakahs generally permitted these managers to independently run the companies day-to-day. One employee, Amgad Zarif, could not recall a single time that Samy Totongy (who Respondents represent was general manager of Medequip) had a decision

overturned by either Lakah.  Medequip had its own separate sales
department with managers dedicated to certain accounts, and Adel
El Shourbagy, general manager of TMSE, testified that he managed
sales and pricing decisions, that the Lakahs were not involved
in setting prices on contracts or employee salaries or managing
employee training, and that he did not need permission from the
Lakahs to withdraw cash for TMSE, write checks for TMSE, or sign
contracts for TMSE.  At the same time, El Shourbagy also
declared that no one acted contrary to the Lakahs' wishes, that
only the Lakahs had full control over TMSE assets or funds, and
that Ramy Lakah would sometimes order El Shourbagy to hire
Ramy's friends as well as to pay them inflated salaries.  The
issue of the degree of discretion of management is therefore in
dispute.

### 3. Arm's Length Transactions

Testifying for Respondents, El Shourbagy declares that:

> "[A]ll of the Lakah Group companies considered themselves
> to be business units of one company.  TMSE used
> Medequip's funds and finance facilities when TMSE's lines
> were short, and vice versa.  I do not recall that the two
> companies used any inter-company transaction
> documentation."

El Shourbagy Decl. ¶ 60. The International Islamic Bank also
treated all the accounts as one.  Further, TMSE and Medequip
accounts were intermingled at a third bank, Arab African Bank.
Mohamed Khadr, a former HCFI board member and sales manager at

Medequip, similarly testified that:  (1) the Lakahs considered and treated the funds of the Lakah Group holding company, its subsidiaries, and their other companies as their own; (2) the employees were treated as interchangeable among companies; and (3) he reported directly to the Lakahs for Medequip functions, despite the fact that to his knowledge, neither Lakah had any formal managerial function within HCFI.

The Lakahs have been unable meaningfully to dispute this point.  While they present evidence that the guarantors were independent profit centers and had separate management day-to-day sufficient to create a dispute of material fact, they have not disputed the Lakahs' involvement in the affairs of the companies and have not disputed the specific allegations involving employees being used interchangeably across companies.

### 4. Commingling of Assets and Misappropriation for Personal Use

Respondents argue that the Lakahs intermingled the assets of the guarantor companies with one another and with their personal assets.  The Lakahs do not credibly dispute these allegations.  For instance, on March 13, 2000, Michel Lakah emailed the manager of the International Islamic Bank and gave standing instructions to "make the necessary transfers between all of our accounts opened with your branches for all purposes and in all currencies" for the "Lakah Group of Companies," which

included Medequip, TMSE, and ASF.  Thus, the Lakahs appeared to

be commingling funds between separate corporate entities.  As

the Lakahs correctly note, however, this instruction postdates

the bond issuance, so it is only relevant as circumstantial

evidence of Lakah Group arrangements at the end of 1999.

Bank records also show that on several occasions Ramy Lakah

withdrew funds from one company (such as ASF), only to transfer

the money to another company, including companies that were not

part of the Lakah Group.  Once, Ramy transferred E£130,000,000

to Medequip and had a check for E£41,500,000 issued to himself.

He instructed that the money be issued from his own deposit

account or ASF's account.  Ramy denies that he ever transferred

or used any company funds for personal use but has nothing to

say about these actual transactions.

The Lakahs assert that exchanges between Lakah companies

were formalized by written agreement, which might suggest that

the intercompany transfers were a result of actual sales and

purchases of items whose documentation has been lost.  However,

they support this claim with a contract that has not been

translated and a description in a due diligence report that is

likely inadmissible.  More relevant is testimony that

accountants kept records of intercompany transfers and that one

intercompany loan was reported in the offering circular itself,

as well as TMSE and Medequip's support of others' obligations.

None of these, however, offer specific explanations for transfers frequently in the millions.  The degree of commingling seems at least somewhat inappropriate.

Respondents also put forth evidence that the Lakahs misappropriated corporate funds for personal use.  For instance, Khadr testifies that the Lakahs used company funds for personal purchases such as automobiles and houses.  Michel Lakah also freely admitted at a deposition to cashing a check for €600,000 meant for Medequip and keeping the proceeds in his own bank account, stating that he received legal advice from someone at HCFI indicating that he could do so.

