# MINTZ LEVIN

Chrysler Center
666 Third Avenue
New York, NY 10017
212-935-3000
212-983-3115 fax
www.mintz.com

Gilbert A. Samberg | 212 692 6804 | gasamberg@mintz.com

February 4, 2016

**VIA ECF**

Honorable Loretta A. Preska
Chief U.S. District Judge
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:   Lakah, et ano. v. UBS AG, et al., No. 07 Civ. 2799 (LAP)(FM) / Application to Preclude the Lakahs from Raising Arguments at Trial that They Disclaimed on the Record

Dear Judge Preska:

On behalf of Respondents UBS AG, National Bank of Abu Dhabi, National Bank of Oman, and Island Capital Ltd. (f/k/a Exporters Insurance Company) (collectively, "Bondholders"), we submit this letter application to preclude the Lakahs from asserting at trial arguments that they expressly disclaimed on the record in 2008.

In 2008, the Bondholders filed a motion for issuance of a subpoena to Ahmed El Bardai,[1] who became the Chairman of the Banque du Caire ("BdC") in early 2000. We sought Bardai's testimony to address certain matters that the Lakahs had described in a witness declaration of Brian Murphy (ECF No. 18, filed 07/09/2007 ("Murphy Decl.")), although they had not raised any such issues in their petition (see Petition (ECF No. 1-2)). That Murphy declaration had been submitted on behalf of the Lakahs' companies in the related arbitration, and the Lakahs thus appeared to be importing arguments from the arbitration into this judicial proceeding.

In support of the subpoena application, the Bondholders described Bardai's likely areas of pertinent knowledge in some detail. (Decl. of G. Samberg, 04/08/2008 (ECF No. 31) ("Samberg Decl.") ¶¶13-32.)  For example, the Bondholders expected that Bardai had

---
[1] The motion was pursuant to 28 U.S.C. § 1783.

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

BOSTON | LONDON | LOS ANGELES | NEW YORK | SAN DIEGO | SAN FRANCISCO | STAMFORD | WASHINGTON

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

February 4, 2016
Page 2

knowledge concerning the "Sale of Arab Steel Factory" ("ASF"). (*Id.* ¶¶17-25, 31). The Lakahs opposed issuance of the subpoena to Bardai by representing that *"Mr. El-Bardai has no testimony relevant to piercing the corporate veil."* (Decl. of L. Steckman, 04/24/2008 (ECF No. 36) ("Steckman Decl.") ¶2.) They furthermore avowed that various matters in Murphy's declaration regarding BdC and Bardai were not relevant in this proceeding and related only to the arbitration. They persuaded Judge Cedarbaum not to issue a subpoena to Bardai, and they waited more than five years, until after the close of discovery, to reverse course and raise in a summary judgment motion the arguments that they had disclaimed in 2008.

The Lakahs now propose to raise those disclaimed matters at trial. The Court should preclude the Lakahs from doing so based on judicial estoppel, waiver, and the Court's inherent equitable powers.

**A.     Judicial Estoppel**

The judicial estoppel doctrine "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment ...." *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (affirming application of judicial estoppel to preclude a change of position by plaintiff, and affirming grant of summary judgment in favor of defendant); *Adelphia Recovery Trust v. HSBC Bank USA*, 634 F.3d 678, 696 (2d Cir. 2011). "In the context of judicial estoppel ... the proper focus is on the objective conduct of a party or its counsel." *Id.* The doctrine is concerned "with the ability of courts to render their decisions based on faithful representations by counsel." *Id.* at 697. "[J]udicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *Intellivision*, 484 F. App'x at 620.

February 4, 2016
Page 3

Courts generally look for three factors: "(1) that a party's new position is "clearly inconsistent" with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 619 (citing *New Hampshire v. Maine,* 532 U.S. 742, 750-51 (2001)). However, those factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," and … "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Id.* at 619.

In *Intellivision*, the Second Circuit Court of Appeals affirmed the district court's application of judicial estoppel in granting summary judgment for the defendant. 484 F. App'x at 618-21. In an earlier phase of the case, the plaintiffs' had stated "that Intellivision owned and assigned the Patent Applications [in question], and that Microsoft's duties were owed to Intellivision." (*Id.* at 619.) The district court applied the doctrine "to bar the individual plaintiffs from asserting—for the first time, in their opposition to Microsoft's motion for summary judgment—that they owned and assigned the patent applications to Microsoft not in their capacities as principals of Intellivision, but rather in their individual capacities." *Id.* at 618. The Court of Appeals stated: "Permitting plaintiffs' opportunistic, last-minute about-face would have unfairly advantaged plaintiffs and imposed an unfair detriment on Microsoft … and would have created a risk of inconsistent results that could damage 'judicial integrity.'" *Id.* at 621.