The Lakahs attempt to rebut this evidence by stating that they had legitimate reasons to receive money from their companies, such as Ramy's salary and Michel's reimbursement of expenses.  This is not sufficient to rebut many of Respondents' specific allegations, which involve misappropriating money earmarked for another purpose.  The Lakahs also introduce a declaration from an auditor for PriceWaterhouseCoopers ("PWC") stating that PWC did not find any indications of misappropriation of funds for personal use during an extensive review of the Lakah Group and would have found any errors.  This generalized conclusion, however, does not constitute a rebuttal of the more specific evidence offered by the Respondents.  The

Lakahs have not meaningfully disputed the allegations that they comingled funds and misappropriated funds for personal use.

### 5. Contribution of Lakah Personal Assets to Guarantee Corporate Obligations

It is undisputed that the Lakahs contributed significant personal assets to guarantee corporate obligations of the guarantors.  HCFI's financial statement for June 30, 2000 states that the Lakahs intended to transfer a number of personal assets (valued at E£92,104,380, according to other financial records) as part of an agreement with a consortium of banks regarding rescheduling HCFI's loans.  Bank records show that the Lakahs signed loans totaling E£270 million for Medequip not only on behalf of the company but also in their personal capacities. Records also show Michel Lakah making various payments to accounts for Lakah Group companies including Medequip; Ramy Lakah also testified that he gave the proceeds from a hotel project that belonged to him to HCFI so it could pay its debts. Finally, a settlement agreement with Bank Du Caire shows that the Lakahs agreed to settle various debts owed by Lakah Group companies including HCFI, TMSE and ASF.

The Lakahs do not attempt to deny these activities, but instead argue that they are a virtue: the fact that the Lakahs were willing to put their personal finances on the line to keep their companies afloat was a benefit, not a detriment, to

25

Respondents.  As a legal matter, their personal contributions are a double-edged sword: they strengthen the inference of domination, but weaken the inference of fraud or wrong.

### 6. Corporate Formalities

Respondents allege that the Lakahs disregarded corporate formalities by forging signatures and falsifying the existence of board and shareholder meetings.  Specifically, El Shourbagy testified that his signature on the minutes of a TMSE board meeting that allegedly took place on October 6, 1999 (a national holiday in Egypt) was fake and that he could not recall any TMSE board or shareholder meetings.  Mohamed Khadr makes similar allegations with respect to HCFI, testifying that his signature was forged on a document waiving his rights as an HCFI shareholder to participate in a stock sale by HCFI and that he had no idea that he had even become a shareholder until 2010. Khadr also states that during the time that he was an HCFI board member, the board never met to his knowledge and performed no function.  Amgad Zarif, who the Medequip commercial register indicates was appointed to the Medequip board on August 3, 1999 (and removed on January 1, 2000), states that he was never informed either of his appointment or of his ultimate removal and certainly was never informed of any board meetings.

The Lakahs present evidence rebutting essentially all of these allegations.  With respect to TMSE, Ramy Lakah certified

to the Luxembourg stock exchange and to UBS that all board
minutes that had been provided to them were true copies.  As for
the allegedly fake TMSE board meeting that took place on a
holiday, Ramy Lakah claims that the date listed in the minutes
was a mistake and that the meeting in fact took place on October
10, 1999.  This is supported by a memorandum that Dewey
Ballantine (Respondent's counsel) wrote on October 6, which
referred to a meeting to be held on October 10.

In addition, Brian Murphy, a former HCFI board member,
recalled attending three or four HCFI board meetings and
testified that he ordinarily received written notice of meetings
two weeks before, so there is evidence that this company, at
least, followed some corporate formalities.  A former auditor
also testified that his auditors made sure that HCFI held board
meetings and annual shareholder meetings.  Further, Ramy Lakah
denies having forged Khadr or El Shourbagy's names, and Michel
Lakah denies Zarif's testimony with respect to Medequip,
declaring that, in fact, he and Ramy asked Zarif to resign all
his positions because he had not disclosed two prior criminal
convictions.  Thus, the question of the frequency of board and
shareholder meetings, the forgery of signatures, and the general
question of whether corporate formalities existed is in dispute.
The only undisputed remaining claim is that Khadr was never
informed that he had become a stockholder.  While somewhat

troubling, this claim standing alone is not sufficient to show that the guarantor companies lacked corporate formalities.

### 7. Inadequate Capitalization

Ramy Lakah certified on December 8, 1999 that the representations contained in the "Subscription Agreement" were accurate as of December 8, 1999.  These representations included statements that the capital of Lakah Funding and all guarantors was validly authorized and fully paid, that all the information in the offering circular (which included financial information about the companies) was true and accurate in all material respects, that the balance sheets of the guarantors fairly presented their financial positions, and that all guarantors maintained a system of internal financial and accounting controls sufficient to provide assurance that transactions and assets were recorded as necessary.  Respondents contend that a number of these representations were false and hence both that the guarantors were undercapitalized and that Respondents were lied to.  These allegations, a relevant consideration in the domination analysis, also constitute the strongest allegations of fraudulent or wrongful conduct by the Lakahs.