B.  **Waiver**

Alternatively, the Lakahs should be precluded because they waived the matters that they avowed would not be at issue in this proceeding. *See, e.g., Sun Life Assur. Co. of Canada (U.S.) v. Gruber*, No. 05 Civ. 10194 (NRB), 2007 U.S. Dist. LEXIS 92141, at * 32-36 (S.D.N.Y. Dec.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

February 4, 2016
Page 4

14, 2007); *Clarex Ltd. v. Natixis Secs. Ams. LLC*, No. 1:12-cv-7908-GHW, 2014 U.S. Dist. LEXIS 121335, at *14-19 (S.D.N.Y. Aug. 29, 2014) (holding defense had been waived). Waiver is an intentional relinquishment of a known right. *Clarex,* at *14. "The waiver of a defense 'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.'" *Id.* (citations omitted).

In *Sun Life* (an interpleader action where two parties claimed to be beneficiaries of a life insurance policy), this court held that claimant Shvachko had waived an argument that the decedent had lacked capacity to designate claimant Gruber as beneficiary because Shvachko's previous counsel "represented to this Court and to opposing counsel during a ... telephone conference that he would not be asserting lack of capacity,"[2] (*id.* at *32), and Shvachko's answer did not assert lack of capacity (*id.* at *33). Moreover, Gruber had "abandoned discovery on these issues." (*Id.*) Considering the clear prejudice, as well as the potential undue delay of the proceedings ("since Gruber abandoned discovery on these issues in reliance on prior counsel's representations to the Court" (*id.* at *35)), the Court found that Shvachko had waived her argument.

The instant situation is quite analogous.

C.  **Absent Preclusion, the Lakahs Will Have Gained an Unfair Advantage, and the Bondholders Will Be Unfairly Prejudiced**

   *1. The Lakahs' Position at Trial Would Contradict the Position They Avowed to the Court in Order to Prevent Discovery*

In July 2007, the Lakahs filed a declaration of Brian Murphy (a Lakah employee), who identified BdC and Bardai, a former Chairman of BdC, as central actors in causing certain alleged harm to the Lakahs' companies and, ultimately, the Eurobond default. (ECF No. 18,

---

[2] The Court also stated, "Shvachko's change of counsel is not a basis to allow her to resurrect abandoned claims." (*Id.* at 35.)

¶164.) That declaration was also submitted in the arbitration on behalf of the Lakahs' companies, and Murphy's allegations were at the heart of the companies' defense and related "fraud in the execution" counterclaim there (together, the "Arbitration Defense").[3] In this proceeding, the Lakahs had not asserted such a defense or counterclaim in their petition but the Lakahs' ECF-filing of Murphy's declaration made their intent unclear, and the Bondholders' sought Bardai's testimony to respond to Murphy's allegations.

On April 8, 2008, the Bondholders filed a motion for issuance of a subpoena to Bardai and supported the motion with a description of matters regarding which we presumed Bardai had knowledge. (ECF Nos. 30, 31, 33.) The Bondholders sought discovery concerning (i) the sale of ASF's assets and the Lakahs' delivery of the sale proceeds to BdC (Samberg Decl. ¶¶17-31); (ii) the significance of a BdC mortgage on ASF's assets that the Lakahs had concealed (*id.* ¶¶22-33); and (iii) BdC's investigation of the Lakahs' fraudulent activity "regarding the issuance of … false bank certificates of deposit that were used by the Lakahs as bases to falsify the financial statements of the Guarantor companies" (*id.* ¶8). That application concluded: "Petitioners place much of the blame for the Eurobond default on BdC. … Therefore, BdC's then Chairman is very probably an important witness to the matters at issue in this proceeding." (*Id.* ¶31.)

The Lakahs opposed the Bondholders' motion by arguing that Bardai had no knowledge relevant to the issues in this proceeding. (*E.g.*, Steckman Decl. (ECF No. 36) ¶2.) The Lakahs disclaimed the materiality in this proceeding of (a) the "fraud in the execution" / Arbitration Defense, (b) BdC's actions regarding the ASF asset sale and its proceeds, (c) BdC's investigation of the Lakahs, and (d) all matters to which Bardai might have knowledge. (*Id.* at pp. 1-5.) The

---

[3]  In December 2008, the Arbitration Panel issued an Award unanimously finding that the Arbitration Defense had been "disproved." (ECF No. 198-24 ¶¶ 353, 458.)