Respondents allege myriad claims relating to the supposed inadequate capitalization of the guarantors, including allegations: (1)that the Lakahs did not pay for their shares in various companies; participated in a stock kiting scheme; (2)

that the Lakahs inflated the value of investments; usurped funds
meant for HCFI; (3) that the Lakahs embezzled the proceeds of
the Eurobond offering; (4) that the Lakahs sold off ASF's assets
so as to render it insolvent; and (5) that HCFI and TMSE were
generally grossly undercapitalized which led to their ultimate
collapse.  Absent the inadmissible government investigatory
reports, Respondents have essentially no evidence that the
Lakahs failed to pay their shares or engaged in stock kiting,
and thus I need not reach those allegations here.  The remaining
undercapitalization allegations are addressed presently.

### a. Inflating the Value of Investments

Respondents put forth evidence based on non-governmental
sources that the Lakahs gave shifting, suspicious accounts of
HCFI's assets in an attempt to inflate their investments.
However, the Lakahs provide rebuttals which place most of these
allegations into dispute.  The remaining undisputed evidence is
as follows: the Lakahs eliminated multimillion-pound investments
listed on HCFI's offering circular in companies called
Intermedica S.A.E. and Helio Medical Company S.A.E. without
explanation, suggesting some disregard for corporate formalities
(though the Lakahs have disputed Respondents' claims that the
investments were entirely fictitious); and the offering circular
failed to account for income from an investment known
alternatively as a joint venture with "Sea Star Company" or

"Investments in Medical Equipment activities in North Africa, Middle East & Turkey" (though again, the Lakahs have disputed Respondents' claims that the investments were fictitious). The Lakahs have also placed into dispute Respondents' contentions that an investment in "Arab Cast Iron & Steel Company" by ASF listed in the offering circular was fictitious and an allegation that the Lakahs deliberately inflated HCFI's assets by listing Eurobonds on its accounting statements after they had been deposited at UBS.

### b. Usurpation of Funds Meant for HCFI

Respondents argue that the Lakahs embezzled funds that were supposed to be deposited into HCFI.  The offering circular states that on June 30, 1999, the Lakahs subscribed to 35 million shares for HCFI and paid a E£35,000,000 deposit, after which they sold the shares in a global offering that raised $102,500,000 (E£350,000,000), which they used to reimburse themselves for the deposit they had made and pay the balance of the capital increase.

The only evidence Respondents provide from non-government sources suggesting that the Lakahs usurped these funds is indirect and disputed.  Respondents cite evidence that inconsistencies exist regarding the timing of the deposit: while the HCFI commercial register records that the first installment of the E£315,000,000 (the sum Lakahs owed after

their deposit) was paid to the company on December 12, 1999,
(with the rest recorded on December 25 and 29), the offering
circular, dated December 6, represented that the entire capital
increase had already been paid.  Imburgia cites to bank records
that he argues prove that at least some of HCFI's paid-in
capital must have actually come from the Eurobond offering,
which occurred on December 8, 1999.

The Lakahs have disputed this contention by providing
evidence that HCFI had in fact received money for the capital
increase before December (and thus before the Eurobond
offering): Michel Lakah asserts that the recorded increases in
HCFI's paid-in capital reflected payments by one of the Lakahs
from the money they received in June.  They also present
financial records demonstrating that the Lakahs paid their
initial E£35 million into HCFI's capital account and that the
E£315 million was in fact transferred into HCFI's capital
account.  Although the Lakahs have not accounted for why the
paid-in capital was not recorded until December if they had
actually received it in June, they have nevertheless raised a
dispute of material fact regarding the usurpation of HCFI funds.

### c. Embezzlement of Eurobond Proceeds

Respondents next argue that the Lakahs embezzled the
Eurobond proceeds.  They point to a letter in which Ramy Lakah
directed the custodian of unsold Eurobonds to transfer

$10,000,000 worth of bonds from Lakah Funding Limited to Ecoban Finance Limited, and then directed that the proceeds be transmitted to the bank accounts of several recipients (primarily Eurotechnicques Ltd. for $9,087,000).  Respondents provide evidence that Eurotechniques was owned by Medequip France, which in turn was 93% owned by the Lakah family.  The Lakahs counter, however, that Respondents have misconstrued Ramy's letter:  they claim the bonds referenced in the letter relate to the $37 million in Eurobonds that HCFI undisputedly bought for its own account, meaning that the sums transferred to Eurotechniques were HCFI's own funds, rather than funds from the Eurobond sale.  The Lakahs have therefore raised a dispute of fact as to whether the transfer to Eurotechnique constituted embezzlement.