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

February 4, 2016
Page 6

Court denied the Bondholders' request for a subpoena to Bardai as "premature" without explanation. (ECF No. 41, filed 02/11/2009.)

After disclaiming those matters, the Lakahs did not amend their petition or answer Bondholders' cross-petition in this proceeding to assert facts or arguments concerning the Arbitration Defense, BdC's conduct concerning the sale of ASF, or BdC's investigation of the Lakahs, nor did they assert any of those matters in a motion during the discovery phase. The Bondholders, therefore, did not renew their application for a subpoena to Bardai.

But more than five years after making those disclaimers, and long after the close of fact discovery, the Lakahs raised those matters in opposition to the Bondholders' motion for summary disposition in September 2013. (*See* ECF No. 207 at 2, 18-19, 21, 66-67, 68-69, 95-96.) A comparison of (a) the Lakahs' disclaimers in 2008 with (b) the Lakahs' current position is shown in Appendix "1" hereto. As is shown therein, the Lakahs propose to rely at trial on matters that they had disclaimed to the Court.

    2.    *The Lakahs Would Derive an Unfair Advantage, and the Bondholders Would Be Unfairly Prejudiced, if the Lakahs Are Not Precluded from Changing Positions*

The matters in question were not raised by the Lakahs in their petition and were expressly disclaimed by the Lakahs on the record. The Lakahs succeeded in preventing discovery regarding those matters by the Bondholders. They would be unfairly advantaged and the Bondholders would be unfairly prejudiced if, years after the close of discovery, the Lakahs were permitted to resurrect those matters. First, the Bondholders' discovery was curtailed because of the Lakahs' disclaimers. Second, long after the close of discovery, the Lakahs named Bardai and BdC as central figures in their opposition to the Bondholders' motion for summary disposition. The Lakahs then successfully applied to exclude Bardai's testimony at trial because

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

February 4, 2016
Page 7

the Bondholders did not list Bardai on a list of "expected trial witnesses" in September 2009. (ECF No. 270 (Schoenberg Decl.) ¶4; ECF No. 300 (Order).) Third, unless the Lakahs are precluded from changing their position, they will be free to spin whatever tales they choose concerning BdC and Bardai, and the Bondholders will have been denied much of the means to rebut those tales. As shown in the enclosed transcript of the deposition of Bardai (Exh. "A"), taken 01/13/2015 to preserve his rebuttal and impeaching testimony for trial, he contradicts the Lakahs' assertions concerning BdC's and Bardai's actions in relation to the Lakahs' sale of ASF's assets, the alleged political motivations behind BdC's dealings with the Lakahs and their companies, etc.

### Conclusion

The Court should preclude the Lakahs from making a strategically-timed about-face and raising at trial matters that they had disclaimed to the Court and waived in 2008. Specifically, the Court should hold the Lakahs to their word, and preclude them from presenting evidence and arguments at trial concerning (1) the alleged "fraud in the execution" defense, involving BdC; (2) BdC's alleged "seizure" of the proceeds of the sale of ASF's assets and other contemporaneous BdC conduct alleged to have injured the Lakahs' companies; and (3) Bardai's and BdC's alleged political motivations for their conduct vis-à-vis the Lakahs.

Respectfully,

Gilbert A. Samberg

cc: Morritt, Hock & Hamroff
    Attn: Bruce Schoenberg, Esq. and David Schrader, Esq.
    Nathaniel Marmur, Esq.

Encl.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

February 4, 2016
Page 8

## Appendix "1"

As illustrated in the following chart, the Lakahs now propose to resurrect at trial matters that they disclaimed in 2008. The column on the left shows their disclaimers in 2008. The column on the right is excerpted from their "Proposed Findings of Fact," dated 1/29/2016:

| LAKAHS' POSITION IN 2008[4] | LAKAHS' POSITION AT TRIAL |
|---|---|
| **ISSUE: "Fraud in the Execution"** | |
| "Just before the bond closing in December 1999, and after HCFI's lawyer had made his final review of the closing documents, BDC altered the release of its lien on ASF's assets so that the release provided that BDC was *"reserving all its rights"* against ASF. UBS knew that BDC altered the release and failed to disclose the alteration to HCFI, Ramy Lakah or Michel Lakah. The alteration was material: HCFI would not have closed if it knew about the alteration. *That was fraud in the execution. ..."* (ECF No. 36 ¶15.) *"Mr. El Bardai's testimony may be relevant to the arbitration fraud in the execution defense, but it is irrelevant to the veil-piercing* | Lakahs' Proposed Fact Nos. 197-202: "[On Dec. 6, 1999] …BdC returned an executed version of the December 3 Letter to Dewey [Ballantine]. However, this version contained a crucial change: … BdC struck the final portion of that sentence and added "only the abovementioned restriction on additional borrowings ." In addition, BdC added additional language at the end of the December 3 Letter indicating that it was "agreed and accepted" *"noting that we keep all our other rights vis a vis arab steel factory. …* The language added by BdC to the December 3 Letter and the Lien Release Letter were obvious "red flags" that BdC believed that it |

---

[4]   All citations in the left column are to the Steckman Decl., filed 04/24/2008 (ECF No. 36) (emphasis added). All citations in the right column, except where separately footnoted, are to the Lakahs' Proposed Findings of Fact, dated 1/29/2016 (emphasis added).

Case 1:07-cv-02799-LAP-FM   Document 361   Filed 02/04/16   Page 9 of 10
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

February 4, 2016
Page 9

| | |
|---|---|
| *allegations that are the subject of this action.*" (*Id.* ¶16.) | retained additional "rights" with respect to ASF which were not being released. If Dewey and UBS had disclosed these changes to the Lakahs, they never would have gone forward with the Eurobond offering." |
| **ISSUE: Arab Steel Factory ("ASF") Sale in 2000** ||
| "Mr. El Bardai Has No Relevant Testimony Regarding the ASF Asset Sale [in 2000]." (*Id.* at 2.) "Mr. El Bardai Has No Testimony On Veil Piercing Resulting From BDC's Retention of $70 Million from the Proceeds of Sale of ASF [in early 2000]." (*Id.* at 4.) "*That is an arbitration claim. It does not bear on piercing the veil.*" (*Id.* ¶14.) | Lakahs' Proposed Fact No. 252 (and related facts): "[In early 2000, the] E£231,280,000 [*ca.* US$70 million] in promissory notes were deposited into ASF's account at BdC, whereupon they were immediately seized by BdC using the commercial mortgage that it had filed on December 7, 1999. The Lakahs did not have any prior notice of BdC's intent to seize the proceeds of the sale of ASF's assets."[5] |
| **ISSUE: Political Motivation for Investigations of Lakahs Activities** ||
| "Mr. El Bardai Has No Testimony About The Alleged "Criminal Investigations" [of the Lakahs]." (*Id.* at 4.) "Even if he [Bardai] had some knowledge of the kind the Banks [i.e., Bondholders] impute to him, it would | Lakahs' Proposed Fact No. 299. "Beginning in or about 2001, various Egyptian governmental agencies began investigations into the financial transactions at issue in this case, including the use of short-term borrowings for the purpose |

---

[5] Lakahs' Oppn. to Bondholders' Mot. for Summary Disposition (ECF No. 207) at 66-67. Moreover, the Lakahs' fraud in the execution defense included BdC's alleged seizure of the ASF sale proceeds, which allegedly injured ASF and led to the Eurobond default.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

February 4, 2016
Page 10

| | |
|---|---|
| be second- or third-hand." "This has nothing to do with Mr. El Bardai." (*Id.* at 3-4.) | of increasing stated capital .... The Lakahs contend that these investigations were politically motivated."<br><br>"BdC nevertheless continued to pressure the Lakahs and their companies, something that Lakah company executives attributed to political repercussions from Ramy's anti-Mubarak activities in Parliament. ... repercussions included El Bardai's reaction to ASF sale ...."[6] |
| **ISSUE: Further Assertions re BdC** | |
| *"Mr. El-Bardai has no testimony relevant to piercing the corporate veil.* The only testimony he might offer concerns defendants' claims on the bond and guaranty in the arbitration. Arbitration discovery should take place in the arbitration, not here." (*Id.* at 1.) | Lakahs' Proposed Fact No. 265. "[BdC] began to block TMSE's accounts in early 2000, making TMSE unable to finance transactions with customers and causing sales volume to decline." |

---

[6]   Lakahs' Oppn. to Bondholders' Mot. for Summary Disposition (ECF No. 207) at 68-69.