### d. Rendering ASF Insolvent

Respondents next argue that the Lakahs drained ASF's assets in a fraudulent manner.  Specifically, they argue that the Lakahs sold ASF's assets shortly after the Eurobond offering, rendering it unable to satisfy its obligations as a guarantor, and then diverted the proceeds of that sale without providing substitute assets.  The Lakahs have raised disputes of material fact as to every important part of Respondents' claim.

At the outset, there is no dispute that Respondents were told of the ASF sale in advance of the Eurobond offering.  Ramy

Lakah testifies that the promissory notes from the ASF buyer were deposited at Banque du Caire, which then froze the accounts; he did not recall whether there had been an agreement over what was to be done with the notes. The bank's board minutes from February and June 2000 tell a different story: that the notes were endorsed over directly to the Banque du Cirque in order to pay debt of HCFI's. If ASF was given any consideration for these notes, such consideration was not listed anywhere. Nevertheless, notes receivable totaling close to E£220 million (almost certainly the notes in question) were listed as assets on ASF's account statement for December 31, 2000. Thus, Respondents argue that the Lakahs inappropriately diverted the proceeds to HCFI without replacing them.

The Lakahs present an innocent explanation for these events, however. They provide evidence via a declaration of Brian Murphy that the notes were seized by Banque du Caire against the Lakahs' wishes and seemingly to their surprise to satisfy what it claimed as a new pledge. This would explain why the notes were still listed as ASF assets while ASF had no control over them. The banks' board minutes, according to this narrative, would presumably be called, at best, inaccurate spin. This explanation is buttressed by the fact that on December 7, 1999, right before the Eurobond offer closed, Banque Du Caire engaged in questionable conduct: Banque Du Caire entered into a

"contract" with ASF mortgaging ASF assets, however it appears that the contract was signed both on behalf of the bank and on behalf of ASF by a bank representative, pursuant to a power of attorney.  This power of attorney was evidently granted for a different, 1998, transaction.[3]  Murphy's declaration, combined with the documentary evidence of Banque du Caire's suspicious conduct, establish a dispute of fact over whether the Lakahs misappropriated the promissory notes from the ASF sale.

### e. Undercapitalization of Medequip and TMSE

Respondents also allege that Medequip and TMSE were grossly undercapitalized, pointing to the fact that both guarantors ceased operations in the fourth quarter of 2001.  They also note that the companies collapsed soon after the Lakahs left Egypt in mid-2000 and 2001, exhibiting additional evidence of domination.  The Lakahs point to less nefarious reasons for the guarantors' collapse, such as: 1) the Egyptian government changed its contractual bidding procedures, harming Medequip's business; 2) the Egyptian economy began to shrink; 3) the government began

---

[3] Respondents argue that Murphy's evidence is inadmissible because he had no direct knowledge of BDC's actions.  He admits that he was not involved with the granting of the original power of attorney, but he heard about the seizure of assets at an HCFI emergency board meeting.  At a minimum then, his testimony can relate to the state of mind of HCFI board members present at the meeting.  Since Respondents' allegations about the promissory notes are all about state of mind -- namely, the fraudulent intent of the Lakahs to misappropriate ASF's assets -- his testimony is admissible for all that matters.

delaying its contract payments or stopped payments entirely and reduced down payments; 4) the exchange rate for the Egyptian pound deteriorated, crucial for companies that paid foreign supplies in foreign currencies; and 5) Banque du Caire and other banks began to block TMSE's access to funds.  This issue is therefore disputed.

Having sifted through all of the disputed and undisputed material facts as they relate to domination as well as the allegations of fraud, it is clear that Respondents have not met their onerous burden of demonstrating that the corporate veil should be pierced.  As the Second Circuit explained in <u>William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.</u>, 933 F.2d 131 (2d Cir. 1991), "disregarding corporate separateness is a remedy that 'differs with the circumstances of each case," <u>id.</u> at 139 (citation omitted).  It is a remedy undertaken with "extreme[ ] reluctan[ce]."  <u>United States v. Funds Held in the Name or for the Benefit of Wetterer</u>, 210 F.3d 96, 106 (2d Cir. 2000).  In <u>Am. Fuel Corp. v. Utah Energy Develop. Co.</u>, 122 F.3d 130 (2d Cir. 1997), for example, the Second Circuit refused to pierce the corporate veil even where the corporation in question was a shell with no contracts, employees, independent office space, independent bank account, capital, or assets, and where the business expenses were paid out of pocket by the owner.  <u>Id.</u> at 134-35.  Relevant to the court's decision in that case were

the facts that individuals aside from the owner actively participated in the corporation's business and that the owner did not use corporate funds for personal matters or intermingle corporate funds with his own (even though he personally guaranteed the loans).  Id. at 135.  Thus, even where multiple Portfolio Consult factors cut in favor of piercing the corporate veil, courts are highly reticent to do so where evidence of domination is incomplete.

Such is the case here.  It is true, on the one hand, that Respondents have established that the Lakahs comingled funds, engaged in shifting accounting with respect to HCFI's assets, were heavily involved in the decision making of the guarantor companies, and contributed personal assets to guarantee corporate obligations.  However, it is also undisputed that the guarantors had separate titular management, offices, addresses, and telephone numbers; that the guarantors did not intermingle property; and that they were, at bottom, independent profit centers -- in other words, real, functional businesses. Further, the Lakahs have disputed Respondents' allegations: (1) that the Lakahs disregarded corporate formalities by falsifying board and shareholder meetings; (2) that the Lakahs embezzled funds from the Eurobond proceedings; (3) that the Lakahs usurped funds meant for HCFI; (4) that the Lakahs diverted proceeds of the ASF sale; fictitiously inflated HCFI's investments; and (5)

that undercapitalization, rather than external factors, caused the collapse of TMSE and Medequip.  Thus, Respondent's allegations of fraud or wrongdoing are almost entirely disputed.

Further, the Lakahs note that courts are especially reluctant to find sufficient evidence of wrongdoing where the party seeking to pierce the veil had the opportunity to investigate the financial records and structure of the relevant corporation ahead of time:  In Brunswick Corp. v. Waxman, 599 F.2d 34 (2d Cir. 1979), the Second Circuit explained it would not accomplish "justice or equity" to pierce the corporate veil where a seller of bowling alleys, Brunswick, was aware before entering a sales agreement that the buyer used a no-asset shell corporation, created for the sole purpose of taking title to the equipment which Brunswick sold, to act as a signatory and avoid personal liability.  Id. at 36.  In reaching this conclusion, the court mentioned that Brunswick "obtained precisely what it bargained for," after having "investigated . . . whether the alleys themselves were likely to generate revenues sufficient to make the payments for the equipment purchased."  Id.  Because the bargain did not "contemplate the individual liability of the Waxmans which it now seeks to enforce," the veil was not pierced.  Id.  Likewise here, Respondents investigated the Lakahs' businesses to determine whether they would be able to meet their obligations under the Eurobond offering, and the

Offering Circular made clear that the Issuer was a shell company.  In essence, Respondents obtained what they bargained for.

In light of all of these disputed material issues of fact, the evidence that Respondents have put forth is not sufficient to compel arbitration on the veil-piercing theory.  Because there are insufficient undisputed material facts upon which to grant summary judgment, it is not necessary to reach the Lakahs' various defenses.

**C. Estoppel**

Respondents argue that even if there are insufficient undisputed material facts upon which to pierce the corporate veil, the Lakahs should nevertheless be compelled to arbitrate based upon an estoppel theory.  A company that "knowingly accepted the benefits of an agreement with an arbitration clause, even without signing the agreement . . . may be bound by the arbitration clause" if those benefits flow directly from the agreement.  MAG Portfolio, 268 F.3d at 61 (internal quotation marks omitted) (finding estoppel inappropriate in that instance).  Respondents argue that the Lakahs accepted a benefit of the Eurobond offering, namely the bond proceeds themselves, which they diverted from their intended purpose.

However, as has been established, there is a dispute of fact as to whether the Lakahs embezzled the Eurobond proceeds or

38

used them to disguise their previous failure to pay in required
paid-in capital.  Respondents  also argue that the Lakahs'
alleged falsification of the guarantor companies' financial
statements constitutes grounds for estoppel, but fail to make
clear how the alleged falsification, which predated the Eurobond
issuance, constitutes accepting a personal benefit from the bond
agreement.  Respondents cannot be granted summary judgment on
their estoppel theory.

**CONCLUSION**

Because there are issues of fact as to the making of the
agreement for arbitration, <u>Bensadoun</u>, 316 F.3d at 175, a trial
is necessary.  Respondents' cross-motion to compel arbitration
is denied.


        SO ORDERED.

Dated:     New York, New York
           March 20, 2014


                          S/_____
                             MIRIAM GOLDMAN CEDARBAUM
                             United States District Judge